## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

In re:                                          Involuntary Chapter 7

ERP Iron Ore, LLC,                              18-50378-RJK

        Alleged Debtor.

---

### EXPEDITED NOTICE OF HEARING AND ALTERNATIVE MOTION OF ALLEGED DEBTOR FOR AN ORDER ABSTAINING OR DISMISSING INVOLUNTARY CHAPTER 7 PETITION[1]

To:   THE HONORABLE ROBERT J. KRESSEL
      UNITED STATES BANKRUPTCY JUDGE

1.     ERP Iron Ore, LLC ("**ERP**"), through its undersigned counsel, files this expedited alternative motion (the "**Motion**") for the relief requested below.

2.     ERP requests that the Court hold a hearing on this matter on **June 26, 2018, at 9:00 AM a.m.** before the Honorable Robert J. Kressel, 300 South Fourth Street, Minneapolis, Minnesota 55415, immediately following the hearing on the Consensual Motion, only if the Consensual Motion is not granted.

3.     Pursuant to Local Rule 9006-1(c), any response to this Motion must be filed and served by delivery or mail not later than **June 21, 2018**, which is five (5) days prior to the hearing.  However, given that an expedited hearing is requested, the parties

---

[1] Three of the four Petitioning Creditors (defined below) and ERP have filed a joint motion to voluntarily dismiss the pending Involuntary Petition (Dkt. No. 11) (the "**Consensual Motion**").  The fourth Petitioning Creditor filed a consent to dismissal and joinder to the Consensual Motion today (Dkt. 12). ERP requests that the Consensual Motion be heard first at the June 26, 2018 hearing and if granted, that would moot the relief sought herein.  ERP files this Motion and the related memorandum of law to preserve its rights in the event the Consensual Motion is not granted at that hearing given the need to close the funding described herein and in the Motion by June 30, 2018.

do not object to responses being filed not less than 72 hours prior to the time set for the hearing.  **UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING.**

4.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, Federal Rule of Bankruptcy Procedure 5005 and Local Rule 1070-1.  This is a core proceeding.  The involuntary petition commencing this Chapter 7 case was filed against ERP on May 25, 2018 (the "**Involuntary Petition**").  The case remains pending in this Court.

5.      This Motion is filed under 11 U.S.C. §  305(a)(1) and § 303(i).

6.      Venue in this District is proper pursuant to 28 U.S.C. § 1408.

7.      Through this Motion, ERP requests that this Court abstain and dismiss this case pursuant to 11 U.S.C. § 305(a)(1) in favor of allowing ERP to satisfy its obligations under the existing terms of the Magnetation and Mesabi Bankruptcy Court approved restructurings.  If the Consensual Motion or ERP's request for abstention and dismissal is not granted, then ERP, in the alternative, reserves its right to request that this Court dismiss this Involuntary Petition as a bad faith filing.

8.      For the avoidance of doubt, ERP does not seek such relief against the Petitioning Creditors at this time given the filing of the Consensual Motion.

9.      For the reasons discussed herein, ERP is seeking expedited consideration of this Motion because, as further outlined below, ERP's future will be put into unnecessary jeopardy if certain obligations under the existing terms of the restructurings approved in the Magnetation and Mesabi Bankruptcies are not satisfied.  The Mesabi Plan requires

2

ERP to be integrated into Reorganized Mesabi.  That integration cannot happen if ERP is subject to a bankruptcy proceeding wherein a trustee is appointed to liquidate its assets. Also, the Mesabi Indenture requires ERP's assets to be delivered under a secured guarantee or a combination with Mesabi by June 30, 2018.  Accordingly, ERP's future is in unnecessary jeopardy absent dismissal of the Involuntary Petition by June 30th.  ERP proposes to provide 14 days' notice of this Motion in accordance with Minnesota Local Rule 9006-1 in lieu of the 21 day notice required by Federal Rule of Civil Procedure 2002(a)(4).  To provide expeditious notice, ERP will provide notice to all required notice parties and its creditors via U.S. Mail.  The notice parties will be sent a copy of the Motion by fax or email where possible.

10.     The relief requested in the Motion under Section 305(a) of the Bankruptcy Code can be ordered without the need for an evidentiary hearing.  However, if the Court believes it needs an evidentiary hearing  is needed, then ERP requests the Court also set a time for an evidentiary hearing on or before June 30, 2018, including at the hearing scheduled for June 26, 2018 and thereafter as needed.

## PRELIMINARY STATEMENT

11.     This is the saga of two separate bankruptcy cases and two affiliated purchasers who have acquired the businesses out of bankruptcy.  Magnetation LLC filed a petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Minnesota in 2015.[2]  Mesabi Metallics Company LLC filed a

---

[2] Case Number 15-50307

petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware in 2016.[3]

12.     ERP was the successful acquirer of the Magnetation assets through a Section 363 sale process.  Its affiliate Chippewa Capital Partners, LLC ("**Chippewa**") acquired Mesabi Metallics in a competitive plan auction process.    The former Magnetation and Mesabi Metallics sites are nearby each other in Itasca County, Minnesota, and as discussed below, ERP and its affiliate Chippewa acquired both businesses with the express goal of developing and operating the companies as a combined operation.[4]

13.     ERP and its affiliate Chippewa, the parent company of Reorganized Mesabi (defined below), have worked tirelessly over the last 18 months to develop and restart the two separate mining facilities in Minnesota.  Shareholders of ERP and Chippewa have invested hundreds of millions of dollars in order to do so and have garnered the support of Governor Dayton, the Minnesota Department of Natural Resources (the "**DNR**"), the Iron Ore Range Delegation, the Iron Range Resources and Rehabilitation Board, Itasca

---

[3] Case Number 16-11626

[4] ERP, Reorganized Mesabi and Chippewa's shareholders have been working together to determine the best way to integrate the companies, including potentially through the payment of debt under the construction financing or through other capital raising efforts.  Reorganized Mesabi is not responsible for satisfying ERP's debt obligations.  Nonetheless, ERP's creditors are better off if the terms of the Mesabi Plan are implemented, Reorganized Mesabi succeeds and ERP is left to pay its debts outside of a bankruptcy.

107638270\V-3

County, various mineral lessors, countless numbers of contractors and mechanics lien holders[5] and many other state, county and local officials.

14.    During that time, ERP and Chippewa have satisfied countless obligations that arose under the bankruptcy court-approved ERP asset purchase agreement and Mesabi plan of reorganization, including various obligations to the State of Minnesota and the creditors of each bankruptcy, including payments to creditors in excess of $100 million.

15.    The last hurdles in the series of milestones involve: (i) raising capital and (ii) ERP's delivery of security over it assets in support of or combination with Reorganized Mesabi. **These milestones must be met by June 30, 2018**.

16.    An involuntary bankruptcy proceeding can seriously harm ERP, its creditors and the livelihood of many businesses and hardworking Minnesotans. The Involuntary Petition should not be allowed to compromise ERP at the eleventh hour.

17.    Each of the creditors that filed the Involuntary Petition (the "**Petitioning Creditors**") has either been paid or agreed to other arrangements to resolve disputes with ERP. There are no active disputes for this court to adjudicate--no bankruptcy objective to

---

[5] The mechanics lien holders constitute primarily Minnesota construction contractors, and include: Accu-Dig, Inc., AW Kuettel & Sons, Brock White Company, LLC, Central Rent-A-Crane, Inc., Fastenal Company Ferguson Enterprises, Inc., General Waste Disposal and Recovery Services, Inc., Hammerlund Champion Steel, Inc., Hammerlund Construction, Inc., Hunt Electric Corporation, Ironman Concrete Pumping, Inc., The Jamar Company, JK Mechanical Contractors, Inc., John J Morgan Company, K Building Components, Inc., Kelly Construction of Indiana, Inc., LeJeune Steel Company, Midwest Constructors LLC, Minnesota Industries, Inc., Noramco Engineering Corporation, Northern Industrial Erectors, Inc., One Source Equipment Rentals LLC, Parsons Electric LLC, Precision Testing, Inc., Range Electric, Inc., Rapids Process Equipment, Inc., Scheck Industrial Corporation, Shambaugh & Son LP, Solid Platforms, Inc., Toltz, King, Duvall, Anderson and Associates, Incorporated, d/b/a TKDA, Trane US, Inc., United Rentals (North America), Inc., Twin City Fan Companies, Ltd., Ulland Brothers, Inc., United Rentals (North America), Inc., Viking Electric Supply, Inc., Wesco Distribution, Inc., and Xtreme Contractors Co., LLC.

107638270\V-3

be achieved by a continuation of this case.  As such, ERP asks that the Court abstain and

dismiss this Involuntary Petition in favor of allowing ERP to carry out the terms of the

Magnetation and Mesabi court approved restructurings.  If the Court does not grant the

Consensual Motion or does not grant ERP's request for abstention and dismissal under

Section 305(a) of the Bankruptcy Code, ERP reserves its right to request that this

Involuntary Petition be dismissed as a bad faith filing.

## FACTUAL BACKGROUND

The Magnetation Bankruptcy Proceeding

18.     On May 5, 2015, Magnetation LLC and certain affiliated entities (the "**Mag

Debtors**") filed voluntary petitions for relief under chapter 11 of title 11 of the United

States Code in the United States Bankruptcy Court for the District of Minnesota (the

"**Mag Bankruptcy**").

19.     On December 6, 2016, the Mag Debtors entered into an agreement to sell

certain of their assets to ERP pursuant to the terms of that certain Asset Purchase

Agreement (the "**Mag APA**").   Those assets included certain mining facilities in

Minnesota and Indiana.

20.     On December 21, 2016, the Bankruptcy Court approved the sale of the Mag

Debtors' assets to ERP pursuant to the terms of that certain sale order (the "**Mag Sale

Order**").  A copy of the Mag Sale Order is attached hereto as **Exhibit A**.

21.     Following entry of the Mag Sale Order, ERP worked to restart operations at

the concentrator plants, located in Itasca County, Minnesota and the pellet plant located

6

in Reynolds, Indiana (the "**Mag Project**").  However, certain emissions issues at the pellet plant in Indiana have significantly increased the cost of, and delayed, the restart.

22.    As part of the asset purchase, and as more fully described in the Mag Sale Order and the Exhibits in Connection with the Mag Sale Order, each of which were publically filed on the Mag Bankruptcy docket, ERP issued: (i) a promissory note dated January 30, 2017 in favor of Progress Rail Leasing Corporation, with principal amount payable up to $5 million as credit support for an underlying railcar lease (the "**Progress Rail Note**"), (ii) Floating Rate Senior Secured Amortizing PIK Toggle Notes due December 31, 2019 issued pursuant to an indenture dated as of January 30, 2017 among ERP, as Issuer, and Wilmington Fund Savings Society, FSB, as Trustee and Collateral Agent, in the original issue amount of $22.5 million and with an outstanding amount payable of approximately $14.8 million as of March 31, 2018 (the "**Mag Indenture**") and (iii) a promissory note dated January 27, 2017, in favor of Lighthouse Management Group, Inc., as Administrative Agent under Settlement Agreement by and between ERP and the Mag Debtor's contractors, issued in the amount of $32,017,807.74 (the "**Mechanic's Lien Note**", and together with the Progress Rail Note and the Mag Indenture, the "**ERP Secured Debt**").

23.    The ERP Secured Debt is secured by substantially all of ERP's assets.  The principal obligations outstanding on the ERP Secured Debt is approximately $50 million. A copy of the Exhibits filed in Connection with the Mag Sale Order, attaching the Progress Rail Note, the Mag Indenture and the Mechanic's Lien Note is attached hereto as **Exhibits B, C and D**.

7

The Mesabi Bankruptcy Proceeding

24.    On July 8, 2016, Essar Steel Minnesota LLC, now known as Mesabi

Metallics Company LLC, and ESML Holdings, Inc. (the "**Mesabi Debtors**"), each filed a

voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States

Bankruptcy Court for the District of Delaware (the "**Mesabi Bankruptcy**").

25.    On June 13, 2017, through the Findings of Fact, Conclusions of Law and

Order Confirming the Plan (the "**Mesabi Confirmation Order**") the Bankruptcy Court

confirmed the Mesabi Debtors' Third Amended Chapter 11 Plan of Reorganization (the

"**Mesabi Plan**") naming Chippewa as plan sponsor.  A copy of the Mesabi Confirmation

Order is attached hereto as **Exhibit E**.   At confirmation, the Mesabi Debtors and

Chippewa received overwhelming support for the Mesabi Plan from each voting class of

creditors.  This support was due to Chippewa's sponsorship, its agreement to provide

immediate funding to Mesabi, and its commitment to invest $250 million of new equity

into the company.  Since the auction, Chippewa has provided substantial funding to

Mesabi, which has recommenced construction on the Mesabi Project.

26.    The Mesabi Plan requires that "[Chippewa] shall cause ERP's business and

operations to be integrated with those of the Reorganized Debtor on the Effective Date,

either pursuant to an inter-company agreement which may be limited to cooperation in

the production of iron ore concentrate and pellets) or a merger (or other form of business

combination), which integration transactions shall be determined by [Chippewa]."

Mesabi Plan at Section 7.1(d). The Mesabi Plan also requires that "the obligations of

[Reorganized Mesabi] in connection with the [Mesabi Notes] shall be secured by a junior

107638270\V-3

lien in and upon substantially all of the assets of the [Reorganized Mesabi] and [ERP], subject only to the liens granted pursuant to the [construction financing documents]." Mesabi Plan at Section 7.1(b).

27.    Mesabi and Chippewa are themselves working to develop and operate a fully-integrated pellet production facility in Itasca County, Minnesota (the "**Mesabi Project**" and together with the Mag Project, the "**Projects**").    Through leases and acquisitions from numerous lessors and sellers, Mesabi assembled mining interests and other rights covering over 20,000 contiguous acres.

28.    Those acquisitions, for example, included court approved settlements with the DNR (the "**State Settlement Agreement**"), and Langdon Warren Limited Partnership, regarding Mesabi's acquisition of those respective leases.    Copies of the Order Implementing Settlement with the DNR, which attach the State Settlement Agreement and the Order Implementing Plan in Connection with Langdon/Warren Mineral Leases are attached hereto as **Exhibits F and G** respectively.

29.    On December 22, 2017, the Mesabi Plan went effective (the "**Mesabi Effective Date**").    Following the Mesabi Effective Date, the Mesabi Debtor became Reorganized Mesabi.    Reorganized Mesabi is a wholly owned subsidiary of Chippewa. Chippewa and ERP are affiliated entities.

30.    Also on December 22, 2017, Reorganized Mesabi, as issuer, closed on the issuance of up to $300 million in face amount of Fixed Rate Junior Secured Notes (the "**Mesabi Notes**") to the Mesabi Debtors' prepetition secured lenders pursuant to that certain Fixed Rated Junior Secured Notes Indenture (the "**Mesabi Indenture**"), a

9

substantially final version of which is attached to the Order Implementing the Provisions of the Mesabi Plan with Respect to the Prepetition Lender Notes and Prepetition Lender Notes Documents (the "**Indenture Implementation Order**")[6].  A copy of the Indenture Implementation Order is attached hereto as **Exhibit H**.

31.    The Mesabi Plan requires that ERP be integrated with Reorganized Mesabi by June 30, 2018.  For this reason, the Mesabi Indenture provides that it is an event of default if ERP fails to (i) issue a guarantee of the Mesabi Indenture with liens on all or substantially all of its assets as collateral security for its guarantee or (ii) contribute all or substantially all of its assets to Reorganized Mesabi by or before June 30, 2018. Indenture Implementation Order, attaching Mesabi Indenture at ¶ 6.01(10).  Reorganized Mesabi's failure to obtain the $650 million of construction financing by June 30, 2018 is also an event of default.  Indenture Implementation Order, attaching Mesabi Indenture at ¶ 6.01(9).

32.    Since the Mesabi Effective Date, Reorganized Mesabi and ERP have been working diligently to satisfy the requirements of the their restructurings, and have made great progress towards achieving all necessary requirements to satisfy the terms and requirements of the ERP APA, the Mesabi Plan, the Mesabi Confirmation Order, the Mesabi Indenture, the State Settlement Agreement and various other settlement agreements and court orders.

---

[6] The finalized and executed Mesabi Indenture is a confidential document.  ERP will work with Mesabi to disclose a copy of the Mesabi Indenture pursuant to a confidentiality order, if necessary.

107638270\V-3

33.    The State Settlement Agreement requires satisfaction of several specific obligations, including, among other things, the requirement that Reorganized Mesabi close transactions for binding and enforceable debt and/or equity commitments for financing to facilitate the completion of the Project by June 30, 2018. *See DNR: Mesabi Metallics moving toward reinstatement of state mineral leases*, Duluth News Tribune, June 4, 2018, attached hereto as **Exhibit I**.

34.    ERP has either paid or reached an alternative agreement with each Petitioning Creditor, who together have moved for consent to dismiss this involuntary bankruptcy proceeding.[7]  As such, an involuntary bankruptcy benefits no one.

<u>Publicity and Media Coverage of the Mag and Mesabi Bankruptcy Proceedings</u>

35.    The Mesabi Bankruptcy and the Mag Bankruptcy have been the subject of significant media coverage in Minnesota and nationally.  Attached hereto as **Exhibit J** are representative samples of the extent and nature of the local and national newspaper articles discussing the two bankruptcies (the "**Mesabi and Mag Bankruptcy Media Coverage**"), including An Open Letter to People on the Iron Rage, dated September 30, 2017 from Minnesota Governor Mark Dayton (the "**Dayton Letter**").

WHEREFORE, ERP respectfully moves the Court for an order as follows:

1.    Granting the Motion for expedited relief.

2.    Abstaining from hearing the Involuntary Petition and dismissing the case under Section 305(a)(1) of the Bankruptcy Code in favor of allowing ERP to satisfy its

---

[7] See Dkt. No. 12.

obligations under the existing terms of the Magnetation and Mesabi Bankruptcy Court approved restructurings.

3.      If the Court does not grant the Consensual Motion or does not grant ERP's request for abstention and dismissal under Section 305(a) of the Bankruptcy Code on June 26, 2018, ERP reserves its right to request dismissal of the Involuntary Petition as a bad faith filing.  To the extent the Court dismisses the Involuntary Petition pursuant to the Consensual Motion, ERP argues this Motion is moot and agrees to withdraw this Motion. ERP reserves all rights to amend and supplement this Motion and the attached Memorandum as necessary.

4.      If the Court believes it needs an evidentiary hearing, then ERP requests the Court also set a time for an evidentiary hearing on or before June 30, 2018, including the hearing scheduled for June 26, 2018 and thereafter as needed.

5.      ERP also requests that this Court take judicial notice of the publically filed documents and Court Orders referenced in this Motion.  *See* FED. R. EVID. 201.


Dated: June 12, 2018                          WINTHROP & WEINSTINE, P.A.

                                              By: */s/*Michael A. Rosow _____
                                              Michael A. Rosow
                                              Thomas J. Hainje
                                              225 South Sixth Street, Suite 3500
                                              Minneapolis, MN 55402-4629
                                              Tel: (612) 604-6400
                                              Fax: (612) 604-6800
                                              Email: mrosow@winthrop.com
                                                      thainje@winthrop.com

                                              *-and-*

107638270\V-3

Oscar N. Pinkas
Arthur H. Ruegger
Lauren Macksoud
Dentons US LLP
1221 Avenue of the Americas
New York, NY 10020
212-768-6700
Email: oscar.pinkas@dentons.com
        arthur.ruegger@dentons.com
        lauren.macksoud@dentons.com

*-and-*

Glenn A. Ballard
Dentons US LLP
LyondellBasell Tower
1221 McKinney Street, Suite 1900
Houston, Texas  77010
713-658-4600
Email: glenn.ballard@dentons.com

*Attorneys for ERP Iron Ore, LLC*

107638270\V-3

**VERIFICATION**

I, Thomas M. Clarke, declare under penalty of perjury that I am Chief Executive Officer for ERP Iron Ore, LLC, that I have read the foregoing document, and that the factual information contained therein and the exhibits hereto are true and correct according to the best of my knowledge, information, and belief.

Dated: June 12, 2018

_____
Thomas M. Clarke
Chief Executive Officer of ERP

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Involuntary Chapter 7 |
| ERP Iron Ore, LLC, | 18-50378-RJK |
| Alleged Debtor. | |

## MEMORANDUM SUPPORTING EXPEDITED ALTERNATIVE MOTION OF ALLEGED DEBTOR FOR AN ORDER ABSTAINING OR DISMISSING INVOLUNTARY CHAPTER 7 PETITION

ERP Iron Ore, LLC ("**ERP**") submits this memorandum (the "**Memorandum**") in support of its alternative Motion of Alleged Debtor for an Order Abstaining Pursuant to 11 U.S.C. § 305 (the "**Motion**").[1] The Motion also reserves the right to seek dismissal on the involuntary petition as being filed in bad faith if the Court does not grant either voluntary dismissal or abstention.

## FACTS

The facts supporting ERP's requested relief are fully set forth in the Motion and are incorporated in this Memorandum as though fully set forth herein.[2]

---

[1] Three of the four Petitioning Creditors and ERP have filed a joint motion to voluntarily dismiss the pending Involuntary Petition (Dkt. No. 11) (the "**Consensual Motion**").  The fourth Petitioning Creditor filed a consent to dismissal and joinder to the Consensual Motion today (Dkt. 12).  ERP requests that the Consensual Motion be heard first at the June 26, 2018 hearing and if granted, that would moot the relief sought herein.  ERP files the Motion and this related memorandum to preserve its rights in the event the Consensual Motion is not granted at that hearing given the need to close the funding described herein and in the Motion by June 30, 2018.

[2] Capitalized terms not otherwise defined in this Memorandum shall have the meanings of such terms in the Motion.

## ARGUMENT

**I.     The Court Should Abstain from the Involuntary Chapter 7 Case Under 11 U.S.C. § 305(a)**

Section 305(a) of the Bankruptcy Code provides, in relevant part, that:

(a) The court, after notice and a hearing, may dismiss a case under this title or may suspend all proceedings in a case under this title, at any time if –

(1) the interests of creditors and the debtor would be better served by such dismissal or suspension.

11 U.S.C. § 305(a).

This is a grant of authority to decline to exercise another grant of authority. *In re NRG Energy, Inc.*, 294 B.R. 71, 79 (Bankr. D. Minn. 2003). The initial grant, of course, is the endowing of jurisdiction over all cases under the Bankruptcy Code and all civil proceedings arising in them which is given by 28 U.S.C. §§ 1334(a)-(b). *Id.* Under § 305(a), however, the Court may decline to exercise that jurisdiction, relegating an alleged debtor and its creditors to the governance of non-bankruptcy law. *Id.* (citing H.R. REP. No. 595, 95th Cong. 1st Sess. 325 (1977); S. REP. No. 989, 95th Cong.2d Sess. 35 (1978), U.S. Code Cong. & Admin. News 1978, pp. 5963, 5787); *see also In re G–N Partners*, 48 B.R. 459, 461 (Bankr.D.Minn.1985) ("Congress has therefore given the Court the power to actually decline the jurisdiction that Congress has given it ...").

In *In re Kujawa*, the court said that when relevant facts are sufficiently established, the bankruptcy court faced with a motion under section 305(a)(1) should not conduct an evidentiary hearing because to do so "would uselessly place form over

2

substance." 224 B.R. 104, 108 (Bankr. E.D. Mo.) (citing *In re Mazzocone*, 200 B.R. 568, 574 (E.D. Pa. 1996).

a.        Abstention is in the Best Interests of Creditors and the Alleged Debtor

Section 305(a) identifies the grounds for abstention making the relevant measure the "interests of creditors and the debtor." *In re NRG Energy*, 294 B.R. at 80.  In *In re Murrin,* the Bankruptcy Court for the District of Minnesota found that involuntary bankruptcy is intended to be exercised for the good of the entire creditor body.  477 B.R. at 105.  "It is not intended to be used in an exclusively self-serving manner as a collection device."  *Id.*  (citing *In re Tichy Elec. Co.*, 332 B.R. at 376).

In *In re NRG Energy, Inc.*, the alleged debtor company's former executives and officers filed an involuntary petition against the company while the company was in the process of negotiating restructuring agreements with its various creditor constituencies. At the time the executives and officers filed the involuntary petition, they also had pending in another court, a suit against the company alleging breach of contract and seeking awards of damages for post-termination payments.  The alleged debtor company moved for abstention.

The *NRG* court referenced seven considerations for applying the language of Bankruptcy Code Section 305(a).  Those include: (i) the economy and efficiency of administration; (ii) the availability of another forum, or the actual pendency of an insolvency proceeding in one; (iii) the essentiality of federal jurisdiction to a just and equitable resolution; (iv) the availability of alternative means for an equitable distribution of assets and value; (v) the lesser cost of a non-bankruptcy process that would serve all

3

interests as well; (vi) the possibility that commencing administration in bankruptcy would duplicate previous effort toward a workout in a non-bankruptcy setting; and (vii) the purpose for which bankruptcy jurisdiction was sought by the petitioners. *Id.* Nonetheless, the *NRG* court found that "a bankruptcy court is not bound by a prescriptive template; it may consider any factors it deems relevant to the determination of whether it is in the best interests of the parties to the suit [sic] to seek dismissal." *Id.* at 81.

The *NRG* court abstained from exercising jurisdiction and dismissed the involuntary bankruptcy case finding that abstention was in the company's and its creditors' best interest. *Id.* at 86. The court found that considerations of cost, efficiency, latitude in action, and likelihood of better outcome all supported this conclusion. *Id.* The interests of creditors and the debtor must "*coincide with the values that underlie the Bankruptcy Code's legal regime. Those values include … an orderly administration of the value inherent in current assets or future revenues, and the preservation of as much of that value as possible during that administration*." *Id.* at 81 (emphasis added).

In *In re Cincinnati Gear Co.*, a company against which an involuntary Chapter 7 petition had been filed moved to dismiss upon ground that dismissal would better serve the interests of the debtor and its creditors. 304 B.R. 784 (Bankr. S.D. Ohio 2003). The involuntary filing occurred after the company had already assigned substantially all of its assets for the benefit of creditors in a state court proceeding that remained pending. *Id.* at 785. In granting the motion to dismiss, the court found that while Section 305(a)(1) is an extraordinary remedy, "***Congress appears to have contemplated the use of this extreme***

4

*remedy particularly in involuntary cases like this where an alternative arrangement exists for the protection of creditors.*" *Id.* (emphasis added).

Similarly, in *In re Fortran Printing, Inc.*, the company filed a motion to dismiss the involuntary Chapter 7 case commenced against them on the grounds that the company was already the subject of a state court receivership proceeding. 297 B.R. 89 (Bankr. N.D. Ohio 2003). The court found that while no uniform test has been established in connection with determinations as to whether abstention is appropriate, early cases noted that three factors were relevant: (1) whether the petition was filed by a small number of creditors and most creditors oppose the bankruptcy; (2) whether there is a state insolvency proceeding or other out-of-court arrangement pending; and (3) whether dismissal is in the best interests of the debtors and all creditors. *Id.* at 94. The court determined that it was in the best interest of the estate to dismiss the case under Section 305 of the Bankruptcy Code in favor of the state court receivership proceeding. *Id.* at 96.

Here, there can be no doubt that the interests of ERP and its respective creditors and parties in interest would be better served by dismissal, as authorized under Section 305(a) of the Bankruptcy Code. With continued hard work and forward motion the ERP and Reorganized Mesabi Projects have the promise of becoming successful mining operations that will revitalize the iron ore range in Northern Minnesota, generate revenue to the benefit of Minnesotans and their children (royalties are paid in connection with the mining of land that is held in trust for Minnesota state schools) and benefit workers, business, local communities and the State of Minnesota in the near future. A Chapter 7

liquidation serves no one's interests and will not produce attractive or timely recoveries for ERP's creditors.

Clearly, ERP's creditors and parties in interest are better suited if the Projects succeed, which is put into doubt with an ERP bankruptcy. ERP has substantial secured debt such that there would be little to nothing for any unsecured creditors to recover should ERP be forced to liquidate in a disorderly fashion now. Those secured creditors have their remedies under non-bankruptcy law, and there is no benefit to unsecured creditors of a bankruptcy due to their inability to recover absent payment in full to secured creditors.

Dismissal of the Involuntary Petition and permitting ERP to continue to work towards restarting of operations provides the best opportunity for secured and unsecured creditors to recover. Even if that day never comes, the parties will be no worse off than they are today. As such, this is not the time to halt ERP's progress or take steps backward, which will result if this involuntary bankruptcy proceeds. Instead, this is the time for ERP and Reorganized Mesabi to be permitted to finish their restructurings that were already adjudicated and approved by the Mag Bankruptcy and the Mesabi Bankruptcy.

     b.    <u>Abstention in this Case is Supported by the Legislative History to Section 305(a)</u>

The legislative history to Section 305(a) of the Bankruptcy Code describes the ***paradigm case for abstention as a case where "an arrangement is being worked out by creditors and the debtor out of court, there is no prejudice to the rights of creditors in***

6

*that arrangement, and an involuntary case has been commenced by a few recalcitrant*

*creditors ….*"  H.R. REP. No. 595, 95th Cong. 1st Sess. 325 (1977) (emphasis added).

Congress declared that in such a situation, a court should dismiss or suspend such a case.

*Id.*, *see also In re Wine and Spirits Specialties of Kansas City, Inc.*, 142 B.R. 345, 347

(Bankr. W.D. Mo. 1992); *In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 463 (Bankr.

S.D.N.Y.2008) (citing legislative history with approval and recognizing "the prevalence

of § 305(a) motions involving involuntary bankruptcy cases"); *In re Westerleigh Dev.*

*Corp.*, 141 B.R. 38, 40 (Bankr. S.D.N.Y. 1992) ("a bankruptcy court should not entertain

a two-party dispute unless special circumstances exist, such as fraud, artifice or scam.");

*In re Cincinnati Gear Co.*, 304 B.R. at 785 (consistent with the legislative history, courts

generally dismiss an involuntary case under §305(a)(1) where the debtor has made an

assignment for the benefit of creditors); *In re Fortran Printing, Inc.*, 297 B.R. at 95

(relying on legislative history to dismiss involuntary petition where state court

receivership already pending).

   In *In re Nordbrock*, the Eighth Circuit upheld the Bankruptcy Court's denial of an

order for relief saying "this case reflects efforts by a single creditor to use the Bankruptcy

Court as a forum for the trial and collection of an isolated disputed claim, a practice

condemned in prior decisions. 72 F.2d 397, 400 (8th Cir. 1985); *See, e.g., Matter of*

*Goldsmith*, 30 B.R. 956, 963 (Bankr.E.D.N.Y.1983); *In re R.N. Salem Corp.*, 29 B.R.

424, 429 (Bankr. S.D. Ohio 1983); *In re SBA Factors of Miami, Inc.*, 13 B.R. 99, 100-101

(Bankr.S.D.Fla.1981); *In re Nar-Jor Enterprises Corp.*, 6 B.R. 584, 586

(Bankr.S.D.Fla.1980)."

Similarly, in *In re NRG*, this Court found that:

> This debtor was injected into involuntary bankruptcy by a small group of creditors whose claims were a very small component of a huge debt structure. They believed that their interests were not being recognized or heeded in negotiations that were well underway; they used a threat–the Archimedes' lever of involuntary bankruptcy—to command NRG's attention. They got what they wanted, on a compromised basis, but in the meantime they put NRG into the arena of bankruptcy before it believed it was best-put to use it.

*Id.* at 85. Rather than let the demands of that small group of creditors dictate the outcome for the debtor and its creditors, this Court instead granted NRG's motion for abstention and dismissed the involuntary bankruptcy case.

At the time of filing, the Involuntary Petition appeared to be nothing more than a two party dispute. Since all issues are likely to be resolved by the Consensual Motion, ERP will not elaborate on this point at this time. However, ERP reserves the right to supplement this argument should the Consensual Motion not be granted on June 26, 2018.

At this time, ERP asks that as has previously done in *In re NRG*, the Court decline to let be destroyed, at the eleventh hour, potentially significant value for ERP and all of the other Minnesotans who stand to benefit from its success. Instead, this Court should abstain from hearing this case in favor of allowing ERP and Reorganized Mesabi to finish their restructurings by raising capital and continuing to work toward the promise of becoming successful  mining operations that will revitalize the iron ore range in Northern Minnesota to the benefit of all Minnesotans.

As established in the Motion, and as evidenced by the significant amount of media coverage for each bankruptcy, and the Dayton Letter, the public is well aware of the June 30, 2018 deadline.  The Mag Bankruptcy and Mesabi Bankruptcy were also highly publicized in Minnesota as the media closely covered both bankruptcies and reported on the progress of each reorganization regularly.  *See* the Mesabi and Mag Bankruptcy Media Coverage.[3]

As such, it is public knowledge that ERP has approximately $50 million outstanding in ERP Secured Debt.[4]  Since the ERP Secured Debt would need to be repaid prior to any payment to unsecured creditors in bankruptcy, and since those secured creditors have their remedies under non-bankruptcy law, there is no benefit to unsecured creditors of a bankruptcy due to their inability to recover absent payment in full to the secured creditors, which is unlikely in an uncoordinated liquidation.  Accordingly, this involuntary bankruptcy benefits no one.

Further, as noted in the Motion, the Mesabi Plan requires that: "the obligations of [Reorganized Mesabi] in connection with the [Mesabi Notes] shall be secured by a junior lien in and upon substantially all of the assets of the [Reorganized Mesabi] and [ERP],

---

[3] On December 22, 2017, The Duluth News Tribune advised of the company's emergence from bankruptcy and described the Itasca County Board's willingness to extend a key date until June 30th.  *See Duluth New Tribune, Mesabi Metallics ready to emerge from bankruptcy, December 22, 2017.*  On December 29, 2017, The Star Tribune reported a similar article describing Chippewa's emergence from bankruptcy and its plan moving forward.  It said "Chippewa has until June 30, 2018 to present the state with evidence that it has indeed secured all of the financing needed to finish construction of the half-build ore-pelletizing plant in Nashwauk."  *See New owners bring Essar project out of bankruptcy, Star Tribune, December 29, 2017.*

[4] The ERP Secured Debt is described and approved in the publically filed Mag Sale Order and attached as an exhibit thereto.

9

subject only to the liens granted pursuant to the [construction financing documents]."
Mesabi Plan at Section 7.1(b).  For this reason, the Mesabi Indenture requires ERP to
become a guarantor of the Mesabi Notes by granting liens on its assets as collateral, or
contribute all or substantially all of its assets to Reorganized Mesabi, by or before June
30, 2018.

The Mesabi Plan also requires that "[Chippewa] shall cause ERP's business and
operations to be integrated with those of the Reorganized Debtor on the Effective Date,
either pursuant to an inter-company agreement which may be limited to cooperation in
the production of iron ore concentrate and pellets) or a merger (or other form of business
combination), which integration transactions shall be determined by [Chippewa]."
Mesabi Plan at  Section 7.1(d).  ERP will not be able to satisfy these obligations if it is in
a Chapter 7 bankruptcy and in turn, Reorganized Mesabi will then have unnecessary
difficulty meeting its Indenture requirements, required by June 30, 2018.[5]

ERP has already established that the best likelihood for repayment of creditors in
full is to complete the Projects and commence revenue generation operations.
Nonetheless, the Involuntary Petition was filed under Chapter 7, rather than Chapter 11
of the Bankruptcy Code, which ensures that a trustee will be appointed to liquidate ERP's
assets.  As such, a Chapter 7 liquidation will destroy ERP's value and impair the ability

---

[5] ERP, Reorganized Mesabi and Chippewa's shareholders have been working together to determine the
best way to integrate the companies, including potentially through the payment of debt under the
construction financing or through other capital raising efforts.  Reorganized Mesabi is not responsible for
satisfying ERP's debt obligations.  Nonetheless, ERP's creditors are better off if the terms of the Mesabi
Plan are implemented, Reorganized Mesabi succeeds and ERP is left to pay its debts outside of a
bankruptcy.

to perform on the Mesabi Plan since ERP and its assets would be in the hands of a trustee.

For the foregoing reasons, ERP requests this Court exercise its discretion to abstain and dismiss these cases under Section 305(a) of the Bankruptcy Code.

## II.    Reservation of Rights and Request for Alternative Relief

"The filing of an involuntary petition is an extreme remedy with serious consequences to the alleged debtor, such as loss of credit standing, inability to transfer assets and carry on business affairs, and public embarrassment." *In re Murrin*, 477 B.R. 99, 105 (Bankr. D. Minn. 2012) (citing *In re Reid*, 773 F.2d 945, 946 (7th Cir. 1985)). Involuntary bankruptcy is to be exercised for the good of the entire creditor body. *Id.* (citing *In re Tichy Elec. Co.*, 332 B.R. 364, 376 (Bankr. N.D. Iowa 2005)). "It is not intended to be used in an exclusively self-serving manner as a collection device." *Id.* (emphasis added). The Murrin court added that "[i]nvoluntary bankruptcy is not to be used 'as a forum for the trial and collection of an isolated disputed claim, a practice condemned in prior decisions.'" (citing *In re Saunders*, 379 B.R. 847, 857 (Bankr. D. Minn. 2007).

The 8th Circuit Bankruptcy Appellate Panel has found that "[t]he filing of an involuntary petition for a nonbankruptcy purpose is evidence of bad faith." *In re Bock Transp., Inc.*, 327 B.R. 378, 382 (8th Cir. BAP 2005) (Bankruptcy Appellate Panel Chief Judge Kressel citing *Basin Elec. Power Coop v. Midwest Processing Co.*, 769 F.2d 483, 486 (8th Cir. 1985). The 8th Circuit BAP said that "the Eighth Circuit has found that the Code contains an implicit good faith requirement" in the filing of an involuntary petition.

11

*Id.* (citing *Cedar Shore Resort, Inc. v. Mueller (In re Cedar Shore Resort, Inc.)*, 235 F. 3d

375,379 (8th Cir. 2000). "A bad faith filing can also be cause for the dismissal of a

petition." *Id.* (citing *Basin Elec. Power Coop*, 769 F.2d at 486).

A majority of courts agree. *See e.g. In re Tichy Elec. Co.*, 332 at 373 ("A bad faith

filing can be cause for the dismissal of a petition. The filing of an involuntary petition for

a non-bankruptcy purpose is evidence of bad faith."); *In re U.S. Optical, Inc.*, 991 F.2d

792, at *3 (4th Cir.1993) (unpublished) ("Courts are duty bound to conduct an inquiry, if

requested, to determine whether an involuntary petition has been filed in good faith. Bad

faith filings are to be dismissed."); *In re Alexander*, No. 00–10500, 2000 WL 33951465,

at *3 (D. Vt. Aug. 29, 2000) ("[I]nvoluntary petitions filed in bad faith should be

dismissed."); *In re Manhattan Indus., Inc.*, 224 B.R. 195, 201 (Bankr. M.D. Fla.1997)

("Involuntary filings must be made in good faith and consequences flow if they are not.

Dismissal is one possible consequence."); *In re Murray*, 543 B.R. 484, 486 (Bankr.

S.D.N.Y 2016) ("where there are no other creditors' needs and concerns to protect; and

where there are no other bankruptcy goals to achieve - the Court will not countenance

misuse of the bankruptcy system in this way. Whether for 'bad faith filing' or merely

unenumerated cause, the petition must be, and is, dismissed for cause").

In *In re Forever Green Athletic Fields, Inc.*, the Third Circuit addressed whether

bad faith may serve as an independent basis for dismissal even where the criteria for

commencing a suit under Section 303 of the Bankruptcy Code are or may be satisfied and

even where the debtor is admittedly not paying its debts as they become due. 804 F.3d

328 (3d Cir. 2015). There, petitioning creditors argued that the court could not engage in

the bad faith inquiry as their subjective motivations were irrelevant when the criteria of

Section 303(b)(1) had been satisfied.[6]  *Id.* at 333.  The Third Circuit disagreed and found

that the text of Section 303 does not foreclose bad-faith dismissal, even if the Section 303

requirements are met.  *Id.* at 334.  The court also said:

> We see no reason why the Code would permit the imposition of damages
> (including punitive damages) for bad-faith filings but not allow the same
> conduct—such as using involuntary bankruptcy as a litigation tactic in
> pending proceedings—to provide a basis for dismissing the petition. The
> better view is that, by including an express reference to bad faith in § 303,
> Congress intended for bad faith to serve as a basis for both dismissal and
> damages.

*Id.* at 334.

The court found that to hold otherwise overlooks the equitable nature of a

bankruptcy.  *Id.*  It said that, "[a]t its most fundamental level, the good faith requirement

ensures that the Bankruptcy Code's careful balancing of interests is not undermined by

petitioners whose aims are antithetical to the basic purposes of bankruptcy."  *Id.*  (citing

*In re Integrated Telecom Express, Inc.,* 384 F.3d 108, 119 (3d Cir. 2004)).  As courts of

equity, bankruptcy courts are equipped with the doctrine of good faith so that they can

patrol the border between good- and bad-faith filings.  *Id.*  (citing *In re SGL Carbon*, 200

F.3d 154, 161 (3d. Cir. 1999); *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir.

1986) (explaining that the "good faith" requirement protects the "integrity of the

bankruptcy courts by rendering their powerful equitable weapons ... available only to

those debtors and creditors with 'clean hands'")). The Third Circuit said "we will not

---

[6] ERP here reserves all defenses to this Involuntary Petition and reserves the right to file an answer or
other appropriate pleading at a later date.

13

depart from this general 'good faith' filing requirement in the context of involuntary petitions for bankruptcy." *Id.*

In *Forever Green*, the Third Circuit adopted a "totality of the circumstances" standard for determining bad faith under Section 303.[7] *Id.* at 336. The court identified a non-exhaustive list of factors that the courts may consider, including whether: the creditors satisfied the statutory criteria for filing the petition; the involuntary petition is meritorious; the creditors made a reasonable inquiry into the relevant facts and pertinent law before filing; there was evidence of preferential payments to certain creditors or dissipation of the debtor's assets; the filing was motivated by ill will or a desire to harass; the petitioning creditors used the filing to obtain a disproportionate advantage for themselves rather than to protect against other creditors doing the same; the filing was used as a tactical advantage in pending actions; the filing was used as a substitute for customary debt-collection procedures; and the filing had suspicious timing. *Id.*

Ultimately, looking at the totality of the circumstances, the *Forever Green* court found that the petitioning creditor's actions "ran counter to the spirit of collective creditor action that should animate an involuntary filing" and that he "put his own interests above

---

[7] Other courts have applied an "improper use" test, which asks whether a "petitioning creditor uses involuntary bankruptcy procedures in an attempt to obtain a disproportionate advantage for itself, rather than to protect against other creditors obtaining disproportionate advantages, particularly when the petitioner could have advanced its own interest in a different forum." *Id.* at 335 (citing *In re K.P. Enter.*, 135 B.R. 174, 179 n. 14 (Bankr. D. Me.1992); or an "improper purpose" test, which looks to whether the filing "was motivated by ill will, malice, or a desire to embarrass or harass the alleged debtor." *Id.* (citing *In re Bayshore Wire Prods. Corp.*, 209 F.3d 100, 105 (2nd Cir.2000). Still others apply an "objective test," which assesses what a reasonable person would have believed and what a reasonable person would have done in the creditor's position. *Id.* (citing *In re Wavelength, Inc.*, 61 B.R. 614, 620 (9th Cir. BAP 1986)). And yet other courts have applied a broad "totality of the circumstances" standard, which effectively combines all the tests and looks to both subjective and objective evidence of bad faith. *Id.* (citing *In re John Richards Homes Bldg. Co.*, 439 F.3d 248, 255 n.2 (6th Cir. 2006)).

107635695\V-4

all others." *In re Forever Green* 804 F.3d at 336. Since the petitioning creditor "used the bankruptcy courts to gain a personal advantage in other pending actions or as a debt-collection device", the Third Circuit upheld the bankruptcy court's decision to dismiss the involuntary petition as a bad faith filing. *Id.* at 337.

It is ERP's view that regardless of which standard the Court would look to apply, a non-bankruptcy purpose was present at the time the Involuntary Petition was filed as several of the factors often-cited by courts were present.

Should the Court not grant the Consensual Motion or grant ERP's request for abstention and dismissal under Section 305(a) of the Bankruptcy Code, ERP reserves the right to request that this Involuntary Petition be dismissed as a bad faith filing. ERP reserves all rights to revise and supplement the Motion and Memorandum with any additional facts or arguments as may be necessary to assert this argument.

For the avoidance of doubt, ERP does not seek such relief against the Petitioning Creditors at this time given the filing of the Consensual Motion.

Pursuant to Section 303(e), in the event this Court determines that for some reason it cannot dismiss the Involuntary Petition at the hearing on June 26, 2018 (for example, a continued evidentiary hearing is needed), ERP requests that on June 26, 2018, the Court order (i) the posting of a bond in ERP's favor on or before June 28, 2018, and (ii) that absent the posting of such bond and filing it on the docket the Involuntary Petition is dismissed without further notice or order of this Court as of that date.

## BASIS FOR EXPEDITED RELIEF

Federal Rule of Bankruptcy Procedure 2002(4) provides that twenty one days' notice is required to parties in  interest on a motion to dismiss the case.  This notice period can be shortened for cause.  *See In re Mandaley Shores Co-Op Housing Ass'n, Inc.*, 63 B.R. 842, 852 (N.D. Ill. 1986) (seven days' notice approved); *In re Hill Top St. Corp.*, 42 B.R. 517, 520 (Bankr. D. Mass. 1984) (one day notice approved).

Expedited consideration of this Motion is necessary because of the June 30th deadline to satisfy the terms of the Mesabi Plan, the Mesabi Indenture and the State Settlement Agreement, which is the deadline for ERP to become a guarantor of the Mesabi Notes and pledge its assets as collateral to secure that guarantee.  As a result, this Motion and the relief requested herein cannot be heard on regular notice.

## CONCLUSION

For the reasons set forth above, ERP requests that the Court abstain and dismiss this Involuntary Petition pursuant to 11 U.S.C. § 305(a)(1) in favor of allowing ERP to satisfy its obligations under the existing terms of the Magnetation and Mesabi Bankruptcy Court approved restructurings.  Should the Court not grant the Consensual Motion or ERP's request for abstention and dismissal under Section 305(a) of the Bankruptcy Code, ERP reserves the right to request that this Involuntary Petition be dismissed as a bad faith filing.  ERP reserves all rights to revise and supplement the Motion and Memorandum with any additional facts or arguments as may be necessary to assert that argument.

16

Dated:  June 12, 2018                   WINTHROP & WEINSTINE, P.A.

                                        By: /s/Michael A. Rosow
                                        Michael A. Rosow
                                        Thomas J. Hainje
                                        225 South Sixth Street, Suite 3500
                                        Minneapolis, MN 55402-4629
                                        Tel: (612) 604-6400
                                        Fax: (612) 604-6800
                                        Email: mrosow@winthrop.com
                                                thainje@winthrop.com

                                        -and-

                                        Oscar N. Pinkas
                                        Arthur H. Ruegger
                                        Lauren Macksoud
                                        Dentons US LLP
                                        1221 Avenue of the Americas
                                        New York, NY 10020
                                        212-768-6700
                                        Email: oscar.pinkas@dentons.com
                                                arthur.ruegger@dentons.com
                                                lauren.macksoud@dentons.com

                                        -and-

                                        Glenn A. Ballard
                                        Dentons US LLP
                                        LyondellBasell Tower
                                        1221 McKinney Street, Suite 1900
                                        Houston, Texas  77010
                                        713-658-4600
                                        Email: glenn.ballard@dentons.com

                                        *Attorneys for ERP Iron Ore, LLC*

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT

DISTRICT OF MINNESOTA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| In re: | **Jointly Administered under**<br>**Case No. 15-50307** |
| MAGNETATION LLC, et al, | Court File No. 15-50307 (WJF) |
| Debtors. | |
| (includes: | Court File Nos.: |
| Mag Lands, LLC<br>Mag Finance Corp.<br>Mag Mining, LLC<br>Mag Pellet LLC) | 15-50308 (WJF)<br>15-50309 (WJF)<br>15-50310 (WJF)<br>15-50311 (WJF) |
| | Chapter 11 Cases<br>Judge William J. Fisher |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**ORDER GRANTING JOINT MOTION FOR AN ORDER (I) APPROVING
THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS'
REMAINING ASSETS, (II) AUTHORIZING THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND
UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Upon the motion (Docket No. 1149, the "Motion")[1] of Magnetation LLC ("Mag LLC")

and its subsidiaries that are debtors and debtors in possession (collectively, the "Debtors") for an

order approving the sale of substantially all of the Debtors' remaining assets, authorizing the

assumption and assignment of certain executory contracts and unexpired leases, and granting

related relief, and the *Notice of Filing Exhibits in Connection with the Joint Motion for an Order*

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in
the Asset Purchase Agreement.

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on *12/21/2016*
Lori Vosejpka, Clerk, by IMR

*(I) Granting Expedited Relief, (II) Approving the Sales and Transfer of Certain Assets and Liabilities Free and Clear of Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (IV) Granting Related Relief*, filed on December 20, 2016 [ECF No. 1195] (the "Sale Order Exhibits"), which is incorporated herein by reference; and the Court having reviewed the Motion; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.     **Jurisdiction, Core Proceeding, Statutory Predicates, and Venue.**  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The predicates for the relief granted herein are Bankruptcy Code sections 105, 363, and 365, Bankruptcy Rules 2002, 6004, 6006 and 9019, and Local Rules 2002-1 and 6004-1(e).  Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.     **Just Cause.**  The legal and factual bases set forth in the Motion establish just cause for the relief granted herein.  Entry of this Order is in the best interests of the Debtors and their respective estates, creditors, and all other parties-in-interest.

C.     **Notice.**  The notice of the Motion, the relief requested therein and herein, the hearing to approve the Motion (the "Sale Hearing"), the assumption and assignment of the Assigned Contracts (as defined below) and Cure Costs related thereto, if any, and the proposed entry of this Order was adequate and sufficient under the circumstances of these chapter 11 cases, and such notice complied with all applicable requirements of the Bankruptcy Code, the

Bankruptcy Rules, and the Local Rules. A reasonable opportunity to object or be heard regarding the relief granted by this Order has been afforded to all parties in interest entitled to notice pursuant to the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules. Accordingly, no further notice of the Motion, the Sale Hearing, or this Order is necessary or required.

D. Actual written notice of the Motion, the Sale Hearing, the assumption and/or assignment of Assumed Contracts and Assumed Leases, the proposed Cure Costs, the sale of the Purchased Assets (which term includes, for all purposes in this Order, the White County TIF Bonds) free and clear of any and all Encumbrances other than Permitted Encumbrances and Assumed Liabilities pursuant to the Asset Purchase Agreement (the "Sale") and all transactions contemplated therein or in connection therewith, and all deadlines related thereto has been given to all persons, governmental units and entities receiving CM/ECF notice or set forth in the *Affidavit of Service*, filed on December 9, 2016 [ECF No. 1155] and the *Affidavit of Service,* filed on December 9, 2016 [ECF No. 1156]. The foregoing constitutes proper, timely, adequate, and sufficient notice under the particular circumstances of these cases, and no further notice need be provided.

E. **Extensive Efforts by Debtors.** Since before the entry of the order approving the Settlement Agreement, the Debtors worked with their counsel and financial advisors to implement a viable transaction that would allow them to maximize the value of the Purchased Assets. The transaction that is the subject of this Order is the result of the Debtors' extensive efforts seeking to maximize recoveries to the Debtors' estates for the benefit of the Debtors' stakeholders.

F. **Business Justification.** The Debtors have demonstrated compelling

3

circumstances and a good, sufficient, and sound business purpose and justification for the Court

to grant the relief requested in the Motion, including, without limitation, to: (i) authorize the Sale

of the Purchased Assets free and clear of Encumbrances other than Permitted Encumbrances and

Assumed Liabilities; (ii) authorize the assumption and assignment of certain executory contracts

and unexpired leases; and (iii) grant related relief as set forth herein.  Such compelling and sound

business purpose and justification was set forth in the Motion and on the record at the Sale

Hearing, are incorporated herein by reference and, among other things, form the basis for the

findings of fact and conclusions of law set forth herein.

G.     **Objections are Overruled.**  All objections, responses, or reservations of rights to

the relief requested in the Motion that have not been withdrawn, waived, or settled as expressly

set forth in this Order or by stipulation filed with the Court are overruled on the merits with

prejudice, except that the objections filed at Docket Nos. 1163, 1164 and 1168 were adjourned.

H.     **Asset Purchase Agreement.**   In an exercise of their business judgment, the

Debtors, in consultation with their management, board of directors, advisors and the other parties

in interest, decided to enter into and consummate the asset purchase agreement attached as

Exhibit A to the Sale Order Exhibits (such asset purchase agreement, including all exhibits,

schedules and ancillary agreements related thereto, as may be amended from time to time, the

"Asset Purchase Agreement") with MG Initial Purchaser, LLC ("Bidco") as assignee of the right

to credit bid from Wilmington Trust, National Association (the "DIP Agent") as agent to the

lenders (the "DIP Lenders") under Mag LLC's Debtor-In-Possession Credit Agreement dated as

of May 7, 2015 (the DIP Lenders, Bidco, and the DIP Agent, collectively the "Credit Bidding

Parties"), which Asset Purchase Agreement will be assigned and novated to ERP Iron Ore, LLC

(the "Buyer").   The consummation of the transactions contemplated by the Asset Purchase

4

Agreement, the Motion, and this Order is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and all of the applicable requirements of such sections and rules have been complied with in respect of such transactions.  As part of the transactions contemplated by the Asset Purchase Agreement, the Debtors have executed the Restated and Amended Technology License Agreement, which they seek the Court's approval of in the Motion and this Order.  Subject to the Closing, the Debtors also seek authorization to execute and perform under the Progress Documents and CFSC Documents (each as defined below) they will be party to.  The Mag Entities also executed the Mag Entities Support Agreement supporting the transactions contemplated by the Asset Purchase Agreement, which Mag Entities Support Agreement does not require Court approval as no Debtor is party thereto.

I.       **MOU Documents**.  The Debtors seek authorization to execute and perform under definitive and ancillary documentation contemplated and/or required to effectuate the terms of Preliminary Memorandum of Understanding dated November 18, 2016 (the "MOU"), attached as Exhibit E to the Sale Order Exhibits, executed by holders of statutory lien claims against certain of the Purchased Assets or to be executed by holders of such statutory lien claims pursuant to a joinder executed by such holders and the Buyer (all such holders are collectively referred to herein as the "Holders").  The definitive and ancillary documentation contemplated and/or required to effectuate the terms of the MOU are intended to provide, among other things: (i) the Debtors dismiss with prejudice all adversary proceedings commenced by any of the Debtors against any of the Holders, (ii) the Debtors release all present and future claims, including warranty claims, against any Holder arising out of or relating to any goods or services provided by such Holder to the Debtors, (iii) the Debtors release the Holders from any and all

claims of the Debtors that arose pre-Closing, (iv) the Holders that appealed this Court's Order

approving the Global Settlement Agreement (ECF No. 1004) and the Debtors execute a

stipulation to dismiss such Holders' pending appeal of such Order, (v) the mechanic's/miner's

liens asserted by any of the Holders in that certain foreclosure action pending before the

Minnesota State District Court, Court File No. 31-CV-15-3288 (the "Foreclosure Action")

pertaining to the property located at or around 28754 County Road 61, Grand Rapids, Minnesota,

but described with more particularity by each such Holder in pleadings each such Holder has

filed in the Foreclosure Action (all such property being referred to herein as "Plant 4") are

Permitted Encumbrances pursuant to an amendment to the Asset Purchase Agreement, which the

Buyer agrees to procure as a condition to Closing and the effectiveness of which amendment is,

in turn, conditioned upon the execution by, as applicable, the Holders, the Debtors, the Buyer

and FerroMagnetica of the MOU Documents, defined below (all such mechanic's/miner's liens

are, collectively, referred to herein as the "Permitted Statutory Liens"), (vi) Buyer and, as

appropriate, FerroMagnetica execute loan documents agreed upon by the Holders,

FerroMagnetica and the Buyer, and as contemplated by the MOU, including a Note or Indenture,

Security Agreement and Mortgages pursuant to which, without limitation, the Buyer agrees to

grant to the Holders liens on all Purchased Assets, provided that such liens are subordinated as

agreed by Buyer and the Holders, and (viii) subject to the execution by Holders, the Buyer and

FerroMagnetica of the agreed definitive and ancillary documentation contemplated and/or

required to effectuate these terms and the MOU, the Holders release all liens, claims and

encumbrances they each have or may have against or that relate to any and all of the Purchased

Assets, other than: (A) subordinated liens on all Purchased Assets to be granted by the Buyer

pursuant to such documentation and are effective upon Closing, (B) the Holders' causes of action

6

asserted in the Foreclosure Action and (C) the Permitted Statutory Liens (all such fully executed

definitive and ancillary documentation, including, without limitation, a MOU, Note or Indenture,

Security Agreement, Mortgages, mechanic's/miner's lien releases, and escrow agreement are,

collectively, referred to herein as the "MOU Documents").  The MOU Documents have agreed

to be executed, as applicable, by the Holders, the Debtors, the Buyer and FerroMagnetica prior to

Closing, and consummated concurrently with the Closing.

J.      **Sale Hearing.**  The Sale Hearing occurred on December 15, 2016.

K.      **Adequate Marketing; Highest or Otherwise Best Offer.**  As demonstrated by

(i) the contents of the Motion, which are verified by Michael J. Talarico, and the contents of any

documents referenced therein, (ii) the testimony and other evidence proffered or adduced at the

Sale Hearing, and (iii) the representations of counsel made on the record at the Sale Hearing,

(a) the Debtors have adequately marketed the Purchased Assets and conducted a fair and

equitable sale process; (b) a reasonable and fair opportunity has been given to any interested

party to make the highest or otherwise best offer for the Purchased Assets; (c) the consideration

provided in the Asset Purchase Agreement constitutes the highest or otherwise best offer for the

Purchased Assets; (d) the consideration in the Asset Purchase Agreement provides fair and

reasonable consideration for the Purchased Assets and constitutes reasonably equivalent value

under the Bankruptcy Code and applicable non-bankruptcy law; (e) taking into consideration all

relevant factors and circumstances, no other entity has offered to purchase the Purchased Assets

for greater economic value to the Debtors or their estates; and (f) the Debtors' determination that

the Asset Purchase Agreement constitutes the highest or otherwise best offer for the Purchased

Assets constitutes a valid and sound exercise of the Debtors' business judgment.

L.      **No Successor Liability.**  Neither the Credit Bidding Parties nor the Buyer is an

"insider" or "affiliate" of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors or stockholders existed or exists between the Buyer, the Credit Bidding Parties, and the Debtors.  The transfer of the Purchased Assets to, and the assumption of the Assumed Liabilities (including any individual elements of the transactions contemplated by the Asset Purchase Agreement or related thereto) by, the Buyer does not, and will not, subject the Buyer or the Credit Bidding Parties to any liability whatsoever, with respect to the operation of the Debtors' businesses prior to the Closing of the Sale or by reason of such transfer under the Bankruptcy Code or applicable non-bankruptcy law, based, in whole or in part, directly or indirectly, in any theory of law or equity including, without limitation, any laws affecting antitrust, successor, transferee or vicarious liability.  For the avoidance of doubt, the Assumed Liabilities shall include Cure Costs (defined below) that will be paid by the Buyer. Pursuant to the Asset Purchase Agreement, the Buyer is not purchasing all of the Debtors' assets in that the Buyer is not purchasing any of the Excluded Assets or assuming the Excluded Liabilities, and the Buyer is not holding itself out to the public as a continuation of the Debtors. The transactions contemplated by the Asset Purchase Agreement or related thereto do not amount to a consolidation, merger or *de facto* merger of the Credit Bidding Parties or Buyer with the Debtors and/or the Debtors' estates.  There is no substantial continuity between either the Credit Bidding Parties or Buyer and the Debtors, and there is no continuity of enterprise between the Debtors and the Buyer or the Credit Bidding Parties.  The Buyer is not a mere continuation of the Debtors or the Debtors' estates, and the Buyer does not constitute a successor to the Debtors or the Debtors' estates.  None of the transactions contemplated by the Asset Purchase Agreement or related thereto, including, without limitation, the Sale or the assumption and/or assignment of the Assumed Contracts (the Assumed Contracts shall include the Restated and Amended

8

Technology License Agreement for all purposes of this Order) and Assumed Leases, is being

undertaken for the purpose of escaping liability for any of the Debtors' debts or hindering,

delaying, or defrauding creditors under the Bankruptcy Code or any applicable non-bankruptcy

law.

M.      **Property of the Estate.**   The Purchased Assets are property of the Debtors'

estates and title thereto is vested in the Debtors' estates.  The Debtors are the sole and lawful

owners of the Purchased Assets.

N.      **Sale in Best Interests.**   The actions taken or to be taken by the Debtors, the

Buyer, and the Credit Bidding Parties are appropriate under the circumstances of these chapter

11 cases and are in the best interests of the Debtors, their estates and creditors, and other parties

in interest.  Approval of the Asset Purchase Agreement, the Sale, the Restated and Amended

Technology License Agreement, and all related transactions at this time is in the best interests of

the Debtors, their creditors, their estates, and all other parties in interest.

O.      **No *Sub Rosa* Plan.**   The consummation of the Sale outside of a plan of

reorganization pursuant to the Asset Purchase Agreement neither impermissibly restructures the

rights of the Debtors' creditors nor impermissibly dictates the terms of a plan of reorganization

or liquidation for the Debtors.  The Asset Purchase Agreement, the Sale, and the transactions

contemplated therein and associated therewith do not constitute a *sub rosa* plan.

P.      **No Fraudulent Transfer.**   The Sale is not for the purpose of hindering, delaying

or defrauding creditors under the Bankruptcy Code or any applicable non-bankruptcy law.  The

Debtors, the Buyer, and the Credit Bidding Parties are not and will not be entering into the Asset

Purchase Agreement or the transactions contemplated thereby fraudulently.

Q.      **Arm's-Length Sale.**   The Asset Purchase Agreement, the Sale, and the

transactions contemplated therein and associated therewith were negotiated, proposed, and entered into by the Debtors, the Credit Bidding Parties, and the Buyer (and the holders of interests in the Buyer) without collusion, in good faith, and from arm's-length bargaining positions. None of the Debtors, the Credit Bidding Parties, the Buyer, the Holders, FerroMagnetica LLC, Magnetation, Inc., MagGlobal LLC, or their respective investors, insiders or affiliated entities has engaged in any conduct that would cause or permit the Asset Purchase Agreement, the Sale, or any part of the transactions thereunder or in connection therewith to be avoided under Bankruptcy Code section 363(n).

R. **Good Faith Purchaser.** The Buyer and the Credit Bidding Parties are good faith purchasers under Bankruptcy Code section 363(m) and, as such, are entitled to all of the protections afforded thereby. Specifically: (i) the Buyer and the Credit Bidding Parties recognized that the Debtors were free to deal with any other party interested in purchasing the Purchased Assets; (ii) all payments to be made by the Buyer or claim reduction to be made by the Credit Bidding Parties in connection with the Sale have been disclosed; (iii) no common identity of directors, officers or controlling stockholders exists among the Buyer or the Credit Bidding Parties and the Debtors; (iv) the negotiation and execution of the Asset Purchase Agreement was at arm's-length and in good faith, and at all times each of the parties was represented by competent counsel of their choosing; (v) neither the Buyer nor the Credit Bidding Parties in any way induced or caused the chapter 11 filing of the Debtors; and (vi) the Buyer (and FerroMagnetica LLC and the holders of interests in the Buyer or FerroMagnetica LLC) and the Credit Bidding Parties have not acted in a collusive manner with any Person. The Buyer and the Credit Bidding parties will be acting in good faith within the meaning of Bankruptcy Code section 363(m) in closing the transactions contemplated by the Asset Purchase Agreement

10

(including the assumption and novation of the Asset Purchase Agreement from Bidco to ERP Iron Ore).

S.    **Corporate Authority.**  Each Debtor (i) has full corporate power and authority to execute the Asset Purchase Agreement and all other documents contemplated thereby, and the Sale of the Purchased Assets has been duly and validly authorized by all necessary corporate action of each of the Debtors, (ii) has all of the corporate power and authority necessary to consummate the transactions contemplated by the Asset Purchase Agreement, (iii) has taken all corporate action necessary to authorize and approve the Asset Purchase Agreement and the consummation by the Debtors of the transactions contemplated thereby, and (iv) needs no further consents or approvals, other than those expressly provided for in the Asset Purchase Agreement, which may be waived in accordance with the terms therewith.

T.    **Free and Clear Findings Required by the Buyer.**  The Buyer and Bidco would not have entered into the Asset Purchase Agreement and the Buyer would not consummate the Sale if the sale of the Purchased Assets to the Buyer were not, pursuant to Bankruptcy Code section 363(f), free and clear, except for Permitted Encumbrances and Assumed Liabilities, of (i) all liens (statutory or otherwise), mortgages, deeds of trust, pledges, charges, security interests, rights of first refusal, hypothecations, encumbrances, royalties, easements, servitudes, leases or subleases, rights-of-way, encroachments, restrictive covenants, restrictions on transferability or other similar restrictions, rights of offset or recoupment, right of use or possession, or conditional sale arrangements, (ii) all claims, including all rights or causes of action (whether in law or in equity), proceedings, warranties, guarantees, indemnities, rights of recovery, setoff, recoupment, indemnity or contribution, obligations, demands, restrictions, indemnification claims, or liabilities relating to any act or omission of the Debtors or any other

11

person prior to the Closing, consent rights, options, contract rights, covenants, and interests of

any kind or nature whatsoever (known or unknown, matured or unmatured, accrued, or

contingent and regardless of whether currently exercisable), whether arising prior to or

subsequent to the commencement of the above-captioned cases, and whether imposed by

agreement, understanding, law, equity, or otherwise, and (iii) all debts, liabilities, obligations,

contractual rights and claims and labor, employment and pension claims, in each case, whether

known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or

unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent

or non-contingent, liquidated or unliquidated, matured or un-matured, material or non-material,

disputed or undisputed, whether arising prior to or subsequent to the commencement of these

chapter 11 cases, and whether imposed by agreement, understanding, law, equity or otherwise

((i), (ii), and (iii) collectively are included in the term "Encumbrances" for any and all purposes

in this Order).  Except for Permitted Encumbrances and Assumed Liabilities, the Sale shall be

free and clear of, and neither the Buyer nor the Credit Bidding Parties shall be responsible for,

any Encumbrances of any kind or nature whatsoever, including, without limitation, in respect of

the following: (i) any rights or Encumbrances based on any successor or transferee liability, (ii)

any Encumbrances that purport to give any party a right or option to effect any forfeiture,

modification, right of first offer or first refusal, or termination of the Debtors' or the Buyer's

interest in the Purchased Assets, or any similar rights; (iii) any labor or employment agreements;

(iv) mortgages, deeds of trust, and security interests; (v) intercompany loans and receivables

between the Debtors and any non-Debtor subsidiary; (vi) any pension, multiemployer plan (as

such term is defined in Section 3(37) or Section 4001(a)(3) of ERISA), health or welfare,

compensation or other employee benefit plans, agreements, practices, and programs, including,

without limitation, any pension plans of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability, including, but not limited to, any and all COBRA Liabilities, Withdrawal Liabilities, or Liabilities relating to a collective bargaining agreement or Benefit Plan; (vii) any other employee, worker's compensation, occupational disease, or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Code and of any similar state law (collectively, "COBRA"), (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, (k) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors, or (l) the WARN Act (29 U.S.C. §§2101 *et seq.*); (viii) any bulk sales or similar law; (ix) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, and any taxes arising under or out of, in connection with, or in any way relating to the operation of the Purchased Assets prior to the Closing, including, without limitation, any *ad valorem* taxes assessed by any applicable taxing authority; (x) any unexpired executory contract or unexpired lease to which a Debtor is a party that is not an Assigned Contract that will be assumed and assigned pursuant to this Order and the Asset Purchase Agreement; or (xi) any other Excluded Liabilities as provided in the Asset Purchase Agreement.

13

A sale of the Purchased Assets other than one free and clear of all Encumbrances would yield substantially less value for the Debtors' estates, with less certainty, than the Sale as contemplated. Therefore, the Sale contemplated by the Asset Purchase Agreement and approved herein free and clear of all Encumbrances, except for Permitted Encumbrances and Assumed Liabilities, is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

      U.    **Binding and Valid Transfer.**  The transfer of the Purchased Assets to the Buyer will be a legal, valid, and effective transfer of the Purchased Assets and, except for the Permitted Encumbrances and Assumed Liabilities, will vest the Buyer with all right, title, and interest of the Debtors to the Purchased Assets free and clear of all Encumbrances and any liabilities of the Debtors.

      V.    **Satisfaction of Section 363(f) Standards.**  The Debtors may sell the Purchased Assets free and clear of all Encumbrances of any kind or nature whatsoever, because, in each case, one or more of the standards set forth in Bankruptcy Code section 363(f)(1)-(5) has been satisfied. Those holders of Encumbrances, and non-debtor parties to the Assigned Contracts who did not object, or who withdrew their objections, to the Motion are deemed to have consented pursuant to Bankruptcy Code section 363(f)(2). In all cases, each such person with Encumbrances in the Purchased Assets is enjoined from taking any action against the Purchased Assets or the Buyer, the Credit Bidding Parties, their respective affiliates, or any agent of the foregoing with respect to any such Encumbrance.

      W.    **Necessity of Order.**  The Buyer and the Credit Bidding Parties would not have entered into the Asset Purchase Agreement and would not consummate the transactions without all of the relief provided for in this Order (including, but not limited to, that the transfer of the

Purchased Assets to the Buyer be free and clear of all Encumbrances and an injunction against creditors and other third parties pursuing Encumbrances).  The consummation of the transactions pursuant to this Order and the Asset Purchase Agreement is necessary for the Debtors to maximize the value of their estates for the benefit of all creditors and other parties in interest.

X.      **Time of the Essence.**  The Sale of the Purchased Assets must be approved and consummated promptly in order to preserve the value of the Purchased Assets.  Therefore, time is of the essence in consummating the Sale, and the Debtors and the Buyer intend to close the Sale as soon as reasonably practicable.

Y.      **Assigned Contracts.**  The Debtors have demonstrated that it is an exercise of their sound business judgment to sell, assume, and assign the unexpired leases and executory contracts designated as Assumed Contracts and Assumed Leases on Exhibit B to the Sale Order Exhibits (collectively, the "Assigned Contracts" and, individually, an "Assigned Contract") to the Buyer in connection with the consummation of the Sale, and the assumption and assignment of the Assigned Contracts is in the best interests of the Debtors, their estates and creditors, and other parties in interest.  The Assigned Contracts being assigned to the Buyer are an integral part of the Purchased Assets being purchased by the Buyer, and, accordingly, such assumption and assignment of the Assigned Contracts and the liabilities associated therewith are reasonable and enhance the value of the Debtors' bankruptcy estates.

Z.      **Cure and Adequate Assurance.**  The Debtors have cured or the Debtors and the Buyer have demonstrated their ability to cure any default with respect to any act or omission that occurred prior to the Closing under any of the Assigned Contracts, within the meaning of Bankruptcy Code section 365(b)(1)(A).  The proposed cure costs listed next to each Assigned Contract on Exhibit B to the Sale Order Exhibits or as otherwise expressly agreed to by Buyer as

set forth in the text of this Order, if any, (the "Cure Costs") are the only amounts necessary to "cure" all "defaults," each within the meaning of Bankruptcy Code section 365(b), under such Assigned Contracts.  Each non-debtor counterparty to an Assigned Contract shall be prohibited from challenging, objecting to or denying the Cure Cost payable.  The Buyer's promise to perform the obligations under the Assigned Contracts arising after the Closing shall constitute adequate assurance of its future performance of and under the Assigned Contracts, within the meaning of Bankruptcy Code sections 365(b)(1) and 365(f)(2).  All counterparties to the Assigned Contracts who did not file an objection to the Cure Costs or an objection to the assumption and assignment of the Assigned Contracts prior to the Sale Hearing, are deemed to consent to the assumption by the Debtors of their respective Assigned Contract and the assignment thereof to the Buyer upon payment of the associated Cure Cost.  The filed objections of all counterparties to the Assigned Contracts that were heard at the Sale Hearing (to the extent not withdrawn or adjourned), were considered by the Court, and are overruled on the merits with prejudice.  The Court finds that, with respect to all such Assigned Contracts, the payment of the Cure Costs in accordance with the terms of the Asset Purchase Agreement is appropriate and is deemed to fully satisfy the obligations under Bankruptcy Code section 365(b).  Accordingly, all of the requirements of Bankruptcy Code section 365(b) have been satisfied for the assumption and the assignment by the Debtors to the Buyer of each of the Assigned Contracts.  To the extent any Assigned Contract that is applicable to a Purchased Asset is not an executory contract or unexpired lease within the meaning of Bankruptcy Code section 365 and is not an Excluded Asset, it shall be transferred to the Buyer in accordance with the terms of this Order.

AA.    **Unenforceability of Anti-Assignment Provisions.**  Anti-assignment provisions in any Assigned Contract shall not restrict, limit, or prohibit the assumption, assignment, and sale

of the Assigned Contracts and are deemed and found to be unenforceable anti-assignment provisions to the maximum extent permitted by Bankruptcy Code section 365(f), and the Assigned Contracts shall have been effectively assigned to Buyer at Closing.

BB.     **Other Contracts and Leases.**     The hearing on assumption and assignment and any related Cure Costs, or rejection, for other Contracts or Leases designated for potential assumption and assignment to Buyer in the Motion, but which do not constitute Assigned Contracts, shall be adjourned to **December 27, 2016 at 1:00 p.m. CT** and noticed by the Debtors to the applicable non-Debtor counterparties.

CC.     **Credit Bid.**     Pursuant to the *Final Order (I) Granting an Expedited Hearing; (II) Authorizing the Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1), 364(E) and 507 and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (III) Granting Adequate Protection to Prepetition Secured Creditors Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507* [Docket No. 169] (the "Final DIP Order"), the DIP Lenders have an allowed superpriority claim of at least $159,705,883.00 which is secured by valid binding and perfected liens on all of the Purchased Assets.   Pursuant to a certain Assignment Agreement, the DIP Agent has transferred the right to credit bid on account of the DIP Obligations to Bidco, and Bidco is therefore entitled to credit bid on behalf of the DIP Lenders.   Further, to the extent any of the Purchased Assets constitute Remaining Asset Proceeds (as such term is used in the Order approving the Settlement Agreement [ECF No. 1004]), the right to receive the first $6,000,000 of such Remaining Asset Proceeds plus, upon payment in cash in full of the Deferred Payment Amount (as defined in the Settlement Agreement), an amount of such Remaining Asset Proceeds equal to the Deferred Payment Amount (which was $6,914,872.22 as of November 30, 2016), shall be transferred to Buyer at Closing by force of this Order and without need for any further agreement.

17

DD.   As such, upon payment in cash in full of the Deferred Payment Amount, the Credit Bidding Parties have the right to credit bid for the Purchased Assets and the Buyer (through the novation of the Asset Purchase Agreement to it) has the right to consummate the Sale reflecting the credit bid.

EE.   **Final Order/Immediate Effect.**  This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Order and expressly directs entry of judgment as set forth herein and waives the stay provided in such Bankruptcy Rules.

FF.   **Best Interest.**  Entry of this Order is in the best interests of the Debtors, the Debtors' estates, their creditors, and other parties in interest.

GG.   **Findings and Conclusions.**  The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.  To the extent any findings of facts are conclusions of law, they are adopted as such.  To the extent any conclusions of law are findings of fact, they are adopted as such.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT**:

<u>**General Provisions**</u>

1.   The Motion is granted and the relief requested therein is granted and approved in its entirety, as set forth herein.  The expedited relief is granted.  After expedited notice, the MOU agreement is approved to the extent it is a settlement.

2.   Any objections, responses, or reservations of rights to the entry of this Order or to the relief granted herein or the relief requested in the Motion, including any objections to the

proposed Cure Costs or the assumption and assignment of any Assigned Contracts, that have not

been adjourned, withdrawn, waived, or settled, or not otherwise addressed or resolved pursuant

to the express terms of this Order or a stipulation filed with the Court, if any, hereby are denied

and overruled on the merits with prejudice.

**Approval of the Sale of the Purchased Assets**

3.      The Asset Purchase Agreement, the Restated and Amended Technology License

Agreement, and all the terms and conditions thereof, are approved.  The Debtors are hereby

authorized to execute and perform the terms of the Progress Documents and CFSC Documents

they will be party to.  The Debtors are hereby authorized to execute and perform the terms of the

MOU Documents they are signatories to.

4.      Pursuant to Bankruptcy Code section 363(b), the Sale of the Purchased Assets to

the Buyer free and clear of all obligations and Encumbrances (except Permitted Encumbrances

and the Assumed Liabilities), and the transactions contemplated thereby and hereunder, are

approved in all respects.

**Sale and Transfer of the Purchased Assets**

5.      Pursuant to Bankruptcy Code sections 105, 363, and 365, and notwithstanding

any provision of the Operating Agreement (as defined in the Settlement Agreement), the Debtors

are authorized to perform their obligations under, and comply with the terms of, the Asset

Purchase Agreement and consummate the Sale and the related transactions pursuant to, and in

accordance with, the terms and conditions of the Asset Purchase Agreement and this Order.  The

Debtors are authorized to execute and deliver, and empowered to perform under, consummate,

and implement, the Asset Purchase Agreement, together with all additional instruments and

documents that the Debtors or the Buyer deem necessary or appropriate to implement the Asset

19

Purchase Agreement and effectuate the transactions contemplated therein, and to take all further actions as may reasonably be required by the Buyer for the purpose of assigning, transferring, granting, conveying, and conferring to the Buyer or reducing to Buyer's possession the Purchased Assets or as may be necessary or appropriate to the performance of the obligations as contemplated by the Asset Purchase Agreement, in each case, without any further corporate action or orders of the Court. All of the Debtors' right, title and interest in the Intercompany Note will be sold and assigned to Buyer at Closing, and, effective as of the Closing, the Debtors disclaim any right, title, or interest in the Intercompany Note. Also, for the avoidance of doubt, Bidco (or Initial Buyer in the Asset Purchase Agreement) has no right, title, or interest in the Intercompany Note, and, in the event any such right, title, or interest may exist, it is disclaimed by Bidco.

6.      Following the Closing, the Debtors or the Buyer are authorized to file a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all obligations, liabilities, and Encumbrances in the Purchased Assets of any kind or nature whatsoever, except for Permitted Encumbrances and Assumed Liabilities. Upon the Closing, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Debtors' interests in the Purchased Assets and a bill of sale transferring good and marketable title in the Purchased Assets to the Buyer free and clear of all Encumbrances, except for the Permitted Encumbrances and Assumed Liabilities.

7.      Except for the Permitted Encumbrances and Assumed Liabilities, pursuant to Bankruptcy Code sections 105(a) and 363(f), the Purchased Assets shall be transferred at Closing to the Buyer as required under the Asset Purchase Agreement, and such transfer shall be free and

clear of all Encumbrances of any Person, including, without limitation, all such Encumbrances specifically enumerated in this Order, whether arising by agreement, by statute, or otherwise and whether occurring or arising before, on, or after the Petition Date, whether known or unknown, occurring, or arising prior to such transfer.  For the avoidance of doubt, the Sale of the Purchased Assets to Buyer shall be free and clear of all Statutory Liens, which are not Permitted Encumbrances, or other security interests listed on <u>Exhibit C</u> to the Sale Order Exhibits.

8.      Effective as of Closing, (a) the transfer and assignment of the Purchased Assets and the Assigned Contracts to the Buyer pursuant to the Asset Purchase Agreement constitutes a legal, valid, and effective transfer of the Purchased Assets and the Assigned Contracts notwithstanding any requirement for approval or consent by any person, and shall vest the Buyer with all right, title, and interest of the Debtors in and to the Purchased Assets free and clear of all Encumbrances of any kind or nature whatsoever, except for the Permitted Encumbrances and Assumed Liabilities, and (b) the assumption of the Assigned Contracts and any Assumed Liabilities by Buyer constitutes a legal, valid, and effective delegation of any and all obligations, liabilities, and claims in respect thereof that first arise or accrue after the Closing to Buyer, and, other than to the extent expressly provided in this Order and/or the Asset Purchase Agreement, divests the Debtors and their officers, directors, employees, counsel, accountants, advisors, agents, consultants, stockholders, partners, members, controlling persons and other representatives of such Person of all liability with respect to the Assigned Contracts and such Assumed Liabilities.

9.      All Persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Purchased Assets to the Buyer in accordance with the Asset Purchase Agreement and this Order to the extent such action

21

violates this Order; *provided* that the foregoing restriction shall not prevent any party from appealing this Order or seeking relief from this Order in accordance with applicable law or opposing any appeal of this Order, or from enforcing its rights under this Order or relieving the Buyer of any Assumed Liability.

10.     Except as expressly permitted by the Asset Purchase Agreement, as amended hereafter, the MOU Documents or this Order, all Persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, dealers, employees, litigation claimants, contract counterparties and other creditors, holding Liens, claims, Encumbrances, and other interests of any kind or nature whatsoever, including, without limitation, rights or claims based on any Taxes or successor or transferee liability, against or in a Debtor or the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets or the operation of the Purchased Assets before the Closing, or the transactions contemplated by the Asset Purchase Agreement, including, without limitation, the Sale and the assumption and assignment of the Assigned Contracts, are forever barred, estopped, and permanently enjoined from asserting, prosecuting, commencing, continuing, or otherwise pursuing in any manner any action, claim or other proceeding of any kind, directly or indirectly, against the Buyer, its respective successors and assigns, its respective property and the Purchased Assets, such Persons' or entities' Liens, claims, or Encumbrances, including, without limitation, rights or claims based on any Taxes or successor or transferee liability.  Actions that are barred hereby include, without limitation: (i) the commencement or continuation of any action or other proceeding, (ii) the enforcement, attachment, collection, or recovery of any judgment, award,

22

decree or order, (iii) the creation, perfection, or enforcement of any Encumbrance, (iv) the

assertion of any right of setoff, subrogation or recoupment of any kind, (v) the commencement or

continuation of any action that does not comply with, or is inconsistent with, the provisions of

this Order, any actions contemplated or taken in respect hereof, or the Asset Purchase

Agreement, and (vi) the revocation, termination or failure or refusal to renew any license, permit,

registration, or governmental authorization or approval to operate any of the Purchased Assets or

conduct the businesses associated with such Purchased Assets.  Following the Closing, no holder

of an Encumbrance on, in or against the Purchased Assets shall interfere with Buyer's title to or

use and enjoyment of the Purchased Assets based on or related to such Encumbrance, or any

actions that the Debtors may take in the Debtors' cases, except for the Permitted Statutory Liens

as permitted by the MOU Documents until the Holders are paid in full.  For the avoidance of

doubt, nothing herein shall impair or otherwise affect any right under this Order or relieve the

Buyer of any Assumed Liability.

      11.    Upon the Closing, each of the Debtors' creditors and any other holder of an

Encumbrance is authorized and directed (save that Buyer will file the releases of Encumbrances

on behalf of the DIP Agent), without cost to the Debtors or the Buyer, to execute such

documents and take all other actions as may be necessary to release its Encumbrance in the

Purchased Assets, if any, as such Encumbrances may have been recorded or may otherwise exist.

Contemporaneously with Closing and in accordance with the consummated MOU Documents,

each Holder of any Permitted Statutory Liens is required by the MOU Documents to deliver into

escrow duly executed releases, in recordable form, releasing such Holder's Permitted Statutory

Liens.  If any Person or entity that has filed financing statements, mortgages, mechanic's liens,

*lis pendens*, or other documents or agreements evidencing an Encumbrance in the Debtors or the

Purchased Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Encumbrances, which the person or entity has with respect to the Debtors or the Purchased Assets or otherwise, then (i) the Debtors or the Buyer are authorized to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Debtors or the Purchased Assets, and (ii) the Buyer is authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, shall constitute conclusive evidence of the release of all Encumbrances of any kind or nature whatsoever in the Debtors or the Purchased Assets, except Permitted Encumbrances and Assumed Liabilities. Notwithstanding anything in this Order to the contrary, contemporaneously with Closing and the consummation of the MOU Documents, each Holder of any Permitted Statutory Lien(s) are required by the MOU Documents to deliver into escrow, in accordance with the MOU Documents, duly executed releases, in recordable form, releasing such Holder's Permitted Statutory Lien(s). Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement, including, without limitation, recordation of this Order and any documents to release any Encumbrances by the Debtors or the Buyer. This Order shall be binding upon and shall govern the acts of all Persons including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other Persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may

24

be required to report or insure any title or state of title in or to any of such assets or other property interests. For the avoidance of doubt, this paragraph shall not apply to Caterpillar Financial Services Corporation and Progress Rail Leasing Corporation in connection with the Railcar Leases and the CFSC Equipment Leases (each as defined below).

12. All entities that are currently, or on the Closing may be, in possession of some or all of the Purchased Assets are hereby directed to surrender possession of the Purchased Assets to the Buyer on the Closing or subsequently if directed by Buyer, unless the Buyer otherwise agrees in writing.

13. The Order is self-executing, and neither the Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Order.

14. To the extent allowed by the Bankruptcy Code, no Governmental Authority may deny, revoke, suspend, or refuse to renew any Permit, License, Mineral Tenure, or similar grant relating to the Purchased Assets sold, transferred, or conveyed to the Buyer on account of the filing or pendency of these chapter 11 cases or the transactions contemplated by the Asset Purchase Agreement and this Order.

15. The Debtors, the Buyer, and the Credit Bidding Parties shall have no obligation to proceed with the Closing until all conditions precedent to their obligations to proceed have been met, satisfied, or waived in accordance with the terms of the Asset Purchase Agreement.

**No Successor Liability**

16. Except to the extent the Buyer assumes the Assumed Liabilities, or takes the Purchased Assets subject to the Permitted Encumbrances, Buyer's purchase of the Purchased Assets shall be free and clear of, and neither the Buyer nor the Credit Bidding Parties shall have

any successor, transferee, derivative, or vicarious liabilities of any kind or character for, any Encumbrances, including under any theory of successor or transferee liability, *de facto* merger or continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated, including without limitation, with respect to any of the following: (i) any foreign, federal, state, or local revenue, pension, ERISA, Tax, labor, employment, the WARN Act, antitrust, environmental, or other law, rule, or regulation (including, without limitation, filing requirements under any such laws, rules or regulations); (ii) under any products liability law, rule, regulation, or doctrine with respect to the Debtors' liability under such law, rule, regulation, or doctrine, or under any product warranty liability law or doctrine; (iii) any employment or labor agreements, consulting agreements, severance arrangements, change-in-control agreements, or other similar agreement to which the Debtors are a party; (iv) any welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plan of the Debtors; (v) the cessation of the Debtors' operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation, or other employee benefit plans, agreements, practices and programs, obligations that might otherwise arise from or pursuant to the (a) Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967, (g) the Americans with Disabilities Act of 1990, or (h) COBRA, including, but not limited to, any and all COBRA Liabilities, Withdrawal Liabilities, or Liabilities relating to a collective bargaining agreement or Benefit Plan; (vi) environmental liabilities, debts, claims, or obligations arising from conditions first existing on or prior to the Closing (including, without

26

limitation, the presence of hazardous, toxic, polluting, or contamination substances or wastes), which may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 <u>et</u> <u>seq</u>.; (vii) any liabilities, debts, or obligations of or required to be paid by the Debtors for any Taxes of any kind for any period; (viii) any liabilities, debts, commitments, or obligations for any Taxes relating to the operation of the Purchased Assets prior to the Closing; (ix) any bulk sale law; and (x) any litigation.  The Buyer shall have no liability or obligation under the WARN Act by virtue of its purchase of assets from the Debtors.

17.    The Buyer and the Credit Bidding Parties have given substantial consideration under the Asset Purchase Agreement, which consideration shall constitute valid and valuable consideration for the releases of any potential claims of successor liability of the Buyer (or the Credit Bidding Parties) and which shall be deemed to have been given in favor of the Buyer and the Credit Bidding Parties by all holders of Encumbrances and Liabilities (except for Permitted Encumbrances and the Assumed Liabilities) in or against the Debtors, or the Purchased Assets. Without limiting the Buyer's obligation to pay and satisfy the Assumed Liabilities, upon consummation of the Sale, neither the Buyer nor the Credit Bidding Parties shall be deemed to (a) be the successor to the Debtors or their estates, (b) have, *de facto* or otherwise, merged with or into the Debtors, or (c) be a mere continuation, alter ego or substantial continuation of the Debtors or the enterprise of the Debtors, in each case, under any theory of law or equity as a result of any action taken in connection with the Asset Purchase Agreement or any of the transactions or documents ancillary thereto or contemplated thereby or in connection with the acquisition of the Purchased Assets.

**<u>Good Faith</u>**

27

18.   The transactions contemplated by the Asset Purchase Agreement are undertaken by the Buyer and the Credit Bidding Parties without collusion and in good faith, as that term is used in Bankruptcy Code section 363(m), and, accordingly, the reversal or modification on appeal of the authorization provided in this Order to consummate the transactions shall not affect the validity or enforceability of the transactions (including the assumption and assignment of any of the Assigned Contracts) approved or obligations or rights granted pursuant to the terms of this Order.  The Buyer and the Credit Bidding Parties are purchasers in good faith of the Purchased Assets and are entitled to all the protections afforded by Bankruptcy Code section 363(m).

19.   Neither Bidco (or the Credit Bidding Parties) nor the Buyer (or FerroMagnetica LLC, Magnetation, Inc., MagGlobal LLC, their respective insiders or affiliated entities, or the holders of interests in any of the foregoing or the Buyer) nor any of the Holders has colluded with or entered into an agreement with any other potential bidders or any other parties interested in the Purchased Assets (except as disclosed to the Court), and the sale price was not controlled by an agreement among potential bidders.  Therefore, there is no basis found in this order for the Debtors or any successor in interest to the Debtors' estates to bring an action against any Persons pursuant to Bankruptcy Code section 363(n) or any other section of the Bankruptcy Code.

20.   The consideration provided by the Buyer and the Credit Bidding Parties for the Purchased Assets under the Asset Purchase Agreement constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and any applicable non-bankruptcy law.  Based upon the evidence presented to the Court, the Sale may not be avoided under Bankruptcy Code section 363(n).  The Asset Purchase Agreement was not entered into, and the Sale is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code or any other applicable non-bankruptcy law.  None of the

28

Debtors, the Buyer, or the Credit Bidding Parties has entered into the Asset Purchase Agreement or any agreement contemplated thereby or is consummating the Sale with any fraudulent or otherwise improper purpose, including, without limitation, to evade any pension liabilities. No other person or entity or group of persons or entities has offered to purchase the Purchased Assets for an amount that would provide greater value to the Debtors and their estates than the value provided by the Buyer. The Court's approval of the Motion and the Asset Purchase Agreement is in the best interests of the Debtors, the bankruptcy estates of the Debtors, their creditors, and all other parties in interest.

**Release**

21.  Each Credit Bidding Party, each Debtor, and each Holder is, and Buyer, Magnetation, Inc., MagGlobal LLC, and the Agent and the Revolving Lenders are, hereby deemed to have released and discharged each Debtor and each Credit Bidding Party (and their respective Affiliates, employees (and members, directors, officers, agents and representatives as to the Credit Bidding Parties), attorneys and advisors, or their successors or assignees) from any and all claims and causes of action (except for claims or causes of action under or to enforce this Order, the Asset Purchase Agreement, or any documents ancillary thereto or entered into as part of Buyer's acquisition of the Purchased Assets), whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors' or Credit Bidding Parties' actions or omissions in connection with or in any way relating to the Asset Purchase Agreement or this Order, including the negotiation and execution thereof and the consummation of the transactions contemplated thereby.

**Assumption and Assignment of Assigned Contracts**

22.     Pursuant to Bankruptcy Code sections 105(a), 363, and 365 and subject to and conditioned upon the Closing of the Sale, the Debtors' sale, assumption and assignment to the Buyer of the Assigned Contracts is approved, and the requirements of Bankruptcy Code section 365(b)(1) with respect thereto are satisfied.

23.     The Debtors are authorized in accordance with Bankruptcy Code sections 105(a) and 365 to (i) assume and assign to the Buyer, effective as of the Closing, as provided by, and in accordance with, the Asset Purchase Agreement, the Assigned Contracts free and clear of all Encumbrances of any kind or nature whatsoever, other than the Permitted Encumbrances and Assumed Liabilities, and (ii) execute and deliver to the Buyer such documents or other instruments as the Buyer reasonably deems necessary to assign and transfer the Assigned Contracts to the Buyer.

24.     At Closing, the Assigned Contracts shall be transferred and assigned to, pursuant to the Asset Purchase Agreement, and thereafter remain in full force and effect for the benefit of, the Buyer, notwithstanding any provision in any such Assigned Contract (including, but not limited to, those of the type described in Bankruptcy Code sections 365(b)(2), (e)(1), and (f)) that prohibits, restricts, or conditions such assignment or transfer.  The Debtors shall be relieved from any further liability with respect to the Assigned Contracts after such assumption and assignment to the Buyer.  The Debtors may assign each Assigned Contract in accordance with Bankruptcy Code sections 363 and 365, and no sections or  provisions of the Assigned Contracts that purport to (a) prohibit, restrict, or condition the Debtors' assignment of the Assigned Contracts, including, but not limited to, the conditioning of such assignment on the consent of the non-Debtor counterparty to such Assigned Contract; (b) authorize the termination, cancellation, or

30

modification of the Assigned Contract based on the filing of a bankruptcy case, the financial condition of the Debtors or similar circumstances; (c) declare a breach or default as a result of a change in control in respect of the Debtors; or (d) provide for additional payments, penalties, conditions, renewals, extensions, charges, or other financial accommodations (for the avoidance of doubt, the Mag Entities Support Agreement does not constitute an Assigned Contract, and this provision shall not alter Buyer's obligation to cancel the Intercompany Note in accordance with the terms of the Mag Entities Support Agreement) in favor of the non-Debtor party to the Assigned Contract, or modification of any term or condition upon the assignment of an Assigned Contract or the occurrence of the conditions set forth in subsection (b) above, shall have any force and effect, and such provisions constitute unenforceable anti-assignment provisions under Bankruptcy Code § 365(f) and/or are otherwise unenforceable under Bankruptcy Code § 365(e).

25.    Except as provided in Paragraph 39 of this Order concerning any Assigned Contracts that are unexpired leases of non-residential real property pertaining to Plant 4 (the "Plant 4 Leases"), the entry of this Order constitutes the consent of the non-Debtor parties to the Assigned Contracts to the assumption and assignment of such agreements without the necessity of obtaining such party's consent, written or otherwise, to such assumption or assignment. Except as provided in Paragraph 39 of this Order concerning the Plant 4 Leases, all Assigned Contracts shall remain in full force and effect, without existing default(s), nor shall there exist any event or condition which, with the passage of time or giving of notice, or both, would constitute such a default, subject only to payment of the applicable Cure Cost, if any, in accordance with the Asset Purchase Agreement.

26.    There shall be no rent accelerations, assignment fees, increases or any other fees charged to Buyer, their successors or assigns, or the Debtors as a result of the assumption and

31

assignment of the Assigned Contracts.

27.     The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of the Debtors' and the Buyer's rights to enforce every term and condition of the Assigned Contracts.

28.     Except as provided in Paragraph 39 of this Order concerning the Plant 4 Leases, the Buyer has provided adequate assurance of its future performance under the relevant Assigned Contracts within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code (including section 365(b)(3) to the extent applicable), and all other requirements and conditions under Bankruptcy Code sections 363 and 365 for the assumption by the Debtors and assignment to the Buyer of each Assigned Contract have been satisfied.

29.     Except as provided in Paragraph 39 of this Order concerning the Plant 4 Leases, all defaults and all other obligations or liabilities under any Assigned Contract occurring, arising, or accruing prior to the date of the assignment or transfer to the Buyer shall be deemed cured or satisfied upon payment by the Buyer of the Cure Cost on Exhibit B to the Sale Order Exhibits, or any other Cure Cost reached by written agreement with the Buyer, and, without limiting the foregoing, no effect shall be given to any default of the type set forth in Bankruptcy Code section 365(b)(2), or the type of default concerning an unexpired lease of real property described in Bankruptcy Code section 365(b)(1) whether or not such Assigned Contract is an executory contract or unexpired lease within the meaning of Bankruptcy Code section 365.  The Cure Costs listed on Exhibit B to the Sale Order Exhibits, or any other Cure Cost reached by written agreement with the Buyer, reflect the sole amounts necessary under Bankruptcy Code section 365(b) to cure all monetary defaults under the Assigned Contracts, and no other amounts are or

32

shall be due to the non-Debtor parties in connection with the assumption by the Debtors and assignment to the Buyer of the Assigned Contracts.

30.   Except as provided in the Asset Purchase Agreement or this Order, after the Closing, the Debtors and their estates shall have no further liabilities or obligations with respect to any Assigned Contract, and all holders of such claims first arising from and after Closing under any Assigned Contract are forever barred, estopped and permanently enjoined from raising or asserting against the Debtors, or the Buyer or the property of any of such parties, any assignment fee, default, breach, claim, pecuniary loss, liability, or obligation (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, known or unknown, liquidated or unliquidated, senior or subordinate) arising by reason of the assumption, assignment and/or Closing.  Notwithstanding the foregoing, pursuant to the terms of the Asset Purchase Agreement, Buyer shall be liable for all obligations and liabilities first arising and accruing after the Closing under the Assigned Contracts (and Cure Costs), all of which shall constitute Assumed Liabilities, and the Debtors shall not be liable for any such obligations or liabilities.

31.   Nothing in this Order, the Motion, or any notice or any other document is or shall be deemed an admission by the Debtors that any contract or lease is an executory contract or unexpired lease.

32.   Except for the Assumed Liabilities and Cure Costs that will be paid as provided in the Asset Purchase Agreement, and except as provided in Paragraph 39 of this Order concerning the Plant 4 Leases, neither the Buyer, nor any of its successors or assigns, or any of their respective affiliates shall have any liability for any Encumbrance that arose or occurred prior to the Closing, or otherwise is assertable against the Debtors or is related to the Purchased Assets

33

prior to the Closing. The Buyer is not and shall not be deemed a "successor" to the Debtors or their estates, have, *de facto* or otherwise, merged with or into the Debtors, or be a mere continuation or substantial continuation of the Debtors or the enterprise of the Debtors under any theory of law or equity as a result of any action taken in connection with the Asset Purchase Agreement or any of the transactions or documents ancillary thereto or contemplated thereby or in connection with the acquisition of the Purchased Assets.

**CFSC and Progress Rail**

33.     Contemporaneously with and conditioned upon the Closing and the execution and consummation of documentation required by the Letter of Intent between Progress Rail Leasing Corporation ("Progress Rail") and the Buyer, a copy of which is attached as Exhibit D to the Sale Order Exhibits, (such documentation, including documentation required by the side agreement between CFSC and the Buyer dated December 9, 2016, the "Progress Documents," which, for the avoidance of doubt, shall include a subordination agreement for the benefit of Progress Rail), the Debtors have agreed to assume and assign to Buyer certain leases with Progress Rail or Caterpillar Financial Services Corporation ("CFSC," and together with Progress Rail, "CAT"), concerning 780 railcars (the "Railcar Leases")[2] as Assigned Contracts.

34.     Upon the Closing and the execution and consummation of the Progress Documents, the Debtors, the Buyer and CAT have agreed that:

(a)     CAT shall cancel or release that certain Irrevocable Standby Letter of Credit issued by JPMorgan Chase Bank, N.A. (as described in the Letter of Intent) (the "Letter of

---

[2] The "Railcar Leases" means the (i) Master Tax Lease for Railcars, by and between CFSC, as Lessor and Mag Pellet LLC ("Mag Pellet"), as Lessee, pursuant to which CFSC and Mag Pellet entered into (a) Lease Schedule No. 1 dated as of June 6, 2014; (b) Lease Schedule No. 2 dated June 30, 2014; (c) Lease Schedule No. 3 dated July 31, 2014; and (d) Lease Schedule No. 4 dated August 27, 2014, and (ii) Master Tax Lease for Railcars dated as of March 10, 2014, by and between Progress Rail, as Lessor and Mag Pellet, as Lessee, pursuant to which Progress Rail and Mag Pellet entered into Lease Schedule No. 1 dated as of August 22, 2014.

34

Credit") in a manner satisfactory to JPMorgan Chase Bank, N.A. and any other security, credit enhancement, financial assurance, or guaranty provided by or on behalf of the Debtors in favor of CAT concerning the Railcar Leases, following which CAT shall have no further rights or claims under the Letter of Credit or any other security, credit enhancement, financial assurance, or guaranty provided by or on behalf of the Debtors in favor of CAT concerning the Railcar Leases (provided, for the avoidance of doubt, the forgoing releases shall not include CAT's rights and interests in the underlying railcars);

(b)     the Debtors shall (i) provide Progress Rail with all applicable information necessary for Progress Rail to register the railcars in the Universal Machine Language Equipment Register ("UMLER"), including, without limitation, any necessary pass keys, logins or passwords; and (ii) assign to Progress Rail the Debtors' rights in the "MGPX" reporting marks owned or otherwise held in the name of Debtors, which are registered on UMLER; and

(c)     Buyer has agreed to pay Cure Costs to Progress Rail with respect to the Railcar Leases in the amount of $100,000.

35.     If the Progress Documents are not entered into and/or consummated, the Debtors, the Buyer and CAT have agreed that the Railcar Leases shall not be Assigned Contracts and CAT, the Buyer, the Debtors and the Credit Bidding Parties shall be returned to the *status quo ante* with respect to the Letter of Credit and any other security, credit enhancement, financial assurance, or guaranty provided by or on behalf of the Debtors in favor of CAT concerning the Railcar Leases; the Railcar Leases; and UMLER and "MGPX" reporting marks such that this Order shall be of no effect with respect thereto or have no  affect thereon.

36.     Contemporaneously with and conditioned upon the Closing and the execution and consummation of definitive documentation (the "CFSC Documents"), the Debtors have agreed to

assume and assign to Buyer certain leases with CFSC listed on <u>Exhibit B</u> to the Sale Order Exhibits concerning miscellaneous equipment (the "<u>CFSC Equipment Leases</u>," which excludes the Railcar Leases) as Assigned Contracts.   Upon the Closing and the execution and consummation of the CFSC Documents, the Debtors, the Buyer and CFSC have agreed that: (a) CFSC shall cancel or release any letter of credit (for the avoidance of doubt, CFSC shall not cancel or release the Letter of Credit except upon the execution and consummation of the Progress Documents), security, credit enhancement, financial assurance, or guaranty provided by or on behalf of the Debtors in favor of CFSC concerning the CFSC Equipment Leases, following which CFSC shall have no further rights or claims under such letter of credit, security, credit enhancement, financial assurance, or guaranty provided by or on behalf of the Debtors in favor of CFSC concerning the CFSC Equipment Leases (provided, for the avoidance of doubt, the forgoing releases shall not include CFSC's rights and interests in the underlying equipment), and (b) the Cure Costs and any post-Closing payments under the CFSC Equipment Leases shall be set in amount and payable to CFSC over time as agreed by Buyer and CFSC.

37.    If the CFSC Documents are not entered into and/or consummated, the Debtors, Buyer and CFSC have agreed that the Equipment Leases shall not be Assigned Contracts and CFSC, the Buyer, the Debtors and the Credit Bidding Parties shall be returned to the *status quo ante* with respect to any letter of credit, security, credit enhancement, financial assurance, or guaranty provided by or on behalf of the Debtors in favor of CFSC concerning the Equipment Leases; and the Equipment Leases such that this Order shall be of no effect with respect thereto or have no affect thereon.

38.    Upon the Closing and the execution and consummation of the Progress Documents and the CFSC Documents, the Debtors and CAT have agreed that the *Notice of*

*Rejection of Executory Contracts and Unexpired Leases*, dated November 2, 2016 [ECF No. 1070], and the *Objection of Caterpillar Financial Services Corporation and Progress Rail Leasing Corporation to the Notice of Rejection of Executory Contracts and Unexpired Leases*, dated November 16, 2016 [ECF No. 1107] shall be deemed withdrawn.

**MOU Documents**

39.     The Debtors are authorized to enter into and consummate the MOU Documents. All parties to the MOU or MOU Documents agree to negotiate and execute the MOU Documents and to do so expeditiously in order that Closing can occur as promptly as practicable, and that the Closing and the enforceability of the MOU Documents are to occur concurrently.   For the avoidance of doubt and notwithstanding anything in this Order or the Asset Purchase Agreement to the contrary, all rights and defenses of the Holders, the non-Debtor Parties to the Plant 4 Leases and Plant 2 Leases,[3] the Debtors, the Buyer and the Credit Bidding Parties concerning assumption and assignment by the Debtors of the Plant 4 Leases to the Buyer as well as all other claims, liens and encumbrances asserted by the Holders related to any of the Purchased Assets are reserved and preserved and not affected by the terms of this Order until the Asset Purchase Agreement is amended, as described in Paragraph I hereof, and the applicable MOU Documents are executed by the Holders, the Buyer, the Debtors and FerroMagnetica (and, upon execution of the MOU Documents, the Plant 4 Leases are deemed for purposes of this Order to be Assigned Contracts subject to all provisions of this Order as if this Paragraph 39 was not included in this Order).   If the applicable MOU Documents are not executed by the Holders, the Buyer, the Debtors and FerroMagnetica, this Order shall have no affect or effect upon any claims, liens and

---

[3] The "Plant 2 Leases" include the leases pertaining to the property located at or around 27692 County Road 10, Bovey, Minnesota, but described with more particularity by each of the Holders in pleadings each of the Holders has filed in the Minnesota State District Court Action, Court File No. 31-CV-16-674.

encumbrances asserted by the Holders related to any of the Purchased Assets and, further, the

rights and defenses of the Debtors, FerroMagnetica, the Holders, the Plant 4 Lessors, the Buyer

and the Credit Bidding Parties shall be as though this Order had not been issued by this Court,

and, further, the Buyer will not consummate the Closing on the Asset Purchase Agreement and

may, instead, contact the Court to schedule a separate hearing before the Court concerning the

claims, liens and encumbrances asserted by the Holders related to any of the Purchased Assets so

that the Court can address such claims, liens and encumbrances. In the event that the Plant 4

Leases become Assigned Contracts, as provided under this Paragraph 39, this Order resolves the

Debtors' motion to assume unexpired leases filed at Docket No. 892.

**Additional Provisions**

40. Notwithstanding anything to the contrary in this Order or the Asset Purchase

Agreement, (i) the Sellers shall not waive the closing condition in Section 10.03 that the

Deferred Payment Amount (as defined in the Settlement Agreement) shall have been paid in full

in cash without the written consent of JPMorgan Chase Bank, N.A., Associated Bank, N.A. and

BMO Harris Bank N.A. (collectively, the "Agent and the Revolving Lenders") and (ii) ERP Iron

Ore, for itself or on its behalf, has agreed it will not execute any agreement with the State of

Minnesota with respect to letters of credit issued under the Credit Agreement, dated as of May

20, 2013, as amended, among the Sellers, the Agent and the Revolving Lenders, unless ERP Iron

Ore's agreement provides that the applicable letter(s) of credit will be returned, undrawn after

the entry of this Order, by the respective beneficiary for cancellation or such other treatment as is

agreed to by the Agent and the Revolving Lenders.

41. Nothing in this Order or the Asset Purchase Agreement releases, nullifies,

precludes or enjoins the enforcement of any environmental liability to a governmental unit in the

United States that any entity would be subject to as the owner or operator of property after the date of entry of this Order; *provided*, *however*, that nothing herein shall subject the Buyer to any liability to a governmental unit in the United States for any monetary fines or penalties for days of violation prior to Closing.  Nothing in this Order or the Asset Purchase Agreement waives any obligation of the Debtors or the Buyer, as applicable, to comply with applicable legal requirements under police or regulatory law governing the transfer or assignment or disposal of, or compliance with, any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval.

42. **Itasca County**.  The Debtors are authorized to enter into and consummate to be agreed definitive documentation that they will be party to that is contemplated by the Settlement Term Sheet between Itasca County, the Debtors and the Buyer, a copy of which is attached as Exhibit F to the Sale Order Exhibits (such agreed definitive documentation, the "Itasca County Documents").  Upon the consummation of the Itasca County Documents, the Plant 2 Lease (as defined in the Settlement Term Sheet with Itasca County), as amended, shall constitute an Assumed Lease and Assigned Contract for any and all purposes in the Asset Purchase Agreement or this Order.  All parties to the Itasca County Documents agree to negotiate, enter into and/or consummate the Itasca County Documents and to do so expeditiously in order that Closing can occur as promptly as practicable, and that the enforceability of the Itasca County Documents is conditioned upon and occurs concurrently with the Closing.  Notwithstanding anything in this Order or the Asset Purchase Agreement to the contrary, in the event the Itasca County Documents are not entered into and/or consummated, Itasca County's, Debtors', Buyer's and Credit Bidding Parties' rights and defenses concerning the subject matter of the Settlement Term Sheet, as it relates to Itasca County, are reserved and preserved and not affected by the

terms of this Order, Itasca County, the Buyer, the Debtors, and the Credit Bidding Parties agree

they shall be returned to the status quo ante with respect thereto such that this Order shall have

no affect or effect thereon, and the Debtors will contact the Court to schedule a separate hearing

on the Motion so that the Court can address any issues with respect to the subject matter of the

Term Sheet, as it relates to Itasca County.

43.   **White County**.  The Debtors are authorized to enter into and consummate to be

agreed definitive documentation that they will be party to that is contemplated by the Settlement

Term Sheet between White County, the Debtors and the Buyer, a copy of which is attached as

Exhibit G to the Sale Order Exhibits (such agreed definitive documentation, the "White County

Documents").  All parties to the White County Documents agree to negotiate and make a good

faith effort to enter into and/or consummate the White County Documents and to do so

expeditiously in order that Closing can occur as promptly as practicable, and that the

enforceability of the White County Documents is conditioned upon and occurs concurrently with

the Closing.  Notwithstanding anything in this Order or the Asset Purchase Agreement to the

contrary, in the event the White County Documents are not entered into and/or consummated,

White County's, the Debtors', the Buyer's and the Credit Bidding Parties' rights and defenses

concerning the subject matter of the Settlement Term Sheet, as it relates to White County, are

reserved and preserved and not affected by the terms of this Order, White County, the Buyer, the

Debtors, and the Credit Bidding Parties agree they shall be returned to the status quo ante with

respect thereto such that this Order shall have no affect or effect thereon, and the Debtors will

contact the Court to schedule a separate hearing on the Motion so that the Court can address any

issues with respect to the subject matter of the Settlement Term Sheet, as it relates to White

County.  For the avoidance of doubt, the Debtors, White County, the Buyer, and the Credit

Bidding Parties agree that if the relevant parties fail to enter into the White County Documents, this Order shall be null and void as to any statement relating to any documentation relating to or arising from the White County, Indiana Taxable Economic Development Revenue Bonds, Series 2013, and/or taxes owed to White County regarding the property of the Debtors in White County, Indiana.

44. **State of Minnesota**. The Debtors are authorized to enter into and consummate to be agreed definitive documentation that they will be party to that is contemplated by the Term Sheet between the State of Minnesota, the Debtors and the Buyer, a copy of which is attached as Exhibit H to the Sale Order Exhibits (such agreed definitive documentation, the "State Documents"). All parties to the State Documents agree to negotiate, enter into and/or consummate the State Documents and to do so expeditiously in order that Closing can occur as promptly as practicable, and that the enforceability of the State Documents is conditioned upon and occurs concurrently with the Closing. Notwithstanding anything in this Order or the Asset Purchase Agreement to the contrary, in the event the State Documents are not entered into and/or consummated, the State of Minnesota's, Debtors', Buyer's and Credit Bidding Parties' rights and defenses concerning the subject matter of the Term Sheet, as it relates to the State, are reserved and preserved and not affected by the terms of this Order, the State of Minnesota, the Buyer, the Debtors, and the Credit Bidding Parties shall be returned to the status quo ante with respect thereto such that this Order shall have no affect or effect thereon, and the Debtors will contact the Court to schedule a separate hearing on the Motion so that the Court can address any issues with respect to same.

45. This Order and the Asset Purchase Agreement shall be binding in all respects on all Persons and entities, including, but not limited to, the Debtors and their affiliates, the Buyer,

41

the Credit Bidding Parties, AK Steel Corporation, JPMorgan Chase Bank, N.A. (in its capacity
as Prepetition Revolving Agent, or otherwise), the holders of Statutory Liens, the State of
Minnesota, Itasca County, MagGlobal LLC, Magnetation, Inc. and their affiliates, and the
respective successors and assigns of the foregoing, and all known and unknown creditors of and
all holders of equity security interests in any Debtor, including any holders of Encumbrances, all
counterparties to the Assigned Contracts, all counterparties to contracts that are not assumed or
assigned, and any trustees appointed in the Debtors' chapter 11 cases or upon a conversion to
cases under chapter 7 of the Bankruptcy Code, and this Order shall not be subject to amendment
or modification and the Asset Purchase Agreement shall not be subject to rejection.  Nothing
contained in any chapter 11 plan confirmed in any Debtor's bankruptcy case, any order
confirming any such chapter 11 plan, or any other order in these chapter 11 cases shall alter,
conflict with, or derogate from, the provisions of the Asset Purchase Agreement or this Order.
The Buyer shall be authorized, as of the Closing, to operate under any Transferred
Permits/Licenses and, to the greatest extent available under applicable law and to the extent
provided for under the Asset Purchase Agreement, all such Transferred Permits/Licenses are
deemed to and shall have been transferred to the Buyer as of the Closing free and clear of any
and all Encumbrances except Assumed Liabilities and Permitted Encumbrances.  All Transferred
Permits/Licenses shall remain in place for the Buyer's benefit until such Transferred
Permits/Licenses are recorded in the name of the Buyer.  This Order shall inure to the benefit of
the Debtors, their estates, Buyer, the Credit Bidding Parties, and the respective permitted
successors and assigns of the foregoing.

46.    To the extent applicable, the automatic stay pursuant to Bankruptcy Code section
362 is hereby lifted with respect to the Debtors to the extent necessary, without further order of

42

the Court (a) to allow Bidco or the Buyer to give the Debtors any notice provided for in the Asset Purchase Agreement, and (b) to allow Bidco or the Buyer to take any and all actions permitted by the Asset Purchase Agreement.

47.     No bulk sales law or similar law shall apply in any way to the transactions contemplated by the Sale, the Asset Purchase Agreement, the Motion, or this Order. The assignment, transfer and/or sale of the Purchased Assets: (i) is in exchange for the Purchase Price and the assumption of Assumed Liabilities, and so no withholding of U.S. federal income Tax pursuant to Sections 1441 or 1442 of the Internal Revenue Code is required, and (ii) constitutes a casual sale or occasional sale, and is exempt from state sales and use Tax or similar Taxes.

48.     This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, (i) compel delivery of the Purchased Assets to the Buyer, (ii) interpret, implement, and enforce the provisions of this Order and the Asset Purchase Agreement and all amendments hereto, and any waivers and consents thereunder, (iii) protect the Buyer, the Credit Bidding Parties, their respective affiliates, or any agent of the foregoing, against any Encumbrances against the Debtors or the Purchased Assets of any kind or nature whatsoever, except for the Permitted Encumbrances and Assumed Liabilities, (iv) decide any disputes concerning this Order and the Asset Purchase Agreement or the rights and duties of the parties hereunder or thereunder or any issues relating to the Asset Purchase Agreement, including, but not limited to, the status, nature, and extent of the Purchased Assets and any Assigned Contracts and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the assets free and clear of all Encumbrances, except for Permitted Encumbrances and Assumed Liabilities, and (v) enforce the injunctions set forth herein.

49. No brokers were involved in consummation of the Sale, and no brokers' commissions are due to any person in connection with the Sale; *provided*, *however*, that this provision does not impact any transaction or other fees due to investment bankers or financial advisors employed by the Debtors or certain of their creditors for which the Debtors may be obligated to pay in accordance with an engagement letter with such professional(s).

50. To the extent there is any inconsistency between the terms of this Order and the terms of the Asset Purchase Agreement or any other document contemplated by the Asset Purchase Agreement or this Order, the terms of this Order shall govern.

51. The failure to specifically include any particular provision of the Asset Purchase Agreement or the Restated and Amended Technology License Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that all the terms and conditions of the Asset Purchase Agreement and the Restated and Amended Technology License Agreement be authorized and approved in their entirety.

52. The Asset Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further notice or order of the Court.

53. Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d), this Order shall not be stayed for fourteen (14) days after its entry and shall be effective immediately upon entry, and the Debtors and the Buyer are authorized to close the transactions contemplated by the Asset Purchase Agreement immediately upon entry of this Order. Time is of the essence in closing the transactions referenced herein, and the Debtors, Bidco, and the Buyer intend to close the transactions as soon as practicable. This Order is a final, appealable order and the period in which an appeal must be filed shall commence upon the entry of this Order. Any party

44

objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being foreclosed as moot. Notwithstanding anything contained in this Order, the Buyer shall not be required to consummate any of the transactions contemplated by the Asset Purchase Agreement or the Mag Entities Support Agreement in the event this Order or this Court's authorization to consummate any of those transactions pursuant to the terms of this Order shall have been (i) reversed, (ii) stayed, or (iii) modified in any material respect prior to the Closing (other than with the prior written consent of Buyer).

54.     The provisions of the Asset Purchase Agreement and this Order may be specifically enforced in accordance with the Asset Purchase Agreement notwithstanding the appointment of any chapter 7 or chapter 11 trustee after the Closing.

55.     Headings utilized in this Order are for convenience of reference only, and do not constitute a part of this Order for any other purpose.

56.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

57.     The provisions of this Order are nonseverable and mutually dependent.

58.     Notwithstanding anything to the contrary herein, all findings of fact, conclusions of law, and the Order as set forth herein are found, determined, ordered, adjudged and decreed, as applicable, solely to the fullest extent allowed by the Bankruptcy Code and applicable non-bankruptcy law and consistent with due process.

Dated:  December 21, 2016        _____
                                /e/ William J. Fisher
                                William J. Fisher
                                United States Bankruptcy Judge

45

# EXHIBIT B

Case 15-50307   Doc 135   Filed 12/20/16   Entered 12/20/16 18:29:34   Desc Main
Document      Page 404 of 453

# EXHIBIT D

**Progress Rail Letter of Intent**

December 5, 2016

Tom Clarke
ERP Iron Ore, LLC
Via email: tom.clarke@kissito.org

Re: Proposal to Lease Railcars

Dear Tom:

This letter (this "Letter") is intended to summarize the principal terms of a proposal by Progress Rail Leasing Corporation ("Progress Rail") to lease railcars to ERP Iron Ore, LLC ("ERP"). Entry into the Definitive and Ancillary Agreements (as defined below) is referred to throughout this Letter as the "Transaction" and Progress Rail and ERP are referred to collectively as the "Parties."

1.     Existing Lease of Railcars.  Progress Rail and Caterpillar Financial Services Corporation ("CFSC") are parties to certain existing railcar leases with Mag Pellet LLC (together with Magnetation LLC and the other, affiliated entities in bankruptcy, collectively, the "Debtors" and the existing railcar leases, collectively, the "Existing Leases"), under which Mag Pellet LLC leases 780 railcars (the "Cars") from Progress Rail and CFSC.

2.     Replacement Lease of Railcars.  Subject to the satisfaction of each of the conditions described in paragraph 7 of this Letter (the "Conditions"), the Parties will enter into a Master Railcar Lease Agreement (Full Service) and a Schedule 1 thereto, all in a form satisfactory to Progress Rail in its sole discretion (and agreed to by ERP), for the lease of the Cars (the "Replacement Lease").  The Replacement Lease will provide for the following, among other things:

(a)     Term.  A lease term commencing immediately upon the Parties' execution of the Replacement Lease at the closing of the Sale (as defined below) (the "Effective Date") and terminating December 31, 2023, subject to automatic renewal, as set forth in the Replacement Lease (the "Term");

(b)     Rent.  A monthly rental rate for all of the Cars, as follows:

| Period of the Term | Monthly Rental Rate |
|---|---|
| Effective Date through June 30, 2017 | |
| July 1, 2017 through December 31, 2017 | |
| January 1, 2018 through December 31, 2018 | |
| January 1, 2019 through December 31, 2019 | |
| January 1, 2020 through December 31, 2020 | |
| January 1, 2021 through December 31, 2023 | |

*During the period of the Term from the Effective Date through June 30, 2017, the Monthly Rental Rate shown above assumes that the Cars will be stored at ERP's expense and otherwise subject to all terms of the Replacement Lease, and no Car will be used during such period.  In the event any Car is used during such period, ERP will pay                    for each Car that is moved or used in such month, except

that if a Car is moved as the result of a Sub-Lease as set forth in Sub-Paragraph 2(d), the monthly rental rate for each sub-leased Car shall be $

(c) <u>Re-Lease or Sale</u>. At any time during the first three years of the Term, Progress Rail will have the right to market the Cars and, if another party offers to lease or purchase the Cars, to re-lease or sell up to 300 of the Cars on commercially reasonable terms. Progress Rail will grant ERP, in writing, a right of first refusal to buy or lease such Cars.

(d) <u>Sublease</u>. ERP will have the right to sub-lease the Cars to any of ERP's affiliated entities.

(e) <u>Promissory Note</u>. As security for its obligations under the Replacement Lease, ERP will execute and deliver a Promissory Note payable to Progress Rail in the amount of $5,000,000, together with a Security Agreement and satisfactory documentation (the "<u>Lien Documentation</u>") evidencing Progress Rail's first priority perfected lien (the "<u>Progress Rail Lien</u>") on substantially all assets to be purchased by ERP as part of the Sale (as defined below) (the "<u>Purchased Assets</u>"), including the assets of the Reynolds, Indiana facility, but excluding Plant 4 in Grand Rapids, Minnesota. ERP will execute and deliver the Promissory Note, Security Agreement, and Lien Documentation contemporaneously with the closing of the Sale (as defined below) and the consummation of the Transaction. No later than March 31, 2017, ERP will refinance at least $2,500,000 of the Promissory Note in the form of a letter of credit in favor of Progress Rail, issued by a financial institution satisfactory to Progress Rail in its reasonable discretion.

3.    <u>Lien Information</u>. As soon as reasonably practicable after the execution of this Letter, ERP will submit to Progress Rail a complete listing of all assets to be covered by the Lien (subject to execution of a confidentiality agreement acceptable to the Debtors if necessary), together with a list of all other creditors (or description thereof if unknown) that have, or will have, liens on such assets and the amounts and relative priorities of such liens.

4.    <u>Letter of Credit</u>. The Debtors' obligations under the Existing Leases are secured by that certain Irrevocable Standby Letter of Credit issued by JPMorgan Chase Bank, N.A. dated as of June 5, 2014 in the original amount of $7,500,000, as amended by that certain Amendment No. 1 dated as of June 9, 2014 and as further amended and reduced to $5,000,000 by that certain Amendment No. 2 dated as of January 9, 2015 (as amended, the "<u>LOC</u>") under which CFSC is the beneficiary. CFSC has previously drawn $664,314.73 under the LOC, leaving a remaining amount of $4,335,685.27. CFSC and ERP will execute a side agreement by which CFSC will agree, (i) not to draw on the LOC (or any other security which CFSC holds to secure the Existing Leases, if any) prior to the termination of this Letter pursuant to Section 9 hereof, and (ii) to cancel or release the LOC (and any other security which CFSC holds to secure the Existing Leases, if any) at the closing of the Sale, following which CFSC shall have no further rights or claims under such LOC.

5.    <u>Rights of First Refusal</u>. In the Replacement Lease, ERP will grant to Progress Rail, in writing, a right of first refusal to:

(a)    lease railcars, locomotives and/or maintenance of way equipment to ERP and all of ERP's affiliated entities, including operations in Canada, on commercially reasonable terms (the "<u>Leasing Right of First Refusal</u>"); and

2

102006087\V-2

(b)　　sell, on commercially reasonable terms, (1) scrap metal owned or managed by Progress Rail and its affiliates (including Progress Rail Services Corporation) to be bundled by ERP and/or its affiliates into its sales to steel mills (the "Scrap Metal Right of First Refusal"); and (2) trackworks related goods and services offered by Progress Rail and its affiliates to ERP and all of ERP's affiliated entities, including operations in Canada (the "Trackworks Right of First Refusal" and, together with the Leasing Right of First Refusal and the Scrap Metal Right of First Refusal, the "Rights of First Refusal").

6.　　Definitive and Ancillary Agreements. As soon as reasonably practicable after the execution of this Letter, the Parties shall commence to negotiate the Replacement Lease, Promissory Note, Security Agreement, Lien Documentation, Rights of First Refusal, and any other ancillary agreements to document the Transaction (the "Definitive and Ancillary Agreements"). The Definitive and Ancillary Agreements will contain customary terms and conditions, subject to modification based upon the fact that ERP is a non-operating company.

7.　　Conditions. The closing of the Transaction is subject to the following Conditions:

(a)　　Progress Rail's satisfactory completion of due diligence of ERP, including the review of the assets to be subject to the Lien contemplated by Section 2(e) above and completion of lien searches;

(b)　　Progress Rail's management and credit committee approval of the Transaction;

(c)　　Entry of a final order of the Bankruptcy Court approving the sale of the Debtors' assets to ERP (the "Sale"), including the assumption of the Existing Leases by Mag Pellet LLC and the assignment of the Existing Leases to ERP, both effective as of the closing of the Sale;

(d)　　the full execution of the Definitive and Ancillary Agreements effective as of the closing of the Sale;

(e)　　Assignment to ERP or execution of a railcar storage agreement with Itasca County for the Cars effective as of the closing of the Sale;

(f)　　Execution of documentation whereby the DIP lenders in the Debtors' cases (the "DIP Lenders") agree to subordinate their lien in the Purchased Assets to the Progress Rail Lien.

(g)　　Payment of $100,000 in cash by ERP to Progress Rail, at the closing of the Sale, which amount shall be the agreed total cure costs for assumption and assignment of the Existing Leases (and no attorneys' fees or expenses will be paid);

(h)　　Termination of the Existing Leases by consent of the Parties effective as of the closing of the Sale;

(i)　　Execution and performance of the side agreement contemplated in paragraph 4; and

(j)　　Closing of the Sale.

3

8.      Due Diligence. From and after the date of this Letter, ERP will authorize its management to allow Progress Rail and its advisors full access to the facilities, records, key employees, customers, suppliers and advisors of ERP for the purpose of completing Progress Rail's due diligence review of the assets (subject to execution of a confidentiality agreement acceptable to the Debtors if necessary) and ERP. The due diligence investigation will include, but is not limited to, a complete review of the financial, legal, tax, environmental, intellectual property and labor records and agreements of ERP, and any other matters as Progress Rail's accountants, tax and legal counsel, and other advisors deem relevant.

9.      Termination. Unless otherwise agreed, this Letter will automatically terminate and be of no further force and effect upon the earlier of (i) full execution of the Definitive and Ancillary Agreements, (ii) mutual agreement of the Parties to terminate, and (iii) December 31, 2016, unless extended by consent of the Parties. Notwithstanding anything in the previous sentence, paragraphs 12, 13 and 14 shall survive the termination of this Letter and the termination of this Letter shall not affect any rights any Party has with respect to the breach of this Letter by another Party prior to such termination.

10.     Bid Expiration. Unless otherwise agreed, this offer will remain in effect until 5:00 p.m. Central time, December 7, 2016, unless accepted or rejected by ERP, or withdrawn by Progress Rail prior to that time.

11.     GOVERNING LAW. THIS LETTER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH INTERNAL LAWS OF THE STATE OF ALABAMA, WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF ALABAMA OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF LAWS OF ANY JURISDICTION OTHER THAN THOSE OF THE STATE OF ALABAMA.

12.     Confidentiality. This Letter is confidential to the Parties and their representatives, but may be shared by ERP with the parties to definitive documentation relating to the Sale pursuant to Federal Rule of Evidence 408 and filed with the Bankruptcy Court as part of the approval of the Sale.

13.     No Third Party Beneficiaries. Except as specifically set forth or referred to herein, nothing herein is intended or shall be construed to confer upon any person or entity other than the Parties and their successors or assigns, any rights or remedies under or by reason of this Letter.

14.     Expenses. The Parties will each pay their own transaction expenses, including the fees and expenses of investment bankers and other advisors, incurred in connection with the proposed Transaction.

15.     No Binding Agreement. This Letter reflects the intention of the Parties, but for the avoidance of doubt neither this Letter nor its acceptance shall give rise to any legally binding or enforceable obligation on any Party, except with regard to paragraphs 9 through 16 hereof. No contract or agreement providing for any transaction shall be deemed to exist between the Parties and any of their affiliates unless and until a final definitive agreement has been executed and delivered.

16.     Miscellaneous. This Letter may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement.  The headings of the various sections of this Letter have been inserted for reference only and shall not be deemed to be a part of this Letter.

[CONTINUED ON NEXT PAGE]

102006087\V-2

If you are in agreement with the terms set forth above and desire to proceed with the proposed Transaction on that basis, please sign this Letter in the space provided below and return an executed copy to the attention of Roger Kelly, rkelly@progressrail.com.

Very truly yours,

PROGRESS RAIL LEASING CORPORATION

Jonathan G. Newman
Senior Vice President

Agreed to and accepted:
ERP IRON ORE, LLC

By: _____
Name: Tom Clarke
Title: Authorized Signatory

If you are in agreement with the terms set forth above and desire to proceed with the proposed Transaction on that basis, please sign this Letter in the space provided below and return an executed copy to the attention of Roger Kelly, rkelly@progressrail.com.

Very truly yours,

PROGRESS RAIL LEASING CORPORATION

_____

Jonathan G. Newman
Senior Vice President

Agreed to and accepted:

ERP IRON ORE, LLC

By: _____

Name: Tom Clarke
Title: Authorized Signatory

# EXHIBIT C

**EXHIBIT G**

**Form of New Indenture and ERP Notes**

*Execution Version*

FLOATING RATE SENIOR SECURED AMORTIZING PIK TOGGLE NOTES INDENTURE

Dated as of December [•], 2016

Among

ERP Iron Ore, LLC as Issuer,

THE GUARANTORS LISTED ON THE SIGNATURE PAGES HERETO

and

WILMINGTON SAVINGS FUND SOCIETY, FSB,
as Trustee, Collateral Agent, Paying Agent, Registrar and Calculation Agent

FLOATING RATE SENIOR SECURED AMORTIZING PIK TOGGLE NOTES DUE 2019

# TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS AND INCORPORATION BY REFERENCE ................................ 1
    Section 1.01    Definitions..................................................................................... 1
    Section 1.02    Other Definitions .......................................................................... 21
    Section 1.03    Rules of Construction ................................................................... 22
    Section 1.04    [Reserved] ...................................................................................... 23
    Section 1.05    Acts of Holders ............................................................................ 23

ARTICLE 2 THE NOTES ...................................................................................................... 25
    Section 2.01    Form and Dating; Terms............................................................... 25
    Section 2.02    Execution and Authentication...................................................... 26
    Section 2.03    Registrar, Paying Agent and Calculation Agent .................................. 26
    Section 2.04    Paying Agent to Hold Money in Trust......................................... 27
    Section 2.05    Holder Lists.................................................................................. 27
    Section 2.06    Transfer and Exchange ................................................................ 28
    Section 2.07    Replacement Notes ...................................................................... 29
    Section 2.08    Outstanding Notes........................................................................ 29
    Section 2.09    Treasury Notes ............................................................................. 29
    Section 2.10    Temporary Notes ......................................................................... 30
    Section 2.11    Cancellation ................................................................................. 30
    Section 2.12    Defaulted Interest........................................................................ 30
    Section 2.13    CUSIP and ISIN Numbers .......................................................... 31
    Section 2.14    Interest......................................................................................... 31
    Section 2.15    Additional Amounts ..................................................................... 32

ARTICLE 3 REDEMPTION ................................................................................................. 35
    Section 3.01    Notices to Trustee........................................................................ 35
    Section 3.02    Selection of Notes to be Redeemed or Purchased in Part..................... 35
    Section 3.03    Notice of Redemption. ................................................................ 35
    Section 3.04    Effect of Notice of Redemption. ................................................. 36
    Section 3.05    Deposit of Redemption or Purchase Price. ................................. 36
    Section 3.06    Optional Redemption. .................................................................. 37
    Section 3.07    Mandatory Redemption. .............................................................. 37
    Section 3.08    Notes Redeemed or Purchased in Part ........................................ 38

ARTICLE 4 COVENANTS .................................................................................................... 38
    Section 4.01    Payment of Notes ........................................................................ 38
    Section 4.02    Prepayment of Notes.................................................................... 38
    Section 4.03    Taxes............................................................................................ 38
    Section 4.04    Stay, Extension and Usury Laws ................................................. 39
    Section 4.05    Corporate Existence .................................................................... 39
    Section 4.06    Reports and Other Information .................................................... 39

#4834-6333-0618

Section 4.07   [Reserved] ................................................................................... 40
Section 4.08   Limitation on Restricted Payments. .............................................. 40
Section 4.09   Limitation on Indebtedness. ........................................................... 41
Section 4.10   Limitation on Liens ........................................................................ 43
Section 4.11   Future Guarantors. ......................................................................... 43
Section 4.12   Limitation on Restrictions on Distribution From Subsidiaries ............. 43
Section 4.13   Limitations on Investments, Loans, Advances, Guarantees and
               Acquisitions. ................................................................................. 45
Section 4.14   Transactions with Affiliates ........................................................... 45
Section 4.15   Repurchase Upon Event of Default ................................................ 46

ARTICLE 5 SUCCESSORS ....................................................................................... 49
Section 5.01   Merger, Consolidation or Sale of Assets. ...................................... 49

ARTICLE 6 DEFAULTS AND REMEDIES ............................................................... 50
Section 6.01   Events of Default ............................................................................ 50
Section 6.02   Acceleration ................................................................................... 52
Section 6.03   Other Remedies .............................................................................. 56
Section 6.04   Waiver of Past Defaults ................................................................. 56
Section 6.05   Control by Majority ....................................................................... 57
Section 6.06   Limitation on Suits ........................................................................ 57
Section 6.07   Rights of Holders to Receive Payment ........................................... 57
Section 6.08   Collection Suit by Trustee ............................................................. 58
Section 6.09   Restoration of Rights and Remedies ............................................... 58
Section 6.10   Rights and Remedies Cumulative ................................................... 58
Section 6.11   Delay or Omission Not Waiver ....................................................... 58
Section 6.12   Trustee May File Proofs of Claim .................................................. 58
Section 6.13   Priorities ........................................................................................ 59
Section 6.14   Undertaking for Costs .................................................................... 59

ARTICLE 7 TRUSTEE ................................................................................................ 60
Section 7.01   Duties of Trustee ............................................................................ 60
Section 7.02   Rights of Trustee ............................................................................ 61
Section 7.03   Individual Rights of Trustee .......................................................... 63
Section 7.04   Trustee's Disclaimer ...................................................................... 63
Section 7.05   Notice of Defaults .......................................................................... 64
Section 7.06   Reports by Trustee to Holders of the Notes ................................... 64
Section 7.07   Compensation and Indemnity ......................................................... 64
Section 7.08   Replacement of Trustee .................................................................. 65
Section 7.09   Successor Trustee by Merger, etc .................................................. 66
Section 7.10   Eligibility; Disqualification ........................................................... 66

ARTICLE 8 [RESERVED] ........................................................................................... 66

ARTICLE 9 AMENDMENT, SUPPLEMENT AND WAIVER ................................. 66

#4834-6333-0618

Section 9.01    Without Consent of Holders ................................................................. 66
Section 9.02    With Consent of Holders ...................................................................... 68
Section 9.03    Compliance with Trust Indenture Act .................................................. 69
Section 9.04    Revocation and Effect of Consents ...................................................... 70
Section 9.05    Notation on or Exchange of Notes ....................................................... 70
Section 9.06    Trustee to Sign Amendments, etc ........................................................ 70
Section 9.07    Payment for Consent ............................................................................ 70

ARTICLE 10 COLLATERAL AND SECURITY ..................................................... 71
Section 10.01    The Collateral ...................................................................................... 71
Section 10.02    Further Assurances ............................................................................. 72
Section 10.03    After-Acquired Property ..................................................................... 72
Section 10.04    Impairment of Security Interest .......................................................... 73
Section 10.05    Real Estate Mortgages and Filings ..................................................... 73
Section 10.06    Release of Collateral ........................................................................... 74
Section 10.07    Authorization of Actions to be Taken by the Trustee or the
                 Collateral Agent Under the Collateral Documents .............................. 75
Section 10.08    Collateral Account .............................................................................. 76
Section 10.09    Information Regarding Collateral ........................................................ 77
Section 10.10    Maintenance of Collateral ................................................................... 77
Section 10.11    Negative Pledge .................................................................................. 77

ARTICLE 11 GUARANTEES .................................................................................. 78
Section 11.01    Guarantee ............................................................................................ 78
Section 11.02    Limitation on Guarantor Liability ....................................................... 79
Section 11.03    Execution and Delivery ....................................................................... 80
Section 11.04    Subrogation ......................................................................................... 80
Section 11.05    Benefits Acknowledged ...................................................................... 80
Section 11.06    Release of Note Guarantees ................................................................ 81

ARTICLE 12 SATISFACTION AND DISCHARGE .............................................. 81
Section 12.01    Satisfaction and Discharge .................................................................. 81
Section 12.02    Application of Trust Money ................................................................. 82

ARTICLE 13 MISCELLANEOUS ........................................................................... 83
Section 13.01    Notices ................................................................................................ 83
Section 13.02    Certificate and Opinion as to Conditions Precedent ........................... 84
Section 13.03    Statements Required in Certificate or Opinion .................................... 85
Section 13.04    Rules by Trustee and Agents ............................................................... 85
Section 13.05    No Personal Liability of Directors, Officers, Employees,
                 Members, Partners and Stockholders ................................................... 85
Section 13.06    Governing Law .................................................................................... 86
Section 13.07    Waiver of Jury Trial ............................................................................ 86
Section 13.08    Force Majeure ..................................................................................... 86
Section 13.09    No Adverse Interpretation of Other Agreements ................................ 86

#4834-6333-0618

Section 13.10 Successors ........................................................................... 86
Section 13.11 Severability .......................................................................... 86
Section 13.12 Counterpart Originals........................................................... 87
Section 13.13 Table of Contents, Headings, etc .......................................... 87
Section 13.14 Facsimile and PDF Delivery of Signature Pages .................. 87
Section 13.15 U.S.A. PATRIOT Act ........................................................... 87
Section 13.16 Payments Due on Non-Business Days................................... 87
Section 13.17 Effectiveness of Indenture .................................................... 87

#4834-6333-0618

Schedule A      Existing Indebtedness

Schedule 6.02  Mechanics Lienholders

Appendix A     Provisions Relating to Notes

Exhibit A      Form of Note
Exhibit B      Form of Institutional Accredited Investor Transferee Letter of Representation
Exhibit C      Form of Supplemental Indenture to Be Delivered by Subsequent Guarantors
Exhibit D      Form of Issuer Notification of PIK Interest Election
Exhibit E      Form of Issuer Notification and Direction to Trustee Under Section 2.14(d) of the
               Indenture Regarding the Payment of PIK Interest

#4834-6333-0618

INDENTURE, dated as of December [•], 2016, among ERP Iron Ore LLC, a Virginia limited liability company (the "Issuer"), the Guarantors listed on the signature pages hereto and Wilmington Savings Fund Society, FSB, as trustee (the "Trustee"), collateral agent (in such capacity, the "Collateral Agent"), paying agent (in such capacity, the "Paying Agent"), registrar (in such capacity, the "Registrar") and calculation agent (in such capacity, the "Calculation Agent").

W I T N E S S E T H

WHEREAS, on May 5, 2015, Magnetation LLC (the "Debtor Company") and certain of its subsidiaries (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., in the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court"), and the Debtor Company and the Debtors have continued to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, by order, dated December [•], 2016 (the "Sale Order"), the Bankruptcy Court approved Initial Buyer's (as defined in the APA) purchase of substantially all of the Debtors' assets free and clear of Liens, claims, encumbrances and interests;

WHEREAS, pursuant to the Sale Order, Initial Buyer designated the Issuer as the purchaser in exchange for the ERP Assumption (as defined in the APA);

WHEREAS, in accordance with the ERP Assumption, the Issuer has duly authorized the creation and issuance at Closing (as defined in the APA) of $22,500,000 aggregate principal amount of Floating Rate Senior Secured Amortizing PIK Toggle Notes due December 31, 2019 (*provided* that the principal amount of the Notes authorized and outstanding may be increased in connection with PIK Interest) (the "Notes"); and

WHEREAS, the Issuer and each of the Guarantors have duly authorized the execution and delivery of this Indenture;

NOW, THEREFORE, the Issuer, the Guarantors, the Trustee and the Collateral Agent agree as follows for the benefit of each other and for the equal and ratable benefit of the Holders of the Notes.

ARTICLE 1

DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01    Definitions.

"Acquired Indebtedness" means, with respect to any specified Person, (1) Indebtedness of any Person or any of its Subsidiaries existing at the time such Person becomes a Subsidiary, (2) Indebtedness assumed in connection with the acquisition of assets from such Person, or (3) Indebtedness secured by a Lien encumbering any asset acquired by such specified Person, in each case whether or not Incurred by such Person in connection with, or in anticipation or contemplation of, such Person becoming a Subsidiary or such acquisition.

Acquired Indebtedness shall be deemed to have been Incurred, with respect to clause (1) of the preceding sentence, on the date such Person becomes a Subsidiary and, with respect to clauses (2) and (3) of the preceding sentence, on the date of consummation of such acquisition of assets.

"Affiliate" of any specified Person means any other Person, directly or indirectly, controlling or controlled by or under direct or indirect common control with such specified Person.  For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with") when used with respect to any Person means possession, directly or indirectly, of the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing, *provided* that exclusively for purposes of Section 4.14, beneficial ownership of 10% or more of the Voting Stock of a Person shall be deemed to be control.

"Agent" means any Collateral Agent, Paying Agent, Registrar or Calculation Agent.

"Amortization Amount" means $2,000,000 or such lesser amount as is due on any Amortization Payment Date.

"Amortization Payment Date" means each of March 31, June 30, September 30 and December 31, of each fiscal year beginning on, and inclusive of, June 30, 2017.

"APA" means that certain asset purchase agreement, dated as of December [•], 2016, by and among MG Initial Purchaser, LLC, a Delaware limited liability company, the Issuer, the Debtor Company and certain of its Subsidiaries.

"Average Life" means, as of the date of determination, with respect to any Indebtedness or Preferred Stock, the quotient obtained by dividing (1) the sum of the products obtained by multiplying (a) the amount of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Preferred Stock by (b) the number of years (calculated to the nearest one-twelfth) from the date of determination to the date of such payment; by (2) the sum of the amounts of all such payments.

"Bankruptcy Code" means Title 11 of the United States Code or any applicable successor statute.

"Bankruptcy Law" means the Bankruptcy Code, as amended, or any similar federal, state or foreign law for the relief of debtors.

"beneficial ownership" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, and "beneficial owner" has a corresponding meaning.

"Board of Directors" means:

(1)     with respect to the Issuer, the board of managers of the Issuer, or in the event the Issuer has no board of managers, the board of directors or managers of the Issuer's managing member;

-2-

(2)       with respect to a corporation, the board of directors of the corporation;

(3)       with respect to a partnership, the board of directors of the general partner of the partnership; and

(4)       with respect to any other Person, the board or committee of such Person serving a similar function;

and, in each case, other than for purposes of determining a Change of Control, any duly authorized committee of any such body.

"Business Day" means each day that is not a Saturday, Sunday or other day on which banking institutions in New York, New York are authorized or required by law to close.

"Calculation Agent" means a financial institution appointed by the Issuer to calculate the interest rate payable on the Notes in respect of each Interest Period, which shall initially be the Trustee.

"Calculation Date" means, with respect to any Interest Determination Date, the earlier of (i) the tenth calendar day after such Interest Determination Date, or, if any such day is not a Business Day, the next succeeding Business Day, and (ii) the Business Day immediately preceding the applicable Interest Payment Date or the maturity date, as the case may be.

"Capital Stock" of any Person means any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) equity of such Person, including any Preferred Stock and limited liability or partnership interests (whether general or limited), but excluding any debt securities convertible or exchangeable into such equity.

"Capitalized Lease Obligations" means an obligation that is required to be classified and accounted for as a capitalized lease for financial reporting purposes in accordance with GAAP. The amount of Indebtedness represented by such obligation will be the capitalized amount of such obligation at the time any determination thereof is to be made as determined in accordance with GAAP, and the Stated Maturity thereof will be the date of the last payment of rent or any other amount due under such lease prior to the first date such lease may be terminated without penalty.

"Cash Equivalents" means:

(1)       U.S. dollars or, in the case of any Foreign Subsidiary, such local currencies held by it from time to time in the ordinary course of business;

(2)       securities issued or directly and fully Guaranteed or insured by the U.S. government or any agency or instrumentality of the United States (*provided* that the full faith and credit of the United States is pledged in support thereof), having maturities of not more than one year from the date of acquisition;

-3-

(3)  marketable general obligations issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition and, at the time of acquisition, having a credit rating of at least "A" or the equivalent thereof by S&P or Moody's or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of investments;

(4)  certificates of deposit, time deposits, eurodollar time deposits, overnight bank deposits or bankers' acceptances having maturities of not more than one year from the date of acquisition thereof issued by any commercial bank the long-term debt of which is rated at the time of acquisition thereof at least "A" or the equivalent thereof by S&P or Moody's, or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of investments, and having combined capital and surplus in excess of $500.0 million;

(5)  repurchase obligations with a term of not more than seven days for underlying securities of the types described in clauses (2), (3) and (4) entered into with any bank meeting the qualifications specified in clause (4) above;

(6)  commercial paper rated at the time of acquisition thereof at least "A-2" or the equivalent thereof by S&P or "P-2" or the equivalent thereof by Moody's, or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of investments, and in any case maturing within one year after the date of acquisition thereof; and

(7)  interests in any investment company or money market fund which invests 95% or more of its assets in instruments of the type specified in clauses (1) through (6) above.

"Cash Interest" means the payment of interest on the Notes in cash equal to the amount of accrued and unpaid interest due on the relevant Interest Payment Date.

"Change of Control" means:

(1)  any person or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act as in effect on the date of the original issuance of the Notes hereunder, but excluding any employee benefit plan of such person and its subsidiaries and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) shall have acquired beneficial ownership (within the meaning of Rules 13d-3 and 13d-5 of the Exchange Act as in effect on the Closing Date) of Equity Interests of the Issuer representing more than 50% of the voting interests represented by the issued and outstanding Equity Interests of the Issuer (determined on a fully diluted basis but not giving effect to contingent voting rights that have not yet vested); or

(2)  the merger or consolidation of the Issuer with or into another Person or the merger of another Person with or into the Issuer or the merger of any Person with or into a Subsidiary of the Issuer, unless the holders of a majority of the

-4-

aggregate voting power of the Voting Stock of the Issuer, immediately prior to such transaction, hold securities of the surviving or transferee Person that represent, immediately after such transaction, at least a majority of the aggregate voting power of the Voting Stock of the surviving or transferee Person; or

(3)     the sale, assignment, conveyance, transfer, lease or other disposition (other than by way of merger or consolidation), in one or a series of transactions, of all or substantially all of the assets of the Issuer and its Subsidiaries taken as a whole to any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act); or

(4)     the adoption by the stockholders of the Issuer or any parent entity of a plan or proposal for the liquidation or dissolution of the Issuer or any parent entity.

"Clarke Guarantors" means each of Thomas Matthew Clarke and Ana Mercedes Clarke, each, an individual, and each with an address for mailing c/o ERP Compliant Fuels, LLC at 15 Appledore Lane, Natural Bridge, Virginia  24578, each, an owner of direct and indirect Equity Interests of the Issuer and certain of its affiliates.

"Code" means the Internal Revenue Code of 1986, as amended.

"COKE" means ERP Compliant COKE, LLC, a Delaware limited liability company, and its successors.

"Coke Collateral" means all assets of the Coke Guarantor subject to Liens created pursuant to Collateral Documents and subject to Liens securing the Coke Guarantor's Obligations.

"Coke Guarantor" means COKE and any of its Subsidiaries or parents which may at any time Guarantee the Notes and the Issuer's Obligations under each other Notes Document.

"Coke Plant" means (i) the 244-acre parcel of real property located in Birmingham, Alabama on which coke manufacturing facilities, including coke ovens, railyard and water treatment assets, are operated by COKE to produce, among other things, blast furnace coke, foundry coke, and industrial coke, and (ii) all fixtures located on such real property.

"Collateral" means all property and assets whether now owned or hereafter acquired, in which Liens are, from time to time, purported to be granted to secure the Notes, the Note Guarantees and the Issuer's Obligations under each other Notes Document pursuant to the Collateral Documents.

"Collateral Account" means one or more segregated accounts pledged under the Collateral Documents that is under the control of the Collateral Agent and is free from all other Liens, and includes cash and Cash Equivalents received by the Trustee or the Collateral Agent from Recovery Events, foreclosures on or sales of Collateral or any other awards or proceeds pursuant to the Collateral Documents, including earnings, revenues, rents, issues, profits and income from the Collateral received pursuant to the Collateral Documents and interest earned thereon.

-5-

"Collateral Documents" means the Mortgages, deeds of trust, deeds to secure debt, security agreements, pledge agreements, hypothecs, collateral agency agreements, collateral assignments, debentures, control agreements and other instruments and documents executed and delivered pursuant to the Indenture or any of the foregoing (including, without limitation, the financing statements under the Uniform Commercial Code of the relevant state) that create or purport to create a Lien in the Collateral in favor of the Collateral Agent and/or the Trustee (for the benefit of the Holders of Notes and the Trustee in its various capacities) or any notice of such pledge, assignment or grant, in each case as they may be amended, supplemented or otherwise modified from time to time.

"Commodity Agreement" means, with respect to any Person, any commodity future or forward, swap or option, cap or collar or other similar agreement or arrangement as to which such Person is a party or beneficiary.

"Common Stock" means with respect to any Person, any and all shares, interests or other participations in, and other equivalents (however designated and whether voting or nonvoting) of such Person's common equity whether or not outstanding on the Issue Date, and includes, without limitation, all series and classes of such common equity.

"Corporate Trust Office of the Trustee" shall be at the address of the Trustee specified in Section 13.01 or such other address as to which the Trustee may give notice to the Holders and the Issuer.

"Currency Agreement" means, with respect to any Person, any foreign exchange future or forward, swap or option, cap or collar or other similar agreement or arrangement as to which such Person is a party or a beneficiary.

"Custodian" means the Trustee, as custodian with respect to the Notes in global form, or any successor entity thereto.

"Default" means any event that is, or after notice or passage of time or both would be, an Event of Default.

"Definitive Note" means a certificated Note (bearing the Restricted Notes Legend if the transfer of such Note is restricted by applicable law) that does not include the Global Notes Legend.

"Depositary" means, with respect to the Notes issuable or issued in whole or in part in global form, the Person specified in Section 2.03 as the Depositary with respect to the Notes, and any and all successors thereto appointed as Depositary hereunder and having become such pursuant to the applicable provision of this Indenture.

"Disqualified Stock" means, with respect to any Person, any Capital Stock of such Person that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable) or upon the happening of any event:

(1) matures or is mandatorily redeemable pursuant to a sinking fund obligation or otherwise;

-6-

(2) is convertible into or exchangeable for Indebtedness or Capital Stock that satisfies the requirements of clause (1) or (3) hereof (excluding Capital Stock which is convertible or exchangeable solely at the option of the Issuer or a Subsidiary (it being understood that upon such conversion or exchange it shall be an Incurrence of such Indebtedness or Disqualified Stock)); or

(3) is redeemable at the option of the holder of the Capital Stock in whole or in part,

in each case on or prior to the date 91 days after the earlier of the final maturity date of the Notes or the date the Notes are no longer outstanding; *provided, however*, that only the portion of Capital Stock which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date will be deemed to be Disqualified Stock.

"DTC" means The Depository Trust Company or any successor thereto.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Fair Market Value" means, with respect to any asset or liability, the fair market value of such asset or liability as determined by Senior Management of the Issuer in good faith; *provided* that, except as otherwise provided in this Indenture, if the fair market value exceeds $2.0 million, such determination shall be made by the Board of Directors of the Issuer or an authorized committee thereof in good faith (including as to the value of all non-cash assets and liabilities).

"FerroMagnetica" means FerroMagnetica, LLC, a Delaware limited liability company and its successors.

"Foreign Subsidiary" means any Subsidiary that is not organized under the laws of the United States or any state thereof or the District of Columbia.

"GAAP" means generally accepted accounting principles in the United States as in effect as of the Issue Date, including those set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as approved by a significant segment of the accounting profession.  Unless otherwise specified, all ratios and computations contained in this Indenture shall be computed in conformity with GAAP, except that in the event the Issuer is acquired in a transaction that is accounted for using purchase accounting, the effects of the application of purchase accounting shall be disregarded in the calculation of such ratios and other computations contained in this Indenture.

-7-

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization.

"Government Securities" means securities that are (1) direct obligations of the United States for the timely payment of which its full faith and credit is pledged or (2) obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States the timely payment of which is unconditionally Guaranteed as a full faith and credit obligation of the United States, which, in either case, are not callable or redeemable at the option of the issuer thereof, and shall also include a depositary receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act), as custodian with respect to any such Government Securities or a specific payment of principal of or interest on any such Government Securities held by such custodian for the account of the holder of such depositary receipt; *provided* that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depositary receipt from any amount received by the custodian in respect of the Government Securities or the specific payment of principal of or interest on the Government Securities evidenced by such depositary receipt.

"Guarantee" means (1) any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness of any other Person and (2) any obligation, direct or indirect, contingent or otherwise, of such Person:

(a)      to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness of such other Person (whether arising by virtue of partnership arrangements, or by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise); or

(b)      entered into for purposes of assuring in any other manner the obligee of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); *provided*, *however*, that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.

"Guarantor" means each of the signatories hereto other than the Issuer and the Trustee as well as any Person that may in the future provide a Note Guarantee or that provides a Note Guarantee on the Issue Date pursuant to this Indenture or otherwise. For purposes of Articles 10 and 11 of this Indenture, the term "Guarantor" will be deemed not to include either of Thomas Matthew Clarke or Ana Mercedes Clarke.

"Hedging Obligations" of any Person means the obligations of such Person pursuant to any Interest Rate Agreement, Currency Agreement or Commodity Agreement.

"Holder" means a Person in whose name a Note is registered on the Registrar's books.

"Incur" means issue, create, assume, Guarantee, incur or otherwise become liable

-8-

for; *provided*, *however*, that any Indebtedness or Capital Stock of a Person existing at the time such Person becomes a Subsidiary (whether by merger, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Subsidiary at the time it becomes a Subsidiary; and the terms "Incurred" and "Incurrence" have meanings correlative to the foregoing.

"Indebtedness" of any Person means, without duplication:

(1)     the principal of and premium (if any) in respect of indebtedness of such Person for borrowed money;

(2)     the principal of and premium (if any) in respect of obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(3)     the principal component of all obligations of such Person in respect of letters of credit, bankers' acceptances or other similar instruments (including reimbursement obligations with respect thereto except to the extent such reimbursement obligation relates to a trade payable and such obligation is satisfied within 30 days of Incurrence);

(4)     the principal component of all obligations of such Person to pay the deferred and unpaid purchase price of property (including earn-out obligations), which purchase price is due after the date of placing such property in service or taking delivery and title thereto, except (a) any such balance that constitutes a trade payable or similar obligation to a trade creditor, in each case accrued in the ordinary course of business and (b) any earn-out obligation until the amount of such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP;

(5)     Capitalized Lease Obligations of such Person (whether or not such items would appear on the balance sheet of such Person in accordance with GAAP);

(6)     the greater of the maximum mandatory redemption or repurchase price (not including, in either case, any redemption or repurchase premium) or the principal component or liquidation preference of all obligations of such Person with respect to the redemption, repayment or other repurchase of any Disqualified Stock;

(7)     the principal component of all Indebtedness of other Persons secured by a Lien on any asset of such Person, whether or not such Indebtedness is assumed by such Person;

(8)     the principal component of Indebtedness of other Persons to the extent Guaranteed by such Person (whether or not such items would appear on the balance sheet of such Person in accordance with GAAP);

(9)     to the extent not otherwise included in this definition, net obligations of such Person under Hedging Obligations (the amount of any such obligations to be equal at any time to the termination value of such agreement or arrangement giving rise to such Obligation that would be payable by such Person at such time); and

-9-

(10)     to the extent not otherwise included in this definition, the amount of obligations outstanding under the legal documents entered into as part of a securitization transaction or series of securitization transactions that would be characterized as principal if such transaction were structured as a secured lending transaction rather than as a purchase relating to a securitization transaction or series of securitization transactions.

Notwithstanding the foregoing, the amount of any Indebtedness outstanding as of any date shall (i) be the accreted value thereof in the case of any Indebtedness issued with original issue discount or the aggregate principal amount outstanding in the case of Indebtedness issued with interest payable in kind and (ii) include any interest (or in the case of Preferred Stock, dividends) thereon that is more than 30 days past due. Except to the extent provided in the preceding sentence, the amount of any Indebtedness that is convertible into or exchangeable for Capital Stock of the Issuer outstanding as of any date shall be deemed to be equal to the principal and premium, if any, in respect of such Indebtedness, notwithstanding the provisions of GAAP (including Accounting Standards Codification Topic 470-20, Debt-Debt with Conversion and Other Options).

In addition, "Indebtedness" of any Person shall include Indebtedness described in the preceding paragraph that would not appear as a liability on the balance sheet of such Person if:

(1)     such Indebtedness is the obligation of a partnership or joint venture that is not a Subsidiary;

(2)     such Person or a Subsidiary of such Person is a general partner of the partnership or joint venture as contemplated in subclause (1) above; and

(3)     there is recourse, by contract or operation of law, with respect to the payment of such Indebtedness to property or assets of such Person or a Subsidiary of such Person; and then such Indebtedness shall be included in an amount not to exceed:

(a)     the lesser of (i) the net assets of a general partner as contemplated in subclause (2) above and (ii) the amount of such obligations to the extent that there is recourse, by contract or operation of law, to the property or assets of such Person or a Subsidiary of such Person; or

(b)     if less than the amount determined pursuant to clause (a) immediately above, the actual amount of such Indebtedness that is recourse to such Person or a Subsidiary of such Person, if the Indebtedness is evidenced by a writing and is for a determinable amount.

Indebtedness shall not include any obligations relating to any factoring or other accounts receivable or iron ore concentrate or pellet inventory sales arrangements the cash proceeds of which are encumbered by the security interest in Collateral granted to the Holders in the Security Agreement, provided that any discount to the face amount of an invoice sold shall not exceed 5.0%.

"Indenture" means this Indenture, as amended or supplemented from time to time.

"Independent Financial Advisor" means an accounting, appraisal, investment banking firm or consultant to Persons engaged in Similar Businesses of nationally recognized standing that is, in the good faith judgment of the Issuer, qualified to perform the task for which it has been engaged.

"Initial Interest Period" means the date of the original issuance of the Notes hereunder through March 30, 2017.

"Interest Determination Date" for an Interest Period shall be the second Business Day preceding the first day of such Interest Period (or, in the case of the Initial Interest Period, the second Business Day preceding the date of the original issuance of Notes hereunder).

"Interest Payment Date" means each of March 31, June 30, September 30 and December 31 of each fiscal year beginning on, and inclusive of, March 31, 2017.

"Interest Period" means the period commencing on an Interest Payment Date (or, in the case of the Initial Interest Period, commencing on the date of the original issuance of the Notes hereunder) and ending on the day preceding the next following Interest Payment Date or the redemption date, as applicable.

"Interest Rate Agreement" means, with respect to any Person, any interest rate future or forward, swap or option, cap or collar or other similar agreement or arrangement as to which such Person is party or a beneficiary.

"Investment" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of any direct or indirect advance, loan (other than advances or extensions of credit to customers in the ordinary course of business) or other extensions of credit (including by way of Guarantee or similar arrangement, but excluding any debt or extension of credit represented by a bank deposit (other than a time deposit)) or capital contribution to (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others), or any purchase or acquisition of Capital Stock, Indebtedness or other similar instruments issued by, such Person and all other items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP; *provided* that an acquisition of assets, Capital Stock or other securities by the Issuer or a Subsidiary for consideration to the extent such consideration consists of Common Stock of the Issuer shall not be deemed to be an Investment.

"Issue Date" means the date of the issuance of any Notes hereunder, including any Interest Payment Date on which additional Notes in respect of PIK Interest are to be issued.

"Issuer" means the party named as such in the first paragraph of this Indenture or any successor obligor to its Obligations under this Indenture, the Notes or the Security Agreement.

"Itasca County Properties Plant #4" means operational facilities in Coleraine, Minnesota for the production of iron ore concentrate, capable of producing at least 1.6 million tonnes annually when operating at maximum capacity.

-11-

"Lien" means, (i) with respect to any asset, any mortgage, lien (statutory or otherwise), pledge, hypothecation, charge, security interest, preference, assignment priority or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, any lease or license in the nature thereof or sale/leaseback, any option, trust, or other preferential arrangement or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction, or having the practical effect of any of the foregoing; *provided* that in no event shall an operating lease be deemed to constitute a Lien; and (ii) in the case of Equity Interests, any purchase option, call or similar right of a third party with respect to such Equity Interests.

"LIBOR" means, with respect to any Interest Determination Date, the London interbank offered rate as administered by ICE Benchmark Administration Limited (or any other Person that takes over the administration of such rate) for deposits in immediately available funds in United States dollars having a maturity of three months as displayed on the Bloomberg screen page that displays such rate, or on the appropriate page or screen of such other comparable information service that publishes such rate from time to time as selected by the Calculation Agent in its discretion (and in consultation with the Issuer) on that Interest Determination Date. If no rate appears, in respect of that Interest Determination Date, the Calculation Agent shall request the principal London offices of each of four major reference banks in the London interbank market, as selected by the Calculation Agent, to provide the Calculation Agent with its offered quotation for deposits in United States dollars for the period of three months, commencing on the second London Business Day following such Interest Determination Date, to prime banks in the London interbank market at approximately 11:00 a.m., London time, on that Interest Determination Date and in a principal amount that is representative for a single transaction in United States dollars in that market at that time. If at least two quotations are provided, then LIBOR on that Interest Determination Date shall be the arithmetic mean of those quotations. If fewer than two quotations are provided, then LIBOR on the Interest Determination Date shall be the arithmetic mean of the rates quoted at approximately 11:00 a.m., in the City of New York, on the Interest Determination Date by three major banks in the City of New York selected by the Calculation Agent for loans in United States dollars to leading European banks, having a three-month maturity and in a principal amount that is representative for a single transaction in United States dollars in that market at that time; *provided, however,* that if the banks selected by the Calculation Agent are not providing quotations in the manner described by this sentence, LIBOR shall be the same as the rate determined for the immediately preceding Interest Period. LIBOR will in no event be less than 0.00% per annum.

"London Business Day" means each day that is not a Saturday, Sunday or other day on which banking institutions in London are authorized or required by law to close.

"Mechanics Lien Royalty Agreements" means those agreements to be entered into pursuant to that certain preliminary memorandum of understanding, dated November 18, 2016 among the Issuer, FerroMagnetica, and the mechanic lien claimants identified in Exhibit A thereto.

"Mechanics Lienholders" means, any Person, whether now or hereafter, entitled to payment pursuant to the ML Notes.

"ML Notes" means the 3% notes issued to the Mechanics Lienholders by the Issuer and FerroMagnetica on or about the date of the original issuance of the Notes hereunder.

"Moody's" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"Mortgages" means the mortgages, debentures, hypothecs, deeds of trust, deeds to secure Indebtedness or other similar documents securing Liens on the Premises, as well as the other Collateral, if any, secured by and described in the mortgages, debentures, hypothecs, deeds of trust, deeds to secure Indebtedness, mortgages made by the Issuer or any other Guarantor in favor or for the benefit of the Trustee or the Collateral Agent, or other similar documents, in form and substance reasonably satisfactory to the Trustee or the Collateral Agent, as the case may be.

"Net Award" means any awards or proceeds in respect of any condemnation, seizure, taking or other eminent domain proceeding relating to any Collateral.

"Net Insurance Proceeds" means any awards or proceeds in respect of any casualty insurance or title insurance claim relating to any Collateral.

"Note Guarantee" means, individually, any Guarantee of payment of the Notes and the Issuer's other Obligations under each other Notes Document by a Guarantor pursuant to the terms of this Indenture and any supplemental indenture thereto or any supplemental guarantee agreement, and, collectively, all such Guarantees.

"Notes" means the Notes and more particularly means any Note authenticated and delivered under this Indenture. For all purposes of this Indenture, the term "Notes" shall also include any Notes to be issued or authenticated upon registration of transfer, replacement or exchange of Notes and any Notes to be issued in connection with a PIK Payment.

"Notes Document" means any of this Indenture, the Notes, the Note Guarantees, the Security Agreement and the Collateral Documents, and any related documents thereto, as amended or supplemented from time to time.

"Obligations" means any principal (including the Amortization Amounts to be paid on each Amortization Payment Date), interest (including any interest accruing subsequent to the filing of a petition in bankruptcy, reorganization or similar proceeding at the rate provided for in the documentation with respect thereto, whether or not such interest is an allowed claim under applicable state, federal or foreign law and any Additional Amounts), other monetary obligations, penalties, fees, indemnifications, reimbursements (including reimbursement obligations with respect to letters of credit and banker's acceptances), damages and other liabilities, and Guarantees of payment of such principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities, payable under the documentation governing any Indebtedness.

-13-

"Obligor" means the Issuer and any Guarantor other than Thomas Matthew Clarke and Ana Mercedes Clarke.

"Officer" of any Person means the Chairman of the Board, the Chief Executive Officer, the President, the Chief Financial Officer, any Executive Vice President, Senior Vice President or Vice President, the Treasurer or the Secretary of such Person or, in the event that such Person is a partnership or a limited liability company that has no such officers, a person duly authorized under applicable law by the general partner, managers, members or a similar body to act on behalf of such Person.

"Officers' Certificate" means a certificate signed by two Officers of the Person delivering such Officers' Certificate, one of whom is the principal executive officer, the principal financial officer or the principal accounting officer.

"Opinion of Counsel" means a written opinion from legal counsel.  The counsel may be an employee of or counsel to the Issuer.

"Partial PIK Interest" means the payment of interest on the Notes through an increase in the principal amount of the outstanding Notes equal to some portion (but not all) of the amount of accrued and unpaid interest due on the relevant Interest Payment Date, to the extent that only a portion of the interest due on an Interest Payment Date is so paid.

"Payment Date" means any Interest Payment Date or Amortization Payment Date, as applicable.

"Permitted Change of Control" means a Change of Control involving one or more investments in the Issuer by Ferro Magnetica, LLC or its Affiliates.

"Permitted Investment" means:

(1)      an Investment in an Obligor or a Subsidiary of such Obligor;

(2)      any Investment in direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States), in each case maturing within one year from the date of acquisition thereof;

(3)      any Investment by an Obligor or any of their Subsidiaries in a Person that is engaged in a Similar Business if as a result of such Investment:

(a)      such Person becomes a Guarantor; or

(b)      such Person, in one transaction or a series of related transactions, is merged or consolidated with or into, or transfers or conveys all or substantially all of its assets to, or is liquidated into, the Issuer or a Guarantor,

and, in each case, any Investment held by such Person; *provided* that such

#4834-6333-0618

Investment was not acquired by such Person in contemplation of such acquisition, merger, consolidation or transfer and does not materially and adversely affect the ability of the Issuer to make scheduled payments of interest and principal under the Notes;

(4)     any Investment in cash and Cash Equivalents;

(5)     Investments in existence on the Issue Date;

(6)     Guarantees issued in accordance with Section 4.09;

(7)     any Investment acquired by an Obligor or any of their Subsidiaries:

        (a)     in exchange for any other Investment or accounts receivable held by such Obligor or any such Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable; or

        (b)     as a result of a foreclosure by such Obligor or any of its Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default; and

(8)     Investments made as a result of the receipt of non-cash consideration from an asset sale that was made pursuant to and in compliance with Section 5.01.

"Permitted Liens" means, with respect to any Person:

(1)     Liens imposed by law, including carriers', warehousemen's, mechanics', materialmen's and repairmen's Liens, Incurred in the ordinary course of business;

(2)     pledges or deposits by such Person under workers' compensation laws, unemployment insurance laws or similar legislation, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import or customs duties or for the payment of rent, in each case Incurred in the ordinary course of business;

(3)     Liens for taxes, assessments or other governmental charges not yet subject to penalties for non-payment or that are being contested in good faith by appropriate proceedings provided appropriate reserves required pursuant to GAAP have been made in respect thereof;

(4)     encumbrances, ground leases, easements or reservations of, or rights of others for, licenses, rights of way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning, building codes or other restrictions (including, without limitation, minor defects or irregularities in title and similar encumbrances) as to the use

-15-

of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties that do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(5)     leases, licenses, subleases and sublicenses of assets (including, without limitation, real property and intellectual property rights) that do not materially interfere with the ordinary conduct of the business of any Obligor or any of their Subsidiaries;

(6)     judgment Liens not giving rise to an Event of Default so long as such Lien is adequately bonded and any appropriate legal proceedings which may have been duly initiated for the review of such judgment have not been finally terminated or the period within which such proceedings may be initiated has not expired;

(7)     Liens arising solely by virtue of any statutory or common law provisions relating to banker's Liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a depositary institution; *provided* that:

(a)     such deposit account is not a dedicated cash collateral account and is not subject to restrictions against access by the applicable Obligor in excess of those set forth by regulations promulgated by the Federal Reserve Board; and

(b)     such deposit account is not intended by the applicable Obligor or any Subsidiary of such Obligor to provide collateral for Indebtedness to the depository institution;

(8)     Liens existing on the Issue Date (other than Liens permitted under clause (10));

(9)     Liens securing Indebtedness or other obligations of a Subsidiary of an Obligor owing to such Obligor or another Subsidiary of such Obligor;

(10)     Liens securing the Notes and the Note Guarantees issued on the Issue Date and any obligations owing to the Trustee or any other Agent under this Indenture or any other Notes Document;

(11)     Liens securing Refinancing Indebtedness Incurred to refinance, refund, replace, amend, extend or modify, as a whole or in part, Indebtedness that was previously so secured pursuant to clauses (8), (10) and this clause (11) of this definition; provided that (i) any such Lien is limited to all or part of the same property or assets (plus improvements, accessions, proceeds or dividends or distributions in respect thereof) that secured (or, under the written arrangements under which the original Lien arose, could secure) the Indebtedness being refinanced or is in respect of property that is the security for a Permitted Lien hereunder and (ii) the new Lien has no greater priority relative to the Notes and to Note Guarantees, and the holders of such Indebtedness secured by such Liens have no greater rights relative to the Notes and the Note Guarantees, than the original Liens and related Indebtedness and the holders thereof;

-16-

(12)    Liens in favor of an Obligor or any Subsidiary of any Obligor;

(13)    Liens under industrial revenue, municipal or similar bonds;

(14)    Liens on the Collateral securing any Indebtedness Incurred under Section 4.09(b)(3); for the avoidance of doubt, Liens permitted under this clause (14) may be senior in priority to the Liens on the Collateral securing the Notes;

(15)    Liens on property or Capital Stock of a Person at the time such Person becomes a Subsidiary of an Obligor; *provided, however*, that such Liens are not created, Incurred or assumed in connection with, or in contemplation of, such other Person becoming a Subsidiary of such Obligor; *provided, further, however*, that any such Lien may not extend to any other property owned by the applicable Obligor or any Subsidiary of such Obligor and as do not materially impair their use in the operation of the business of such Person; *provided, further*, that such Liens not materially and adversely affect the ability of such Obligor to make scheduled payments of interest and principal under the Notes;

(16)    Liens on property at the time an Obligor or a Subsidiary of an Obligor acquired the property, including any acquisition by means of a merger or consolidation with or into such Obligor or any Subsidiary of such Obligor; *provided, however*, that such Liens are not created, Incurred or assumed in connection with, or in contemplation of, such acquisition; *provided, further, however*, that such Liens may not extend to any other property owned by such Obligor or any Subsidiary of such Obligor and as do not materially impair their use in the operation of the business of such Person; *provided, further*, that such Liens not materially and adversely affect the ability of such Obligor to make scheduled payments of interest and principal under the Notes;

(17)    Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods and as do not materially impair their use in the operation of the business of such Person; *provided, further, however*, that such Liens may not extend to any other property owned by such Obligor or any Subsidiary of such Obligor and as do not materially impair their use in the operation of the business of such Person; *provided, further*, that such Liens not materially and adversely affect the ability of such Obligor to make scheduled payments of interest and principal under the Notes;

(18)    mortgage Liens and security interests granted in all real and personal property acquired by the Issuer under the APA to mechanic's/miner's lien claimants identified as of the date of the original issuance of the Notes hereunder, which mortgage Liens and security interests will be junior in payment priority to the Liens granted to the Collateral Agent under the Collateral Documents, *provided, however*, that Liens claimed by such mechanic's/miner's lien claimants in the assets known as the Itasca County Properties Plant #4 shall have the payment priority decided in the final resolution of a civil action pending in Itasca County District Court (Court File No. #31-CV-15-3288);

-17-

(19)     Liens to be granted to AK Steel Holding Corporation ("AKS") in connection with the Issuer's purchase of materials and supplies from AKS pursuant to the Global Settlement Agreement (as defined in the APA); and

(20)     Liens on the Coke Guarantor's assets other than the Coke Plant securing any Indebtedness Incurred under Section 4.09(b)(12); for the avoidance of doubt no Liens shall be placed on the Coke Plant pursuant to this provision.

"<u>Person</u>" means any natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and governmental authorities.

"<u>PIK Interest</u>" means the payment of interest (including Additional Amounts, if any) on the Notes through an increase in the principal amount of the outstanding Notes equal to the amount of accrued and unpaid interest due on the relevant Interest Payment Date.

"<u>Premises</u>" means the owned real property (including all real property) that is required to be subject to Mortgages and forms a portion of the Collateral.

"<u>Preferred Stock</u>," as applied to the Capital Stock of any corporation, means Capital Stock of any class or classes (however designated) which is preferred as to the payment of dividends, or as to the distributions of assets upon any voluntary or involuntary liquidation or dissolution of such corporation, over shares of Capital Stock of any other class of such corporation.

"<u>Real Estate Leases</u>" means any existing or hereafter acquired leasehold interests in real property, or licenses or other agreements with regard to accessing real property or accessing or removing iron ore or iron ore tailings and the term "<u>Leased Real Property</u>" shall have a meaning correlative to the foregoing.

"<u>Receivable</u>" means a right to receive payment arising from a sale or lease of goods or the performance of services by a Person pursuant to an arrangement with another Person pursuant to which such other Person is obligated to pay for goods or services under terms that permit the purchase of such goods and services on credit and shall include, in any event, any items of property that would be classified as an "account," "chattel paper," "payment intangible" or "instrument" under the Uniform Commercial Code as in effect in the State of New York and any "supporting obligations" as so defined.

"<u>Recovery Event</u>" means any event, occurrence, claim or proceeding that results in any Net Award or Net Insurance Proceeds.

"<u>Record Date</u>" for the amount payable on any Payment Date means March 15, June 15, September 15 and December 15, (whether or not a Business Day) next preceding such Interest Payment Date.

"<u>Refinancing Indebtedness</u>" means Indebtedness that is Incurred to refund, refinance, replace, exchange, renew, repay or extend (including pursuant to any defeasance or

discharge mechanism) (collectively, "refinance," "refinances," "refinanced" and "refinancing" shall each have a correlative meaning) any Indebtedness existing on the Issue Date or Incurred in compliance with this Indenture, defeasance costs, accrued interest and fees and expenses (including fees and expenses relating to the Incurrence of such Refinancing Indebtedness) in connection with any such refinancing) including Indebtedness that refinances Refinancing Indebtedness; *provided, however*, that:

(1) (a) if the Stated Maturity of the Indebtedness being refinanced is earlier than the Stated Maturity of the Notes, the Refinancing Indebtedness has a Stated Maturity no earlier than the Stated Maturity of the Indebtedness being refinanced or (b) if the Stated Maturity of the Indebtedness being refinanced is later than the Stated Maturity of the Notes, the Refinancing Indebtedness has a Stated Maturity at least 91 days later than the Stated Maturity of the Notes;

(2) the Refinancing Indebtedness has an Average Life at the time such Refinancing Indebtedness is Incurred that is equal to or greater than the Average Life of the Indebtedness being refinanced;

(3) such Refinancing Indebtedness is Incurred in an aggregate principal amount (or if issued with original issue discount, an aggregate issue price) that is equal to or less than the sum of the aggregate principal amount (or if issued with original issue discount, the aggregate accreted value) then outstanding of the Indebtedness being refinanced (plus, without duplication, any additional Indebtedness Incurred to pay premiums required by the instruments governing such existing Indebtedness or reasonable tender premiums, as determined in good faith, defeasance costs, accrued interest and fees and expenses in connection with any such refinancing);

(4) to the extent such Refinancing Indebtedness is secured, the Liens securing such Refinancing Indebtedness have a Lien priority equal with or junior to the Liens securing the Indebtedness being refunded, refinanced, replaced, exchanged, renewed, repaid or extended; and

(5) if the Indebtedness being refinanced is subordinated in right of payment to the Notes or the Note Guarantees, such Refinancing Indebtedness is subordinated in right of payment to the Notes or the Note Guarantees on terms at least as favorable to the Holders as those contained in the documentation governing the Indebtedness being refinanced.

"Responsible Officer" means, when used with respect to the Trustee, any officer within the corporate trust department of the Trustee having direct responsibility for the administration of this Indenture.

"Restricted Investment" means any Investment other than a Permitted Investment.

"Reuters Screen LIBOR01 Page" means the display designated on page "LIBOR01" on Reuters (or such other page as may replace the LIBOR01 page on that service or any successor service for the purpose of displaying London interbank offered rates for U.S. dollar deposits of major banks).

"S&P" means Standard & Poor's, a division of The McGraw-Hill Companies,

-19-

Inc., and any successor to its rating agency business.

"SEC" means the U.S. Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Security Agreement" means the Security Agreement, dated on or about the date of the original issuance of the Notes hereunder, by and among the Issuer, certain other grantors party thereto from time to time and the Collateral Agent.

"Senior Management" means the chief executive officer and the chief financial officer of the Issuer.

"Similar Business" means any business conducted or proposed to be conducted by the Issuer and its Subsidiaries on the Issue Date or any business that is similar, reasonably related, incidental or ancillary thereto.

"Specified Event of Default" means a quarterly interest payment Event of Default under Section 6.01(a)(1) that continues for a period of nine (9) consecutive months after the scheduled Interest Payment Date.

"Stated Maturity" means, with respect to any security, the date specified in the agreement governing or certificate relating to such Indebtedness as the fixed date on which the final payment of principal of such security is due and payable, including pursuant to any mandatory redemption provision, but not including any contingent obligations to repay, redeem or repurchase any such principal prior to the date originally scheduled for the payment thereof.

"Subordinated Indebtedness" means any financing from any source, including Affiliates of the Issuer, incurred by the Issuer to meet its working capital requirements, which indebtedness is subordinated in right of payment to the Notes and the Note Guarantees.

"Subsidiary" of any Person means (1) any corporation, association or other business entity (other than a partnership, joint venture, limited liability company or similar entity) of which more than 50% of the total ordinary voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof (or Persons performing similar functions) or (2) any partnership, joint venture limited liability company or similar entity of which more than 50% of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, is, in the case of clauses (1) and (2), at the time owned or controlled, directly or indirectly, by (a) such Person, (b) such Person and one or more Subsidiaries of such Person or (c) one or more Subsidiaries of such Person.  Unless otherwise specified herein, each reference to a Subsidiary shall refer to a Subsidiary of the Issuer.

"Transfer Restricted Notes" means Definitive Notes and any other Notes that bear or are required to bear the Restricted Notes Legend.

"Trust Indenture Act" means the Trust Indenture Act of 1939, as amended.

"Trustee" means the party named as such in the first paragraph of this Indenture, until a successor replaces it in accordance with the applicable provisions of this Indenture and thereafter means the successor serving hereunder.

"Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in any applicable jurisdiction.

"Voting Stock" of a Person means all classes of Capital Stock of such Person then outstanding and normally entitled to vote in the election of directors, managers or trustees, as applicable, of such Person.

"Wholly Owned Subsidiary" means a Subsidiary, all of the Capital Stock of which (other than directors' qualifying shares) is owned by an Obligor or another Wholly Owned Subsidiary.

Section 1.02    Other Definitions.

| Term | Defined in Section |
|---|---|
| "Acceleration Effective Date" | 6.02(a)(2) |
| "Acceleration Effective Date Notice" | 4.15(a) |
| "Additional Amounts" | 2.15(a) |
| "Affiliate Transaction" | 4.14 |
| "Agent Members" | 2.1(b) of Appendix A |
| "Applicable Procedures" | 1.1(a) of Appendix A |
| "Applicable Rate" | 2.14(a) |
| "Authentication Order" | 2.02(c) |
| "Clarke Redemption Date" | 6.02(b) |
| "Clarke Redemption Failure Notice" | 6.02(b) |
| "Clearstream" | 1.1(a) of Appendix A |
| "Deficiency Amount" | 6.02(b) |
| "Definitive Notes Legend" | 2.2(e) of Appendix A |
| "Distribution Compliance Period" | 1.1(a) of Appendix A |
| "ERISA" | 2.2(e) of Appendix A |
| "ERISA Legend" | 2.2(e) of Appendix A |
| "Euroclear" | 1.1(a) of Appendix A |
| "Event of Default" | 6.01(a) |
| "Event of Default Redemption" | 4.15(a) |
| "Event of Default Redemption Notice" | 6.02(b) |
| "Event of Default Redemption Payment Date" | 4.15(a) |
| "Event of Default Redemption Price" | 4.15(a) |
| "Expiration Date" | 1.05(j) |
| "First Standstill Expiration Date" | 6.02(b) |
| "Global Note" | 2.1(a) of Appendix A |
| "Global Notes Legend" | 2.2(e) of Appendix A |
| "Guaranteed Obligations" | 11.01(a) |
| "Guarantor Redemption Date" | 6.02(b) |
| "Guarantor Redemption Failure Notice" | 6.02(b) |
| "IAI" | 1.1(a) of Appendix A |
| "IAI Global Note" | 2.1(a) of Appendix A |
| "Interest Reset Date" | 2.14(a) |
| "Issuer Redemption Date" | 6.02(b) |

-21-

| Term | Defined in Section |
|------|--------------------|
| "Issuer Redemption Failure Notice" .............................................. | 6.02(b) |
| "Leased Real Property" ................................................................. | Definition of Real Estate Leases |
| "Note Register" ............................................................................. | 2.03(a) |
| "OID Notes Legend" .................................................................... | 2.2(e) of Appendix A |
| "Paying Agent" ............................................................................. | 2.03(a) |
| "PDF" ........................................................................................... | 2.06(i) |
| "PIK Payment" ............................................................................. | 2.01(a) |
| "QIB" ............................................................................................ | 1.1(a) of Appendix A |
| "Redemption Failure Notice" ....................................................... | 6.02(b) |
| "Registrar" ................................................................................... | 2.03(a) |
| "Regulation S" ............................................................................. | 1.1(a) of Appendix A |
| "Regulation S Global Note" ......................................................... | 2.1(a) of Appendix A |
| "Relevant Jurisdictions" ............................................................... | 2.15(a) |
| "Relevant Taxing Jurisdiction" .................................................... | 2.15(a) |
| "Resale Restriction Termination Date" ........................................ | 2.2(e) of Appendix A |
| "Restricted Notes Legend" ........................................................... | 2.2(e) of Appendix A |
| "Restricted Payment" ................................................................... | 4.08 |
| "Rule 144" .................................................................................... | 1.1(a) of Appendix A |
| "Rule 144A" .................................................................................. | 1.1(a) of Appendix A |
| "Rule 144A Global Note" ............................................................. | 2.1(a) of Appendix A |
| "Second Standstill Expiration Date" ............................................ | 6.02(b) |
| "Section 4.15 Notice" ................................................................... | 4.15(b) |
| "Similar Laws" ............................................................................. | 2.2(e) of Appendix A |
| "Standstill Period" ........................................................................ | 6.02(b) |
| "Successor Company" ................................................................... | 5.01 |
| "Third Standstill Expiration Date" ............................................... | 6.02(b) |
| "Unrestricted Global Note" .......................................................... | 1.1(a) of Appendix A |
| "U.S. Person" ............................................................................... | 1.1(a) of Appendix A |

Section 1.03    Rules of Construction.

Unless the context otherwise requires:

(1)     a term defined in Section 1.01 or 1.02 has the meaning assigned to it therein;

(2)     an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(3)     "or" is not exclusive;

(4)     words in the singular include the plural, and words in the plural include the singular;

(5)     provisions apply to successive events and transactions;

(6)     unless the context otherwise requires, any reference to an "Appendix," "Article," "Section," "clause," "Schedule" or "Exhibit" refers to an Appendix, Article, Section, clause, Schedule or Exhibit, as the case may be, of this Indenture;

-22-

(7)     the words "herein," "hereof" and other words of similar import refer to this Indenture as a whole and not any particular Article, Section, clause or other subdivision;

(8)     "including" means including without limitation;

(9)     references to sections of, or rules under, the Securities Act or the Exchange Act shall be deemed to include substitute, replacement or successor sections or rules adopted by the SEC from time to time; and

(10)     unless otherwise provided, references to agreements and other instruments shall be deemed to include all amendments and other modifications to such agreements or instruments, but only to the extent such amendments and other modifications are not prohibited by the terms of this Indenture.

Section 1.04     [Reserved]

Section 1.05     Acts of Holders.

(a)     Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in person or by an agent duly appointed in writing.  Except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments or record or both are delivered to the Trustee and, where it is hereby expressly required, to the Issuer and the Guarantors.  Proof of execution of any such instrument or of a writing appointing any such agent, or the holding by any Person of a Note, shall be sufficient for any purpose of this Indenture and (subject to Section 7.01) conclusive in favor of the Trustee, the Issuer and the Guarantors, if made in the manner provided in this Section 1.05.

(b)     The fact and date of the execution by any Person of any such instrument or writing may be proved (1) by the affidavit of a witness of such execution or by the certificate of any notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to him the execution thereof or (2) in any other manner deemed reasonably sufficient by the Trustee.  Where such execution is by or on behalf of any legal entity other than an individual, such certificate or affidavit shall also constitute proof of the authority of the Person executing same.  The fact and date of the execution of any such instrument or writing, or the authority of the Person executing the same, may also be proved in any other manner that the Trustee deems sufficient.

(c)     The ownership of Notes shall be proved by the Note Register.

(d)     Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Note shall bind every future Holder of the same Note and the Holder of every Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, in respect of any action taken, suffered or omitted by the Trustee, the Issuer or the Guarantors in reliance thereon, whether or not notation of such action is made upon such Note.

-23-

(e)     The Issuer may set a record date for purposes of determining the identity of Holders entitled to make, give or take any request, demand, authorization, direction, notice, consent, waiver or other action provided in this Indenture to be made, or to vote on or consent to any action authorized or permitted to be taken by the Holders; *provided* that the Issuer may not set a record date for, and the provisions of this paragraph shall not apply with respect to, the giving or making of any notice, declaration, request or direction referred to in clause (f) below. Unless otherwise specified, if not set by the Issuer prior to the first solicitation of a Holder made by any Person in respect of any such action, or in the case of any such vote, prior to such vote, any such record date shall be the later of 30 days prior to the first solicitation of such consent or vote or the date of the most recent list of Holders furnished to the Trustee prior to such solicitation or vote. If any record date is set pursuant to this clause (e), the Holders on such record date, and only such Holders, shall be entitled to make, give or take such request, demand, authorization, direction, notice, consent, waiver or other action (including revocation of any action), whether or not such Holders remain Holders after such record date; *provided* that no such action shall be effective hereunder unless made, given or taken on or prior to the applicable Expiration Date by Holders of the requisite principal amount of Notes, or each affected Holder, as applicable, on such record date. Promptly after any record date is set pursuant to this paragraph, the Issuer, at its own expense, shall cause notice of such record date, the proposed action by Holders and the applicable Expiration Date to be given to the Trustee in writing and to each Holder in the manner set forth in Section 13.01.

(f)     The Trustee may set any day as a record date for the purpose of determining the Holders entitled to join in the giving or making of (1) any notice of default under Section 6.01(a), (2) any declaration of acceleration referred to in Section 4.15 or Section 6.02, (3) any direction referred to in Section 6.04 or (4) any request to pursue a remedy as permitted in Section 6.05. If any record date is set pursuant to this paragraph, the Holders on such record date, and no other Holders, shall be entitled to join in such notice, declaration, request or direction, whether or not such Holders remain Holders after such record date; *provided* that no such action shall be effective hereunder unless made, given or taken on or prior to the applicable Expiration Date by Holders of the requisite principal amount of Notes or each affected Holder, as applicable, on such record date. Promptly after any record date is set pursuant to this paragraph, the Trustee, at the Issuer's expense, shall cause notice of such record date, the proposed action by Holders and the applicable Expiration Date to be given to the Issuer and to each Holder in the manner set forth in Section 13.01.

(g)     Without limiting the foregoing, a Holder entitled to take any action hereunder with regard to any particular Note may do so with regard to all or any part of the principal amount of such Note or by one or more duly appointed agents, each of which may do so pursuant to such appointment with regard to all or any part of such principal amount. Any notice given or action taken by a Holder or its agents with regard to different parts of such principal amount pursuant to this paragraph shall have the same effect as if given or taken by separate Holders of each such different part.

(h)     Without limiting the generality of the foregoing, a Holder, including a Depositary that is the Holder of a Global Note, may make, give or take, by a proxy or proxies duly appointed in writing, any request, demand, authorization, direction, notice, consent, waiver or other action provided in this Indenture to be made, given or taken by Holders, and a

Depositary that is the Holder of a Global Note may provide its proxy or proxies to the beneficial owners of interests in any such Global Note through such Depositary's standing instructions and customary practices.

(i)     The Issuer may fix a record date for the purpose of determining the Persons who are beneficial owners of interests in any Global Note held by a Depositary entitled under the procedures of such Depositary, if any, to make, give or take, by a proxy or proxies duly appointed in writing, any request, demand, authorization, direction, notice, consent, waiver or other action provided in this Indenture to be made, given or taken by Holders; *provided* that if such a record date is fixed, only the beneficial owners of interests in such Global Note on such record date or their duly appointed proxy or proxies shall be entitled to make, give or take such request, demand, authorization, direction, notice, consent, waiver or other action, whether or not such beneficial owners remain beneficial owners of interests in such Global Note after such record date. No such request, demand, authorization, direction, notice, consent, waiver or other action shall be effective hereunder unless made, given or taken on or prior to the applicable Expiration Date.

(j)     With respect to any record date set pursuant to this Section 1.05, the party hereto that sets such record date may designate any day as the "Expiration Date" and from time to time may change the Expiration Date to any earlier or later day; *provided* that no such change shall be effective unless notice of the proposed new Expiration Date is given to the other party hereto in writing, and to each Holder of Notes in the manner set forth in Section 13.01, on or prior to both the existing and the new Expiration Date. If an Expiration Date is not designated with respect to any record date set pursuant to this Section 1.05, the party hereto which set such record date shall be deemed to have initially designated the 90th day after such record date as the Expiration Date with respect thereto, subject to its right to change the Expiration Date as provided in this clause (j).

ARTICLE 2

THE NOTES

Section 2.01     Form and Dating; Terms.

(a)     Provisions relating to the Notes issued under this Indenture are set forth in Appendix A, which is hereby incorporated in and expressly made a part of this Indenture. The Notes and the Trustee's certificate of authentication shall each be substantially in the form of Exhibit A hereto, which is hereby incorporated in and expressly made a part of this Indenture. The Notes may have notations, legends or endorsements required by law, rules or agreements with national securities exchanges to which the Issuer or any Guarantor is subject, if any, or usage (*provided* that any such notation, legend or endorsement is in a form acceptable to the Issuer). Each Note shall be dated the date of its authentication. Subject to the issuance of additional Notes or the increase in the principal amount of the Global Notes in order to evidence PIK Interest (which additional Notes or increased principal amount shall be in denominations of $1.00 or any integral multiple of $1.00 in excess thereof), the Notes shall be issuable only in registered form without interest coupons and in denominations of $2,000 and any integral multiples of $1.00. On any Interest Payment Date on which the Issuer pays interest all or in part

-25-

in PIK Interest (a "PIK Payment") with respect to a Global Note, the Trustee shall, subject to the Issuer's compliance with Section 2.14(d), increase the principal amount of such Global Note by an amount equal to the interest payable as PIK Interest, rounded up to the nearest whole dollar, for the relevant Interest Period on the principal amount of such Global Note as of the relevant Record Date for such Interest Payment Date, to the credit of the Holders of such Global Note on such Record Date and an adjustment shall be made on the books and records of the Trustee with respect to such Global Note to reflect such increase.

(b)     The aggregate principal amount of Notes that may be authenticated and delivered under this Indenture is limited to $22,500,000, *provided* that nothing herein shall prevent the issuance of additional Notes or the increase in the aggregate principal amount of the Global Notes issuable hereunder in connection with the payment of PIK Interest.

The terms and provisions contained in the Notes shall constitute, and are hereby expressly made, a part of this Indenture, and the Issuer, the Guarantors and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby.  However, to the extent any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

Additional Notes issued from time to time by the Issuer in connection with the payment of PIK Interest shall be pari passu with the outstanding Notes, shall be consolidated with and form a single class with any outstanding Notes and shall have the same terms as to status, redemption or otherwise.

Section 2.02    Execution and Authentication.

(a)     At least one Officer of the Issuer shall execute the Notes on behalf of the Issuer by manual or facsimile signature.  If an Officer whose signature is on a Note no longer holds that office at the time a Note is authenticated, the Note shall nevertheless be valid.

(b)     A Note shall not be entitled to any benefit under this Indenture or be valid or obligatory for any purpose until authenticated substantially in the form of Exhibit A attached hereto by the manual signature of an authorized signatory of the Trustee.  The signature shall be conclusive evidence that the Note has been duly authenticated and delivered under this Indenture.

(c)     On each Issue Date, the Trustee shall, upon receipt of a written order of the Issuer signed by an Officer of the Issuer (an "Authentication Order"), authenticate and deliver the Notes specified in such Authentication Order.

(d)     The Trustee may appoint an authenticating agent acceptable to the Issuer to authenticate Notes.  An authenticating agent may authenticate Notes whenever the Trustee may do so.  Each reference in this Indenture to authentication by the Trustee includes authentication by such agent.  An authenticating agent has the same rights as an Agent to deal with Holders, the Issuer or an Affiliate of the Issuer.

Section 2.03    Registrar, Paying Agent and Calculation Agent.

-26-

#4834-6333-0618

(a)      The Issuer shall maintain an office or agency where Notes may be presented for registration of transfer or for exchange ("Registrar") and at least one office or agency where Notes may be presented for payment ("Paying Agent").  The Registrar shall keep a register of the Notes ("Note Register") and of their transfer and exchange.  The Issuer may appoint one or more co-registrars and one or more additional paying agents.  The term "Registrar" includes any co-registrar, and the term "Paying Agent" includes any additional paying agent.  The Issuer may change any Paying Agent or Registrar without prior notice to any Holder.  The Issuer shall notify the Trustee in writing of the name and address of any Agent not a party to this Indenture.  If the Issuer fails to appoint or maintain another entity as Registrar or Paying Agent, the Trustee shall act as such.  The Issuer or any of its Subsidiaries may act as Paying Agent or Registrar.

(b)      The Issuer initially appoints The Depository Trust Company to act as Depositary with respect to the Global Notes.  The Issuer initially appoints the Trustee to act as Paying Agent, Registrar and Calculation Agent for the Notes and to act as Custodian with respect to the Global Notes.

(c)      The Issuer may change the Paying Agent, Registrar or Calculation Agent without notice to the Holders.  The Issuer or any of its Subsidiaries may act in any such capacity.

Section 2.04    Paying Agent to Hold Money in Trust.

The Issuer shall, no later than 11:00 a.m. (New York City time) on each due date for the payment of principal, premium and Additional Amounts, if any, and, subject to Section 2.14(a), interest on any of the Notes, deposit with a Paying Agent a sum sufficient to pay such amount, such sum to be held in trust for the Holders entitled to the same, and (unless such Paying Agent is the Trustee) the Issuer shall promptly notify the Trustee in writing of its action or failure so to act.  Each Paying Agent shall promptly notify the Issuer in the event that there is deposited with such Paying Agent an amount in excess of the amount required to be paid on any such due date, and the Issuer shall be entitled to remittance of such excess amount.  The Issuer shall require each Paying Agent other than the Trustee to agree in writing that such Paying Agent shall hold in trust for the benefit of Holders or the Trustee all money held by such Paying Agent for the payment of principal, premium and Additional Amounts, if any, and interest on the Notes, and shall notify the Trustee of any default by the Issuer in making any such payment.  While any such default continues, the Trustee may require a Paying Agent to pay all money held by it to the Trustee.  The Issuer at any time may require a Paying Agent to pay all money held by it to the Trustee.  Upon payment over to the Trustee, a Paying Agent shall have no further liability for the money.  If the Issuer or a Subsidiary acts as Paying Agent, it shall segregate and hold in a separate trust fund for the benefit of the Holders all money held by it as Paying Agent.  Upon any bankruptcy or reorganization proceedings relating to the Issuer, the Trustee shall serve as Paying Agent for the Notes.

Section 2.05    Holder Lists.

The Registrar shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of all Holders.  If the Trustee is not the Registrar, the Issuer shall furnish to the Trustee at least five Business Days after each Record

-27-

Date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of the Holders.

Section 2.06    Transfer and Exchange.

(a)    The Notes shall be issued in registered form and shall be transferable only upon the surrender of a Note for registration of transfer and in compliance with Appendix A.

(b)    To permit registrations of transfers and exchanges, the Issuer shall execute and the Trustee shall authenticate Global Notes and Definitive Notes upon receipt of an Authentication Order in accordance with Section 2.02 or at the Registrar's request.

(c)    No service charge shall be imposed in connection with any registration of transfer or exchange (other than pursuant to Section 2.07), but the Holders shall be required to pay any transfer tax or similar governmental charge payable in connection therewith (other than any such transfer taxes or similar governmental charge payable upon exchange or transfer pursuant to Sections 2.10 and 9.05).

(d)    All Global Notes and Definitive Notes issued upon any registration of transfer or exchange of Global Notes or Definitive Notes shall be the valid obligations of the Issuer, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Global Notes or Definitive Notes surrendered upon such registration of transfer or exchange.

(e)    Neither the Issuer nor the Registrar shall be required to register the transfer of or to exchange any Note between a Record Date and the next succeeding Payment Date.

(f)    Prior to due presentment for the registration of a transfer of any Note, the Trustee, any Agent and the Issuer may deem and treat the Person in whose name any Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal, premium, if any, and (subject to the Record Date provisions of the Notes) interest on such Notes and for all other purposes, and none of the Trustee, any Agent or the Issuer shall be affected by notice to the contrary.

(g)    Upon surrender for registration of transfer of any Note at the office of the Trustee as set forth in Section 13.01, the Issuer shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more replacement Notes of any authorized denomination or denominations of a like aggregate principal amount.

(h)    At the option of the Holder, Notes may be exchanged for other Notes of any authorized denomination or denominations of a like aggregate principal amount upon surrender of the Notes to be exchanged at such office or agency.  Whenever any Global Notes or Definitive Notes are so surrendered for exchange, the Issuer shall execute, and the Trustee shall authenticate and deliver, the replacement Global Notes and Definitive Notes which the Holder making the exchange is entitled to in accordance with the provisions of Appendix A.

(i)    All certifications, certificates and Opinions of Counsel required to be submitted to the Registrar pursuant to this Section 2.06 to effect a registration of transfer or

-28-

exchange may be submitted by mail or by facsimile or transmission in portable document format ("PDF").

Section 2.07    Replacement Notes.

If a mutilated Note is surrendered to the Trustee or if a Holder claims that its Note has been lost, destroyed or wrongfully taken and the Trustee receives evidence to its satisfaction of the ownership and loss, destruction or theft of such Note, the Issuer shall issue and the Trustee, upon receipt of an Authentication Order, shall authenticate a replacement Note if the Trustee's requirements are otherwise met.  Such Holder shall furnish to the Issuer and to the Trustee such security or indemnity as may be required by them to save each of them harmless, and, in every case of destruction, loss, or theft, the Holder shall also furnish to the Issuer and to the Trustee evidence to their satisfaction of the destruction, loss or theft, of such Note and of the ownership thereof.  The Issuer may charge the Holder for the expenses of the Issuer and the Trustee in replacing a Note.  Every replacement Note is a contractual obligation of the Issuer and shall be entitled to all of the benefits of this Indenture equally and proportionately with all other Notes duly issued hereunder.  Notwithstanding the foregoing provisions of this Section 2.07, in case any mutilated, lost, destroyed or wrongfully taken Note has become or is about to become due and payable, the Issuer in its discretion may, instead of issuing a new Note, pay such Note.

Section 2.08    Outstanding Notes.

(a)    The Notes outstanding at any time are all the Notes authenticated by the Trustee except for those canceled by it, those delivered to it for cancellation, those reductions in the interest in a Global Note effected by the Trustee in accordance with the provisions hereof, and those described in this Section 2.08 as not outstanding.  Except as set forth in Section 2.09, a Note does not cease to be outstanding because the Issuer or an Affiliate of the Issuer holds the Note.

(b)    If a Note is replaced pursuant to Section 2.07, it ceases to be outstanding unless the Trustee receives proof satisfactory to it that the replaced Note is held by a protected purchaser, as such term is defined in Section 8-303 of the Uniform Commercial Code in effect in the State of New York.

(c)    If the principal amount of any Note is considered paid under Section 4.01, it ceases to be outstanding and interest on it ceases to accrue from and after the date of such payment.

(d)    If a Paying Agent (other than the Issuer, a Subsidiary or an Affiliate of any thereof) holds, on the maturity date or any redemption date, money sufficient to pay Notes payable or to be purchased on that date, then on and after that date such Notes shall be deemed to be no longer outstanding and shall cease to accrue interest.

Section 2.09    Treasury Notes.

In determining whether the Holders of the requisite principal amount of Notes have concurred in any direction, waiver or consent, Notes beneficially owned by the Issuer or by any Affiliate of the Issuer, shall be considered as though not outstanding, except that for the

-29-

#4834-6333-0618

purposes of determining whether the Trustee shall be protected in conclusively relying on any such direction, waiver or consent, only Notes that a Responsible Officer of the Trustee actually knows are so owned shall be so disregarded. Notes so owned which have been pledged in good faith shall not be disregarded if the pledgee establishes to the satisfaction of the Trustee the pledgee's right to deliver any such direction, waiver or consent with respect to the Notes and that the pledgee is the Issuer or any obligor upon the Notes or any Affiliate of the Issuer or of such other obligor.

Section 2.10    Temporary Notes.

Until Definitive Notes are ready for delivery, the Issuer may prepare and the Trustee, upon receipt of an Authentication Order, shall authenticate temporary Notes. Temporary Notes shall be substantially in the form of Definitive Notes but may have variations that the Issuer considers appropriate for temporary Notes and as shall be reasonably acceptable to the Trustee. Without unreasonable delay, the Issuer shall prepare and the Trustee shall authenticate Definitive Notes in exchange for temporary Notes. Holders and beneficial holders, as the case may be, of temporary Notes shall be entitled to all of the benefits accorded to Holders, or beneficial holders, respectively, of Notes under this Indenture.

Section 2.11    Cancellation.

The Issuer at any time may deliver Notes to the Trustee for cancellation. The Registrar and Paying Agent shall forward to the Trustee any Notes surrendered to them for registration of transfer, exchange or payment. The Trustee or, at the direction of the Trustee, the Registrar or the Paying Agent and no one else shall cancel all Notes surrendered for registration of transfer, exchange, payment, replacement or cancellation and shall dispose of such cancelled Notes in accordance with its customary procedures (subject to the record retention requirement of the Exchange Act). Certification of the cancellation of Notes delivered pursuant to this Section 2.11 shall, upon the written request of the Issuer, be delivered to the Issuer. The Issuer may not issue new Notes to replace Notes that it has paid or that have been delivered to the Trustee for cancellation.

Section 2.12    Defaulted Interest.

(a)    Upon the occurrence and during the continuance of an Event of Default, the outstanding principal amount of the Notes and any accrued and unpaid interest and all other overdue amounts shall each bear interest until paid to the Persons who are Holders on a subsequent special record date at the Applicable Rate, *plus* 2.00% per annum, as provided in the Notes and in Sections 2.14 and 4.01. The Issuer shall notify the Trustee in writing of the amount of defaulted interest proposed to be paid on each Note and the date of the proposed payment, and at the same time the Issuer shall deposit with the Paying Agent an amount of money equal to the aggregate amount proposed to be paid in respect of such defaulted interest or shall make arrangements satisfactory to the Trustee for such deposit prior to the date of the proposed payment, such money when deposited to be held in trust for the benefit of the Persons entitled to such defaulted interest as provided in this Section 2.12. The Trustee shall fix or cause to be fixed each such special record date and payment date; *provided* that no such special record date shall be less than 10 days prior to the related payment date for such defaulted interest. The Trustee

-30-

shall promptly notify the Issuer of such special record date. At least 15 days before the special record date, the Issuer (or, upon the written request of the Issuer, the Trustee in the name and at the expense of the Issuer) shall mail or deliver by electronic transmission in accordance with the applicable procedures of the Depositary, or cause to be mailed or delivered by electronic transmission in accordance with the applicable procedures of the Depositary to each Holder a notice that states the special record date, the related payment date and the amount of such interest to be paid.

(b)     Subject to the foregoing provisions of this Section 2.12 and for greater certainty, each Note delivered under this Indenture upon registration of transfer of or in exchange for or in lieu of any other Note shall carry the rights to interest accrued and unpaid, and to accrue interest, which were carried by such other Note.

Section 2.13     CUSIP and ISIN Numbers.

The Issuer in issuing the Notes may use CUSIP or ISIN numbers (if then generally in use) and, if so, the Trustee shall use CUSIP or ISIN numbers in notices of redemption or exchange as a convenience to Holders; *provided* that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice of redemption or exchange and that reliance may be placed only on the other identification numbers printed on the Notes, and any such redemption or exchange shall not be affected by any defect in or omission of such numbers. The Issuer shall as promptly as practicable notify the Trustee in writing of any change in the CUSIP or ISIN numbers.

Section 2.14     Interest.

(a)     (1) Interest on the Notes shall accrue from and including the most recent date to which interest has been paid (or, if no interest has been paid, from the Issue Date) through but excluding the date on which interest is paid. Interest shall be payable quarterly in arrears on each Interest Payment Date in cash, commencing the date of the original issuance of the Notes hereunder at a rate per annum equal to LIBOR plus 8.00% (the "Applicable Rate"); *provided* that for Interest Payment Dates prior to the Interest Payment Date on June 30, 2017, the Issuer may elect, prior to the beginning of such Interest Period, to pay some or all interest as PIK Interest and, if the Issuer so elects, the Issuer shall deliver to the Trustee and the Paying Agent written notification, executed by an Officer of the Issuer, substantially in the form of Exhibit D, setting forth such election at any time prior to the first day of the applicable Interest Period (and the Trustee shall furnish a copy thereof to the Holders in accordance with the applicable procedures of the Depository). In the event that the Issuer is entitled to and elects to pay Partial PIK Interest for an Interest Period, each Holder shall be entitled to receive Cash Interest in respect of the applicable percentage of the principal amount of the Notes held by such Holder on the relevant Record Date and PIK Interest in respect of the remaining percentage of the principal amount of the Notes held by such Holder on the relevant Record Date. Following an increase in the principal amount of the outstanding Global Notes as a result of a PIK Payment, the Notes shall bear interest on such increased principal amount from and after the date of such PIK Payment. With respect to any PIK Payment in the form of Definitive Notes, no later than 10 Business Days prior to the relevant Interest Payment Date the Issuer shall deliver to the Trustee and the Paying

Agent (if other than the Trustee) an Authentication Order to authenticate on the relevant Interest Payment Date new Notes in the required principal amount (rounded up to the nearest whole dollar) (the "PIK Notes"), and the Trustee will, on the relevant Interest Payment Date, authenticate and deliver such PIK Notes in certificated form for original issuance to the Holders of Definitive Notes on the relevant Record Date, as shown by the records of the register of Holders. Each PIK Note so issued will be dated as of the applicable Interest Payment Date and will bear interest from and after such date. Any payment of PIK Interest shall be deemed to be payment in full to the same extent as if it were paid in cash.

(2)     The rate of interest shall be reset on the first day of each Interest Period other than the Initial Interest Period (the date on which each such reset occurs, an "Interest Reset Date").

(b)     On or before each Calculation Date, the Calculation Agent shall determine the Applicable Rate and notify the Issuer and the Paying Agent. The Calculation Agent shall, upon the written request of any Holder of the Notes, provide the interest rate then in effect with respect to the Notes. All calculations of the Calculation Agent, in the absence of manifest error, shall be conclusive for all purposes and binding on the Issuer and Guarantors and the Holders of the Notes and neither the Trustee nor the Paying Agent shall have the duty to verify determinations of interest rates made by the Calculation Agent.

(c)     If the due date for any payment in respect of any Notes is not a Business Day at the place at which such payment is due to be paid, the Holder thereof shall not be entitled to payment of the amount due until the next succeeding Business Day at such place, and shall not be entitled to any further interest or other payment as a result of any such delay.

(d)     No later than 10 (ten) days prior to the relevant Interest Payment Date in connection with any PIK Payment, the Issuer shall deliver to the Trustee and the Paying Agent (if other than the Trustee) written notification, executed by an Officer of the Issuer, substantially in the form of Exhibit E hereto, setting forth the amount of PIK Interest to be paid on such Interest Payment Date and directing the Trustee and the Paying Agent (if other than the Trustee) to issue PIK Notes or increase the principal amount of the Global Notes in accordance with this paragraph and Section 2.14(a), which notification the Trustee and Paying Agent shall be entitled to rely upon.

Section 2.15    Additional Amounts

(a)     All payments by or on behalf of the Issuer, a Successor Company or a Guarantor of principal of, and premium (if any) and interest on the Notes or under any applicable Guarantees shall be made without withholding or deduction for, or on account of, any present or future taxes, duties, assessments or governmental charges of whatever nature imposed or levied by or within any jurisdiction in which the Issuer, a Successor Company or an applicable Guarantor is organized or resident for tax purposes or any political subdivision or taxing authority thereof or therein (each, as applicable, a "Relevant Taxing Jurisdiction") or any jurisdiction through which payment is made or any political subdivision or taxing authority thereof or therein (together with the Relevant Taxing Jurisdictions, the "Relevant Jurisdictions"), unless such withholding or deduction is required by law or by regulation or governmental policy

-32-

having the force of law. In the event that any such withholding or deduction is so required, the Issuer, a Successor Company or the applicable Guarantor, as the case may be, shall pay such additional amounts ("Additional Amounts") as shall result in receipt by the Holder of each Note or the Guarantees, as the case may be, of such amounts as would have been received by such Holder had no such withholding or deduction been required, except that no Additional Amounts shall be payable:

(1)     for or on account of:

(A)     any tax, duty, assessment or other governmental charge that would not have been imposed but for:

(i)     the existence of any present or former connection between the Holder or beneficial owner of such Note or Guarantee, as the case may be, and the Relevant Jurisdiction other than merely holding such Note or the receipt of payments thereunder or under a Guarantee, including, without limitation, such Holder or beneficial owner being or having been a national, domiciliary or resident of such Relevant Jurisdiction or treated as a resident thereof or being or having been physically present or engaged in a trade or business therein or having or having had a permanent establishment therein;

(B)     the presentation of such Note (in cases in which presentation is required) more than 30 days after the later of the date on which the payment of the principal of, premium, if any, and interest on, such Note became due and payable pursuant to the terms thereof or was made or duly provided for, except to the extent that the Holder thereof would have been entitled to such Additional Amounts if it had presented such Note for payment on any date within such 30-day period; or

(C)     the failure of the Holder or beneficial owner to comply with a timely request of the Issuer, a Successor Company or any Guarantor addressed to the Holder to provide information concerning such Holder's or beneficial owner's nationality, residence, identity or connection with any Relevant Jurisdiction, if and to the extent that due and timely compliance with such request would have reduced or eliminated any withholding or deduction as to which Additional Amounts would have otherwise been payable to such Holder;

(D)     any estate, inheritance, gift, sale, transfer, personal property or similar tax, assessment or other governmental charge;

(E)     any withholding or deduction that is required to be made pursuant to European Council Directive 2003/48/EC on the taxation of savings income or any other Directive amending, supplementing or replacing such Directive, or any law implementing or complying with, or introduced in order to conform to, such Directives;

(F)     any tax, duty, assessment or other governmental charge to the

-33-

extent such tax, duty, assessment or other governmental charge results from the presentation of the Note (where presentation is required) for payment and the payment can be made without such withholding or deduction by the presentation of the Note for payment elsewhere;

(G)     any combination of taxes, duties, assessments or other governmental charges referred to in the preceding clauses (A), (B), (C) and (D); or

(H)     to a Holder that is a fiduciary, partnership or person other than the sole beneficial owner of any payment to the extent that such payment would be required to be included in the income under the laws of a Relevant Jurisdiction, for tax purposes, of a beneficiary or settlor with respect to the fiduciary, or a member of that partnership or a beneficial owner who would not have been entitled to such Additional Amounts had that beneficiary, settlor, partner or beneficial owner been the Holder thereof.

(2)     The Issuer shall (i) make such withholding or deduction and (ii) remit the full amount deducted or withheld to the relevant authority in accordance with applicable law. The Issuer shall, upon request by any Holder, make reasonable efforts to obtain certified copies of tax receipts evidencing the payment of any taxes so deducted or withheld from the Relevant Jurisdiction imposing such taxes. Upon request by any Holder, the Issuer shall furnish to Holders, within 60 days after the date the payment of any taxes so deducted or withheld is due pursuant to applicable law, either certified copies of tax receipts evidencing such payment or, if such receipts are not obtainable, other evidence of such payments.

(3)     At least 30 days prior to each date on which any payment under or with respect to the Notes is due and payable, if the Issuer shall be obligated to pay Additional Amounts with respect to such payment, the Issuer shall deliver to the Trustee an Officer's Certificate stating the fact that such Additional Amounts will be payable and the amounts so payable and shall set forth such other information necessary to enable the Paying Agent to pay such Additional Amounts to the Holders on such payment date.

(4)     In addition, the Issuer shall pay any stamp, issue, registration, documentary, value added or other similar taxes and other duties (including interest and penalties) payable in any Relevant Jurisdiction in respect of the creation, issue, offering, execution or enforcement of the Notes, or any documentation with respect thereto.

(5)     Whenever there is mentioned in any context the payment of principal of, and any premium or interest on, any Note or under any Guarantee, such mention shall be deemed to include payment of Additional Amounts provided for in this Indenture to the extent that, in such context, Additional Amounts are, were or would be payable in respect thereof.

-34-

# ARTICLE 3

# REDEMPTION

**Section 3.01    Notices to Trustee.**

(a)    If the Issuer elects to redeem Notes pursuant to Section 3.06, it shall furnish to the Trustee, at least two Business Days before notice of redemption is required to be mailed or delivered to Holders pursuant to Section 3.03 (unless a shorter notice shall be agreed to by the Trustee) but not more than 60 days before a redemption date, an Officers' Certificate setting forth (1) the paragraph or subparagraph of such Note or Section of this Indenture pursuant to which the redemption shall occur, (2) the redemption date, (3) the principal amount of the Notes to be redeemed, (4) the redemption price, if then ascertainable and (5) if applicable, any conditions to such redemption.

**Section 3.02    Selection of Notes to be Redeemed or Purchased in Part**

If less than all of the Notes are to be redeemed at any time (including, for the avoidance of doubt, under Section 4.15), selection of Notes for redemption shall be made by the Trustee by lot; *provided* that no Notes of $2,000 or less shall be redeemed in part. If any Note is to be redeemed in part only, the notice of redemption that relates to such Notes shall state the portion of the principal amount thereof to be redeemed.

**Section 3.03    Notice of Redemption.**

(a)    The Issuer shall mail or deliver by electronic transmission in accordance with the applicable procedures of the Depositary, or cause to be mailed (or delivered by electronic transmission in accordance with the applicable procedures of the Depositary) notices of redemption of Notes not less than 30 days but not more than 60 days before the redemption date to each Holder whose Notes are to be redeemed pursuant to this Article at such Holder's registered address or otherwise in accordance with the applicable procedures of the Depositary, except that redemption notices may be mailed more than 60 days prior to a redemption date if the notice is issued in connection with Article 8 or Article 12.

(b)    The notice shall identify the Notes to be redeemed (including CUSIP and ISIN number, if applicable) and shall state:

(1)    the redemption date;

(2)    the redemption price, including the portion thereof representing any accrued and unpaid interest; *provided* that in connection with a redemption under Section 3.06(a), the notice need not set forth the redemption price but only the manner of calculation thereof;

(3)    the name and address of the Paying Agent;

(4)    that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price;

-35-

(5)     that, unless the Issuer defaults in making such redemption payment or the Paying Agent is prohibited from making such payment pursuant to the terms of this Indenture, interest on Notes called for redemption ceases to accrue on and after the redemption date;

(6)     the paragraph or subparagraph of the Notes or Section of this Indenture pursuant to which the Notes called for redemption are being redeemed;

(7)     that no representation is made as to the correctness or accuracy of the CUSIP or ISIN number, if any, listed in such notice or printed on the Notes;

(8)     if any Note is being redeemed in part, the portion of the principal amount of such Note to be redeemed and that, after the applicable redemption date upon surrender of such Note, a new Note or Notes in principal amount equal to the unredeemed portion will be issued upon cancellation of the original Note; and

(9)     if applicable, any condition to such redemption.

(c)     At the Issuer's request, the Trustee shall give the notice of redemption in the Issuer's name and at the Issuer's expense; *provided* that the Issuer shall have delivered to the Trustee, at least five Business Days before notice of redemption is required to be sent or caused to be sent to Holders pursuant to this Section 3.03 (unless a shorter notice shall be agreed to by the Trustee), an Officers' Certificate requesting that the Trustee give such notice and setting forth the information to be stated in such notice as provided in Section 3.03(b).

(d)     If any Note is to be redeemed in part only, the notice of redemption that relates to that Note shall state the portion of the principal amount thereof to be redeemed, in which case a portion of the original Note will be issued in the name of the Holder thereof upon cancellation of the original Note. In the case of a Global Note, an appropriate notation will be made on such Note to decrease the principal amount thereof to an amount equal to the unredeemed portion thereof. Subject to the terms of the applicable redemption notice (including any conditions contained therein), Notes called for redemption become due on the date fixed for redemption. On and after the applicable redemption date, unless the Issuer defaults in the payment of the applicable redemption price, interest ceases to accrue on Notes or portions of them called for redemption.

Section 3.04     Effect of Notice of Redemption.

Once notice of redemption is mailed or delivered in accordance with Section 3.03, Notes called for redemption become irrevocably due and payable on the redemption date at the redemption price. The notice, if mailed or delivered by electronic transmission in a manner herein provided, shall be conclusively presumed to have been given, whether or not the Holder receives such notice. In any case, failure to give such notice or any defect in the notice to the Holder of any Note designated for redemption shall not affect the validity of the proceedings for the redemption of any other Note. Subject to Section 3.05, on and after the redemption date, interest ceases to accrue on Notes or portions of Notes called for redemption.

Section 3.05     Deposit of Redemption or Purchase Price.

-36-

(a)     No later than 11:00 a.m. (New York City time) on the Business Day prior to the redemption or purchase date, the Issuer shall deposit with the Trustee or with the Paying Agent money sufficient to pay the redemption or purchase price of and accrued and unpaid interest and Additional Amounts, if any, on all Notes to be redeemed or purchased on that date. If a Note is redeemed or purchased on or after a Record Date but on or prior to the related Payment Date, then any accrued and unpaid interest shall be paid to the Holder of record on such Record Date. The Paying Agent shall promptly mail to each Holder whose Notes are to be redeemed or repurchased the applicable redemption or purchase price thereof and accrued and unpaid interest and Additional Amounts, if any, thereon. The Trustee or the Paying Agent shall promptly return to the Issuer any money deposited with the Trustee or the Paying Agent by the Issuer in excess of the amounts necessary to pay the redemption or purchase price of, and accrued and unpaid interest and Additional Amounts, if any, on all Notes to be redeemed or purchased.

(b)     If the Issuer complies with the provisions of Section 3.05(a), on and after the redemption or purchase date, interest shall cease to accrue on the Notes called for redemption or purchase. If a Note is redeemed or purchased on or after a Record Date but on or prior to the related Payment Date, then any accrued and unpaid interest to the redemption or purchase date in respect of such Note shall be paid on such redemption or purchase date to the Person in whose name such Note is registered at the close of business on such Record Date. If any Note called for redemption or purchase shall not be so paid upon surrender for redemption or purchase because of the failure of the Issuer to comply with Section 3.05(a), interest shall be paid on the unpaid principal, from the redemption or purchase date until such principal is paid, and, to the extent lawful, on any interest accrued to the redemption or purchase date not paid on such unpaid principal, in each case at the rate provided in the Notes and in Sections 2.12 and Section 4.01.

Section 3.06     Optional Redemption.

(a)     The Issuer may, at any time, redeem the Notes, in whole or in part, upon notice pursuant to Section 3.03 at a redemption price equal to 100% of the aggregate principal amount of the Notes *plus* accrued and unpaid interest and Additional Amounts, if any, thereon, if any, to the redemption date. Promptly after the determination thereof, the Issuer shall give the Trustee notice of the redemption price provided for in this Section 3.06(a), and the Trustee shall not be responsible for such calculation.

(b)     Except pursuant to clause (a) of this Section 3.06, to the extent applicable, the Notes shall not be redeemable at the Issuer's option.

(c)     Any redemption pursuant to this Section 3.06 shall be made pursuant to the provisions of Sections 3.01 through 3.05.

(d)     Any redemption notice in connection with this Section 3.06 may, at the Issuer's discretion, be subject to one or more conditions precedent.

Section 3.07     Mandatory Redemption.

The Issuer shall not be required to make mandatory redemption or sinking fund payments with respect to the Notes other than as set forth in Section 6.02.

-37-

#4834-6333-0618

Section 3.08    Notes Redeemed or Purchased in Part

Upon surrender of a Note that is redeemed or purchased in part, the Issuer will issue and, upon receipt of an Authentication Order from the Issuer, the Trustee will authenticate for the Holder at the expense of the Issuer a new Note equal in principal amount to the unredeemed or unpurchased portion of the Note surrendered; *provided* that each such new Note will be in a principal amount of $2,000 or integral multiple of $1.00 in excess thereof.

ARTICLE 4

COVENANTS

Section 4.01    Payment of Notes.

(a)    (1) The Issuer shall pay, or cause to be paid, the principal, premium and Additional Amounts, if any, and interest on the Notes on the dates and in the manner provided in the Notes.  Principal, premium and Additional Amounts, if any, and interest shall be considered paid on the date due if the Paying Agent, if other than the Issuer or a Subsidiary, holds as of 11:00 a.m. (New York City) time, on the due date money deposited by the Issuer in immediately available funds and designated for and sufficient to pay the principal, premium and Additional Amounts, if any, and interest then due, *provided* that PIK Interest shall be considered paid on the date due if in accordance with the terms hereof and of the Notes, PIK Notes are issued or and the principal amount of the applicable Global Notes is increased in an amount equal to the amount of the applicable amount of interest pursuant to Section 2.01(a).

(2)    Notwithstanding whether the Issuer has elected to pay PIK Interest, beginning on June 30, 2017 and on each Amortization Payment Date thereafter, the Issuer shall make quarterly payments of the Amortization Amount in cash in immediately available funds in lawful money of the United States of America, by wire transfer to the bank account designated by the Trustee or Paying Agent in writing from time to time not later than 11:00 a.m. (New York City time) on such date.

(b)    The Issuer shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal and premium, if any, at the rate equal to the then applicable interest rate on the Notes; it shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest (without regard to any applicable grace period) at the same rate on the Notes to the extent lawful.

Section 4.02    Prepayment of Notes

The Issuer may at any time and from time to time prepay any principal amount of the Notes in whole or in part without premium or penalty, pursuant to Article 3.

Section 4.03    Taxes

Each Obligor shall pay, and shall cause each of its Subsidiaries to pay, prior to delinquency, all taxes, assessments and governmental levies except (a) such as are being

-38-

contested in good faith and by appropriate negotiations or proceedings or (b) where the failure to effect such payment is not adverse in any material respect to the Holders.

Section 4.04   Stay, Extension and Usury Laws

Each Obligor covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Indenture; and each Obligor (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenant that it shall not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law has been enacted.

Section 4.05   Corporate Existence.

Subject to Article 5, each Obligor shall do or cause to be done all things necessary to preserve and keep in full force and effect (1) its corporate or limited liability company existence and the corporate, partnership, limited liability company or other existence of each of its Subsidiaries, in accordance with the respective organizational documents (as the same may be amended from time to time) of such Obligor or any such Subsidiary and (2) the rights (charter and statutory), licenses and franchises of such Obligor and its Subsidiaries; *provided* that such Obligor shall not be required to preserve any such right, license or franchise, or the corporate, partnership, limited liability company or other existence of any of its Subsidiaries, if such Obligor in good faith shall determine that the preservation thereof is no longer desirable in the conduct of the business of such Obligor and its Subsidiaries, taken as a whole.

Section 4.06   Reports and Other Information

(a)     Notwithstanding that the Issuer may not be subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, each of the Issuer and the Coke Guarantor shall provide to the Holders the following reports:

(1)     within 120 days after the end of each fiscal year, beginning April 30, 2018 for the Issuer's 2017 fiscal year, audited consolidated annual financial statements with all notes related thereto, prepared in accordance with GAAP as in effect on the date thereof; and

(2)     within 45 days after the end of each of the first three fiscal quarters of each fiscal year, quarterly consolidated financial statements containing substantially the same information as in their annual financial statements including notes relating thereto, prepared in accordance with GAAP as in effect on the date thereof.

(b)     To the extent not satisfied by Section 4.06(a), for so long as any Notes are outstanding, the Issuer shall furnish to Holders and to securities analysts and prospective purchasers of the Notes, upon their request, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act. The requirements set forth in this Section 4.06(b) and Section 4.06(a) may be satisfied by delivering such information to the Trustee and posting copies

-39-

of such information on a website (which may be nonpublic and may be maintained by the Issuer or a third party) to which access will be given to Holders, prospective purchasers of the Notes (which prospective purchasers will be limited to QIBs) or non-U.S. persons (as defined in Regulation S), securities analysts and market making institutions that certify their status as such to the reasonable satisfaction of the Issuer.

(c)      In the event that any direct or indirect parent company of the Issuer becomes a Guarantor of the Notes, the Issuer may satisfy its obligations under this Section 4.06 to provide consolidated financial information of the Issuer by furnishing consolidated financial information relating to such parent; *provided* that (1) such financial statements are accompanied by consolidating financial information for such parent, the Issuer and the Subsidiaries in the manner prescribed by the SEC and (2) such parent is not engaged in any business in any material respect other than such activities as are incidental to its ownership, directly or indirectly, of the Capital Stock of the Issuer.

Section 4.07    [Reserved]

Section 4.08    Limitation on Restricted Payments.

Each Obligor shall not, and shall not permit any of its Subsidiaries, directly or indirectly, to

(1)      declare or pay any dividend or make any distribution (whether made in cash, securities or other property) on or in respect of its or any of its Subsidiaries' Capital Stock (including any payment in connection with any merger or consolidation involving such Obligor or any of its Subsidiaries), other than dividends or distributions by a Subsidiary, so long as, in the case of any dividend or distribution payable on or in respect of any Capital Stock issued by a Subsidiary that is not a Wholly Owned Subsidiary, the Obligor or the Subsidiary holding such Capital Stock receives at least its pro rata share of such dividend or distribution;

(2)      purchase, redeem, retire or otherwise acquire for value, including in connection with any merger or consolidation, any Capital Stock of such Obligor or any direct or indirect parent of such Obligor held by Persons other than such Obligor or a Subsidiary thereof;

(3)      make any principal payment on, or purchase, repurchase, redeem, defease or otherwise acquire or retire for value, prior to any scheduled repayment, scheduled sinking fund payment or scheduled maturity, any junior obligations, other than:

(A)      Indebtedness of such Obligor owing to and held by any of its Subsidiaries, or Indebtedness of any such Subsidiary owing to and held by such Obligor or any other Subsidiary, permitted under clause (5)) of Section 4.09(b); or

(B)      the purchase, repurchase, redemption, defeasance or other acquisition or retirement of junior obligations of any Guarantor purchased in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of purchase, repurchase,

-40-

redemption, defeasance or other acquisition or retirement; or

(4)    make any Restricted Investment (all such payments and other actions referred to in clauses (1) through (4) of this Section 4.08 (other than any exception thereto) shall be referred to as a "Restricted Payment").

Section 4.09    Limitation on Indebtedness.

(a)    Each Obligor shall not, and shall not permit any of its Subsidiaries to, create, incur, assume or permit to exist any Indebtedness (including Acquired Indebtedness) or issue any shares of Disqualified Stock.

(b)    The provisions of Section 4.09(a) shall not prohibit the Incurrence of the following Indebtedness:

(1)    the incurrence by any Obligor of Indebtedness represented by the Notes and the related Note Guarantees to be issued on the Issue Date;

(2)    Indebtedness existing on the date of the original issuance of the Notes hereunder (other than Indebtedness described in clauses (1), (4) and (5);

(3)    Indebtedness for the Issuer and its Subsidiaries in an aggregate principal amount not exceeding at any time outstanding (a) $5.0 million or (b) with the consent of the Holders of a majority in principal amount of the Notes then outstanding voting as a single class, $10.0 million;

(4)    Indebtedness Incurred by an Obligor or their Subsidiaries in respect of workers' compensation claims, health, disability or other employee benefits or property, casualty or liability insurance, self-insurance obligations, performance, bid, surety and similar bonds and completion Guarantees (not for borrowed money) provided in the ordinary course of business;

(5)    Indebtedness of an Obligor owing to and held by any of its Subsidiaries or Indebtedness of a Subsidiary of an Obligor owing to and held by such Obligor or any other Subsidiary of such Obligor; provided, however, (i) any subsequent issuance or transfer of Capital Stock or any other event which results in any such Indebtedness being beneficially held by a Person other than an Obligor or a Subsidiary of an Obligor; and

(i)    any sale or other transfer of any such Indebtedness to a Person other than an Obligor or a Subsidiary of an Obligor shall be deemed, in each case under this clause (5) of this Section 4.09(b), to constitute an Incurrence of such Indebtedness by such Obligor or such Subsidiary, as the case may be;

(6)    the Incurrence by an Obligor or any of their Subsidiaries of Refinancing Indebtedness that serves to refund or refinance any Indebtedness Incurred as permitted under Section 4.09(a) and clauses (1), (2), (3) and this clause (6) of this Section 4.09(b);

-41-

(7)     Preferred Stock of a Subsidiary of an Obligor held by such Obligor or any other Subsidiary of such Obligor; provided, however, (A) any subsequent issuance or transfer of Capital Stock or any other event which results in such Preferred Stock being beneficially held by a Person other than such Obligor or a Subsidiary of such Obligor; and (B) any sale or other transfer of any such Preferred Stock to a Person other than such Obligor or a Subsidiary of such Obligor shall be deemed in each case under this clause (7) to constitute an Incurrence of such Preferred Stock by such Subsidiary;

(8)     Indebtedness of Persons Incurred and outstanding on the date on which such Person became a Subsidiary of, or was acquired by, or merged into, an Obligor or any Subsidiary of any Obligor (other than Indebtedness Incurred (A) to provide all or any portion of the funds utilized to consummate the transaction or series of related transactions pursuant to which such Subsidiary became a Subsidiary of an Obligor or was otherwise acquired by an Obligor or (B) otherwise in connection with, or in contemplation of, such acquisition); provided, however, that the Incurrence of such Indebtedness does not materially impair the ability of the Issuer or the Guarantors to pay interest, principal and Amortization Amounts on the Notes; and

(9)     Indebtedness arising from agreements of an Obligor or a Subsidiary of any Obligor providing for indemnification, adjustment of purchase price or similar obligations, in each case, Incurred or assumed in connection with the disposition of any business or assets of such Obligor or any business, assets or Capital Stock of a Subsidiary of such Obligor, other than Guarantees of Indebtedness Incurred by any Person acquiring all or any portion of such business, assets or a Subsidiary of an Obligor for the purpose of financing such acquisition; provided that:

(A)     the maximum aggregate liability in respect of all such Indebtedness shall at no time exceed the gross proceeds including non-cash proceeds (the Fair Market Value of such non-cash proceeds being measured at the time received and without giving effect to subsequent changes in value) actually received by such Obligor and its Subsidiaries in connection with such disposition; and

(B)     such Indebtedness is not reflected on the balance sheet of such Obligor or any of its Subsidiaries (contingent obligations referred to in a footnote to financial statements and not otherwise reflected on the balance sheet will not be deemed to be reflected on such balance sheet for purposes of this clause (9)),

and the Incurrence of such Indebtedness does not materially impair the ability of any Obligor to pay interest, principal and Amortization Amounts on the Notes;

(10)     Subordinated Indebtedness;

(11)     the ML Notes; and

(12)     Indebtedness Incurred by the Coke Guarantor in an aggregate principal amount not exceeding at any time outstanding $10.0 million for working capital purposes.

-42-

Section 4.10    Limitation on Liens.

Each Obligor shall not, and shall not permit any of their Subsidiaries to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, other than Permitted Liens.

Section 4.11    Future Guarantors.

(a)    After the Issue Date, each Obligor shall cause each of its Subsidiaries (other than a Foreign Subsidiary) created or acquired by such Obligor or one or more of its Subsidiaries to execute and deliver to the Trustee a supplemental indenture to the Indenture pursuant to which such Subsidiary shall irrevocably and unconditionally Guarantee, on a joint and several basis, the full and prompt payment of the principal of, premium, if any, and interest on the Notes and all other Obligations of the Issuer under the Notes Documents on a senior secured first-priority basis.

(b)    The Obligations of each Guarantor shall be limited to the maximum amount as will, after giving effect to all other contingent and fixed liabilities of such Guarantor and after giving effect to any collections from or payments made by or on behalf of any other Guarantor in respect of the Obligations of such other Guarantor under its Note Guarantee or pursuant to its contribution Obligations under the Indenture, result in the Obligations of such Guarantor under its Note Guarantee not constituting a fraudulent conveyance or fraudulent transfer under federal or state law.

(c)    Each Person that becomes a Guarantor after the Issue Date shall also become a party to the applicable Collateral Documents and shall as promptly as practicable execute and deliver such security instruments, financing statements, mortgages, deeds of trust (in substantially the same form as those executed and delivered with respect to the Collateral on the Issue Date or on the date first delivered in the case of Mortgages and certificates and opinions of counsel (to the extent, and substantially in the form, delivered on the Issue Date or the date first delivered in the case of Mortgages (but no greater scope)) as may be necessary to vest in the Collateral Agent a perfected first-priority security interest (subject to Permitted Liens) in properties and assets that constitute Collateral as security for the Notes or the Note Guarantees and as may be necessary to have such property or asset added to the applicable Collateral as required under the Collateral Documents and the Indenture, and thereupon all provisions of the Indenture relating to the Collateral shall be deemed to relate to such properties and assets to the same extent and with the same force and effect.

(d)    Each Note Guarantee shall be released in accordance with the provisions of Section 11.06.

Section 4.12    Limitation on Restrictions on Distribution From Subsidiaries

(a)    No Obligor shall, or shall permit any of its Subsidiaries to, directly or indirectly, create or otherwise cause or permit to exist or become effective any consensual encumbrance or consensual restriction on the ability of such Obligor or any such Subsidiary to:

-43-

(1)     pay dividends or make any other distributions on its Capital Stock to an Obligor or any of its Subsidiaries, or with respect to any other interest or participation in, or measured by, its profits, or pay any Indebtedness or other obligations owed to an Obligor or any Subsidiary of an Obligor (it being understood that the priority of any Preferred Stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on Common Stock shall not be deemed a restriction on the ability to make distributions on Capital Stock);

(2)     make any loans or advances to an Obligor or any Subsidiary (it being understood that the subordination of loans or advances made to an Obligor or any Subsidiary to other Indebtedness Incurred by such Obligor or any such Subsidiary shall not be deemed a restriction on the ability to make loans or advances); or

(3)     sell, lease or transfer any of its property or assets to an Obligor or any Subsidiary of any Obligor (it being understood that such transfers shall not include any type of transfer described in clause (1) or (2) of this Section 4.13(a)).

(b)     Section 4.12(a) shall not prohibit encumbrances or restrictions existing under or by reason of:

(1)     contractual encumbrances or restrictions pursuant to the Collateral Documents and related documentation and other agreements or instruments in effect at or entered into on the Issue Date;

(2)     this Indenture, the Notes and the Note Guarantees;

(3)     any agreement or other instrument of a Person acquired by an Obligor or any of its Subsidiaries in existence at the time of such acquisition (but not created in contemplation thereof), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person and its Subsidiaries, or the property or assets of the Person and its Subsidiaries, so acquired (including after-acquired property);

(4)     any amendment, restatement, modification, renewal, supplement, refunding, replacement or refinancing of an agreement referred to in clauses (1), (2) or (3) of this Section 4.12(b) or this clause (4) of this Section 4.12(b); provided, however, that such amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings are, in the good faith determination of the Senior Management of the applicable Obligor, no more restrictive than the encumbrances and restrictions contained the agreements referred to in clauses (1), (2) or (3) of this Section 4.12(b) on the Issue Date or the date an applicable Subsidiary became a Subsidiary of any such Obligor or was merged into a Subsidiary of any such Obligor, whichever is applicable;

(5)     any customary provisions in leases, subleases or licenses and other agreements entered into by an Obligor or any Subsidiary of such Obligor in the ordinary course of business;

-44-

(6)     encumbrances or restrictions arising or existing by reason of applicable law or any applicable rule, regulation or order; or

(7)     Indebtedness Incurred or Preferred Stock issued by a Subsidiary of an Obligor permitted to be Incurred pursuant to Section 4.09 that, in the good faith determination of the Board of Directors of the applicable Obligor, are not more restrictive, taken as a whole, than those applicable to such Obligor in this Indenture on the Issue Date (which results in encumbrances or restrictions at a Subsidiary level comparable to those applicable to such Obligor); provided that such encumbrances or restrictions shall not materially affect the Issuer's or the Guarantor's ability to make anticipated principal and interest payments on the Notes (in the good faith determination of the Board of Directors of such Obligor).

Section 4.13     Limitations on Investments, Loans, Advances, Guarantees and Acquisitions.

No Obligor shall, or shall permit any of its Subsidiaries to, purchase, hold or acquire (including pursuant to any merger with any Person that was not a Subsidiary or otherwise a Guarantor prior to such merger) any Capital Stock, evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, Guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit, except Permitted Investments. and investments by such Obligor existing on the date of the original issuance of the Notes hereunder in the Capital Stock of its Subsidiaries.

Section 4.14     Transactions with Affiliates

(a)     No Obligor shall, or shall permit any of its Subsidiaries to, directly or indirectly, enter into or conduct any transaction (including the purchase, sale, lease or exchange of any property or asset or the rendering of any service) with any Affiliate of such Obligor (an "Affiliate Transaction"), other than when:

(1)     the terms of such Affiliate Transaction are no less favorable to such Obligor or such Subsidiary, as the case may be, than those that could have been obtained by such Obligor or such Subsidiary in a comparable transaction at the time of such transaction in arms' length dealings with a Person that is not an Affiliate;

(2)     in the event such Affiliate Transaction involves an aggregate consideration in excess of $1.0 million, the terms of such transaction have been approved by a majority of the members of the Board of Directors of such Obligor and by a majority of the members of such Board of Directors having no personal stake in such transaction, if any (and such majority determines that such Affiliate Transaction satisfies the criteria in clause (1) of this Section 4.14(a)); and

(3)     in the event such Affiliate Transaction involves an aggregate consideration in excess of $2.0 million, such Obligor has received a written opinion from an Independent Financial Advisor stating that such Affiliate Transaction is fair to such Obligor or such Subsidiary from a financial point of view or stating that the terms are not

-45-

materially less favorable than those that could have been obtained by such Obligor or such Subsidiary in a comparable transaction at such time on arms' length basis from a Person that is not an Affiliate.

(b)     Section 4.14(a) shall not apply to:

(1)     any transaction between the Issuer and the Coke Guarantor or between any Obligor and its Subsidiaries or between the Issuer and the Subsidiaries of the Coke Guarantor or between the Coke Guarantor and the Subsidiaries of the Issuer, and any Guarantees issued by an Obligor or a Subsidiary of any Obligor for the benefit of any other Obligor or any other Subsidiary of any Obligor, as the case may be, in accordance with Section 4.09;

(2)     Restricted Payments permitted to be made pursuant to Section 4.08 or Permitted Investments;

(3)     any agreement as in effect as of the Issue Date, as these agreements may be amended, modified, supplemented, extended or renewed from time to time, so long as any such amendment, modification, supplement, extension or renewal is not more disadvantageous to the Holders in any material respect in the good faith judgment of the Board of Directors of the applicable Obligor, when taken as a whole, than the terms of the agreements in effect on the Issue Date; provided that such amendment, modification, supplement, extension or renewal shall not materially affect the Issuer's or Guarantor's ability to make anticipated principal and interest payments on the Notes (in the good faith determination of the Board of Directors of such Obligor); or

(4)     any agreement between any Person and an Affiliate of such Person existing at the time such Person is acquired by or merged into an Obligor or a Subsidiary of any Obligor; provided that such agreement was not entered into in contemplation of such acquisition or merger, and any amendment thereto, so long as any such amendment is not disadvantageous to the Holders in the good faith judgment of the Board of Directors of the applicable Obligor, when taken as a whole, as compared to the applicable agreement as in effect on the date of such acquisition or merger; provided that such agreement or any amendment thereof shall not materially affect such Obligor's ability to make anticipated principal and interest payments on the Notes (in the good faith determination of the Board of Directors of such Obligor).

Section 4.15   Repurchase Upon Event of Default

(a)     If an Event of Default occurs and is continuing, the Issuer shall redeem, in accordance with Section 6.02(b), all of the Notes at a redemption price in cash equal to 100% of the aggregate principal amount of the Notes outstanding plus accrued and unpaid interest (including additional interest to be paid following an Event of Default as set forth in Section 2.12), and interest upon overdue interest, if any (the "Event of Default Redemption Price"), to the date of redemption (the "Event of Default Redemption Payment Date"), subject to the right of Holders of record on a Record Date to receive any interest due on such Event of Default Redemption Payment Date (the redemption described in this Section 4.15(a), an "Event of

-46-

Default Redemption"). For the avoidance of doubt, each of the Issuer Redemption Date, the Guarantor Redemption Date and the Clarke Redemption Date (each as defined in Section 6.02(b)) shall be deemed an Event of Default Redemption Payment Date, as applicable.

(1)     Within five Business Days following any Acceleration Effective Date, the Issuer shall mail a notice of the Acceleration Effective Date and of the Event of Default giving rise to such Acceleration Effective Date to each Holder at such Holder's registered address or otherwise deliver notice in accordance with the applicable procedures of the Depositary, with a copy to the Trustee (an "Acceleration Effective Date Notice"), stating:

(A)     the paragraph or subparagraph or Section pursuant to which such Event of Default has occurred; and

(B)     that the Notes have become immediately due and payable, subject to the extension and procedure set forth in Section 6.02(b), if applicable.

(b)     If the Issuer is obligated to deliver an Event of Default Redemption Notice pursuant to Section 6.02(b), the Issuer shall, subject to the timing set forth in Section 6.02(b), deliver such Event of Default Redemption Notice to the Trustee and to each Holder at such Holder's registered address or otherwise deliver notice in accordance with the applicable procedures of the Depositary, identifying the Notes to be redeemed (including CUSIP and ISIN number, if applicable) and stating:

(1)     the paragraph or subparagraph or Section pursuant to which an Event of Default has occurred and referring to any Acceleration Effective Date Notice previously delivered with respect to such Event of Default;

(2)     that the Notes have become immediately due and payable;

(3)     that an Event of Default Redemption is being made pursuant to this Section 4.15, and that all Notes shall be redeemed by the Issuer at a purchase price in cash equal to the Event of Default Redemption Price (subject to the right of Holders of record on the applicable Record Date to receive interest due on the Event of Default Redemption Payment Date), and setting forth the calculation of the Event of Default Redemption Price;

(4)     the Event of Default Redemption Payment Date;

(5)     that Notes will remain outstanding and continue to accrue interest until such time as the entire aggregate principal outstanding Notes have been redeemed;

(6)     the name and address of the Paying Agent, and that Holders shall be required to surrender such Notes to the specified Paying Agent at the specified address prior to the close of business on the Event of Default Redemption Payment Date;

(7)     that no representation is made as to the correctness or accuracy of the CUSIP or ISIN number, if any, listed in the Acceleration Effective Date Notice or printed on the Notes; and

-47-

(8)    the other procedures, as determined by the Issuer, consistent with this Section 4.15, that a Holder must follow.

Each of the Acceleration Effective Date Notice and the Event of Default Redemption Notice (together, each a "Section 4.15 Notice"), respectively, if mailed or otherwise delivered in a manner herein provided, shall be conclusively presumed to have been given, whether or not the Holder receives such Section 4.15 Notice. If (A) a Section 4.15 Notice is mailed in a manner herein provided and (B) any Holder fails to receive such Section 4.15 Notice or a Holder receives such Section 4.15 Notice but it is defective, such Holder's failure to receive such Section 4.15 Notice or such defect shall not affect the validity of the proceedings for the purchase of the Notes as to all other Holders that properly received such Section 4.15 Notice without defect.

(c)    No later than 11:00 a.m. (New York City time) on the Business Day prior to the Event of Default Redemption Payment Date, the Issuer shall, to the extent lawful, deposit with the Paying Agent an amount equal to the Event of Default Redemption Price in respect of all Notes. The Trustee or Paying Agent shall promptly return to the Issuer any cash in U.S. dollars, deposited with the Trustee or Paying Agent, as applicable, by the Issuer in excess of the amounts necessary to pay the Event of Default Redemption Price on all Notes to be redeemed.

(d)    On the Event of Default Redemption Payment Date, the Issuer shall, to the extent lawful, deliver or cause to be delivered to the Trustee for cancellation all Notes together with an Officers' Certificate stating the aggregate principal amount of Notes purchased by the Issuer in accordance with this Section 4.15 represents the total aggregate principal amount of Notes outstanding.

(e)    The Paying Agent shall promptly pay (or otherwise deliver in accordance with the applicable procedures of the Depositary) to each Holder of Notes the Event of Default Redemption Price for such Notes.

(f)    If the Event of Default Redemption Payment Date is on or after a Record Date and on or before the related Payment Date, any accrued and unpaid interest to the Event of Default Redemption Payment Date shall be paid on the Event of Default Redemption Payment Date to the Person in whose name a Note is registered at the close of business on such Record Date.

(g)    The Issuer shall not be required to make an Event of Default Redemption upon an Event of Default if a third party consummates the Event of Default Redemption in the manner, at the times and otherwise in compliance with the requirements set forth in this Section 4.15 applicable to an Event of Default Redemption made by the Issuer and purchases all Notes.

(h)    If the Issuer complies with the provisions of Section 4.15, on and after the Event of Default Redemption Payment Date, interest shall cease to accrue on all redeemed Notes. If any Note called for redemption by an Acceleration Effective Date Notice shall not be so paid upon surrender for redemption because of the failure of the Issuer to comply with Section 4.15(b), interest shall be paid on the unpaid principal, from the Event of Default Redemption Payment Date until such principal is paid, and, to the extent lawful, on any interest accrued to the

-48-

Event of Default Redemption Payment Date not paid on such unpaid principal, in each case at the rate provided in the Notes and in Sections 2.12 and Section 4.01.

ARTICLE 5

SUCCESSORS

Section 5.01    Merger, Consolidation or Sale of Assets.

No Obligor shall, or shall permit any of its Subsidiaries to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) (x) all or any substantial part of its assets, or (y) all or substantially all of the Capital Stock of any of its Subsidiaries (in each case, whether now owned or hereafter acquired), or liquidate or dissolve, except that

(1)    in the case of any sale, transfer, lease or other disposition of assets which is not a substantial part of its assets, the net cash proceeds from such transaction are equal or greater than the depreciated value of such asset and such net proceeds, within five (5) Business Days after receipt shall be either deposited in a segregated account to be used for the payment of Amortization Amounts or to purchase replacement assets which are useful in the business; and

(2)    a merger or combination shall be permitted so long as, after giving effect thereto:  (i) the value of the Collateral securing the Obligations and the Note Guarantees by the Guarantors of the Obligations are not materially reduced, (ii) the Liens in favor of Trustee or the Collateral Agent, as applicable, for the benefit of the Holders under the Notes Documents are not materially impaired, (iii) there is no material and adverse effect on the material rights and remedies of the Trustee, the Collateral Agent and/or the Holders under any Notes Document, including the legality, validity, binding effect or enforceability of any Notes Document, (v) immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing and (vi) if the Obligor or the applicable Subsidiary is not the entity surviving such merger or combination (any such Person, the "Successor Company"), then the Successor Company shall be an entity organized or existing under the laws of the United States of America, any State or territory thereof, the District of Columbia, any member state of the European Union on January 1, 2004 (other than Greece), Canada or any province of Canada, Norway, Switzerland, Guernsey or Jersey and shall expressly assume all of the Obligations of its predecessor under this Indenture and any other obligations under the other Notes Document, including the obligation to pay Additional Amounts with respect to any jurisdiction in which it is organized or resident for tax purposes or through which it makes payments, and such Obligor shall, or cause such Subsidiary to, have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, merger, winding up or disposition, and such supplemental indenture, if any, comply with this Indenture.

-49-

## ARTICLE 6

### DEFAULTS AND REMEDIES

Section 6.01   Events of Default.

(a)      Each of the following is an "<u>Event of Default</u>":

(1)      default in any payment of interest (including Additional Amounts) or an Amortization Amount on any Note when due, continued for three (3) days;

(2)      default in the payment of principal or premium, if any, on any Note when due;

(3)      failure by the Issuer or any Guarantor to comply with its obligations under Section 5.01;

(4)      failure by the Issuer or any Guarantor to comply for 30 days after notice as provided below with any of its obligations under Article 4 (other than Sections 4.08, 4.09, 4.10, 4.12, 4.13, 4.14 and 4.15) and Article 5 (in each case, other than (A) a failure to purchase Notes which constitutes an Event of Default under Section 6.01(a)(2), (B) a failure to comply with Section 5.01 which constitutes an Event of Default under Section 6.01(a)(3) or (C) a failure to comply with Section 9.07, which constitutes an Event of Default under Section 6.01(a)(6));

(5)      failure by an Obligor or any of its Subsidiaries to comply with its obligations under Sections 4.08, 4.09, 4.10, 4.12, 4.13, 4.14 and 4.15;

(6)      failure by the Issuer or any Guarantor to comply for 60 days after notice as provided below with its other agreements contained in this Indenture, the Notes, the Note Guarantees and the Collateral Documents;

(7)      default under any mortgage, indenture or instrument under which there is issued or by which there is secured or evidenced any Indebtedness for money borrowed by any Obligor or any of its Subsidiaries (or the payment of which is Guaranteed by any Obligor or any of its Subsidiaries), other than Indebtedness owed to any Obligor or any of its Subsidiaries, whether such Indebtedness or Guarantee now exists or is created after the Issue Date, which default:

(A)      is caused by a failure to pay principal of, or interest or premium, if any, on such Indebtedness prior to the expiration of the grace period provided in such Indebtedness; or

(B)      results in the acceleration of such Indebtedness prior to its maturity;

and, in each case, the principal amount of any such Indebtedness, together with the principal amount of any other such Indebtedness under which there has been a payment

-50-

default or the maturity of which has been so accelerated, aggregates $2.5 million or more;

(8)     failure by any Obligor or any of its Subsidiaries to pay final judgments aggregating in excess of $5.0 million (net of any amounts that a reputable and creditworthy insurance company has acknowledged liability for in writing), which judgments are not paid, discharged or stayed for a period of 60 days or more after such judgment becomes final;

(9)     (i) any Obligor or any of its Subsidiaries, pursuant to or within the meaning of the Bankruptcy Law:

(A)     commences proceedings to be adjudicated bankrupt or insolvent;

(B)     consents to the institution of bankruptcy or insolvency proceedings against it, or the filing by it of a petition or answer or consent seeking an arrangement of debt, reorganization, dissolution, winding up or relief under applicable Bankruptcy Law;

(C)     consents to the appointment of a receiver, interim receiver, receiver and manager, liquidator, assignee, trustee, sequestrator or other similar official of it or for all or substantially all of its property;

(D)     makes a general assignment for the benefit of its creditors;

(E)     is unable or admits in writing its inability to pay its debts as they mature;

(F)     generally is not paying its debts as they become due;

(ii)     a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(A)     is for relief against any Obligor or any of its Subsidiaries in a proceeding in which any such Obligor or any such Subsidiary is to be adjudicated bankrupt or insolvent;

(B)     appoints a receiver, interim receiver, receiver and manager, liquidator, assignee, trustee, sequestrator or other similar official of any Obligor or any of their Subsidiaries, or for all or substantially all of the property of any Obligor or any of its Subsidiaries; or

(C)     orders the liquidation, dissolution or winding up of any Obligor or any of its Subsidiaries;

and the order or decree remains unstayed and in effect for 60 consecutive days;

(10)     any Note Guarantee or Collateral Document ceases to be in full force and effect (except as contemplated by the terms of this Indenture) or is declared null and void

-51-

in a judicial proceeding or any Guarantor or the Issuer denies or disaffirms its obligations under this Indenture, its Note Guarantee or the Collateral Documents, or contests the validity or enforceability of any part of this Indenture or any other Notes Document;

(11)    the occurrence of a Change of Control other than a Permitted Change of Control;

(12)    this Indenture or any other Notes Document shall for any reason cease to create, or any Lien purported to be created by such Notes Document shall be asserted in writing by the Issuer or any Guarantor not to be, a valid and perfected first priority Lien on and security interest in any portion of the Collateral purported to be covered thereby, other than Liens explicitly permitted hereunder; or with respect to any Collateral having a fair market value in excess of $2.5 million, individually or in the aggregate, (A) the failure of the security interest with respect to such Collateral under the Collateral Documents, at any time, to be in full force and effect for any reason other than in accordance with their terms and the terms of this Indenture, which failure continues for 60 days or (B) the assertion by the Issuer or any Guarantor, in any pleading in any court of competent jurisdiction, that any such security interest is invalid or unenforceable; or

(13)    (i) Any Clarke Guarantor is criminally indicted or convicted of a felony, (ii) the death of Thomas Matthew Clarke or (iii) a conservator shall have been appointed to oversee the affairs of Thomas Matthew Clarke;

*provided*, *however*, that a Default under clauses (4) and (6) of this Section 6.01(a) shall not constitute an Event of Default until the Trustee notifies the Issuer or the Holders of at least 25% in principal amount of the then outstanding Notes notify the Issuer and the Trustee of the Default and the Issuer does not cure such Default within the time specified in clauses (4) and (6) of this Section 6.01(a) after receipt of such notice.

Section 6.02   Acceleration.

(a)    (1)    If an Event of Default occurs and is continuing, the Trustee or the Holders of at least 25% in aggregate principal amount of outstanding Notes by written notice to the Issuer (and the Trustee, if given by the Holders) may declare the principal of, premium and Additional Amounts, if any, and accrued and unpaid interest, if any, on all the Notes to be due and payable and upon such declaration, shall be due and payable immediately.

(2)    If an Event of Default under clauses (1), (2) or (9) of Section 6.01(a) occurs and is continuing, the principal, premium, if any, and accrued and unpaid interest, if any, on all the Notes shall become and be immediately due and payable, without any declaration or other act on the part of the Trustee or any Holders (such date in the case of this paragraph and the paragraph above, the "Acceleration Effective Date").

(b)    Notwithstanding Section 6.02(a), if on or after an Acceleration Effective Date arising out of an Event of Default other than a Specified Event of Default the Issuer delivers to the Trustee an Officer's Certificate certifying that the Issuer does not have sufficient cash and Cash Equivalents to pay all amounts then due and owing to the Holders on the Notes, including the Event of Default Redemption Price, then the Issuer, the Coke Guarantor and the

-52-

Clarke Guarantors shall not be permitted to make any payments to the Mechanics Lienholders, and:

(1)      the Issuer shall have 180 days (a "Standstill Period") from and including the Acceleration Effective Date (such 180th day, the "First Standstill Expiration Date") to sell, transfer, lease or otherwise dispose of sufficient assets to pay the Event of Default Redemption Price; *provided* that if during such Standstill Period the Issuer uses commercially reasonable efforts to sell, transfer, lease or otherwise dispose of assets to pay the Event of Default Redemption Price, none of the Trustee, the Collateral Agent or any Holder shall be permitted to take any enforcement action against the Collateral, and at no time thereafter prior to the last day for the Issuer to deliver an Issuer Redemption Failure Notice, may any of the Trustee, Collateral Agent or any Holder take an enforcement action or pursue any other remedy against the Issuer, the Coke Guarantor, the Clarke Guarantors or the Collateral.

(A)      If, on or prior to the First Standstill Expiration Date, the Issuer determines it shall not have sufficient cash and Cash Equivalents to pay the Event of Default Redemption Price on the date falling five Business Days after the First Standstill Expiration Date (the "Issuer Redemption Date"), then the Issuer shall immediately, and no later than four Business Days prior to the Issuer Redemption Date, furnish an Officers' Certificate to the Trustee certifying that the Issuer is unable to redeem the Notes in full pursuant to Section 4.15. Upon receipt of such Officer's Certificate, the Trustee shall furnish a copy thereof to the Holders in accordance with the applicable procedures of the Depositary (an "Issuer Redemption Failure Notice").

(B)      If at any time, and from time to time, prior to the First Standstill Expiration Date, the Issuer has sufficient cash and Cash Equivalents to redeem, pursuant to Section 4.15, no less than $2.0 million aggregate principal amount of Notes outstanding, then the Issuer shall promptly deposit with the Trustee an amount of cash equal to the Event of Default Redemption Price for the maximum aggregate principal amount of the Notes for which the Issuer has sufficient cash or Cash Equivalents, and shall redeem such Notes pursuant to Sections 4.15 and 6.13.

(2)      Upon the delivery of an Issuer Redemption Failure Notice, the Coke Guarantor shall have a Standstill Period, from and including the date of such notice (the last day of such Standstill Period, the "Second Standstill Expiration Date"), to sell, transfer, lease or otherwise dispose of the Coke Collateral, or such other assets as it determines, to pay any outstanding unpaid amount of the Event of Default Redemption Price (including defaulted interest pursuant to Section 2.12) (the "Deficiency Amount"); *provided* that if during such Standstill Period the Coke Guarantor uses commercially reasonable efforts to sell, transfer, lease or otherwise dispose of the Coke Collateral, or such other assets as it determines, to pay the Deficiency Amount, none of the Trustee, the Collateral Agent or any Holder shall be permitted to take an enforcement action against the Coke Collateral, and at no time thereafter prior to the last day for the Coke Guarantor to deliver a Coke Redemption Failure Notice, may any of the Trustee, Collateral Agent or

-53-

any Holder take an enforcement action or pursue any other remedy against the Coke Guarantor or the Clarke Guarantors or the Coke Collateral.

(A)     If, on or prior to the Second Standstill Expiration Date, the Coke Guarantor determines it shall not have sufficient cash and Cash Equivalents to pay the Deficiency Amount on the date falling five Business Days after the Guarantor Notice Expiration Date (the "Guarantor Redemption Date"), then the Issuer shall promptly, and no later than four Business Days prior to the Guarantor Redemption Date, furnish an Officer's Certificate to the Trustee certifying that the Issuer is unable to redeem the Notes pursuant to Section 4.15. Upon receipt of such Officer's Certificate, the Trustee shall furnish a copy thereof to the Holders in accordance with the applicable procedures of the Depositary (a "Guarantor Redemption Failure Notice").

(B)     If at any time, and from time to time, prior to the Second Standstill Expiration Date, the Coke Guarantor has sufficient cash and Cash Equivalents to redeem, pursuant to Section 4.15, no less than $2.0 million aggregate principal amount of Notes at the Event of Default Redemption Price, then the Coke Guarantor shall promptly deposit with the Trustee an amount of cash equal to the Event of Default Redemption Price for the maximum aggregate principal amount of the Notes for which the Issuer has sufficient cash or Cash Equivalents into the Collateral Account and shall redeem such Notes pursuant to Sections 4.15 and 6.13.

(3)     Upon the delivery of a Guarantor Redemption Failure Notice, the Clarke Guarantors shall have a Standstill Period, from and including the date of such notice (the last day of such Standstill Period, the "Third Standstill Expiration Date" and, together with the First Standstill Expiration Date and the Second Standstill Expiration Date, each an "Expiration Date"), to sell, transfer, lease or otherwise dispose of assets to pay the Deficiency Amount; *provided* that if during such Standstill Period the Clarke Guarantors use commercially reasonable efforts to sell, transfer, lease or otherwise dispose of assets to pay the Deficiency Amount, prior to the last day for the Clarke Guarantors to deliver a Clarke Redemption Failure Notice none of the Trustee, Collateral Agent or any Holder may take an enforcement action or pursue any other remedy against the Clarke Guarantors.

(A)     If on or prior to the Third Standstill Expiration Date, the Clarke Guarantors determine they shall not have sufficient cash and Cash Equivalents necessary to pay the Deficiency Amount on the date falling five Business Days after the Third Standstill Expiration Date (the "Clarke Redemption Date"), then the Issuer shall promptly, and no later than four Business Days prior to the Clarke Redemption Date, furnish an Officer's Certificate to the Trustee certifying that the Issuer is unable to redeem the Notes pursuant to Section 4.15. Upon receipt of such Officer's Certificate, the Trustee shall furnish a copy thereof to the Holders in accordance with the applicable procedures of the Depositary (a "Clarke Redemption Failure Notice" and, together with the Issuer Redemption Failure Notice and the Guarantor Redemption Failure Notice, each a "Redemption Failure

-54-

Notice") and furnish notice of such in accordance with the applicable procedures of the Depositary, with a copy to the Trustee, upon receipt of which the Trustee may pursue any remedy pursuant to Section 6.03.

(B)     If at any time, and from time to time, prior to the Third Standstill Expiration Date, the Clarke Guarantors have sufficient cash and Cash Equivalents to redeem, pursuant to Section 4.15, no less than $2.0 million aggregate principal amount of Notes at the Event of Default Redemption Price, then the Clarke Guarantors shall promptly deposit with the Trustee an amount of cash equal to the Event of Default Redemption Price for the maximum aggregate principal amount of the Notes for which the Issuer has sufficient cash or Cash Equivalents and shall redeem such Notes pursuant to Sections 4.15 and 6.13.

For purposes of Section 6.02(b)(1)(B), 6.02(b)(2)(B) and 6.02(b)(3)(B), the Issuer, the Coke Guarantor and the Clarke Guarantors shall provide the Trustee with their cash and Cash Equivalents on each Interest Payment Date following an Event of Default.

(c)     If an Event of Default under Section 6.01(a)(9) occurs and is continuing, the Standstill Period for the entity subject of such Event of Default shall end and the Standstill Period for the next entity pursuant to Section 6.02(b) shall begin.

(d)     If, at any time, (x) a Specified Event of Default has occurred and is continuing or (y) any Deficiency Amount remains outstanding following the Third Standstill Expiration Date, then the Trustee and the Holders may pursue any available remedy to collect the payment of principal, premium, if any, and interest due on the Notes, or to enforce the performance of any provision of the Notes or this Indenture.

(e)     The Holders of a majority in principal amount of the outstanding Notes may waive all past Events of Default (except with respect to nonpayment of principal, premium or interest) and rescind any acceleration with respect to the Notes and its consequences if (1) such rescission would not conflict with any judgment or decree of a court of competent jurisdiction, (2) all existing Events of Default, other than the nonpayment of the principal of, premium, if any, and interest on the Notes that have become due solely by such declaration of acceleration, have been cured or waived and (3) there has been deposited with the Trustee a sum sufficient to pay its fees, expenses and indemnities in connection with such Event of Default, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel and all other amounts payable to the Trustee under Section 7.07.

(f)     For the avoidance of doubt, following an Event of Default, and until such Event of Default is cured or all amounts due and outstanding under this Indenture have been paid, the Issuer shall not be permitted to pay any interest as PIK Interest.

(g)     If the Trustee has not received (x) an Acceleration Effective Date Notice within five Business Days following an Acceleration Effective Date or (y) a Redemption Failure Notice within ten Business Days following any Notice Expiration Date, the Trustee, the Collateral Agent and the Holders may pursue any available remedy to collect the payment of principal, premium, if any, and interest on the Notes or to enforce the performance of any

-55-

provision of the Notes or this Indenture.

(h)     Notwithstanding Section 6.02(b), if upon acceleration of the Notes any Obligor or Clarke Guarantor shall make any payment to the Mechanics Lienholders, pursuant to the Mechanics Lien Royalty Agreements, then Section 6.02(b) shall be of no force and effect and the Trustee and the Holders may pursue any available remedy to collect the payment of principal, premium, if any, and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture.

(i)     All proceeds from any sale, transfer, lease or disposition of assets pursuant to Section 6.02(b) shall be deposited no later than ten Business Days after receipt thereof into the Collateral Account for application in accordance with Sections 4.15, 6.02(b) and Section 6.13 (and subject to Section 10.08). If the Issuer or any Guarantor fails to deposit such proceeds within five Business Days, then Section 6.02(b) shall be of no force and effect and the Trustee and the Holders may pursue any available remedy to collect the payment of principal, premium, if any, and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture.

Section 6.03    Other Remedies.

(a)     If a Specified Event of Default has occurred and is continuing, or if at any time following an Event of Default any Deficiency Amount has not been fully-paid to the Trustee or the Collateral Agent by the Issuer or any of the Guarantors, then the Trustee and the Holders may, subject to Section 6.02(b), pursue any available remedy to collect such Deficiency Amount.

(b)     The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding.  A delay or omission by the Trustee or any Holder of a Note in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default.  All remedies are cumulative to the extent permitted by law.

Section 6.04    Waiver of Past Defaults.

The Holders of a majority in principal amount of the outstanding Notes by written notice to the Trustee may on behalf of all Holders waive any existing Default and its consequences hereunder, except:

(1)     a continuing Default in the payment of the principal, premium, if any, or interest on any Note held by a non-consenting Holder; and

(2)     a Default with respect to a provision that under Section 9.02 cannot be amended without the consent of each Holder affected,

*provided* that, subject to Section 6.02, the Holders of a majority in principal amount of the then outstanding Notes may rescind an acceleration and its consequences, including any related payment default that resulted from such acceleration.  Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for

-56-

every purpose of this Indenture, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.

Section 6.05    Control by Majority.

The Holders of a majority in principal amount of the outstanding Notes may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or the Collateral Agent of exercising any trust or power conferred on the Trustee or the Collateral Agent.  However, the Trustee and the Collateral Agent, as the case may be, may refuse to follow any direction that conflicts with law, this Indenture, the Notes, any Note Guarantee or the Collateral Documents, or that the Trustee or the Collateral Agent determines in good faith is unduly prejudicial to the rights of any other Holder or that would involve the Trustee or the Collateral Agent in personal liability.

Section 6.06    Limitation on Suits.

Subject to Section 6.07, no Holder may pursue any remedy with respect to this Indenture or the Notes <u>unless</u>:

(1)      such Holder has previously given the Trustee written notice that an Event of Default is continuing;

(2)      the Holders of at least 25% in principal amount of the then outstanding Notes have requested the Trustee to pursue the remedy;

(3)      such Holders have offered the Trustee security or indemnity reasonably satisfactory to the Trustee against any loss, liability or expense;

(4)      the Trustee has not complied with such request within 60 days after the receipt of the request and the offer of security or indemnity; and

(5)      the Holders of a majority in principal amount of the then outstanding Notes have not given the Trustee a direction that, in the opinion of the Trustee, is inconsistent with such request within such 60-day period.

A Holder may not use this Indenture to prejudice the rights of another Holder or to obtain a preference or priority over another Holder (it being understood that the Trustee does not have an affirmative duty to ascertain whether or not such actions or forbearances are prejudicial to such Holders).

Section 6.07    Rights of Holders to Receive Payment.

Notwithstanding any other provision of this Indenture, the right of any Holder to receive payment of principal, premium, if any, and interest on its Note, on or after the respective due dates expressed or provided for in such Note, or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder.

#4834-6333-0618

Section 6.08    Collection Suit by Trustee.

If an Event of Default specified in Section 6.01(a)(1) or (2) occurs and is continuing, subject to Section 6.02(b), the Trustee may recover judgment in its own name and as trustee of an express trust against the Issuer and any other obligor on the Notes for the whole amount of principal, premium, if any, and interest remaining unpaid on the Notes, together with interest on overdue principal and, to the extent lawful, interest and such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee and its agents and counsel.

Section 6.09    Restoration of Rights and Remedies.

If the Trustee or any Holder has instituted any proceeding to enforce any right or remedy under this Indenture and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to such Holder, then and in every such case, subject to any determination in such proceedings, the Issuer, the Guarantors, the Trustee and the Holders shall be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Trustee and the Holders shall continue as though no such proceeding has been instituted.

Section 6.10    Rights and Remedies Cumulative.

Except as otherwise provided with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes in Section 2.07, no right or remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other right or remedy, and every right and remedy are, to the extent permitted by law, cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 6.11    Delay or Omission Not Waiver.

No delay or omission of the Trustee or of any Holder to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein.  Every right and remedy given by this Article or by law to the Trustee or to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders, as the case may be.

Section 6.12    Trustee May File Proofs of Claim.

The Trustee may file proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel) and the Holders of the Notes allowed in any judicial proceedings relative to the Issuer (or any other obligor upon the Notes, including the Guarantors), its creditors or its property and is entitled and empowered to participate as a member in any official committee of creditors appointed in such matter and to collect, receive and distribute any money or other property

-58-

payable or deliverable on any such claims. Any custodian in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee, and in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee and its agents and counsel, and any other amounts due the Trustee or the Collateral Agent under Section 7.07. To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee or the Collateral Agent under Section 7.07 out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Holders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise. Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

Section 6.13    Priorities.

(a)    Application of Proceeds.  If an Event of Default shall have occurred and be continuing, the Trustee or Paying Agent, as applicable, shall apply all or any part of proceeds constituting Collateral, any proceeds of the Guarantee set forth in Article 11 and any proceeds of the Clarke Guaranty, in payment of the Obligations in the following order:

(1)    to pay incurred and unpaid fees, expenses and indemnities of the Trustee and/or each Agent under the Notes Documents, including all amounts due under Section 7.07;

(2)    Second, to the Trustee and/or Paying Agent, for application by it towards payment of amounts then due and owing and remaining unpaid in respect of the Obligations to the Holders, *pro rata* among the Holders according to the amounts of the Obligations then due and owing and remaining unpaid to the Holders;

(3)    Third, to the Trustee and/or Paying Agent, for application by it towards prepayment of the Obligations, *pro rata* among the Holders according to the amounts of the Obligations then held by the Holders; and

(4)    Fourth, any balance remaining after the Obligations shall have been paid in full shall be paid over to or at the direction of the Issuer or as a court of competent jurisdiction may otherwise direct.

The Trustee may fix a record date and payment date for any payment to Holders pursuant to this Section 6.13. Promptly after any record date is set pursuant to this Section 6.13, the Trustee shall cause notice of such record date and payment date to be given to the Issuer and to each Holder in the manner set forth in Section 13.01.

Section 6.14    Undertaking for Costs.

#4834-6333-0618

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as a Trustee, a court in its discretion may require the filing by any party litigant in such suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 6.14 does not apply to a suit by the Trustee, a suit by a Holder pursuant to Section 6.07, or a suit by Holders of more than 10% in aggregate principal amount of the outstanding Notes.

## ARTICLE 7

## TRUSTEE

Section 7.01   Duties of Trustee.

(a)   If an Event of Default has occurred and is continuing of which a Responsible Officer of the Trustee has received written notice, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b)   Except during the continuance of an Event of Default of which a Responsible Officer of the Trustee has received written notice:

(1)   the duties of the Trustee shall be determined solely by the express provisions of this Indenture and the Trustee need perform only those duties that are specifically set forth in this Indenture and no others, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(2)   in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture. However, in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

(c)   The Trustee may not be relieved from liabilities for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(1)   this paragraph does not limit the effect of paragraph (b) of this Section 7.01;

(2)   the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it is proved in a court of competent jurisdiction that the Trustee was negligent in ascertaining the pertinent facts; and

-60-

(3)     the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05.

(d)     Whether or not therein expressly so provided, every provision of this Indenture that in any way relates to the Trustee is subject to the provisions of this Section 7.01.

(e)     The Trustee shall be under no obligation to exercise any of the rights or powers under this Indenture, Collateral Documents, the Notes and the Note Guarantees at the request or direction of any of the Holders or expend or risk its own funds or otherwise incur financial liability in the performance of its duties hereunder or under any of the Notes Documents unless such Holders have offered to the Trustee indemnity or security reasonably satisfactory to it against any loss, liability or expense.

(f)     The Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Issuer.  Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

Section 7.02    Rights of Trustee.

Subject to Section 7.01:

(a)     The Trustee may conclusively rely upon any document believed by it to be genuine and to have been signed or presented by the proper Person.  The Trustee need not investigate any fact or matter stated in the document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine in good faith to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuer, personally or by agent or attorney at the sole cost of the Issuer and shall incur no liability or additional liability of any kind by reason of such inquiry or investigation.

(b)     Before the Trustee acts or refrains from acting, it may require an Officers' Certificate or an Opinion of Counsel or both subject to the other provisions of this Indenture. The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on such Officers' Certificate or Opinion of Counsel.  The Trustee may consult with counsel of its selection and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection from liability in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(c)     The Trustee may act through its attorneys and agents and shall not be responsible for the misconduct or negligence of any agent or attorney appointed with due care.

(d)     The Trustee shall not be liable for any action it takes or omits to take in good faith that it believes to be authorized or within the rights or powers conferred upon it by this Indenture.

(e)     Unless otherwise specifically provided in this Indenture, any demand, request, direction or notice from the Issuer or a Guarantor shall be sufficient if signed by an

-61-

Officer of the Issuer or such Guarantor.

(f)     None of the provisions of this Indenture shall require the Trustee to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or indemnity reasonably satisfactory to it against such risk or liability is not assured to it.

(g)     The Trustee shall not be deemed to have notice or knowledge of any Default or Event of Default unless a Responsible Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such a Default is received by the Trustee at the Corporate Trust Office of the Trustee, and such notice references the existence of a Default or Event of Default, the Notes and this Indenture.

(h)     In no event shall the Trustee be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(i)     The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian and other Person employed to act hereunder.

(j)     The Trustee may request that the Issuer deliver an Officers' Certificate setting forth the names of individuals or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officers' Certificate may be signed by any person authorized to sign an Officers' Certificate, including any Person specified as so authorized in any such certificate previously delivered and not superseded.

(k)     The Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder.

(l)     The Trustee shall have no duty (A) to see to any recording, filing, or depositing of this Indenture or any agreement referred to herein or any financing statement or continuation statement evidencing a security interest, or to see to the maintenance of any such recording or filing or depositing or to any rerecording, refiling or redepositing of any thereof, (B) to see to any insurance or (C) to see to the payment or discharge of any tax, assessment, or other governmental charge or any Lien or encumbrance of any kind owing with respect to, assessed or levied against, any part of the trust fund.

(m)     Except as otherwise expressly provided herein, the rights, privileges, protections, exculpations, immunities, indemnities and benefits provided to the Trustee hereunder (including but not limited to its right to be indemnified) are extended to, and shall be enforceable by, the Trustee and to its Responsible Officers and other Persons duly employed by them hereunder as if they were each expressly set forth herein for the benefit of the Trustee in such capacity, Responsible Officers or employees of the Trustee mutatis mutandis.

-62-

(n)      The Trustee may request that an Issuer deliver an Officers' Certificate setting forth the names of the individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officers' Certificate may be signed by any person authorized to sign an Officers' Certificate, including any person specified as so authorized in any such certificate previously delivered and not superseded.

(o)      Anything in this Indenture notwithstanding, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit), even if the Trustee has been advised as to the likelihood of such loss or damage and regardless of the form of action.

(p)      The Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Indenture arising out of or caused, directly or indirectly, by circumstances beyond its control, including, without limitation, any provision of any law or regulation or any act of any governmental authority; natural catastrophes or other acts of God; earthquakes; fire; flood; terrorism; wars and other military disturbances; sabotage; epidemics; riots; interruptions; loss or malfunctions of utilities, computer (hardware or software) or communication services; accidents; labor disputes; acts of civil or military authority and governmental action.

(q)      The permissive right of the Trustee to take any action under this Indenture or under any other agreement in connection herewith shall not be construed as a duty.

Section 7.03    Individual Rights of Trustee.

The Trustee or any Agent in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Issuer or any Affiliate of the Issuer with the same rights it would have if it were not Trustee or such Agent.  Any Agent may do the same with like rights and duties.  The Trustee is also subject to Section 7.10.

Section 7.04    Trustee's Disclaimer.

The recitals contained herein and in the Notes, except for the Trustee's certificates of authentication, shall be taken as the statements of the Issuer, and the Trustee assumes no responsibility for their correctness.  The Trustee makes no representations as to the validity, sufficiency or adequacy of this Indenture, of the Notes or of the Note Guarantees, or of any other Notes Document except that the Trustee represents that it is duly authorized to execute and deliver this Indenture, authenticate the Notes and perform its obligations hereunder.  The Trustee shall not be accountable for the use or application by the Issuer of Notes or the proceeds thereof. The Trustee shall not be responsible to make any calculation with respect to any matter under this Indenture.  It shall not be responsible for the use or application of any money received by any Paying Agent other than the Trustee, and it shall not be responsible for any statement or recital herein or any statement in the Notes or the Note Guarantees or any other document in connection with the issuance or sale of the Notes or pursuant to this Indenture other than its certificate of authentication.  The Trustee shall have no duty to monitor or investigate the Issuer's compliance with or the breach of, or cause to be performed or observed, any representation, warranty or covenant made in this Indenture or any Security Document.

-63-

Section 7.05    Notice of Defaults.

        If a Default occurs and is continuing of which a Responsible Officer of the Trustee has received written notice, the Trustee shall send electronically or mail to each Holder a notice of the Default within 90 days after it has received such written notice.  Except in the case of an Event of Default specified in clauses (1) or (2) of Section 6.01(a), the Trustee may withhold from the Holders notice of any continuing Default if the Trustee determines in good faith that withholding the notice is in the interest of the Holders.

Section 7.06    Reports by Trustee to Holders of the Notes.

        The Issuer shall promptly notify the Trustee in writing in the event the Notes are listed on any national securities exchange or delisted therefrom.

Section 7.07    Compensation and Indemnity.

        (a)    The Issuer and the Guarantors, jointly and severally, shall pay to the Trustee, in its capacity as Trustee and as an Agent, from time to time such compensation for its acceptance of this Indenture and services hereunder and under each other Notes Document as the parties shall agree in writing from time to time.  The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust.  The Issuer shall reimburse the Trustee promptly upon request for all reasonable disbursements, advances and expenses incurred or made by it, in its capacity as Trustee and as an Agent, in addition to the compensation for its services.  Such expenses shall include the reasonable compensation, disbursements and expenses of the respective agents and counsel of the Trustee and the Collateral Agent.

        (b)    The Issuer and the Guarantors, jointly and severally, shall indemnify the Trustee, in its capacity as Trustee and as an Agent, for, and hold the Trustee and any predecessor harmless against, any and all loss, damage, claims, liability or expense (including attorneys' fees and expenses) incurred by it in connection with the acceptance or administration of this trust and the performance of its duties hereunder (including the costs and expenses of enforcing this Indenture against the Issuer or any Guarantor (including this Section 7.07)) or defending itself against any claim whether asserted by any Holder, the Issuer or any Guarantor, or liability in connection with the acceptance, exercise or performance of any of its powers or duties hereunder).  The Trustee shall notify the Issuer promptly of any claim for which it may seek indemnity.  Failure by the Trustee to so notify the Issuer shall not relieve the Issuer of its obligations hereunder.  The Issuer shall defend the claim and the Trustee may have separate counsel and the Issuer shall pay the fees and expenses of such counsel.  The Issuer need not reimburse any expense or indemnify against any loss, liability or expense incurred by the Trustee, in its capacity as Trustee and as an Agent, through the Trustee's own willful misconduct, gross negligence or bad faith.

        (c)    The obligations of the Issuer and the Guarantors under this Section 7.07 shall survive the satisfaction and discharge of this Indenture or the earlier resignation or removal of the Trustee, in its capacity as Trustee and as an Agent, as the case may be.

        (d)    To secure the payment obligations of the Issuer and the Guarantors in this Section 7.07, the Trustee shall have a Lien prior to the Notes on all money or property held or

collected by the Trustee, in its capacity as Trustee and as an Agent, as the case may be, except that held in trust to pay principal and interest on particular Notes. Such Lien shall survive the satisfaction and discharge of this Indenture or the earlier resignation or removal of the Trustee, in its capacity as Trustee and as an Agent, as the case may be.

(e)     When the Trustee incurs expenses or renders services after an Event of Default specified in Section 6.01(a)(9) occurs, the expenses and the compensation for the services (including the fees and expenses of its agents and counsel) are intended to constitute expenses of administration under any Bankruptcy Law.

Section 7.08    Replacement of Trustee.

(a)     A resignation or removal of the Trustee and appointment of a successor Trustee shall become effective only upon the successor Trustee's acceptance of appointment as provided in this Section 7.08. The Trustee may resign in writing at any time by giving 30 days prior notice of such resignation to the Issuer and be discharged from the trust hereby created by so notifying the Issuer. The Holders of a majority in aggregate principal amount of the then outstanding Notes may remove the Trustee by so notifying the Trustee and the Issuer in writing. The Issuer may remove the Trustee if:

(1)     the Trustee fails to comply with Section 7.10;

(2)     the Trustee is adjudged a bankrupt or an insolvent or an order for relief is entered with respect to the Trustee under any Bankruptcy Law;

(3)     a receiver or public officer takes charge of the Trustee or its property; or

(4)     the Trustee becomes incapable of acting.

(b)     If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, the Issuer shall promptly appoint a successor Trustee. Within one year after the successor Trustee takes office, the Holders of a majority in aggregate principal amount of the then outstanding Notes may remove the successor Trustee to replace it with another successor Trustee.

(c)     If a successor Trustee does not take office within 45 days after the retiring Trustee resigns or is removed, the retiring Trustee (at the Issuer's expense), the Issuer or the Holders of at least 10% in aggregate principal amount of the then outstanding Notes may petition any court of competent jurisdiction for the appointment of a successor Trustee.

(d)     If the Trustee, after written request by any Holder who has been a Holder for at least six months, fails to comply with Section 7.10, such Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(e)     A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Issuer. Thereupon, the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture. The successor Trustee shall mail a notice of its

-65-

succession to Holders. The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee; *provided* that all sums owing to the Trustee hereunder have been paid and such transfer shall be subject to the Lien provided for in Section 7.07. Notwithstanding replacement of the Trustee pursuant to this Section 7.08, the Issuer's Obligations under Section 7.07 shall continue for the benefit of the retiring Trustee.

(f)     As used in this Section 7.08, the term "Trustee" shall also include each Agent.

Section 7.09    Successor Trustee by Merger, etc.

If the Trustee consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to, another corporation or national banking association, the successor corporation or national banking association without any further act shall be the successor Trustee, subject to Section 7.10.

Section 7.10    Eligibility; Disqualification.

(a)     There shall at all times be a Trustee hereunder that is a corporation or national banking association organized and doing business under the laws of the United States or of any state thereof that is authorized under such laws to exercise corporate trustee power, that is subject to supervision or examination by federal or state authorities and that has a combined capital and surplus of at least $50.0 million as set forth in its most recent published annual report of condition.

(b)     This Indenture shall always have a Trustee who satisfies the requirements of Trust Indenture Act Sections 310(a)(1), (2) and (5). The Trustee is subject to Trust Indenture Act Section 310(b).

ARTICLE 8

[RESERVED]

ARTICLE 9

AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01    Without Consent of Holders.

(a)     Notwithstanding Section 9.02, without the consent of any Holder, the Issuer, the Guarantors and the Trustee may amend this Indenture, the Notes, the Note Guarantees and each other Notes Document to:

(1)     cure any ambiguity, omission, defect or inconsistency;

(2)     provide for the assumption by a successor entity of the Obligations of the Issuer or any Guarantor under this Indenture, the Note Guarantees and the other Notes Documents in accordance with Article 5;

-66-

#4834-6333-0618

(3)     provide for or facilitate the issuance of uncertificated Notes in addition to or in place of certificated Notes; *provided* that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code or in a manner such that the uncertificated Notes are described in Section 163(f)(2)(B) of the Code;

(4)     comply with the rules of any applicable depositary;

(5)     add Guarantors with respect to the Notes or release a Guarantor from its Obligations under its Note Guarantee or this Indenture in accordance with the applicable provisions of this Indenture;

(6)     add covenants of the Issuer, any other Obligor, and any of its or their Subsidiaries or Events of Default for the benefit of Holders or to make changes that would provide additional rights to the Holders or to surrender any right or power conferred upon any Obligor;

(7)     make any change that does not materially adversely affect the legal rights under this Indenture, the Notes or any other Notes Document of any Holder;

(8)     evidence and provide for the acceptance of an appointment under this Indenture of a successor trustee or collateral agent; *provided* that the successor trustee or collateral agent is otherwise qualified and eligible to act as such under the terms of this Indenture;

(9)     confirm and evidence the release, termination or discharge of any Lien with respect to or securing the Notes or the Note Guarantees when such release, termination or discharge is provided for in accordance with the terms of this Indenture or the Collateral Documents;

(10)     to comply with requirements of the SEC in order to effect or maintain the qualification of this Indenture under the Trust Indenture Act;

(11)     make any amendment to the provisions of this Indenture relating to the transfer and legending of Notes as permitted by this Indenture, including, without limitation, to facilitate the issuance and administration of the Notes; *provided*, *however*, that (A) compliance with this Indenture as so amended would not result in Notes being transferred in violation of the Securities Act or any applicable securities law and (B) such amendment does not materially and adversely affect the rights of Holders to transfer Notes.

(b)     Upon the request of the Issuer, and upon receipt by the Trustee of the documents described in Section 13.04, the Trustee shall join with the Issuer and the Guarantors in the execution of any amended or supplemental indenture or other Notes Document authorized or permitted by the terms of this Indenture and to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee shall not be obligated to enter into such amended or supplemental indenture or other Notes Document that affects its own rights, duties or immunities in any capacity under this Indenture or otherwise.  Notwithstanding the foregoing, no Opinion of Counsel shall be required in connection with the addition of a

-67-

Guarantor under this Indenture upon execution and delivery by such Guarantor, the Trustee of a supplemental indenture to this Indenture, the form of which is attached as Exhibit C, and delivery of an Officers' Certificate.

Section 9.02    With Consent of Holders.

(a)    Except as provided in Section 9.01 and this Section 9.02, the Issuer, the Guarantors and the Trustee may amend or supplement this Indenture, the Notes, the Note Guarantees and each other Notes Document with the consent of the Holders of a majority in principal amount of the Notes then outstanding voting as a single class (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes) and, subject to Section 6.04 and Section 6.07, any existing Default or Event of Default (other than a Default or Event of Default in the payment of the principal, premium, if any, or interest on the Notes, except a payment default resulting from an acceleration that has been rescinded) or compliance with any provision of this Indenture, the Notes, the Note Guarantees or any other Notes Document may be waived with the consent of the Holders of a majority in principal amount of the Notes then outstanding voting as a single class (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes).  Section 2.08 and Section 2.09 shall determine which Notes are considered to be "outstanding" for the purposes of this Section 9.02.

(b)    Upon the request of the Issuer, and upon the filing with the Trustee of evidence satisfactory to the Trustee of the consent of the Holders as aforesaid, and upon receipt by the Trustee of the documents described in Section 7.02 and Section 13.02, the Trustee shall join with the Issuer and the Guarantors in the execution of such amended or supplemental indenture unless such amended or supplemental indenture directly affects the Trustee's own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee may in its discretion, but shall not be obligated to, enter into such amended or supplemental indenture.

(c)    It shall not be necessary for the consent of the Holders under this Section 9.02 to approve the particular form of any proposed amendment, supplement or waiver. It shall be sufficient if such consent approves the substance of such proposed amendment, supplement or waiver.

(d)    After an amendment, supplement or waiver under this Section 9.02 becomes effective, the Issuer shall give to the Holders a notice briefly describing such amendment, supplement or waiver.  However, the failure of the Issuer to give such notice to all the Holders, or any defect in the notice, shall not impair or affect the validity of any such amendment, supplement or waiver.

(e)    [Reserved]

(f)    Without the consent of each affected Holder, an amendment, supplement or waiver under this Section 9.02 may not (with respect to any Notes held by a non-consenting Holder):

(1)    reduce the principal amount of Notes whose Holders must consent to an amendment, supplement or waiver;

-68-

(2)      reduce the stated rate of interest or extend the stated time for payment of interest on any Note;

(3)      reduce the principal of or extend the Stated Maturity of any Note;

(4)      waive a Default or Event of Default in the payment of principal of, premium, if any, or interest on the Notes (except a rescission of acceleration of the Notes by the Holders of at least a majority in aggregate principal amount of the then outstanding Notes with respect to a nonpayment default and a waiver of the payment default that resulted from such acceleration);

(5)      reduce the premium payable upon the redemption or repurchase of any Note or change the time at which any Note may be redeemed or repurchased as described in Sections 3.06, 4.15, 6.02(b) or 6.02(c), whether through an amendment or waiver of provisions in the covenants, definitions or otherwise;

(6)      make any Note payable in a currency other than that stated in the Note;

(7)      impair the right of any Holder to receive payment of principal, premium, if any, or interest on such Holder's Notes on or after the due dates therefor or to institute suit for the enforcement of any payment on or with respect to such Holder's Notes;

(8)      make any change in the amendment or waiver provisions which require each Holder's consent;

(9)      modify the Note Guarantees in any manner adverse to the Holders; or

(10)     amend, change or modify the obligation of the Issuer or any Guarantor to pay Additional Amounts.

In addition, without the consent of the Holders of at least 66 2/3% of the principal amount of the Notes then outstanding (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes), no amendment, supplement or waiver may modify any Collateral Document or the provisions in this Indenture dealing with Collateral Documents or application of trust moneys in any manner, taken as a whole, materially adverse to the Holders or otherwise release any Collateral other than in accordance with this Indenture and the Collateral Documents.

(g)      A consent to any amendment, supplement or waiver of this Indenture, the Notes or the Note Guarantee or any other Notes Document by any Holder given in connection with a tender of such Holder's Notes shall not be rendered invalid by such tender.

Section 9.03    Compliance with Trust Indenture Act.

If this Indenture is qualified under the Trust Indenture Act, every amendment or supplement to this Indenture or the Notes shall be set forth in an amended or supplemental indenture that complies with the Trust Indenture Act as then in effect.

-69-

Section 9.04    Revocation and Effect of Consents.

(a)    Until an amendment, supplement or waiver becomes effective, a consent to it by a Holder of a Note is a continuing consent by the Holder of a Note and every subsequent Holder of a Note or portion of a Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent is not made on any Note.  However, any such Holder of a Note or subsequent Holder of a Note may revoke the consent as to its Note if the Trustee receives written notice of revocation before the date the waiver, supplement or amendment becomes effective.  An amendment, supplement or waiver becomes effective in accordance with its terms and thereafter binds every Holder.

(b)    The Issuer may, but shall not be obligated to, fix a record date pursuant to Section 1.05 for the purpose of determining the Holders entitled to consent to any amendment, supplement or waiver.

Section 9.05    Notation on or Exchange of Notes.

(a)    The Trustee may place an appropriate notation about an amendment, supplement or waiver on any Note thereafter authenticated.  The Issuer in exchange for all Notes may issue and the Trustee shall, upon receipt of an Authentication Order, authenticate new Notes that reflect the amendment, supplement or waiver.

(b)    Failure to make the appropriate notation or issue a new Note shall not affect the validity and effect of such amendment, supplement or waiver.

Section 9.06    Trustee to Sign Amendments, etc.

The Trustee shall sign any amendment, supplement or waiver authorized pursuant to this Article 9 if the amendment, supplement or waiver does not adversely affect the rights, duties, liabilities or immunities of the Trustee.  In executing any amendment, supplement or waiver, the Trustee shall receive and (subject to Section 7.01) shall be fully protected in conclusively relying upon, in addition to the documents required by Section 13.02, an Officers' Certificate and an Opinion of Counsel stating that the execution of such amendment, supplement or waiver is authorized or permitted by this Indenture and that such amendment, supplement or waiver is the legal, valid and binding obligation of the Issuer and any Guarantor party thereto, enforceable against them in accordance with its terms, subject to customary exceptions, and complies with the provisions hereof (including Section 9.03).

Section 9.07    Payment for Consent.

No Obligor shall, or shall permit any of its Subsidiaries to, directly or indirectly, pay or cause to be paid any consideration to or for the benefit of any Holder for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of this Indenture or the Notes unless such consideration is offered to all Holders and is paid to all Holders that consent, waive or agree to amend in the time frame set forth in the solicitation documents relating to such consent, waiver or amendment; *provided* that if such consents, waivers or amendments are sought in connection with an exchange offer where participation in such exchange offer is limited to Holders who are QIBs, or non-U.S. Persons, within the

-70-

meaning given to such term in Regulation S under the Securities Act then such consideration need only be offered to all Holders to whom the exchange offer is made and to be paid to all such Holders that consent, waive or agree to amend in such time frame.

ARTICLE 10

COLLATERAL AND SECURITY

Section 10.01  The Collateral.

(a)     The Issuer hereby appoints the Trustee to act as Collateral Agent, and each Holder by its acceptance of any Notes and the Guarantees thereof, irrevocably consents and agrees to such appointment.  The Collateral Agent shall have the privileges, powers and immunities set forth in this Indenture and the Collateral Documents.  All of the rights and protections granted to the Trustee pursuant to Article 7 and Section 13.02 of this Indenture are applicable to the Collateral Agent *mutatis mutandis*.  The due and punctual payment of the principal of, premium, if any, and interest on the Notes and the Guarantees thereof when and as the same shall be due and payable, whether on an Amortization Payment Date, an Interest Payment Date, at maturity, by acceleration, repurchase, redemption or otherwise, interest on the overdue principal of and interest (to the extent permitted by law), if any, on the Notes and the Guarantees thereof and performance of all other Obligations under this Indenture, including, without limitation, the Obligations of the Issuer set forth in Section 7.07 herein, and the Notes and the Guarantees thereof and the Collateral Documents, shall be secured by first-priority Lien and security interests in the Collateral, in each case subject to Permitted Liens, as and to the extent provided in the Collateral Documents which the Issuer and Guarantors have entered into simultaneously with the execution of this Indenture and shall be secured by all Collateral Documents hereafter delivered as required or permitted by this Indenture and the Collateral Documents.  The Issuer and the Guarantors hereby agree that the Collateral Agent shall hold the Collateral in trust for the benefit of all of the Holders and the Trustee, in each case pursuant to the terms of the Collateral Documents, and the Collateral Agent and the Trustee are hereby authorized to execute and deliver the Collateral Documents.

(b)     Each Holder, by its acceptance of any Notes and the Guarantees thereof, irrevocably consents and agrees to the terms of the Collateral Documents (including, without limitation, the provisions providing for foreclosure and release of Collateral) as the same may be in effect or may be amended from time to time in accordance with their terms, agrees to the appointment of the Collateral Agent and authorizes and directs the Collateral Agent to perform its obligations and exercise its rights, powers and discretions under the Collateral Documents in accordance therewith.

(c)     The Trustee and each Holder, by accepting the Notes and the Guarantees thereof, acknowledges that, as more fully set forth in the Collateral Documents, the Collateral as now or hereafter constituted shall be held for the benefit of all the Holders and the Trustee, and that the Lien of this Indenture and the Collateral Documents in respect of the Trustee and the Holders is subject to and qualified and limited in all respects by the Collateral Documents and actions that may be taken thereunder.

-71-

Section 10.02  Further Assurances.

(a)     The Issuer and the Guarantors shall execute any and all further documents, financing statements, agreements and instruments, and take all further actions that may be required under applicable law, or that the Collateral Agent or the Trustee may reasonably request, in order to grant, preserve, protect and perfect the validity and priority of the security interests and Liens created or intended to be created by the Collateral Documents in the Collateral.  In addition, to the extent required under this Indenture or any of the Collateral Documents, from time to time, the Issuer and the Guarantors shall reasonably promptly secure the Obligations under this Indenture and Collateral Documents by pledging or creating, or causing to be pledged or created, perfected security interests and Liens with respect to the Collateral to the extent required by the Collateral Documents.  Such security interests and Liens shall be created under the Collateral Documents and other security agreements and other instruments and documents in form and substance reasonably satisfactory to the Collateral Agent.

(b)     Without limiting any rights or powers granted by this Indenture to the Trustee, Paying Agent or Collateral Agent, the Trustee, Paying Agent or Collateral Agent, as applicable, is hereby appointed the attorney in fact of each of the Issuer and the Guarantors for the purpose of carrying out the provisions of this Indenture and taking any action and executing any instruments that the Trustee, Paying Agent or Collateral Agent, as applicable, may deem necessary or advisable to accomplish the purposes, which appointment as attorney in fact is irrevocable and coupled with an interest.  Without limiting the generality of the foregoing, so long as the Trustee, Paying Agent or Collateral Agent, as applicable, shall be entitled under this Indenture or any of the Collateral Documents to make collections in respect of the Collateral, the Trustee, Paying Agent or Collateral Agent, as applicable, shall have the right and power to receive, endorse and collect all checks made payable to the order of any of the Issuer or Guarantors representing any dividend, payment or other distribution in respect of the Collateral or any part thereof and to give full discharge for the same.

Section 10.03  After-Acquired Property.

(a)     Upon the acquisition by the Issuer or any of the Guarantors after the Issue Date of any assets, or any equipment or fixtures which constitute accretions, additions or technological upgrades to the equipment or fixtures or any working capital assets that, in any such case, form part of the Collateral, the Issuer or such Guarantor shall execute and deliver:

(1)     with regard to real property, the items described in Section 10.05 within 90 days of the date of acquisition of the applicable asset (but not earlier than 150 days after the Issue Date) and,

(2)     with regard to any other after-acquired property to the extent required by the Collateral Documents, any information, documentation, financing statements or other certificates and opinions of counsel as may be necessary to vest in the Collateral Agent a perfected security interest, subject only to Permitted Liens, in such after-acquired property and to have such after-acquired property added to the Collateral, and thereupon all provisions of the Indenture and the Collateral Documents relating to the Collateral

-72-

shall be deemed to relate to such after-acquired property to the same extent and with the same force and effect.

(b)    With respect to as-extracted Collateral, if any, on any real property, the Issuer and Guarantors shall be required to make or permit any financing statement required by the Collateral Documents as soon as reasonably practicable, but in any event, within 30 days of date of acquisition of the real property.  Further, the Issuer and Guarantors shall not be obligated to make or permit any financing statement filings at any county, real estate or other local filing office solely with respect to fixtures or as-extracted Collateral, if any, located on Leased Real Property until 30 days after the date the Issuer or Guarantors acquire rights to such Leased Real Property, or in any event if such a filing would be prohibited by, or constitute a breach or default under or result in the termination of or require any consent not obtained under, any contract, license, agreement, instrument or other document evidencing or giving rise to the Leased Real Property.

Section 10.04  Impairment of Security Interest.

Neither the Issuer nor any of the Subsidiaries or Guarantors shall (i) take or omit to take any action which would materially adversely affect or impair the Liens in favor of the Collateral Agent and the Holders of Notes with respect to the Collateral, (ii) grant any Person, or permit any Person (other than the Collateral Agent), to retain any Liens on the Collateral, other than Permitted Liens or (iii) enter into any agreement that requires the proceeds received from any sale of Collateral to be applied to repay, redeem, defease or otherwise acquire or retire any Indebtedness of any Person in a manner that conflicts with this Indenture, the Notes, the Note Guarantees and the Collateral Documents.  The Issuer and each Guarantor shall, at their sole cost and expense, execute and deliver all such agreements and instruments as necessary, or as the Trustee or the Collateral Agent reasonably requests, to more fully or accurately describe the assets and property intended to be Collateral or the Obligations intended to be secured by the Collateral Documents.

Section 10.05  Real Estate Mortgages and Filings.

With respect to any fee interest in any Premises owned by an Obligor or any of their Subsidiaries on the Issue Date or acquired by an Obligor or any of their Subsidiaries after the Issue Date that forms a part of the Collateral, within 150 days of the Issue Date or 90 days of the date of acquisition (but not earlier than 150 days from the Issue Date), as applicable:

(a)    each Obligor or any of their Subsidiaries shall deliver to the Collateral Agent, as mortgagee or beneficiary, as applicable, for the ratable benefit of itself and the Holders, fully executed counterparts of Mortgages, in accordance with the requirements of this Indenture and/or the Collateral Documents, duly executed by such Obligor or such Subsidiary, together with satisfactory evidence of the completion (or satisfactory arrangements for the completion) of all recordings and filings of such Mortgage (and payment of any taxes or fees in connection therewith), together with any necessary fixture filings, as may be necessary to create a valid, perfected Lien, with the priority required by the Collateral Documents, subject to Permitted Liens, against the properties purported to be covered thereby;

(b)    the Collateral Agent shall have received mortgagee's title insurance policies in favor of the Collateral Agent, and its successors and/or assigns, in the form necessary, with respect to the surface rights in real property purported to be covered by the applicable Mortgages, to insure that the interests created by the Mortgages constitute valid Liens thereon, with the priority required by the Collateral Documents, free and clear of all Liens, defects and encumbrances, other than Permitted Liens.  All such title policies to be in amounts equal to 100% of the estimated Fair Market Value of the Premises covered thereby and such policies shall also include, to the extent available, all such endorsements as shall be reasonably required in transactions of similar size and purpose and shall be accompanied by evidence of the payment in full by the Issuer or the applicable Guarantor of all premiums thereon (or that satisfactory arrangements for such payment have been made); and

(c)    each applicable Obligor or any of their Subsidiaries shall deliver to the Collateral Agent (x) with respect to each of the Premises owned on the Issue Date, such existing surveys, plats, or maps that are in the possession of any such Obligor or Subsidiary and such local counsel opinions and opinions of counsel in the jurisdiction of organization of the owner of the applicable Premises as are necessary and appropriate and (y) with respect to each of the Premises acquired after the Issue Date, such existing surveys, plats, or maps that are in the possession of such Obligor or such Subsidiary and such local counsel opinions and opinions of counsel in the jurisdiction of organization of the owner of the applicable Premises as the Collateral Agent and its counsel may reasonably request.

Section 10.06  Release of Collateral.

(a)    The Liens on the Collateral shall be released with respect to the Notes and the Note Guarantees, as applicable:

(1)    in whole, upon payment in full of the principal of, accrued and unpaid interest and premium, if any, on the Notes;

(2)    in whole, upon satisfaction and discharge of this Indenture in accordance with Article 12 of this Indenture;

(3)    [Reserved];

(4)    in part, as to any property constituting Collateral (A) that is sold, transferred or otherwise disposed of by the Issuer or any of the Guarantors (other than to the Issuer or another Guarantor) in a transaction permitted by the Collateral Documents (to the extent of the interest sold or disposed of); or (B) otherwise in accordance with, and as expressly provided for under, this Indenture or the Collateral Documents;

(5)    in whole as to all Collateral that is owned by a Guarantor that is released from its Note Guarantee in accordance with this Indenture; and

(6)    in whole or in part, with the consent of Holders of $66^{2/3}\%$ in aggregate principal amount of the Notes (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes);

-74-

*provided*, that, in the case of any release in whole pursuant to clauses (1) through (3) above, all amounts owing to the Trustee and the Collateral Agent under this Indenture, the Notes, the Note Guarantees and the Collateral Documents have been paid or otherwise provided for to the reasonable satisfaction of the Trustee and Collateral Agent.

(b)     With respect to the release of Collateral, the Issuer shall furnish to the Trustee and Collateral Agent, prior to each proposed release of Collateral pursuant to the Collateral Documents and this Indenture, an Officers' Certificate and an Opinion of Counsel to the effect that all conditions precedent provided for in this Indenture and the Collateral Documents to such release have been complied with; *provided, however*, in no event shall an Officers' Certificate be required to release a Lien on Collateral that is sold or pledged in the ordinary course of business to the extent such sale or pledge is permitted by this Indenture.

Upon compliance by the Issuer or the Guarantors, as the case may be, with the conditions precedent set forth above, the Trustee or the Collateral Agent shall promptly cause to be released and reconveyed to the Issuer or the Guarantors, as the case may be, the released Collateral and, if necessary, the Collateral Agent shall, at the Issuer's expense, execute (and the Issuer shall file) such documents or instruments (that are prepared by the Issuer and provided to the Collateral Agent) as shall be necessary to provide for the release by the Collateral Agent of the released Collateral.

Section 10.07   Authorization of Actions to be Taken by the Trustee or the Collateral Agent Under the Collateral Documents.

(a)     Subject to the provisions of the Collateral Documents, each of the Trustee or the Collateral Agent may, in its sole discretion and without the consent of the Holders, on behalf of the Holders, take all actions it deems necessary or appropriate in order to (a) enforce any of its rights or any of the rights of the Holders under the Collateral Documents and (b) collect and receive any and all amounts payable in respect of the Collateral in respect of the Obligations of the Obligors and any of their Subsidiaries hereunder and thereunder.  Subject to the provisions of the Collateral Documents, the Trustee or the Collateral Agent shall have the power to institute and to maintain such suits and proceedings as it may deem expedient to prevent any impairment of the Collateral by any acts that may be unlawful or in violation of the Collateral Documents or this Indenture, and such suits and proceedings as the Trustee or the Collateral Agent may deem expedient to preserve or protect its interest and the interests of the Holders in the Collateral (including power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair the security interest hereunder or be prejudicial to the interests of the Holders or the Trustee).

(b)     The Trustee or the Collateral Agent shall not be responsible for the perfection or priority of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence, bad faith or willful misconduct on the part of the Trustee or the Collateral Agent, for the validity, sufficiency, existence, genuineness or value of the Collateral or the validity or enforceability of the Liens in any of the Collateral or any

-75-

agreement or assignment contained therein, for the validity of the title of the Issuer or the Guarantors to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral. The Trustee or the Collateral Agent shall have no responsibility for recording, filing, re-recording or re-filing any financing statement, continuation statement, document, instrument or other notice in any public office at any time or times or to otherwise take any action to perfect or maintain the perfection of any security interest granted to it under the Collateral Documents or otherwise.

(c)     Where any provision of this Indenture requires that additional property or assets be added to the Collateral, the Issuer shall deliver to the Trustee or the Collateral Agent the following:

(1)     the form of instrument adding such Collateral, which, based on the type and location of the property subject thereto, shall be in substantially the form of the applicable Collateral Documents entered into on or about the date of this Indenture, with such changes thereto as the Issuer shall consider appropriate, or in such other form as the Issuer shall deem proper; provided that any such changes or such form are administratively satisfactory to the Trustee or the Collateral Agent; and

(2)     such financing statements, if any, as the Issuer shall deem necessary to perfect the Collateral Agent's security interest in such Collateral.

Section 10.08  Collateral Account.

(a)     The Collateral Agent is authorized to receive any funds for the benefit of the Holders distributed under, and in accordance with, the Collateral Documents, and to make further distributions of such funds to the Holders according to the provisions of this Indenture and the Collateral Documents.

(b)     All cash and Cash Equivalents received by the Collateral Agent from Recovery Events, Net Award or Net Insurance Proceeds, foreclosures of or sales of the Collateral, and other awards or proceeds pursuant to the Collateral Documents, including earnings, revenues, rents, issues, profits and income from the Collateral received pursuant to the Collateral Documents, shall be deposited in the Collateral Account and thereafter shall be held, applied and/or disbursed by the Collateral Agent in accordance with the terms of this Indenture (including, without limitation, Section 6.13 and Section 10.08(a)).  The Collateral Account shall be a trust account and shall be established and maintained by the Collateral Agent at one of its corporate trust offices (which may include the New York corporate trust office), and all Collateral shall be credited thereto.

(c)     Pending the distribution of funds in the Collateral Account in accordance with the provisions hereof and provided that no Event of Default shall have occurred and be continuing, the Issuer may direct the Collateral Agent in writing to invest such funds in Cash Equivalents specified in such direction, such investments to mature by the times such funds are needed hereunder and such direction to certify that such funds constitute Cash Equivalents and that no Event of Default shall have occurred and be continuing.  So long as no Event of Default

-76-

shall have occurred and be continuing, the Issuer may direct the Collateral Agent to sell, liquidate or cause the redemption of any such investments, such direction to certify that no Event of Default shall have occurred and be continuing. Any gain or income on any investment of funds in the Collateral Account shall be credited to the Collateral Account. The Collateral Agent shall have no liability for any loss, fee, tax or other charge incurred in connection with any investment or any sale, reinvestment, liquidation or redemption thereof made in accordance with the provisions of this Section 10.08(c).

Section 10.09  Information Regarding Collateral.

(a)  The Issuer shall furnish to the Collateral Agent, with respect to the Issuer or any Guarantor, promptly (and in any event within 30 days of such change) written notice of any change in such Person's (1) legal name, (2) jurisdiction of organization or formation, (3) identity or corporate structure or (4) organizational identification number. The Issuer and the Guarantors shall agree not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the Uniform Commercial Code and any other applicable laws that are required in this Indenture and/or the Collateral Documents in order for the Collateral to be made subject to the Lien of the Collateral Agent under this Indenture and/or the Collateral Documents in the manner and to the extent required by this Indenture or any of the Collateral Documents and shall take all necessary action so that such Lien is perfected with the same priority as immediately prior to such change to the extent required by the Indenture and/or the Collateral Documents. The Issuer also agree promptly to notify the Collateral Agent in writing if any material portion of the Collateral is damaged, destroyed or condemned.

(b)  Each year, within 150 days after the end of the preceding fiscal year, the Issuer shall deliver to each of the Trustee and the Collateral Agent an Officers' Certificate setting forth the information required pursuant to the schedules required by the Collateral Documents or confirming that there has been no change in such information since the date of the prior annual certification.

Section 10.10  Maintenance of Collateral.

Each Obligor shall maintain the Collateral in good, safe and insurable operating order, condition and repair (ordinary wear and tear excepted, and only to the extent such Collateral is in operating order as of the date of the original issuance of the Notes hereunder, or the relevant Obligor brings non-operating Collateral into operation after the date of the original issuance of the Notes hereunder) and do all other acts as may be reasonably necessary or appropriate to maintain and preserve the Collateral; *provided*, that the foregoing requirement shall not prevent any Obligor or any of their Subsidiaries from discontinuing the use, operation or maintenance of Collateral or disposing of Collateral, if such discontinuance or disposal (x) is, in the judgment of the Issuer, desirable in the conduct of the business of the Obligors taken as a whole and (y) is otherwise in compliance with the provisions of this Indenture and the Collateral Documents. The Obligors shall pay all real estate and other taxes, and maintain in full force and effect all material permits and insurance in amounts that insure against such losses and risks as are reasonable for the type and size of the business conducted by the Obligors.

Section 10.11  Negative Pledge

-77-

#4834-6333-0618

(a)      None of the Obligors, any Person that is a parent of an Obligor, or any of their respective Subsidiaries shall pledge its Equity Interests as security or otherwise.

(b)      No Obligor shall, and each Obligor shall not permit any of its Subsidiaries to, further pledge the Collateral as security or otherwise, subject to Permitted Liens.

ARTICLE 11

GUARANTEES

Section 11.01  Guarantee.

(a)      Subject to this Article 11, each of the Guarantors party hereto jointly and severally irrevocably and unconditionally guarantees, on a senior secured basis, to each Holder and to the Trustee and its successors and assigns, in its capacity as Trustee and in each other capacity in which the Trustee serves as an Agent, irrespective of the validity and enforceability of this Indenture, the Notes or the Obligations of the Issuer hereunder or under any other Notes Document, that:  (1) the principal, premium and Additional Amounts, if any, and interest on the Notes shall be promptly paid in full when due, whether at Stated Maturity, by acceleration, redemption or otherwise, and interest on the overdue principal and interest on the Notes, if any, if lawful, and all other Obligations of the Issuer to the Holders or the Trustee hereunder or under the Notes Documents shall be promptly paid in full or performed, all in accordance with the terms hereof and thereof; and (2) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that same shall be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at Stated Maturity, by acceleration or otherwise collectively, the "Guaranteed Obligations".  Failing payment by the Issuer when due of any amount so guaranteed or any performance so guaranteed for whatever reason, the Guarantors shall be jointly and severally obligated to pay.  Each Guarantor agrees that this is a guarantee of payment and not a guarantee of collection.

(b)      The Guarantors hereby agree that their Obligations hereunder shall be unconditional, irrespective of the validity, regularity or enforceability of the Notes or this Indenture or any other Notes Document, the absence of any action to enforce the same, any waiver or consent by any Holder with respect to any provisions hereof or thereof, the recovery of any judgment against the Issuer, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor.  Each Guarantor hereby waives diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Issuer, protest, notice and all demands whatsoever and covenants that this Note Guarantee shall not be discharged except by complete performance of the Obligations contained in the Notes, this Indenture and each other Notes Document, or pursuant to Section 11.06.

(c)      Each of the Guarantors jointly and severally also agrees to pay any and all costs and expenses (including reasonable attorneys' fees and expenses) incurred by the Trustee, any Agent or any Holder in enforcing any rights under this Section 11.01.

(d)      If any Holder, any Agent or the Trustee is required by any court or

-78-

otherwise to return to the Issuer, the Guarantors or any custodian, trustee, liquidator or other similar official acting in relation to the Issuer or the Guarantors, any amount paid either to the Trustee, such Agent or such Holder, this Note Guarantee, to the extent theretofore discharged, shall be reinstated in full force and effect.

(e)     Each Guarantor agrees that it shall not be entitled to enforce any right of subrogation in relation to the Holders in respect of any Obligations guaranteed hereby until payment in full of all Obligations guaranteed hereby.  Each Guarantor further agrees that, as between the Guarantors, on the one hand, and the Holders, each Agent and the Trustee, on the other hand, (1) the maturity of the Obligations guaranteed hereby may be accelerated as provided in Article 6 for the purposes of this Note Guarantee, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Obligations guaranteed hereby, and (2) in the event of any declaration of acceleration of such Obligations as provided in Article 6, such Obligations (whether or not due and payable) shall forthwith become due and payable by the Guarantors for the purpose of this Note Guarantee.  The Guarantors shall have the right to seek contribution from any non-paying Guarantor so long as the exercise of such right does not impair the rights of the Holders under the Note Guarantees.

(f)     Each Note Guarantee shall remain in full force and effect and continue to be effective should any petition be filed by or against the Issuer for liquidation or reorganization, should the Issuer become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any significant part of the Issuer's assets, and shall, to the fullest extent permitted by law, continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Notes are, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee on the Notes or the Note Guarantees, whether as a "voidable preference," "fraudulent transfer" or otherwise, all as though such payment or performance had not been made.  In the event that any payment or any part thereof, is rescinded, reduced, restored or returned, the Notes shall, to the fullest extent permitted by law, be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

(g)     In case any provision of any Note Guarantee shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

(h)     Each payment to be made by a Guarantor in respect of its Note Guarantee shall be made without set-off, counterclaim, reduction or diminution of any kind or nature.

Section 11.02  Limitation on Guarantor Liability.

Each Guarantor, and by its acceptance of Notes, each Holder, hereby confirms that it is the intention of all such parties that the Note Guarantee of such Guarantor not constitute a fraudulent conveyance or a fraudulent transfer for purposes of Bankruptcy Law, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar federal or state law to the extent applicable to any Note Guarantee.  To effectuate the foregoing intention, the Trustee, each Agent, the Holders and the Guarantors hereby irrevocably agree that the Obligations of each Guarantor shall be limited to the maximum amount as will, after giving

-79-

effect to such maximum amount and all other contingent and fixed liabilities of such Guarantor that are relevant under such laws and after giving effect to any collections from, rights to receive contribution from or payments made by or on behalf of any other Guarantor in respect of the Obligations of such other Guarantor under this Article 11, result in the Obligations of such Guarantor under its Note Guarantee not constituting a fraudulent conveyance or fraudulent transfer under applicable law. Each Guarantor that makes a payment under its Note Guarantee shall be entitled upon payment in full of all Guaranteed Obligations under this Indenture to a contribution from each other Guarantor in an amount equal to such other Guarantor's pro rata portion of such payment based on the respective net assets of all the Guarantors at the time of such payment, determined in accordance with GAAP.

Section 11.03  Execution and Delivery.

(a)  To evidence its Note Guarantee set forth in Section 11.01, each Guarantor hereby agrees that this Indenture shall be executed on behalf of such Guarantor by an Officer or person holding an equivalent title.

(b)  Each Guarantor hereby agrees that its Note Guarantee set forth in Section 11.01 shall remain in full force and effect notwithstanding the absence of the endorsement of any notation of such Note Guarantee on the Notes.

(c)  If an Officer whose signature is on this Indenture no longer holds that office at the time the Trustee authenticates the Note, the Note Guarantees shall be valid nevertheless.

(d)  The delivery of any Note by the Trustee, after the authentication thereof hereunder, shall constitute due delivery of the Note Guarantee set forth in this Indenture on behalf of the Guarantors.

(e)  If required by Section 4.11, any applicable Obligor shall cause any newly created or acquired Subsidiary to comply with the provisions of Section 4.11 and this Article 11, to the extent applicable.

Section 11.04  Subrogation.

Each Guarantor shall be subrogated to all rights of Holders against the Issuer in respect of any amounts paid by any Guarantor pursuant to the provisions of Section 11.01; *provided* that, if an Event of Default has occurred and is continuing, no Guarantor shall be entitled to enforce or receive any payments arising out of, or based upon, such right of subrogation until all amounts then due and payable by the Issuer under this Indenture or the Notes shall have been paid in full.

Section 11.05  Benefits Acknowledged.

Each Guarantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated by this Indenture and that the guarantee and waivers made by it pursuant to its Note Guarantee are knowingly made in contemplation of such benefits.

-80-

Section 11.06  Release of Note Guarantees.

(a)     A Note Guarantee by a Guarantor shall be automatically and unconditionally released and discharged, and no further action by such Guarantor, the Issuer or the Trustee shall be required for the release of such Guarantor's Note Guarantee, upon:

(1)     (A) in the case of a Guarantor, any sale, assignment, transfer, conveyance, exchange or other disposition (by merger, consolidation or otherwise) of the Capital Stock of such Guarantor after which the applicable Guarantor is no longer a Subsidiary, which sale, assignment, transfer, conveyance, exchange or other disposition is made in compliance with the provisions of this Indenture and Section 5.01; *provided* that (i) all the Note Guarantees and other obligations of such Guarantor in respect of all other Indebtedness of the Issuer and its Subsidiaries terminate upon consummation of such transaction and (ii) any Investment of the Issuer or any other Subsidiary of the Issuer (other than any Subsidiary of such Guarantor) in such Guarantor or any Subsidiary of such Guarantor in the form of an Obligation or Preferred Stock is repaid, satisfied, released and discharged in full upon such release; or

(B)     [Reserved];

(C)     the discharge of the Issuer's Obligations in accordance with Article 12 of this Indenture; and

(2)     such Guarantor delivering to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that all conditions precedent provided for in this Indenture relating to such transaction or release have been complied with.

(b)     At the written request of the Issuer, the Trustee shall execute and deliver any documents reasonably required in order to evidence such release, discharge and termination in respect of the applicable Note Guarantee.

## ARTICLE 12

## SATISFACTION AND DISCHARGE

Section 12.01  Satisfaction and Discharge.

(a)     This Indenture shall be discharged, and shall cease to be of further effect as to all Notes, when either:

(1)     all Notes that have been authenticated and delivered (except lost, stolen or destroyed Notes that have been replaced or paid and Notes for whose payment money has been deposited in trust) have been delivered to the Trustee for cancellation; or

(2)     (A) all Notes not theretofore delivered to the Trustee for cancellation have become due and payable by reason of the giving of a notice of redemption or otherwise, shall become due and payable within one year or are to be called for redemption within one year under arrangements satisfactory to the Trustee for

-81-

the giving of notice of redemption by the Trustee in the name, and at the expense, of the Issuer, and the Issuer or any Guarantor have irrevocably deposited or caused to be deposited with the Trustee, as trust funds in trust solely for the benefit of the Holders, cash in U.S. dollars, Government Securities, or a combination thereof, in such amounts as shall be sufficient, as confirmed, certified or attested to by an Independent Financial Advisor in writing to the Trustee, without consideration of any reinvestment of interest, to pay and discharge the entire Indebtedness on the Notes not theretofore delivered to the Trustee for cancellation for principal, premium, if any, and accrued interest to the date of maturity or redemption, as the case may be;

(B)    no Default or Event of Default has occurred and is continuing on the date of such deposit or will occur as a result of such deposit (other than a Default or an Event of Default resulting from the borrowing of funds to be applied to make such deposit and any similar and simultaneous deposit relating to other Indebtedness and, in each case, the granting of Liens in connection therewith) and the deposit will not result in a breach or violation of, or constitute a default under, any other material agreement or material instrument (other than this Indenture) to which the Issuer or any Guarantor are a party or by which the Issuer or any Guarantor are bound;

(C)    the Issuer or any Guarantor has paid or caused to be paid all sums payable by the Issuer under this Indenture; and

(D)    the Issuer has delivered irrevocable instructions to the Trustee to apply the deposited money toward the payment of the Notes at maturity or the redemption date, as the case may be.

(b)    In addition, the Issuer shall, upon its request for acknowledgement of satisfaction and discharge, deliver to the Trustee an Officers' Certificate and an Opinion of Counsel (which Opinion of Counsel may be subject to customary assumptions and exclusions) each stating that all conditions precedent to satisfaction and discharge have been satisfied. Notwithstanding the satisfaction and discharge of this Indenture, if money shall have been deposited with the Trustee pursuant to subclause (A) of clause (2) of Section 12.01(a), the provisions of Section 12.02 shall survive.

Section 12.02  Application of Trust Money.

(a)    All money deposited with the Trustee pursuant to Section 12.01 shall be held in trust and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Issuer acting as its own Paying Agent) as the Trustee may determine, to the Persons entitled thereto, of the principal, premium, if any, and interest for whose payment such money has been deposited with the Trustee, but such money need not be segregated from other funds except to the extent required by law.

(b)    If the Trustee or Paying Agent is unable to apply any money or Government Securities in accordance with Section 12.01 by reason of any legal proceeding or by reason of any order or judgment of any court or Governmental Authority enjoining, restraining

-82-

or otherwise prohibiting such application, the Issuer's and any Guarantor's Obligations under this Indenture, the Notes and the Note Guarantees shall be revived and reinstated as though no deposit had occurred pursuant to Section 12.01; *provided* that if the Issuer has made any payment of principal, premium, if any, or interest on any Notes because of the reinstatement of its Obligations, the Issuer shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money or Government Securities held by the Trustee or Paying Agent, as the case may be.

ARTICLE 13

MISCELLANEOUS

Section 13.01  Notices.

(a)      Any notice or communication to the Issuer, any Guarantor or the Trustee is duly given if in writing and (1) delivered in person, (2) mailed by first-class mail (certified or registered, return receipt requested), postage prepaid, or overnight air courier guaranteeing next day delivery or (3) sent by facsimile or electronic transmission (PDF only), to its address:

> if to the Issuer or any Guarantor:
>
> c/o ERP Compliant Fuels, LLC
> 15 Appledore Lane
> Natural Bridge, Virginia 24578
> Attention: Tom Clarke
> Email:  Tom.Clarke@kissito.org
>
> with a copy to:
>
> Dentons US LLP
> 1221 Avenue of the Americas
> New York, New York 10022
> Attention:  Oscar Pinkas
> oscar.pinkas@dentons.com
>
> if to the Trustee, Collateral Agent, Paying Agent, Registrar or Calculation Agent:
>
> Wilmington Savings Fund Society, FSB, as Trustee
> 500 Delaware Avenue, 11th Floor
> Wilmington, Delaware 19801
> Attention: Geoffrey Lewis
> Fax No.:  (302) 421-9137
> Email:  glewis@wsfsbank.com

The Issuer, any Guarantor or the Trustee, by like notice, may designate additional or different addresses for subsequent notices or communications.

(b)      All notices and communications (other than those sent to Holders) shall be

-83-

#4834-6333-0618

deemed to have been duly given:  at the time delivered by hand, if personally delivered; on the first date of which publication is made, if by publication; five calendar days after being deposited in the mail, postage prepaid, if mailed by first-class mail; the next Business Day after timely delivery to the courier, if mailed by overnight air courier guaranteeing next day delivery; when receipt acknowledged, if sent by facsimile or electronic transmission; *provided* that any notice or communication delivered to the Trustee shall be deemed effective upon actual receipt thereof.

(c)      Any notice or communication to a Holder shall be mailed by first-class mail (certified or registered, return receipt requested) or by overnight air courier guaranteeing next day delivery to its address shown on the Note Register or by such other delivery system as the Trustee agrees to accept.  Failure to mail a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.

(d)      Where this Indenture provides for notice in any manner, such notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice.  Waivers of notice by Holders shall be filed with the Trustee, but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

(e)      Notwithstanding any other provision herein, where this Indenture provides for notice of any event to any Holder of an interest in a Global Note (whether by mail or otherwise), such notice shall be sufficiently given if given to the Depositary for such Note (or its designee), according to the applicable procedures of such Depositary, if any, prescribed for the giving of such notice.

(f)      The Trustee agrees to accept and act upon notice, instructions or directions pursuant to this Indenture sent by unsecured facsimile or electronic transmission; *provided*, *however*, that (1) the party providing such written notice, instructions or directions, subsequent to such transmission of written instructions, shall provide the originally executed instructions or directions to the Trustee in a timely manner, and (2) such originally executed notice, instructions or directions shall be signed by an authorized representative of the party providing such notice, instructions or directions.  The Trustee shall not be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's reasonable reliance upon and compliance with such notice, instructions or directions notwithstanding such notice, instructions or directions conflict or are inconsistent with a subsequent notice, instructions or directions.

(g)      If a notice or communication is sent in the manner provided above within the time prescribed, it is duly given, whether or not the addressee receives it.

(h)      If the Issuer mails a notice or communication to Holders, it shall mail a copy to the Trustee and each Agent at the same time.

Section 13.02  Certificate and Opinion as to Conditions Precedent.

Upon any request or application by the Issuer or any Guarantor to the Trustee to take any action under this Indenture, including any action as an Agent, the Issuer or such Guarantor, as the case may be, shall furnish to the Trustee, at the Trustee's request, either or both of:

-84-

(1)     an Officers' Certificate in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 13.03) stating that, in the opinion of the signer(s), all conditions precedent and covenants, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(2)     an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 13.03) stating that, in the opinion of such counsel, all such conditions precedent and covenants have been complied with.

Section 13.03  Statements Required in Certificate or Opinion.

Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture shall include:

(1)     a statement that the Person making such certificate or opinion has read such covenant or condition;

(2)     a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(3)     a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to enable him or her to express an informed opinion as to whether or not such covenant or condition has been complied with (and, in the case of an Opinion of Counsel, may be limited to reliance on an Officers' Certificate as to matters of fact); and

(4)     a statement as to whether or not, in the opinion of such Person, such condition or covenant has been complied with.

Section 13.04  Rules by Trustee and Agents.

The Trustee may make reasonable rules for action by or at a meeting of Holders. The Registrar or Paying Agent may make reasonable rules and set reasonable requirements for its functions.

Section 13.05  No Personal Liability of Directors, Officers, Employees, Members, Partners and Stockholders.

No past, present or future director, officer, employee, incorporator, member, partner or stockholder of the Issuer or any Guarantor, as such, shall have any liability for any Obligations of the Issuer or any Guarantor (other than the Issuer in respect of the Notes and each Guarantor in respect of its Note Guarantee) under the Notes, the Note Guarantees or this Indenture or for any claim based on, in respect of, or by reason of, such Obligations or their creation.

-85-

#4834-6333-0618

Each Holder by accepting a Note waives and releases all such liability.  The waiver and release are part of the consideration for issuance of the Notes.

Section 13.06  Governing Law.

THIS INDENTURE, THE NOTES AND ANY NOTE GUARANTEE WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

Section 13.07  Waiver of Jury Trial.

THE ISSUER AND EACH OF THE GUARANTORS, THE COLLATERAL AGENT AND THE TRUSTEE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES, THE NOTE GUARANTEES OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 13.08  Force Majeure.

In no event shall the Trustee or any Agent be responsible or liable for any failure or delay in the performance of its Obligations under this Indenture arising out of or caused by, directly or indirectly, forces beyond its reasonable control, including without limitation strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services; it being understood that the Trustee and each Agent shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

Section 13.09  No Adverse Interpretation of Other Agreements.

This Indenture may not be used to interpret any other indenture, loan or debt agreement of the Issuer or its Subsidiaries or of any other Person.  Any such indenture, loan or debt agreement may not be used to interpret this Indenture.

Section 13.10  Successors.

All agreements of the Issuer in this Indenture and the Notes shall bind its successors. All agreements of the Trustee in this Indenture shall bind its successors.  All agreements of each Guarantor in this Indenture shall bind its successors, except as otherwise provided in Section 11.06.

Section 13.11  Severability.

In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

#4834-6333-0618

Section 13.12  Counterpart Originals.

The parties may sign any number of copies of this Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.

Section 13.13  Table of Contents, Headings, etc.

The Table of Contents and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and shall in no way modify or restrict any of the terms or provisions hereof.

Section 13.14  Facsimile and PDF Delivery of Signature Pages.

The exchange of copies of this Indenture and of signature pages by facsimile or PDF transmission shall constitute effective execution and delivery of this Indenture as to the parties hereto and may be used in lieu of the original Indenture for all purposes.  Signatures of the parties hereto transmitted by facsimile or PDF shall be deemed to be their original signatures for all purposes.

Section 13.15  U.S.A. PATRIOT Act.

The parties hereto acknowledge that in accordance with Section 326 of the U.S.A. PATRIOT Act, the Trustee is required to obtain, verify, and record information that identifies each Person or legal entity that establishes a relationship or opens an account with the Trustee. The parties to this Indenture agree that they shall provide the Trustee with such information as it may request in order for the Trustee to satisfy the requirements of the U.S.A. PATRIOT Act.

Section 13.16  Payments Due on Non-Business Days.

In any case where any Payment Date, redemption date or repurchase date or the Stated Maturity of the Notes shall not be a Business Day, then (notwithstanding any other provision of this Indenture or of the Notes) payment of principal, premium, if any, or interest on the Notes need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on the applicable Payment Date, redemption date or repurchase date, or at the Stated Maturity of the Notes, *provided* that no interest will accrue for the period from and after such Payment Date, redemption date, repurchase date or Stated Maturity, as the case may be.

Section 13.17  Effectiveness of Indenture

No party shall have any rights, obligations or other benefits or responsibilities hereunder unless and until such time as the parties have issued the Notes hereunder in connection with the Closing (as defined in the APA), and the Closing has occurred; *provided* that the Trustee shall be entitled to an Officers' Certificate and Opinion of Counsel that such closing has occurred and that all conditions precedent have been satisfied.

*[Signatures on following page]*

-87-

ERP IRON ORE, LLC

By

    By:    _____
            Name:
            Title:

ERP COMPLIANT COKE, LLC

By

    By:    _____
            Name:
            Title:

THOMAS MATTHEW CLARKE, as a Guarantor

By

    By:    _____
            Name: Thomas Matthew Clarke

ANA MERCEDES CLARKE, as a Guarantor

By

    By:    _____
            Name: Ana Mercedes Clarke

*[Signature page to Indenture]*

WILMINGTON SAVINGS FUND SOCIETY, FSB
as Trustee

By: _____
    Name:
    Title:

*[Signature page to Indenture]*

Case 18-50878 Doc 135 Filed 06/12/18 Entered 06/12/18 21:10:23 Desc Main
Document Page 183 of 437

SCHEDULE A

EXISTING INDEBTEDNESS

[None]

SCHEDULE 6.02

MECHANICS LIENHOLDERS

**Indiana Pellet Plant**

Twin City Fan Companies, Ltd.

Solid Platforms, Inc.

Solid Platforms, Inc.

Northern Industrial Erectors, Inc.

Hammerlund's Champion Steel, Inc. d/b/a Champion Steel

Fastenal Company

Accu-Dig, Inc.

Xtreme Contractors Co., LLC

Midwest Constructors, LLC

Wesco Distribution, Inc.

One Source Equipment Rentals, LLC

Central Rent-A-Crane

Ferguson Enterprises, Inc.

Kelly Construction of Indiana, Inc.

Shambaugh & Son L.P.

**Plant 4**

A.W. Kuettel

Ferguson Enterprises, Inc.

Hammerlund's Champion Steel, Inc., d/b/a Champion Steel

Hammerlund Construction

Hunt Electric Corporation

Ironman Concrete Pumping, Inc.

Jamar Company

JK Mechanical Contractors, Inc.

John J. Morgan Company

K Building Components, Inc.

LeJeune Steel Company

Minnesota Industries, Inc.

#4834-6333-0618

Noramco Engineering Corporation

Northern Industrial Erectors

Parsons Electric LLC

Range Electric Inc.

Rapids Process Equipment, Inc.

Scheck Industrial Corp.

Toltz, King Duvall Anderson and Associates, Inc. d/b/a TKDA

Trane US Inc.

United Rentals (North America)

Viking Electric Supply

Wesco Distribution

**Plant 2**

Ferguson Enterprises, Inc.

Rapids Process Equipment, Inc.

Viking Electric Supply Inc.

Hammerlund's Champion Steel, Inc. d/b/a Champion Steel

Hammerlund Construction

Wesco Distribution, Inc.

**Plant 1**

Ferguson Enterprises, Inc.

Hammerlund's Champion Steel, Inc. d/b/a Champion Steel

**Jessie Loadout**

Noramco Engineering

Toltz, King, Duval, Anderson & Associates, Inc.

Ulland Brothers, Inc.

Viking Electric Supply, Inc.

Hammerlund's Champion Steel, Inc. d/b/a Champion Steel

Hammerlund's Champion Steel, Inc. d/b/a Champion Steel

Hammerlund Construction

#4834-6333-0618

PROVISIONS RELATING TO NOTES

Section 1.1    <u>Definitions</u>.

    (a)    <u>Capitalized Terms</u>.

    Capitalized terms used but not defined in this Appendix A have the meanings given to them in this Indenture.  The following capitalized terms have the following meanings:

    "<u>Applicable Procedures</u>" means, with respect to any transfer or transaction involving a Global Note or beneficial interest therein, the rules and procedures of the Depositary for such Global Note, Euroclear or Clearstream, in each case to the extent applicable to such transaction and as in effect from time to time.

    "<u>Clearstream</u>" means Clearstream Banking, Société Anonyme, or any successor securities clearing agency.

    "<u>Distribution Compliance Period</u>," with respect to any Note, means the period of 40 consecutive days beginning on and including the later of (a) the day on which such Note is first offered to Persons other than distributors (as defined in Regulation S) in reliance on Regulation S, notice of which day shall be promptly given by the Issuer to the Trustee, and (b) the date of issuance with respect to such Note or any predecessor of such Note.

    "<u>Euroclear</u>" means Euroclear Bank S.A./N.Y., as operator of Euroclear systems Clearance System or any successor securities clearing agency.

    "<u>IAI</u>" means an institution that is an "accredited investor" as described in Rule 501(a)(1), (2), (3) or (7) under the Securities Act and is not a QIB.

    "<u>QIB</u>" means a "qualified institutional buyer" as defined in Rule 144A.

    "<u>Regulation S</u>" means Regulation S promulgated under the Securities Act.

    "<u>Rule 144</u>" means Rule 144 promulgated under the Securities Act.

    "<u>Rule 144A</u>" means Rule 144A promulgated under the Securities Act.

    "<u>Unrestricted Global Note</u>" means any Note in global form that does not bear or is not required to bear the Restricted Notes Legend.

    "<u>U.S. Person</u>" means a "U.S. person" as defined in Regulation S.

(b)      Other Definitions.

| Term: | Defined in Section: |
|---|---|
| "Agent Members" | 2.1(b) |
| "Definitive Notes Legend" | 2.2(e) |
| "ERISA Legend" | 2.2(e) |
| "Global Notes" | 2.1(a) |
| "Global Notes Legend" | 2.2(e) |
| "IAI Global Note" | 2.1(a) |
| "Regulation S Global Note" | 2.1(a) |
| "Restricted Notes Legend" | 2.2(e) |
| "Rule 144A Global Note" | 2.1(a) |

Section 2.1    Form and Dating

(a)      *Global Notes*.  Rule 144A Notes shall be issued initially in the form of one or more permanent global Notes in definitive, fully registered form, numbered RA-1 upward (collectively, the "Rule 144A Global Note") and Regulation S Notes shall be issued initially in the form of one or more global Notes, numbered RS-1 upward (collectively, the "Regulation S Global Note"), in each case without interest coupons and bearing the Global Notes Legend and Restricted Notes Legend, which shall be deposited on behalf of the purchasers of the Notes represented thereby with the Custodian, and registered in the name of the Depositary or a nominee of the Depositary, duly executed by the Issuer and authenticated by the Trustee as provided in the Indenture.  One or more global Notes in definitive, fully registered form without interest coupons and bearing the Global Notes Legend and the Restricted Notes Legend, numbered RIAI-1 upward (collectively, the "IAI Global Note") shall also be issued at the request of the Trustee, deposited with the Custodian, and registered in the name of the Depositary or a nominee of the Depositary, duly executed by the Issuer and authenticated by the Trustee as provided in this Indenture to accommodate transfers of beneficial interests in the Notes to IAIs subsequent to the initial distribution.  The Rule 144A Global Note, the IAI Global Note, the Regulation S Global Note and any Unrestricted Global Note are each referred to herein as a "Global Note" and are collectively referred to herein as "Global Notes."  Each Global Note shall represent such of the outstanding Notes as shall be specified in the "Schedule of Exchanges of Interests in the Global Note" attached thereto and each shall provide that it shall represent the aggregate principal amount of Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be reduced or increased, as applicable, to reflect exchanges, redemptions or increases due to any PIK Payments.  Any endorsement of a Global Note to reflect the amount of any increase or decrease in the aggregate principal amount of outstanding Notes represented thereby shall be made by the Trustee or the Custodian, at the direction of the Trustee, in accordance with instructions given by the Holder thereof as required by Section 2.06 of this Indenture and Section 2.2(c) of this Appendix A.

(b)      *Book-Entry Provisions*.  This Section 2.1(c) shall apply only to a Global Note deposited with or on behalf of the Depositary.

2

The Issuer shall execute and the Trustee shall, in accordance with this Section 2.1(c) and Section 2.02 of this Appendix A and pursuant to an Authentication Order, authenticate and deliver initially one or more Global Notes that (i) shall be registered in the name of the Depositary for such Global Note or Global Notes or the nominee of such Depositary and (ii) shall be delivered by the Trustee to such Depositary or pursuant to such Depositary's instructions or held by the Trustee as Custodian.

Members of, or participants in, the Depositary ("Agent Members") shall have no rights under the Indenture with respect to any Global Note held on their behalf by the Depositary or by the Trustee as Custodian or under such Global Note, and the Depositary may be treated by the Issuer, the Trustee and any agent of the Issuer or the Trustee as the absolute owner of such Global Note for all purposes whatsoever.  Notwithstanding the foregoing, nothing herein shall prevent the Issuer, the Trustee or any agent of the Issuer or the Trustee from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Agent Members, the operation of customary practices of such Depositary governing the exercise of the rights of a holder of a beneficial interest in any Global Note.

(c)      *Definitive Notes*.  Except as provided in Section 2.2 or Section 2.3 of this Appendix A, owners of beneficial interests in Global Notes shall not be entitled to receive physical delivery of Definitive Notes.

Section 2.2      Transfer and Exchange.

(a)      *Transfer and Exchange of Definitive Notes for Definitive Notes*.  When Definitive Notes are presented to the Registrar with a request:

(i)      to register the transfer of such Definitive Notes; or

(ii)      to exchange such Definitive Notes for an equal principal amount of Definitive Notes of other authorized denominations,

the Registrar shall register the transfer or make the exchange as requested if its reasonable requirements for such transaction are met; *provided*, *however*, that the Definitive Notes surrendered for registration of transfer or exchange:

(1)      shall be duly endorsed or accompanied by a written instrument of transfer in form reasonably satisfactory to the Issuer and the Registrar, duly executed by the Holder thereof or his attorney duly authorized in writing; and

(2)      in the case of Transfer Restricted Notes, they are being transferred or exchanged pursuant to an effective registration statement under the Securities Act or pursuant to Section 2.2(b) of this Appendix A or otherwise in accordance with the Restricted Notes Legend, and are accompanied by a certification from the transferor in the form provided on the reverse side of the Form of Note in Exhibit A for exchange or registration of transfers and, as applicable, delivery of such legal opinions, certifications and other information as may be requested pursuant thereto.

(b)      *Restrictions on Transfer of a Definitive Note for a Beneficial Interest in a Global Note*.  A Definitive Note may not be exchanged for a beneficial interest in a Global Note except upon satisfaction of the requirements set forth below.  Upon receipt by the Trustee of a Definitive Note, duly endorsed or accompanied by a written instrument of transfer in form reasonably satisfactory to the Issuer and the Registrar, together with:

(i)      a certification from the transferor in the form provided on the reverse side of the Form of Note in Exhibit A for exchange or registration of transfers and, as applicable, delivery of such legal opinions, certifications and other information as may be requested pursuant thereto; and

(ii)      written instructions directing the Trustee to make, or to direct the Custodian to make, an adjustment on its books and records with respect to such Global Note to reflect an increase in the aggregate principal amount of the Notes represented by the Global Note, such instructions to contain information regarding the Depositary account to be credited with such increase,

the Trustee shall cancel such Definitive Note and cause, or direct the Custodian to cause, in accordance with the standing instructions and procedures existing between the Depositary and the Custodian, the aggregate principal amount of Notes represented by the Global Note to be increased by the aggregate principal amount of the Definitive Note to be exchanged and shall credit or cause to be credited to the account of the Person specified in such instructions a beneficial interest in the Global Note equal to the principal amount of the Definitive Note so canceled.  If the applicable Global Note is not then outstanding, the Issuer shall issue and the Trustee shall authenticate, upon an Authentication Order, a new applicable Global Note in the appropriate principal amount.

(c)      *Transfer and Exchange of Global Notes*.

(i)      The transfer and exchange of Global Notes or beneficial interests therein shall be effected through the Depositary, in accordance with the Indenture (including applicable restrictions on transfer set forth in Section 2.2(d) of this Appendix A, if any) and the procedures of the Depositary therefor.  A transferor of a beneficial interest in a Global Note shall deliver to the Registrar a written order given in accordance with the Depositary's procedures containing information regarding the participant account of the Depositary to be credited with a beneficial interest in such Global Note, or another Global Note and such account shall be credited in accordance with such order with a beneficial interest in the applicable Global Note and the account of the Person making the transfer shall be debited by an amount equal to the beneficial interest in the Global Note being transferred.

(ii)      If the proposed transfer is a transfer of a beneficial interest in one Global Note to a beneficial interest in another Global Note, the Registrar shall reflect on its books and records the date and an increase in the principal amount of the Global Note to which such interest is being transferred in an amount equal to the principal amount of the interest to be so transferred, and the Registrar shall reflect on its books and records the date and a corresponding decrease in the principal amount of the Global Note from which such interest is being transferred.

4

(iii)    Notwithstanding any other provisions of this Appendix A (other than the provisions set forth in Section 2.3 of this Appendix A), a Global Note may not be transferred except as a whole and not in part if the transfer is by the Depositary to a nominee of the Depositary or by a nominee of the Depositary to the Depositary or another nominee of the Depositary or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary.

(d)    *Restrictions on Transfer of Global Notes; Voluntary Exchange of Interests in Transfer Restricted Global Notes for Interests in Unrestricted Global Notes.*

(i)    Transfers by an owner of a beneficial interest in a Rule 144A Global Note or an IAI Global Note to a transferee who takes delivery of such interest through another Transfer Restricted Global Note shall be made in accordance with the Applicable Procedures and the Restricted Notes Legend and only upon receipt by the Trustee of a certification from the transferor in the form provided on the reverse side of the Form of Note in <u>Exhibit A</u> for exchange or registration of transfers and, as applicable, delivery of such legal opinions, certifications and other information as may be requested pursuant thereto.  In addition, in the case of a transfer of a beneficial interest in either a Regulation S Global Note or a Rule 144A Global Note for an interest in an IAI Global Note, the transferee shall furnish a signed letter substantially in the form of <u>Exhibit B</u> to the Trustee.

(ii)    Prior to the expiration of the Distribution Compliance Period, (A) the Regulation S Global Note shall be a temporary global security for purposes of Rules 903 and 904 under the Securities Act, whether or not designated as such on the face of such Note, and (B) interests in the Regulation S Global Note may only be held through Euroclear or Clearstream.  During the Distribution Compliance Period, beneficial ownership interests in the Regulation S Global Note may only be sold, pledged or transferred through Euroclear or Clearstream in accordance with the Applicable Procedures, the Restricted Notes Legend on such Regulation S Global Note and any applicable securities laws of any state of the U.S.  Prior to the expiration of the Distribution Compliance Period, transfers by an owner of a beneficial interest in the Regulation S Global Note to a transferee who takes delivery of such interest through a Rule 144A Global Note or an IAI Global Note shall be made only in accordance with the Applicable Procedures and the Restricted Notes Legend and upon receipt by the Trustee of a written certification from the transferor of the beneficial interest in the form provided on the reverse side of the Form of Note in <u>Exhibit A</u> for exchange or registration of transfers.  Such written certification shall no longer be required after the expiration of the Distribution Compliance Period.  Upon the expiration of the Distribution Compliance Period, beneficial ownership interests in the Regulation S Global Note shall be transferable in accordance with applicable law and the other terms of the Indenture.

(iii)    Upon the expiration of the Distribution Compliance Period, beneficial interests in the Regulation S Global Note may be exchanged for beneficial interests in an Unrestricted Global Note upon certification in the form provided on the reverse side of the Form of Note in <u>Exhibit A</u> for an exchange from a Regulation S Global Note to an Unrestricted Global Note.

(iv)    Beneficial interests in a Transfer Restricted Note that is a Rule 144A

5

Global Note or an IAI Global Note may be exchanged for beneficial interests in an Unrestricted
Global Note if the Holder certifies in writing to the Registrar that its request for such exchange is
in respect of a transfer made in reliance on Rule 144 (such certification to be in the form set forth
on the reverse side of the Form of Note in Exhibit A) and/or upon delivery of such legal
opinions, certifications and other information as the Issuer or the Trustee may reasonably
request.

(v)     If no Unrestricted Global Note is outstanding at the time of a transfer
contemplated by the preceding clauses (iii) and (iv), the Issuer shall issue and the Trustee shall
authenticate, upon an Authentication Order, a new Unrestricted Global Note in the appropriate
principal amount.

(e)     *Legends*.

(i)     Except as permitted by Section 2.2(d) and this Section 2.2(e) of this
Appendix A, each Note certificate evidencing the Global Notes and the Definitive Notes (and all
Notes issued in exchange therefor or in substitution thereof) shall bear a legend in substantially
the following form (each defined term in the legend being defined as such for purposes of the
legend only) ("Restricted Notes Legend"):

> THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE
> SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES
> ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER
> JURISDICTION.  NEITHER THIS SECURITY NOR ANY INTEREST
> OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD,
> ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR
> OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH
> REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT
> FROM, OR NOT SUBJECT TO, SUCH REGISTRATION.  THE
> HOLDER OF THIS SECURITY, BY ITS ACCEPTANCE HEREOF,
> AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY
> INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED
> SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER SUCH
> SECURITY, PRIOR TO THE DATE (THE "RESALE RESTRICTION
> TERMINATION DATE") THAT IS [*IN THE CASE OF RULE 144A
> NOTES:*  ONE YEAR AFTER THE LATER OF THE ORIGINAL ISSUE
> DATE OF THE ISSUANCE OF THE NOTES HEREUNDER AND THE
> LAST DATE ON WHICH THE ISSUER OR ANY AFFILIATE OF THE
> ISSUER WERE THE OWNER OF THIS SECURITY (OR ANY
> PREDECESSOR OF SUCH SECURITY)] [*IN THE CASE OF
> REGULATION S NOTES:*  40 DAYS AFTER THE LATER OF THE
> ORIGINAL ISSUE DATE OF THE ISSUANCE OF THE NOTES
> HEREUNDER, THE ORIGINAL ISSUE DATE OF THE ISSUANCE
> AND THE DATE ON WHICH THIS SECURITY (OR ANY
> PREDECESSOR OF SUCH SECURITY) WAS FIRST OFFERED TO
> PERSONS OTHER THAN DISTRIBUTORS (AS DEFINED IN
> RULE 902 OF REGULATION S UNDER THE SECURITIES ACT) IN

6

RELIANCE ON REGULATION S], ONLY (A) TO THE ISSUER OR
ANY SUBSIDIARY THEREOF, (B) PURSUANT TO A
REGISTRATION STATEMENT THAT HAS BEEN DECLARED
EFFECTIVE UNDER THE SECURITIES ACT, (C) FOR SO LONG AS
THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO
RULE 144A UNDER THE SECURITIES ACT ("RULE 144A"), TO A
PERSON IT REASONABLY BELIEVES IS A "QUALIFIED
INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A THAT
PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT
OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS
GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON
RULE 144A, (D) PURSUANT TO OFFERS AND SALES TO NON-
U.S. PERSONS THAT OCCUR OUTSIDE THE UNITED STATES
WITHIN THE MEANING OF REGULATION S UNDER THE
SECURITIES ACT, (E) TO AN INSTITUTIONAL "ACCREDITED
INVESTOR" WITHIN THE MEANING OF RULE 501(a)(1), (2), (3) OR
(7) UNDER THE SECURITIES ACT THAT IS NOT A QUALIFIED
INSTITUTIONAL BUYER AND THAT IS PURCHASING FOR ITS
OWN ACCOUNT OR FOR THE ACCOUNT OF ANOTHER
INSTITUTIONAL ACCREDITED INVESTOR, IN EACH CASE IN A
MINIMUM PRINCIPAL AMOUNT OF SECURITIES OF AT LEAST
$250,000 OR (F) PURSUANT TO ANOTHER AVAILABLE
EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF
THE SECURITIES ACT, SUBJECT TO THE ISSUER'S AND THE
TRUSTEE'S RIGHT PRIOR TO ANY SUCH OFFER, SALE OR
TRANSFER PURSUANT TO CLAUSES (D), (E) OR (F) TO REQUIRE
THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATION
AND/ OR OTHER INFORMATION SATISFACTORY TO EACH OF
THEM.  THIS LEGEND SHALL BE REMOVED UPON THE
REQUEST OF THE HOLDER AFTER THE RESALE RESTRICTION
TERMINATION DATE.  [*IN THE CASE OF REGULATION S NOTES:*
BY ITS ACQUISITION HEREOF, THE HOLDER HEREOF
REPRESENTS THAT IT IS NOT A U.S. PERSON NOR IS IT
PURCHASING FOR THE ACCOUNT OF A U.S. PERSON AND IS
ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION
IN ACCORDANCE WITH REGULATION S UNDER THE
SECURITIES ACT.]

Each Definitive Note shall bear the following additional legend ("Definitive Notes Legend"):

IN CONNECTION WITH ANY TRANSFER, THE HOLDER SHALL
DELIVER TO THE REGISTRAR AND TRANSFER AGENT SUCH
CERTIFICATES AND OTHER INFORMATION AS SUCH
REGISTRAR AND TRANSFER AGENT MAY REASONABLY
REQUIRE TO CONFIRM THAT THE TRANSFER COMPLIES WITH
THE FOREGOING RESTRICTIONS.

Each Global Note shall bear the following additional legend ("Global Notes Legend"):

> UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED
> REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A
> NEW YORK CORPORATION ("DTC"), NEW YORK, NEW YORK,
> TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF
> TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE
> ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH
> OTHER NAME AS IS REQUESTED BY AN AUTHORIZED
> REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO
> CEDE & CO., OR TO SUCH OTHER ENTITY AS IS REQUESTED BY
> AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER,
> PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE
> BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE
> REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST
> HEREIN.

> TRANSFERS OF THIS GLOBAL SECURITY SHALL BE LIMITED
> TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO DTC, TO
> NOMINEES OF DTC OR TO A SUCCESSOR THEREOF OR SUCH
> SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF
> THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS
> MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH
> IN THE INDENTURE REFERRED TO ON THE REVERSE HEREOF.

Each Note shall bear the following additional legend ("ERISA Legend"):

> BY ITS ACQUISITION OF THIS SECURITY, THE HOLDER
> THEREOF SHALL BE DEEMED TO HAVE REPRESENTED AND
> WARRANTED THAT EITHER (1) NO PORTION OF THE ASSETS
> USED BY SUCH HOLDER TO ACQUIRE OR HOLD THIS
> SECURITY CONSTITUTES THE ASSETS OF AN EMPLOYEE
> BENEFIT PLAN THAT IS SUBJECT TO TITLE I OF THE
> U.S. EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974,
> AS AMENDED ("ERISA"), OF A PLAN, INDIVIDUAL RETIREMENT
> ACCOUNT OR OTHER ARRANGEMENT THAT IS SUBJECT TO
> SECTION 4975 OF THE U.S. INTERNAL REVENUE CODE OF 1986,
> AS AMENDED (THE "CODE") OR PROVISIONS UNDER ANY
> OTHER FEDERAL, STATE, LOCAL, NON-U.S. OR OTHER LAWS
> OR REGULATIONS THAT ARE SIMILAR TO SUCH PROVISIONS
> OF ERISA OR THE CODE ("SIMILAR LAWS"), OR OF AN ENTITY
> WHOSE UNDERLYING ASSETS ARE CONSIDERED TO INCLUDE
> "PLAN ASSETS" OF ANY SUCH PLAN, ACCOUNT OR
> ARRANGEMENT, OR (2) THE ACQUISITION AND HOLDING OF
> THIS SECURITY WILL NOT CONSTITUTE A NON-EXEMPT
> PROHIBITED TRANSACTION UNDER SECTION 406 OF ERISA OR

#4834-6333-0618

SECTION 4975 OF THE CODE OR A SIMILAR VIOLATION UNDER ANY APPLICABLE SIMILAR LAWS.

Any Note issued with original issue discount shall also bear the following additional legend ("<u>OID Notes Legend</u>"):

> THIS NOTE HAS BEEN ISSUED WITH "ORIGINAL ISSUE DISCOUNT" (WITHIN THE MEANING OF SECTION 1272 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED) FOR U.S. FEDERAL INCOME TAX PURPOSES.  UPON WRITTEN REQUEST, THE ISSUER SHALL PROMPTLY MAKE AVAILABLE TO ANY HOLDER OF THIS NOTE THE FOLLOWING INFORMATION:  (1) THE ISSUE PRICE AND DATE OF THE NOTE, (2) THE AMOUNT OF ORIGINAL ISSUE DISCOUNT ON THE NOTE AND (3) THE YIELD TO MATURITY OF THE NOTE.  HOLDERS SHOULD CONTACT JOE BROKING, CHIEF FINANCIAL OFFICER AT 102 NE 3RD ST, SUITE 120, GRAND RAPIDS, MINNESOTA 55744.

(ii)     Upon any sale or transfer of a Transfer Restricted Note that is a Definitive Note, the Registrar shall permit the Holder thereof to exchange such Transfer Restricted Note for a Definitive Note that does not bear the Restricted Notes Legend and the Definitive Notes Legend and rescind any restriction on the transfer of such Transfer Restricted Note if the Holder certifies in writing to the Registrar that its request for such exchange is in respect of a transfer made in reliance on Rule 144 (such certification to be in the form set forth on the reverse side of the Form of Note in <u>Exhibit A</u>) and provides such legal opinions, certifications and other information as the Issuer or the Trustee may reasonably request.

(f)     *Cancellation or Adjustment of Global Note.*  At such time as all beneficial interests in a Global Note have either been exchanged for Definitive Notes, transferred in exchange for an interest in another Global Note, redeemed, repurchased or canceled, such Global Note shall be returned by the Depositary to the Trustee for cancellation or retained and canceled by the Trustee.  At any time prior to such cancellation, if any beneficial interest in a Global Note is exchanged for Definitive Notes, transferred in exchange for an interest in another Global Note, redeemed, repurchased or canceled, the principal amount of Notes represented by such Global Note shall be reduced and an adjustment shall be made on the books and records of the Registrar (if it is then the Custodian for such Global Note) with respect to such Global Note, by the Registrar or the Custodian, to reflect such reduction.

(g)     *Obligations with Respect to Transfers and Exchanges of Notes.*

(i)     To permit registrations of transfers and exchanges, the Issuer shall execute and the Trustee shall authenticate, Definitive Notes and Global Notes at the Registrar's request.

(ii)     No service charge shall be imposed in connection with any registration of transfer or exchange, but the Issuer may require payment of a sum sufficient to cover any transfer tax, assessments, or similar governmental charge payable in connection therewith (other

than any such transfer taxes, assessments or similar governmental charge payable upon exchanges pursuant to Sections 2.10 and 9.05 of this Indenture).

(iii)     Neither the Issuer nor the Registrar shall be required to register the transfer of or to exchange any Note between a Record Date and the next succeeding Payment Date.

(iv)     Prior to the due presentation for registration of transfer of any Note, the Issuer, the Trustee, the Paying Agent or the Registrar may deem and treat the Person in whose name a Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal, premium, if any, and interest on such Note and for all other purposes whatsoever, whether or not such Note is overdue, and none of the Issuer, the Trustee, the Paying Agent or the Registrar shall be affected by notice to the contrary.

(v)     All Notes issued upon any transfer or exchange pursuant to the terms of this Indenture shall evidence the same debt and shall be entitled to the same benefits under this Indenture as the Notes surrendered upon such transfer or exchange.

(vi)     In order to effect any transfer or exchange of an interest in any Transfer Restricted Note for an interest in a Note that does not bear the Restricted Notes Legend and has not been registered under the Securities Act, if the Registrar so requests or if the Applicable Procedures so require, an Opinion of Counsel, in form reasonably acceptable to the Registrar to the effect that no registration under the Securities Act is required in respect of such exchange or transfer or the re-sale of such interest by the beneficial holder thereof, shall be required to be delivered to the Registrar and the Trustee.

(h)     *No Obligation of the Trustee.*

(i)     The Trustee shall have no responsibility or obligation to any beneficial owner of a Global Note, a member of, or a participant in the Depositary or any other Person with respect to the accuracy of the records of the Depositary or its nominee or of any participant or member thereof, with respect to any ownership interest in the Notes or with respect to the delivery to any participant, member, beneficial owner or other Person (other than the Depositary) of any notice (including any notice of redemption or repurchase) or the payment of any amount, under or with respect to such Notes.  All notices and communications to be given to the Holders and all payments to be made to Holders under the Notes shall be given or made only to the registered Holders (which shall be the Depositary or its nominee in the case of a Global Note). The rights of beneficial owners in any Global Note shall be exercised only through the Depositary subject to the applicable rules and procedures of the Depositary.  The Trustee may rely and shall be fully protected in relying upon information furnished by the Depositary with respect to its members, participants and any beneficial owners.

(ii)     The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any Note (including any transfers between or among Depositary participants, members or beneficial owners in any Global Note) other than to require delivery of such certificates and other documentation or evidence as are

10

expressly required by, and to do so if and when expressly required by, the terms of this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

Section 2.3    Definitive Notes.

(a)    A Global Note deposited with the Depositary or with the Trustee as Custodian pursuant to Section 2.1 may be transferred to the beneficial owners thereof in the form of Definitive Notes in an aggregate principal amount equal to the principal amount of such Global Note, in exchange for such Global Note, only if (i) such transfer complies with Section 2.2 of this Appendix A and (ii) the Depositary notifies the Issuer that it is unwilling or unable to continue as a Depositary for such Global Note or if at any time the Depositary ceases to be a "clearing agency" registered under the Exchange Act and, in each case, a successor depositary is not appointed by the Issuer within 90 days of such notice or after the Issuer become aware of such cessation. Notwithstanding anything to the contrary in this Section 2.3, no Regulation S Global Note may be exchanged for a Definitive Note until the end of the Distribution Compliance Period applicable to such Regulation S Global Note and receipt by the Trustee and the Issuer of any certificates required by either of them pursuant to Rule 903(b)(3)(ii)(B) under the Securities Act.

(b)    Any Global Note that is transferable to the beneficial owners thereof pursuant to this Section 2.3 shall be surrendered by the Depositary to the Trustee, to be so transferred, in whole or from time to time in part, without charge, and the Trustee shall authenticate and deliver, upon such transfer of each portion of such Global Note, an equal aggregate principal amount of Definitive Notes of authorized denominations.  Any portion of a Global Note transferred pursuant to this Section 2.3 shall be executed, authenticated and delivered only in denominations of $2,000 and integral multiples of $1 in excess thereof and registered in such names as the Depositary shall direct.  Any Definitive Note delivered in exchange for an interest in a Global Note that is a Transfer Restricted Note shall, except as otherwise provided by Section 2.2(e) of this Appendix A, bear the Restricted Notes Legend.

(c)    The registered Holder of a Global Note may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Holder is entitled to take under this Indenture or the Notes.

(d)    In the event of the occurrence of any of the events specified in Section 2.3(a) of this Appendix A, the Issuer shall promptly make available to the Trustee a reasonable supply of Definitive Notes in fully registered form without interest coupons.

11

[FORM OF FACE OF NOTE]

[Insert the Restricted Notes Legend, if applicable, pursuant to the provisions of the Indenture]

[Insert the Global Notes Legend, if applicable, pursuant to the provisions of the Indenture]

[Insert the Definitive Notes Legend, if applicable, pursuant to the provisions of the Indenture]

[Insert the ERISA Legend, if applicable, pursuant to the provisions of the Indenture]

CUSIP [            ]

ISIN [            ][1]

## [RULE 144A][REGULATION S][IAI] NOTE

Floating Rate Senior Secured Amortizing PIK Toggle Notes due 2019

No. [RA-    ] [RS-    ] [RIAI-    ]                                    [Up to][2] [$____]

### ERP IRON ORE, LLC

promises to pay to [CEDE & CO.][3] [_____] or registered assigns the principal sum [set forth on the Schedule of Exchanges of Interests in the Global Note attached hereto][4] [of $_____(_____ Dollars)][5] on December [•], 2019.

Interest Payment Dates: March 31, June 30, September 30 and December 31, beginning on, and inclusive of, March 31, 2017

Amortization Payment Dates: March 31, June 30, September 30 and December 31, beginning on, and inclusive of, June 30, 2017

Record Dates: March 15, June 15, September 15 and December 15

---

[1] Rule 144A Note CUSIP:
Rule 144A Note ISIN:
IAI Note CUSIP:
IAI Note ISIN:
Regulation S CUSIP:
Regulation S ISIN:
[2] Include in Global Notes
[3] Include in Global Notes
[4] Include in Global Notes
[5] Include in Definitive Notes

A-2

IN WITNESS HEREOF, the Issuer has caused this instrument to be duly executed.

Dated:  December [•], 2016

ERP IRON ORE, LLC

By: _____
Name:
Title:

CERTIFICATE OF AUTHENTICATION

This is one of the Notes referred to in the within-mentioned Indenture:

WILMINGTON SAVINGS FUND SOCIETY,
FSB

As Trustee

By: _____
Authorized Signatory:

Dated:  December [•], 2016

A-3

[Reverse Side of Note]

Floating Rate Senior Secured Amortizing PIK Toggle Notes due 2019

Capitalized terms used herein shall have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

1.      INTEREST AND AMORTIZATION AMOUNTS. (a) ERP Iron Ore, LLC (the "Issuer") promises to pay interest on the principal amount of this Note at a rate equal to the sum of (i) LIBOR plus (ii) 8.00%, reset quarterly, as determined by the Calculation Agent, from the above date until maturity. The Issuer will pay interest quarterly in arrears on March 31, June 30, September 30 and December 31 of each year, or if any such day is not a Business Day, on the next succeeding Business Day (each an "Interest Payment Date"). Interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the date of issuance; provided that if there is no existing Default in the payment of interest, and if this Note is authenticated between a record date referred to on the face hereof and the next succeeding Interest Payment Date, interest shall accrue from such next succeeding Interest Payment Date; provided, further, that the first Interest Payment Date shall be March 31, 2017. The Issuer may elect, prior to the beginning of such Interest Period, to pay some or all interest as PIK Interest. If the Issuer elects to pay PIK Interest, interest on the Notes will be paid entirely (subject to the following sentence) by issuing PIK Notes or adding accrued and unpaid interest as of such Interest Payment Date to the principal amount of the Global Notes then outstanding ("PIK Interest"). In the event that the Issuer is entitled to and elects to pay Partial PIK Interest for an Interest Period, each Holder shall be entitled to receive Cash Interest in respect of the applicable percentage of the principal amount of the Notes held by such Holder on the relevant Record Date and PIK Interest in respect of the remaining percentage of the principal amount of the Notes held by such Holder on the relevant Record Date. Following an increase in the principal amount of the Global Notes as a result of a PIK Payment, the Global Notes will bear interest on such increased principal amount from and after the date of such PIK Payment. Unless the context requires otherwise, references to Notes or the "principal" or the "principal amount" of Notes, including for purposes of calculating any redemption price or redemption amount, include any increase in the principal amount of the Global Notes as a result of a PIK Payment. The Issuer shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal and premium, if any, from time to time on demand at a rate that is 2.0% per annum in excess of the rate then in effect; it shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest and Additional Amounts (without regard to any applicable grace periods) from time to time on demand at the same rate to the extent lawful. The Issuer promises to pay Amortization Amounts on each Amortization Payment Date as set forth in Section 4.01 of the Indenture.

        b.      The rate of interest shall be reset on the first day of each Interest Period other than the Initial Interest Period.

        c.      On or before each Calculation Date, the Calculation Agent shall determine the Applicable Rate and notify the Trustee and the Paying Agent.

        d.      The Calculation Agent shall, upon the written request of any Holder of the Notes, provide the interest rate then in effect with respect to the Notes.

e.  All percentages resulting from any calculation of any interest rate for the Notes shall be rounded, if necessary, to the nearest one hundred thousandth of a percentage point, with five one-millionths of a percentage point rounded upward (e.g., 3.876545% (or .03876545) would be rounded to 3.87655% (or .0387655)), and all United States dollar amounts shall be rounded to the nearest cent, with one-half cent being rounded upward.

f.  Set forth below is a summary of certain of the defined terms used in this Note relating to the calculation of interest on the Notes:

"Business Day" means each day that is not a Saturday, Sunday or other day on which banking institutions in New York, New York are authorized or required by law to close.

"Calculation Date" means, with respect to any Interest Determination Date, the earlier of (i) the tenth calendar day after such Interest Determination Date, or, if any such day is not a Business Day, the next succeeding Business Day, and (ii) the Business Day immediately preceding the applicable Interest Payment Date or the maturity date, as the case may be.

"Interest Determination Date" for an Interest Period shall be the second Business Day preceding the first day of such Interest Period (or, in the case of the Initial Interest Period, the second Business Day preceding the date of the original issuance of Notes hereunder).

"Initial Interest Period" means the date of the issuance of the initial Notes issued under the Indenture through March 30, 2017.

"Interest Period" means the period commencing on an Interest Payment Date (or, in the case of the Initial Interest Period, commencing on the date of the issuance of the Notes under the Indenture) and ending on the day preceding the next following Interest Payment Date or the redemption date, as applicable.

"LIBOR means, with respect to any Interest Determination Date, the London interbank offered rate as administered by ICE Benchmark Administration Limited (or any other Person that takes over the administration of such rate) for deposits in immediately available funds in United States dollars having a maturity of three months as displayed on the Bloomberg screen page that displays such rate, or on the appropriate page or screen of such other comparable information service that publishes such rate from time to time as selected by the Calculation Agent in its discretion (and in consultation with the Issuer) on that Interest Determination Date. If no rate appears, in respect of that Interest Determination Date, the Calculation Agent shall request the principal London offices of each of four major reference banks in the London interbank market, as selected by the Calculation Agent, to provide the Calculation Agent with its offered quotation for deposits in United States dollars for the period of three months, commencing on the second London Business Day following such Interest Determination Date, to prime banks in the London interbank market at approximately 11:00 a.m., London time, on that Interest Determination Date and in a principal amount that is representative for a single transaction in United States dollars in that market at that time. If at least two quotations are provided, then LIBOR on that Interest Determination Date shall be the arithmetic mean of those quotations. If fewer than two quotations are provided, then LIBOR on the

A-5

Interest Determination Date shall be the arithmetic mean of the rates quoted at approximately 11:00 a.m., in the City of New York, on the Interest Determination Date by three major banks in the City of New York selected by the Calculation Agent for loans in United States dollars to leading European banks, having a three-month maturity and in a principal amount that is representative for a single transaction in United States dollars in that market at that time; provided, however, that if the banks selected by the Calculation Agent are not providing quotations in the manner described by this sentence, LIBOR shall be the same as the rate determined for the immediately preceding Interest Period. LIBOR will in no event be less than 0.00% per annum.

2.      METHOD OF PAYMENT. By no later than 11:00 a.m. (New York City time) on the date on which any principal of, premium and Additional Amounts, if any, or interest on any Note is due and payable, the Issuer shall irrevocably deposit with the Paying Agent money sufficient to pay such principal, premium and Additional Amounts, if any, and/or interest (other than PIK Interest, which is payable as described above). The Issuer shall pay interest on the Notes and all applicable Amortization Amounts to the Persons who are registered holders of Notes at the close of business on March 15, June 15, September 15 and December 15 (whether or not a Business Day), as the case may be, immediately preceding the related Interest Payment Date, even if such Notes are canceled after such Record Date and on or before such Interest Payment Date, except as provided in Section 2.12 of the Indenture with respect to defaulted interest. Principal, premium and Additional Amounts, if any, and interest (other than PIK Interest, which is payable as described above) on the Notes shall be payable at the office or agency of the Issuer maintained for such purpose or, at the option of the Issuer, payment of interest and premium, if any, may be made by check mailed to the Holders at their respective addresses set forth in the Note Register; provided that payment by wire transfer of immediately available funds shall be required with respect to principal (including Amortization Amounts, as applicable), premium and Additional Amounts, if any, and interest (other than PIK Interest, which is payable as described above) on all Global Notes and all other Notes the Holders of which shall have provided wire transfer instructions to the Issuer or the Paying Agent at least ten Business Days prior to the applicable payment date.  Such payment shall be in such coin or currency of the United States as at the time of payment is legal tender for payment of public and private debts.

3.      PAYING AGENT, CALCULATION AGENT AND REGISTRAR. Initially, Wilmington Savings Fund Society, FSB, the Trustee under the Indenture, shall act as Paying Agent, Calculation Agent and Registrar. The Issuer may change any Paying Agent or Registrar without notice to the Holders. The Issuer may act in any such capacity.

4.      INDENTURE.  The Issuer issued the Notes under an Indenture, dated as of December [•], 2016 (as amended or supplemented from time to time, the "Indenture"), among the Issuer, the Guarantors named therein, the Trustee, the Collateral Agent, the Paying Agent, the Registrar and the Calculation Agent. This Note is one of a duly authorized issue of notes of the Issuer designated as its Floating Rate Senior Secured Amortizing PIK Toggle Notes due 2019. The terms of the Notes include those stated in the Indenture. The Notes are subject to all such terms, and Holders are referred to the Indenture for a statement of such terms. Any term used in this Note that is defined in the Indenture shall have the meaning assigned to it in the Indenture. To the extent any provision of this Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling.

5.      REDEMPTION AND REPURCHASE. The Notes are subject to optional redemption, and may be the subject of an Event of Default Redemption, as further described in the Indenture. The Issuer shall not be required to make mandatory redemption or sinking fund payments with respect to the Notes.

6.      GUARANTEE. To guarantee the due and punctual payment of the principal, premium, if any, and interest (including post-filing or post-petition interest) on the Notes and all other amounts payable by the Issuer under the Indenture and the Notes when and as the same shall be due and payable, whether at maturity, by acceleration or otherwise, according to the terms of the Notes and the Indenture, the Guarantors have unconditionally Guaranteed (and future guarantors shall unconditionally Guarantee), jointly and severally, such obligations on a senior secured basis.

7.      SECURITY.  From the Issue Date, the Notes and the Guarantees will be secured by the Collateral, pursuant to the Security Documents. Reference is made to the Indenture and the Security Documents for terms relating to such security, including the release, termination and discharge thereof. The Issuer shall not be required to make any notation on this Note to reflect any grant of such security or any such release, termination or discharge.

8.      DENOMINATIONS, TRANSFER, EXCHANGE.  The Notes are in registered form without coupons in denominations of $2,000 and integral multiples of $1.00 in excess thereof. The transfer of Notes may be registered and Notes may be exchanged as provided in the Indenture. The Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements and transfer documents, and Holders shall be required to pay any taxes and fees required by law or permitted by the Indenture. The Issuer need not exchange or register the transfer of any Note or portion of a Note selected for redemption, except for the unredeemed portion of any Note being redeemed or repurchased in part. The Issuer need not exchange or register the transfer of any Note during a period of 15 days before a mailing of notice of redemption of Notes or during a period between a Record Date and the next succeeding Interest Payment Date or Amortization Payment Date, as applicable.

9.      PERSONS DEEMED OWNERS.  The registered Holder of a Note may be treated as its owner for all purposes.

10.     AMENDMENT, SUPPLEMENT AND WAIVER.  The Indenture, the Note Guarantees or the Notes may be amended or supplemented as provided in the Indenture.

11.     DEFAULTS AND REMEDIES.  The Events of Default relating to the Notes are defined in Section 6.01 of the Indenture. Upon the occurrence of an Event of Default, the rights and obligations of the Issuer, the Guarantor, the Trustee and the Holders shall be as set forth in the applicable provisions of the Indenture.

12.     AUTHENTICATION.  This Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose until authenticated by the manual signature of the Trustee.

13.     GOVERNING LAW.  THIS NOTE WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

14.     CUSIP AND ISIN NUMBERS.  Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Issuer has caused CUSIP and ISIN numbers to be

printed on the Notes, and the Trustee may use CUSIP and ISIN numbers in notices of redemption as a convenience to Holders.  No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

15. ABBREVIATIONS. Customary abbreviations may be used in the name of Note Holder or an assignee, such as TEN COM (=tenants in common), TEN ENT (=tenants by the entireties), JT TEN (=joint tenants with rights of survivorship and not as tenants in common), CUST (=custodian), and U/G/M/A (=Uniform Gift to Minors Act). Additional abbreviations may also be used though not identified in the preceding list

The Issuer shall furnish to any Holder upon written request and without charge a copy of the Indenture.  Requests may be made to the Issuer at the following address:

ERP Iron Ore, LLC
c/o ERP Compliant Fuels, LLC
15 Appledore Lane
Natural Bridge, Virginia 24578
Attention: Tom Clarke
Email:  Tom.Clarke@kissito.org

## ASSIGNMENT FORM

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note to: _____

(Insert assignee's legal name)

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____
_____
_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint_____
to transfer this Note on the books of the Issuer. The agent may substitute another to act for him.

Date: _____

Your Signature: _____

(Sign exactly as your name appears
on the face of this Note)

Signature Guarantee*: _____

* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

### CERTIFICATE TO BE DELIVERED UPON EXCHANGE OR REGISTRATION OF
### TRANSFERS OF TRANSFER RESTRICTED NOTES

This certificate relates to $ _____ principal amount of Notes held in (check applicable space) _____ book-entry or _____definitive form by the undersigned.

The undersigned (check one box below):

☐  has requested the Trustee by written order to deliver in exchange for its beneficial interest in a Global Note held by the Depositary a Note or Notes in definitive, registered form of authorized denominations and an aggregate principal amount equal to its beneficial interest in such Global Note (or the portion thereof indicated above) in accordance with the Indenture; or

☐  has requested the Trustee by written order to exchange or register the transfer of a Note or Notes.

In connection with any transfer of any of the Notes evidenced by this certificate, the undersigned confirms that such Notes are being transferred in accordance with its terms:

CHECK ONE BOX BELOW

(1)  ☐  to the Issuer or Subsidiary thereof; or

(2)  ☐  to the Registrar for registration in the name of the Holder, without transfer; or

(3)  ☐  pursuant to an effective registration statement under the Securities Act of 1933, as amended (the "Securities Act"); or

(4)  ☐  to a Person that the undersigned reasonably believes is a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act ("Rule 144A")) that purchases for its own account or for the account of a qualified institutional buyer and to whom notice is given that such transfer is being made in reliance on Rule 144A, in each case pursuant to and in compliance with Rule 144A; or

(5)  ☐  pursuant to offers and sales to non-U.S. persons that occur outside the United States within the meaning of Regulation S under the Securities Act (and if the transfer is being made prior to the expiration of the Distribution Compliance Period, the Notes shall be held immediately thereafter through Euroclear or Clearstream); or

(6)  ☐  to an institutional "accredited investor" (as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act) that has furnished to the Trustee a signed letter containing certain representations and agreements; or

(7)  ☐  Pursuant to Rule 144 under the Securities Act; or

(8)  ☐  pursuant to another available exemption from registration under the Securities

A-10

Act.

Unless one of the boxes is checked, the Trustee will refuse to register any of the Notes evidenced by this certificate in the name of any Person other than the registered Holder thereof; provided, however, that if box (5), (6), (7) or (8) is checked, the Issuer or the Trustee may require, prior to registering any such transfer of the Notes, such legal opinions, certifications and other information as the Issuer or the Trustee have reasonably requested to confirm that such transfer is being made pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act.


_____
Your Signature

Date: _____        _____
                                     Signature of
                                     Guarantor


### TO BE COMPLETED BY PURCHASER IF (4) ABOVE IS CHECKED.

The undersigned represents and warrants that it is purchasing this Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a "qualified institutional buyer" within the meaning of Rule 144A, and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Issuer as the undersigned has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon the undersigned's foregoing representations in order to claim the exemption from registration provided by Rule 144A.


Dated: _____        _____
                                     NOTICE:  To be executed by an
                                              executive officer
                                     Name:
                                     Title:


Signature Guarantee*: _____

* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

A-11

TO BE COMPLETED IF THE HOLDER REQUIRES AN EXCHANGE
FROM A REGULATION S GLOBAL NOTE TO AN UNRESTRICTED
GLOBAL NOTE, PURSUANT TO SECTION 2.2(d)(iii) OF APPENDIX
A TO THE INDENTURE[6]

The undersigned represents and warrants that either:

❐   the undersigned is not a dealer (as defined in the Securities Act) and is a non-U.S. person
(within the meaning of Regulation S under the Securities Act); or

❐   the undersigned is not a dealer (as defined in the Securities Act) and is a U.S. person (within
the meaning of Regulation S under the Securities Act) who purchased interests in the Notes
pursuant to an exemption from, or in a transaction not subject to, the registration
requirements under the Securities Act; or

❐   the undersigned is a dealer (as defined in the Securities Act) and the interest of the
undersigned in this Note does not constitute the whole or a part of an unsold allotment to or
subscription by such dealer for the Notes.

Date: _____          _____

                                                    Your Signature

_____

[6] Include only for Regulation S Global Notes.

A-12

## SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL NOTE*

The initial outstanding principal amount of this Global Note is $_____. The following exchanges of a part of this Global Note for an interest in another Global Note or for a Definitive Note, or exchanges of a part of another Global Note or Definitive Note for an interest in this Global Note, have been made:

| Date of Exchange | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee, Depositary or Custodian |
|---|---|---|---|---|

_____

*This schedule should be included only if the Note is issued in global form.

A-13

Case 15-50307   Doc 135   Filed 06/12/16   Entered 06/12/16 18:29:34   Desc Main
Document    Page 253 of 493

**EXHIBIT B**

## FORM OF TRANSFEREE LETTER OF REPRESENTATION

ERP Iron Ore, LLC
c/o ERP Compliant Fuels, LLC
15 Appledore Lane
Natural Bridge, Virginia 24578
Attention: Tom Clarke
Email:  Tom.Clarke@kissito.org

Ladies and Gentlemen:

     This certificate is delivered to request a transfer of $[_____] principal amount of the Floating Rate Senior Secured Amortizing PIK Toggle Notes due 2019 (the "Notes") of ERP Iron Ore, LLC, a Virginia limited liability company (the "Issuer").

     Upon transfer, the Notes would be registered in the name of the new beneficial owner as follows:

Name: _____

Address: _____

Taxpayer ID Number: _____

     The undersigned represents and warrants to you that:

     1.     We are an institutional "accredited investor" (as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act of 1933, as amended (the "Securities Act")), purchasing for our own account or for the account of such an institutional "accredited investor" at least $250,000 principal amount of the Notes, and we are acquiring the Notes, for investment purposes and not with a view to, or for offer or sale in connection with, any distribution in violation of the Securities Act. We have such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of our investment in the Notes, and we invest in or purchase securities similar to the Notes in the normal course of our business. We, and any accounts for which we are acting, are each able to bear the economic risk of our or its investment.

     2.     We understand that the Notes have not been registered under the Securities Act and, unless so registered, may not be sold except as permitted in the following sentence.  We agree on our own behalf and on behalf of any investor account for which we are purchasing Notes to offer, sell or otherwise transfer such Notes prior to the date that is one year after the later of the date of original issue and the last date on which the Issuers or any affiliate of the Issuers was the owner of such Notes (or any predecessor thereto) (the "Resale Restriction Termination Date") only in accordance

with the Restricted Notes Legend (as such term is defined in the indenture under which the Notes were issued) on the Notes and any applicable securities laws of any state of the United States. The foregoing restrictions on resale will not apply subsequent to the Resale Restriction Termination Date. If any resale or other transfer of the Notes is proposed to be made pursuant to the preceding clause prior to the Resale Restriction Termination Date, the transferor shall deliver a letter from the transferee substantially in the form of this letter to the Issuers and the Trustee, which shall provide, among other things, that the transferee is an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), (3) or (7) under the Securities Act and that it is acquiring such Notes for investment purposes and not for distribution in violation of the Securities Act. Each purchaser acknowledges that the Issuers and the Trustee reserve the right prior to the offer, sale or other transfer prior to the Resale Restriction Termination Date of the Notes with respect to applicable transfers described in the Restricted Notes Legend to require the delivery of an opinion of counsel, certifications and/or other information satisfactory to the Issuers and the Trustee.

TRANSFEREE: _____,

by: _____

EXHIBIT C

FORM OF SUPPLEMENTAL INDENTURE
TO BE DELIVERED BY SUBSEQUENT GUARANTORS

Supplemental Indenture (this "Supplemental Indenture"), dated as of [_____] [__], 20[__], among [_____] (the "Guaranteeing Subsidiary"), a subsidiary of [_____], a [_____] company [(the "Issuer")] [(the "Coke Guarantor")][1] and [_____], as trustee (the "Trustee").

W I T N E S S E T H

WHEREAS, each of the Issuer and the Guarantor(s) (as defined in the Indenture referred to below) have heretofore executed and delivered to Wilmington Savings Fund Society, FSB, as trustee, an indenture (the "Indenture"), dated as of [•], 2016, providing for the issuance of $22,500,000 aggregate principal amount of Floating Rate Senior Secured Amortizing PIK Toggle Notes due 2019 (*provided* that the principal amount of the Notes authorized and outstanding may be increased in connection with PIK Interest) (the "Notes");

WHEREAS, the Indenture provides that under certain circumstances the Guaranteeing Subsidiary shall execute and deliver to the Trustee a supplemental indenture pursuant to which the Guaranteeing Subsidiary shall unconditionally Guarantee all of the Issuer's Obligations under the Notes and the Indenture on the terms and conditions set forth herein and under the Indenture; and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee is authorized to execute and deliver this Supplemental Indenture.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties mutually covenant and agree for the equal and ratable benefit of the Holders as follows:

1.      Capitalized Terms.  Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

2.      Guarantor. The Guaranteeing Subsidiary hereby agrees to be a Guarantor under the Indenture and to be bound by the terms of the Indenture applicable to Guarantors, including Article 11 thereof.

3.      Governing Law. THIS SUPPLEMENTAL INDENTURE WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

4.      Waiver of Jury Trial.  EACH OF THE GUARANTEEING SUBSIDIARY AND THE TRUSTEE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS

---

[1] TBD - whether the new guaranteeing subsidiary is a subsidiary of the Issuer or the original Guarantor.

SUPPLEMENTAL INDENTURE, THE INDENTURE, THE NOTES, THE NOTE
GUARANTEES OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

   5. <u>Counterparts and Delivery</u>. The parties may sign any number of copies of
this Supplemental Indenture. Each signed copy shall be an original, but all of them together
represent the same agreement. The exchange of copies of this Supplemental Indenture and of
signature pages by facsimile or portable document format ("<u>PDF</u>") transmission shall constitute
effective execution and delivery of this Supplemental Indenture as to the parties hereto and may
be used in lieu of the original Supplemental Indenture for all purposes. Signatures of the parties
hereto transmitted by facsimile or PDF shall be deemed to be their original signatures for all
purposes.

   6. <u>Headings</u>. The headings of the Sections of this Supplemental Indenture
have been inserted for convenience of reference only, are not to be considered a part of this
Supplemental Indenture and shall in no way modify or restrict any of the terms or provisions
hereof.

   7. <u>The Trustee</u>. The Trustee shall not be responsible in any manner
whatsoever for or in respect of the validity, sufficiency or adequacy of this Supplemental
Indenture or for or in respect of the recitals contained herein, all of which recitals are made
solely by the Guaranteeing Subsidiary and the Issuer.

<em>[Remainder of page intentionally left blank]</em>

C-2

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed, all as of the date first above written.

[NAME OF GUARANTEEING SUBSIDIARY]

By: _____
    Name:
    Title:

[_____], as Trustee

By: _____
    Name:
    Title:

C-3

## ISSUER NOTIFICATION OF PIK INTEREST ELECTION.

[•], 2016

    This notification is delivered to you, [_____], Trustee (the "Trustee") under the indenture dated [•], 2016, among ERP Iron Ore, LLC (the "Issuer"), the guarantor(s) listed thereunder, and the Trustee (as amended, supplemented, or otherwise modified from time to time, the "Indenture"), in connection with the Issuer's option to elect to pay PIK Interest as set forth in Section 2.14(a) of the Indenture. Capitalized terms used and not otherwise defined herein shall have the meanings assigned thereto in the Indenture.

    The undersigned Officer of the Issuer (the "Officer") hereby certifies that the undersigned is authorized to execute this notification on behalf of the Issuer (and not in a personal capacity) and does hereby notify the Trustee and the Paying Agent, in the name and on behalf of the Issuer (and not in a personal capacity), that for the Interest Payment Date of [_____], 20[XX], the Issuer shall pay all or some of the interest on the Notes that will be due and payable on such Interest Payment Date by way of a PIK Payment.

[REMAINDER OF THE PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the undersigned have executed this Officer's Certificate as of the date first written above.

By: _____

Name: _____

Title: _____

**ISSUER NOTIFICATION AND DIRECTION TO TRUSTEE UNDER SECTION 2.14(D)
OF THE INDENTURE REGARDING THE PAYMENT OF PIK INTEREST.**

[•], 2016

This notification and direction is delivered to you, [_____], Trustee
(the "<u>Trustee</u>") under the indenture dated [•], 2016, among ERP Iron Ore, LLC (the "<u>Issuer</u>"),
the guarantor(s) listed thereunder, and the Trustee (as amended, supplemented, or otherwise
modified from time to time, the "<u>Indenture</u>"), in connection with the payment of PIK Interest as
set forth in Section 2.14(d) of the Indenture. Capitalized terms used and not otherwise defined
herein shall have the meanings assigned thereto in the Indenture.

The undersigned Officer of the Issuer (the "<u>Officer</u>") hereby certifies that the undersigned
is authorized to execute this notification on behalf of the Issuer (and not in a personal capacity)
and does hereby notify the Trustee and the Paying Agent, in the name and on behalf of the Issuer
(and not in a personal capacity), that for the Interest Payment Date of
[_____], 20[XX], the Issuer is obligated to pay interest on the Notes in the
aggregate amount of $[_____] and the Issuer shall pay $[_____] in PIK
Interest.

The Officer hereby authorizes and directs the Trustee to increase the principal amount of
the Global Notes and/or to authenticate new Definitive Notes in respect of the PIK Interest to be
paid on such Interest Payment Date in accordance with Section 2.14(d) of the Indenture.

[REMAINDER OF THE PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the undersigned have executed this Officer's Certificate as of the date first written above.

By: _____

Name: _____
Title: _____

# EXHIBIT D

Case 15-50307   Doc 195   Filed 02/20/16   Entered 02/20/16 18:29:34   Desc Main
Document     Page 441 of 493

# EXHIBIT E

## MOU

**INADMISSIBLE SETTLEMENT DISCUSSION PROTECTED BY RULE 408 OF THE
FEDERAL RULES OF EVIDENCE AND MINNESOTA RULES OF EVIDENCE**

## PRELIMINARY MEMORANDUM OF UNDERSTANDING

THIS PRELIMINARY MEMORANDUM OF UNDERSTANDING (this "**Agreement**")
is made this 18th day of November, 2016, by and among the following parties (the "**Parties**"):
ERP Iron Ore, LLC ("**ERPI**"); FerroMagnetica, LLC ("**FerroMagnetica**"); the Mechanic Lien
Claimants identified in Exhibit A hereto and executing this Agreement (the "**Lien Claimants**").

I.      **Background and Purpose of Agreement**

A.      ERPI is in the process of entering into an Asset Purchase Agreement ("**APA**")
with Magnetation LLC and its subsidiaries (the "**Debtors**") pursuant to which, among other
things, ERPI will acquire substantially all of the assets of the Debtors (the "**Assets**")  pursuant to
the terms of the APA as approved pursuant to a sale order of the United States Bankruptcy Court
for the District of Minnesota (the "**Court**") under 11 USC § 363 in the case captioned, *In Re
Magnetation, LLC, et al*, Case No. 15-50307 (WJF) and related cases, *Mag Lands, LLC*, Case
No. 15-50308, *Mag Finance Corp.*, Case No. 15-50309, *Mag Mining, LLC*, Case No. 15-50310,
and *Mag Pellet LLC*, Case No. 15-50311 (collectively, the "**Cases**").

B.      In connection with its negotiation of the APA, ERPI and FerroMagnetica entered
into an investment letter agreement pursuant to which, among other things, they set forth the
basic terms of an agreement whereby FerroMagnetica intends to invest as equity a minimum of
$15 million and up to $30 million into ERPI.

C.      ERPI and FerroMagnetica have approached the Lien Claimants and informed
them that in order to complete ERPI's purchase of the Assets, they have determined it is
necessary for them to reach agreement with the Lien Claimants concerning the amounts owed to
them by the Debtors and the lien claims asserted by the Lien Claimants against any of the Assets,
and to reach agreement to pay Lien Claimants.

D.      The Parties have entered into negotiations regarding the agreements and
undertakings of ERPI and FerroMagnetica to satisfy the lien claims of the Lien Claimants.

II.     **Agreement**

1.      This Agreement is subject to review and approval by counsel for the Lien
Claimants of definitive documents memorializing (i) ERPI's purchase of the Assets including,
without limitation, the sale order to be submitted to Court approving the sale of the Assets to
ERPI, the APA, together with all schedules referred to therein, and (ii) the transactions
contemplated by this Agreement including, without limitation, the Note, Security Agreement,
Mortgages and any other documents and agreements related to the transactions contemplated by
this Agreement. The Parties agree that all of the mechanic lien claims held by parties that
choose to be part of the Settlement shall be undertaken with Payment Over Time as set forth in
2, below, unless ERPI elects to make a Cash Out Settlement Payment to the Cash-Out
Claimants, as set forth in Section 3 below.

**INADMISSIBLE SETTLEMENT DISCUSSION PROTECTED BY RULE 408 OF THE
FEDERAL RULES OF EVIDENCE AND MINNESOTA RULES OF EVIDENCE**

2.     **Payment Over Time.**  The Lien Claimants are to be paid pursuant to the terms of a promissory note executed by ERPI and FerroMagnetica, jointly and severally, for the face amount of (i) the principal amount of all unpaid mechanic's/miner's lien claims of each of the Lien Claimants and (ii) pre-settlement legal fees and costs of each of the Lien Claimants (the "Note").[1]  The Note will accrue interest at the rate of 3% per annum from and after the date ERPI closes on the APA (the "**Closing**") and will include such other terms agreed upon by the Parties. ERPI will secure its payment obligations under the Note by granting a security and/or mortgage interest in all real and personal property acquired by ERPI under the APA including, without limitation in the "Itasca County Properties" (Plant #1, Plant #2, Plant #4, and Jessie Loadout) and the Indiana Pellet Plant, subject only to a lien in favor of the senior secured noteholders and debtor-in-possession financing lenders (collectively, the "**Bond Holders**") of the Debtors that agree to loan ERPI the principal amount of $22,500,000 in connection with ERPI's acquisition of the Assets and a lien in favor of another yet to be indentified financing source for ERPI, excluding FerroMagnetica, limited to the principal amount of $5,000,000.  The terms of the Security Agreement and/or Mortgages pursuant to which ERPI grants to the Lien Claimants a security and/or mortgage interest in the Assets will include such terms agreed upon by the Parties, including, without limitation, the right to recover legal fees, costs, and expenses to enforce all obligations under the Note, Security Agreement, and the Mortgages.

- Upon Closing, the Lien Claimants that have mechanic's/miner's lien claims against any of the Assets, other than Plant #4, will sign mechanic's/miner's lien releases and deliver them to ERPI.  Concerning the lien claims against Plant #4, which is the subject of a pending lawsuit in Itasca County District Court (Court File No. #31-CV-15-3288), the Lien Claimants with mechanic's/miner's lien claims against Plant #4 will deliver their lien releases into escrow and these releases will be held in escrow until all the obligations of ERPI and FerroMagnetica under the Note are fully satisfied pursuant to the terms of an escrow agreement, as more fully agreed by the Parties, and which agreement will address, among other things, the timing and circumstance under which these lien releases will be released to ERPI or the Lien Claimants.  The Itasca County District Court lawsuit (Court File No. #31-CV-15-3288) will remain pending.  In addition, the sale order of the Court approving the APA shall include a provision that preserves these mechanic's/miner's lien claims notwithstanding the sale of Plant #4.

- The Debtors shall with Court approval release each of the Lien Claimants from all claims and terminate all pending litigation against each of the Lien Claimants as follows:

  - Dismissal with prejudice of all Adversary Proceedings commenced by the Debtors in any of the Cases against any and all Lien Claimants including the dismissal with prejudice of any preference claims and/or any clawback claims.

---

[1] The principal amount contractually owed to each Lien Claimant and the pre-settlement legal fees and costs of each of the Lien Claimants will be confirmed by an ad hoc committee of the Lien Claimants.  For the avoidance of doubt, confirmation of the principal amount is limited to assure that the amount of each mechanic lien claim is not duplicative of a lower-tier mechanic lien claim.
.

2

**INADMISSIBLE SETTLEMENT DISCUSSION PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND MINNESOTA RULES OF EVIDENCE**

- o Release of all present and future claims, including warranty claims, by the Debtors, ERPI, and Ferro Magnetica against each of the Lien Claimants related to construction work performed by such Lien Claimant.

- o No obligation on the part of any of the Lien Claimants to return to any of the Debtors' project sites to perform any work.

- ERPI agrees to defend and indemnify each Lien Claimant in any future proceeding if ERPI asserts a warranty claim against any material or equipment supplier and the supplier asserts a claim against any of the Lien Claimants.

- ERPI and FerroMagnetica agree that they have no right of offset against any of their payment obligations under the Note if there is a future payment dispute or default under the Security Agreement or Mortgages.

- Repayment Terms of the Note:

- o At Closing by ERPI, the Lien Claimants asserting mechanic's/miner's liens on the Itasca County Properties (i.e., Plant #1, Plant #2, Plant #4, and Jessie Loadout) and the Indiana Pellet Plant would receive pro rata distribution of any cash exceeding $2.0 million that ERPI obtains as part of its purchase of the Assets.

- o Immediately upon the date that FerroMagnetica invests in ERPI any sums less than $15 million, then (i) 23.3% of such sums will be paid to the Lien Claimants that held or hold mechanic's/miner's liens against the Itasca County Properties (i.e., Plant #1, Plant #2, Plant #4, and Jessie Loadout) on a pro rata basis and (ii) 6.7% of such sums will be paid to the Lien Claimants, collectively, that held mechanic's/miner's lien claims on the Indiana Pellet Plant on a pro rata basis.

- o Immediately upon the date that ERPI receives funds, whether as debt or equity, and/or FerroMagnetica invests in ERPI a sum in the cumulative amount of $15 million, then (i) $3.5 million will be paid to the Lien Claimants, collectively, that held or hold mechanic's/miner's liens against the Itasca County Properties (i.e., Plant #1, Plant #2, Plant #4, and Jessie Loadout) on a pro rata basis and (ii) $1,000,000 will be paid to the Lien Claimants, collectively, that held mechanic's/miner's lien claims on the Indiana Pellet Plant on a pro rata basis.

- o Immediately upon the date that ERPI receives funds, whether as debt or equity, and/or FerroMagnetica invests in ERPI an additional sum in the cumulative amount of $15 million, then an additional payment in the amount of $6.5 million will be paid to the Lien Claimants, collectively, that held or hold mechanic's/miner's liens against the Itasca County Properties on a pro rata basis.

- o Immediately upon the date that ERPI receives any funds at or after Closing, whether as debt or equity, and/or FerroMagnetica invests in ERPI any amount in excess of $30 million, exclusive of a working capital revolving line of credit in

**INADMISSIBLE SETTLEMENT DISCUSSION PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND MINNESOTA RULES OF EVIDENCE**

favor of ERPI not to exceed the principal amount of $18,000,000, then 25% of all such funds shall be paid to the Lien Claimants on a pro rata basis.

o   Payment under the Note will also be paid to all Lien Claimants on a pro rata basis as follows:

▪   Quarterly payments discussed below based on shipments of iron ore concentrate from any of the Itasca County Properties during the prior 90-day period and based upon the IODEX pricing of iron ore concentrate. For avoidance of doubt, it is also agreed that the quarterly payment under the Note shall be based upon IODEX pricing, rather than profitability of ERPI.

▪   The following schedule of quarterly payments is intended to provide a means of payment commensurate with the anticipated expenses of operation of ERP. The Parties intend to review and finalize this schedule of quarterly payments prior to Closing.

▪   Quarterly payments shall be based upon weighted average price of iron ore concentrate shipped from any of the Itasca County Properties:

| Price of Iron Ore Shipped IODEX 62% Fe Brazil Netback | Pay Amount to Lien Claimants |
|---|---|
| For every dollar increase in per metric tonnage at $52 per dry metric ton or above. | 50% of each dollar at or above $52 per dry metric ton |

o   Notwithstanding anything to the contrary herein, any payments made by ERPI under the Note within sixty days of the date of this Agreement will be held in escrow by the Lien Claimants during this sixty day period and, in the event that ERPI fails to tender to the Cash-Out Claimants an amount equal to the Cash Out Payment less the Cash-Out Claimants' pro rata share of the escrowed payment, all escrowed payments will forthwith be paid to the Lien Claimants on a pro rata basis as provided under the terms of the Note.

o   ERPI agrees to pay for periodic independent accountings requested by the ad hoc committee of Lien Claimants to verify the tonnages of iron ore concentrate shipped by ERPI from any of the Itasca County Properties for a period of time determined by the ad hoc committee of Lien Claimants. This accounting shall be under the control and direction of the ad hoc committee of the Lien Claimants.

3.   **Cash Out Settlement Payment.** If ERPI elects to make a Cash Out Settlement Payment, the following Lien Claimants agree that in exchange for a payment in immediately available funds within 60 days of the date hereof and for such other and further consideration as provided hereinafter, they agree to satisfy their lien claims as follows:

4

**INADMISSIBLE SETTLEMENT DISCUSSION PROTECTED BY RULE 408 OF THE
FEDERAL RULES OF EVIDENCE AND MINNESOTA RULES OF EVIDENCE**

- Parsons Electric                              $2,330,837.40 lien
- Hunt Electric                                 $1,913,159.54 lien
- Jamar                                         $ 426,548.43 lien
- Jamar                                         $     875.00  lien
- Jamar                                         $   4,269.66  lien
- LeJeune Steel                                 $1,572,897.99 lien
- United Rentals                                $ 225,869.48 lien
- Scheck Industrial Corporation                 $3,953,086.63 lien
- A.W. Kuettel                                  $1,229,499.43 lien
- Range Electric Inc.                           $ 389,816.10 lien
- Northern Industrial Erectors, Inc.            $1,460,756.90 lien (Indiana Pellet Plant only)
- Midwest Constructors, LLC                     $2,432,189.00 lien (Indiana Pellet Plant)
- Noramco Engineering Corporation   $ 866,288.03 lien
- Noramco Engineering Corporation   $  19,916.00 lien

There may be other Lien Claimants who agree to satisfy their lien claims in full in exchange for
the Cash Out Payment, as provided herein. Such additional Lien Claimants may be added by a
written supplementation to this Agreement. The above identified Lien Claimants together with
such other Lien Claimants added by the written supplementation to this Agreement are
collectively referred to herein as the ("**Cash-Out Claimants**").

In exchange for the release from escrow to ERPI of the lien releases of the Cash-Out Claimants
and satisfaction in full of lien claims of the Cash-Out Claimants against any of the Assets or any
other property in which the Cash-Out Lien Claimants assert an interest, the Cash-Out Claimants
are to receive all of the following consideration:

- 90% of the principal amount owed under each of the Cash-Out Claimant's mechanic's
  lien claim and all legal fees and costs incurred by each Cash-Out Claimant through the
  Closing (the "**Cash-Out Payment**") paid no later than 60 days from the date of this
  Agreement (the "**Payment Date**"), time being of the essence hereof, and, accordingly, no
  discount provided unless full payment is made by the Payment Date. For the avoidance
  of doubt, (i) the principal amount of the Cash-Out Payment shall not exceed the principal
  amount contractually owed to each Cash-Out Claimant as of the Payment Date; and (ii)
  each Cash-Out Claimant agrees to waive all interest accruing on the Payment Amount
  through the Payment Date on the condition that the Cash-Out Payment is received by the
  Cash-Out Claimant on or before the Payment Date.

- In addition to the foregoing payments, the Debtors shall with Court approval release each
  Cash-Out Claimant from all claims and terminate all pending litigation against each of
  the Cash-Out Claimants as follows:

  o Dismissal with prejudice of all Adversary Proceedings commenced by the
    Debtors in any of the Cases against any and all Lien Claimants including the
    dismissal with prejudice of any preference claims and/or any clawback claims.

5

**INADMISSIBLE SETTLEMENT DISCUSSION PROTECTED BY RULE 408 OF THE
FEDERAL RULES OF EVIDENCE AND MINNESOTA RULES OF EVIDENCE**

- o Release of all present and future claims, including warranty claims, by the Debtors, ERPI, and FerroMagnetica related to construction work performed by each Cash-Out Claimant.

- o No obligation on the part of any Cash-Out Claimant to return to any of the Debtors' project sites to perform any work.

- If ERPI makes the Cash-Out Payment, as provided herein, then ERPI shall agree to defend and indemnify each Cash-Out Claimant in any future proceeding if ERPI or FerroMagnetica asserts a warranty claim against any material or equipment supplier and the supplier asserts a claim against any of the Cash-Our Claimants.

4.   **Miscellaneous.**  This Agreement is preliminary and intended to memorialize preliminary agreements and understandings, subject to additional review of documents to be provided by ERPI and FerroMagnetica, and for counsel for the Lien Claimants to review and approve the APA and proposed Sale Order to be approved by the Court and other documents necessary for the Closing to occur as well as the other documents and agreements referred in paragraph 1 above.

*[Signature Page Follows]*

6

**INADMISSIBLE SETTLEMENT DISCUSSION PROTECTED BY RULE 408 OF THE
FEDERAL RULES OF EVIDENCE AND MINNESOTA RULES OF EVIDENCE**

*On behalf of*:                                            ERP Iron Ore, LLC
Hammerlund's Champion Steel, Inc.
d/b/a Champion Steel
Northern Industrial Erectors, Inc.
Midwest Constructors, LLC                                 By:_____
A.W. Kuettel                                              Its: _____
Hammerlund Construction
Range Electric, Inc.                                      FerroMagnetica, LLC

                                                          By:_____
_____                                  Its: _____

*On behalf of*:
Hunt Electric Corporation
Jamar Company
LeJeune Steel Company
Parsons Electric LLC
United Rentals (North America)

_____  Aaron Dean  11.18.2016

*On behalf of*:
JK Mechanical Contractors, Inc.

_____

*On behalf of*:
Scheck Industrial Corp. and its assignee
(except as to paragraph 2 hereof, as to which
it reserves its rights)

_____

*On behalf of*:
Noramco Engineering Corporation

_____

7

**INADMISSIBLE SETTLEMENT DISCUSSION PROTECTED BY RULE 408 OF THE
FEDERAL RULES OF EVIDENCE AND MINNESOTA RULES OF EVIDENCE**

*On behalf of*:
Hammerlund's Champion Steel, Inc.
d/b/a Champion Steel
Northern Industrial Erectors, Inc.
Midwest Constructors, LLC
A.W. Kuettel
Hammerlund Construction
Range Electric, Inc.

_____

*On behalf of*:
Hunt Electric Corporation
Jamar Company
LeJeune Steel Company
Parsons Electric LLC
United Rentals (North America)

_____

*On behalf of*:
JK Mechanical Contractors, Inc.

_____

*On behalf of*:
Scheck Industrial Corp. and its assignee
(except as to paragraph 2 hereof, as to which
it reserves its rights)

_____

*On behalf of*:
Noramco Engineering Corporation

_____

ERP Iron Ore, LLC


By:_____
Its: _____

FerroMagnetica, LLC

By:_____
Its: _____

**INADMISSIBLE SETTLEMENT DISCUSSION PROTECTED BY RULE 408 OF THE
FEDERAL RULES OF EVIDENCE AND MINNESOTA RULES OF EVIDENCE**

*On behalf of:*
Hammerlund's Champion Steel, Inc.
d/b/a Champion Steel
Northern Industrial Erectors, Inc.
Midwest Constructors, LLC
A.W. Kuettel
Hammerlund Construction
Range Electric, Inc.

ERP Iron Ore, LLC

By:_____
Its: _____

FerroMagnetica, LLC

By:_____
Its: _____

*On behalf of:*
Hunt Electric Corporation
Jamar Company
LeJeune Steel Company
Parsons Electric LLC
United Rentals (North America)

On behalf of:
Ulland Brothers, Inc.
Minnesota Industries, Inc.
K Building Components, Inc.

*On behalf of:*
JK Mechanical Contractors, Inc.

*On behalf of:*
Scheck Industrial Corp. and its assignee
(except as to paragraph 2 hereof, as to which
it reserves its rights)

*On behalf of:*
Noramco Engineering Corporation

7

**INADMISSIBLE SETTLEMENT DISCUSSION PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND MINNESOTA RULES OF EVIDENCE**

*On behalf of:*                                           ERP Iron Ore, LLC
Hammerlund's Champion Steel, Inc.
d/b/a Champion Steel
Northern Industrial Erectors, Inc.
Midwest Constructors, LLC                     By:_____
A.W. Kuettel                                          Its: _____
Hammerlund Construction
Range Electric, Inc.                                 FerroMagnetica, LLC

                                                              By:_____
_____                     Its: _____

*On behalf of:*
Hunt Electric Corporation
Jamar Company
LeJeune Steel Company
Parsons Electric LLC
United Rentals (North America)

_____

*On behalf of:*
JK Mechanical Contractors, Inc.

_____

*On behalf of:*
Scheck Industrial Corp. and its assignee
(except as to paragraph 2 hereof, as to which
it reserves its rights)

_____

*On behalf of:*
Noranco Engineering Corporation

_____

7

**INADMISSIBLE SETTLEMENT DISCUSSION PROTECTED BY RULE 408 OF THE
FEDERAL RULES OF EVIDENCE AND MINNESOTA RULES OF EVIDENCE**

*On behalf of*:                                    ERP Iron Ore, LLC
Hammerlund's Champion Steel, Inc.
d/b/a Champion Steel
Northern Industrial Erectors, Inc.
Midwest Constructors, LLC                          By:_____
A.W. Kuettel                                       Its: _____
Hammerlund Construction
Range Electric, Inc.                               FerroMagnetica, LLC

                                                   By:_____
_____                          Its: _____

*On behalf of*:
Hunt Electric Corporation
Jamar Company
LeJeune Steel Company
Parsons Electric LLC
United Rentals (North America)


_____

*On behalf of*:
JK Mechanical Contractors, Inc.



*On behalf of*:
Scheck Industrial Corp. and its assignee
(except as to paragraph 2 hereof, as to which
it reserves its rights)


_____

*On behalf of*:
Noramco Engineering Corporation


_____

7

**INADMISSIBLE SETTLEMENT DISCUSSION PROTECTED BY RULE 408 OF THE
FEDERAL RULES OF EVIDENCE AND MINNESOTA RULES OF EVIDENCE**

*On behalf of*:
Hammerlund's Champion Steel, Inc.
d/b/a Champion Steel
Northern Industrial Erectors, Inc.
Midwest Constructors, LLC
A.W. Kuettel
Hammerlund Construction
Range Electric, Inc.

_____

*On behalf of*:
Hunt Electric Corporation
Jamar Company
LeJeune Steel Company
Parsons Electric LLC
United Rentals (North America)

_____

*On behalf of*:
JK Mechanical Contractors, Inc.

_____

*On behalf of*:
Scheck Industrial Corp. and its assignee
(except as to paragraph 2 hereof, as to which
it reserves its rights)

_____

*On behalf of*:
Noramco Engineering Corporation

_____

ERP Iron Ore, LLC, provided that this Agreement
is non-binding and subject to closing on the APA

By: _____  Thomas M. Clarke
Its: Managing Member and Treasurer

FerroMagnetica, LLC, provided that this Agreement
is non-binding and subject to closing on the APA

By: _____
Its: _____

7

**INADMISSIBLE SETTLEMENT DISCUSSION PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND MINNESOTA RULES OF EVIDENCE**

*On behalf of*:
Hammerlund's Champion Steel, Inc.
d/b/a Champion Steel
Northern Industrial Erectors, Inc.
Midwest Constructors, LLC
A.W. Kuettel
Hammerlund Construction
Range Electric, Inc.

_____

*On behalf of*:
Hunt Electric Corporation
Jamar Company
LeJeune Steel Company
Parsons Electric LLC
United Rentals (North America)

_____

*On behalf of*:
JK Mechanical Contractors, Inc.

_____

*On behalf of*:
Scheck Industrial Corp. and its assignee
(except as to paragraph 2 hereof, as to which
it reserves its rights)

_____

*On behalf of*:
Noramco Engineering Corporation

_____

ERP Iron Ore, LLC, provided that this Agreement
is non-binding and subject to closing on the APA

By:_____
Its:_____

FerroMagnetica, LLC, provided that this Agreement
is non-binding and subject to closing on the APA
By:_____
Its:_____Chairman_____

7

**INADMISSIBLE SETTLEMENT DISCUSSION PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND MINNESOTA RULES OF EVIDENCE**

**Exhibit A**
**Schedule of Mechanic Lien Claimants**

**Indiana Pellet Plant**

Twin City Fan Companies, Ltd.
Solid Platforms, Inc.
Solid Platforms, Inc.
Northern Industrial Erectors, Inc.
Hammerlund's Champion Steel, Inc. d/b/a Champion Steel
Fastenal Company
Accu-Dig, Inc.
Xtreme Contractors Co., LLC
Midwest Constructors, LLC
Wesco Distribution, Inc.
One Source Equipment Rentals, LLC
Central Rent-A-Crane
Ferguson Enterprises, Inc.
Kelly Construction of Indiana, Inc.
Shambaugh & Son L.P.

**Plant 4**

A.W. Kuettel
Ferguson Enterprises, Inc.
Hammerlund's Champion Steel, Inc., d/b/a Champion Steel
Hammerlund Construction
Hunt Electric Corporation
Ironman Concrete Pumping, Inc.
Jamar Company
JK Mechanical Contractors, Inc.
John J. Morgan Company
K Building Components, Inc.
LeJeune Steel Company
Minnesota Industries, Inc.
Noramco Engineering Corporation
Northern Industrial Erectors
Parsons Electric LLC
Range Electric Inc.
Rapids Process Equipment, Inc.
Scheck Industrial Corp.
Toltz, King Duvall Anderson and Associates, Inc. d/b/a TKDA
Trane US Inc.

8

**INADMISSIBLE SETTLEMENT DISCUSSION PROTECTED BY RULE 408 OF THE
FEDERAL RULES OF EVIDENCE AND MINNESOTA RULES OF EVIDENCE**

United Rentals (North America)
Viking Electric Supply
Wesco Distribution

### Plant 2

Ferguson Enterprises, Inc.
Rapids Process Equipment, Inc.

Viking Electric Supply Inc.

Hammerlund's Champion Steel, Inc. d/b/a Champion Steel
Hammerlund Construction
Wesco Distribution, Inc.

### Plant 1

Ferguson Enterprises, Inc.
Hammerlund's Champion Steel, Inc. d/b/a Champion Steel

### Jessie Loadout

Noramco Engineering
Toltz, King, Duval, Anderson & Associates, Inc.
Ulland Brothers, Inc.
Viking Electric Supply, Inc.
Hammerlund's Champion Steel, Inc. d/b/a Champion Steel
Hammerlund's Champion Steel, Inc. d/b/a Champion Steel
Hammerlund Construction

9

## JOINDER TO PRELIMINARY MEMORANDUM OF UNDERSTANDING

This Joinder (the "Joinder"), by and among the Mechanic Lien Claimants identified in the signature block below (the "MLC Signatories"), ERP Iron Ore, LLC ("ERPI") and FerroMagnetica, LLC ("FerroMagnetica"), is to that certain Preliminary Memorandum of Understanding dated as of November 18, 2016 (the "MOU") by and among ERPI, FerroMagnetica and the Lien Claimants (as defined in the MOU).

**WHEREAS**, the MLC Signatories desire to execute this Joinder so that they may be considered a Lien Claimant under the MOU;

**WHEREAS**, ERPI and FerroMagnetica consent to the MLC Signatories' being considered a Lien Claimant under the MOU;

**NOW, THEREFORE**, in consideration of the premises and agreements contained in this Joinder, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the MLC Signatories, ERPI and FerroMagnetica, hereby AGREE as follows:

1.  The MLC Signatories shall be considered a Lien Claimant for all purposes under the MOU.

2.  This Joinder shall be of no force and effect unless and until it is fully executed by the MLC Signatories, ERPI and FerroMagnetica.

3.  Each person who executes this Joinder represents that he or she is duly authorized to execute this Joinder on behalf of the person or entity for whom they execute this Joinder.

4.  This Joinder may be executed in multiple counterparts, any of which may be transmitted by electronic mail, and each of which shall be deemed an original, but all of which together shall constitute one instrument.

5.  This Joinder shall not be modified, altered, amended, supplemented, or vacated without the prior written agreement of the MLC Signatories, ERPI and FerroMagnetica.

Page 1 of 2

Dated: December 12, 2016

**MLC SIGNATORIES**

**[INSERT NAME OF SIGNATORY]**,
holder of a mechanic's and/or miner's lien
claim against the Debtors' Assets in the
amount of [INSERT AMOUNT /
SEPARATE SIGNATURES FOR EACH
LIEN CLAIM]

Name: _____
Title: Authorized Signatory

**FERGUSON ENTERPRISES INC.** holder
of a mechanic's and/or miner's lien claim
against the Debtors' Assets in the amount of
$348,854.87 on Plant 4; $5,086.27 on Plant 1;
$36,910.67 on Plant 2; and $312,670.17 on
Indiana Pellet Plant.

By: _____
Name: Michael J. DuPont
Title: Attorney and Agent for Ferguson Enterprises Inc.
Wagner, Falconer & Judd, Ltd.
100 South 5th Street, Suite 800
Minneapolis, MN 55402

**ERP IRON ORE, LLC**

By: _____
Name: Tom Clarke, Member
Title: Authorized Signatory

**FERROMAGNETICA, LLC**

By: _____
Name: Anders Larson
Title: Authorized Signatory

Dated: December 12, 2016

**MLC SIGNATORIES**

[INSERT NAME OF SIGNATORY],
holder of a mechanic's and/or miner's lien
claim against the Debtors' Assets in the
amount of [INSERT AMOUNT /
SEPARATE SIGNATURES FOR EACH
LIEN CLAIM]

Name: _____
Title: Authorized Signatory

**FERGUSON ENTERPRISES INC.** holder
of a mechanic's and/or miner's lien claim
against the Debtors' Assets in the amount of
$348,854.87 on Plant 4; $5,086.27 on Plant 1;
$36,910.67 on Plant 2; and $312,670.17 on
Indiana Pellet Plant.

By: _____
Name: Michael J. DuPont
Title: Attorney and Agent for Ferguson Enterprises Inc.
Wagner, Falconer & Judd, Ltd.
100 South 5th Street, Suite 800
Minneapolis, MN 55402 .

**ERP IRON ORE, LLC**

By: _____
Name: Tom Clarke
Title: Authorized Signatory

**FERROMAGNETICA, LLC**

By: _____
Name: Anders Larson
Title: Authorized Signatory

## JOINDER TO PRELIMINARY MEMORANDUM OF UNDERSTANDING

This Joinder (the "Joinder"), by and among the Mechanic Lien Claimants identified in the signature block below (the "MLC Signatories"), ERP Iron Ore, LLC ("ERPI") and FerroMagnetica, LLC ("FerroMagnetica"), is to that certain Preliminary Memorandum of Understanding dated as of November 18, 2016 (the "MOU") by and among ERPI, FerroMagnetica and the Lien Claimants (as defined in the MOU).

**WHEREAS**, the MLC Signatories desire to execute this Joinder so that they may be considered a Lien Claimant under the MOU;

**WHEREAS**, ERPI and FerroMagnetica consent to the MLC Signatories' being considered a Lien Claimant under the MOU;

**NOW, THEREFORE**, in consideration of the premises and agreements contained in this Joinder, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the MLC Signatories, ERPI and FerroMagnetica, hereby AGREE as follows:

1.      The MLC Signatories shall be considered a Lien Claimant for all purposes under the MOU.

2.      This Joinder shall be of no force and effect unless and until it is fully executed by the MLC Signatories, ERPI and FerroMagnetica.

3.      Each person who executes this Joinder represents that he or she is duly authorized to execute this Joinder on behalf of the person or entity for whom they execute this Joinder.

4.      This Joinder may be executed in multiple counterparts, any of which may be transmitted by electronic mail, and each of which shall be deemed an original, but all of which together shall constitute one instrument.

5.      This Joinder shall not be modified, altered, amended, supplemented, or vacated without the prior written agreement of the MLC Signatories, ERPI and FerroMagnetica.

Dated: December 9, 2016

MLC SIGNATORIES

**TOLTZ, KING, DUVALL, ANDERSON ASSOCIATES, INCORPORATED, D/B/A TKDA**, holder of a mechanic's lien claim against the Debtors' Assets (Plant #4) in the amount of **$358,897.38 (Original Principal) plus costs expenses and attorney fees.**

Name:    Mark J. Heley
Heley, Duncan & Melander, PLLP
8500 Normandale Lake Boulevard,
Suite 2110,
Bloomington, Minnesota 55435

**TOLTZ, KING, DUVALL, ANDERSON ASSOCIATES, INCORPORATED, D/B/A TKDA**, holder of a mechanic's lien claim against the Debtors' Assets (Jesse Loadout) in the amount of **$39,194.12 (Original Principal) plus costs expenses and attorney fees.**

Name:    Mark J. Heley
Heley, Duncan & Melander, PLLP
8500 Normandale Lake Boulevard,
Suite 2110,
Bloomington, Minnesota 55435

**ERP IRON ORE, LLC**

By: _____
Name: Tom Clarke, Member
Title: Authorized Signatory


**FERROMAGNETICA, LLC**


By: _____
Name: Anders Larson
Title: Authorized Signatory

**ERP IRON ORE, LLC**

By: _____
Name: Tom Clarke
Title: Authorized Signatory

**FERROMAGNETICA, LLC**

By: _____
Name: Anders Larson
Title: Authorized Signatory

## JOINDER TO PRELIMINARY MEMORANDUM OF UNDERSTANDING

This Joinder (the "Joinder"), by and among the Mechanic Lien Claimants identified in the signature block below (the "MLC Signatories"), ERP Iron Ore, LLC ("ERPI") and FerroMagnetica, LLC ("FerroMagnetica"), is to that certain Preliminary Memorandum of Understanding dated as of November 18, 2016 (the "MOU") by and among ERPI, FerroMagnetica and the Lien Claimants (as defined in the MOU).

**WHEREAS**, the MLC Signatories desire to execute this Joinder so that they may be considered a Lien Claimant under the MOU;

**WHEREAS**, ERPI and FerroMagnetica consent to the MLC Signatories' being considered a Lien Claimant under the MOU;

**NOW, THEREFORE**, in consideration of the premises and agreements contained in this Joinder, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the MLC Signatories, ERPI and FerroMagnetica, hereby AGREE as follows:

1. The MLC Signatories shall be considered a Lien Claimant for all purposes under the MOU.

2. This Joinder shall be of no force and effect unless and until it is fully executed by the MLC Signatories, ERPI and FerroMagnetica.

3. Each person who executes this Joinder represents that he or she is duly authorized to execute this Joinder on behalf of the person or entity for whom they execute this Joinder.

4. This Joinder may be executed in multiple counterparts, any of which may be transmitted by electronic mail, and each of which shall be deemed an original, but all of which together shall constitute one instrument.

5. This Joinder shall not be modified, altered, amended, supplemented, or vacated without the prior written agreement of the MLC Signatories, ERPI and FerroMagnetica.

Dated: December 9, 2016

**MLC SIGNATORIES**

**[INSERT NAME OF SIGNATORY]**, holder of a mechanic's and/or miner's lien claim against the Debtors' Assets in the amount of [INSERT AMOUNT / SEPARATE SIGNATURES FOR EACH LIEN CLAIM]

Name: _____
Title: Authorized Signatory

**TRANE US INC.** holder of a mechanic's and/or miner's lien claim against the Debtors' Assets in the amount of $217,576.16

By: _Mark O. Anderson_
Name: Mark O. Anderson
Title: Attorney and Agent for Trane US Inc.
Wagner, Falconer & Judd, Ltd.
100 South 5th Street, Suite 800
Minneapolis, MN 55402

**ERP IRON ORE, LLC**

By: _____
Name: Tom Clarke, Member
Title: Authorized Signatory

**FERROMAGNETICA, LLC**

By: _____
Name: Anders Larson
Title: Authorized Signatory

Dated: December 9, 2016

**MLC SIGNATORIES**

**[INSERT NAME OF SIGNATORY]**,
holder of a mechanic's and/or miner's lien
claim against the Debtors' Assets in the
amount of [INSERT AMOUNT /
SEPARATE SIGNATURES FOR EACH
LIEN CLAIM]

Name: _____
Title: Authorized Signatory

**TRANE US INC.** holder of a mechanic's
and/or miner's lien claim against the Debtors'
Assets in the amount of $217,576.16

By: _____
Name: Mark O. Anderson
Title: Attorney and Agent for Trane US Inc.
Wagner, Falconer & Judd, Ltd.
100 South 5th Street, Suite 800
Minneapolis, MN 55402

**ERP IRON ORE, LLC**

By: _____
Name: Tom Clarke
Title: Authorized Signatory

**FERROMAGNETICA, LLC**

By: _____
Name: Anders Larson
Title: Authorized Signatory

Case 15-50978   Doc 135   Filed 06/12/18   Entered 06/12/18 18:29:34   Desc Main
Document      Page 437 of 493

## JOINDER TO PRELIMINARY MEMORANDUM OF UNDERSTANDING

This Joinder (the "Joinder"), by and among the Mechanic Lien Claimants identified in the signature block below (the "MLC Signatories"), ERP Iron Ore, LLC ("ERPI") and FerroMagnetica, LLC ("FerroMagnetica"), is to that certain Preliminary Memorandum of Understanding dated as of November 18, 2016 (the "MOU") by and among ERPI, FerroMagnetica and the Lien Claimants (as defined in the MOU).

**WHEREAS**, the MLC Signatories desire to execute this Joinder so that they may be considered a Lien Claimant under the MOU;

**WHEREAS**, ERPI and FerroMagnetica consent to the MLC Signatories' being considered a Lien Claimant under the MOU;

**NOW**, **THEREFORE**, in consideration of the premises and agreements contained in this Joinder, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the MLC Signatories, ERPI and FerroMagnetica, hereby AGREE as follows:

1.      The MLC Signatories shall be considered a Lien Claimant for all purposes under the MOU.

2.      This Joinder shall be of no force and effect unless and until it is fully executed by the MLC Signatories, ERPI and FerroMagnetica.

3.      Each person who executes this Joinder represents that he or she is duly authorized to execute this Joinder on behalf of the person or entity for whom they execute this Joinder.

4.      This Joinder may be executed in multiple counterparts, any of which may be transmitted by electronic mail, and each of which shall be deemed an original, but all of which together shall constitute one instrument.

5.      This Joinder shall not be modified, altered, amended, supplemented, or vacated without the prior written agreement of the MLC Signatories, ERPI and FerroMagnetica.

Dated: December 8, 2016

**MLC SIGNATORIES**

**John J. Morgan Company**, holder of a
mechanic's and/or miner's lien claim against
the Debtors' Assets in the amount of $227,368
(rounded); Reservation of rights: John J.
Morgan Company reserves all rights, recourse
and claims in connection with that certain
custom designed and produced equipment that
was not shipped to Debtors, Mag Mining, LLC
or Magnetation LLC due to the bankruptcy
filings and is described on Invoice No. 26543
and which equipment and related costs, charges
and claims are not included in the mechanic's
and/or miner's lien claim referenced above.

Name: Michael J. Morgan
Title: President


**ERP IRON ORE, LLC**

By: _____
Name: Tom Clarke , Member
Title: Authorized Signatory


**FERROMAGNETICA, LLC**

By: _____
Name: Anders Larson
Title: Authorized Signatory

Dated: December 8, 2016

**MLC SIGNATORIES**

**John J. Morgan Company**, holder of a
mechanic's and/or miner's lien claim against
the Debtors' Assets in the amount of $227,368
(rounded); Reservation of rights: John J.
Morgan Company reserves all rights, recourse
and claims in connection with that certain
custom designed and produced equipment that
was not shipped to Debtors, Mag Mining, LLC
or Magnetation LLC due to the bankruptcy
filings and is described on Invoice No. 26543
and which equipment and related costs, charges
and claims are not included in the mechanic's
and/or miner's lien claim referenced above.

Name: Michael J. Morgan
Title: President


**ERP IRON ORE, LLC**

By: _____
Name: Tom Clarke
Title: Authorized Signatory


**FERROMAGNETICA, LLC**

By: _____
Name: Anders Larson
Title: Authorized Signatory

## JOINDER TO PRELIMINARY MEMORANDUM OF UNDERSTANDING

This Joinder (the "Joinder"), by and among the Mechanic Lien Claimants identified in the signature block below (the "MLC Signatories"), ERP Iron Ore, LLC ("ERPI") and FerroMagnetica, LLC ("FerroMagnetica"), is to that certain Preliminary Memorandum of Understanding dated as of November 18, 2016 (the "MOU") by and among ERPI, FerroMagnetica and the Lien Claimants (as defined in the MOU).

**WHEREAS,** the MLC Signatories desire to execute this Joinder so that they may be considered a Lien Claimant under the MOU;

**WHEREAS,** ERPI and FerroMagnetica consent to the MLC Signatories' being considered a Lien Claimant under the MOU;

**NOW, THEREFORE,** in consideration of the premises and agreements contained in this Joinder, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the MLC Signatories, ERPI and FerroMagnetica, hereby AGREE as follows:

1.      The MLC Signatories shall be considered a Lien Claimant for all purposes under the MOU.

2.      This Joinder shall be of no force and effect unless and until it is fully executed by the MLC Signatories, ERPI and FerroMagnetica.

3.      Each person who executes this Joinder represents that he or she is duly authorized to execute this Joinder on behalf of the person or entity for whom they execute this Joinder.

4.      This Joinder may be executed in multiple counterparts, any of which may be transmitted by electronic mail, and each of which shall be deemed an original, but all of which together shall constitute one instrument.

5.      This Joinder shall not be modified, altered, amended, supplemented, or vacated without the prior written agreement of the MLC Signatories, ERPI and FerroMagnetica.

Dated: December 7, 2016

**WESCO DISTRIBUTION, INC.,** holder of
a mechanic's and/or miner's lien claim
against the Debtors' Assets in the amount of
$459,892.01 Magnetation Plant 4 Minnesota

Name: Robert A. Judd
Title: Authorized Signatory

**WESCO DISTRIBUTION, INC.,** holder
of a mechanic's and/or miner's lien claim
against the Debtors' Assets in the amount of
$7,527.74 Magnetation Plant 2 Minnesota

Name: Robert A. Judd
Title: Authorized Signatory

**WESCO DISTRIBUTION, INC.,** holder
of a mechanic's and/or miner's lien claim
against the Debtors' Assets in the amount of
$4,538.84 Magnetation Indiana Pellet Plant

Name: Robert A. Judd
Title: Authorized Signatory

**ERP IRON ORE, LLC**

By: _____
Name: Tom Clarke, Member
Title: Authorized Signatory

**FERROMAGNETICA, LLC**

By: _____
Name: Anders Larson
Title: Authorized Signatory

Dated: December 7, 2016

**WESCO DISTRIBUTION, INC.**, holder of
a mechanic's and/or miner's lien claim
against the Debtors' Assets in the amount of
$459,892.01 Magnetation Plant 4 Minnesota

Name: Robert A. Judd
Title: Authorized Signatory

**WESCO DISTRIBUTION, INC.**, holder
of a mechanic's and/or miner's lien claim
against the Debtors' Assets in the amount of
$7,527.74 Magnetation Plant 2 Minnesota

Name: Robert A. Judd
Title: Authorized Signatory

**WESCO DISTRIBUTION, INC.**, holder
of a mechanic's and/or miner's lien claim
against the Debtors' Assets in the amount of
$4,538.84 Magnetation Indiana Pellet Plant

Name: Robert A. Judd
Title: Authorized Signatory

**ERP IRON ORE, LLC**

By: _____
Name: Tom Clarke
Title: Authorized Signatory

**FERROMAGNETICA, LLC**

By: _____
Name: Anders Larson
Title: Authorized Signatory

## JOINDER TO PRELIMINARY MEMORANDUM OF UNDERSTANDING

This Joinder (the "Joinder"), by and among the Mechanic Lien Claimants identified in the signature block below (the "MLC Signatories"), ERP Iron Ore, LLC ("ERPI") and FerroMagnetica, LLC ("FerroMagnetica"), is to that certain Preliminary Memorandum of Understanding dated as of November 18, 2016 (the "MOU") by and among ERPI, FerroMagnetica and the Lien Claimants (as defined in the MOU).

**WHEREAS**, the MLC Signatories desire to execute this Joinder so that they may be considered a Lien Claimant under the MOU;

**WHEREAS**, ERPI and FerroMagnetica consent to the MLC Signatories' being considered a Lien Claimant under the MOU;

**NOW, THEREFORE**, in consideration of the premises and agreements contained in this Joinder, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the MLC Signatories, ERPI and FerroMagnetica, hereby AGREE as follows:

1.      The MLC Signatories shall be considered a Lien Claimant for all purposes under the MOU.

2.      This Joinder shall be of no force and effect unless and until it is fully executed by the MLC Signatories, ERPI and FerroMagnetica.

3.      Each person who executes this Joinder represents that he or she is duly authorized to execute this Joinder on behalf of the person or entity for whom they execute this Joinder.

4.      This Joinder may be executed in multiple counterparts, any of which may be transmitted by electronic mail, and each of which shall be deemed an original, but all of which together shall constitute one instrument.

5.      This Joinder shall not be modified, altered, amended, supplemented, or vacated without the prior written agreement of the MLC Signatories, ERPI and FerroMagnetica.

Dated: December 8, 2016

**MLC SIGNATORIES**

**RAPIDS PROCESS EQUIPMENT, INC.**,
holder of a mechanic's and/or miner's lien
claim against the Debtors' Assets in the
amount of $32,687.23 on Plant 2 and
$4,128.76 on Plant 4

By: _____
Name: Stephen A. Melcher, Esq.
    Melcher Law Office, PLLC
      Attorney for Rapids Process Equipment, Inc.
Title: Authorized Signatory


**ERP IRON ORE, LLC**

By: _____
Name: Tom Clarke, Member
Title: Authorized Signatory


**FERROMAGNETICA, LLC**

By: _____
Name: Anders Larson
Title: Authorized Signatory

Dated: December 8, 2016

**MLC SIGNATORIES**

**RAPIDS PROCESS EQUIPMENT, INC.,**
holder of a mechanic's and/or miner's lien
claim against the Debtors' Assets in the
amount of $32,687.23 on Plant 2 and
$4,128.76 on Plant 4

By: _____
Name: Stephen A. Melcher, Esq.
        Melcher Law Office, PLLC
        Attorney for Rapids Process Equipment, Inc.
Title: Authorized Signatory


**ERP IRON ORE, LLC**

By: _____
Name: Tom Clarke
Title: Authorized Signatory


**FERROMAGNETICA, LLC**

By: _____
Name: Anders Larson
Title: Authorized Signatory

## JOINDER TO PRELIMINARY MEMORANDUM OF UNDERSTANDING

This Joinder (the "Joinder"), by and among the Mechanic Lien Claimants identified in the signature block below (the "MLC Signatories"), ERP Iron Ore, LLC ("ERPI") and FerroMagnetica, LLC ("FerroMagnetica"), is to that certain Preliminary Memorandum of Understanding dated as of November 18, 2016 (the "MOU") by and among ERPI, FerroMagnetica and the Lien Claimants (as defined in the MOU).

**WHEREAS**, the MLC Signatories desire to execute this Joinder so that they may be considered a Lien Claimant under the MOU;

**WHEREAS**, ERPI and FerroMagnetica consent to the MLC Signatories' being considered a Lien Claimant under the MOU;

**NOW, THEREFORE**, in consideration of the premises and agreements contained in this Joinder, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the MLC Signatories, ERPI and FerroMagnetica, hereby AGREE as follows:

1.      The MLC Signatories shall be considered a Lien Claimant for all purposes under the MOU.

2.      This Joinder shall be of no force and effect unless and until it is fully executed by the MLC Signatories, ERPI and FerroMagnetica.

3.      Each person who executes this Joinder represents that he or she is duly authorized to execute this Joinder on behalf of the person or entity for whom they execute this Joinder.

4.      This Joinder may be executed in multiple counterparts, any of which may be transmitted by electronic mail, and each of which shall be deemed an original, but all of which together shall constitute one instrument.

5.      This Joinder shall not be modified, altered, amended, supplemented, or vacated without the prior written agreement of the MLC Signatories, ERPI and FerroMagnetica.

Dated: December *8*, 2016

**MLC SIGNATORIES**

**VIKING ELECTRIC SUPPLY, INC**,
holder of a mechanic's lien claim against the
Debtors' Assets (Plant #4) in the amount of
$66,741.61 (Original principal) plus costs,
expenses and attorneys' fees.

Name: Michael P. Coaty, Esq.
Heley, Duncan & Melander, PLLP
8500 Normandale Lake Boulevard
Suite 2110
Minneapolis, MN 55437
(952) 841-0211
Title: Authorized Signatory

**VIKING ELECTRIC SUPPLY, INC**,
holder of a mechanic's lien claim against the
Debtors' Assets (Plant #2) in the amount of
$7,818.90 (Original principal) plus costs,
expenses and attorneys' fees.

Name: Michael P. Coaty, Esq.
Heley, Duncan & Melander, PLLP
8500 Normandale Lake Boulevard
Suite 2110
Minneapolis, MN 55437
(952) 841-0211
Title: Authorized Signatory

**VIKING ELECTRIC SUPPLY, INC**,
holder of a mechanic's lien claim against the
Debtors' Assets (Jessie Loadout) in the
amount of $12,656.78 (Original principal)
plus costs, expenses and attorneys' fees.

Name: Michael P. Coaty, Esq.
Heley, Duncan & Melander, PLLP
8500 Normandale Lake Boulevard
Suite 2110
Minneapolis, MN 55437
(952) 841-0211
Title: Authorized Signatory

**ERP IRON ORE, LLC**

By: _____
Name: Tom Clarke, Member
Title: Authorized Signatory


**FERROMAGNETICA, LLC**


By: _____
Name: Anders Larson
Title: Authorized Signatory

**ERP IRON ORE, LLC**

By: _____
Name: Tom Clarke
Title: Authorized Signatory

**FERROMAGNETICA, LLC**

By: _____
Name: Anders Larson
Title: Authorized Signatory

## JOINDER TO PRELIMINARY MEMORANDUM OF UNDERSTANDING

This Joinder (the "Joinder"), by and among the Mechanic Lien Claimants identified in the signature block below (the "MLC Signatories"), ERP Iron Ore, LLC ("ERPI") and FerroMagnetica, LLC ("FerroMagnetica"), is to that certain Preliminary Memorandum of Understanding dated as of November 18, 2016 (the "MOU") by and among ERPI, FerroMagnetica and the Lien Claimants (as defined in the MOU).

**WHEREAS**, the MLC Signatories desire to execute this Joinder so that they may be considered a Lien Claimant under the MOU;

**WHEREAS**, ERPI and FerroMagnetica consent to the MLC Signatories' being considered a Lien Claimant under the MOU;

**NOW**, **THEREFORE**, in consideration of the premises and agreements contained in this Joinder, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the MLC Signatories, ERPI and FerroMagnetica, hereby AGREE as follows:

1.      The MLC Signatories shall be considered a Lien Claimant for all purposes under the MOU.

2.      The MLC Signatories agree that they shall be bound by the terms of any revisions to an order of the Court (as defined in the MOU) in the Cases (as defined in the MOU) concerning the sale of the Debtors' Assets (each as defined in the MOU) to ERPI that are agreed to by ERPI and the Lien Claimants.

3.      This Joinder shall be of no force and effect unless and until it is fully executed by the MLC Signatories, ERPI and FerroMagnetica.

4.      Each person who executes this Joinder represents that he or she is duly authorized to execute this Joinder on behalf of the person or entity for whom they execute this Joinder.

5.      This Joinder may be executed in multiple counterparts, any of which may be transmitted by electronic mail, and each of which shall be deemed an original, but all of which together shall constitute one instrument.

6.      This Joinder shall not be modified, altered, amended, supplemented, or vacated without the prior written agreement of the MLC Signatories, ERPI and FerroMagnetica.

17723792\V-8

Dated: December ___, 2016

**MLC SIGNATORIES**

**PRECISION TESTING, INC.**, holder of a mechanic's and/or miner's lien claim against the Debtors' Assets (Plant 4 and Jesse Load-out) in the amount of $9,740

_____
Name: John F. Hedtke
Title: Authorized Signatory

**[INSERT NAME OF SIGNATORY]**, holder of a mechanic's and/or miner's lien claim against the Debtors' Assets in the amount of [INSERT AMOUNT / SEPARATE SIGNATURES FOR EACH LIEN CLAIM]

_____
Name:
Title: Authorized Signatory

**ERP IRON ORE, LLC**

By: _____
Name: Tom Clarke, Member
Title: Authorized Signatory

**FERROMAGNETICA, LLC**

By: _____
Name: Anders Larson
Title: Authorized Signatory

Dated: December 16, 2016

**MLC SIGNATORIES**

**PRECISION TESTING, INC.,** holder of a mechanic's and/or miner's lien claim against the Debtors' Assets (Plant 4 and Jesse Load-out) in the amount of $9,740

Name: John F. Hedtke
Title: Authorized Signatory

**[INSERT NAME OF SIGNATORY],** holder of a mechanic's and/or miner's lien claim against the Debtors' Assets in the amount of [INSERT AMOUNT / SEPARATE SIGNATURES FOR EACH LIEN CLAIM]

Name:
Title: Authorized Signatory

**ERP IRON ORE, LLC**

By:
Name: Tom Clarke
Title: Authorized Signatory

**FERROMAGNETICA, LLC**

By:
Name: Anders Larson
Title: Authorized Signatory

## JOINDER TO PRELIMINARY MEMORANDUM OF UNDERSTANDING

This Joinder (the "Joinder"), by and among the Mechanic Lien Claimants identified in the signature block below (the "MLC Signatories"), ERP Iron Ore, LLC ("ERPI") and FerroMagnetica, LLC ("FerroMagnetica"), is to that certain Preliminary Memorandum of Understanding dated as of November 18, 2016 (the "MOU") by and among ERPI, FerroMagnetica and the Lien Claimants (as defined in the MOU).

**WHEREAS**, the MLC Signatories desire to execute this Joinder so that they may be considered a Lien Claimant under the MOU;

**WHEREAS**, ERPI and FerroMagnetica consent to the MLC Signatories' being considered a Lien Claimant under the MOU;

**NOW, THEREFORE**, in consideration of the premises and agreements contained in this Joinder, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the MLC Signatories, ERPI and FerroMagnetica, hereby AGREE as follows:

1.      The MLC Signatories shall be considered a Lien Claimant for all purposes under the MOU.

2.      This Joinder shall be of no force and effect unless and until it is fully executed by the MLC Signatories, ERPI and FerroMagnetica.

3.      Each person who executes this Joinder represents that he or she is duly authorized to execute this Joinder on behalf of the person or entity for whom they execute this Joinder.

4.      This Joinder may be executed in multiple counterparts, any of which may be transmitted by electronic mail, and each of which shall be deemed an original, but all of which together shall constitute one instrument.

5.      This Joinder shall not be modified, altered, amended, supplemented, or vacated without the prior written agreement of the MLC Signatories, ERPI and FerroMagnetica.

Dated: December 14, 2016               **MLC SIGNATORIES**

**SHAMBAUGH & SON, L.P.,** holder of a
mechanic's and/or miner's lien claim against
the Debtors' Assets in the amount of
$23,695.00 (Lien of $23,200.00 plus $495 of
Legal Fees to File)

Name:  William J. Meyer
Title:  Sr. Vice President

**ERP IRON ORE, LLC**

By: _____
Name: Tom Clarke
Title: Authorized Signatory


**FERROMAGNETICA, LLC**

By: _____
Name: Anders Larson
Title: Authorized Signatory

**ERP IRON ORE, LLC**

By: _____
Name: Tom Clarke, Member
Title: Authorized Signatory


**FERROMAGNETICA, LLC**


By: _____
Name: Anders Larson
Title: Authorized Signatory

## JOINDER TO PRELIMINARY MEMORANDUM OF UNDERSTANDING

This Joinder (the "Joinder"), by and among the Mechanic Lien Claimants identified in the signature block below (the "MLC Signatories"), ERP Iron Ore, LLC ("ERPI") and FerroMagnetica, LLC ("FerroMagnetica"), is to that certain Preliminary Memorandum of Understanding dated as of November 18, 2016 (the "MOU") by and among ERPI, FerroMagnetica and the Lien Claimants (as defined in the MOU).

**WHEREAS**, the MLC Signatories desire to execute this Joinder so that they may be considered a Lien Claimant under the MOU;

**WHEREAS**, ERPI and FerroMagnetica consent to the MLC Signatories' being considered a Lien Claimant under the MOU;

**NOW, THEREFORE**, in consideration of the premises and agreements contained in this Joinder, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the MLC Signatories, ERPI and FerroMagnetica, hereby AGREE as follows:

1. The MLC Signatories shall be considered a Lien Claimant for all purposes under the MOU.

2. The MLC Signatories agree that they shall be bound by the terms of any revisions to an order of the Court (as defined in the MOU) in the Cases (as defined in the MOU) concerning the sale of the Debtors' Assets (each as defined in the MOU) to ERPI that are agreed to by ERPI and the Lien Claimants.

3. This Joinder shall be of no force and effect unless and until it is fully executed by the MLC Signatories, ERPI and FerroMagnetica.

4. Each person who executes this Joinder represents that he or she is duly authorized to execute this Joinder on behalf of the person or entity for whom they execute this Joinder.

5. This Joinder may be executed in multiple counterparts, any of which may be transmitted by electronic mail, and each of which shall be deemed an original, but all of which together shall constitute one instrument.

6. This Joinder shall not be modified, altered, amended, supplemented, or vacated without the prior written agreement of the MLC Signatories, ERPI and FerroMagnetica.

17723792\V-8

Dated: December 15, 2016

**MLC SIGNATORIES**

**SOLID PLATFORMS, INC.,** holder of a
mechanic's and/or miner's lien claim against
the Debtors' Assets in the principal amount
of $22,991.94.

Name: Jason R. Lammertin – President & C.O.O.
Title: Authorized Signatory

**SOLID PLATFORMS, INC.,** holder of a
mechanic's and/or miner's lien claim against
the Debtors' Assets in the principal amount
of $298,025.49.

Name: Jason R. Lammertin – President & C.O.O.
Title: Authorized Signatory

**ERP IRON ORE, LLC**

By: _____
Name: Tom Clarke, Member
Title: Authorized Signatory

**FERROMAGNETICA, LLC**

By: _____
Name: Anders Larson
Title: Authorized Signatory

## JOINDER TO PRELIMINARY MEMORANDUM OF UNDERSTANDING

This Joinder (the "Joinder"), by and among the Mechanic Lien Claimants identified in the signature block below (the "MLC Signatories"), ERP Iron Ore, LLC ("ERPI") and FerroMagnetica, LLC ("FerroMagnetica"), is to that certain Preliminary Memorandum of Understanding dated as of November 18, 2016 (the "MOU") by and among ERPI, FerroMagnetica and the Lien Claimants (as defined in the MOU).

**WHEREAS**, the MLC Signatories desire to execute this Joinder so that they may be considered a Lien Claimant under the MOU;

**WHEREAS**, ERPI and FerroMagnetica consent to the MLC Signatories' being considered a Lien Claimant under the MOU;

**NOW**, **THEREFORE**, in consideration of the premises and agreements contained in this Joinder, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the MLC Signatories, ERPI and FerroMagnetica, hereby AGREE as follows:

1.      The MLC Signatories shall be considered a Lien Claimant for all purposes under the MOU.

2.      The MLC Signatories agree that they shall be bound by the terms of any revisions to an order of the Court (as defined in the MOU) in the Cases (as defined in the MOU) concerning the sale of the Debtors' Assets (each as defined in the MOU) to ERPI that are agreed to by ERPI and the Lien Claimants.

3.      This Joinder shall be of no force and effect unless and until it is fully executed by the MLC Signatories, ERPI and FerroMagnetica.

4.      Each person who executes this Joinder represents that he or she is duly authorized to execute this Joinder on behalf of the person or entity for whom they execute this Joinder.

5.      This Joinder may be executed in multiple counterparts, any of which may be transmitted by electronic mail, and each of which shall be deemed an original, but all of which together shall constitute one instrument.

6.      This Joinder shall not be modified, altered, amended, supplemented, or vacated without the prior written agreement of the MLC Signatories, ERPI and FerroMagnetica.

17723792\V-8

Dated: December 14, 2016

**MLC SIGNATORIES**

**Brock White Company, LLC,** holder of a
mechanic's and/or miner's lien claim against
the Debtors' Assets (Plant 1) in the amount
of $12,501.00

Name: Jonathan Lloyd
Title: Authorized Signatory

**[INSERT NAME OF SIGNATORY]**,
holder of a mechanic's and/or miner's lien
claim against the Debtors' Assets in the
amount of [INSERT AMOUNT /
SEPARATE SIGNATURES FOR EACH
LIEN CLAIM]

Name:
Title: Authorized Signatory

**ERP IRON ORE, LLC**

By:
Name: Tom Clarke, Member
Title: Authorized Signatory

**FERROMAGNETICA, LLC**

By:
Name: Anders Larson
Title: Authorized Signatory

Dated: December 14, 2016

**MLC SIGNATORIES**

**Brock White Company, LLC,** holder of a
mechanic's and/or miner's lien claim against
the Debtors' Assets (Plant 1) in the amount
of $12,501.00

Name: Jonathan Lloyd
Title: Authorized Signatory

**[INSERT NAME OF SIGNATORY]**,
holder of a mechanic's and/or miner's lien
claim against the Debtors' Assets in the
amount of [INSERT AMOUNT /
SEPARATE SIGNATURES FOR EACH
LIEN CLAIM]

Name:
Title: Authorized Signatory

**ERP IRON ORE, LLC**

By:
Name: Tom Clarke , Member
Title: Authorized Signatory

**FERROMAGNETICA, LLC**

By:
Name: Anders Larson
Title: Authorized Signatory

## JOINDER TO PRELIMINARY MEMORANDUM OF UNDERSTANDING

This Joinder (the "Joinder"), by and among the Mechanic Lien Claimants identified in the signature block below (the "MLC Signatories"), ERP Iron Ore, LLC ("ERPI") and FerroMagnetica, LLC ("FerroMagnetica"), is to that certain Preliminary Memorandum of Understanding dated as of November 18, 2016 (the "MOU") by and among ERPI, FerroMagnetica and the Lien Claimants (as defined in the MOU).

WHEREAS, the MLC Signatories desire to execute this Joinder so that they may be considered a Lien Claimant under the MOU;

WHEREAS, ERPI and FerroMagnetica consent to the MLC Signatories' being considered a Lien Claimant under the MOU;

NOW, THEREFORE, in consideration of the premises and agreements contained in this Joinder, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the MLC Signatories, ERPI and FerroMagnetica, hereby AGREE as follows:

1.      The MLC Signatories shall be considered a Lien Claimant for all purposes under the MOU.

2.      This Joinder shall be of no force and effect unless and until it is fully executed by the MLC Signatories, ERPI and FerroMagnetica.

3.      Each person who executes this Joinder represents that he or she is duly authorized to execute this Joinder on behalf of the person or entity for whom they execute this Joinder.

4.      This Joinder may be executed in multiple counterparts, any of which may be transmitted by electronic mail, and each of which shall be deemed an original, but all of which together shall constitute one instrument.

5.      This Joinder shall not be modified, altered, amended, supplemented, or vacated without the prior written agreement of the MLC Signatories, ERPI and FerroMagnetica.

Dated: December 14, 2016

**MLC SIGNATORIES**

> **General Waste Disposal and Recovery**
> **Services, Inc. (Plant 1, $1,162.16);**
> **General Waste Disposal and Recovery**
> **Services, Inc. (Plant 2, $7,395.28);**
> **Jasper Engineering & Equipment Co.**
> **(Plant 2, $71,544.40);**
> **Metso Minerals Industries, Inc. (Plant 2,**
> **$79,595.25);**
> **Ulland Brothers, Inc. (Plant 2,**
> **$1,241,341.74);**
> **Jasper Engineering & Equipment Co.**
> **(Plant 4, $31,738.88);**
> **Metso Minerals Industries, Inc. (Plant 4,**
> **$189,019.24);**
> **K Building Components, Inc. (Plant 4,**
> **$28,412.86);**
> **Minnesota Industries, Inc. (Plant 4,**
> **$37,269.39); and**
> **Ulland Brothers, Inc. (Jessie Loadout,**
> **$466,100.75),**
> holder(s) of a mechanic's and/or miner's lien
> claim against the Debtors' Assets in the
> amount(s) above

Name: Roy J. Christensen, Esq.
Title: Authorized Signatory

**ERP IRON ORE, LLC**

By: _____

Name: Tom Clarke, Member

Title: Authorized Signatory


**FERROMAGNETICA, LLC**


By: _____

Name: Anders Larson

Title: Authorized Signatory

**ERP IRON ORE, LLC**

By: _____

Name: Tom Clarke, **Member**

Title: Authorized Signatory


**FERROMAGNETICA, LLC**

By: _____

Name: Anders Larson

Title: Authorized Signatory

## JOINDER TO PRELIMINARY MEMORANDUM OF UNDERSTANDING

This Joinder (the "Joinder"), by and among the Mechanic Lien Claimants identified in the signature block below (the "MLC Signatories"), ERP Iron Ore, LLC ("ERPI") and FerroMagnetica, LLC ("FerroMagnetica"), is to that certain Preliminary Memorandum of Understanding dated as of November 18, 2016 (the "MOU") by and among ERPI, FerroMagnetica and the Lien Claimants (as defined in the MOU).

**WHEREAS**, the MLC Signatories desire to execute this Joinder so that they may be considered a Lien Claimant under the MOU;

**WHEREAS**, ERPI and FerroMagnetica consent to the MLC Signatories' being considered a Lien Claimant under the MOU;

**NOW**, **THEREFORE**, in consideration of the premises and agreements contained in this Joinder, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the MLC Signatories, ERPI and FerroMagnetica, hereby AGREE as follows:

1. The MLC Signatories shall be considered a Lien Claimant for all purposes under the MOU.

2. The MLC Signatories agree that they shall be bound by the terms of any revisions to an order of the Court (as defined in the MOU) in the Cases (as defined in the MOU) concerning the sale of the Debtors' Assets (each as defined in the MOU) to ERPI that are agreed to by ERPI and the Lien Claimants.

3. This Joinder shall be of no force and effect unless and until it is fully executed by the MLC Signatories, ERPI and FerroMagnetica.

4. Each person who executes this Joinder represents that he or she is duly authorized to execute this Joinder on behalf of the person or entity for whom they execute this Joinder.

5. This Joinder may be executed in multiple counterparts, any of which may be transmitted by electronic mail, and each of which shall be deemed an original, but all of which together shall constitute one instrument.

6. This Joinder shall not be modified, altered, amended, supplemented, or vacated without the prior written agreement of the MLC Signatories, ERPI and FerroMagnetica.

17723792\V-8

Dated: December 15, 2016

**MLC SIGNATORIES**

**ONE SOURCE EQUIPMENT RENTALS
LLC**, holder of a mechanic's and/or miner's
lien claim against the Debtors' Assets
(Magnetation Pellet Plant) in the amount of
$15,358.61.

Name: _____
Title: Authorized Signatory

**ERP IRON ORE, LLC**

By: _____
Name: Tom Clarke , **Member**
Title: Authorized Signatory

**FERROMAGNETICA, LLC**

By: _____
Name: Anders Larson
Title: Authorized Signatory

Dated: December 15, 2016

**MLC SIGNATORIES**

**ONE SOURCE EQUIPMENT RENTALS
LLC**, holder of a mechanic's and/or miner's
lien claim against the Debtors' Assets
(Magnetation Pellet Plant) in the amount of
$15,358.61.

Name:
Title: Authorized Signatory

**ERP IRON ORE, LLC**

By:
Name: Tom Clarke
Title: Authorized Signatory

**FERROMAGNETICA, LLC**

By:
Name: Anders Larson
Title: Authorized Signatory

DocuSign Envelope ID: 76467D0B-A077-4D54-94B1-83E...

## JOINDER TO PRELIMINARY MEMORANDUM OF UNDERSTANDING

This Joinder (the "Joinder"), by and among the Mechanic Lien Claimants identified in the signature block below (the "MLC Signatories"), ERP Iron Ore, LLC ("ERPI") and FerroMagnetica, LLC ("FerroMagnetica"), is to that certain Preliminary Memorandum of Understanding dated as of November 18, 2016 (the "MOU") by and among ERPI, FerroMagnetica and the Lien Claimants (as defined in the MOU).

**WHEREAS**, the MLC Signatories desire to execute this Joinder so that they may be considered a Lien Claimant under the MOU;

**WHEREAS**, ERPI and FerroMagnetica consent to the MLC Signatories' being considered a Lien Claimant under the MOU;

**NOW**, **THEREFORE**, in consideration of the premises and agreements contained in this Joinder, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the MLC Signatories, ERPI and FerroMagnetica, hereby AGREE as follows:

1.      The MLC Signatories shall be considered a Lien Claimant for all purposes under the MOU.

2.      This Joinder shall be of no force and effect unless and until it is fully executed by the MLC Signatories, ERPI and FerroMagnetica.

3.      Each person who executes this Joinder represents that he or she is duly authorized to execute this Joinder on behalf of the person or entity for whom they execute this Joinder.

4.      This Joinder may be executed in multiple counterparts, any of which may be transmitted by electronic mail, and each of which shall be deemed an original, but all of which together shall constitute one instrument.

5.      This Joinder shall not be modified, altered, amended, supplemented, or vacated without the prior written agreement of the MLC Signatories, ERPI and FerroMagnetica.

Dated: December 12/14/2016

**MLC SIGNATORIES**

**IRONMAN CONCRETE PUMPING, INC.**, holder of a mechanic's and/or miner's lien claim against the Debtors' Assets in the amount of $19,800.07

DocuSigned by:

Norm Voigt

Name: Norm Voigt
Title: Authorized Signatory

1411186.1

**ERP IRON ORE, LLC**

By: _____

Name: Tom Clarke, Member

Title: Authorized Signatory


**FERROMAGNETICA, LLC**

By: _____

Name: Anders Larson

Title: Authorized Signatory

DocuSign Envelope ID: 76467D0B-A277-4D54-94B1-83F294F95543

**ERP IRON ORE, LLC**

By: _____

Name: Tom Clarke, **Member**
Title: Authorized Signatory

**FERROMAGNETICA, LLC**

By: _____

Name: Anders Larson
Title: Authorized Signatory

1411186.1

# JOINDER TO PRELIMINARY MEMORANDUM OF UNDERSTANDING

This Joinder (the "Joinder"), by and among the Mechanic Lien Claimants identified in the signature block below (the "MLC Signatories"), ERP Iron Ore, LLC ("ERPI") and FerroMagnetica, LLC ("FerroMagnetica"), is to that certain Preliminary Memorandum of Understanding dated as of November 18, 2016 (the "MOU") by and among ERPI, FerroMagnetica and the Lien Claimants (as defined in the MOU).

**WHEREAS**, the MLC Signatories desire to execute this Joinder so that they may be considered a Lien Claimant under the MOU;

**WHEREAS**, ERPI and FerroMagnetica consent to the MLC Signatories' being considered a Lien Claimant under the MOU;

**NOW, THEREFORE**, in consideration of the premises and agreements contained in this Joinder, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the MLC Signatories, ERPI and FerroMagnetica, hereby AGREE as follows:

1.      The MLC Signatories shall be considered a Lien Claimant for all purposes under the MOU.

2.      The MLC Signatories agree that they shall be bound by the terms of any revisions to an order of the Court (as defined in the MOU) in the Cases (as defined in the MOU) concerning the sale of the Debtors' Assets (each as defined in the MOU) to ERPI that are agreed to by ERPI and the Lien Claimants.

3.      This Joinder shall be of no force and effect unless and until it is fully executed by the MLC Signatories, ERPI and FerroMagnetica.

4.      Each person who executes this Joinder represents that he or she is duly authorized to execute this Joinder on behalf of the person or entity for whom they execute this Joinder.

5.      This Joinder may be executed in multiple counterparts, any of which may be transmitted by electronic mail, and each of which shall be deemed an original, but all of which together shall constitute one instrument.

6.      This Joinder shall not be modified, altered, amended, supplemented, or vacated without the prior written agreement of the MLC Signatories, ERPI and FerroMagnetica.

17723792\V-8

Dated: December *16*, 2016

**MLC SIGNATORIES**

**KELLY CONSTRUCTION OF
INDIANA**, holder of a mechanic's and/or
miner's lien claim against the Debtors'
Assets (Magnetation Pellet Plant) in the
amount of $44,574.91.

Name: David L Daugherty
Title: Authorized Signatory *President*

**KELLY CONSTRUCTION OF
INDIANA**, holder of a mechanic's and/or
miner's lien claim against the Debtors'
Assets (Magnetation Pellet Plant) in the
amount of $87,106.48.

Name: David L Daugherty
Title: Authorized Signatory *President*

**ERP IRON ORE, LLC**

By: _____
Name: Tom Clarke, **Member**
Title: Authorized Signatory

**FERROMAGNETICA, LLC**

By: _____
Name: Anders Larson
Title: Authorized Signatory

## JOINDER TO PRELIMINARY MEMORANDUM OF UNDERSTANDING

This Joinder (the "Joinder"), by and among the Mechanic Lien Claimants identified in the signature block below (the "MLC Signatories"), ERP Iron Ore, LLC ("ERPI") and FerroMagnetica, LLC ("FerroMagnetica"), is to that certain Preliminary Memorandum of Understanding dated as of November 18, 2016 (the "MOU") by and among ERPI, FerroMagnetica and the Lien Claimants (as defined in the MOU).

WHEREAS, the MLC Signatories desire to execute this Joinder so that they may be considered a Lien Claimant under the MOU;

WHEREAS, ERPI and FerroMagnetica consent to the MLC Signatories' being considered a Lien Claimant under the MOU;

NOW, THEREFORE, in consideration of the premises and agreements contained in this Joinder, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the MLC Signatories, ERPI and FerroMagnetica, hereby AGREE as follows:

1.    The MLC Signatories shall be considered a Lien Claimant for all purposes under the MOU.

2.    The MLC Signatories agree that they shall be bound by the terms of any revisions to an order of the Court (as defined in the MOU) in the Cases (as defined in the MOU) concerning the sale of the Debtors' Assets (each as defined in the MOU) to ERPI that are agreed to by ERPI and the Lien Claimants.

3.    This Joinder shall be of no force and effect unless and until it is fully executed by the MLC Signatories, ERPI and FerroMagnetica.

4.    Each person who executes this Joinder represents that he or she is duly authorized to execute this Joinder on behalf of the person or entity for whom they execute this Joinder.

5.    This Joinder may be executed in multiple counterparts, any of which may be transmitted by electronic mail, and each of which shall be deemed an original, but all of which together shall constitute one instrument.

6.    This Joinder shall not be modified, altered, amended, supplemented, or vacated without the prior written agreement of the MLC Signatories, ERPI and FerroMagnetica.

17723792\V-8

Dated: December 16, 2016

**MLC SIGNATORIES**

**CENTRAL RENT-A-CRANE, INC.,**
holder of a mechanic's and/or miner's lien
claim against the Debtors' Assets
(Magnetation Pellet Plant) in the amount of
$16,717.10.

Name: RONARD KOOS S
Title: Authorized Signatory GENERAL
                                    MANAGER

**ERP IRON ORE, LLC**

By: _____
Name: Tom Clarke, Member
Title: Authorized Signatory


**FERROMAGNETICA, LLC**

By: _____
Name: Anders Larson
Title: Authorized Signatory

## JOINDER TO PRELIMINARY MEMORANDUM OF UNDERSTANDING

This Joinder (the "Joinder"), by and among the Mechanic Lien Claimants identified in the signature block below (the "MLC Signatories"), ERP Iron Ore, LLC ("ERPI") and FerroMagnetica, LLC ("FerroMagnetica"), is to that certain Preliminary Memorandum of Understanding dated as of November 18, 2016 (the "MOU") by and among ERPI, FerroMagnetica and the Lien Claimants (as defined in the MOU).

**WHEREAS**, the MLC Signatories desire to execute this Joinder so that they may be considered a Lien Claimant under the MOU;

**WHEREAS**, ERPI and FerroMagnetica consent to the MLC Signatories' being considered a Lien Claimant under the MOU;

**NOW, THEREFORE**, in consideration of the premises and agreements contained in this Joinder, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the MLC Signatories, ERPI and FerroMagnetica, hereby AGREE as follows:

1.    The MLC Signatories shall be considered a Lien Claimant for all purposes under the MOU.

2.    The MLC Signatories agree that they shall be bound by the terms of any revisions to an order of the Court (as defined in the MOU) in the Cases (as defined in the MOU) concerning the sale of the Debtors' Assets (each as defined in the MOU) to ERPI that are agreed to by ERPI and the Lien Claimants.

3.    This Joinder shall be of no force and effect unless and until it is fully executed by the MLC Signatories, ERPI and FerroMagnetica.

4.    Each person who executes this Joinder represents that he or she is duly authorized to execute this Joinder on behalf of the person or entity for whom they execute this Joinder.

5.    This Joinder may be executed in multiple counterparts, any of which may be transmitted by electronic mail, and each of which shall be deemed an original, but all of which together shall constitute one instrument.

6.    This Joinder shall not be modified, altered, amended, supplemented, or vacated without the prior written agreement of the MLC Signatories, ERPI and FerroMagnetica.

17723792\V-8

Dated: December 19, 2016

**MLC SIGNATORIES**

**FASTENAL COMPANY,** holder of a
mechanic's and/or miner's lien claim against
the Debtors' Assets (Magnetation Pellet
Plant) in the amount of ~~$9,716.003~~ $3,716.03.

Name: John Milek – General Counsel
Title: Authorized Signatory

**ERP IRON ORE, LLC**

By: _____
Name: Tom Clarke, Member
Title: Authorized Signatory

**FERROMAGNETICA, LLC**

By: _____
Name: Anders Larson
Title: Authorized Signatory

Dated: December 19, 2016

**MLC SIGNATORIES**

**FASTENAL COMPANY,** holder of a
mechanic's and/or miner's lien claim against
the Debtors' Assets (Magnetation Pellet
Plant) in the amount of $~~9,716.003~~, 716.03.

Name: John Milek – General Counsel
Title: Authorized Signatory

**ERP IRON ORE, LLC**

By: _____
Name: Tom Clarke
Title: Authorized Signatory

**FERROMAGNETICA, LLC**

By: _____
Name: Anders Larson
Title: Authorized Signatory

## JOINDER TO PRELIMINARY MEMORANDUM OF UNDERSTANDING

This Joinder (the "Joinder"), by and among the Mechanic Lien Claimants identified in the signature block below (the "MLC Signatories"), ERP Iron Ore, LLC ("ERPI") and FerroMagnetica, LLC ("FerroMagnetica"), is to that certain Preliminary Memorandum of Understanding dated as of November 18, 2016 (the "MOU") by and among ERPI, FerroMagnetica and the Lien Claimants (as defined in the MOU).

**WHEREAS**, the MLC Signatories desire to execute this Joinder so that they may be considered a Lien Claimant under the MOU;

**WHEREAS**, ERPI and FerroMagnetica consent to the MLC Signatories' being considered a Lien Claimant under the MOU;

**NOW, THEREFORE**, in consideration of the premises and agreements contained in this Joinder, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the MLC Signatories, ERPI and FerroMagnetica, hereby AGREE as follows:

1.      The MLC Signatories shall be considered a Lien Claimant for all purposes under the MOU.

2.      The MLC Signatories agree that they shall be bound by the terms of any revisions to an order of the Court (as defined in the MOU) in the Cases (as defined in the MOU) concerning the sale of the Debtors' Assets (each as defined in the MOU) to ERPI that are agreed to by ERPI and the Lien Claimants.

3.      This Joinder shall be of no force and effect unless and until it is fully executed by the MLC Signatories, ERPI and FerroMagnetica.

4.      Each person who executes this Joinder represents that he or she is duly authorized to execute this Joinder on behalf of the person or entity for whom they execute this Joinder.

5.      This Joinder may be executed in multiple counterparts, any of which may be transmitted by electronic mail, and each of which shall be deemed an original, but all of which together shall constitute one instrument.

6.      This Joinder shall not be modified, altered, amended, supplemented, or vacated without the prior written agreement of the MLC Signatories, ERPI and FerroMagnetica.

Page 1 of 2

Dated: December ___, 2016

**MLC SIGNATORIES**

**TWIN CITY FAN COMPANIES, LTD.,** holder of a mechanic's and/or miner's lien claim against the Debtors' Assets (Magnetation Pellet Plant) in the amount of $38,243.00.

_____

Name:
Title: Authorized Signatory

**ERP IRON ORE, LLC**

By: _____
Name: Tom Clarke
Title: Authorized Signatory

**FERROMAGNETICA, LLC**

By: _____
Name: Anders Larson
Title: Authorized Signatory

Dated: December ___, 2016

**MLC SIGNATORIES**

**TWIN CITY FAN COMPANIES, LTD.,**
holder of a mechanic's and/or miner's lien
claim against the Debtors' Assets
(Magnetation Pellet Plant) in the amount of
$38,243.00.

Name:
Title: Authorized Signatory

**ERP IRON ORE, LLC**

By:
Name: Tom Clarke, Member
Title: Authorized Signatory

**FERROMAGNETICA, LLC**

By:
Name: Anders Larson
Title: Authorized Signatory

# EXHIBIT E

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| | Case No. 16-11626 (BLS) |
| ESSAR STEEL MINNESOTA LLC and ESML HOLDINGS INC.,[1] | Jointly Administered |
| Debtors. | **Re: Docket Nos. 690, 691, 791, 792, 793, 794, 795, 808, 809, 810, 811, 814, 817, 918, 919, 956, 957, 958, 960, 961, 962, 990, 991, 992, 993, 999, 1000, 1002, 1003, 1005, 1009, 1010, 1012, 1022** |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING THE THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR MESABI METALLICS COMPANY LLC (F/K/A ESSAR STEEL MINNESOTA LLC) AND ESML HOLDINGS INC. ## PROPOSED BY THE DEBTORS

On July 8, 2016 (the "**Petition Date**"), Mesabi Metallics Company LLC (f/k/a Essar

Steel Minnesota LLC) ("**Mesabi**") and ESML Holdings Inc. ("**Holdings**," collectively with

Mesabi, the "**Debtors**") each filed voluntary petitions for relief under chapter 11 of title 11 of the

United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the

District of Delaware (the "**Bankruptcy Court**"), thereby commencing the above-captioned

chapter 11 cases (the "**Chapter 11 Cases**"). The Debtors manage their property as debtors-in-

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On July 19, 2016, the United States Trustee for the District of Delaware (the "**United**

**States Trustee**") appointed the Official Committee of Unsecured Creditors (the "**Committee**").

To date, no trustee or examiner has been requested or appointed in these Chapter 11 Cases.

---

[1] Essar Steel Minnesota LLC has changed its name to Mesabi Metallics Company LLC. The last four digits of its federal taxpayer identification number are 8770. The last four digits of ESML Holdings Inc.'s federal taxpayer identification number are 8071.

On February 2, 2017, the Debtors filed their *Chapter 11 Plan of Reorganization of Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc.* [D.I. 690] and their *Proposed Disclosure Statement Relating to the Chapter 11 Plan of Reorganization of Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc.* [D.I. 691].

On March 14, 2017, the Debtors filed their (i) *First Amended Chapter 11 Plan of Reorganization for Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc.* [D.I. 791] (as amended from time to time, and currently the "**Third Amended Plan**" or the "**Plan**")[2] and (ii) a proposed first amended disclosure statement relating to such Plan [D.I. 793] (as amended from time to time, the "**Disclosure Statement**").

On March 16, 2017, the Bankruptcy Court held a hearing on the adequacy of the Disclosure Statement (the "**Disclosure Statement Hearing**").   At the Disclosure Statement Hearing, subject to certain amendments made on the record of the Disclosure Statement Hearing, the Bankruptcy Court approved the Disclosure Statement.  Following the Disclosure Statement Hearing, the Debtors revised the language of the Disclosure Statement in accordance with the discussion on the record at the Disclosure Statement Hearing.  Thereafter, on March 16, 2017, the Debtors filed a revised Disclosure Statement reflecting the foregoing modifications [D.I. 808], as well as a conformed version of their *First Amended Chapter 11 Plan of Reorganization for Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc.* [D.I. 810].

---

[2] Where the context requires, each capitalized term used but not otherwise defined herein shall have the meaning ascribed to such term in the Plan, and if not ascribed a meaning in the Plan, then the meaning ascribed in the Disclosure Statement.

Americas 92908653 (2K)

On March 17, 2017, the Bankruptcy Court entered the *Order (i) Approving the Disclosure Statement Relating to the Chapter 11 Plan of Reorganization of Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc., (ii) Approving Form of Ballots and Proposed Solicitation and Tabulation Procedures for the Plan, (iii) Approving the Solicitation Packages and Prescribing the Form and Manner of Notice and Distribution Thereof, (iv) Establishing Procedures for Voting in Connection with the Plan Confirmation Process, and (v) Scheduling a Confirmation Hearing* [D.I. 817] (the "**Disclosure Statement Order**").

The Disclosure Statement Order, among other things, (a) established April 19, 2017 at 4:00 p.m. (Prevailing Eastern Time) as the deadline for voting on the Plan, and (b) scheduled a hearing commencing on April 26, 2017 at 9:30 a.m. (Prevailing Eastern Time) to consider confirmation of the Plan and objections thereto (the "**Confirmation Hearing**"). The Disclosure Statement Order also provides, among other things:

> **If no votes to accept or reject the Plan are received with respect to a particular class, such class may be deemed to have voted to accept the Plan**; provided, however, that such deemed acceptance shall not itself constitute at least one impaired class accepting the Plan sufficient to satisfy section 1129(a)(10) of the Bankruptcy Code, unless otherwise ordered by the Court.

Disclosure Statement Order, ¶ 24(m) (emphasis added).

On March 20, 2017, the Debtors' administrative advisor, Epiq Bankruptcy Solutions LLC ("**Epiq**"), transmitted the solicitation packages and confirmation hearing notices in accordance with the Disclosure Statement Order, as attested to in the Affidavit of Service [D.I. 833] (the "**Solicitation Affidavit**").

On April 12, 2017, the Debtors filed the *Notice of Plan Documents* [D.I. 889], including forms of the Litigation Trust Agreement, Transition Services Agreement, New By-Laws, New Charter, Prepetition Lender Notes, Prepetition Lien Trade Creditor Notes, Management Incentive

Americas 92908653 (2K)

Program, and Notice of Governors of the Reorganized Debtor (collectively, and, as amended or removed from time to time, the "**Plan Documents**").

The deadline for filing objections to the Plan as set forth in the Disclosure Statement Order was April 17, 2017 at 4:00 p.m. (Prevailing Eastern Time) (the "**Objection Deadline**"). The deadline for all Holders of Claims and Equity Interests entitled to vote on the First Amended Plan to cast their ballots was April 19, 2017, at 4:00 p.m. (Prevailing Eastern Time) (the "**Voting Deadline**"). The Debtors agreed to extend the Objection Deadline and the Voting Deadline for certain parties. Specifically, the Objection Deadline was extended to April 20, 2017 for the United States Trustee and to April 25, 2017 at 10:00 a.m. (Prevailing Eastern Time) for (a) ArcelorMittal, (b) the Committee, and (c) the Prepetition Lenders.[3] The Voting Deadline was extended to April 21, 2017 for ArcelorMittal.

Upon the adjournment of the Confirmation Hearing (as further described below), the Objection Deadline and deadline to change their votes were further extended for the Project Finance Lenders and Supplier Credit Lenders, initially to May 19, 2017 at 4:00 p.m. (Prevailing Eastern Time), and later to June 8, 2017 at 4:00 p.m. (Prevailing Eastern Time). Accordingly, the votes submitted by such parties and objections listed below are deemed timely for purposes of plan confirmation. The following objections (collectively, the "**Objections**") were filed:

- On February 8, 2017, the Minnesota Department of Natural Resources (the "**DNR**") filed an objection to the Debtors' motion to assume its mineral leases [D.I. 713]. On April 17, 2017, the DNR filed a revised objection to the Debtors' assumption of the mineral leases and opposition to the Plan's confirmation [D.I. 893] (the "**DNR Objection**").

---

[3] Certain of the Prepetition Lenders also had until April 25, 2017 by 5:00 p.m. (Prevailing Eastern Time) to change their vote on the First Amended Plan.

Americas 92908653 (2K)

- On April 12, 2017, Glacier Park Iron Ore Properties LLC ("**GPIOP**") filed an objection to the Debtors' assumption of GPIOP's mineral leases [D.I. 888].[4]

- On April 17, 2017, objections to confirmation were also filed by (a) Iowa Trenchless, L.C. ("**Iowa Trenchless**") [D.I. 894] and (b) River Consulting, LLC ("**River Consulting**") [D.I. 896].

Further, on April 17, 2017, Essar Steel Algoma Inc. ("**Algoma**") filed its *Reservation of Rights of Essar Steel Algoma Inc. Regarding the First Amended Chapter 11 Plan of Reorganization of Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc.* [D.I. 895] (the "**Reservation of Rights**") regarding that certain Pellet Sale and Purchase Agreement, dated as of January 28, 2014 (the "**Algoma Offtake Agreement**") by and between Algoma and ESML.

On March 16, 2017, the Debtors filed the *Notice of Hearing to Approve the Bid Procedures in Connection with the First Amended Chapter 11 Plan of Reorganization for Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc. and the First Amended Disclosure Statement Thereto* [D.I. 814] (the "**Bid Procedures Notice**"), which scheduled a hearing on April 13, 2017 to approve the proposed procedures to obtain the highest distributable value under the Plan through an auction. Between the filing of the Bid Procedures Notice and the bid procedures hearing date, the Debtors worked continuously to modify the bid procedures to satisfy the concerns and comments of the DIP Lender, the Prepetition Lenders, the Committee, and the United States Trustee. Prior to the hearing on the Bid Procedures, the Debtors reached a consensus with their key stakeholders and submitted revised bid procedures (the "**Bid Procedures**") under Certification of Counsel and this Bankruptcy Court entered an order approving the Bid Procedures on April 12, 2017 [D.I. 887].

---

[4] On April 25, 2017, GPIOP withdrew its objection [D.I. 927] after the entry of the *Order Approving Stipulation Regarding Assumption of GPIOP Mineral Leases* [D.I. 924], which resolved GPIOP's objection.

Americas 92968653 (2K)

On April 24, 2017, the Debtors filed the *Declaration of Jane Sullivan on Behalf of Epiq Bankruptcy Solutions, LLC Regarding Voting and Tabulation of Ballots Cast on the First Amended Chapter 11 Plan of Reorganization of Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc.* [D.I. 918].

On April 24, 2017, the Confirmation Hearing was continued to May 22, 2017.

On April 26, 2017, after the auction, the Debtors, in consultation with the Committee and the Prepetition Lenders, selected Chippewa Capital Partners, LLC ("**Chippewa**") as the Successful Bidder (as defined in the Bid Procedures) pursuant to the Bid Procedures.

On May 17, 2017, the Debtors filed their *Second Amended Chapter 11 Plan of Reorganization for Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc.* [D.I. 956].

On May 18, 2017, the Bankruptcy Court entered the *Order Approving Stipulation of Authorizing Votes of Acceptance of the Second Amended Plan of Reorganization of Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc. by the Member of the Official Committee of Unsecured Creditors pursuant to Federal Rule of Bankruptcy Procedure 3018(a)* [D.I. 960], which changed the votes of Amur Equipment Finance, Inc. (f/k/a Axis Capital, Inc.) ("**Axis Capital**"), ArcelorMittal, and FLSmidth USA Inc. (the individual members of the Committee) from reject to accept.

On May 19, 2017, the Confirmation Hearing was continued to June 13, 2017 at 10:30 a.m. (Prevailing Eastern Time).

On June 8, 2017, the Debtors filed the *Third Amended Chapter 11 Plan of Reorganization for Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc.* [D.I. 990] (as defined above, the Third Amended Plan) and the *Third*

6

*Amended Chapter 11 Plan of Reorganization of Mesabi Metallics Company LLC (f/k/a Essar
Steel Minnesota LLC) and ESML Holdings Inc. [Blackline]* [D.I. 991].

On June 8, 2017, the Debtors filed the *Stipulation Authorizing Withdrawal of Votes on
the First Amended Plan of Reorganization of Mesabi Metallics Company LLC (f/k/a Essar Steel
Minnesota LLC) and ESML Holdings Inc. by the Project Finance Lenders pursuant to Federal
Rules of Bankruptcy Procedure 3018(a)* [D.I. 992], and the *Stipulation Authorizing Withdrawal
of Votes on the First Amended Plan of Reorganization of Mesabi Metallics Company LLC (f/k/a
Essar Steel Minnesota LLC) and ESML Holdings Inc. by the Supplier Credit Lenders pursuant to
Federal Rules of Bankruptcy Procedure 3018(a)* [D.I. 993].

On June 9, 2017, the Debtors filed (a) the *Revised Certification of Jane Sullivan on
behalf of Epiq Bankruptcy Solutions, LLC, Regarding Voting and Tabulation of Ballots Cast on
the First Amended Chapter 11 Plan of Reorganization of Mesabi Metallics Company LLC (f/k/a
Essar Steel Minnesota LLC) and ESML Holdings Inc.* [D.I. 1000] (as revised, the "**Voting
Certification**"); (b) the *Memorandum of Law in Support of Confirmation of Third Amended
Chapter 11 Plan of Reorganization for Mesabi Metallics Company LLC (f/k/a Essar Steel
Minnesota LLC) and ESML Holdings Inc.* [D.I. 1003] (the "**Confirmation Memorandum**"); and
(c) the *Declaration of David Pauker, Chief Restructuring Officer, in Support of Confirmation of
the Debtors' Third Amended Chapter 11 Plan of Reorganization* [D.I. 1002] (the "**Pauker
Declaration**").

Further, the Debtors provided the following declarations in support of confirmation of the
Plan: (a) the declaration of Adam M. Rosen of B. Riley & Co., LLC, Financial Advisor to ERP
Iron Ore, Inc. and Chippewa Capital Partners, LLC (the "**Rosen Declaration**"); (b) the
declaration of Robb J. Bigelow, Managing Director of ERP Iron Ore, Inc. (the "**Bigelow**

**Declaration**"); and (c) the declaration of Thomas M. Clarke of Chippewa Capital Partners, LLC (the "**Clarke Declaration**") (collectively, and with the Pauker Declaration, the "**Declarations in Support of the Plan**").

On June 12, 2017 and June 13, 2017, the Debtors filed additional and amended Plan Documents [D.I. 1005, 1022].

Based on the treatment contained in the Plan, Class 2, Class 3,[5] Class 4,[6] Class 5, Class 6, and Class 7 have all accepted the Plan; Class 1 is deemed to have accepted the Plan; and Class 8 is deemed to have rejected the Plan.

The Confirmation Hearing concluded on June 13, 2017.

NOW, THEREFORE, the Bankruptcy Court having considered the Plan, the Solicitation Affidavit, the Voting Certification, the Declarations in Support of the Plan, the Confirmation Memorandum, the Objections, the Reservation of Rights, all evidence proffered or adduced and the arguments of counsel at the Confirmation Hearing, and the entire record of the Chapter 11 Cases, and after due deliberation thereon and good cause appearing therefor, this Bankruptcy Court hereby makes and issues the following Findings of Fact and Conclusions of Law and hereby orders:[7]

---

[5] All voting subclasses, other than four, voted to accept the First Amended Plan. A.W. Kuettel & Sons, Inc., Iowa Trenchless, L.C., Lakehead Constructor, Inc., and Machinewell, Inc. initially voted to reject the Plan but changed their votes to accept the Plan prior to the Confirmation Hearing.

[6] All voting subclasses, other than one, voted to accept the First Amended Plan. Claudius Peters (Americas) Inc. initially voted to reject the Plan but changed its vote to accept the Plan prior to the Confirmation Hearing.

[7] This Confirmation Order constitutes this Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure (the "**Federal Rules**"), made applicable by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"). Any and all findings of fact shall constitute findings of fact even if they are stated as conclusions of law, and any and all conclusions of law shall constitute conclusions of law even if they are stated as findings of fact.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

A.     Jurisdiction and Venue.  This Bankruptcy Court has subject matter jurisdiction to confirm the Plan pursuant to 28 U.S.C. §§ 157 and 1334.  Venue before this Bankruptcy Court was proper as of the Petition Date and continues to be proper pursuant to 28 U.S.C. §§ 1408 and 1409.  Confirmation of the Plan is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (L) and (O).  The Debtors were and are qualified to be debtors under section 109 of the Bankruptcy Code.

B.     Burden of Proof.  The Debtors, as proponents of the Plan, have the burden of proving the elements of section 1129(a) of the Bankruptcy Code by preponderance of the evidence, and, as set forth below, the Debtors have met that burden.

C.     Judicial Notice.  This Bankruptcy Court takes judicial notice of the docket in the Chapter 11 Cases maintained by the clerk of the Bankruptcy Court and/or its duly appointed agent, including, without limitation, all pleadings, notices and other documents filed, all orders entered and all evidence and arguments made, proffered or adduced at the hearings held before the Bankruptcy Court during the Chapter 11 Cases, including, without limitation, the Disclosure Statement Hearing and the Confirmation Hearing.

D.     The Record.  The following record (the "**Record**") was established to support confirmation of the Plan:

(i)      all documents identified by the Debtors at the Confirmation Hearing, including, without limitation, the Plan, the Disclosure Statement and all exhibits, schedules and attachments thereto and filed in connection therewith, and the Plan Documents, all of which were admitted into evidence without objection;

(ii)      the Declarations in Support of the Plan;

Americas 92908653 (2K)

(iii)      the Solicitation Affidavit;

(iv)      the Voting Certification;

(v)      the entire record of the Chapter 11 Cases and the docket maintained by the clerk of the Bankruptcy Court and/or its duly appointed agent, including, without limitation, all pleadings and other documents filed, all orders entered and evidence and argument made, proffered or adduced at the hearings held before the Bankruptcy Court during the pendency of the Chapter 11 Cases, as to all of which the Bankruptcy Court took judicial notice at the Confirmation Hearing; and

(vi)      the statements and argument of counsel on the record at the Confirmation Hearing, and all papers and pleadings filed with the Bankruptcy Court in support of, in opposition to or otherwise in connection with, confirmation of the Plan.

The evidence that was admitted into the Record in support of confirmation of the Plan and all related matters demonstrates, by a clear preponderance of the evidence, that the Plan should be confirmed.

E.      Modifications to the Plan.   The Plan contains certain modifications (the "**Modifications**"), which were made after the expiration of the Voting Deadline.   The Modifications do not materially or adversely affect or change the treatment of any Holder of a Claim or Equity Interest that previously voted to "accept" the Plan.   All affected parties in interest had due and adequate notice and opportunity to participate in the plan confirmation process and the Confirmation Hearing. Pursuant to section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, the Modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that the Holders of Claims be afforded an opportunity to change previously

Americas 92906653 (2K)

cast acceptances or rejections of the Plan. The Plan as modified by the Modifications shall constitute the Plan submitted for confirmation by the Bankruptcy Court.

F. <u>Resolution of the Objections</u>. The consensual resolutions of all the Objections[8] and the Reservation of Rights satisfy all applicable requirements of the Bankruptcy Code and the Bankruptcy Rules and are in the best interest of the Debtors and their Estates and supported by the Record, and therefore are approved. The Objections and the Reservation of Rights were consensually resolved as provided in (a) the Plan, (b) the Confirmation Brief, and/or (c) in paragraphs 44, 60-63 of this Confirmation Order.

G. <u>Solicitation and Notice</u>. To obtain the requisite acceptance of the Plan, on March 20, 2017, the Debtors commenced the solicitation of acceptances and rejections of the Plan by distributing the Disclosure Statement and related materials to Holders of Claims against the Debtors classified in Class 2 – Prepetition Lender Secured Claims, Class 3 –Mechanic's Lien Claims, Class 4 – Other Secured Claims, Class 5 – Project Unsecured Claims, Class 6 – General Unsecured Claims, and Class 7 – Convenience Claims.

H. As evidenced by the Solicitation Affidavit, and in compliance with the requirements of the Disclosure Statement Order, the Debtors transmitted to Holders of scheduled claims as of the date of entry of the Disclosure Statement Order (the "**Record Date**") and to Holders of timely filed Claims as of the Record Date, except as provided below: (a) a CD-ROM containing the Disclosure Statement (together with the Plan and certain other exhibits attached thereto); (b) a copy of the Disclosure Statement Order; (c) with respect to all Holders of Unsecured Claims, a copy of a recommendation letter from the Committee; (d) a notice of hearing to consider confirmation of the Plan and deadline for filing objections thereto (the

---

[8] As described further below, the Debtors and the DNR have reached an agreement in principle, which resolves the DNR Objection.

Americas 92908653 (2K)

"**Confirmation Hearing Notice**"); (e) an applicable ballot, customized for each recipient; and (f) a postage prepaid return envelope (collectively, the "**Solicitation Packages**").

(i)     As evidenced by the Solicitation Affidavit, and in compliance with the requirements of the Disclosure Statement Order, the Debtors transmitted to all known Holders of Claims against and Equity Interests in the Debtors that were either classified as unimpaired or deemed to have rejected the Plan either a Notice of Non-Voting Status – Unimpaired Classes or Notice of Non-Voting Status – Deemed to Reject, as applicable. Specifically, a Notice of Non-Voting Status – Unimpaired Classes was sent to each Holder of a claim in Class 1 – Priority Claims, and a Notice of Non-Voting Status – Deemed to Reject was sent to each Holder of a claim in Class 8 – Equity Interests.

(ii)     As evidenced by the Solicitation Affidavit, the Debtors transmitted to parties in interest who were not entitled to vote on the Plan a Confirmation Hearing Notice.

(iii)     In compliance with the requirements of the Disclosure Statement Order, the Debtors caused the Confirmation Hearing Notice to be published electronically at www.deb.uscourts.gov and http://dm.epiq11.com/ESM immediately following the Disclosure Statement Hearing. On March 21, 2017, the Debtors also caused the Confirmation Hearing Notice to be published in the *Hibbing Daily Tribune*.

(iv)     On May 24, 2017, the Debtors caused the *Second Amended Chapter 11 Plan of Reorganization of Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc.*, dated May 17, 2017 [D.I. 956] and *Second Amended Chapter 11 Plan of Reorganization of Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc., [Blackline]*, dated May 17, 2017 [D.I. 957] to be served [D.I. 966].

(v)     On June 8, 2017, the Debtors caused the *Third Amended Chapter 11 Plan*

*of Reorganization of Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and*

*ESML Holdings Inc.*, dated June 8, 2017 [D.I. 990] and *Third Amended Chapter 11 Plan of*

*Reorganization of Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML*

*Holdings Inc., [Blackline]*, dated June 8, 2017 [D.I. 991] to be served [D.I. 999].

(vi) The Debtors caused the additional and amended Plan Documents filed on
June 12, 2017 [D.I. 1005] to be served that day [D.I. 1018].

(vii) The Debtors have complied with the Disclosure Statement Order, the
Bankruptcy Code, the Bankruptcy Rules, and all other applicable laws and rules in connection
with the solicitation of votes on the Plan and the provision of notice of the Confirmation
Hearing, the April 17, 2017 deadline for filing and serving objections to confirmation, the April
19, 2017 deadline for voting on the Plan, and all other relevant deadlines related to the Plan. As
such, the notice provided was due and proper with respect to all matters relating to the
solicitation of votes on, and the confirmation of, the Plan and satisfied the requirements of due
process with respect to all creditors, equity holders and parties in interest who were provided
actual or constructive notice.

I. <u>Voting</u>. As evidenced by the Voting Certification, each class of Claims and
Equity Interests either (a) voted to accept the Plan under section 1126 of the Bankruptcy Code
and for purposes of section 1129(a)(8)(A) of the Bankruptcy Code; (b) is deemed to have voted
to accept the Plan pursuant to paragraph 24(m) of the Disclosure Statement Order; (c) is not
impaired as provided in section 1124 and 1129(a)(8)(B) of the Bankruptcy Code; or (d) is
deemed, under section 1126(g) of the Bankruptcy Code, to have voted to reject the Plan. Class
2, Class 3, Class 4, Class 5, Class 6, and Class 7 have all accepted the Plan and Class 1 is
deemed to have accepted the Plan. Although section 1129(a)(8) of the Bankruptcy Code has not

13

been satisfied with respect to Class 8, the Plan is confirmable because the Plan satisfies section

1129(b) with respect to this class of Claims.

J.    Compromises and Settlements Under and in Connection With the Plan. All of the

settlements and compromises pursuant to and in connection with the Plan, including the

resolution of the DNR Objection, described below, comply with the requirements of section

1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.

K.    Releases, Exculpations, and Injunctions.    The releases, exculpations, and

injunctions provided in the Plan and this Confirmation Order (a) are within the jurisdiction of the

Bankruptcy Court under 28 U.S.C. § 1334; (b) are integral elements of the transactions

incorporated into the Plan and inextricably bound with the other provisions of the Plan; (c)

confer material benefit on, and are in the best interests of, the Debtors, their Estates, and their

creditors; (d) are fair, equitable, and reasonable; (e) are given and made after due notice and

opportunity for hearing; and (f) are consistent with sections 105, 524, 1123, 1129, 1141, and

other applicable provisions of the Bankruptcy Code and other applicable law.

L.    Securities under the Plan. Pursuant to the Plan, and without further corporate or

other action, the following debt and equity will be issued by the Reorganized Debtor: (a) the

New Membership Interests and (b) the Prepetition Lender Notes and the Prepetition Lien Trade

Creditor Notes, if any.

M.    Exit Financing.    The Debtors have demonstrated that they have a reasonable

probability of obtaining exit financing in the approximate amount of $675 million. The Exit

Facility will likely be secured by a first priority lien in and upon substantially all of the assets of

the Reorganized Debtor (and/or a lien on assets of ERPI, on the terms agreed to by the Plan

Sponsor), subject only to certain customary permitted liens. The Exit Facility will be used, *inter*

Americas 92908663 (2K)

*alia*, to fund the Plan and complete the Project. The Debtors are authorized to execute, deliver, and perform their obligations under the Exit Facility Documents in accordance with the Plan and to satisfy the requirements of Sections 7.1(c) and 11.2 of the Plan.

N. <u>Notes</u>. Each of the Plan Notes Documents to which the Reorganized Debtor is a party constitutes a valid and binding obligation, enforceable against the Reorganized Debtor in accordance with such Plan Notes Document's terms. The execution, delivery, and performance by the Reorganized Debtor of the Plan Notes Documents are not in contravention of any applicable law or agreements. All liens and security interests created pursuant to the Plan Notes Documents shall be valid, binding, enforceable, and effective.

O. <u>Executory Contracts and Unexpired Leases</u>. The Debtors have satisfied the requirements of Section 365 of the Bankruptcy Code necessary to assume the Mineral and Surface Leases, as well as the other executory contracts specified in Schedule 2 to the Disclosure Statement (which schedule is attached to this Confirmation Order as **Exhibit B**), which assumption shall be effective on, and conditioned on the occurrence of, the Effective Date. The Debtors have provided adequate assurance of future performance for each of the assumed executory contracts and unexpired leases that are being assumed by the Reorganized Debtor pursuant to the Plan. The Debtors have also cured or provided adequate assurance that the Reorganized Debtor will cure any defaults (if any) under or relating to each of the executory contracts and unexpired leases that are being assumed by the Reorganized Debtor pursuant to the Plan.

(i) The Debtors have exercised reasonable business judgment in determining to reject any executory contracts and unexpired leases (which exclude the Mineral and Surface Leases, the assumed executory contracts and unexpired leases on Exhibit B hereto, and

15

executory contracts and unexpired leases assumed pursuant to Article XII of the Plan), under the terms of the Plan and this Confirmation Order. Each such rejection of an executory contract or unexpired lease pursuant to Article XII of the Plan will be legal, valid, and binding upon the Debtors and all non-Debtors parties to such executory contract or unexpired lease, as applicable, on the Effective Date, all to the same extent as if such rejection had been effectuated pursuant to an appropriate order of the Bankruptcy Court entered before the Confirmation Date under section 365 of the Bankruptcy Code. Each of the executory contracts and unexpired leases to be rejected is deemed to be an executory contract or an unexpired lease, as applicable.

(ii)     The Plan constitutes a motion to reject all executory contracts and unexpired leases of the Debtors not previously or otherwise assumed, except (1) any executory contracts and unexpired leases excepted from rejection herein; (2) any executory contracts and unexpired leases that are the subject of separate motions to reject or assume filed pursuant to section 365 of the Bankruptcy Code by the Debtors before the entry of this Confirmation Order; (3) all executory contracts and unexpired leases assumed by order of the Bankruptcy Court entered before the Effective Date and not subsequently rejected pursuant to an order of the Bankruptcy Court; (4) all executory contracts and unexpired leases listed on Exhibit B hereto; (5) a guaranty or similar agreement executed by a third party which solely guarantees repayment or performance of an obligation owed to the Debtors or solely indemnifies the Debtors; (6) all executory contracts and unexpired leases with third parties regarding preservation of the confidentiality of documents produced by the Debtors; and (7) to the extent it is executory, other than master development agreements, an agreement embodied in development orders, city and/or county ordinances, zoning approvals, permits, and/or other related documents or any other official action of a governmental unit, quasi-governmental unit, and/or utility granting certain

16

development rights, property interests and/or entitlements to the Debtors, is rejected on the Effective Date. The rejection of any executory contract or unexpired lease rejected postconfirmation shall constitute a prepetition breach under sections 365(g) and 502(g) of the Bankruptcy Code as if such rejection was effected preconfirmation. Each executory contract or unexpired lease to be rejected pursuant to the Plan is burdensome and the rejection thereof is in the best interests of the Estates.

P.      <u>Standing</u>. The Debtors have satisfied section 1121 of the Bankruptcy Code in that the Debtors have standing to file a plan. Furthermore, the Plan reflects the date it was filed with the Bankruptcy Court and identifies the entities submitting it as plan proponents, thereby satisfying Bankruptcy Rule 3016(a).

Q.      <u>The Plan Complies with the Bankruptcy Code (11 U.S.C. § 1129(a)(1))</u>. As set forth below and as demonstrated by the Record, the Plan complies with all relevant sections of the Bankruptcy Code, Bankruptcy Rules, and applicable non-bankruptcy law relating to the confirmation of the Plan. In particular, the Plan complies with all of the requirements of section 1129 of the Bankruptcy Code.

R.      <u>Proper Classification (11 U.S.C. §§ 1122 and 1123(a)(1))</u>. The Plan complies fully with the requirements of sections 1122 and 1123 of the Bankruptcy Code. The Plan's classifications conform to the statute and separately classify claims based on valid business and legal reasons. The Debtors' classification has a rational basis because it is based on the respective legal rights of each Holder of a Claim against or Equity Interest in the Debtors' Estates and was not proposed to create a consenting impaired class and, thereby, manipulate class voting. Article II of the Plan designates classes of Claims and Equity Interests that require classification.

Americas 92908653 (2K)

S.     Specified Unimpaired Classes (11 U.S.C. § 1123(a)(2)).  The Plan complies fully with the requirements of section 1123(a)(2) of the Bankruptcy Code.  Article III of the Plan specifies which classes of Claims and Equity Interests are not impaired under the Plan.

T.     Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)).  The Plan complies fully with the requirements of section 1123(a)(3) of the Bankruptcy Code.  Article IV of the Plan specifies the treatment of classes and interests under the Plan, including those which are impaired.

U.     No Discrimination (11 U.S.C. § 1123(a)(4)).  The Plan complies fully with the requirements of section 1123(a)(4) of the Bankruptcy Code.  As reflected in the treatment set forth in Article IV of the Plan, the treatment of each of the Claims and Equity Interests in each particular class is the same as the treatment of each of the other Claims or Equity Interests in such class; *provided, however*, to the extent any claimant received any better treatment than that described by the Plan for its class on the basis of the standards for compromise and settlement, the Bankruptcy Court hereby finds that such better treatment does not need to be made available to other members of the class.

V.     Implementation of Plan (11 U.S.C. § 1123(a)(5)).  The Plan complies fully with the requirements of section 1123(a)(5) of the Bankruptcy Code.  The Plan provides adequate means for implementation of the Plan through, among other things, issuance of certain equity securities and notes, entry into the Exit Facility, assumption of the Mineral and Surface Leases, integration of the Reorganized Debtor and ERPI, and the implementation of the Litigation Trusts.

W.     Prohibition of Issuance of Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6)).  The Plan complies fully with the requirements of section 1123(a)(6) of the Bankruptcy Code.

Americas 92908653 (2K)

The Debtors are not issuing any nonvoting securities, and, therefore, satisfy section 1123(a)(6).

X.      **Designation of Directors and Officers (11 U.S.C. § 1123(a)(7))**.   Section 7.11 of the Plan provides for the selection of the initial governors of the Reorganized Debtor.   Under Section 7.12 of the Plan, unless Chippewa determines otherwise, ESML's current officers shall continue in such positions after the Effective Date for the Reorganized Debtor until replaced or removed in accordance with the New Governing Documents or company policy, or until any of such individual's voluntary resignation.   Section 8.4 of the Plan (a) identifies Bradley E. Scher as the initial SC Litigation Trustee, (b) provides for the selection of (i) the UC Litigation Trustee by the UC Litigation Trustee Selection Committee and (ii) the members of the UC Litigation Trust Advisory Board and SC Litigation Trust Advisory Board.   Therefore, section 1123(a)(7) of the Bankruptcy Code is satisfied.

Y.      **Additional Plan Provisions (11 U.S.C. § 1123(b))**.   The Plan's provisions are appropriate and consistent with the provisions of the Bankruptcy Code.

Z.      **Debtors' Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(2))**.   The Plan complies fully with the requirements of section 1129(a)(2) of the Bankruptcy Code as do the provisions of this Confirmation Order.   Pursuant to section 1129(a)(2) of the Bankruptcy Code, the Debtors have complied with the applicable provisions of title 11, including, specifically, sections 1125 and 1126 of the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order governing notice, disclosure, and solicitation in connection with the Plan, the Disclosure Statement, the Plan Documents, and all other matters considered by the Bankruptcy Court in connection with the Chapter 11 Cases.

AA.     **Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3))**.   The Plan complies fully with the requirements of section 1129(a)(3) of the Bankruptcy Code.   Having examined the

Americas 92908653 (2K)

totality of the circumstances surrounding the Plan, the Bankruptcy Court has determined that the Plan was proposed in good faith and not by any means forbidden by law. The Plan achieves the rehabilitative and reorganizational goals of the Bankruptcy Code by restructuring the Debtors' obligations and providing the means through which the Project can be completed and become operational. It is clear that the Plan promotes the objectives and purposes of the Bankruptcy Code.

BB.     Payment for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)). The Plan complies fully with the requirements of section 1129(a)(4) of the Bankruptcy Code. Section 5.2 of the Plan clearly provides that each Professional Person who holds or asserts a Fee Claim will be required to file with the Bankruptcy Court, and serve upon all parties required to receive notice, a Fee Application within forty-five (45) days after the Effective Date. Failure to file and serve such notice timely and properly results in the Fee Claim not being entitled to any distribution under the Plan. A Fee Claim in respect of which a Fee Application has been properly filed and served pursuant to Section 5.2(c) of the Plan will become an Allowed Administrative Claim only to the extent allowed by an order of this Bankruptcy Court. Pursuant to Section 14.15 of the Plan, no award or reimbursement of attorneys' fees or related expenses or disbursements will be allowed on, or in connection with, any Claims, except as expressly set forth in the Plan or as ordered by the Bankruptcy Court. This Bankruptcy Court previously approved interim application procedures under section 331 of the Bankruptcy Code, pursuant to which the Bankruptcy Court authorized and approved the payment of certain fees and expenses of Professional Persons retained in the Chapter 11 Cases on an interim basis. All such fees and expenses, as well as all other accrued fees and expenses of Professional Persons through the Effective Date, remain subject to final review by the Bankruptcy Court and objection for

reasonableness or any other reason under applicable provisions of the Bankruptcy Code, and all rights and defenses with respect thereto are reserved. The foregoing procedures for this Bankruptcy Court's review and ultimate determination of fees and expenses paid satisfy the objectives of section 1129(a)(4) of the Bankruptcy Code.

CC.    Directors, Officers and Insiders (11 U.S.C. § 1129(a)(5)). The Plan complies fully with the requirements of section 1129(a)(5) of the Bankruptcy Code. The identity and affiliations of the persons that will serve as initial governors or officers of the Reorganized Debtor as of the Effective Date of the Plan have been fully disclosed in the Plan Documents. The appointment to, or continuance in, such offices of such persons is consistent with the interests of Holders of Claims against and Equity Interests in the Debtors and with public policy. The replacement or removal of the initial governors and officers of the Reorganized Debtor shall be subject to the terms of the New Governing Documents. The identity of any insider that will be employed or retained by the Reorganized Debtor and the nature of such insider's compensation have also been fully disclosed, to the extent applicable and presently determinable.

DD.    No Rate Changes (11 U.S.C. § 1129(a)(6)). The Plan complies fully with the requirements of section 1129(a)(6) of the Bankruptcy Code. Pursuant to Section 14.20, the Plan does not provide for the change of any rate that is within the jurisdiction of any governmental regulatory commission after the occurrence of the Effective Date. Therefore, the provisions of section 1129(a)(6) of the Bankruptcy Code are inapplicable and thus satisfied.

EE.    Best Interests of Creditors (11 U.S.C. § 1129(a)(7)). The Plan complies fully with the requirements of section 1129(a)(7) of the Bankruptcy Code. As set forth fully in the Liquidation Analysis and by the evidence adduced in the Confirmation Hearing, the "best interests" test is satisfied as to all impaired classes of Claims and Equity Interests. Furthermore,

Americas 92008653 (2K)

a liquidation under chapter 7 as set forth in the Liquidation Analysis would adversely affect the ultimate proceeds available for distribution to all Holders of Allowed Claims in the Chapter 11 Cases. Moreover, the increased costs associated with a liquidation under chapter 7 would substantially reduce the proceeds available for distribution. These costs would include, among other things, increased administrative fees and costs payable to a trustee in bankruptcy and professional advisors to such trustee, each of which would be unfamiliar with the Chapter 11 Cases. In the context of the increased costs and delay associated with the administration of a chapter 7 case, confirmation of the Plan provides each rejecting creditor and interest holder with a recovery that is not less than such holder would receive in a chapter 7 liquidation of the Debtors. Based upon the foregoing, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code. Therefore, the "best interests" test is satisfied with respect to each of these classes.

FF. <u>Acceptance by Impaired Classes (11 U.S.C. § 1129(a)(8))</u>. Class 8 –Equity Interests is deemed to have rejected the Plan pursuant to section 1126(g). Accordingly, section 1129(a)(8) has not and cannot be satisfied. The Plan, however, is still confirmable because it satisfies the nonconsensual confirmation provisions of section 1129(b), as set forth below.

GG. <u>Treatment of Administrative, Priority and Tax Claims (11 U.S.C. § 1129(a)(9))</u>. The treatment of Allowed Administrative Claims pursuant to Section 5.2 of the Plan satisfies the requirements of 1129(a)(9)(A), (B) and (C) of the Bankruptcy Code. The treatment of Allowed Tax Claims pursuant to Section 5.3 of the Plan satisfies the requirements of 1129(a)(9)(D) of the Bankruptcy Code.

HH. <u>Acceptance by Impaired Classes (11 U.S.C. § 1129(a)(10))</u>. The Plan complies fully with the requirements of section 1129(a)(10) of the Bankruptcy Code. Specifically, as set

Americas 97908653 (2K)

forth in the Voting Certification, Class 2, Class 3, Class 4, Class 5, Class 6, and Class 7 have voted to accept the Plan.

II.     Feasibility (11 U.S.C. § 1129(a)(11)).     The Plan complies fully with the requirements of section 1129(a)(11) of the Bankruptcy Code.   Based on the Record before the Bankruptcy Court, the Bankruptcy Court concludes that the Debtors will have sufficient means to meet all of their obligations under the Plan.   The Record establishes that the Reorganized Debtor will emerge from bankruptcy as a viable, financially healthy entity, unlikely to be in need of further financial reorganization, and likely to be able to incrementally complete the Project.

JJ.     Payment of Fees (11 U.S.C. § 1129(a)(12)).     The Plan complies fully with the requirements of section 1129(a)(12) of the Bankruptcy Code.   Section 14.1 of the Plan provides for the payment of all statutory fees (a) by the Debtors on or before the Effective Date and (b) by the Reorganized Debtor as the Disbursing Agent post-Effective Date.   The Plan accordingly satisfies section 1129(a)(12) of the Bankruptcy Code.

KK.     Miscellaneous Provisions (11 U.S.C. §§ 1129(a)(13)-(16)).   Sections 1129(a)(13)-(16) are inapplicable as the Debtors (a) do not provide retiree benefits[9] (1129(a)(13)), (b) have no domestic support obligations (1129(a)(14)), (c) are not individuals (1129(a)(15)), and (d) are for-profit businesses (1129(a)(16)).

LL.     Nonconsensual Confirmation (Cramdown) of Non-Accepting Classes (11 U.S.C. § 1129(b)).   The Plan does not discriminate unfairly and is fair and equitable to each class of Claims or Equity Interests that has not accepted the Plan, specifically including Class 8 – Equity

---

[9] As defined in section 1114 of the Bankruptcy Code, "retiree benefits" means "payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under [the Bankruptcy Code]." 11 U.S.C. § 1114(a).

Interests.  Further, within their respective classes, there exists no unfair discrimination of any of the Holders of Claims or Equity Interests.  Finally, the Plan does not violate the "absolute priority" rule contained in section 1129(b)(2).

MM.   Confirmation of Only One Plan (11 U.S.C. § 1129(c)).  The Plan (including previous versions thereof) is the only plan that has been filed in these Chapter 11 Cases which has been found to satisfy the requirements of subsections (a) and (b) of section 1129 of the Bankruptcy Code.  Accordingly, the requirements of section 1129(c) of the Bankruptcy Code have been satisfied.

NN.   Principal Purpose of Plan (11 U.S.C. § 1129(d)).  The Plan complies fully with the requirements of section 1129(d) of the Bankruptcy Code.  The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933 and no governmental unit has objected to the confirmation of the Plan on any such grounds.

OO.   Satisfaction of Confirmation Requirements.   The Plan satisfies all of the requirements for confirmation set forth in section 1129 of the Bankruptcy Code and should be confirmed.

PP.   Good Faith Solicitation (11 U.S.C. § 1125(e)).  Based on the record in the Chapter 11 Cases, the Debtors and each of their respective current or former officers, governors, members, employees, agents, attorneys, advisors, accountants, restructuring consultants, financial advisors and investment bankers have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all of their respective activities relating to the solicitation of acceptances to the Plan.

24

QQ.  <u>Plan Documents</u>.  The Plan Documents, as they may be amended as contemplated and permitted by the Plan, have been negotiated in good faith and are, in the judgment of the parties, necessary and appropriate to effectuate the Plan and the Bankruptcy Court so finds.

RR.  <u>Plan Consolidation</u>.  The consolidation of the Debtors for purposes of voting on the Plan, confirmation of the Plan, and making Plan Distributions is appropriate.  Furthermore, no Holder of a Claim or Equity Interest has objected or opposed such consolidation.

## ORDER

### Confirmation of the Plan

1.  Pursuant to section 1127 of the Bankruptcy Code, the Modifications are approved, and pursuant to section 1129 of the Bankruptcy Code, the Plan is hereby CONFIRMED.  Each of the Objections and reservation of rights to the Plan not otherwise withdrawn, resolved, or otherwise disposed of (including by the resolutions set forth in paragraphs 44, 60-63 of this Confirmation Order), are OVERRULED and denied.  All withdrawn Objections and reservation of rights are deemed withdrawn with prejudice.

2.  Notice of the Confirmation Hearing complied with (a) the terms of the Disclosure Statement Order, (b) the Bankruptcy Code, and (c) the Bankruptcy Rules; and was appropriate and satisfactory based on the circumstances of the Chapter 11 Cases.

3.  The following are hereby incorporated by reference into and are an integral part of this Confirmation Order: (a) the Plan, (b) the exhibits to the Plan, and (c) the Plan Documents (as may be amended or modified).  The failure to reference any particular Plan Document, any provision of a Plan Document, or the Plan in this Confirmation Order will have no effect on the Bankruptcy Court's approval and authorization of, or the validity, binding effect, or enforceability of, the Plan and the Plan Documents in their entirety, it being the intention of the

Americas 92906653 (2K)

Bankruptcy Court that all of their terms and provisions are approved, as if they are incorporated in this Confirmation Order.

### Compromises and Settlements Under the Plan

4.      The settlements and compromises set forth in the Plan and this Confirmation Order are approved in all respects.

### Classification and Treatment

5.      All Claims and Equity Interests shall be, and hereby are, classified and treated as set forth in the Plan. The Plan's classification scheme shall be, and hereby is, approved.

6.      The treatment of all Claims and Equity Interests as provided in the Plan and the Plan Documents shall be, and hereby is, approved.

### Administrative Claims

7.      The Holder of an Administrative Claim other than (a) a Fee Claim, (b) a Claim for Statutory Fees, (c) a DIP Claim, (d) an Administrative Claim, or (e) a Claim under the Chippewa Cash Collateral Order that has been Allowed on or before the Effective Date, must file and serve on the Debtors, the Committee (if before the Effective Date), and the Office of the United States Trustee, notice of such Administrative Claim within forty-five (45) days after service of the Notice of the Effective Date.   The Notice of Effective Date shall include notice of the Administrative Bar Date.  Any and all Administrative Claims filed must include at a minimum (a) the name of the Holder of the Claim; (b) the amount of the Claim; and (c) the basis of the Claim.   **Failure to timely and properly file and serve a request for payment of an Administrative Claim shall result in such Administrative Claim not being entitled to any distribution under the Plan.**

8.      An Administrative Claim with respect to which notice has been properly filed and served pursuant to Section 5.2(a) of the Plan shall become an Allowed Administrative Claim if

26

no objection is filed on or before the later of (a) the date that is ninety (90) days after the

Effective Date; and (b) such date as may be (i) agreed to by the Holder of such Administrative

Claim, or (ii) approved by the Bankruptcy Court on motion of a party in interest, without notice

or a hearing.  If an objection is filed by the applicable objection deadline (or any extension

thereof), the Administrative Claim shall become an Allowed Administrative Claim only to the

extent allowed by Final Order.

9.     Each Professional Person who holds or asserts a Fee Claim shall be required to

file with the Bankruptcy Court, and serve on all parties required to receive notice, a Fee

Application within forty-five (45) days after the Effective Date.  **The failure to file and serve**

**such Fee Application timely and properly shall result in the Fee Claim not being entitled to**

**any distribution under the Plan.**  A Fee Claim in respect of which a Fee Application has been

properly filed and served pursuant to Section 5.2(b) of the Plan shall become an Allowed

Administrative Claim only to the extent allowed by order of the Bankruptcy Court.

### Enforceability of Plan and Plan Documents

10.     Pursuant to sections 1123(a), 1141(a) and 1142 of the Bankruptcy Code and the

provisions of this Confirmation Order, the Plan and all Plan-related documents (including, but

not limited to, the Plan Documents, as may be amended or modified) shall be, and hereby are,

valid, binding and enforceable notwithstanding any otherwise applicable nonbankruptcy law.

Each of the Plan Documents (to the extent not already approved by order of this Bankruptcy

Court) is hereby approved, as amended hereafter from time to time.  The Debtors may modify,

amend, or enter into the Plan Documents, without further order of the Bankruptcy Court, in

accordance with the provisions of the Plan.  All Plan Documents shall be in the form and

substance acceptable to the Plan Sponsor.

27

## Authorization to Implement the Plan

11.     Upon the entry of this Confirmation Order, the Debtors and the Litigation Trustees, as applicable, are authorized to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan and to execute, enter into or otherwise make effective all documents arising in connection therewith, including, without limitation, the Plan Documents (as they may be amended or modified as permitted by the Plan), prior to, on and after the Effective Date.  All such actions taken or caused to be taken shall be, and hereby are, authorized and approved by the Bankruptcy Court such that no further approval, act or action need to be taken under any applicable law, order, rule or regulation.

12.     The governors of the Debtors are authorized and directed to do all things and to execute and deliver all agreements, documents, instruments, notices and certificates as are contemplated by the Plan and to take all necessary actions required in connection therewith, in the name of and on behalf of the Debtors.

13.     The approvals and authorizations specifically set forth in this Confirmation Order are not intended to limit the authority of the Debtors or any officer or governor thereof or the Litigation Trustees to take any and all actions necessary or appropriate to implement, effectuate, and consummate any and all documents or transactions contemplated by the Plan or this Confirmation Order.

14.     In furtherance of Section 7.1(d) of the Plan, the Debtors are authorized to enter into agreements with the Plan Sponsor (or ERPI), prior to the Effective Date, without further order of the Bankruptcy Court, to, among other things, save or share certain costs and capture synergies among businesses, *provided, however,* any such agreements shall be funded by Chippewa (or ERPI) and shall (i) not add to the cost of administering the Estates, or (ii) require

Americas 92906653 (2K)

reimbursement to the Estates of any expenditure by the Estates that is primarily for the benefit of the Plan Sponsor or ERPI.

## Cancellation of Instruments and Securities

15.    Upon the occurrence of the Effective Date, all Equity Interests in the Debtors and any other note, bond, indenture or other instrument, or document evidencing or creating any indebtedness or obligation of the Debtors, including, but not limited to, the Prepetition Credit Facilities, shall be deemed cancelled on the Effective Date.

## Transfers by Debtors; Revesting of Assets

16.    All transfers of property of the Estates, including without limitation, the distribution to Holders of Allowed Claims and Equity Interests to be made under Sections 4.1, 5.2, 5.3 of the Plan, (a) are or will be legal, valid, and effective transfers of property; (b) vest or will vest in the transferees with good title to such property free and clear of all Claims, interests, Liens, charges, or other encumbrances of any and every kind or nature whatsoever; (c) do not and will not constitute avoidable transfers under the Bankruptcy Code or under applicable law; (d) do not and will not subject the Reorganized Debtor to any liability by reason of such transfer under the Bankruptcy Code or under applicable nonbankruptcy law, including, without limitation, any laws affecting successor, transferee, or stamp and recording tax liability; and (e) are for good consideration and value.  Pursuant to 11 U.S.C. § 1411(b) and (c), all property of the Debtors shall revest in the Reorganized Debtor or its successor or assign, free and clear of all Claims, interests, Liens, charges, and other encumbrances of any and every kind or nature whatsoever, except as expressly provided in the Plan.  Such revesting does not constitute an avoidable transfer under the Bankruptcy Code or applicable nonbankruptcy law.

Americas 92908653 (2K)

17.    On and after the occurrence of the Effective Date, except as expressly provided in the Plan, the Reorganized Debtor may operate its business and may use, acquire, and dispose of its Assets free of any restrictions of the Bankruptcy Code.

18.    Notwithstanding the foregoing, all Transferred Causes of Action and the Litigation Trust Assets shall be transferred to the UC Litigation Trust and SC Litigation Trust as provided in the Plan on the Effective Date without the need for any further action or court order.

19.    The obligations of the Reorganized Debtor in connection with the Prepetition Lender Notes shall be secured by a junior lien in and upon substantially all of the assets of the Reorganized Debtor and ERPI, subject only to the liens granted pursuant to the Exit Facility Documents, the Prepetition Lien Trade Creditor Notes, and certain customary permitted liens and exceptions. The Prepetition Lender Notes Documents (as may be amended or modified) shall be in form and substance reasonably acceptable to the Term Loan Lenders, Project Finance Lenders and Supplier Credit Lenders, and their acceptance thereof, or any comments thereto, shall not be unreasonably withheld, conditioned, or delayed. The Bankruptcy Court shall adjudicate whether the Prepetition Lenders' acceptance of the Prepetition Lender Notes Documents, or any comments thereto, is being unreasonably withheld, conditioned, or delayed in the event of a dispute with respect thereto.

20.    The obligations of the Reorganized Debtor in connection with the Prepetition Lien Trade Creditor Notes shall be secured by assets to be determined at or after the Confirmation Hearing.

## Plan Distributions

21.    The Disbursing Agent shall make all Plan Distributions, except that payments made to Litigation Trust Beneficiaries from the Litigation Trusts shall be made by the Litigation Trustees in accordance with the Litigation Trust Agreements, and such distributions shall be in

Americas 92908653 (2K)

accordance with the Plan and Plan Documents. For federal income tax purposes, *except* to the extent a Plan Distribution is made in connection with reinstatement of an obligation pursuant to section 1124 of the Bankruptcy Code, a Plan Distribution will be allocated first to the principal amount of a Claim and then, to the extent the Plan Distribution exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest. Except as otherwise provided herein, Plan Distributions shall be made to the Holders of Allowed Claims as reflected in the registry of claims maintained by the Claims Agent on the Effective Date.

22.     The Disbursing Agent and the Litigation Trustees shall only recognize a transfer of a Claim after the Effective Date that complies with Bankruptcy Rule 3001(e).

23.     Interest accrued after the Petition Date will accrue and be paid on Claims only to the extent specifically provided for in the Plan, this Confirmation Order, or as otherwise required by this Bankruptcy Court or by applicable law. No award or reimbursement of attorneys' fees or related expenses or disbursements shall be allowed on, or in connection with, any Claim, except as expressly set forth in the Plan or as ordered by this Bankruptcy Court.

24.     Each Plan Distribution shall be made on the relevant Plan Distribution Date therefor and shall be deemed to have been timely made if made on such date or within twenty (20) days thereafter.

25.     Proof of Claim Number 116, as amended, filed by Wilmington Trust, National Association as Security Agent under the ICA shall be treated as an Other Secured Claim and shall receive treatment pursuant to Section 4.1(f)(i) of the Plan.

26.     Allowed Other Secured Claims that arise from enforceable warehouseman's liens shall receive treatment pursuant to Section 4.1(f)(i) of the Plan.

Americas 92908653 (2K)

27. Proof of Claim Number 93, filed by Machinewell, Inc., is an Allowed Mechanic's Lien Claim in the amount of $496,568.09, which shall receive treatment pursuant to Section 4.1(e)(i)(A) of the Plan.

28. Claudius Peters (Americas) Inc.'s Amended Proof of Claim Number 129 (which amended and superseded Proof of Claim Number 11) shall be deemed Allowed in the agreed amount of $185,000.00, in full satisfaction of its Amended Proof of Claim Number 129. Such claim shall be paid in full in cash on the Effective Date of the Plan. Furthermore, Claudius Peters (Americas) Inc. shall retain its lien, which shall remain effective and enforceable until such time as the Allowed Claim is paid in full in Cash on the Effective Date.

29. For the avoidance of doubt, notwithstanding anything in this Confirmation Order or the Plan, under no circumstance will the Reorganized Debtor or the Disbursing Agent have to issue, surrender, or pay any Plan Distributions that are different in type or in excess of the Plan Distributions provided for in Section 4.1 of the Plan.

### Administration of the Litigation Trusts

30. The Litigation Trust Agreements, substantially in the forms filed as Plan Documents (as may be amended or modified), are hereby approved. Any material amendments or modifications to the SC Litigation Trust Agreement (as may be amended or modified) shall be in form and substance acceptable to each of the Term Loan Lenders, Project Finance Lenders and Supplier Credit Lenders.

31. The Litigation Trustees shall be compensated in the manner set forth in and consistent with their respective Litigation Trustee Agreements. The Litigation Trustees shall have all powers, rights, duties and protections afforded the Litigation Trustees under the Plan and their respective Litigation Trust Agreements.

32

32. On and after the Effective Date, in furtherance of and consistent with the purpose of their respective Litigation Trusts and the Plan, and in each case subject to all terms and conditions of the Litigation Trust Agreements, the Litigation Trustees shall be authorized to (a) invest the respective Litigation Trust Assets, withdraw funds from their respective Litigation Trusts, make distributions, incur obligations for reasonable and necessary expenses of liquidating and converting their respective Litigation Trust Assets to Cash, and pay taxes and other obligations owed by such Litigation Trust from funds held by such Litigation Trustee in accordance with the Plan; (b) engage professionals and service providers to assist such Litigation Trustee with respect to its responsibilities; (c) evaluate and determine strategy with respect to the Transferred Causes of Action and the objections to Trust Claims, and to prosecute, compromise, transfer, release, abandon, and/or settle the Transferred Causes of Action and the objections to Trust Claims on behalf of their respective Litigation Trusts; (d) liquidate any remaining Litigation Trust Assets of their respective Litigations Trusts, and provide for the distributions therefrom in accordance with the provisions of the Plan; (e) interpret the provisions of the Plan relating to their respective Litigation Trusts in such Litigation Trustee's reasonable discretion; (f) obtain insurance, as necessary; (g) obtain financing, as necessary; (h) establish reserves to fund ongoing litigation; (i) purchase assignments of Claims; (j) enter into joint prosecution agreements providing for allocation of expenses and proceeds; (k) maintain an office; (l) investigate, prosecute, compromise, and/or settle any Causes of Action related to or against Cliffs Natural Resources Inc. with respect to the SC Litigation Trust or any other party against which the Debtors have a claim or Cause of Action; (m) otherwise administer their respective Litigation Trust; and (n) exercise such other powers and authority as may be vested in or

Americas 92008653 t2K1

assumed by such Litigation Trustee by any Final Order, or as may be necessary and proper to carry out the provisions of the Plan relating to their respective Litigation Trust.

33.     The Litigation Trustees shall be responsible for all decisions and duties with respect to their respective Litigation Trust and its assets.  In all circumstances, the Litigation Trustees shall act in the best interests of all beneficiaries and in furtherance of the purpose of their respective Litigation Trust.

## Vesting of Assets in the Litigation Trusts

34.     On the Effective Date, the Litigation Trusts will be created pursuant to their respective Litigation Trust Agreements.  In accordance with section 1141 of the Bankruptcy Code, all of the Litigation Trust Assets, as well as the rights and powers of the Estates applicable to the Litigation Trust Assets, shall automatically vest in their respective Litigation Trusts, free and clear of all Claims and interests, for the benefit of their respective Litigation Trust Beneficiaries.

## Executory Contracts and Unexpired Leases

35.     Except as otherwise provided for in the Plan, on the Effective Date, each executory contract and unexpired lease that is not or was not (a) a Mineral and Surface Lease; (b) the subject of a separate motion to reject or assume filed pursuant to section 365 of the Bankruptcy Code by the Debtors before the entry of this Confirmation Order; (c) assumed by order of the Bankruptcy Court entered before the Effective Date and not subsequently rejected pursuant to an order of the Bankruptcy Court; (d) listed on Exhibit B hereto and any subsequently filed "Schedule of Assumed Executory Contracts and Unexpired Leases" to be filed by the Debtors with the Bankruptcy Court before the Effective Date; (e) a guaranty or similar agreement executed by a third party which guarantees repayment or performance of an obligation owed to the Debtors or to indemnify the Debtors; (f) with third parties regarding

34

preservation of the confidentiality of documents produced by the Debtors; or (g) to the extent it is executory, other than master development agreements, an agreement embodied in development orders, city and/or county ordinances, zoning approvals, permits and/or other related documents or any other official action of a governmental unit, quasi-governmental unit, and/or utility granting certain development rights, property interests and/or entitlements to the Debtors, is rejected as of the Effective Date. The rejection of any executory contract or unexpired lease rejected postconfirmation shall constitute a prepetition breach under sections 365(g) and 502(g) of the Bankruptcy Code as if such rejection was effected preconfirmation; *provided, however,* that the rejection of any executory contract or unexpired lease previously breached by the non-Debtor party to the contract or lease will not create a counterclaim or defense of any kind, including a right of setoff, against the Debtors, nor shall it impair the Reorganized Debtor's right to pursue a damage claim against the non-Debtor counterparty on account of such breach.

36. All master development agreements with any governmental unit or quasi-governmental unit are rejected effective as of the Effective Date.

37. Notice of the Confirmation Order to contract counterparties of executory contracts or unexpired leases rejected hereby constitutes adequate and sufficient notice that (a) any Claims arising thereunder or related thereto shall be treated as Unsecured Claims under the Plan, and (b) the Debtors are no longer bound by, or otherwise obligated to perform, any such obligations, transactions or undertakings relating thereto or arising thereunder.

38. Claims created by the rejection of executory contracts and unexpired leases or the expiration or termination of any executory contract or unexpired lease must be filed with the Bankruptcy Court and served on the Debtors (a) in the case of an executory contract or unexpired

Americas 92908653 (2K)

lease rejected by the Debtors prior to the Confirmation Date, in accordance with the Bar Date Notice; (b) in the case of an executory contract or unexpired lease that was rejected by the Debtors prior to the Effective Date or that was terminated or expired by its terms prior to the Effective Date, no later than thirty (30) days after the Effective Date (the "**Rejection Claim Bar Date**"); or (c) in the case of an executory contract or unexpired lease that is rejected pursuant to Section 12.1 of the Plan, no later than the Rejection Claim Bar Date. Any such Claims for which a proof of claim is not filed and served by the deadlines set forth in the Bar Date Notice or the Rejection Claim Bar Date, as applicable, will be forever barred from assertion and shall not be enforceable against the Debtors or the Estates. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as Unsecured Claims under the Plan subject to objection by a Litigation Trustee. The Notice of Effective Date shall include notice of the Rejection Claim Bar Date.

39.    Subject to paragraph 44 herein, all of the executory contracts and unexpired leases included in Exhibit B hereto or any subsequently filed "Schedule of Assumed Executory Contracts and Unexpired Leases" or as otherwise designated as being assumed in the Plan, other than the GPIOP Mineral Lease, are hereby assumed, which assumption shall be effective on, and conditioned on the occurrence of, the Effective Date. The Debtors have provided adequate assurance of future performance for each of the assumed executory contracts and unexpired leases that are being assumed by the Reorganized Debtor pursuant to the Plan. The Debtors have also cured or provided adequate assurance that the Reorganized Debtor will cure defaults (if any) under or relating to each of the executory contracts and unexpired leases that are being assumed by the Reorganized Debtor pursuant to the Plan.

40.    Assumption of each executory contract and unexpired lease that is designated to
be assumed as set forth in the Plan and for which no timely objection was filed as required by
Section 12.1(d) is approved pursuant to sections 365 of the Bankruptcy Code, and any objections
to such assumption are hereby deemed waived in all respects.

41.    At the election of the Debtors, any monetary defaults under each executory
contract and unexpired lease to be assumed under the Plan shall be satisfied pursuant to section
365(b)(1) of the Bankruptcy Code: (a) by payment of the default amount in Cash on the Effective
Date or as soon thereafter as practicable; or (b) on such other terms as agreed to by the parties to
such executory contract or unexpired lease.

42.    Exhibit B and any subsequently filed "Schedule of Assumed Executory Contracts
and Unexpired Leases" set forth the Debtors' cure obligations for each agreement for which a
cure obligation must be satisfied as a condition to the assumption of such agreement.  The cure
obligation set forth on Exhibit B and any subsequently filed "Schedule of Assumed Executory
Contracts and Unexpired Leases" shall be binding on the non-Debtor counterparty, and the non-
Debtor counterparty shall be deemed to have waived any and all objections to the assumption of
the relevant agreement or cure amount as proposed by the Debtors.

43.    Subject to paragraph 44 herein, prior to the Effective Date, the Bankruptcy Court
or the Debtors and the lessors of the Mineral and Surface Leases will determine the amount of
any cure payments under the Mineral and Surface Leases.  Within five (5) days after this
Confirmation Order becomes a Final Order, the Plan Sponsor shall post (a) a $1 million letter of
credit, escrow, or similar financial guarantee such as a surety bond to secure the payment of any
cure amounts due and owing under the Mineral and Surface Leases, other than the DNR Leases
(the "**Non-DNR Guarantee**").  Any requirement in the Plan to post or provide a letter of credit,

Americas 92908653 12K1

escrow, or similar financial guarantee such as a surety bond for the benefit of the DNR is void as superseded in its entirety by the DNR Settlement Agreement (as defined below). All deposits, letters of credit, escrows, or similar financial guarantees such as surety bonds that are issued, placed or caused to be issued or placed by Chippewa shall be released, cancelled and returned to Chippewa in the event the Effective Date does not occur.

44.    The DNR Settlement.

(i)    Subject to Definitive Documentation (as defined below) and the approval of the Executive Council of the State of Minnesota, the Debtors, Chippewa, and the DNR have reached an agreement in principle resolving the DNR Objection (the "**DNR Settlement Agreement**") upon the terms reflected under the term sheet attached hereto as **Exhibit A** and other documentation. The DNR Settlement Agreement is hereby approved by the Court.

(ii)    Upon execution of definitive documentation of the DNR Settlement Agreement and all other necessary and appropriate documentation (including a master amendment to the DNR Leases and the Itasca County royalty agreement) (the "**Definitive Documentation**"), the Debtors shall file a proposed implementation order attaching the Definitive Documentation by certification of counsel; *provided, however*, that if by June 21, 2017 (or such later date the Debtors, Chippewa, and the DNR agree to), the Executive Council of the State of Minnesota has not approved the Definitive Documentation or the Debtors, Chippewa, and the DNR are unable to agree on the Definitive Documentation, the Bankruptcy Court shall schedule a hearing on less than one week's notice to adjudicate any disputes related to the assumption of the DNR Leases (including the issues raised in the DNR Objection) (the "**DNR Hearing**"), and the DNR consents to an extension of time to assume or reject the DNR Leases under section 365(d)(4) of the Bankruptcy Code until the later of (a) entry of the

Americas 92008653 (2K)

implementation order attaching the Definitive Documentation, or (b) final order of the Bankruptcy Court resolving any disputes related to the assumption or rejection of the DNR Leases.

(iii)     The letter of credit posted by Chippewa pursuant to the DNR Settlement Agreement shall remain undrawn, and shall be cancelled and the $4 million released to Chippewa, prior to any DNR Hearing; *provided*, *however*, that this subparagraph shall be null and void in the event the implementation order attaching the Definitive Documentation is entered prior to the DNR Hearing.

45.     If the Effective Date does not occur within six (6) months after the Confirmation Date, (a) the lessors may draw and/or apply the entire Non-DNR Guarantee, as applicable, as liquidated damages and (b) absent prior written consent to other treatment by a lessor regarding the Mineral and Surface Leases, other than the DNR Leases, to which they are a party, such Mineral and Surface Leases shall be deemed rejected and the Debtors will immediately surrender such leases.

46.     Pursuant to the Plan, the Algoma Offtake Agreement is rejected. Nothing in paragraph 35 herein or in subsection 12.1 of the Plan shall preclude or otherwise impair a claim asserted by Algoma in connection with the rejection of the Algoma Offtake Agreement or any other asserted breach of the Algoma Offtake Agreement by the Debtors, and Algoma shall retain any and all claims, counterclaims, and defenses (including setoff rights) in respect thereof, and the Debtors, creditors, and other parties in interest (including the SC Litigation Trust and the UC Litigation Trust) shall retain the right to assert any and all Causes of Action, claims, counterclaims and defenses in response thereto.

Americas 92908853 (2K)

## Releases and Exculpations

47.    The exculpations set forth in Section 14.5 of the Plan are incorporated herein by reference and shall be, and hereby are, approved, and shall be effective without further action upon the occurrence of the Effective Date.  None of the Debtors, the Reorganized Debtor, the Committee, or any of their respective officers, governors, employees, Professional Persons, or successors and assigns will have or incur any liability to any Person for any act or omission in connection with, arising out of, or relating to the Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation of the Plan, or the implementation or administration of the Plan or the property to be distributed under the Plan, except for willful misconduct, gross negligence, or fraud as finally determined by the Bankruptcy Court, and, in all respects shall be entitled to rely upon the advice of counsel and all information provided by other exculpated persons herein without any duty to investigate the veracity or accuracy of such information with respect to their duties and responsibilities under the Plan.  The exculpation in Section 14.5 of the Plan shall only be applicable to any prepetition officers, directors, governors, or employees of the Debtors or the Reorganized Debtor who are employed by the Debtors as of the Confirmation Date.

48.    The releases set forth in Section 7.6 of the Plan are incorporated herein by reference and shall be, and hereby are, approved, and shall be effective without further action upon the occurrence of the Effective Date.  **For the avoidance of doubt, nothing in the Plan or the Confirmation Order, including sections 14.6, 14.7, and 14.22 of the Plan, shall operate as a release of, or impair in any way, any claim or judgment by any party against any of the Debtors' affiliates and/or related non-debtor entities, including, without limitation, Essar Global Fund Limited or any of its affiliates, including claims or judgments predicated upon guarantees of claims against the Debtors.  Furthermore, the discharge and release of the Debtors in the Plan and the Confirmation Order shall not impair any party**

40

**from enforcing any and all guarantees of the Debtors' obligations by any non-debtor affiliates.**

49.    All liens on non-Debtor assets held by Holders of Mechanic's Lien Claims are hereby released.

## Dissolution of Holdings

50.    Holdings shall dissolve on the Effective Date or as soon as practicable thereafter, without further court order. The Reorganized Debtor shall be authorized to take all necessary actions that may be necessary or appropriate to dissolve Holdings as required by applicable nonbankruptcy law.

## Retention of Jurisdiction

51.    Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall retain and shall have exclusive jurisdiction over any matter: (a) arising under the Bankruptcy Code; (b) arising in or related to the Chapter 11 Cases or the Plan; or (c) that relates to any of the matters set forth in Article XIII of the Plan.

## Effect of Confirmation

52.    The rights afforded in the Plan and the treatment of all Claims and Equity Interests therein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any accrued postpetition interest, against the Debtors and the Debtors in Possession, or any of their Estates, Assets, properties, or interests in property.    Except as otherwise provided in the Plan or this Confirmation Order, on the Effective Date, all Claims against and Equity Interests in the Debtors and the Debtors in Possession, or any of their Estates, Assets, properties, or interests in property shall be satisfied, discharged, and released in full. Neither the Debtors nor their Estates nor the Reorganized Debtor shall be responsible for any pre-Effective Date obligations of the Debtors or

41

the Debtors in Possession.  Except as otherwise provided in the Plan or this Confirmation Order, all Persons shall be precluded and forever barred from asserting against the Debtors or the Reorganized Debtor, their respective successors or assigns, or their Estates, Assets, properties, or interests in property any event, occurrence, condition, thing, or other or further Claims or Causes of Action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefor were known or existed prior to the Effective Date.

53.     Except as otherwise provided in the Plan or this Confirmation Order, on the Effective Date, without further notice or order, all Claims of any nature whatsoever shall be automatically discharged forever.  Except as otherwise provided in the Plan or this Confirmation Order, on the Effective Date, the Assets, the Debtors, their Estates, and all successors thereto shall be deemed fully discharged and released from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), and 502(i) of the Bankruptcy Code, whether or not (a) a proof of claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code; (b) a Claim based upon such debt is allowed under section 502 of the Bankruptcy Code; or (c) the Holder of a Claim based upon such debt has accepted the Plan.  This Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtors, their Estates, and all successors thereto.  As provided in section 524 of the Bankruptcy Code, such discharge shall void any judgment against the Assets, the Debtors, their Estates, or any successor thereto at any time obtained to the extent it relates to a discharged Claim, and operates as an injunction against the prosecution of any action against the Assets, the Debtors, their Estates, or property of the Debtors to the extent it relates to a discharged Claim.

Americas 92908653 (2K)

54.    Except as otherwise provided in the Plan, upon the occurrence of the Effective Date, the Debtors shall be discharged from all Claims and Causes of Action to the fullest extent permitted by section 1141 of the Bankruptcy Code, and all Holders of Claims and Equity Interests shall be precluded from asserting against the Debtors, the Reorganized Debtor, the Assets, or any property dealt with under the Plan, any further Claim or other Cause of Action based upon any act or omission, transaction, event, thing, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date.

55.    Pursuant to section 1146 of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, lien, pledge or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.   This Bankruptcy Court may enter any order necessary or appropriate to implement this paragraph or Section 14.13 of the Plan.

### Injunctions

56.    **On the Effective Date and *except* as otherwise provided herein, all Persons who have been, are, or may be Holders of Claims against or Equity Interests in the Debtors shall be permanently enjoined from taking any of the following actions against or affecting (i) the Debtors, the Estates, the Litigation Trustees, the Reorganized Debtor, the Plan Sponsor, ERPI, the Investors, the Committee, or any of their successors and assigns, or their respective assets and property with respect to such Claims or Equity Interests (except for actions brought to enforce any rights or obligations under the Plan); or (ii) in respect of any of the Causes of Action released pursuant to the Plan:**

43

(i)        commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (*including* all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice);

(ii)       enforcing, levying, attaching, collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order;

(iii)      creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any lien or encumbrance; and

(iv)      asserting any setoff or right of subrogation of any kind; *provided*, that any defenses, offsets or counterclaims which the Debtors and the Litigation Trustees may have or assert in respect of the above referenced Claims are fully preserved in accordance with Section 14.18 of the Plan.

57.     Notwithstanding anything to the contrary contained in the Plan, no Insider or other Person that is a current or former employee of the Debtors shall be released from any obligation that may be due and owing thereby to the IRS as a result of the IRS's Claims against the Debtors; *provided, however,* so long as the Debtors are in substantial compliance with the payment of Allowed Tax Claims held by the IRS as set forth in Section 5.3 of the Plan, the IRS shall be enjoined from pursuing any such Insider or Person for payment of its Claims against the Debtors.

58.     For the avoidance of doubt, the releases, exculpations, and injunctions in Sections 14.5 and 14.22 of the Plan include all Claims, Causes of Action, rights of subrogation, contribution or indemnification, interests, obligations, other rights, suits,

Americas 92908653 (2K)

damages, defenses, remedies, and liabilities whatsoever that any Holder could assert in respect of Claims, Causes of Action, rights of subrogation, contribution or indemnification, interests, obligations, other rights, suits, damages, defenses, remedies, and liabilities asserted or that could be asserted against a Holder prior to the Effective Date.

59.    **Notwithstanding anything to the contrary herein or in the Plan, for the avoidance of doubt, the Debtors' affiliates are excluded from all releases, exculpations, and injunctions in the Plan and this Confirmation Order, including, but not limited to, as provided in Sections 14.5 and 14.22 of the Plan.**

### Resolution of Objections

60.    Notwithstanding anything in the Plan or this Confirmation Order to the contrary, pursuant to the Certification of Counsel filed on April 24, 2017 [D.I. 917] and the related order entered by this Bankruptcy Court [D.I. 924], the deadline to assume the GPIOP Mineral Lease was extended to June 30, 2017. For the avoidance of doubt, the Plan shall not operate as a motion to assume the GPIOP Mineral Lease and the GPIOP Mineral Lease shall not be rejected under any provision of the Plan or this Confirmation Order. On April 25, 2017, GPIOP withdrew its objection [D.I. 927].

61.    Iowa Trenchless shall be included on Schedule 4 to the Disclosure Statement, and shall receive treatment pursuant to Section 4.1(e)(1)(A) of the Plan.

62.    The forms of Post-Emergence Trade Agreements agreed to between (a) the Debtors and River Consulting and (b) the Debtors and Iowa Trenchless are hereby approved. The objections of River Consulting and Iowa Trenchless have been resolved thereby.

63.    The resolution to the DNR Objection is provided in paragraph 44 above.

Americas 92906653 (2K)

64.    Nothing in the Plan or this Confirmation Order shall or shall be deemed to preclude *Great Lakes Gas Transmission Limited Partnership* from asserting that is has a valid right of setoff under section 553 of the Bankruptcy Code and/or recoupment with respect to the amount awarded by the Honorable Susan Richard Nelson in connection with the Order, dated May 26, 2017, in Case No. 09-cv-3037 pending in the United States District Court for the District of Minnesota, but only to the extent of the Allowed amount subject to setoff as provided in section 506(a) of the Bankruptcy Code; provided, further, that (i) any party in interest in the Chapter 11 Cases (including the SC Litigation Trustee and the UC Litigation Trustee) may oppose any asserted setoff and/or recoupment claim; and (ii) any setoff and/or recoupment claim asserted by *Great Lakes Gas Transmission Limited Partnership* shall be heard and decided by the Bankruptcy Court.

65.    The foregoing language resolves the limited objection filed by Great Lakes Gas Transmission Limited Partnership on June 12, 2017 [D.I. 1019].

## **Miscellaneous Provisions**

66.    New Membership Interests will be issued without registration under the Securities Act of 1933 or any similar laws, rules or regulations pursuant to section 1145 of the Bankruptcy Code and are exempt from such laws, rules, or regulations to the maximum extent permitted by law.

67.    The provisions of the Plan and this Confirmation Order, including the findings of fact and conclusions of law set forth herein, are each nonseverable and mutually dependent.

68.    The treatment of Claims and Equity Interests set forth in the Plan is in full and complete satisfaction of the legal, contractual, and equitable rights that each Person holding a Claim or an Equity Interest may have against or in the Debtors, the Estates, or the Assets.  This

46

treatment supersedes and replaces any agreements or rights those Persons may have in or against

the Debtors, the Estates, or the Assets.

69.    In accordance with section 1142 of the Bankruptcy Code, the Debtors and the

Reorganized Debtor shall be, and hereby are, authorized and empowered to issue, execute,

deliver, file, and record any document whether or not such document is specifically referred to in

the Plan, the Plan Documents, or any exhibit thereto, and to take any action necessary or

appropriate to consummate this Confirmation Order, the Plan and all transactions and

agreements therein (including recordings to release liens, claims, encumbrances, or interests) in

accordance with its terms without further notice to or action, order, or approval of the

Bankruptcy Court or any other Person.

70.    The Reorganized Debtor, its successors or assigns, and their respective properties

(including the Assets) shall not, as a result of confirmation or consummation of the Plan or

related transactions, (a) be or be deemed to be a successor to the Debtors or the Estates, (b) have

or be deemed to have, de facto or otherwise, merged, or consolidated with or into the Debtors or

the Estates; or (c) be or be deemed to be a continuation or substantial continuation of the

Debtors, the Estates, or any enterprise of the Debtors.

71.    The Debtors are authorized to consummate the Plan at any time after the entry of

this Confirmation Order, subject to the satisfaction or waiver of the conditions precedent to the

Effective Date.    On the Effective Date, the Plan shall be deemed to be substantially

consummated under sections 1101 and 1127 of the Bankruptcy Code.    If any or all of the

provisions of this Confirmation Order are hereafter reversed, modified, or vacated by subsequent

order of this Bankruptcy Court or any other court, such reversal, modification, or vacatur shall

not affect the validity of the acts or obligations incurred or undertaken pursuant to, or in

connection with the Plan prior to the Debtors' receipt of written notice of such order. Notwithstanding any such reversal, modification, or vacatur of this Confirmation Order, any such act or obligation incurred or undertaken pursuant to, and in reliance on, the Confirmation Order prior to the effective date of such reversal, modification, or vacatur shall be governed in all respects by the provisions of the Confirmation Order and the Plan and all related documents or any amendments or modifications thereto.

72.    The stay in effect in the Chapter 11 Cases pursuant to section 362(a) of the Bankruptcy Code shall continue to be in effect until the Effective Date, and at that time shall be dissolved and of no further force or effect, subject to the injunctions set forth in this Confirmation Order, Section 14.22 of the Plan and/or sections 524 and 1141 of the Bankruptcy Code; *provided, however*, that nothing herein shall bar the taking of such actions by the Debtors and the Committee as are necessary to effectuate the transactions contemplated by the Plan or by this Confirmation Order prior to the Effective Date.

73.    During the period from the Confirmation Date through and until the Effective Date, the Debtors shall continue to operate their businesses as debtors-in-possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules and all orders of the Bankruptcy Court that are then in full force and effect.

74.    Except with respect to the treatment of any Claim, nothing in the Plan or this Confirmation Order shall be construed to modify, discharge, alter, amend or impair the terms of, or rights under or reserved in, any stipulation or agreement (including any reservations of rights contained therein) between the Debtors and any party in interest that has been approved by a Final Order (each a "**Settlement Agreement**"). Nothing in the Plan or this Confirmation Order creates jurisdiction in the Bankruptcy Court that the Bankruptcy Court otherwise would not have

Americas 92908653 (2K)

over any such rights under or reserved in any Settlement Agreement.

75. Upon the Effective Date, the Committee shall dissolve automatically, whereupon its members, professionals, and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to (a) applications for Fee Claims or reimbursement of expenses incurred as a member of the Committee and (b) any motions or other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order or pending appeals of orders entered in the Chapter 11 Cases.

76. In accordance with Section 14.14 of the Plan, the Debtors will serve and publish notice of the entry of this Confirmation Order within 15 days of the occurrence of the Effective Date in the *Hibbing Daily Tribune*.

77. To the extent that any provisions of this Confirmation Order may be inconsistent with the terms of the Plan or any Plan Documents, the terms of this Confirmation Order shall be controlling, binding, and conclusive.

78. Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 6006(d) and 7062, to the extent applicable, the Bankruptcy Court finds that there is no reason for delay in the implementation of this Confirmation Order and, thus, this Confirmation Order shall be effective and enforceable immediately upon entry. The period in which an appeal of this Confirmation Order must be filed shall commence upon the entry hereof.

Dated: Wilmington, Delaware
June 13, 2017

UNITED STATES BANKRUPTCY JUDGE

49

**EXHIBIT A**

# DNR Non-Binding Mesabi Lease Amendment Term Sheet

*Unless specifically noted in this term sheet all other terms remain the same as the existing
state mineral leases.*

| Topic | Terms |
|---|---|
| **Parties** | Minnesota Department of Natural Resources ("DNR")<br><br>Mesabi Metallics ("Mesabi" or "Lessee") / Chippewa Capital Partners, LLC ("Chippewa") / Vencer Capital Partners, LLC ("Vencer") |
| **Type of Agreement** | Master Amendment to Mineral Lease Agreements |
| **Lease Assets/Mining Units** | State mineral and surface leases currently held by Mesabi as outlined in Exhibit A<br><br>For the purposes of this agreement "Nashwauk" means the facilities subject to Mesabi's permit to mine at Nashwauk, Minnesota. |
| **Vencer** | • Vencer will be a signatory to lease amendment and acknowledge and agree to fulfill its obligations thereunder<br>• Vencer will guaranty all lease obligations to pay rents and royalties after December 31, 2021<br>• If different than Vencer, DNR may require any entity that owns or operates a value added iron or steel facility at Nashwauk to join the lease as a signatory and guarantor to the same extent as Vencer |
| **Letter of Credit/DNR Assumption Objection** | • Lessee will amend Mesabi's bankruptcy plan to incorporate and approve the settlement.<br>• A $4 million letter of credit will be posted in favor of the DNR by June 15 to provide security for defaults.<br>• DNR may draw and apply the full $4 million as liquidated damages on existing lease defaults unless all of the following events occur: (1) Mesabi's plan of reorganization (with certain required provisions as set forth below) is confirmed by June 30, 2017; (2) Mesabi obtains by August 31, 2017 binding, enforceable equity and debt commitments totaling at least (a) $850 million or (b) $625 million along with demonstrated availability of equipment financing of all equipment necessary to Lessee's plans of operation; (3) 100% of the total debt commitment shall consist of commitments by lenders unaffiliated with the post-petition equity holders. No more than $50 million of these amounts can be for financing of the construction or completion of facilities not located at Nashwauk.<br>• In the event the DNR draws on the $4 million letter of credit, the draw shall constitute full satisfaction of the lease defaults.<br>• In the event Mesabi's plan of reorganization becomes Effective (with respect to assumption of the leases as set forth below), the $4 million letter of credit will be cancelled per the settlement agreement.<br>• Mesabi's plan of reorganization shall be modified to provide the DNR |

1

| | |
|---|---|
| | with a general unsecured claim in the amount of $4 million in the event the plan becomes Effective and there has been no draw on the letter of credit.<br>• Assumption of the leases is additionally conditioned upon satisfaction of ERP Iron Ore, LLC's ("ERPI") obligation to pay royalties to DNR of $621,792.38 by July 1, 2017, October 1, 2017, and January 1, 2018, pursuant to its assumption of the Magnetation assets. |
| **Plan Requirements** | • Lessee must secure confirmation of a Mesabi plan of reorganization by June 30, 2017, that includes the following:<br>  o A requirement that the assumption of the DNR's leases shall not become Effective unless, by August 31, 2017, Lessee secure binding, enforceable equity and debt commitments for the Nashwauk project and ERPI totaling at least: (1) $850 million, or (2) $625 million and demonstrate availability of equipment financing of all equipment necessary to Lessee's plans of operation;<br>  o Assumption of the amended leases may be approved in the plan and confirmation order, but assumption shall be Effective and enforceable only on the Effective Date of the plan, after binding and enforceable equity and financing commitments have been received;<br>  o A release of all mechanics liens filed by any entity on any state land or mineral interests, or if not released, they shall be bonded off within 30 days of the plan effective date. Lessee will indemnify, defend, and hold the DNR harmless with respect to any mechanics lien claims that are bonded off;<br>  o A release of all claims against the State, known or unknown, Lessee may hold against the State (the released claims shall also be explicitly excluded from the claims assigned to any litigation trust)<br>  o Should Lessee fail to meet any of these requirements, or fail to obtain the financing by August 31, 2017, the DNR's objection to assumption of its leases will be resolved by termination of the leases, which will automatically revert to State without further court proceedings or litigation |
| **Mining Requirements** | • Mine at least 1.6 million tons of taconite crude ore from State Properties in each calendar quarter beginning in the quarter after completion of the Pellet Production Plant in Nashwauk, and continuing through December 31, 2019. Commencing on January 1, 2020, 30% of all crude ore mined shall be from the State Properties, and shall continue through the term of the lease. Lessee shall pay for any difference owed in the same manner as royalties as part in parcel of the Minimum Base Payment; provided, however, the obligation of payment for any such difference shall not sunset.<br>• Lessee shall marshal their mining efforts in a commercially reasonable manner to mine all commercially viable ore, and will not preferentially mine higher quality or more accessible ore while leaving lower quality ore in place. For purposes of this provision, all ore containing a minimum of 14% magnetic iron content that can be mined from in- |

10392704X \- 1

| | place taconite deposits with thicknesses greater than or equal to 15 feet above 5B geologic horizon or equivalent geologic unit are deemed commercially viable. This provision applies to State lease parcels where over 65% of commercially viable crude ore has been removed by Lessee. Lessee shall pay for such in-place ore that is not mined prior to lease termination or cancellation due to high grading as part in parcel of the discrepancy payment for remaining ore reserves; provided, however, the obligation of payment for such in-place ore that is not mined shall not sunset. |
|---|---|
| **No Diversion Requirement** | Mesabi's equity and debt financing agreements shall include provisions requiring at least $575 million of the debt and equity commitments be committed exclusively to construction of facilities at Nashwauk, and precluding the diversion of more than $50 million in funds from the equity and debt financing to use in the construction or completion of facilities not located at Nashwauk. |
| **Pellet Plant Requirements** | • Recommence construction of the Taconite Pellet Production Plant in Itasca County Minnesota by September 30, 2017.<br>• Complete construction of Taconite Pellet Production Plant by December 31, 2019.<br>• Ship at least 3 million tons of pellets from the completed Taconite Pellet Production Plant in a single calendar year by December 31, 2020. |
| **Value Added Iron or Steel Production Requirements** | • Vencer to commence construction of a value added iron or other steel production facility capable of producing 2 million metric tons per annum (mmtpa) value added iron or steel production facility in Minnesota by December 31, 2018<br>• Vencer to complete construction of a value added iron or other steel production facility in Minnesota by December 31, 2021<br>• Vencer to ship at least 1 mmtpa of value added iron or other steel product by December 31, 2022<br>• Vencer to ship at least 2 mmpta of value added iron or other steel product by December 31, 2023 |
| **Additional Requirements** | • There shall be no equity distributions from Lessee or ERPI if there is a default on Value Added Iron or Steel Production Requirements<br>• The debt financing agreements shall provide that Lessee assets and the facilities located at Nashwauk shall not be utilized as collateral for any financing for any person or entity other than Mesabi or ERPI, and shall not be utilized as collateral for loans for operations of entities other than Mesabi or ERPI |
| **Equity/Loan Defaults** | An uncured material default of Mesabi's obligations under any of its equity or debt agreements shall be a default under the leases. Any default resulting in the lender or equity contributor accelerating the obligation to repay a loan or equity commitment shall be deemed a material default.<br><br>A default by Lessee under the No Diversion Requirements shall be a material default under the leases. |

| | |
|---|---|
| | The failure of an equity or lending counterparty to advance funds as required under an agreement with Mesabi for a period of three consecutive months shall constitute a material default under the leases. |
| **Term** | No change from current leases |
| **Minimum Base Payment** | For the calendar year ending December 31, 2019, if the sum of rentals and royalties paid by Mesabi to the DNR under the leases does not total at least $6 million, Mesabi shall make an additional base payment to the DNR sufficient to bring the total of the rents and royalties to $6,000,000.

For the calendar year ending December 31, 2020, if the sum of rentals and royalties paid by Mesabi to the DNR under the leases does not total at least $9 million, Mesabi shall make an additional base payment to the DNR sufficient to bring the total of the rents and royalties to $9,000,000.

In each calendar year after December 31, 2020 in which the sum of rentals and royalties paid by Mesabi under the leases does not total at least $11,827,377 the Mesabi shall make an additional base payment to the DNR sufficient to bring the total of the rents and royalties to $11,827,377.

Lessee's obligation to make annual Minimum Base Payments shall terminate upon either Vencer's production of 2 mmpta value added iron or other steel at Nashwauk. |
| **Additional Termination Rights** | In addition to the DNR's general right to terminate the leases for nonpayment or material default, the DNR may, at its sole discretion, exercise the right to terminate the leases within one year of any of the following events:

- Failure to mine 1.6 million tons of ore in at least two full quarters prior to January 1, 2021
- Failure to meet Taconite Pellet Plant construction requirements as set forth in this term sheet by December 31, 2020
- Uncured material defaults by Mesabi under the equity/loan document default clauses as set forth in this term sheet
- Failure to meet the No Diversion Requirements set forth in this term sheet
- The service or filing of any mechanics liens, for work performed directly or indirectly at the direction of Mesabi, on any land or state interest that is subject to the leases.  Subject to a 30 day cure period. Cure requires either removal of the liens or the posting of an irrevocable bond or letter of credit at a financial institution of the DNR's choosing in an amount equal to 120% of the mechanic's lien

The additional termination rights afforded under this provision are subject to the notice and cure process set forth in Paragraph 24 of the Leases.

Termination may also be effected without cause by mutual written |

HD927.048 V-1

| | agreement of the parties |
|---|---|
| **Additional Lease Remedies** | Upon any of the following defaults, the rents, royalties, and minimum payment under the leases shall double until such time as the default is cured:<br><br>• Failure to fully meet the terms of the Mining Requirements section set forth in this term sheet;<br>• Failure to meet the terms of the Pellet Plant Requirements as set forth in this term sheet;<br>• Vencer's failure to meet the terms of the Value Added Iron or Steel Production Requirements as set forth in this term sheet; |
| **Reporting and Inspections** | • Provide DNR with access to review and information through a monthly meeting concerning 30-day, 60-day, 90-day and annual mine plans covering state and non-state properties covered by Mesabi's permit to mine.<br>• Provide quarterly detailed construction reports for both the Pellet Plant and the value added iron ore facility which shall include but not be limited to the status of construction, feasibility of proposals and status of financing for said construction projects<br>• Provide a post-effective date right of inspection of documents relating to equity and loan issues, including copies of lending and equity agreements and correspondence |
| **Assignment** | None of Mesabi, Chippewa, or Vencer's rights or obligations may be assigned to a third party without DNR's prior written consent |
| **Method of Weighing Ore** | Existing lease provisions |
| **Lease Rental Payments** | Existing lease provisions |
| **Royalty Payments** | • The base Taconite Royalty Rate is $0.75 per long ton subject to the escalator provision<br>• Royalty paid shall be based on an agreed crude ore allocation determination and shall be due and payable each quarter<br>• Royalty escalator<br>  o Continue to use Producer Price Index for Iron and Steel and Vale published average sale price for pellets<br>  o Eliminate the adjustment to the Vale published average sales price for pellets for a 65% iron pellet. This adjustment will be calculated into the new Vale base price.<br>  o Revise the base Vale price and base PPI Iron and Steel index to reflect the same escalated royalty rate for 2nd quarter 2017 as would have been calculated using the method found in current leases.<br>• Upon cessation of mining and removal of crude ore on the premises for 3 consecutive years, the quantity of remaining unpaid royalty ore reserves will be determined by an agreed survey method. Within 12 months of determination of the discrepancy between an agreed crude |

10-9927048 X -1

| | |
|---|---|
| | ore allocation determination and the survey method Mesabi shall pay to the state, at the escalated royalty rate as determined at the time of the survey, for all crude tonnage discrepancy determined by the survey.  All crude ore remaining on the premises remains the property of the State regardless of this payment.<br>• All royalty due required to be guaranteed by a bond or letter of credit.  This financial assurance shall be sufficient to cover at least one quarter of expected State royalties.  This financial assurance requirement will sunset after two years of production by Mesabi. |
| **Payment Schedule** | • All rent and royalty payments are due quarterly on or before the 20th of April, July, October, and January of each year. |
| **Licenses and Permits** | Lessee are responsible for obtaining all licenses and permits necessary for operating and maintaining all mining operations, pellet production and value added iron or steel production.  This includes any separate financial assurance permit requirements. |
| **Reservation of Surface Rights** | Existing Lease Provisions |

6

**EXHIBIT B**

## Schedule of Assumed Executory Contracts and Unexpired Leases

|  | Debtor Entity | Contract Counterparty | Contract Name/Description | Cure Amount |
|---|---|---|---|---|
| 1. | ESML | A-1 Rental Services, Inc. | Lease agreement (portable toilets) | $0 |
| 2. | ESML | Automatic Data Processing, Inc. & ADP, LLC | Payroll, human resources information system | $0 |
| 3. | ESML | Benefit Administration, Inc. | 401(k) plan third party administrator | $0 |
| 4. | ESML | Cologix | Data center rack space | $0 |
| 5. | ESML | Compudyne | Internet service provider | $0 |
| 6. | ESML | Go Daddy | Contract for company website (1st domain name) | $0 |
| 7. | ESML | Go Daddy | Contract for company website (2nd domain name) | $0 |
| 8. | ESML | Go Daddy | Contract for company blog | $0 |
| 9. | ESML | Go Daddy | Contract for VPN certificate | $0 |
| 10. | ESML | Go Daddy | Contract for company website web hosting | $0 |
| 11. | ESML | Hurricane Electric LLC | Internet service provider | $48.77 |
| 12. | ESML | Nexterra | Telecom services | $0 |
| 13. | ESML | Salan Company | Lease agreement (administrative office building in Hibbing, Minnesota) | $148.83 |
| 14. | ESML | Satellite Shelters, Inc. | Lease agreement (office trailers) | $0 |
| 15. | ESML | SelectAccount | Health Savings Account administration | $0 |
| 16. | ESML | Temco Properties LLC | Lease agreement (warehouse in Hibbing, Minnesota) | $0 |
| 17. | ESML | Tom Godward Farms | Project Wetlands Mitigation Site | $0 |
| 18. | ESML | VOYA Financial | 401(k) platform | $0 |

Americas 92521028

# EXHIBIT F

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| | Case No. 16-11626 (BLS) |
| ESSAR STEEL MINNESOTA LLC and ESML HOLDINGS INC.,[1] | Jointly Administered |
| Debtors. | **Re: Docket No.  1025** |

**ORDER IMPLEMENTING SETTLEMENT WITH THE
STATE OF MINNESOTA AND ITASCA COUNTY**

Upon the Certification of Counsel filed June 26, 2017 (Docket No. [   ]) for entry of an

order implementing the DNR Settlement Agreement, as contemplated in the Confirmation

Order,[2] and approving the Definitive Documentation of the resolution of the DNR Objection; and

the Court having found it has jurisdiction pursuant to the Confirmation Order and 28 U.S.C.

§§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2); and the Court having found that venue is proper pursuant to 28 U.S.C. §§ 1408 and

1409; and the Court having found that due and proper notice of the relief requested herein was

provided and no other or further notice need be provided; and the Court having reviewed the

record, filings in support thereof, exhibits admitted into evidence at the Confirmation Hearing,

and the statements of counsel at the Confirmation Hearing; and the Court having approved the

DNR Settlement Agreement in the Confirmation Order and assumption of the Leases (as defined

---

[1]  Essar Steel Minnesota LLC has changed its name to Mesabi Metallics Company LLC.  The last four digits of its federal taxpayer identification number are 8770.  The last four digits of ESML Holdings Inc.'s federal taxpayer identification number are 8071.

[2]  "Confirmation Order" means the *Findings of Fact, Conclusions of Law and Order Confirming the Third Amended Chapter 11 Plan of Reorganization for Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc. Proposed by the Debtors* entered on June 13, 2017 (Docket No. 1025).  Capitalized terms not defined herein have the meaning ascribed in the Confirmation Order.

in the Master Lease Amendment) and the Lease Agreement (as defined in the Settlement
Agreement) (collectively, the "State and County Leases") pursuant to the Third Amended Plan,
and further implements the DNR Settlement Agreement with the entry of this Order pursuant to
11 U.S.C. § 1142; and after due deliberation, it is **HEREBY ORDERED**:

1.      The Definitive Documentation of the DNR Settlement Agreement attached hereto
is approved by the Court, and includes the: (a) Master Lease Amendment Agreement Amending
Certain Leases and Permitting Assumption Pursuant To 11 U.S.C. § 365 attached as Exhibit 1
(the "Master Lease Amendment"), and (b) Settlement Agreement dated as of June 19, 2017
between Itasca County, Minnesota and Mesabi Metallics Company LLC (f/k/a Essar Steel
Minnesota LLC) attached as Exhibit 2, including the Royalty Agreement attached as an exhibit
thereto (the "Settlement Agreement").  The failure to reference any particular provision of the
Definitive Documentation will have no effect on the Court's approval and authorization of, or
the validity, binding effect, or enforceability of, the Definitive Documentation in its entirety, it
being the intention of the Court that all terms and provisions of the Definitive Documentation are
approved as if incorporated in this Order.

2.      Implementing the Term Sheet attached to the Confirmation Order as Exhibit A,
the Court Orders that the Third Amended Plan is modified as follows (as modified, the "Plan"),
and as modified by this Order shall constitute the Conforming Bankruptcy Plan (as defined in the
Master Lease Amendment):

a.      On June 26, 2017, the Plan Sponsor posted the $4 million letter of credit
acceptable to the DNR to secure damages and cure of existing defaults under the Leases.  DNR
may draw and apply the full $4 million as liquidated damages to satisfy pre-Effective Date Lease
defaults unless all of the following events occur: (a) the Debtors or Plan Sponsor obtain by

103998771

August 31, 2017 binding, enforceable commitments for the Investment and Exit Facility totaling at least (i) $850 million, or (ii) $625 million along with demonstrated availability of equipment financing of all equipment necessary to the Reorganized Debtor's plans of operation; and (b) at least $450 million of the Exit Facility commitment must be made by lenders unaffiliated with the equity holders of the Debtors, Chippewa and Vencer Capital Partners, LLC on the Effective Date. If those events do not occur and the DNR draws on the $4 million letter of credit, the draw shall constitute full satisfaction of all Lease defaults. In the event the Effective Date occurs, the letter of credit will be cancelled by DNR and the remaining balance thereof released to the Reorganized Debtor as designee of the Plan Sponsor, the residual beneficiary of the letter of credit.

      b.     Assumption of the State and County Leases was approved in the Confirmation Order; provided that such assumption shall only become enforceable and effective upon the occurrence of the Effective Date.

      c.     As conditions precedent to the Effective Date, waivable in whole or in part by the DNR:

      i.     The Debtors or the Plan Sponsor must obtain by August 31, 2017, binding, enforceable Investment and Exit Facility commitments totaling at least (a) $850 million, or (b) $625 million along with demonstrated availability of equipment financing of all equipment necessary to Mesabi's plans of construction;

      ii.     At least $450 million of the Exit Facility commitment must be made by lenders unaffiliated with the equity holders of the Debtors, Chippewa and Vencer Capital Partners, LLC on the Effective Date; and

      iii.     The Investment and Exit Facility must conform to the "No

103998771

Diversion Requirement" of the Master Lease Amendment.

       d.     The Leases will automatically revert to the State without further Bankruptcy Court proceedings or litigation in the event that the Effective Date does not occur on or prior to August 31, 2017. In such circumstance, the Leases are deemed rejected pursuant to 11 U.S.C. § 365 and DNR may take any action with respect to the Leases and the leased properties and interests and such actions will not constitute a violation of the automatic stay or other provisions of the Bankruptcy Code.

       e.     No cure amount shall be paid in connection with assumption of the Leases. The DNR shall instead have an Allowed General Unsecured Claim in the amount of $4 million in connection with any amounts owed or payable prior to the Effective Date under the Leases, which shall include satisfaction of all Lease defaults, less any amounts drawn by DNR under the $4 million letter of credit on a dollar for dollar basis.

       f.     Mechanic's Lien Claims on State of Minnesota land or mineral interests shall be released, terminated or cancelled on the Effective Date of the Plan (including pursuant to Post-Emergence Trade Agreements executed in connection therewith), and if not released, terminated or cancelled the Reorganized Debtor shall bond them off within 30 days of the Effective Date. The Reorganized Debtor shall indemnify, defend, and hold the State harmless with respect to any mechanic's lien claims that are bonded off.

       g.     Effective on the Effective Date, the Debtors release all Claims and Causes of Action against the State of Minnesota or Itasca County (as defined in the Settlement Agreement), whether known or unknown. No such Claims or Causes of Action shall be transferred to the Litigation Trusts.

       h.     Pursuant to existing agreements with the DNR, ERPI shall pay a royalty

103998771

payment to DNR of $621,792.38 on July 1, 2017.

    3.    This Court shall retain jurisdiction over any and all matters arising from or related

to this Order.

Dated: June 28, 2017
      Wilmington, Delaware

                              UNITED STATES BANKRUPTCY JUDGE

5

**EXHIBIT 1**

*Execution Copy*

## MASTER LEASE AMENDMENT AGREEMENT AMENDING CERTAIN LEASES AND PERMITTING ASSUMPTION PURSUANT TO 11 U.S.C. § 365

This master lease amendment agreement (the "Agreement") is made as of June 19, 2017 by and among the following parties (the "Parties" and each, a "Party"): (i) Chippewa Capital Partners, LLC ("Chippewa"), (ii) Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) ("Mesabi") and ESML Holdings Inc. (together, the "Debtors"), (iii) Vencer Capital Partners, LLC ("Vencer"); (iv) ERP Iron Ore, LLC ("ERPI"); and (iv) the Minnesota Department of Natural Resources ("DNR").

## RECITALS

**WHEREAS**, on July 8, 2016, the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are jointly administered under the caption *In re Essar Steel Minnesota LLC and ESML Holdings Inc.*, 16-11626 (Bankr. D. Del.) (BLS);

**WHEREAS**, prior to filing for bankruptcy, Mesabi held a number of mineral leases from the DNR as listed on Schedule 1 (collectively, as amended and further amended by this Agreement, the "Leases");

**WHEREAS**, the Debtors sought to assume the Leases through the provision of the Bankruptcy Code;

**WHEREAS**, the Debtors filed the *First Amended Chapter 11 Plan of Reorganization of Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc.* (Docket No. 823-1)[1] with SPL Advisors LLC as plan sponsor (the "First Amended Plan");

**WHEREAS**, on February 8, 2017 and April 17, 2017, the DNR objected to the First Amended Plan and the Debtors' assumption of the Leases (Docket Nos. 713, 893);

**WHEREAS**, on April 26, 2017, the Debtors held an auction pursuant to the procedures approved by the Bankruptcy Court in that certain *Order (I) Authorizing and Approving Bid Procedures to be Employed in Connection with the First Amended Chapter 11 Plan of Reorganization of Mesabi Metallics Company, LLC (F/K/A Essar Steel Minnesota LLC) and ESML Holdings, Inc., And (II) Scheduling an Auction* (Docket No. 887);

**WHEREAS**, the Debtors declared Chippewa as the successful bidder and new plan sponsor after the auction;

**WHEREAS**, on June 8, 2017, the Debtors filed the *Third Amended Chapter 11 Plan of Reorganization of Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc.* (Docket No. 990, as may be amended or supplemented from time to time, including

---

[1]   "Docket No." shall refer to filings on the docket of the Bankruptcy Cases.

103934787

*Execution Copy*

as set forth herein, the "<u>Amended Plan</u>") reflecting Chippewa as plan sponsor and successful bidder;

**WHEREAS**, by this Agreement, the Parties seek to resolve the issues regarding the Debtors' proposed assumption of the Leases and the DNR's objections to Debtors' plan of reorganization, assumption of Leases, and DNR's claims against the Debtors;

**WHEREAS**, Mesabi would be required to pay substantial sums to the DNR to cure existing defaults under the Leases, and would be in immediate default of its obligations under the Leases if assumed;

**WHEREAS**, the DNR is willing to amend the Leases contingent upon Chippewa and Mesabi's binding commitment to construct a Pellet Plant and Vencer's commitment to construct an HBI Plant at the Nashwauk Project Site as set forth in this Agreement;

**NOW, THEREFORE**, in light of the foregoing and consideration of the promises, mutual covenants, and agreements set forth herein and for other good and valuable consideration, the Parties wish to enter into this Agreement, and do hereby stipulate and agree as follows:

<u>AGREEMENT</u>

<u>General Terms</u>

1.    <u>Incorporation of Recitals; Capitalized Terms</u>.  The recitals above are accurate and incorporated by reference as if set forth herein.

2.    <u>Modification of Leases</u>.  The Agreement shall constitute a master amendment of the Leases as set forth in Schedule 1, which is attached and made a part of this Agreement.  Except as specifically provided herein, the Agreement does not modify the Lease terms, and the unamended terms of the Leases shall remain in full force and effect.  To the extent provisions of this Agreement are inconsistent with terms of the Leases, the terms of this Agreement shall control.  This Agreement shall be attached as an addendum to each of the Leases set forth in Schedule 1.

3.    <u>Additional Definitions</u>

The definitions set forth below apply to this Agreement, and are in addition to the definitions already set forth in the Leases.

a.    "<u>Bankruptcy Cases</u>" means the Debtors' consolidated bankruptcy matters captioned *In re Essar Steel Minnesota LLC and ESML Holdings Inc.*, Case No. 16-11626 (Bankr. D. Del.) (BLS).

b.    "<u>Conforming Bankruptcy Plan</u>" means the Third Amended Plan as conformed to meet the requirements of Section 4 of this Agreement, which may be by order of the Bankruptcy Court.

c.    "<u>Effective Conforming Bankruptcy Plan</u>" means a Conforming Bankruptcy Plan that

2

103934787

*Execution Copy*

becomes effective after all of the conditions set forth in Sections 4 and 8 of this Agreement are satisfied.

d.  "HBI Constructor" shall mean the entity designated by Chippewa that constructs the HBI Plant, which designee is currently Vencer. An affiliate of Mesabi or Vencer may be designated as the HBI Constructor without amendment to the Leases. Any other entity designated as the HBI Constructor must obtain approval of the DNR, which approval will not be unreasonably withheld, and must execute a guarantee as set forth below for the HBI Constructor.

e.  "HBI Plant" shall mean a plant located at the Nashwauk Project Site, or with DNR's agreement another site in Minnesota, with a capacity of producing 2 mmtpa or more of Value Added Iron or Steel Products.

f.  "Lessee" means Mesabi, or such other party that becomes the lessee under the Leases with the DNR's agreement, which must be in writing.

g.  "Nashwauk Project Site" means the lands subject to the boundaries of Mesabi's permit to mine dated August 22, 2007 (as amended by that certain Amendment dated April 16, 2012, that certain Letter dated September 24, 2015, and that certain Amendment and Assignment dated March 3, 2016 and as it may be subsequently amended).

h.  "Pellet Plant" means a taconite pellet production plant located on the Nashwauk Project Site with a capacity of producing at least 6.5 mmtpa of finished, saleable taconite pellets, and includes the concentrator at the Nashwauk Project Site to the extent it could constitute a separate plant of Lessee.

i.  "State Properties" means the lands and minerals subject to the Leases.

j.  "Value Added Iron or Steel Products" means an iron or steel product with an iron content of higher than 90%. Chippewa and Vencer presently intend to construct a facility to produce hot briquetted iron, which is hereby deemed by these Leases to be a Value Added Iron or Steel Product as long as the hot briquetted iron produced by the facility has an iron content in excess of 90%. Direct reduced iron products, pig iron products, or steel products also constitute Value Added Iron or Steel Products as long as those products have an iron content exceeding 90%.

**Agreements Settling Bankruptcy Plan and Lease Assumption**
**Objections and Establishing Conditions Precedent to Assumption of the Leases**

4.    Conforming Bankruptcy Plan/Deemed Rejection of Leases

As a condition of the Debtors' assumption of the Leases becoming effective, by June 30, 2017, the Debtors must obtain confirmation of a plan of reorganization that has the following features or requirements, which shall be contained in an order of the Bankruptcy Court revising the Amended Plan (the Amended Plan, as revised per this Section 4, shall constitute a "Conforming Bankruptcy Plan," as defined above):

3

*Execution Copy*

(a) A Conforming Bankruptcy Plan must approve this Agreement and make assumption of the Leases conditional upon the plan becoming effective by August 31, 2017.

(b) A Conforming Bankruptcy Plan must include, as conditions to its becoming effective, satisfaction of all of the following conditions;

    (i) That by August 31, 2017, Chippewa or Mesabi must obtain binding, enforceable equity and debt commitments totaling at least (a) $850 million, or (b) $625 million along with demonstrated availability of equipment financing of all equipment necessary to Mesabi's plans of construction as evidenced by written commitment(s) from the applicable equipment financier(s);

    (ii) At least $450 million of the debt commitment must be made by lenders unaffiliated with the equity holders of Debtors, Chippewa, and Vencer on the effective date of the Conforming Plan of Reorganization;

    (iii) The financing and equity commitments must conform to the "No Diversion Requirement" of this Agreement.

(c) A Conforming Bankruptcy Plan must include a release of any and all claims the Debtors hold or may hold against the State, known or unknown, and an explicit provision excluding any such claim from the claims transferred to the plan's contemplated litigation trusts.

(d) A Conforming Bankruptcy Plan must include provisions: (1) providing that if there is not a Conforming Bankruptcy Plan for Debtors that becomes effective on or before August 31, 2017, the Leases are deemed rejected pursuant to 11 U.S.C. § 365 and (2) providing that in the event of a deemed rejection of the Leases pursuant to this section of the Agreement, DNR may take any action with respect to the Leases and the leased properties and interests, including immediate termination, and such actions will not constitute a violation of the automatic stay or other provisions of the Bankruptcy Code. Any termination right exercised by DNR pursuant to this subsection shall not be subject to the cure provisions of the Leases.

(e) A Conforming Bankruptcy Plan must provide an allowed general unsecured claim in the amount of $4 million to the DNR in satisfaction of Lease defaults. If DNR draws on the letter of credit as set forth below, the unsecured claim is deemed satisfied. No cure amounts will be paid in connection with assumption of the Leases.

(f) A Conforming Bankruptcy Plan must provide that, on or before June 26, 2017, an unconditional letter of credit issued by a U.S. bank acceptable to the DNR and in a form acceptable to the DNR must be (or have been) posted in favor of DNR, to secure damages and cure of existing defaults

4

*Execution Copy*

under the Leases (the "Letter of Credit").

(g)     A Conforming Bankruptcy Plan must provide that, pursuant to existing agreements with the DNR, ERPI shall pay a royalty payment to DNR of $621,792.38 on July 1, 2017.

The express purpose of this Section of the Agreement is to make clear that in the event Debtors fail to secure an Effective Conforming Bankruptcy Plan by August 31, 2017, the Lease interests are rejected and revert to the DNR with no need for the DNR to obtain further court approval from the Bankruptcy Court or any other court, or to provide an opportunity to cure under the Leases. Mesabi's assumption of the Leases is conditioned on the effectiveness of an Effective Conforming Bankruptcy Plan by August 31, 2017.

5.     Extinguishment of Pre Effective Date Mechanic's Liens

With respect to mechanic's liens served or filed before the effective date of the Conforming Plan of Reorganization, Debtors must obtain a release of all mechanic's liens connected to work regarding the Nashwauk Project Site filed by any entity on any state land or mineral interest as part of the Conforming Bankruptcy Plan (including documents executed in connection therewith), or if not released, the liens shall be bonded over within 30 days of the plan effective date. Lessee will indemnify, defend, and hold the DNR harmless with respect to any mechanic's lien claims that are bonded over. Failure to obtain a release or bonding over the mechanics liens as set forth in the section constitutes a material default under the Leases, subject to the cure and termination provisions of the Leases.

6.     Cross-Default for ERPI Royalty Obligations

Debtors contemplate that the reorganized debtor will be integrated with the operations of ERPI. Pursuant to existing agreements with the DNR, ERPI has agreed to make three separate royalty payments of $621,792.38 each to DNR. Said royalty payments are due on July 1, 2017, October 1, 2017, and January 1, 2018.

Payment of the July 1, 2017 royalty of $621,792.38 is a condition of a Conforming Bankruptcy Plan becoming effective. Non-payment of the October 1, 2017 or January 1, 2018 royalties of $621,792.38 each shall constitute defaults under the Leases, subject to the cure and termination provisions of the Leases.

7.     Letter of Credit For Assumption of Leases.

On or before June 26, 2017, a letter of credit from Keybank National Association in the amount of $4 million (the "Letter of Credit") shall post in favor of DNR. DNR may not draw on the Letter of Credit until September 1, 2017 under any circumstance.

After September 1, 2017, DNR may draw and apply the full $4 million Letter of Credit as liquidated damages on existing Lease defaults; provided, however, if there is an Effective Conforming Bankruptcy Plan prior to September 1, 2017, DNR shall instead cancel and release the Letter of Credit.

*Execution Copy*

In the event DNR draws on the $4 million Letter of Credit, the draw shall constitute full satisfaction of any defaults under the Leases. The DNR may draw any amount on the Letter of Credit, in its sole discretion, up to the full $4 million as liquidated damages.

Cancelation of the Letter of Credit shall be effected through a letter or other document countersigned by DNR, or pursuant to a court order issued in a proceeding in which the DNR had notice and the opportunity to participate.

8.      No Diversion Requirement

Lessee's equity and debt financing agreements required as a condition to an Effective Conforming Bankruptcy Plan shall include provisions requiring at least $575 million of the debt and equity commitments be committed exclusively to construction of the Pellet Plant, and precluding the diversion of more than $50 million in funds from the equity and debt financing to use in the construction or completion of facilities not located at the Nashwauk Project Site.

### Agreements Amending the Terms of the Leases

### Modification of Royalty Rates and Escalators

9.      Security for Royalty Payments

Lessee must post a bond or a letter of credit sufficient to cover at least one calendar quarter of expected payments to the DNR under this Agreement. The bond or letter of credit shall be from an issuer acceptable to the DNR and in a form acceptable to the DNR. The bond or letter of credit shall be initially posted after the effective date of the plan at a time and in an amount agreed to between the Lessee and DNR; provided that Lessee will post a bond or letter of credit of not less than $1.5 million by no later than June 1, 2019, reflecting Lessee's obligation to make a $6 million Minimum Base Payment for the year ending December 31, 2019. This financial assurance requirement will sunset, and any such financial assurance previously provided shall be cancelled and released, after two years of production by Mesabi.

10.      Escalator Clause

The Leases are amended to add the following term:

Notwithstanding any other provision in the Leases or in this Agreement, if the calculated royalty rate after escalation for any calendar quarter is less than $.80 per long ton, the Lessee shall pay a royalty of $.80 per long ton.

11.      Minimum Base Payment

The Leases are amended to add the following term:

For the calendar year ending December 31, 2019, if the sum of rentals and royalties paid by Lessee to the DNR under the Leases does not equal or exceed $6 million, Lessee shall make an additional royalty payment to the DNR sufficient to bring the total of the rents and royalties to $6,000,000 for the calendar year ending on December 31, 2019.

103934787

For the calendar year ending December 31, 2020, if the sum of rentals and royalties paid by Lessee to the DNR under the Leases does not total equal or exceed $9 million, Lessee shall make an additional royalty payment to the DNR sufficient to bring the total of the rents and royalties to $9,000,000 for the calendar year ending on December 31, 2020.

In each calendar year after December 31, 2020, in which the sum of rentals and royalties paid by Lessee under the Leases does not equal or exceed $11,827,377, Lessee shall make an additional royalty payment to the DNR sufficient to bring the total of the rents and royalties to $11,827,377 for the calendar year at issue.

Lessee's obligation to make minimum payments under this provision (the "Minimum Base Payments") shall terminate upon the HBI Constructor's production of 2 mmpta of Value Added Iron or Steel Products from the HBI Plant.

12. HBI Constructor Guaranty

By this agreement, Vencer guarantees all Lease obligations to pay rents and royalties after December 31, 2021. Subject to the notice provisions of the Leases, DNR may enforce this guarantee on any obligation past due by more than 30 days, and is not required to first make efforts to collect the past due amounts from the Lessee.

No entity may own or operate a facility producing Value Added Iron or Steel Products at the Nashwauk Project Site unless it agrees to join this Agreement, become the HBI Constructor, and substitute for Vencer as guarantor to the same extent as Vencer. Additionally, no entity, other than those entities that are a party to this Agreement, may own or operate a facility producing Value Added Iron or Steel Products at the Nashwauk Project Site without the prior written agreement of the DNR.

**Amendments to the Leases Concerning Mining and Construction**

13. Pellet Plant Construction and Production Requirements

The Leases are amended to add the following term:

Lessee will recommence construction of the Pellet Plant on or before September 30, 2017. Lessee will complete construction of the Pellet Plant on or before December 31, 2019. Lessee will ship at least 3 million tons of pellets from the completed Pellet Plant in a single calendar year by December 31, 2020.

14. HBI Plant Construction and Production Requirements

The Leases are amended to add the following term:

15. The HBI Constructor will commence construction of the HBI Plant on or before December 31, 2018. The HBI Constructor will complete construction of the HBI Plant on or before December 31, 2021. The HBI Constructor will ship at least 1 mmtpa of Value Added Iron or Steel Products made at the HBI Plant on or before December 31, 2022. The HBI Constructor will ship at least 2 mmtpa of Value Added Iron or Steel Products made at the HBI

7

103934787

Plant on or before December 31, 2023. The HBI Constructor will ship at least 1.5 mmtpa of Value Added Iron or Steel Products made at the HBI Plant in a single calendar year by December 31, 2024.

16.    <u>No High Grading</u>

The Leases are amended to add the following term:

(a)    Lessee shall marshal its mining efforts in a commercially reasonable manner to mine all commercially viable ore, and will not preferentially mine higher quality or more accessible ore while leaving lower quality ore in place. For purposes of this provision, all ore containing a minimum of 14% magnetic iron content that can be mined from in-place taconite deposits with thicknesses greater than or equal to 15 feet above 5B geologic horizon or equivalent geologic unit are deemed commercially viable. This provision applies to Lease parcels where over 65% of commercially viable crude ore has been removed by Lessee.

(b)    Lessee shall pay for such in-place ore that constitutes proven reserves not mined prior to Lease termination or cancellation due to high grading. Payments by Lessee pursuant to this sub-section (b) shall be counted as royalties for purposes of the calculating the crude tonnage discrepancy of sub-section (c).

(c)    Upon cessation of mining and removal of crude ore on State Properties for 3 consecutive years, the quantity of remaining unpaid royalty ore that constitutes proven reserves will be determined by an agreed survey method. Within 12 months of determination of the discrepancy between an agreed crude ore allocation determination and the survey method Mesabi shall pay to the DNR, at the escalated royalty rate as determined at the time of the survey, for all crude tonnage discrepancy determined by the survey. All crude ore remaining on State Properties remains the property of the State regardless of this payment.

17.    <u>Mining Requirements</u>

The Leases are amended to add the following term:

(a) Lessee must mine at least 1.6 million tons of taconite crude ore from State Properties in each calendar quarter beginning in the first quarter that immediately follows after the actual completion date of the Pellet Plant in Nashwauk, and continuing per quarter thereafter through December 31, 2019. Commencing on January 1, 2020, 30% of all crude ore mined per quarter shall be from the State Properties, and shall continue through the term of the Leases irrespective of the sunsetting of any other provision of this Agreement.

(b) Lessee shall make payment for any shortfall under sub-section (a) as an additional royalty payment. Payments by Lessee pursuant to this sub-section (b) shall be counted as royalties for purposes of the calculating the Minimum Base Payment.

*Execution Copy*

**Amendments to Lease Default, Remedy, and Termination Provisions**

18.    <u>Preservation of Existing Lease Default Provisions</u>

Unless specifically amended by this Agreement, all existing Lease provisions concerning default, termination, and remedies remain in effect.

Any existing defaults that predate the effective date of an Effective Conforming Bankruptcy Plan are deemed cured through an effective assumption of the Leases pursuant to this Agreement.

19.    <u>Cross Defaults for Loan or Equity Agreement Defaults</u>

The Leases are amended to add the following term:

An uncured material default of Lessee's obligations under any of its equity or debt agreements shall be a material default under the Leases. Any default resulting in the lender or equity contributor accelerating the obligation to repay a loan or equity commitment shall be deemed a material default.

A default by Lessee under the No Diversion Requirement of this Agreement shall be a material default under the Leases.

The failure of an equity or lending counterparty to advance funds as required under an agreement with Lessee for a period of three consecutive months shall constitute a material default under the Leases.

20.    <u>Additional Termination Rights</u>

The "LESSOR'S RIGHT TO TERMINATE LEASE FOR FAILURE TO MEET PERFORMANCE REQUIREMENTS" provisions of the Leases, generally found at paragraph 25 of the Leases, is amended as follows:

In addition to the DNR's general right to terminate the Leases for nonpayment or material default, the DNR may, at its sole discretion, exercise the right to terminate the Leases within one year of any of the following events:

(a) Failure of Lessee to mine at least 1.6 million tons of taconite crude ore from State Properties in at least two quarters prior to January 1, 2021;

(b) Failure to meet any of the requirements in Section 13 "Pellet Plant Construction and Production Requirements" of this Agreement by the dates set forth for those requirements in that section;

(c) An uncured material default by Lessee under Section 19 "Cross Defaults for Loan or Equity Agreement Defaults" of this Agreement;

(d) Failure to meet any of the requirements in Section 8 "No Diversion Requirement"

9

*Execution Copy*

section of this Agreement;

(e) With respect to mechanic's liens served or filed after the effective date of the Conforming Plan of Reorganization, for work performed directly or indirectly at the direction of Lessee, on any land or state interest that is subject to the Leases. This sub-provision is subject to a 30 day cure period. Cure by Lessee requires either removal of the liens or the posting of an irrevocable bond or letter of credit from a financial institution acceptable to the DNR in an amount equal to 120% of the mechanic's lien.

Any defaults under this Agreement, and the additional termination rights afforded under this provision, are subject to the notice and cure process set forth in Paragraph 24 of the Leases.

21. <u>Additional Lease Remedies</u>

The Leases are amended to add the following term:

Upon any of the following events under this Agreement, the rents, royalties, and Minimum Base Payment under the Leases shall double until such time as the failure is cured (irrespective of any original or amended deadline relating to such event):

(a) Failure to meet any of the requirements in Section 17 "Mining Requirements" of this Agreement in any applicable quarter (provided that, for the avoidance of doubt, any such failure is cured pursuant to this Agreement if the "Mining Requirements" are satisfied in a subsequent quarter irrespective of any original or amended deadline);

(b) Failure to meet any of the requirements in Section 13 "Pellet Plant Construction and Production Requirements" of this Agreement;

(c) Failure of the HBI Constructor to meet any of the requirements in Section 14 "HBI Plant Construction and Production Requirements" of this Agreement.

Lessee specifically acknowledges that in the event of the failure of the HBI Constructor to meet any of the requirements of Section 14 "HBI Plant Construction and Production Requirements" of this Agreement, Lessee is itself obligated to pay the additional rents, royalties, and Minimum Base Payments. Lessee further acknowledges that the requirements to pay additional rents, royalties, and Minimum Base Payments shall continue until the HBI Constructor's obligations under Section 14 "HBI Plant Construction and Production Requirements" are satisfied (irrespective of any original or amended deadline therefor).

The parties to this Agreement acknowledge and agree that the failure of the HBI Constructor to build the HBI Plant and meet the requirements of Section 14 "HBI Plant Construction and Production Requirements" of this Agreement would deny the DNR and the State the full benefit this Agreement, and would be a material default under the Leases that, but for this section, would allow the DNR to terminate the Leases under the common law, and that by this section DNR has agreed that any such failure cannot give rise to a termination of the Leases and instead simply requires Lessee to make the additional payments provided for herein.

103934787

*Execution Copy*

Lessee and Vencer have represented to DNR that: (1) Lessee would be unable to secure financing for the Pellet Plant if this Agreement permitted DNR to terminate the Leases for failure to complete the HBI Plant; and (2) that the HBI Plant will likely need to be constructed by a special purpose entity separate from Mesabi. Based on these representations, DNR agreed to structure this Agreement to permit separate entities to construct the Pellet Plant and HBI Plant, and to forgo the right to terminate the Leases for failure to complete construction of the HBI Plant.

The parties agree that the doubling of rents, royalties, and Minimum Base Payments under these Leases for failure to meet any of the requirements of Section 14 "HBI Plant Construction and Production Requirements" of this Agreement is not a penalty, but is instead a remedy substituted for the right the DNR would otherwise have under the common law to terminate the Leases if the HBI Plant is not built. This accommodation has been made by DNR at the request of Lessee to facilitate its ability to obtain financing for construction of the Pellet Plant and HBI Plant.

The parties agree that the doubling of rents, royalties, and Minimum Base Payments under these Leases with respect to the other events that trigger this section is not a penalty, but is instead a remedy that provides an alternative to the termination rights the DNR is afforded under this Lease.

The parties acknowledge that the DNR has agreed to forgo substantial cure payments that Mesabi would otherwise be required to pay if the Leases were assumed over the DNR's objection. The parties acknowledge that the DNR has forgone these payments in return for a commitment to build an HBI Plant and obtain timely completion of the other requirements of this Agreement.

Nothing herein is intended to preclude DNR from exercising its rights to terminate the Leases pursuant to the rights provided to DNR under this Agreement and the Leases other than in respect of Section 14 "HBI Plant Construction and Production Requirements" of this Agreement. Nor does this section require DNR to forgo such termination rights in favor of the doubling of rents, royalties, and Minimum Base Payments.

The parties further acknowledge that the Leases give the Lessee a general right of termination without cause, and that Lessee can terminate its obligation to pay double rents, royalties, and Minimum Base Payments by terminating the Leases.

22. <u>No Equity Distributions</u>

The Leases are amended to add the following term:

There shall be no equity distributions from Lessee or ERPI if there is a default on any of the "HBI Plant Construction and Production Requirements" section of this Agreement until such default is cured.

The debt financing agreements required for there to be an Effective Conforming Bankruptcy Plan shall provide that Lessee's assets and the facilities located at the Nashwauk Project Site shall not be pledged as collateral for any financing for any person or entity other than Lessee or ERPI, and shall not be pledged as collateral for loans for operations of entities other than Lessee or ERPI. Nothing in this provision alters Lessee's obligations under Section 8 "No Diversion Requirement" of this Agreement to obtain financing that conforms to that Section.

11

*Execution Copy*

## Other Provisions

23. <u>Executive Council Approval</u>

This Agreement is subject to approval of the Minnesota Executive Council pursuant to Minn. Stat. § 93.1925 (2016).

24. <u>Additional Reporting and Disclosure Obligations</u>

In addition to the existing reporting requirements under the Leases, Lessee and the HBI Constructor, as applicable, must: (1) provide DNR with access and the right to review any 30-day, 60-day, 90-day and annual mine plans covering state and non-state properties covered by Mesabi's permit to mine at monthly meetings as reasonably scheduled between the Lessee, HBI Constructor, and DNR; (2) provide quarterly detailed construction reports for both the Pellet Plant and the HBI Plant which shall include but not be limited to the status of construction, feasibility of proposals and status of financing for said construction projects as well as issues pertaining to implementation of the Leases or this Agreement; and (3) after the effective date of an Effective Conforming Bankruptcy Plan, upon reasonable notice from DNR, provide a right of inspection of documents relating to equity and loan issues, including copies of lending and equity agreements and correspondence.

25. <u>Permits</u>

Lessee is responsible for obtaining all licenses and permits necessary for operating and maintaining all mining operations, pellet production and Value Added Iron or Steel Product production covered by this Agreement. This includes any separate financial assurance permit requirements.

26. <u>No Waiver</u>. The failure of any Party to enforce any of the provisions of this Agreement at any time, or to require performance by any other Party of any of the provisions of this Agreement at any time, will not constitute a defense to or waiver of any of the provisions of this Agreement, nor shall said failure in any way affect the validity, of this Agreement, or the right of any Party to enforce each and every provision of this Agreement.

27. <u>No Assignment</u>.

No rights, interests, or obligations under this Agreement or the Leases may be assigned to a third party without DNR's prior written consent.

28. <u>Severability</u>. If any provision of this Agreement is deemed invalid, illegal or incapable of being enforced by any rule of law or public policy, all other provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any provision is invalid, illegal or incapable of being enforced, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

103934787

*Execution Copy*

29.    <u>Further Assurances and Actions</u>.  Each of the parties agrees to use commercially reasonable efforts to take, or cause to be taken, all appropriate action, and to do, or cause to be done, all things necessary to fully reflect, consummate, perform and make effective the terms and provisions of this Agreement, including, without limitation, using their respective commercially reasonable efforts to (i) obtain all consents, approvals, or authorizations necessary to fully reflect, consummate, perform and make effective the terms and provisions of this Agreement, and (ii) perform and fulfill all obligations and conditions precedent within such party's control pursuant to this Agreement.

30.    <u>Notice</u>.  All notices, requests and demands shall be in writing and to or upon the parties at the addresses listed below and shall be deemed to have been given or made five business days after a record has been dispatched by registered mail, postage prepaid, or one business day after a record has been deposited with an overnight courier, charges prepaid, or on the day of delivery if delivered manually with receipt acknowledged.

| <u>Chippewa</u> | <u>DNR</u> |
|---|---|
| Thomas M. Clarke<br>Chippewa Capital Partners, LLC<br>192 Summerfield Court, Suite 201<br>Roanoke, Virginia 24019<br><br>with a copy to:<br><br>Oscar N. Pinkas, Esq.<br>Dentons US LLP<br>1221 Avenue of the Americas<br>New York, New York 10020 | Director, Lands and Minerals Division<br>Minnesota Department of Natural Resources<br>500 Lafayette Road<br>St. Paul, Minnesota 55155 |
| <u>Vencer</u> | <u>Mesabi</u> |
| Thomas M. Clarke<br>Vencer Capital Partners, LLC<br>192 Summerfield Court, Suite 201<br>Roanoke, Virginia 24019<br><br>with a copy to:<br><br>Oscar N. Pinkas, Esq.<br>Dentons US LLP<br>1221 Avenue of the Americas<br>New York, New York 10020 | Susan Fennessey, Esq.<br>General Counsel<br>555 W 27th St.<br>Hibbing, Minnesota  55764<br><br>with a copy to:<br><br>Craig H. Averch, Esq.<br>Ronald K. Gorsich, Esq.<br>555 South Flower Street, Suite 2700<br>Los Angeles, California 90071 |

103934787

| ERPI<br><br>Thomas M. Clarke<br>ERP Iron Ore, LLC<br>192 Summerfield Court, Suite 201<br>Roanoke, Virginia 24019<br><br>with a copy to:<br><br>Oscar N. Pinkas, Esq.<br>Dentons US LLP<br>1221 Avenue of the Americas<br>New York, New York 10020 | |

31.  <u>Governing Law</u>.  This Agreement shall be governed in all respects, including validity, interpretation, and effect, by the laws of the State of Minnesota, without giving effect to the principles of conflicts of law thereof.

32.  <u>Modification</u>.  This Agreement cannot be modified, altered, amended, supplemented, or vacated, or any rights or obligations under this Agreement waived, without the written agreement of the parties (except that the agreement of the Debtor that does not become the reorganized Debtor shall not be required, and such Debtor shall no longer constitute a party to this Agreement, after it is dissolved).

33.  <u>Execution in Counterparts</u>.  This Agreement may be executed and delivered (by email or otherwise) in any number of copy counterparts, each of which, when executed and delivered, shall be deemed an original and all of which together shall constitute one and the same agreement.  Signatures delivered via .pdf or email are binding.

*[signature pages follow]*

14

*Execution Copy*

IN WITNESS WHEREOF, the parties have entered into this Agreement on the day and year first above written.

| | |
|---|---|
| Chippewa Capital Partners, LLC<br><br>Name: Thomas M. Clarke<br>Title: Authorized Signatory | Mesabi Metallics Company LLC<br><br>_____<br>Name: Susan Fennessey<br>Title: Authorized Signatory |
| State of Minnesota<br><br>_____<br>Name: Thomas Landwehr<br>Title:   Commissioner<br>        Department of Natural Resources | ERP Iron Ore, LLC<br><br>Name: Thomas M. Clarke<br>Title: Authorized Signatory |
| Vencer Capital Partners, LLC<br><br>Name: Thomas M. Clarke<br>Title: Authorized Signatory | |

*Execution Copy*

IN WITNESS WHEREOF, the parties have entered into this Agreement on the day and year first above written.

| | |
|---|---|
| Chippewa Capital Partners, LLC | Mesabi Metallics Company LLC |
| | |
| Name: Thomas M. Clarke | Name: Susan Tennessey |
| Title: Authorized Signatory | Title: Authorized Signatory |
| State of Minnesota | ERP Iron Ore, LLC |
| | |
| Name: Thomas Landwehr | Name: Thomas M. Clarke |
| Title:  Commissioner | Title: Authorized Signatory |
|          Department of Natural Resources | |

Veneer Capital Partners, LLC

Name: Thomas M. Clarke
Title: Authorized Signatory

15

*Execution Copy*

IN WITNESS WHEREOF, the parties have entered into this Agreement on the day and year first above written.

| | |
|---|---|
| Chippewa Capital Partners, LLC<br><br><br>_____<br>Name: Thomas M. Clarke<br>Title: Authorized Signatory | Mesabi Metallics Company LLC<br><br><br>_____<br>Name: Susan Fennessey<br>Title: Authorized Signatory |
| State of Minnesota<br>Department of Natural Resources<br><br><br>_____<br>Name: Jess Richards<br>Title:   Director, Division of Lands and<br>          Minerals | ERP Iron Ore, LLC<br><br><br>_____<br>Name: Thomas M. Clarke<br>Title: Authorized Signatory |
| Vencer Capital Partners, LLC<br><br><br>_____<br>Name: Thomas M. Clarke<br>Title: Authorized Signatory | |

*Execution Copy*

### Schedule 1

**Leases**

The following Miscellaneous Leases with the State of Minnesota, as previously amended through the date of this Agreement:

Lease # 144-012-0725
Lease # 144-012-0726
Lease # 144-012-0727.

The Taconite Iron Ore Mining Leases with the State of Minnesota concerning the following parcels (as and to the extent amended by the First Amendment to Taconite Iron Ore Mining Leases Numbered 3109-N Through 3126-N and T-5081-N Through T-5089-N dated October 1, 2009, that certain Letter Agreement dated January 9, 2012, the Second Amendment to Taconite Iron Ore Mining Lease Numbered T-5081-N dated June 7, 2012 and that certain Letter Agreement dated March 25, 2015):

| | |
|---|---|
| A. | 3109-N |
| B. | 3110-N |
| C. | 3111-N |
| D. | 3112-N |
| E. | 3113-N |
| F. | 3114-N |
| G. | 3115-N |
| H. | 3116-N |
| I. | 3117-N |
| J. | 3118-N |
| K. | 3119-N |
| L. | 3120-N |
| M. | 3121-N |
| N. | 3122-N |
| O. | 3123-N |
| P. | 3124-N |
| Q. | 3125-N |
| R. | 3126-N |
| S. | 3155-N |
| T. | 3156-N |
| U. | T-5081-N |
| V. | T-5082-N |
| W. | T-5083-N |
| X. | T-5084-N |
| Y. | T-5085-N |
| Z. | T-5086-N |
| AA. | T-5087-N |
| BB. | T-5088-N |

16

103934787

CC.   T-5089-N
DD.   T-5101-N
EE.   T-5102-N
FF.   T-5103-N.

103934787

**EXHIBIT 2**

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (the "**Agreement**") is made effective as of the 19th day of June, 2017.

BETWEEN:

Itasca County, Minnesota and any department, agency or instrumentality of Itasca County, Minnesota, including the Itasca County Regional Railroad Authority ("**ICRRA**") (collectively, "**Itasca County**")

AND:

Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) ("**Mesabi**").

Itasca County and Mesabi shall collectively be known as the "**Parties**" and each is a "**Party**."

## ARTICLE 1

**WHEREAS**, on July 8, 2016, Mesabi and ESML Holdings, Inc. (together, the "**Debtors**") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), which cases are jointly administered under the caption *In re Essar Steel Minnesota LLC and ESML Holdings Inc.*, 16-11626 (Bankr. D. Del.) (BLS) (the "**Bankruptcy Cases**");

**WHEREAS**, the Debtors sought to assume that certain Lease Agreement for Tailings Pipeline and Underground Water Pipeline, dated August 26, 2015, by and between the State of Minnesota and Essar Steel Minnesota LLC, including lease of 41.2 acre parcel from Itasca County for construction of Tailings Pipeline Bridge & Underground Pipeline (the "**Lease Agreement**");

**WHEREAS**, the Debtors are in default with respect to section 28 of the Lease Agreement, concerning prohibitions against the filing of liens with respect to the leased property and indemnification of the State and Itasca County, and the Debtors, the State, and Itasca County are parties to that certain foreclosure proceeding filed as an adversary case captioned *A.W. Kuettel & Sons, Inc. v. Essar Steel Minnesota LLC*, No. 16-51542 (Bankr. D. Minn. 2016) (the "**Mechanic's Lien Case**");

**WHEREAS**, the Debtors filed the *First Amended Chapter 11 Plan of Reorganization of Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc.* (Docket No. 823-1)[1] with SPL Advisors LLC as plan sponsor;

**WHEREAS**, on April 17, 2017, the State objected to confirmation of such plan and the Debtors' assumption of leases with the State (Docket No. 893), and on April 12, 2017 Itasca County submitted its ballot rejecting the plan in regards to the Lease Agreement and its unsecured claim;

---

[1]    "Docket No." shall refer to filings on the docket of the Bankruptcy Cases.

- 2 -

WHEREAS, on April 26, 2017, the Debtors held an auction pursuant to the procedures approved by the Bankruptcy Court in that certain *Order (I) Authorizing and Approving Bid Procedures to be Employed in Connection with the First Amended Chapter 11 Plan of Reorganization of Mesabi Metallics Company, LLC (F/K/A Essar Steel Minnesota LLC) and ESML Holdings, Inc., And (II) Scheduling an Auction* (Docket No. 887);

WHEREAS, the Debtors declared Chippewa Capital Partners, LLC ("**Chippewa**") as the successful bidder and new plan sponsor after the auction;

WHEREAS, on June 8, 2017, the Debtors filed the Plan reflecting Chippewa as plan sponsor and successful bidder; and

WHEREAS, by way of this Agreement, the Parties seek to resolve the issues regarding the Debtors' proposed assumption of the Lease Agreement, and Itasca County's concerns regarding the Plan and claims against the Debtors;

NOW, THEREFORE, in light of the foregoing and consideration of the promises, mutual covenants, and agreements set forth herein and for other good and valuable consideration, the Parties wish to enter into this Agreement, and do hereby stipulate and agree as follows:

## ARTICLE 2
## INTERPRETATION

**2.1    Defined Terms**

The following words and terms set forth in this Article 2 shall have the meanings respectively assigned to them.

(a)    "**Bankruptcy Court**" shall have the meaning set forth in the Plan.

(b)    "**Confirmation Order**" means the *Findings of Fact, Conclusions of Law and Order Confirming the Third Amended Chapter 11 Plan of Reorganization for Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc.* entered on June 13, 2017 (Docket No. 1025).

(c)    "**Effective Date**" shall have the meaning set forth in the Plan.

(d)    "**Exit Facility**" shall have the meaning set forth in the Plan.

(e)    "**Investment**" shall have the meaning set forth in the Plan.

(f)    "**Implementation Order**" means the agreed proposed Order Implementing Settlement with the State of Minnesota and Itasca County contemplated by Paragraph 44 of the Confirmation Order.

(g)    "**Plan**" shall mean the *Third Amended Chapter 11 Plan of Reorganization of Mesabi Metallics LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc.*, filed on June 8, 2017, as it may be amended from time to time.

- 3 -

(h)     **"Post-Emergence Trade Agreement"** shall have the meaning set forth in the Plan.

(i)     **"Project"** shall have the meaning set forth in the Plan.

(j)     **"Reorganized Debtor"** shall have the meaning set forth in the Plan.

(k)     **"Royalty Agreement"** means that certain Royalty Agreement between Itasca County and Mesabi dated June 19, 2017 a copy of which is attached as **Exhibit A** to this Agreement, and which is incorporated herein by reference.

(l)     **"State"** means the State of Minnesota, including its departments and agencies.

### ARTICLE 3
### LEASE ASSUMPTION

**3.1     Incorporation of Recitals; Capitalized Terms.**

The recitals above are accurate and incorporated by reference throughout the Agreement as if set forth herein.

**3.2     Lease Agreement.**

**3.2.1.**    Assumption of the Lease Agreement was approved in the Confirmation Order; provided that such assumption shall only become enforceable and effective (x) upon the Effective Date, and (y) in the event that, on or before August 31, 2017, the Debtors or Chippewa secure binding, enforceable commitments for the Investment and Exit Facility for the Project and ERPI totaling at least: (i) $850 million, or (ii) $625 million and they demonstrate availability of equipment financing of all equipment necessary to the Reorganized Debtor's plans of construction.

**3.2.2.**    The Reorganized Debtor shall not pay any cure amount to Itasca County in connection with assumption of the Lease Agreement, but on the Effective Date shall pay Itasca County a sum equal to the out of pocket fees and costs which the county has incurred for attorney's fees and costs relating to its legal representation in regards to the litigation of mechanic's liens, bankruptcy and in connection with assumption of the Lease Agreement, not to exceed $50,000 in the aggregate.

**3.3     Bankruptcy Court Approval.**

As part and parcel of entering into this Agreement, Itasca County requires Mesabi to obtain the approval of this Agreement by the Bankruptcy Court pursuant to the Implementation Order.

**3.4     Transparency.**

Prior to the Effective Date, Mesabi shall provide the State and Itasca County with non-confidential documents and information and shall report through regular meetings and/or communications with the State (which Itasca County is invited to attend) regarding progress

- 4 -

towards the Effective Date, including but not limited to, negotiation and closing of the Exit Facility.

**3.5    Mechanic's or Miner's Liens.**

      **3.5.1**    To the extent there are any mechanic's or miner's liens on Itasca County property for goods or services provided prior to the date of this Agreement in connection with the construction of the Project that are not satisfied, released and/or discharged as of the Effective Date pursuant to the Plan (including under Post-Emergence Trade Agreements), the Reorganized Debtor shall bond those liens off of such property within 30 days following the Effective Date pending a determination of their invalidity, or their resolution or satisfaction, through litigation or otherwise. Any litigation or other proceeding concerning such liens after the Effective Date shall not create or constitute a default or breach under the Lease Agreement.

      **3.5.2**    Notwithstanding anything to the contrary in this Agreement, the Reorganized Debtor shall be liable to pay all damages and be required to indemnify Itasca County or hold Itasca County harmless with respect to any lien created or filed against any of the premises leased that are Itasca County land in the Lease Agreement, and upon ICRRA real property interests related to this Agreement, on or prior to the Effective Date only up to the face amount of the claim against Itasca County held by such lienholder as of the Effective Date of the Plan plus reasonable interest expense and fees that are due and payable associated with such claims, including, without limitation, fees incurred by Itasca County, specifically including legal expenses and fees incurred by Itasca County for outside counsel for work performed in connection with negotiation and approval of this Agreement and defense of mechanic's liens and solely to the extent that Reorganized Debtor is provided the sole and exclusive right and authority to defend, negotiate and settle any litigation related to any such lien; provided that Itasca County shall cooperate with Reorganized Debtor in any investigation, settlement or defense related thereto. The estimated total of any and all amounts for out of pocket attorney's fees and costs that could be due or payable as of May 1, 2017 is less than $5,000.

**3.6    Rail Line Access.**

      (a)    Within 6 months of the Effective Date, the Reorganized Debtor, ERP Iron Ore, LLC ("**ERPI**") and the ICRRA shall have entered into a fully effective Rail Line Access Agreement (the "**Access Agreement**") providing, on commercially reasonable terms, for the Reorganized Debtor's and ERPI's access to rail lines and sidetracks located between Nashwauk, Minnesota and Taconite, Minnesota (the "**Rail Lines**"), including storage of as many railcars as is feasible and desired by the Reorganized Debtor and ERPI on the Rail Lines and in Itasca County storage yards. The Access Agreement shall amend as necessary the Temporary Rail Line Access & Use Agreement dated September 23, 2014 by and between ICRRA and ERPI, as modified from time to time.

(b)     ICRRA shall use commercially reasonable efforts to enter into an agreement within 12 months after the Effective Date with an operator to operate the Rail Lines to support and facilitate the Access Agreement, but failure to do so shall not impair the Reorganized Debtor's or ERPI's access of the Rail Lines.  The Access Agreement shall provide for the Reorganized Debtor's and ERPI's operation, subject to applicable legal requirements, of the short line Rail Lines and related sidetracks in the event ICRRA has not entered into a commercially reasonable operating agreement therefor as contemplated by this Section 3.6(b) within 12 months after the Effective Date.

(c)     All rail agreements shall meet State bonding requirements and be subject to the approval by State of Minnesota, Department of Employment and Economic Development.

(d)     All deadlines shall be subject to Reorganized Debtor's providing the ICRRA with sufficient data concerning its rail shipments, operations and requirements as are necessary to negotiate these agreements.

(e)     The Reorganized Debtor shall reimburse ICCRA's reasonable expenses, including reasonable legal expenses, incurred after the Effective Date in connection with the agreements contemplated pursuant to this Section 3.6, within 30 days of submission of written requests for such reimbursement to the Reorganized Debtor.

**3.7     Releases.**

The Plan must include a release of any and all claims the Debtors hold or may hold against Itasca County, known or unknown, and an explicit provision excluding any such claim from the claims transferred to the Plan's contemplated litigation trusts (as defined in the Plan).

**3.8     Effective Date.**

Mesabi will undertake commercially reasonable efforts to effectuate the consummation of the Plan on the terms and conditions thereof.

**3.9     Effectiveness of This Agreement; Termination.**

(a)     This Agreement and the Royalty Agreement shall have been executed by all signatories on or prior to the date of this Agreement.  This Agreement and the Royalty Agreement, and the rights and obligations of the Parties, shall become fully effective and enforceable on the date on which each of the Parties shall have executed and delivered counterpart signatures of this Agreement and the Royalty Agreement; provided, however, that Mesabi's obligations under this Agreement and the Royalty Agreement shall be subject to the approval of the Bankruptcy Court and the exhibits hereto in the Implementation Order.

(b)     In the event (i) the Plan is withdrawn or revoked prior to the Effective Date, or (ii) it is not a condition precedent to occurrence of the Effective Date that the Investment shall have been made and the Exit Facility shall have become

- 6 -

effective, this Agreement, any exhibits hereto, and any order or portion of an order of the Bankruptcy Court approving this Agreement or any exhibits hereto shall be null and void, and the Parties shall be returned to the status quo ante as if this Agreement and any exhibits hereto had never existed. In the event the Effective Date of the Plan does not occur on or prior to August 31, 2017, Itasca County or Mesabi (with Chippewa's consent), may terminate this Agreement and any exhibits hereto by providing notice of such termination to the other Parties.

## ARTICLE 4
## GENERAL

**4.1    Applicable Law**

This Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota and each of the Parties submits to the jurisdiction of the courts of the State of Minnesota located in Itasca County for the resolution of any dispute or controversy arising in connection herewith.

**4.2    Notice**

   **4.2.1**   Any notice or other communication required or permitted to be given hereunder shall be in writing and shall be: (i) delivered by courier; or (ii) sent by registered mail (postage prepaid), unless there is a postal strike then in progress; or (iii) transmitted by electronic mail (but only if an email address is provided below for the Party in question), addressed or sent as follows:

   (a)    if to Itasca County:

          Jack Muhar, Esq.
          Itasca County Attorney
          123 4th Street NE
          Grand Rapids, Minnesota 55744

          with a copy to:

          Brett Skyles
          Itasca County Administrator
          123 4th Street NE
          Grand Rapids, Minnesota 55744

          and:

          Wendy S. Tien, Esq.
          Assistant Attorney General
          Office of the Minnesota Attorney General
          445 Minnesota Street, Suite 900

104001741

- 7 -

(b)     if to Mesabi:

Mesabi Metallics Company LLC
Susan Fennessey, Esq.
General Counsel
555 W 27th St.
Hibbing, Minnesota  55764

with a copy to:

Craig H. Averch, Esq.
Ronald K. Gorsich, Esq.
555 South Flower Street, Suite 2700
Los Angeles, California 90071

**4.2.2**   Any such notice or other communication shall be deemed to have been given and received: (i) if delivered by courier, on the day on which it is so delivered; (ii) if sent by registered mail, on the 10th day after posting, but if there shall be any intervening postal strike, then on the 10th day after the end of such postal strike; and (iii) if transmitted by electronic mail, on the date of such transmission if received before 5 pm local time by the addressee.

**4.2.3**   Any Party may at any time change its address for service from time to time by giving notice to the other Parties in accordance with this Section.

**4.3      Entire Agreement**

This Agreement, the Royalty Agreement, the Implementation Order and Paragraph 44 of the Confirmation Order constitute the entire agreement between the Parties with respect to the subject matter hereof, and supersede and replace all prior agreements, understandings, negotiations and discussions, whether written or oral.  There are no warranties, conditions or representations (including any that may be implied by statute) and there is no agreement in connection with such subject matter, except as specifically set forth or referred to in this Agreement, the Royalty Agreement, the Implementation Order or Paragraph 44 of the Confirmation Order.  Drafts of this Agreement and any exhibits hereto and modifications reflected in such drafts (including, as to each, communications with respect thereto) shall not be utilized in any manner, dispute, or proceeding, including as evidence of intent in connection with or interpretation of this Agreement or any of the exhibits hereto.   In the event of any inconsistency between this Agreement or any exhibits hereto and the Plan, this Agreement or any exhibits hereto shall govern and control.

**4.4      Amendment**

This Agreement and/or the Royalty Agreement cannot be modified, altered, amended, supplemented, or vacated, or any rights or obligations thereunder waived, without the written agreement of the Parties and, prior to the Effective Date, Chippewa; provided that after the Effective Date, the Reorganized Debtor may agree on behalf of Mesabi.  No waiver of any provision of this Agreement shall constitute a waiver of any other provision, nor shall any waiver

- 8 -

constitute a continuing waiver unless otherwise expressly provided.

**4.5   Validity**

If any provision of this Agreement is determined to be invalid or unenforceable by an arbitrator or a court of competent jurisdiction from which no further appeal lies or is taken, that provision shall be deemed to be severed, and the remaining provisions of this Agreement shall not be affected thereby and shall remain valid and enforceable.

**4.6   Legal Representation**

The Parties acknowledge that they have had the opportunity to obtain legal representation in connection with this Agreement.  Any rule of construction to the effect that any ambiguity is to be resolved against the drafting Party shall not be applicable in the interpretation of this Agreement.  The Parties acknowledge to each other that they have entered into the transactions herein contemplated voluntarily, and without duress or undue pressure from any other Party.

**4.7   Further Assurances and Actions**

With the exception of the Reorganized Debtor, which shall execute a joinder and be bound by this Agreement as a "Party" on the Effective Date as if executed by the Reorganized Debtor in the first instance, nothing in this Agreement or any exhibits hereto, whether express or implied, is intended to or shall confer upon any Person, other than a Party, Chippewa, ERPI or any of their successors, any right, benefit or remedy of any kind or nature whatsoever under or by reason of this Agreement.   Chippewa and ERPI are third party beneficiaries of this Agreement.

**4.8   Binding Effect and Non-Assignability**

This Agreement shall enure to the benefit of and shall be binding upon and enforceable by the Parties and their respective successors.   This Agreement, or any rights under this Agreement, may not be assigned.

**4.9   Business Day**

If any day on or before which any action is required to be taken under this Agreement is not a Business Day, such action shall be required to be taken on the next succeeding day that is a Business Day.  "**Business Day**" means any day except Saturday, Sunday or a statutory holiday in the State of Minnesota.

**4.10   Execution in Counterparts.**

This Agreement may be executed and delivered (by email or otherwise) in any number of copy counterparts, each of which, when executed and delivered, shall be deemed an original and all of which together shall constitute one and the same agreement.  Signatures delivered via .pdf or email are binding.

*[Signature page follows]*

104001741

IN TESTIMONY, the Parties have entered into and duly executed and delivered this Agreement effective as of the date first above written.

**ITASCA COUNTY**

By: _____

Its: _____

Dated the ___ day of _____, 2017

**MESABI METALLICS COMPANY LLC**
**(f/k/a ESSAR STEEL MINNESOTA LLC)**

By: _____

Its: _____

Dated the ___ day of _____, 2017

**ACKNOWLEDGED AND AGREED:**

**STATE OF MINNESOTA**

By: _____

Its: _____

Dated the ___ day of _____, 2017

9

IN TESTIMONY, the Parties have entered into and duly executed and delivered this Agreement effective as of the date first above written.

**ITASCA COUNTY**

By: _____

Its: _____

Dated the ___ day of _____, 2017

**MESABI METALLICS COMPANY LLC**
**(f/k/a ESSAR STEEL MINNESOTA LLC)**

By: _____

Its: _Authorized Signatory_

Dated the _20th_ day of _June_, 2017

**ACKNOWLEDGED AND AGREED:**

**STATE OF MINNESOTA**

By: _____

Its: _____

Dated the ___ day of _____, 2017

IN TESTIMONY, the Parties have entered into and duly executed and delivered this Agreement effective as of the date first above written.

**ITASCA COUNTY**

By: _____

Its: _____

Dated the ___ day of _____, 2017

**MESABI METALLICS COMPANY LLC
(f/k/a ESSAR STEEL MINNESOTA LLC)**

By: _____

Its: _____

Dated the ___ day of _____, 2017

**ACKNOWLEDGED AND AGREED:**

**STATE OF MINNESOTA**

By: _WENDY S. TIEN_____

Its: _ASSISTANT ATTORNEY GENERAL_

Dated the 20TH day of JUNE____, 2017

- 2 -

**Exhibit A**
**Royalty Agreement**

## ROYALTY AGREEMENT

THIS ROYALTY AGREEMENT (the "**Agreement**") is made effective as of the 19th day of June, 2017.

BETWEEN:

     Itasca County, Minnesota and any department, agency or instrumentality of Itasca County, Minnesota (together, "**Itasca County**" or the "**Royalty Holder**")

AND:

     Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) ("**Mesabi**," or the "**Royalty Payor**" or "**Interest Holder**").

Itasca County and Mesabi shall collectively be known as the "**Parties**" and each is a "**Party**."

## ARTICLE 1
## INTERPRETATION

### 1.1    Defined Terms

The following words and terms set forth in this Article 1.1 shall have the meanings respectively assigned to them.

    (a)    "**Chippewa**" means Chippewa Capital Partners, LLC.

    (b)    "**Commercial Production**" means the commercial exploitation of taconite from any part of the Properties to create Products sold to customers.  It does not include bulk sampling or milling for the purpose of testing, milling by a pilot plant, or unsold Product.  Commercial Production shall be deemed to have commenced on the Production Date.

    (c)    "**Effective Date**" shall have the meaning set forth in the Plan.

    (d)    "**HBI Plant**" means a hot briquetted iron plant in Minnesota.

    (e)    "**Master Lease Agreement**" means that "Master Lease Amendment Agreement" among the State of Minnesota, Mesabi Metallics Company, LLC, ERP Iron Ore, LLC, Vencer Capital Partners, LLC and Chippewa Capital Partners, LLC, dated June 19, 2017.

    (f)    "**Maturity Date**" means the earliest of (1) the date on which the Interest Holder has completed payment of aggregate Royalty Payments and Default Rate payments in an amount equal to the Royalty Amount, (2) the date that is ten years after the Effective Date, or (3) the date on which the Interest Holder has completed construction of the Pellet Plant and Vencer has completed construction of the HBI Plant, regardless of any deadlines for such construction set forth in Section 2.2.

Case 18-50378-Doc-13 Filed 06/12/18 Entered 06/12/18 21:10:22 Desc Main
Case 16-11626-BLS Doc 1051-2 Filed 06/26/17 Page 13 of 25
Document    Page 389 of 437

- 2 -

(g)    **"Pellet Plant"** shall mean a taconite pellet production plant as defined in the Master Lease Agreement.

(h)    **"Plan"** shall mean the Third Amended Chapter 11 Plan of Reorganization of Mesabi Metallics LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc., as it may be amended from time to time.

(i)    **"Production Date"** means the date not later than the first business day following the first fourteen (14) consecutive days during which at least six thousand (6000) metric tons of iron ore concentrate is produced per day from mining operations at the Properties.

(j)    **"Products"** means iron ore concentrate and/or iron ore pellets produced at the Properties, together with all tailings and residue resulting from the Interest Holder's operations and activities on the Properties should the same be processed in the future and result in production of iron ore concentrate and/or iron ore pellets at the Properties.

(k)    **"Properties"** means those (i) mining concessions in Nashwauk, Minnesota that are owned by the Interest Holder or leased by the Interest Holder from Itasca County, the State of Minnesota, or private lessors, and (ii) processing operations located in Nashwauk, Minnesota that are owned by the Interest Holder.

(l)    **"Public Infrastructure Claims"** means any claims, causes or action or other right to payment relating to or on account of installation or construction of Public Infrastructure (as defined in that certain Reimbursement Agreement dated as of September 9, 2008 executed by the State and Itasca County) or the funding thereof, including but not limited to pursuant to the Reimbursement Agreement or the Business Subsidy Agreement dated as of September 9, 2008 executed by Itasca County.

(m)    **"Revenues"** means any and all revenues received by the Interest Holder on account of Products produced or sold from the Properties, without regard to any Trading Activities.

For purposes of this Agreement, "Revenues" shall be the higher of (a) the revenues received by the Interest Holder on account of the production or sale of Products, or (b) the monthly average price for iron ore published by <u>Platts Steel Market Daily</u> (FOB Brazil), defined as follows as the Brazil Price. <u>Platts Steel Market Daily</u> refers to a Brazil route under the caption currently titled "FOB netbacks per route/basis IODEX 62% Fe." The Brazil Price in dollars per dry metric ton is found under this caption in the column titled "IODEX ($/dmt)." The monthly average of the daily published Brazil Price for the first month of each calendar quarter shall be used as the Brazil Price for purposes of this Agreement.

In the event <u>Platts Steel Market Daily</u> or its successors cease to quote a prevailing iron ore price FOB Brazil, or these quotations cease to reflect transactions sold at arm's length, the quotations to be used as previously provided must be the

- 3 -

quotations independently published, which after necessary adjustments, if any, provide the most reasonable substitutes for the quotations published in <u>Platts Steel Market Daily</u>, it being intended to substitute quotations that most accurately reflect arm's length transactions of the prevailing price of iron ore FOB Brazil, in the manner currently reported by <u>Platts Steel Market Daily</u>.

(n)     **"Royalty Amount"** means $64,181,912.74 less (1) if the Interest Holder purchases from the owners thereof any improved Minnesota real property constructed or acquired by the seller or prior owners with grant funds that are the subject of the Reimbursement Agreement dated as of September 9, 2008 by and between Essar Global Limited, Minnesota Steel Industries, LLC, Itasca County and the State of Minnesota, and the related Master Development Agreement and Business Subsidy Agreement, the total purchase price agreed and paid to the owner, and (2) amounts received by Itasca County or the State from any other source on account of Public Infrastructure Claims, including, without limitation, recoveries pursuant to the Plan or the litigation trusts provided for therein, or from Essar Global Fund Limited or its affiliates; provided, however, that nothing in this Agreement provided, shall create any option or right to acquire such real property on the part of the Interest Holder.

(o)     **"Settlement Agreement"** shall mean the Settlement Agreement to which this Agreement is attached.

(p)     **"State"** means the State of Minnesota, including its departments and agencies.

(q)     **"Trading Activities"** shall have the meaning set out in Article 5 of this Agreement.

(r)      **"Vencer"** means Vencer Capital Partners, LLC, an entity formed by the ERP Group of companies, or its assignee as permitted by the Master Lease Agreement.

## ARTICLE 2
## GRANT OF ROYALTY

**2.1     Grant of Royalty**

2.1.1   Subject to the terms set forth herein, the Interest Holder hereby grants and agrees to pay or cause to be paid to the Royalty Holder a quarterly royalty equal to the lesser of (a) with respect to i) the sale of iron ore pellets, 1.84% of Revenues for each calendar quarter, *plus* ii) with respect to the sale of iron ore concentrate, 2.6% of Revenues for each calendar quarter, or (b) $1 million for each calendar quarter (the lesser of 2.1.1(a) or 2.1.1(b) for each quarter being the **"Royalty Payment"**), from and after the date that the Interest Holder brings the Properties or any portion thereof into Commercial Production (**"Commencement Date"**) through the Maturity Date, subject to such payment at an increased rate as set forth in section 2.4.

2.1.2   The balance of the Royalty Amount less any Royalty Payments and/or Default Rate payments made hereunder shall be due and payable on the date that is 10 years after the Effective Date; *provided*, *however*, notwithstanding anything in this Agreement, if the Maturity Date

104002145

- 4 -

occurs prior to the date that is 10 years after the Effective Date, the Interest Holder shall have no further obligations (payment obligations or otherwise) under this Agreement, and this Agreement shall terminate automatically and without notice. Under no circumstances will the Interest Holder be obligated to pay more than the Royalty Amount under this Agreement.

## 2.2 Construction and Production Requirements

### 2.2.1 Pellet Plant Construction and Production Requirements

The Interest Holder will recommence construction of the Pellet Plant by September 30, 2017. The Interest Holder will complete construction of the Pellet Plant by December 31, 2019. The Interest Holder will ship at least 3 million tons of pellets from the completed Pellet Plant in a single calendar year by December 31, 2020.

### 2.2.2 HBI Plant Construction Requirements

Vencer will commence construction of the HBI Plant by December 31, 2018. Vencer will complete construction of the HBI Plant by December 31, 2021.

## 2.3 Events of Default

The following shall constitute events of default:

(a) Failure to meet any of the requirements in the "Pellet Plant Construction and Production Requirements" section 2.2.1 of this Agreement;

(b) Failure to meet any of the requirements of the "HBI Plant Construction Requirements" section 2.2.2 of this Agreement.

## 2.4 Default Royalty Payments

In the event of a default as set forth in section 2.3, unless such default is waived in writing by the Royalty Holder, the quarterly payment payable by the Interest Holder to the Royalty Holder pursuant to Section 2.1 will be paid at double the rate of the Royalty Payment amount (the "Default Rate"), until the earlier of (a) the Maturity Date and (b) the date such default is cured. Subject to section 2.1.2, under no circumstance may any amounts payable under this Agreement be accelerated or payable in a single lump sum.

## ARTICLE 3
## INTEREST HOLDER'S RIGHTS AND OBLIGATIONS

## 3.1 Royalty Holder Access and Inspection Rights

The Interest Holder shall keep books and records consistent with accepted mining practice relating to its production on the Properties and, to the extent reasonably possible, the processing of such ores through the Interest Holder's concentrator and pellet production facilities on the Properties. Upon the prior consent of the Interest Holder (not to be unreasonably withheld), duly authorized representatives of the Royalty Holder may have access to such records relating to the determination of Royalty Payment payable to the Royalty Holder for the

- 5 -

purpose of confirming any information contained in any statement delivered to the Royalty Holder, provided always that such access shall not interfere with the Interest Holder's operations or production plan. The Royalty Holder shall have the right to make copies of or to take extracts from such records for its own use. The Royalty Holder shall keep any such copies or extracts, and any information contained therein, confidential. The figures contained in such records, in the absence of bad faith on the part of the Interest Holder, shall be conclusive evidence of the Product shipments to customers from the Properties and related Revenues.

## 3.2    Acquired Properties

If at any time after the date of this Agreement the Interest Holder stakes or otherwise acquires, directly or indirectly, any right to or interest in any mining tenure, license, lease, grant, concession, permit, patent, or other mineral property (the "**Acquired Properties**") located within three miles of the boundary of each mining concession comprising the Properties (the "**Area of Interest**"), the Revenues from the Acquired Properties shall be subject to the Royalty Payment (or Default Rate payment, as applicable) payable pursuant to this Agreement and, notwithstanding any other provisions of this Agreement, all amounts to be calculated under this Agreement shall relate to the Revenues from the Properties and Acquired Properties.

Notwithstanding anything in this Agreement, the Properties, Acquired Properties and/or Area of Interest shall not include any mining concessions or processing operations owned or leased by any person or entity that is not the Interest Holder, but the Royalty Payment or Default Rate payment shall be payable by Interest Holder on account of its Products sold to another person or entity and processed at their plant or facility, including the HBI Plant and ERP Iron Ore, LLC's pellet plant in Reynolds, Indiana.

## ARTICLE 4
## TIME AND MANNER OF ROYALTIES PAYMENTS

### 4.1    Royalty Calculation and Payment

The Royalty Payment or the Default Rate payment, as applicable, shall be calculated by the Interest Holder according to the terms and conditions set forth herein and at the end of each calendar quarter after the Commencement Date, and payments of the Royalty Payment or the Default Rate payment shall be made quarterly in arrears within 30 days after such calendar quarter. Each payment shall be accompanied by a statement containing reasonable details concerning the basis on which it was computed (the "**Statement**"). The amount of any quarterly Royalty Payment may be estimated; provided that, payment for the final quarter of each calendar year shall be reconciled to the final Revenues figures for the Properties for the calendar year, and the aggregate Royalty Payments for the calendar year shall be subject to adjustment, further payments or repayments of Royalty Payment amounts, as the case may be, by the Party affected. Royalty Payments or Default Rate payments shall be made by check or wire as directed in writing by Royalty Holder to Royalty Payor pursuant to the notice procedures in Section 6.2 of this Agreement.

### 4.2    Adjustments and Verification

4.2.1    Payment of any amount by the Interest Holder shall not prejudice the right of the Interest

- 6 -

Holder to adjust the Statement supporting the payment; *provided*, *however*, that all Statements presented to the Royalty Holder by the Interest Holder for any quarter shall conclusively be presumed to be true and correct, unless within a 12-month period a Party gives notice making claim for an adjustment to the Statement which will be reflected in subsequent payments as settled.

4.2.2    The Interest Holder shall not adjust any Statement in favor of itself after the expiration of 12 months following the end of the quarter to which the statement relates.

4.2.3    If the supporting documentation and any discussion with the Interest Holder do not resolve the Royalty Holder's concerns asserted pursuant to Section 4.2.1, the Royalty Holder shall be entitled upon notice to the Interest Holder to request from the Interest Holder that mutually accepted auditors be requested to provide the Royalty Holder with their report that any statement delivered in respect of any quarterly period falling with the 12-month period immediately preceding the date of the Royalty Holder's notice has been prepared in accordance with this Agreement.  When giving any notice aforesaid, the Royalty Holder will reasonably articulate the matter or matters of concern to them.

4.2.4    The time required for giving the audit report contemplated in Section 4.2.3 of this Agreement shall not extend the time for the taking of exception to and making claim for adjustment as provided in this Agreement.

4.2.5    The cost of the auditor's report shall be shared by the Interest Holder and Royalty Holder unless the audit report reveals an error adverse to the Royalty Holder of greater than 5%, in which case the cost shall be solely for the account of the Interest Holder.

**4.3    Tax**

In the event payments made to the Royalty Holder by the Interest Holder pursuant to this Agreement are subject to any taxes or royalties required to be withheld or paid by the Interest Holder on behalf of the Royalty Holder, such taxes or royalties shall be deemed to be included in and considered part of any payment payable hereunder to the Royalty Holder.

**ARTICLE 5**
**TRADING ACTIVITIES**

**5.1    Trading Activities**

The Royalty Payor may, but need not, engage in forward sales, futures trading or commodity options trading, and other price hedging, price protection and speculative arrangements (collectively, "**Trading Activities**") which may involve the possible delivery of Products produced from the Properties.  The Parties acknowledge and agree that the Royalty Holder shall not be entitled to participate in the proceeds or be obligated to share in any losses generated by the Trading Activities, unless otherwise agreed by the Parties.  The Parties further acknowledge and agree that the Royalty Payor's supply agreements with its customers shall not be considered forward sales.

- 7 -

## ARTICLE 6
## GENERAL

### 6.1 Applicable Law

This Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota and each of the Parties submits to the jurisdiction of the courts of the State of Minnesota located in Itasca County for the resolution of any dispute or controversy arising in connection herewith.

### 6.2 Notice

6.2.1 Any notice or other communication required or permitted to be given hereunder shall be in writing and shall be: (i) delivered by courier; or (ii) sent by registered mail (postage prepaid), unless there is a postal strike then in progress; or (iii) transmitted by electronic mail (but only if an email address is provided below for the Party in question), addressed or sent as follows:

    (a)    if to the Royalty Holder:

        Jack Muhar, Esq.
        Itasca County Attorney
        123 4th Street NE
        Grand Rapids, Minnesota 55744

        with a copy to:

        Brett Skyles
        Itasca County Administrator
        123 4th Street NE
        Grand Rapids, Minnesota 55744

        and:

        Wendy S. Tien, Esq.
        Assistant Attorney General
        Office of the Minnesota Attorney General
        445 Minnesota Street, Suite 900

    (b)    if to the Royalty Payor:

        Mesabi Metallics Company LLC
        Susan Fennessey, Esq.
        General Counsel
        555 W 27th St.
        Hibbing, Minnesota 55764

        with a copy to:

104002145

- 8 -

Craig H. Averch, Esq.
Ronald K. Gorsich, Esq.
555 South Flower Street, Suite 2700
Los Angeles, California 90071

6.2.2   Any such notice or other communication shall be deemed to have been given and received: (i) if delivered by courier, on the day on which it is so delivered; (ii) if sent by registered mail, on the 10th day after posting, but if there shall be any intervening postal strike, then on the 10th day after the end of such postal strike; and (iii) if transmitted by electronic mail, on the date of such transmission if received before 5 pm local time by the addressee.

6.2.3   Any Party may at any time change its address for service from time to time by giving notice to the other Parties in accordance with this Section.

**6.3     Entire Agreement**

This Agreement, the Settlement Agreement, the Implementation Order (as defined in the Settlement Agreement) and Paragraph 44 of the Confirmation Order (as defined in the Settlement Agreement) constitute the entire agreement between the Parties with respect to the subject matter hereof, and supersede and replace all prior agreements, understandings, negotiations and discussions, whether written or oral.  There are no warranties, conditions or representations (including any that may be implied by statute) and there is no agreement in connection with such subject matter, except as specifically set forth or referred to in this Agreement, the Settlement Agreement, the Implementation Order or Paragraph 44 of the Confirmation Order.  Drafts of this Agreement and any exhibits hereto and modifications reflected in such drafts (including, as to each, communications with respect thereto) shall not be utilized in any manner, dispute, or proceeding, including as evidence of intent in connection with or interpretation of this Agreement or any of the exhibits hereto.  In the event of any inconsistency between this Agreement or any exhibits hereto and the Plan, this Agreement or any exhibits hereto shall govern and control.

**6.4     Amendment**

This Agreement and/or the Settlement Agreement cannot be modified, altered, amended, supplemented, or vacated, or any rights or obligations thereunder waived, without the written agreement of the Parties and, prior to the Effective Date, Chippewa; provided that after the Effective Date, the Reorganized Debtor (as defined in the Plan) may agree on behalf of Mesabi. No waiver of any provision of this Agreement shall constitute a waiver of any other provision, nor shall any waiver constitute a continuing waiver unless otherwise expressly provided.

**6.5     Validity**

If any provision of this Agreement is determined to be invalid or unenforceable by an arbitrator or a court of competent jurisdiction from which no further appeal lies or is taken, that provision shall be deemed to be severed, and the remaining provisions of this Agreement shall not be affected thereby and shall remain valid and enforceable.

Case 18-50378- Doc 13 Filed 06/18/18 Entered 06/12/18 21:10:22 Desc Main
Case 16-11026-BLS Doc 1051-2 Filed 06/26/17 Page 22 of 25
Document     Page 396 of 437

- 9 -

### 6.6    Legal Representation

The Parties acknowledge that they have had the opportunity to obtain legal representation in connection with this Agreement. Any rule of construction to the effect that any ambiguity is to be resolved against the drafting Party shall not be applicable in the interpretation of this Agreement. The Parties acknowledge to each other that they have entered into the transactions herein contemplated voluntarily, and without duress or undue pressure from any other Party.

### 6.7    Further Assurances and Actions

With the exception of the Reorganized Debtor, which shall execute a joinder and be bound by this Agreement as a "Party" on the Effective Date as if executed by the Reorganized Debtor in the first instance, nothing in this Agreement or any exhibits hereto, whether express or implied, is intended to or shall confer upon any Person, other than Chippewa, Vencer, or a Party and any of their successors, any right, benefit or remedy of any kind or nature whatsoever under or by reason of this Agreement. Chippewa and Vencer are third party beneficiaries of this Agreement.

### 6.8    Binding Effect and Non-Assignability

This Agreement shall enure to the benefit of and shall be binding upon and enforceable by the Parties and their respective successors. Notwithstanding anything contained in this Agreement or the Settlement Agreement, however, this Agreement shall not become effective or enforceable unless and until the occurrence of the Effective Date of the Plan. This Agreement, or any rights under this Agreement, may not be assigned.

### 6.9    Business Day

If any day on or before which any action is required to be taken under this Agreement is not a Business Day, such action shall be required to be taken on the next succeeding day that is a Business Day. "**Business Day**" means any day except Saturday, Sunday or a statutory holiday in the State of Minnesota.

### 6.10    Execution in Counterparts.

This Agreement may be executed and delivered (by email or otherwise) in any number of copy counterparts, each of which, when executed and delivered, shall be deemed an original and all of which together shall constitute one and the same agreement. Signatures delivered via .pdf or email are binding.

*[Signature page follows]*

104002145

IN TESTIMONY, the Parties have entered into and duly executed and delivered this Royalty Agreement effective as of the date first above written.

**ROYALTY HOLDER:**

**ITASCA COUNTY**

By: _Terry Snyder_____

Its: _Chair Person_____

Dated the _30_ day of _June_____, 2017


**ROYALTY PAYOR:**

**MESABI METALLICS COMPANY LLC
(f/k/a ESSAR STEEL MINNESOTA LLC)**


By: _____

Its: _____

Dated the ___ day of _____, 2017


**ACKNOWLEDGED AND AGREED:**

**STATE OF MINNESOTA**


By: _____

Its: _____

Dated the ___ day of _____, 2017

IN TESTIMONY, the Parties have entered into and duly executed and delivered this Royalty Agreement effective as of the date first above written.

**ROYALTY HOLDER:**

**ITASCA COUNTY**

By: _____

Its: _____

Dated the ___ day of _____, 2017

**ROYALTY PAYOR:**

**MESABI METALLICS COMPANY LLC
(f/k/a ESSAR STEEL MINNESOTA LLC)**

By: _____

Its: _Authorized Signatory_

Dated the _20th_ day of _June_, 2017

**ACKNOWLEDGED AND AGREED:**

**STATE OF MINNESOTA**

By: _____

Its: _____

Dated the ___ day of _____, 2017

IN TESTIMONY, the Parties have entered into and duly executed and delivered this Royalty Agreement effective as of the date first above written.

<u>ROYALTY HOLDER:</u>

**ITASCA COUNTY**

By: _____

Its: _____

Dated the ___ day of _____, 2017

<u>ROYALTY PAYOR:</u>

**MESABI METALLICS COMPANY LLC**
**(f/k/a ESSAR STEEL MINNESOTA LLC)**

By: _____

Its: _____

Dated the ___ day of _____, 2017

<u>ACKNOWLEDGED AND AGREED:</u>

**STATE OF MINNESOTA**

By: _WENDY S. TIEN_____

Its: _ASSISTANT ATTORNEY GENERAL_

Dated the 20th day of _JUNE___, 2017

# EXHIBIT G

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| | Case No. 16-11626 (BLS) |
| ESSAR STEEL MINNESOTA LLC and ESML HOLDINGS INC.,[1] | Jointly Administered |
| Debtors. | **Re: Docket Nos. 990 and 1025** |

## ORDER IMPLEMENTING PLAN IN CONNECTION
## WITH LANGDON/WARREN MINERAL LEASES

Upon the Certification of Counsel filed December [   ], 2017 for entry of a supplemental

order regarding the provisions regarding the Langdon/Warren Mineral Leases in the *Third*

*Amended Chapter 11 Plan of Reorganization of Mesabi Metallics Company LLC (f/k/a Essar*

*Steel Minnesota LLC) and ESML Holdings Inc.* [D.I. 990] (as amended from time to time, the

"**Plan**")[2] and *Findings of Fact, Conclusions of Law and Order Confirming the Third Amended*

*Chapter 11 Plan of Reorganization for Mesabi Metallics Company LLC (f/k/a Essar Steel*

*Minnesota LLC) and ESML Holdings Inc. Proposed by the Debtors* [D.I. 1025] (the

"**Confirmation Order**"); and the Court having found it has jurisdiction pursuant to the

Confirmation Order and 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a

core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that due and proper

notice of the relief requested herein was provided and no other or further notice need be

---

[1]     Essar Steel Minnesota LLC has changed its name to Mesabi Metallics Company LLC. The last four digits of its federal taxpayer identification number are 8770. The last four digits of ESML Holdings Inc.'s federal taxpayer identification number are 8071.

[2]     Capitalized terms not defined herein shall have the meaning ascribed in the Confirmation Order.

provided; and the Court having reviewed the record of these bankruptcy cases and exhibits admitted into evidence at the hearings in these bankruptcy cases; and the Court further implements the Plan with the entry of this Order pursuant to 11 U.S.C. § 1142; and after due deliberation, it is **HEREBY ORDERED**:

1.      Paragraph 45 of the Confirmation Order is amended and restated in its entirety as follows: "If the Effective Date does not occur on or before December 31, 2017, (a) the lessors may draw and/or apply the entire Non-DNR Guarantee, as applicable, as liquidated damages and (b) absent prior written consent to other treatment by a lessor regarding the Mineral and Surface Leases, other than the DNR Leases, to which they are a party, such Mineral and Surface Leases shall be deemed rejected and the Debtors will immediately surrender such leases."

2.      The Plan Sponsor shall conform the Non-DNR Guarantee to comply with this Order and extend the timeline for beneficiaries thereof to demand payment on the Non-DNR Guarantee to January 31, 2018.

3.      This Order is immediately effective and enforceable, *nunc pro tunc* to December 12, 2017 if entered thereafter.

4.      This Order shall govern and control in the event of any inconsistency with the Confirmation Order or the Plan.

5.      This Court shall retain jurisdiction over any and all matters arising from or related to this Order.

Dated: ___Dec. 12___, 2017

Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT H

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
| ESSAR STEEL MINNESOTA LLC and ESML HOLDINGS INC.,[1] | Case No. 16-11626 (BLS) |
|  | (Jointly Administered) |
| Debtors. | Re: Docket Nos. 1286, 1311 _____ |

## ORDER GRANTING DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105(a) AND 1142(b) FOR ENTRY OF ORDER IMPLEMENTING THE PROVISIONS OF THE PLAN WITH RESPECT TO THE PREPETITION LENDER NOTES AND PREPETITION LENDER NOTES DOCUMENTS

Upon consideration of the motion (the "**Motion**"),[2] dated November 9, 2017, of Mesabi

Metallics Company LLC ("**Mesabi**") (f/k/a Essar Steel Minnesota LLC) and ESML Holdings

Inc. ("**Holdings**," and, together with Mesabi, the "**Debtors**"), for entry of an order implementing

the Plan[3] with respect to the Fixed Rate Junior Secured Notes Indenture and exhibits thereto

attached as **Exhibit 1** (together, the "**Indenture**") and the Prepetition Lender Notes; and upon

consideration of any and all objections, responses, and filings related to the Motion, as reflected

on the Court's docket for the above-captioned chapter 11 cases; and the Court having jurisdiction

to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157(b)

and 1334; and upon consideration of the Motion and the relief requested therein being a core

---

[1] The last four digits of Essar Steel Minnesota LLC's federal taxpayer identification number are 8770. The last four digits of ESML Holdings Inc.'s federal taxpayer identification number are 8071.

[2] Each capitalized term used but not otherwise ascribed a meaning herein shall have the meaning ascribed to such term in the Plan, and if not ascribed a meaning in the Plan, shall have the meaning ascribed to such term in the Indenture.

[3] "**Plan**" means the *Third Amended Chapter 11 Plan of Reorganization of Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc.* [D.I. 990], as amended from time to time.

proceeding within the meaning of 28 U.S.C. § 157(b); and venue being proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been

provided; and it appearing that no other or further notice need be provided; and a mediation

having been held to consider the relief requested in the Motion (the "**Mediation**"); and upon the

record of all of the proceedings had before this Court; and good cause existing therefor;

IT IS HEREBY ORDERED THAT:

1.    The Motion is GRANTED.

2.    The Indenture, attached hereto as **Exhibit 1**, is approved as a revised Plan

Document, valid, binding, and enforceable notwithstanding any otherwise applicable

nonbankruptcy law, and incorporated by reference into, and an integral part of, the Plan and

Confirmation Order[4] for all purposes; *provided, however*, that further revisions may be made to

the Indenture prior to the Effective Date without further notice or Court order as agreed by the

Debtors, Plan Sponsor and Prepetition Lenders.

3.    The Debtors are authorized to issue the Prepetition Lender Notes in accordance

with the Indenture on the Effective Date.

4.    This Order shall be deemed to constitute a fully executed counterpart Mortgage

on the Issuer's interest in Real Estate Leases (to the extent permitted by law, and after having

obtained any and all necessary consents) and any fee interest in a Premises owned by the Issuer

on the Effective Date of the Plan, together with any fixture filing as may be necessary to create a

valid, perfected Lien (as defined in the Indenture) against the Premises owned by the Issuer on

the Effective Date of the Plan, as to each with the priority required by the Collateral Documents

and the Intercreditor Agreement (each, an "**Issuer Interest**"), delivered to the Collateral Agent,

---

[4]    "**Confirmation Order**" means the *Findings of Fact, Conclusions of Law, and Order Confirming the Third Amended Chapter 11 Plan of Reorganization for Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc. Proposed by the Debtors* [D.I. 1025].

2

as mortgagee or beneficiary, as applicable, for the ratable benefit of itself and the Holders (as

defined in the Indenture), in accordance with the requirements of <u>Section 10.03</u> of the Indenture

and/or the Collateral Documents (each, a "**Deemed Mortgage and Fixture Filing**").   Each

Deemed Mortgage and Fixture Filing shall be subject, in all instances, to the Permitted Liens as

well as all of the terms and conditions of the Indenture (including any requirements of release,

cancellation, subordination, or otherwise), the Intercreditor Agreement and/or the Priority Lien

Documents, as if such Deemed Mortgage and Fixture Filing constituted an actual Mortgage and

fixture filing delivered by the Issuer in accordance with the requirements of <u>Section 10.03</u> of the

Indenture and/or the Collateral Documents.

     5.      A Deemed Mortgage and Fixture Filing shall remain valid until such time as an

actual Mortgage and fixture filing, as applicable, concerning the Issuer Interest that is the subject

of such Deemed Mortgage and Fixture Filing is delivered to the Collateral Agent in accordance

with <u>Section 10.03(a)</u> of the Indenture, at which time such Deemed Mortgage and Fixture Filing

shall be, automatically and without notice or Court order, amended thereby, with such actual

Mortgage and fixture filing relating back to the effectiveness of the Deemed Mortgage and

Fixture Filing as of the Effective Date.  The Issuer shall file the Mortgages required by <u>Section</u>

<u>10.03</u> of the Indenture in favor of the Collateral Agent as soon as reasonably practicable after the

Effective Date, and the Issuer and the Collateral Agent shall use commercially reasonable efforts

to cooperate in effectuating any applicable provisions of this Order.

     6.      The Issuer shall file a certified copy of this Order (including only the pages of the

Indenture containing defined terms used in this Order and <u>Section 10.03</u> of the Indenture) with

any applicable Governmental Authority[5] necessary to reflect a Deemed Mortgage and Fixture

---

[5]    "**Governmental Authority**" means any nation or government, any state or other political subdivision thereof,
any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive,

Filing as soon as reasonably practicable on or after the Effective Date. This Order shall be

sufficient and conclusive evidence of the validity, perfection and priority of the Deemed

Mortgage and Fixture Filing as of the Effective Date without the necessity of filing or recording

any deed of trust, mortgage, or other instrument or document which may otherwise be required

under the law of any jurisdiction or the taking of any other action to validate or perfect the

Deemed Mortgage and Fixture Filing or to entitle the Deemed Mortgage and Fixture Filing to the

lien priority granted in the Indenture. The Issuer shall execute and deliver to the Collateral

Agent all such other documents as the Collateral Agent may reasonably request to evidence,

confirm, validate or perfect, or to ensure the contemplated priority of the Deemed Mortgage and

Fixture Filing as of the Effective Date. In the event the Issuer has not done so, the Collateral

Agent, in its sole discretion, may file a photocopy of this Order with any recording officer or

with any registry of deeds or similar office in any jurisdiction in which the Issuer has real

property and, in such event, the subject filing or recording officer shall be authorized to file or

record such copy of this Order. Any filing of this Order with a recording officer or with any

registry of deeds or similar office in any jurisdiction in which the Issuer has real property shall

be deemed to have been filed or recorded as of the Effective Date.

      7.     In accordance with Section 1146 of the Bankruptcy Code, the issuance of the

Indenture and Prepetition Lender Notes thereunder, or the incurrence of Priority Lien Debt, and

the creation of any mortgage, deed of trust, lien, pledge, or other security interest, the making or

assignment of any lease or sublease, or the making or delivery of any deed or other instrument of

transfer under the Indenture, Collateral Documents, Priority Lien Debt, or Priority Lien

---

legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities
exchange and any self-regulatory organization, and any filing agents, filing officers, title agents, recording
agencies, secretaries of state, and all other Persons and entities who may be required by operation of law, the
duties of their office or contract, to accept, file, register, or otherwise record or release any documents or
instruments.

4

Documents is in furtherance of or in connection with the Plan, and so shall not be subject to any stamp, transfer, mortgage recording, or other similar tax (collectively, the "**Taxes**"). The Indenture and any Prepetition Lender Notes issued pursuant to it are exempt from and outside the purview of the Trust Indenture Act.

8.    Each Governmental Authority shall be bound by this Order and shall accept for filing this Order as contemplated in <u>paragraph 6</u>, and any other Mortgages or fixture filings pursuant to the Indenture and/or the Collateral Documents, without payment of any Taxes.

9.    In accordance with the agreement reached through Mediation:

    a.    The Indenture Trustee shall be an intended third party beneficiary of:

        i.    the obligation under the operating agreement of Chippewa Capital Partners, LLC (the "**Chippewa Operating Agreement**") for Nubai Global Investment Limited and/or DSA Investments Inc. (collectively, "**DSA**") to fund the remaining portion of its $250 million equity commitment in the aggregate (to the extent such equity has not been funded as of the Effective Date) (the "**Remaining Equity Contribution**") on the terms below; and

        ii.    Chippewa's obligation to contribute to the Issuer any Contributable Funds on the terms below.[6]

    b.    In the event the Remaining Equity Contribution has not been funded (from DSA or any other source, for example, if the Chippewa Members voluntarily choose to fund the balance of DSA's Remaining Equity Contribution) to Chippewa Capital Partners, LLC ("**Chippewa**"), and Chippewa and/or the other members of Chippewa (the members of Chippewa other than DSA, the "**Chippewa Members**") fail to file suit or any other action

---

[6]  "**Contributable Funds**" means cash held by Chippewa (i) that was received from DSA to satisfy all or a portion of DSA's Remaining Equity Contribution to Chippewa (or from any other source that voluntarily funds the balance of DSA's Remaining Equity Contribution), if any, and (ii) that Chippewa has an obligation to contribute to the Issuer pursuant to the terms and conditions of the operating agreement of the Issuer (the "**Issuer Operating Agreement**").

5

against DSA by June 30, 2018, then the Indenture Trustee may file a suit or any other action against DSA on behalf and in the name of Chippewa seeking enforcement of DSA's Remaining Equity Contribution.

        c.     In the event the Remaining Equity Contribution has not been funded (from DSA or any other source, for example, if the Chippewa Members voluntarily choose to fund the balance of DSA's Remaining Equity Contribution) to Chippewa, and Chippewa and/or the Chippewa Members have filed suit or any other action against DSA by June 30, 2018, then after June 30, 2018 the Indenture Trustee may intervene in the filed suit or other action as a plaintiff against DSA on behalf and in the name of Chippewa seeking enforcement of DSA's Remaining Equity Contribution.

        d.     In the event the Remaining Equity Contribution has not been funded (from DSA or any other source, for example, if the Chippewa Members voluntarily choose to fund the balance of DSA's Remaining Equity Contribution) to Chippewa, and Chippewa and/or the Chippewa Members have filed suit or any other action against DSA by June 30, 2018, then after June 30, 2018 Chippewa, the Chippewa Members and the Indenture Trustee shall cooperate and determine jointly whether any other suit or action against DSA on behalf and in the name of Chippewa is desirable to seek enforcement of DSA's Remaining Equity Contribution and, in that event, shall cooperate in such other suit or action; *provided, however,* that in the event the Indenture Trustee determines that Chippewa and/or the Chippewa Members are unreasonably delaying the prosecution of any such other suit or action, the Indenture Trustee may do so after June 30, 2018.

        e.     Chippewa, the Chippewa Members and the Indenture Trustee shall consult with one another regarding any suit or other action seeking enforcement of DSA's Remaining

Equity Contribution and, where possible, agree as to the manner, strategy and other aspects regarding its prosecution.  Chippewa, the Chippewa Members and the Indenture Trustee shall execute a mutually acceptable, joint defense, common interest and confidentiality agreement concerning any such suit or other action.  The Indenture Trustee shall be entitled to the applicable benefits of the Indenture, including without limitation, Sections 7.01(e) and 7.07(b) in connection with its prosecution of any such suit or action.

       f.    In the event Chippewa has received Contributable Funds and has not contributed such funds to the Issuer, the Indenture Trustee may file a suit or any other action against Chippewa on behalf and in the name of the Issuer seeking enforcement of Chippewa's obligation to contribute the Contributable Funds to the Issuer.  The Indenture Trustee shall be entitled to the applicable benefits of the Indenture, including without limitation, Sections 7.01(e) and 7.07(b) in connection with its prosecution of any such suit or action.

       g.    The Indenture Trustee's rights under paragraph 9(a - i) of this Order shall terminate on the date the Remaining Equity Contribution is received by Chippewa (from DSA or any other source, for example, if the Chippewa Members voluntarily choose to fund the balance of DSA's Remaining Equity Contribution) and the full $250 million of equity funding in the aggregate has been funded to the Issuer; *provided*, that Chippewa and/or the Chippewa Members shall be entitled to continue the prosecution of any suit or other action thereafter on behalf and in the name of Chippewa in place of the Indenture Trustee.  All cash Investment amounts and/or equity contributions made, or deemed made by Chippewa, through the Effective Date of the Plan or thereafter shall be counted in determining whether the full $250 million of equity funding in the aggregate has been funded.  Any payment or recovery (net of amounts payable to the Indenture Trustee pursuant to Section 7.07(b) of the Indenture in connection with its prosecution

of such enforcement action) in connection with the Remaining Equity Contribution shall constitute the property of Chippewa and be immediately turned over to it in satisfaction of the Remaining Equity Contribution, in whole or in part, as applicable, of which Chippewa shall then immediately contribute to the Issuer the amount or portion thereof, if any, necessary to satisfy Chippewa's $250 million equity commitment in the aggregate that has not been funded prior thereto. Any agreement or obligation to contribute equity and/or any right, claim or cause of action to enforce any agreement or obligation to contribute equity, as to each as to Chippewa and/or Mesabi, and any payment or recovery on any of the foregoing, shall not constitute collateral or proceeds thereof under the Indenture, and there shall be no Lien thereon, on the Effective Date or thereafter unless and until it shall constitute collateral under the Indenture and Priority Lien Documents.

       h.    Pursuant to the Chippewa Operating Agreement and this Order, Chippewa's members consent to the jurisdiction of the United States District Court for the District of Delaware for enforcement of the equity contribution obligations in the Chippewa Operating Agreement and DSA agrees to accept service by certified mail or registered mail in an enforcement action at its address at Level 28G, Silver Tower, Cluster 1, Jumeriah Lake Towers, P.O. Box 393324 Dubai, United Arab Emirates, Attn.: John Oram.

       i.    Pursuant to the Issuer Operating Agreement and this Order, Chippewa consents to the jurisdiction of the United States District Court for the District of Delaware for enforcement of the equity contribution obligations in the Issuer Operating Agreement.

       j.    Chippewa's equity interest in the Issuer shall be pledged to the Collateral Agent as collateral under the Indenture, and any remedy with respect such pledge shall be enforceable under the terms of the Indenture and the Uniform Commercial Code upon the

occurrence of an Event of Default under the Indenture that remains uncured after any applicable notice or grace period. Such pledge shall be subordinated to the pledge of Chippewa's equity interest in the Issuer to the collateral agent or lenders of the Priority Lien Debt, upon the closing on the Priority Lien Debt provided for in section 4.09(b)(3) of the Indenture (a "**Priority Lien Closing**").

        k.      Starting with the month ended January 31, 2018 and ending upon the Priority Lien Closing under section 4.09(b)(3) of the Indenture, the Reorganized Debtor shall provide a monthly cash report by the 15th day of the following month to the Indenture Trustee and to the existing counsel to the Prepetition Lenders (the "**Recipients**"). Until the Priority Lien Closing under section 4.09(b)(3) of the Indenture, the Recipients may also, upon at least 5 business days' notice, request a call with the Reorganized Debtor and its professionals at a mutually convenient time for an update on construction of the Project, payment of post-Effective Date vendors on the Project, progress towards closing on the Priority Lien Debt and/or related matters (subject to any confidentiality restrictions which may be in place with respect to such information).

        l.      The right to pursue collection and/or enforcement of the cost judgment entered by the United States District Court for the District of Minnesota on May 26, 2017 (Case No. 09-cv-3037), in favor of the Debtors and against Great Lakes Gas Transmission Limited Partnership, shall be a right of the SC Litigation Trust on the Effective Date.

        10.      Any action taken by the Indenture Trustee pursuant to this Order shall be at the direction of Holders of the requisite principal amount of Notes.

        11.      Notwithstanding anything to the contrary in the Plan or the SC Litigation Trust Agreement, the beneficial interests in the SC Litigation Trust shall be freely transferable.

12.     This Order shall be null and void if the Effective Date does not occur on or before December 31, 2017, or such later date as is agreed by counsel to the Debtors, Plan Sponsor and Prepetition Lenders, each acting in its sole discretion. In the event this Order is rendered null and void pursuant to the prior sentence, absent an agreement otherwise by the Debtors, Plan Sponsor and Prepetition Lenders, the Motion will be reset for a hearing within 10 days (subject to the Court's calendar), and a new deadline set for the Project Finance Lenders' objection and any reply.

13.     In the event of any inconsistency between this Order, on the one hand, and the Indenture, the Chippewa Operating Agreement, the Issuer Operating Agreement, the Plan and/or the Confirmation Order, on the other hand, this Order shall govern and control.

14.     This Court shall retain jurisdiction to interpret and enforce this Order. Any and all disputes concerning the subject matter of this Order, or the filings and recordings made in accordance with paragraph 6 of this Order, shall be adjudicated by the Court.

Dated: December 12, 2017
      Wilmington, Delaware

                                  Honorable Brendan L. Shannon
                                  United States Bankruptcy Judge

105651910 V-5

# EXHIBIT I



# DNR: Mesabi Metallics moving toward reinstatement of state mineral leases

By **News Tribune** on Jun 4, 2018 at 6:42 p.m.

◁ 1

Mesabi Metallics is one step closer to getting its state mineral leases back.

Mesabi Metallics, the mining company planning to finish a taconite mine and processing center and also build an iron plant on the Nashwauk site that Essar Steel Minnesota left several years ago, has entered into contracts for facility construction and the sale of taconite pellets, according to a preliminary review by the Minnesota Department of Natural Resources.

The contracts, submitted on May 31 by parent company Chippewa Capital Partners, are among the last requirements to earn back the mineral leases.

The company must now secure financing for the project by June 30 after which the DNR will have seven days to decide if all conditions were met, in which case mineral leases will be reinstated.

Owner Tom Clarke said he's confident construction can begin in July.

"It's almost like watching a kid play a video game — seven levels we had to get to and we're passed the sixth level," Clarke told the News Tribune in a phone call Monday afternoon.

**SPONSORED CONTENT**



### Get A Porch Bo Can't Keep His Paws Off ⬈

# EXHIBIT J

NEWS > BUSINESS

# Agreement struck on Magnetation sale

By **JOHN MYERS** | Forum News Service

December 17, 2016 at 1:40 pm

A federal bankruptcy court judge in St. Paul appears ready to approve a deal that will sell the remaining assets of bankrupt Magnetation Inc. to Roanoke, Va., entrepreneur Tom Clarke in a move that could see hundreds of Iron Range steelworkers back on the job in 2017.

At a Thursday court hearing Judge William Fisher indicated he is ready to sign off on the deal after final details are put into writing and one last notice published to give any party a chance to object.

"The judge says he's ready to approve this; we just need to get all of the final agreements in writing and give (any opponents) one last chance for objections," Clarke said.

Fisher ordered that any new objections must be filed by noon Tuesday. A final hearing to approve the sale is set for 9 a.m.Wednesday.

The bankruptcy agreement, first unveiled last week, appears to have the backing of all major parties — from major creditors owed millions of dollars by Magnetation, to local contractors who helped build the company's newest Plant 4 but were not fully paid.

The deal was sold in bankruptcy court documents filed last week as the last, best hope to reopen the failed company's shuttered iron ore recovery operations on the Iron Range.

Clarke, owner of Kissito Healthcare, ERP Compliant Fuels and now ERP Iron Ore, brokered the deal to acquire Magnetation's now-idled plants in Keewatin, Bovey and Grand Rapids that turn leftover mining waste into valuable iron ore concentrate.

The deal also includes all of Grand Rapids-based Magnetation's rail operations and the company's pellet-making plant in Reynolds, Ind.

Clarke said he hopes to close the deal by year's end and restart at least some operations in 2017. It's likely Plant 4, which had about 130 employees when it closed in October,  would be the first to reopen. The future is less clear for the Bovey plant, which had 167 employees until closing in January, and the Keewatin plant, which had about 50 employees when it closed in 2015.

One critical element remaining is finding customers to agree to buy Magnetation's iron ore pellets.

The last remaining parties objecting to the deal, including Itasca County, filed court documents Thursday saying they now back the agreement.

"This is great news for the Minnesota miners heading back to work this spring and for the entire Mesabi Range,'' said U.S. Rep. Rick Nolan after talking to county officials about the agreement. "The deal appears to be a very positive step for the citizens of Itasca County, the many vendors and contractors waiting on payment or contracts, and other stakeholders. We will continue to monitor the situation as events proceed. Hats off to the various investors, the Itasca County Board, the area contractors and creditors owed money and other parties involved for coming to this solution that reactivates the mining operation and brings our miners back to work."

Under the deal, Clarke will repay $22.7 million to bondholders, part of the money they are owed for funding construction of the various Magnetation facilities that, combined, cost about $700 million to build. That $22.7 million note is personally guaranteed by Clarke and his wife, Ana.

Clarke also has offered to repay contractors and vendors the more than $30 million they are owed by Magnetation for past work — but they will have to wait to get all of that money. The bankruptcy deal calls for the vendors to get some money as soon as the new company, ERP Iron Ore LLC, raises operating equity. The rest would be paid back over time, Clarke said, from a royalty on every ton of iron ore pellets produced.

Magnetation LLC was founded in 2006 and was a joint venture between Grand Rapids-based Magnetation Inc. and AK Iron Resources LLC, an affiliate of steelmaker AK Steel. Magnetation recovered valuable iron ore from waste dumps left behind by long-closed mining operations. It sold its finished pellets to AK's steel mills in Ohio.

Under the direction of Magnetation CEO Larry Lehtinen and his son, Magnetation President Matt Lehtinen, the company grew rapidly. At its peak in 2014, the company had more than 500 employees, including more than 400 on the Iron Range.

But the company was hit hard when the price of iron ore plummeted from more than $100 to less than $50 per ton through 2014 and 2015. The company began to close plants in 2015, and Magnetation filed for Chapter 11 bankruptcy reorganization in May 2015.

---

Tags:    Minnesota

---



As you comment, please be respectful of other commenters and other viewpoints. Our goal with article comments is to provide a space for civil, informative and constructive conversations. We reserve the right to remove any comment we deem to be defamatory, rude, insulting to others, hateful, off-topic or reckless to the community. See our full terms of use here.



# Magnetation startup could come this summer

By **John Myers** on Jan 10, 2018 at 6:58 p.m.

◁ 1

GRAND RAPIDS, Minn.—The long-awaited restart of the former Magnetation operations just outside Grand Rapids could happen as soon as the summer, with more than 100 people back to work, months earlier than previously expected.

New owner Tom Clarke said this week that he now has engineering plans ready and financing in place to complete an estimated $20 million in retrofitting work to the former Magnetation pellet plant in Reynolds, Indiana.

Clarke said his ERP Iron Ore LLC, which now owns the former Magnetation operations, will need to spend about $2 million to get the Grand Rapids concentrating and mining operations back on track.

"I think we can have Grand Rapids up and producing concentrate late in the second quarter and shipping it down to Indiana, we have room to stockpile a lot down there, and then have Reynolds going by the third quarter to make pellets," Clarke told the Duluth News Tribune this week.

The pellets made in Indiana are destined to make pig iron at a plant in Lorain, Ohio.

"The goal is to be making iron by the end of this year," Clarke said.

The rebirth of the former Magnetation Plant 4 outside Grand Rapids has been on hold for months pending a reworking of the Reynolds plant to meet federal Clean Air Act standards.

Clarke's ERP Iron Ore won the bankruptcy rights to Magnetation one year ago and hoped to be producing iron ore concentrate at Plant 4 by now, with most of the operation's 130 employees back on the job.

But, as first reported in August, ERP has been thwarted by two violation notices filed by the federal Environmental Protection Agency in 2016 against the Indiana plant, alleging the former Magnetation owners didn't have proper pollution control equipment in several areas of operation. The EPA has an effective hold an any restart of the operations until the new equipment is installed, said Rob Bigelow, ERP's managing director.

ERP found out late last year that it will take at least $20 million and several months to retrofit the plant. The company initially said it could be the end of 2018 before the Grand Rapids operations restarted, but now has moved that target forward.

# Buyers unaware of severity of violations

Clarke said ERP acquired the bankrupt Magnetation without knowing the extent of the problem in Indiana, noting the EPA was still conducting its investigation. He said the plant apparently never met permit standards.

"I'll take the blame for it. Maybe we didn't do all of our due diligence. ... But it wasn't something that was easy to find," Clarke said, adding that the Reynolds plant was violating at 14 of 18 different potential emissions locations. "I likely

would still have acquired the (Magnetation) assets if I had known. I just wouldn't have paid as much."

Bigelow said ERP is working with the EPA and Indiana Department of Environmental Management to resolve the issue.

Documents obtained by the News Tribune through a federal records request show that the EPA found the Indiana plant in violation of emissions limits for fluoride, sulfur dioxide, nitrogen oxide and particulate matter — basic pollutants that are often the cause of urban smog and haze that the EPA says can cause health problems. Some tests found emissions between two and five times permit levels.

There are allegations that Mag Pellet LLC used devices to intentionally hide emissions from state and federal regulators.

# 'A very big deal'

The Grand Rapids plant uses proprietary technology to separate valuable iron ore from old mine waste and turn it into iron ore concentrate. That concentrate is moved by rail to Indiana to be made into pellets used in steel mills. The same technology can be used to process virgin taconite ore from recently mined rock.

Once the Grand Rapids and Indiana plants are operating, ERP plans to sell those pellets made from Minnesota iron ore to an all-new pig iron plant in Lorain, Ohio. That iron could be used in electric-arc furnaces — a market previously unavailable for Minnesota ore.

Clarke also acquired the the former Essar Steel project in Nashwauk and hopes to "blend" both operations to become a major player in the U.S. iron ore industry,

supplying both traditional blast furnace steel mills as well as electric arc mini-mills that now control nearly two-thirds of domestic steel production.

"We're going to be producing about 10 million tons" of processed iron ore annually, Bigelow said, making the combined Magnetation-Mesabi Metallics operations among the largest U.S iron ore producers. "This is going to be a very big deal. It just takes time to get there."

Magnetation LLC was founded in 2006 as a joint venture between Grand Rapids-based Magnetation Inc. and an affiliate of steelmaker AK Steel. The company was hit hard when the price of iron ore plummeted through 2014 and 2015, and filed for Chapter 11 bankruptcy reorganization in May 2015. The company slowly closed all four of its Minnesota operations, the last to close being Plant 4 in 2016.

ADVERTISEMENT

http://www.grandrapidsmn.com/free_press/mesabi-metallics-ready-to-emerge-from-bankruptcy/article_549aa200-e766-11e7-894c-8fb42169f056.html

# MESABI METALLICS READY TO EMERGE FROM BANKRUPTCY

By John Myers Forum News Service    Dec 23, 2017

NASHWAUK — Attorneys with Chippewa Capital Partners are expected to file documents in federal bankruptcy court within days that will bring the idled Mesabi Metallics project out of the ashes of the Essar Steel Minnesota bankruptcy for good.

The documents, which could be filed as early as today in Delaware, will inform federal Bankruptcy Judge Brendan Shannon that all requirements of the bankruptcy plan, approved last summer, are in place — so-called bankruptcy emergence.

"We're ready to exit bankruptcy. Nothing in the case is contested anymore," said Tom Clarke, the Roanoke, Va., billionaire who has dived into the Minnesota iron ore industry over the past year.

A major sticking point, with secured junior debtors, was hammered out in arbitration in New York City in recent weeks. Those debtors, mostly banks in India, were owed a combined $1 billion by India-based Essar. Now they are in line to get $300 million from Clarke if the project succeeds, a sort of second mortgage on Mesabi Metallics.

The Itasca County Board Thursday night held an emergency meeting to make last-minute changes in its contracts with Chippewa, unanimously agreeing to extend a key date until June 30, as the company appeared to be tying up the last remaining loose ends.

"I think it's going to be a good project, a successful project," commissioner Leo Turnt said of Mesabi Metallics.

Any other disagreements are set for arbitration or discussions that can occur as the new company moves forward, Clarke told the News Tribune.

Company officials have been working to overcome lingering issues in advance of a Dec. 31 deadline by the state of Minnesota for Chippewa to emerge from bankruptcy or potentially lose state mineral rights at the Nashwauk site.

Clarke is the Roanoke health care industry billionaire who began buying and reviving defunct coal mines in recent years. He formed ERP Iron Ore to buy the bankrupt Magnetation operations last year and has formed Chippewa Capital Partners to bring Essar out of bankruptcy as Mesabi Metallics, forging agreements with global banks and securing both domestic and Chinese customers for his iron products.

Company officials say bankruptcy emergence is necessary before work can start in earnest in Nashwauk. They said construction financing will be secured in coming weeks and will have hundreds of construction workers on the Nashwauk project by April.

Battle with Cleveland-Cliffs

Clarke said a recent announcement that Cleveland-Cliffs has purchased some of the mineral rights that Clark wants for the Nashwauk project from Glacier Park Iron Ore Properties LLC, is not a dealbreaker for Chippewa.

Clarke confirmed that the land Cliffs says it purchased mineral rights under was part of the parcels Mesabi Metallics planned to mine on. But he said other mineral rights at the site would give his company ample mining reserves even if the Cliffs deal is upheld. Chippewa still has access to other private leases as well as state of Minnesota mineral rights.

"We have the permits, they (Cliffs) do not," Clarke noted.

A media report cited an unnamed source saying Cliff's agreement with Glacier Park was a "crippling blow" to Mesabi Metallics. But Clarke said that's far from the case.

"We have multiple ore bodies to choose from there. They (Cliffs) aren't going to stop us," Clarke said.

Others have said that the deal between Cleveland-Cliffs and Glacier Park, a subsidiary of Houston-based ConocoPhillips, may be invalid, in violation of orders by Judge Shannon attaching previous Essar mineral rights to the bankruptcy case.

It's not the first time Cliffs has moved to thwart the Nashwauk project. Chippewa filed court documents earlier this year accusing Cliffs of trying to sabotage their effort to revive the Essar project. Cliffs denied those allegations.

For their part, state officials appeared to be monitoring the situation but sticking with Chippewa which is promising to employ hundreds of people and invest billions of dollars. Cliffs officials have been less clear on what they would do with the ore at the site.

"The purchase and leasing of private property holdings by Cliffs came as a complete surprise, and it presents significant additional challenges for the Chippewa Capital Partners project," said Matt Swenson, spokesman for Gov. Mark Dayton, in a statement. "The Governor is intensively reviewing possible options with his project team."

The Department of Natural Resources noted that Chippewa still controls the vast majority of iron ore under the site.

"Chippewa Capital Partners continues to hold the permit to mine for this site, as well as the largest share of the mineral rights necessary for the approved mine plan," said DNR spokesman Chris Niskanen in a statement. "It will be up to Chippewa to determine how they will proceed. DNR continues to review all options for the site and any implications that the Cliffs acquisition may have on the current project design. Our primary concern has always been to maximize the careful use of our state's natural resources for the wellbeing of Minnesotans, and we will continue to work with any partners who share those goals."

Slow progress so far

The Nashwauk site has been mostly idled for two years after Essar Steel Minnesota walked away from a project a year behind schedule and mired in financial mismanagement, according to court filings. Essar filed for bankruptcy in July 2016.

Now, a few construction cranes and bucket trucks already have returned to the Nashwauk site, with about 35 ironworkers on the job in recent weeks, mostly trying to finish the giant induration building that will house the taconite-baking ovens at the plant.

Chippewa won the rights to the bankruptcy Essar Steel Minnesota last summer when Judge Shannon ruled they were the best hope to pay creditors some of what they were owed and to raise money to resume construction on the project. But until the bankruptcy plan was in place, every move had to be approved by the court, and lenders might be reluctant to hand over hundreds of millions of dollars to a company not fully in charge of its own project.

When the bankruptcy plan is in place, "it's the first big step going forward, to get past emergence and get out of bankruptcy so this can operate like a normal company," said Robb Bigelow, managing director of Chippewa and its sister company, ERP Iron Ore, in a recent interview with the News Tribune.

Some buildings show progress since Essar walked away.

"It's not fast, but we're making progress, and that's what counts," said Dave Sorby, senior manager of projects for the company, on a recent tour of the site. "We're pretty excited to get this back on track again soon."

Sorby said final engineering plans are being completed and that the project's Omaha-based general contractor, Kiewit, will be on site soon. The project will eventually ramp up to nearly 1,000 construction workers, Bigelow said.

Priority will go to the taconite mine and processing plant which sits about half-finished. But Chippewa now plans to simultaneously build the hot briquetted iron plant at essentially the same time, just across the railroad track form the pellet plant. Chippewa is working with Tenova, an Italian ming and steelmaking company that will supply the technology to build the iron plant. Iron form the facility will go to electric-arc steel mills, the so-called mini-mills that are now producing nearly two-thirds of American steel and a market that Minnesota taconite iron ore has yet to crack.

Production by 2020?

Once work starts in earnest it will take two full years of construction to finish both parts of the project. The first taconite pellets — the plant will produce 7 million tons annually— won't be rolling out of the furnace until mid-2020, Bigelow said, with iron coming soon after that.

Ramping up construction over the next year will be a huge challenge, Bigelow noted.

"This is one of the biggest projects going anywhere in the country, so it takes a while. We want to get it right where (Essar) got it wrong," Bigelow said. "Weather becomes a factor. We're banking on getting a lot of work done in the summers of 2018 and 2019, but if the (in between) weather is good, that could speed things up."

Eventually the two Nashwauk facilities could employ about 450 people.

Clarke has estimated that, in all, Chippewa Capital Partners will pump another $1.3 billion on top of $1.8 billion already spent by Essar on the taconite operations. The iron plant will cost another $650 million or so making it a combined $3.7 billion project — making Mesabi Metallics Minnesota's largest private project ever.

Company officials say a key element of the Nashwauk project is that about 2.5 million tons of the plant's taconite will go to the on-site iron plant. The other 4.5 million tons annually has been pledged to a Chinese steelmaker.

The goal is that none of the newly mined iron ore will compete with other Minnesota mines for customers, Clarke told the News Tribune.



BUSINESS

# New owners bring Essar project out of bankruptcy

Bankruptcy plan includes payment to contractors from stalled project.

**By Dee DePass (http://www.startribune.com/dee-depass/10644746/)** Star Tribune |

**DECEMBER 29, 2017 — 8:34PM**

The former Essar Steel Minnesota project has emerged from bankruptcy court under the new ownership of Chippewa Capital Partners, company officials announced Friday.

Essar, which had been renamed Mesabi Metallics, officially exited its Chapter 11 bankruptcy reorganization plan Dec. 22 after nearly a year and a half, according to records filed in Delaware, where the bankruptcy case was heard.

Virginia billionaire Tom Clarke, who is a Chippewa principal and Mesabi's new CEO, praised the bankruptcy process and the efforts of Gov. Mark Dayton, the Minnesota Department of Natural Resources and the Itasca County Board of Commissioners.

State and local officials worked closely with Mesabi and Chippewa to make sure the $1.9 billion project could be brought back to life under new ownership, Clarke said in a statement. Chippewa and its partners committed to investing another $500 million in the project through loans and equity payments and also promised to partly pay many contractors who were left unpaid when the former Essar ran into financial trouble.

Under Chippewa, the half-built plant in Nashwauk is expected to see construction completed in the next two years or so. It is expected to produce 7 million tons of iron ore pellets a year. Separately, a new advanced ore processing plant will be added on the same site. It will produce 2 million tons of hot briquette iron a year.

Chippewa Capital officials thanked Minnesota contractors for their patience and commitment to finish the multibillion-dollar ore project. Many contractors were left in the lurch for millions of dollars after the massive construction project mostly shuttered in 2015 after years of financing woes by the prior owner, based in Mumbai, India.

As a result of the bankruptcy restructuring plan, Chippewa Capital provided the funding for Mesabi to make deferred mechanic lien-holder payments last Friday. Those payments are now three years ahead of schedule, officials said in the statement.

**Dayton thanks company**

Dayton said in an e-mail that he thanks Chippewa Capital and specifically Clarke for expediting the critical lien-holder payments, which were another step that helped the long Essar drama move forward.

"The Nashwauk project's emergence from bankruptcy is a very important step toward Chippewa Capital Partners' stated goal of finishing construction on the former Essar plant, obtaining the necessary financing and operating agreements and beginning production, which will mean more jobs for the Range," Dayton said.

Mesabi is working with an international team of experts including Kiewit Energy Group, Tenova and Danieli to complete the Nashwauk pellet plant and to build the briquette plant next door.

Clarke said the project has equity investors from three continents and believes prospective global pellet sales will revive the old Essar site and inject jobs and economic value into the once-dead project. The project is intended to provide "substantial employment and tax benefits to northern Minnesota" throughout the construction period and afterward, he said.

The former Magnetation ore assets in Grand Rapids that are owned by another Clarke affiliate, ERP Iron Ore (ERPI), will be integrated into the Mesabi operations in Nashwauk. They will provide an additional 3 million tons of ore that will eventually be pelletized at ERPI's Metso plant in Indiana or sent to a production facility in Lorain, Ohio.

**Liquidation averted**



(http://stmedia.startribune.com/images/ows_151457484371050.jpg)
Iron workers set up a crane in 2014 to move



(http://stmedia.startribune.com/images/ows_151460043‹
LEILA NAVIDI • STAR TRIBUNE

Essar Steel's taconite mine project in Nashwauk, Minn.

David Pauker, Mesabi's chief restructuring officer throughout the Chapter 11 bankruptcy, said the bankruptcy raised "the very real prospect of liquidation" of the Nashwauk properties.

"Instead, on emergence from bankruptcy, contractors and others who worked on the project received 75 cents on the dollar and lenders received a notional recovery of 30 cents, including new bonds," he said.

Barb Naramore, assistant commissioner of the Minnesota Department of Natural Resources (DNR), said Chippewa Capital still has a few steps to complete before the state will give the company the mineral lease rights associated with the Nashwauk mining property.

Chippewa has until May 2018 to present the state with a copy of the contract proving it has a buyer for the iron ore that will be mined from Nashwauk. Chippewa has until June 30, 2018, to present the state with evidence that it has indeed secured all of the financing needed to finish construction of the half-built ore pelletizing plant in Nashwauk.

"They are making progress but have more work to do," said Naramore during a phone interview.

The fact that Mesabi Metallics has formally exited bankruptcy means that the control of the mineral lease rights for Nashwauk now transfers from the court back to the state's DNR division, Naramore explained.

The DNR will maintain control of the leases until Chippewa fully complies with all its financing and contract obligations to the state.

Once Chippewa meets the conditions of its agreement, the state will reinstate the mineral leases so they are under Chippewa's control, Dayton and Naramore said.

---

dee.depass@startribune.com        612-673-7725        DePassStrib

http://www.businessnorth.com/businessnorth_exclusives/erp-execs-suffer-setbacks-unveil-plans/article_c5b8b306-d52c-11e7-82e1-1f69acb0ffae.html

## ERP execs suffer setbacks, unveil plans

By BETH BILY/BusinessNorth   Nov 29, 2017



Pictured is an interior view of the former Magnetation Plant 4 property when it was still under construction.

BusinessNorth file photo.

When one purchases a used car, there are always a few surprises under the hood, Robb Bigelow, former manager of Magnetation's Plant 4 and ERP managing director, told Itasca County Commissioners last month.

ERP Iron Ore is the new owner of the former Magnetation assets. Here, executives report that acquisition was no different. The biggest of those "surprises" was the need for a $10 to $20 million retrofit of the Reynolds, Indiana pellet plant. After meeting with federal Environmental Protection Agency officials, ERP executives learned that the plant was out of compliance with air emissions standards, which would require both time and money to remedy.

The Reynolds plant is part of an integrated ERP plan, which would produce iron ore feedstock in Grand Rapids, then be manufactured into pellets in Indiana and ultimately shipped to Lorain, Ohio to be converted to pig iron. ERP and Republic Steel, the owner of the Lorain plant, announced the joint venture partnership in August of this year.

Bigelow noted that the discovery of deficiencies in Indiana did impact restart dates on the West Range. He told Itasca County Commissioners that it likely would be 12 months before hiring began at the Grand Rapids Plant 4 facility. While Bigelow characterized the news as "disappointing" he added, "We need to be a good steward and a good neighbor to those folks in Indiana." Company executives are working with federal and state regulators in

Indiana to bring the plant there in compliance with air emission standards.

In addition to the need for investment in Reynolds, Bigelow also noted that the investment also was needed in Ohio and at Plant 4, which he described as having been heavily utilized in the final days Magnetation was operational.

The former Magnetation assets also include a processing plant in Bovey and a small iron ore recovery operation in Keewatin, Minn. The fate of those two plants remain uncertain. Executives had previously publicly stated that while the Bovey plant could possibly again operate, the Keewatin plant, which was a pilot project, is less likely to reopen.

ERP is led by Virginia businessman Tom Clarke, whose career background includes nursing home ownership.  More recently, Clarke has ventured into commodities. He purchased a number of troubled North American coal mines in recent years as well as iron ore properties. Clarke has said in interviews with national media that his hope was to continue to produce those commodities while reducing the environmental impact.

**Nashwauk property**

Affiliates of ERP are also in control of the assets of Mesabi Metallics near Nashwauk, formerly known as Essar Steel Minnesota. Here, Bigelow reported that the immediate goal was to get the project out of bankruptcy, which he anticipates will happen in the coming three to four weeks. Executives hope to achieve financial closure on the needed capital to resume construction by year's end.

Once those goals are met, construction plans will be solidified with a plan to ramp up again in March.

In a separate public meeting last month, Mitch Brunfelt, Mesabi Metallics spokesperson, told Nashwauk city officials that company personnel had been moved from offices in Hibbing to Nashwauk. He added that some construction work had taken place even as the company remains in bankruptcy. Currently, Brunfelt estimated that about 30 construction workers are active on the site.

The financial investment needed in Nashwauk is significant. The project involves two developments – a 2.4 million/annual ton capacity pellet plant and the a 1.8 million/annual ton capacity HBI production facility, or briquetted iron. The projects collectively require a $1.5 billion investment, Bigelow said.

While the financial needs are substantial, Bigelow said that the good news is there's enormous appetite in Asia for northern Minnesota pellets. Significant pollution problems have led China to search for cleaner burning sources of iron, such as pellets. Executives with Mesabi Metallics are working on forging agreements that would see 4.5 million tons of pellets shipped and marketed in Asia, he added.

Meanwhile delayed restart may have been a disappointment locally, but Bigelow pointed to the investments already made in Itasca County as evidence that things were progressing. He said, to date, the new owners have invested a total of $85 million in Minnesota between the two sites.

## *Essar Steel gets new owners*

Star Tribune (Minneapolis, MN)

December 30, 2017 Saturday, METRO EDITION

Copyright 2017 Star Tribune All Rights Reserved

**Section:** BUSINESS; Pg. 1D

**Length:** 838 words

**Byline:** DEE DePASS; STAFF WRITER, STAR TRIBUNE (Mpls.-St. Paul)

**Highlight:** Bankruptcy plan includes payment to contractors from stalled project.

# Body

The former Essar Steel Minnesota project has emerged from bankruptcy court under the new ownership of Chippewa Capital Partners, company officials announced Friday.

Essar, which had been renamed Mesabi Metallics, officially exited its Chapter 11 bankruptcy reorganization plan Dec. 22 after nearly a year and a half, according to records filed in Delaware, where the bankruptcy case was heard.

Virginia billionaire Tom Clarke, who is a Chippewa principal and Mesabi's new CEO, praised the bankruptcy process and the efforts of Gov. Mark Dayton, the Minnesota Department of Natural Resources and the Itasca County Board of Commissioners.

State and local officials worked closely with Mesabi and Chippewa to make sure the $1.9 billion project could be brought back to life under new ownership, Clarke said in a statement. Chippewa and its partners committed to investing another $500 million in the project through loans and equity payments and also promised to partly pay many contractors who were left unpaid when the former Essar ran into financial trouble.

Under Chippewa, the half-built plant in Nashwauk is expected to see construction completed in the next two years or so. It is expected to produce 7 million tons of iron ore pellets a year. Separately, a new advanced ore processing plant will be added on the same site. It will produce 2 million tons of hot briquette iron a year.

Chippewa Capital officials thanked Minnesota contractors for their patience and commitment to finish the multibillion-dollar ore project. Many contractors were left in the lurch for millions of dollars after the massive construction project mostly shuttered in 2015 after years of financing woes by the prior owner, based in Mumbai, India.

As a result of the bankruptcy restructuring plan, Chippewa Capital provided the funding for Mesabi to make deferred mechanic lien-holder payments last Friday. Those payments are now three years ahead of schedule, officials said in the statement.

Dayton thanks company

Dayton said in an e-mail that he thanks Chippewa Capital and specifically Clarke for expediting the critical lien-holder payments, which were another step that helped the long Essar drama move forward.

"The Nashwauk project's emergence from bankruptcy is a very important step toward Chippewa Capital Partners' stated goal of finishing construction on the former Essar plant, obtaining the necessary financing and operating agreements and beginning production, which will mean more jobs for the Range," Dayton said.

Essar Steel gets new owners

Mesabi is working with an international team of experts including Kiewit Energy Group, Tenova and Danieli to complete the Nashwauk pellet plant and to build the briquette plant next door.

Clarke said the project has equity investors from three continents and believes prospective global pellet sales will revive the old Essar site and inject jobs and economic value into the once-dead project. The project is intended to provide "substantial employment and tax benefits to northern Minnesota" throughout the construction period and afterward, he said.

The former Magnetation ore assets in Grand Rapids that are owned by another Clarke affiliate, ERP Iron Ore (ERPI), will be integrated into the Mesabi operations in Nashwauk. They will provide an additional 3 million tons of ore that will eventually be pelletized at ERPI's Metso plant in Indiana or sent to a production facility in Lorain, Ohio.

Liquidation averted

David Pauker, Mesabi's chief restructuring officer throughout the Chapter 11 bankruptcy, said the bankruptcy raised "the very real prospect of liquidation" of the Nashwauk properties.

"Instead, on emergence from bankruptcy, contractors and others who worked on the project received 75 cents on the dollar and lenders received a notional recovery of 30 cents, including new bonds," he said.

Barb Naramore, assistant commissioner of the Minnesota Department of Natural Resources (DNR), said Chippewa Capital still has a few steps to complete before the state will give the company the mineral lease rights associated with the Nashwauk mining property.

Chippewa has until May 2018 to present the state with a copy of the contract proving it has a buyer for the iron ore that will be mined from Nashwauk. Chippewa has until June 30, 2018, to present the state with evidence that it has indeed secured all of the financing needed to finish construction of the half-built ore pelletizing plant in Nashwauk.

"They are making progress but have more work to do," said Naramore during a phone interview.

The fact that Mesabi Metallics has formally exited bankruptcy means that the control of the mineral lease rights for Nashwauk now transfers from the court back to the state's DNR division, Naramore explained.

The DNR will maintain control of the leases until Chippewa fully complies with all its financing and contract obligations to the state.

Once Chippewa meets the conditions of its agreement, the state will reinstate the mineral leases so they are under Chippewa's control, Dayton and Naramore said.

Dee DePass · 612-673-7725

**Load-Date:** January 2, 2018

End of Document

Sign Up    Log In

http://www.virginiamn.com/mine/magnetation-now-erp-iron-ore/article_2d8bc88e-f87d-11e6-878e-ab03f39ea3e8.html

# MAGNETATION NOW ERP IRON ORE

### WITH NEW OWNERSHIP COME NEW HOPE AND NEW NAME FOR RANGE PLANTS

Lisa Rosemore Herald-Review    Feb 21, 2017



A truck empties a load of ore at Magnetation's Plant 4 in Coleraine in this February 2015 file photo.

Mark Sauer/Mesabi Daily News

At its peak in 2015, Magnetation, LLC employed nearly 500 people between its mining operations in Minnesota and its pellet plant in Reynolds, Ind.

However, Magnetation LLC had also in early May 2015 filed Chapter 11 bankruptcy to reorganize its finances. At the time, then-president and chief operating officer of Magnetation, Matt Lehtinen, said the bankruptcy filing was the equivalent to refinancing a home mortgage.

By the time 2016 rolled around, the domestic iron market was in shambles and with the closure of its mining operations in Minnesota as well as the Indiana pellet plant, it looked to be the end of the company with the innovative technology to produce iron ore concentrate.

Enter Tom Clarke of Roanoke, Va.

Clarke, whose background is in the healthcare industry, late in 2016 entered into an asset purchase agreement to purchase Magnetation LLC's assets and certain liabilities as well as assume some contracts and leases. The sale was approved by the federal bankruptcy court and closed on Jan. 30.

At the time the then-proposed sale was announced, Magnetation CEO Larry Lehtinen said in a statement that the sale provided the potential for a restart of the shuttered company.

"We are especially pleased to be acquired by ERP Iron Ore, LLC, an affiliate of ERP Compliant Fuels, LLC, an innovative company founded and led by Tom Clarke with whom we share a vision for advancing our unique and environmentally responsible technology that turns abandoned iron resources into valuable, high quality iron ore pellets to serve steelmakers on a global scale."

The interest in iron ore is new for Clarke's firm. In a phone interview, Clarke's excitement for this new venture shone through.

"We've got great plans," Clarke said excitedly about the company which will now be known as ERP Iron Ore, adding that the purchase did not include Magnetation, Inc.

Since the sale closed , Clarke explained that the company has been in the process of maintaining and caring for not only the Indiana pellet plant, but Plant 1 in Keewatin, Plant 2 in Bovey and Plant 4 in Grand Rapids.

We've had to get the snow plows out, Clarke said, explaining they've also had a couple broken pipes to repair as well.

They have also been spending a lot of time transferring massive amounts of data, giving the IT professionals much to do.

Eight people have been hired to senior positions in the three weeks since the sale , he continued, adding that Rob Bigelow, former manager of Plant 4, had entered into a consulting agreement with ERP.

Thousands of hours have already gone into preparations to restart operations, Clarke said.

Currently, all their energy has been focused on Plant 4 and the pellet plan.

Plant 2 may be brought back online in some capacity in the future, but Clarke said he did not know if Plant 1 in Keewatin, which he referred to as a pilot plant, would ever be back up and running.

Negotiations have also been underway for the sale of pellets.

"Our ultimate goal is a fully-integrated business (from ore to steel)," Clarke said.

"If we hadn't been successful (in our bid to purchase), Magnetation would have gone into liquidation."



## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Involuntary Chapter 7 |
| ERP Iron Ore, LLC, | 18-50378-RJK |
| Alleged Debtor. | |

## ORDER GRANTING EXPEDITED NOTICE OF HEARING
## AND ALTERNATIVE MOTION OF ALLEGED DEBTOR FOR AN ORDER
## ABSTAINING OR DISMISSING INVOLUNTARY CHAPTER 7 PETITION

This case was commenced by an involuntary petition under Chapter 7 of the United States Bankruptcy Code.  This matter came before the undersigned on June 26, 2018, on the motion of alleged debtor ERP Iron Ore, LLC for a Motion seeking Expedited Relief for an Order Abstaining or Dismissing the Involuntary Chapter 7 Petition (the "**Motion**").  At a hearing on June 26, 2018, the Court heard argument on the Motion.

Based on the record, the Court finds that grounds exist under 11 U.S.C. § 305(a)(1) to warrant relief.

**IT IS ORDERED:**

1.    The Motion for expedited relief is granted.

2.    Pursuant to 11 U.S.C. § 305(a)(1), this Court abstains from exercising jurisdiction over any aspect of this case, which is hereby dismissed.

Dated: _____          _____

                                        Judge Robert J. Kressel