# Exhibit H
# (replaces incomplete Exhibit H from Docket No. 13)

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| ESSAR STEEL MINNESOTA LLC and ESML HOLDINGS INC.,[1] | Case No. 16-11626 (BLS)<br><br>(Jointly Administered) |
| Debtors. | Re: Docket Nos. 1286, 1311 _____ |

## ORDER GRANTING DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105(a) AND 1142(b) FOR ENTRY OF ORDER IMPLEMENTING THE PROVISIONS OF THE PLAN WITH RESPECT TO THE PREPETITION LENDER NOTES AND PREPETITION LENDER NOTES DOCUMENTS

Upon consideration of the motion (the "**Motion**"),[2] dated November 9, 2017, of Mesabi

Metallics Company LLC ("**Mesabi**") (f/k/a Essar Steel Minnesota LLC) and ESML Holdings

Inc. ("**Holdings**," and, together with Mesabi, the "**Debtors**"), for entry of an order implementing

the Plan[3] with respect to the Fixed Rate Junior Secured Notes Indenture and exhibits thereto

attached as **Exhibit 1** (together, the "**Indenture**") and the Prepetition Lender Notes; and upon

consideration of any and all objections, responses, and filings related to the Motion, as reflected

on the Court's docket for the above-captioned chapter 11 cases; and the Court having jurisdiction

to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157(b)

and 1334; and upon consideration of the Motion and the relief requested therein being a core

---

[1]   The last four digits of Essar Steel Minnesota LLC's federal taxpayer identification number are 8770. The last four digits of ESML Holdings Inc.'s federal taxpayer identification number are 8071.

[2]   Each capitalized term used but not otherwise ascribed a meaning herein shall have the meaning ascribed to such term in the Plan, and if not ascribed a meaning in the Plan, shall have the meaning ascribed to such term in the Indenture.

[3]   "**Plan**" means the *Third Amended Chapter 11 Plan of Reorganization of Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc.* [D.I. 990], as amended from time to time.

proceeding within the meaning of 28 U.S.C. § 157(b); and venue being proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been

provided; and it appearing that no other or further notice need be provided; and a mediation

having been held to consider the relief requested in the Motion (the "**Mediation**"); and upon the

record of all of the proceedings had before this Court; and good cause existing therefor;

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED.

2.      The Indenture, attached hereto as **Exhibit 1**, is approved as a revised Plan

Document, valid, binding, and enforceable notwithstanding any otherwise applicable

nonbankruptcy law, and incorporated by reference into, and an integral part of, the Plan and

Confirmation Order[4] for all purposes; *provided, however,* that further revisions may be made to

the Indenture prior to the Effective Date without further notice or Court order as agreed by the

Debtors, Plan Sponsor and Prepetition Lenders.

3.      The Debtors are authorized to issue the Prepetition Lender Notes in accordance

with the Indenture on the Effective Date.

4.      This Order shall be deemed to constitute a fully executed counterpart Mortgage

on the Issuer's interest in Real Estate Leases (to the extent permitted by law, and after having

obtained any and all necessary consents) and any fee interest in a Premises owned by the Issuer

on the Effective Date of the Plan, together with any fixture filing as may be necessary to create a

valid, perfected Lien (as defined in the Indenture) against the Premises owned by the Issuer on

the Effective Date of the Plan, as to each with the priority required by the Collateral Documents

and the Intercreditor Agreement (each, an "**Issuer Interest**"), delivered to the Collateral Agent,

---

[4]     "**Confirmation Order**" means the *Findings of Fact, Conclusions of Law, and Order Confirming the Third Amended Chapter 11 Plan of Reorganization for Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc. Proposed by the Debtors* [D.I. 1025].

2

as mortgagee or beneficiary, as applicable, for the ratable benefit of itself and the Holders (as

defined in the Indenture), in accordance with the requirements of <u>Section 10.03</u> of the Indenture

and/or the Collateral Documents (each, a "**Deemed Mortgage and Fixture Filing**"). Each

Deemed Mortgage and Fixture Filing shall be subject, in all instances, to the Permitted Liens as

well as all of the terms and conditions of the Indenture (including any requirements of release,

cancellation, subordination, or otherwise), the Intercreditor Agreement and/or the Priority Lien

Documents, as if such Deemed Mortgage and Fixture Filing constituted an actual Mortgage and

fixture filing delivered by the Issuer in accordance with the requirements of <u>Section 10.03</u> of the

Indenture and/or the Collateral Documents.

5.     A Deemed Mortgage and Fixture Filing shall remain valid until such time as an

actual Mortgage and fixture filing, as applicable, concerning the Issuer Interest that is the subject

of such Deemed Mortgage and Fixture Filing is delivered to the Collateral Agent in accordance

with <u>Section 10.03(a)</u> of the Indenture, at which time such Deemed Mortgage and Fixture Filing

shall be, automatically and without notice or Court order, amended thereby, with such actual

Mortgage and fixture filing relating back to the effectiveness of the Deemed Mortgage and

Fixture Filing as of the Effective Date.  The Issuer shall file the Mortgages required by <u>Section</u>

<u>10.03</u> of the Indenture in favor of the Collateral Agent as soon as reasonably practicable after the

Effective Date, and the Issuer and the Collateral Agent shall use commercially reasonable efforts

to cooperate in effectuating any applicable provisions of this Order.

6.     The Issuer shall file a certified copy of this Order (including only the pages of the

Indenture containing defined terms used in this Order and <u>Section 10.03</u> of the Indenture) with

any applicable Governmental Authority[5] necessary to reflect a Deemed Mortgage and Fixture

---

[5]  "**Governmental Authority**" means any nation or government, any state or other political subdivision thereof,
any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive,

10565191B:V-5

Filing as soon as reasonably practicable on or after the Effective Date. This Order shall be

sufficient and conclusive evidence of the validity, perfection and priority of the Deemed

Mortgage and Fixture Filing as of the Effective Date without the necessity of filing or recording

any deed of trust, mortgage, or other instrument or document which may otherwise be required

under the law of any jurisdiction or the taking of any other action to validate or perfect the

Deemed Mortgage and Fixture Filing or to entitle the Deemed Mortgage and Fixture Filing to the

lien priority granted in the Indenture. The Issuer shall execute and deliver to the Collateral

Agent all such other documents as the Collateral Agent may reasonably request to evidence,

confirm, validate or perfect, or to ensure the contemplated priority of the Deemed Mortgage and

Fixture Filing as of the Effective Date. In the event the Issuer has not done so, the Collateral

Agent, in its sole discretion, may file a photocopy of this Order with any recording officer or

with any registry of deeds or similar office in any jurisdiction in which the Issuer has real

property and, in such event, the subject filing or recording officer shall be authorized to file or

record such copy of this Order. Any filing of this Order with a recording officer or with any

registry of deeds or similar office in any jurisdiction in which the Issuer has real property shall

be deemed to have been filed or recorded as of the Effective Date.

     7.     In accordance with Section 1146 of the Bankruptcy Code, the issuance of the

Indenture and Prepetition Lender Notes thereunder, or the incurrence of Priority Lien Debt, and

the creation of any mortgage, deed of trust, lien, pledge, or other security interest, the making or

assignment of any lease or sublease, or the making or delivery of any deed or other instrument of

transfer under the Indenture, Collateral Documents, Priority Lien Debt, or Priority Lien

---

legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities
exchange and any self-regulatory organization, and any filing agents, filing officers, title agents, recording
agencies, secretaries of state, and all other Persons and entities who may be required by operation of law, the
duties of their office or contract, to accept, file, register, or otherwise record or release any documents or
instruments.

Documents is in furtherance of or in connection with the Plan, and so shall not be subject to any stamp, transfer, mortgage recording, or other similar tax (collectively, the "**Taxes**"). The Indenture and any Prepetition Lender Notes issued pursuant to it are exempt from and outside the purview of the Trust Indenture Act.

8.      Each Governmental Authority shall be bound by this Order and shall accept for filing this Order as contemplated in <u>paragraph 6</u>, and any other Mortgages or fixture filings pursuant to the Indenture and/or the Collateral Documents, without payment of any Taxes.

9.      In accordance with the agreement reached through Mediation:

    a.      The Indenture Trustee shall be an intended third party beneficiary of:

        i.      the obligation under the operating agreement of Chippewa Capital Partners, LLC (the "**Chippewa Operating Agreement**") for Nubai Global Investment Limited and/or DSA Investments Inc. (collectively, "**DSA**") to fund the remaining portion of its $250 million equity commitment in the aggregate (to the extent such equity has not been funded as of the Effective Date) (the "**Remaining Equity Contribution**") on the terms below; and

        ii.      Chippewa's obligation to contribute to the Issuer any Contributable Funds on the terms below.[6]

    b.      In the event the Remaining Equity Contribution has not been funded (from DSA or any other source, for example, if the Chippewa Members voluntarily choose to fund the balance of DSA's Remaining Equity Contribution) to Chippewa Capital Partners, LLC ("**Chippewa**"), and Chippewa and/or the other members of Chippewa (the members of Chippewa other than DSA, the "**Chippewa Members**") fail to file suit or any other action

---

[6] "**Contributable Funds**" means cash held by Chippewa (i) that was received from DSA to satisfy all or a portion of DSA's Remaining Equity Contribution to Chippewa (or from any other source that voluntarily funds the balance of DSA's Remaining Equity Contribution), if any, and (ii) that Chippewa has an obligation to contribute to the Issuer pursuant to the terms and conditions of the operating agreement of the Issuer (the "**Issuer Operating Agreement**").

against DSA by June 30, 2018, then the Indenture Trustee may file a suit or any other action against DSA on behalf and in the name of Chippewa seeking enforcement of DSA's Remaining Equity Contribution.

        c.     In the event the Remaining Equity Contribution has not been funded (from DSA or any other source, for example, if the Chippewa Members voluntarily choose to fund the balance of DSA's Remaining Equity Contribution) to Chippewa, and Chippewa and/or the Chippewa Members have filed suit or any other action against DSA by June 30, 2018, then after June 30, 2018 the Indenture Trustee may intervene in the filed suit or other action as a plaintiff against DSA on behalf and in the name of Chippewa seeking enforcement of DSA's Remaining Equity Contribution.

        d.     In the event the Remaining Equity Contribution has not been funded (from DSA or any other source, for example, if the Chippewa Members voluntarily choose to fund the balance of DSA's Remaining Equity Contribution) to Chippewa, and Chippewa and/or the Chippewa Members have filed suit or any other action against DSA by June 30, 2018, then after June 30, 2018 Chippewa, the Chippewa Members and the Indenture Trustee shall cooperate and determine jointly whether any other suit or action against DSA on behalf and in the name of Chippewa is desirable to seek enforcement of DSA's Remaining Equity Contribution and, in that event, shall cooperate in such other suit or action; *provided, however*, that in the event the Indenture Trustee determines that Chippewa and/or the Chippewa Members are unreasonably delaying the prosecution of any such other suit or action, the Indenture Trustee may do so after June 30, 2018.

        e.     Chippewa, the Chippewa Members and the Indenture Trustee shall consult with one another regarding any suit or other action seeking enforcement of DSA's Remaining

Equity Contribution and, where possible, agree as to the manner, strategy and other aspects regarding its prosecution. Chippewa, the Chippewa Members and the Indenture Trustee shall execute a mutually acceptable, joint defense, common interest and confidentiality agreement concerning any such suit or other action. The Indenture Trustee shall be entitled to the applicable benefits of the Indenture, including without limitation, Sections 7.01(e) and 7.07(b) in connection with its prosecution of any such suit or action.

f.    In the event Chippewa has received Contributable Funds and has not contributed such funds to the Issuer, the Indenture Trustee may file a suit or any other action against Chippewa on behalf and in the name of the Issuer seeking enforcement of Chippewa's obligation to contribute the Contributable Funds to the Issuer. The Indenture Trustee shall be entitled to the applicable benefits of the Indenture, including without limitation, Sections 7.01(e) and 7.07(b) in connection with its prosecution of any such suit or action.

g.    The Indenture Trustee's rights under paragraph 9(a - i) of this Order shall terminate on the date the Remaining Equity Contribution is received by Chippewa (from DSA or any other source, for example, if the Chippewa Members voluntarily choose to fund the balance of DSA's Remaining Equity Contribution) and the full $250 million of equity funding in the aggregate has been funded to the Issuer; *provided*, that Chippewa and/or the Chippewa Members shall be entitled to continue the prosecution of any suit or other action thereafter on behalf and in the name of Chippewa in place of the Indenture Trustee. All cash Investment amounts and/or equity contributions made, or deemed made by Chippewa, through the Effective Date of the Plan or thereafter shall be counted in determining whether the full $250 million of equity funding in the aggregate has been funded. Any payment or recovery (net of amounts payable to the Indenture Trustee pursuant to Section 7.07(b) of the Indenture in connection with its prosecution

105651918/V-5

of such enforcement action) in connection with the Remaining Equity Contribution shall constitute the property of Chippewa and be immediately turned over to it in satisfaction of the Remaining Equity Contribution, in whole or in part, as applicable, of which Chippewa shall then immediately contribute to the Issuer the amount or portion thereof, if any, necessary to satisfy Chippewa's $250 million equity commitment in the aggregate that has not been funded prior thereto. Any agreement or obligation to contribute equity and/or any right, claim or cause of action to enforce any agreement or obligation to contribute equity, as to each as to Chippewa and/or Mesabi, and any payment or recovery on any of the foregoing, shall not constitute collateral or proceeds thereof under the Indenture, and there shall be no Lien thereon, on the Effective Date or thereafter unless and until it shall constitute collateral under the Indenture and Priority Lien Documents.

      h.    Pursuant to the Chippewa Operating Agreement and this Order, Chippewa's members consent to the jurisdiction of the United States District Court for the District of Delaware for enforcement of the equity contribution obligations in the Chippewa Operating Agreement and DSA agrees to accept service by certified mail or registered mail in an enforcement action at its address at Level 28G, Silver Tower, Cluster 1, Jumeriah Lake Towers, P.O. Box 393324 Dubai, United Arab Emirates, Attn.: John Oram.

      i.    Pursuant to the Issuer Operating Agreement and this Order, Chippewa consents to the jurisdiction of the United States District Court for the District of Delaware for enforcement of the equity contribution obligations in the Issuer Operating Agreement.

      j.    Chippewa's equity interest in the Issuer shall be pledged to the Collateral Agent as collateral under the Indenture, and any remedy with respect such pledge shall be enforceable under the terms of the Indenture and the Uniform Commercial Code upon the

8

occurrence of an Event of Default under the Indenture that remains uncured after any applicable notice or grace period. Such pledge shall be subordinated to the pledge of Chippewa's equity interest in the Issuer to the collateral agent or lenders of the Priority Lien Debt, upon the closing on the Priority Lien Debt provided for in section 4.09(b)(3) of the Indenture (a "**Priority Lien Closing**").

k.      Starting with the month ended January 31, 2018 and ending upon the Priority Lien Closing under section 4.09(b)(3) of the Indenture, the Reorganized Debtor shall provide a monthly cash report by the 15th day of the following month to the Indenture Trustee and to the existing counsel to the Prepetition Lenders (the "**Recipients**"). Until the Priority Lien Closing under section 4.09(b)(3) of the Indenture, the Recipients may also, upon at least 5 business days' notice, request a call with the Reorganized Debtor and its professionals at a mutually convenient time for an update on construction of the Project, payment of post-Effective Date vendors on the Project, progress towards closing on the Priority Lien Debt and/or related matters (subject to any confidentiality restrictions which may be in place with respect to such information).

l.      The right to pursue collection and/or enforcement of the cost judgment entered by the United States District Court for the District of Minnesota on May 26, 2017 (Case No. 09-cv-3037), in favor of the Debtors and against Great Lakes Gas Transmission Limited Partnership, shall be a right of the SC Litigation Trust on the Effective Date.

10.     Any action taken by the Indenture Trustee pursuant to this Order shall be at the direction of Holders of the requisite principal amount of Notes.

11.     Notwithstanding anything to the contrary in the Plan or the SC Litigation Trust Agreement, the beneficial interests in the SC Litigation Trust shall be freely transferable.

I05651918V-5

12.     This Order shall be null and void if the Effective Date does not occur on or before December 31, 2017, or such later date as is agreed by counsel to the Debtors, Plan Sponsor and Prepetition Lenders, each acting in its sole discretion.  In the event this Order is rendered null and void pursuant to the prior sentence, absent an agreement otherwise by the Debtors, Plan Sponsor and Prepetition Lenders, the Motion will be reset for a hearing within 10 days (subject to the Court's calendar), and a new deadline set for the Project Finance Lenders' objection and any reply.

13.     In the event of any inconsistency between this Order, on the one hand, and the Indenture, the Chippewa Operating Agreement, the Issuer Operating Agreement, the Plan and/or the Confirmation Order, on the other hand, this Order shall govern and control.

14.     This Court shall retain jurisdiction to interpret and enforce this Order.  Any and all disputes concerning the subject matter of this Order, or the filings and recordings made in accordance with paragraph 6 of this Order, shall be adjudicated by the Court.

Dated: December 12, 2017
       Wilmington, Delaware

Honorable Brendan L. Shannon
United States Bankruptcy Judge

10

01565191013V-5

**EXHIBIT 1**

Further Revised Indenture and Blackline

Reference is made to that certain Intercreditor Agreement, to be entered into by the Priority Lien Agent (as defined therein), [the representative of Prepetition Lien Trade Creditor Agent (as defined therein),] and Wilmington Savings Fund Society, FSB, as Second Lien Collateral Trustee (as defined therein) and acknowledged and agreed by Mesabi Metallics Company LLC and certain of its subsidiaries (the "Intercreditor Agreement"). Each holder of Second Lien Obligations (as defined therein) (i) consents to the subordination of Liens provided for in the Intercreditor Agreement, (ii) agrees that it will be bound by, and will take no actions contrary to, the provisions of the Intercreditor Agreement and (iii) authorizes and instructs the Second Lien Collateral Trustee (as defined therein) on behalf of each Second Lien Secured Party (as defined therein) to enter into the Intercreditor Agreement as Second Lien Collateral Trustee on behalf of such Second Lien Secured Parties. The foregoing provisions are intended as an inducement to the lenders under the Priority Lien Documents (as defined in the Intercreditor Agreement) to extend credit to Mesabi Metallics Company LLC and such lenders are intended third party beneficiaries of such provisions and the provisions of the Intercreditor Agreement.

## FIXED RATE JUNIOR SECURED NOTES INDENTURE

Dated as of [__], 2017

Among

Mesabi Metallics Company LLC as Issuer,

ERP Iron Ore, LLC as Guarantor

and

Wilmington Savings Fund Society, FSB
as Trustee, Collateral Agent, Paying Agent and Registrar

FIXED RATE JUNIOR SECURED NOTES DUE 2027

TABLE OF CONTENTS

Page

Article 1 DEFINITIONS AND INCORPORATION BY REFERENCE ....................................... 1
    Section 1.01    Definitions.................................................................................. 1
    Section 1.02    Other Definitions .................................................................... 35
    Section 1.03    Rules of Construction ............................................................. 36
    Section 1.04    [Reserved] ............................................................................... 37
    Section 1.05    Acts of Holders ...................................................................... 37

Article 2 THE NOTES........................................................................................................... 39
    Section 2.01    Form and Dating; Terms........................................................ 39
    Section 2.02    Execution and Authentication................................................ 40
    Section 2.03    Registrar and Paying Agent. .................................................. 41
    Section 2.04    Paying Agent to Hold Money in Trust................................... 41
    Section 2.05    Holder Lists............................................................................ 41
    Section 2.06    Transfer and Exchange .......................................................... 42
    Section 2.07    Replacement Notes ................................................................ 43
    Section 2.08    Outstanding Notes.................................................................. 43
    Section 2.09    Treasury Notes ....................................................................... 44
    Section 2.10    Temporary Notes ................................................................... 44
    Section 2.11    Cancellation ........................................................................... 44
    Section 2.12    Defaulted Interest................................................................... 44
    Section 2.13    CUSIP and ISIN Numbers .................................................... 45
    Section 2.14    Interest.................................................................................... 45

Article 3 REDEMPTION....................................................................................................... 46
    Section 3.01    Notices to Trustee. ................................................................. 46
    Section 3.02    Selection of Notes to be Redeemed or Purchased in Part...... 46
    Section 3.03    Notice of Redemption. ........................................................... 46
    Section 3.04    Effect of Notice of Redemption............................................. 48
    Section 3.05    Deposit of Redemption or Purchase Price. ............................ 48
    Section 3.06    Optional Redemption. ............................................................ 49
    Section 3.07    Mandatory Redemption. ......................................................... 49
    Section 3.08    Notes Redeemed or Purchased in Part ................................... 49

Article 4 COVENANTS ........................................................................................................ 50
    Section 4.01    Payment of Notes................................................................... 50
    Section 4.02    Prepayment of Notes.............................................................. 50
    Section 4.03    Taxes...................................................................................... 50
    Section 4.04    Stay, Extension and Usury Laws ........................................... 51
    Section 4.05    Corporate Existence ............................................................... 51
    Section 4.06    Reports and Other Information ............................................... 51
    Section 4.07    Compliance Certificate. ......................................................... 52

Section 4.08    Limitation on Restricted Payments.........................................................53
Section 4.09    Limitation on Indebtedness....................................................................57
Section 4.10    Limitation on Liens.................................................................................61
Section 4.11    Designation of Restricted and Unrestricted Subsidiaries.....................61
Section 4.12    Future Guarantors. ................................................................................62
Section 4.13    Limitation on Restrictions on Distribution From Restricted
                Subsidiaries............................................................................................63
Section 4.14    Transactions with Affiliates...................................................................65
Section 4.15    Redemption Upon Event of Default. .....................................................66
Section 4.16    Offer to Repurchase Upon Change of Control. ....................................68
Section 4.17    Payments for Consent. ...........................................................................70
Section 4.18    [Reserved.]..............................................................................................70
Section 4.19    Asset Sales. .............................................................................................70

Article 5 SUCCESSORS .............................................................................................71
Section 5.01    Merger, Consolidation or Sale of Assets. ..............................................71

Article 6 DEFAULTS AND REMEDIES ......................................................................72
Section 6.01    Events of Default ....................................................................................72
Section 6.02    Acceleration ...........................................................................................75
Section 6.03    Remedies.................................................................................................75
Section 6.04    Waiver of Past Defaults .........................................................................75
Section 6.05    Control by Majority ...............................................................................76
Section 6.06    Limitation on Suits.................................................................................76
Section 6.07    Rights of Holders to Receive Payment ..................................................76
Section 6.08    Collection Suit by Trustee .....................................................................77
Section 6.09    Restoration of Rights and Remedies......................................................77
Section 6.10    Rights and Remedies Cumulative..........................................................77
Section 6.11    Delay or Omission Not Waiver...............................................................77
Section 6.12    Trustee May File Proofs of Claim .........................................................77
Section 6.13    Priorities.................................................................................................78
Section 6.14    Undertaking for Costs ...........................................................................79

Article 7 TRUSTEE.......................................................................................................79
Section 7.01    Duties of Trustee....................................................................................79
Section 7.02    Rights of Trustee....................................................................................80
Section 7.03    Individual Rights of Trustee ..................................................................82
Section 7.04    Trustee's Disclaimer ..............................................................................82
Section 7.05    Notice of Defaults ..................................................................................83
Section 7.06    Reports by Trustee to Holders of the Notes...........................................83
Section 7.07    Compensation and Indemnity ...............................................................83
Section 7.08    Replacement of Trustee .........................................................................84
Section 7.09    Successor Trustee by Merger, etc ..........................................................85
Section 7.10    Eligibility; Disqualification ...................................................................85

Article 8 OTHER OBLIGATIONS AND OFFSETS ................................................. 85
    Section 8.01    Plan Obligations.................................................................. 85
    Section 8.02    Guarantor Working Capital Obligations. ........................... 85
    Section 8.03    Other Iron or Steel Production Facilities ........................... 86
    Section 8.04    Holder Covenant. ................................................................ 86
    Section 8.05    KYC. .................................................................................. 86

Article 9 AMENDMENT, SUPPLEMENT AND WAIVER ................................... 86
    Section 9.01    Without Consent of Holders ............................................. 86
    Section 9.02    With Consent of Holders .................................................. 88
    Section 9.03    Relation to Trust Indenture Act ........................................ 90
    Section 9.04    Revocation and Effect of Consents................................... 90
    Section 9.05    Notation on or Exchange of Notes .................................... 90
    Section 9.06    Trustee to Sign Amendments, etc ..................................... 90

Article 10 COLLATERAL AND SECURITY ........................................................ 91
    Section 10.01    The Collateral. ................................................................... 91
    Section 10.02    After-Acquired Property. ................................................... 92
    Section 10.03    Real Estate Mortgages and Filings ................................... 93
    Section 10.04    Release of Collateral ......................................................... 94
    Section 10.05    Authorization of Actions to be Taken by the Trustee or the
                        Collateral Agent Under the Collateral Documents ............... 95
    Section 10.06    Intercreditor Agreement .................................................... 96
    Section 10.07    Collateral Account ............................................................ 96

Article 11 GUARANTEES.................................................................................... 97
    Section 11.01    Guarantee .......................................................................... 97
    Section 11.02    Limitation on Guarantor Liability...................................... 99
    Section 11.03    Execution and Delivery...................................................... 99
    Section 11.04    Subrogation ..................................................................... 100
    Section 11.05    Benefits Acknowledged ................................................... 100
    Section 11.06    Release of Note Guarantees ............................................. 100
    Section 11.07    Effective Date of ERPI Note Guarantee. ......................... 101

Article 12 SATISFACTION AND DISCHARGE ................................................ 101
    Section 12.01    Satisfaction and Discharge............................................... 101
    Section 12.02    Application of Trust Money............................................... 102

Article 13 MISCELLANEOUS ........................................................................... 103
    Section 13.01    Notices ............................................................................ 103
    Section 13.02    Certificate and Opinion as to Conditions Precedent............ 104
    Section 13.03    Statements Required in Certificate or Opinion.................... 105
    Section 13.04    Rules by Trustee and Agents ........................................... 105
    Section 13.05    No Personal Liability of Directors, Officers, Employees,
                        Members, Partners and Stockholders.................................. 105

| | | |
|---|---|---|
| Section 13.06 | Governing Law | 106 |
| Section 13.07 | Waiver of Jury Trial | 106 |
| Section 13.08 | Force Majeure | 106 |
| Section 13.09 | No Adverse Interpretation of Other Agreements | 106 |
| Section 13.10 | Successors | 106 |
| Section 13.11 | Severability | 106 |
| Section 13.12 | Counterpart Originals | 107 |
| Section 13.13 | Table of Contents, Headings, etc | 107 |
| Section 13.14 | Facsimile and PDF Delivery of Signature Pages | 107 |
| Section 13.15 | U.S.A. PATRIOT Act | 107 |
| Section 13.16 | Payments Due on Non-Business Days | 107 |
| Section 13.17 | Effectiveness of Indenture. | 107 |
| Section 13.18 | Trustee as Agent. | 108 |
| Section 13.19 | Trustee as Third Party Beneficiary | 108 |

Appendix A    Provisions Relating to Notes

Exhibit A     Form of Note
Exhibit B     Form of Institutional Accredited Investor Transferee Letter of Representation
Exhibit C     Form of Supplemental Indenture to Be Delivered by Subsequent Guarantors
Exhibit D     Form of Issuer Notification and Direction to Trustee Under Section 2.14(d) of this
              Indenture Regarding the Payment of PIK Interest
Exhibit E     Form of Intercreditor Agreement

INDENTURE, dated as of [__], 2017, among Mesabi Metallics Company LLC, a Minnesota limited liability company, as issuer (the "Issuer"), ERP Iron Ore, LLC, a Virginia limited liability company, a Guarantor (as defined below), and Wilmington Savings Fund Society, FSB, as trustee (the "Trustee"), collateral agent (in such capacity, the "Collateral Agent"), paying agent (in such capacity, the "Paying Agent") and registrar (in such capacity, the "Registrar").

## W I T N E S S E T H

WHEREAS, on July 8, 2016, the Issuer (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc. ("ESML;" together with the Issuer, the "Debtors") each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and the Debtors have continued to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, on June 13, 2017, the Bankruptcy Court entered an order confirming the Debtors' Third Amended Chapter 11 Plan of Reorganization (the "Plan");

WHEREAS, in accordance with the Debtors' Plan, the Issuer has duly authorized the creation and issuance of $300 million aggregate principal amount of Fixed Rate Junior Secured Notes due [_____], 2027 (*provided* that the principal amount of the Notes authorized and outstanding may be increased in connection with PIK Interest) (the "Notes"); and

WHEREAS, the Issuer and the Guarantors have each duly authorized the execution and delivery of this Indenture;

NOW, THEREFORE, the Issuer, the Guarantor, the Trustee and the Collateral Agent agree as follows for the benefit of each other and for the equal and ratable benefit of the Holders (defined below) of the Notes.

Article 1

DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01    Definitions.

"Acquired Indebtedness" means, with respect to any specified Person, (1) Indebtedness of any Person or any of its Subsidiaries existing at the time such Person becomes a Restricted Subsidiary, (2) Indebtedness assumed in connection with the acquisition of assets from such Person, or (3) Indebtedness secured by a Lien encumbering any asset acquired by such specified Person, in each case whether or not Incurred by such Person in connection with, or in anticipation or contemplation of, such Person becoming a Restricted Subsidiary or such acquisition. Acquired Indebtedness shall be deemed to have been Incurred, with respect to clause (1) of the preceding sentence, on the date such Person becomes a Restricted Subsidiary and, with respect to clauses (2) and (3) of the preceding sentence, on the date of consummation of such acquisition of assets.

"Additional Notes" means additional Notes (other than the Initial Notes) issued under this Indenture in accordance with Section 2.01, Section 2.02 and Section 4.09 hereof, as part of the same series as the Initial Notes.

"Affiliate" of any specified Person means any other Person, directly or indirectly, controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with") when used with respect to any Person means possession, directly or indirectly, of the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing, provided that exclusively for purposes of Section 4.14, beneficial ownership of 30% or more of the Voting Stock of a Person shall be deemed to be control; *provided* that none of the lenders or agents under the Priority Lien Documents shall be deemed to be an "Affiliate" of any Obligor, the Issuer, or any of its respective Subsidiaries.

"Agent" means any Collateral Agent, Paying Agent or Registrar.

"Asset Sale" means

(1)     the sale, lease, conveyance or other disposition of any assets; *provided* that the sale, lease, conveyance or other disposition of all or substantially all of the assets of the Issuer and its Restricted Subsidiaries taken as a whole will be governed by Section 4.16 hereof and/or Section 5.01 and not by the provisions of Section 4.19; and

(2)     the sale of Equity Interests in any Obligor or its Subsidiaries or the sale of Equity Interests held by any Obligor or any of its Subsidiaries in any of its other Subsidiaries.

Notwithstanding the preceding, none of the following items will be deemed to be an Asset Sale:

(1)     any single transaction or series of related transactions that involves assets having a Fair Market Value of less than $50 million, *provided, however*, that during the Indenture Covenant Compliance Period such Fair Market Value shall not exceed $10 million;

(2)     a transfer of assets (a) between or among the Issuer and the Obligors, (b) between or among any Restricted Subsidiaries that are not Obligors or (c) from any Restricted Subsidiary that is not an Obligor to the Issuer or an Obligor;

(3)     an issuance of Equity Interests by a Restricted Subsidiary of the Issuer to the Issuer or to a Restricted Subsidiary of the Issuer;

(4)     the disposition of products, services, inventory or accounts receivable in the ordinary course of business and any sale or other disposition of damaged, worn-out or obsolete assets in the ordinary course of business;

(5)     the sale or other disposition of cash or Cash Equivalents;

(6)    a Restricted Payment that does not violate Section 4.08;

(7)    Permitted Investments, including, without limitation, unwinding Hedging Obligations;

(8)    the creation or perfection of a Lien (but not, except to the extent contemplated in clause (9) below, the sale or other disposition of the properties or assets subject to such Lien);

(9)    the creation or perfection of a Permitted Lien and the exercise by any Person in whose favor a Permitted Lien is granted of any of its rights in respect of that Permitted Lien;

(10)    any exchange of assets (including a combination of assets and Cash Equivalents) for assets related to a Similar Business of comparable or greater fair market value or usefulness to the business of the Issuer and the Restricted Subsidiaries as a whole, as determined in good faith by an Officer of the Issuer and, to the extent allowable under Section 1031 of the Code, any exchange of like property for use in a Similar Business;

(11)    the licensing or sublicensing of intellectual property in the ordinary course of business and which do not materially interfere with the business of the Issuer and its Restricted Subsidiaries;

(12)    sales, assignments, or transfers of interests in production, *provided, however,* that during the Indenture Covenant Compliance Period such sales, assignments, or transfers of interests in production shall occur in the ordinary course of business; and

(13)    a surrender or waiver of contract rights or the settlement, release or surrender of contract, tort or other claims of any kind, *provided, however*, that during the Indenture Covenant Compliance Period such actions shall occur in the ordinary course of business.

"Attributable Debt" in respect of a sale and leaseback transaction means, at the time of determination, the present value of the obligation of the lessee for net rental payments during the remaining term of the lease included in such sale and leaseback transaction including any period for which such lease has been extended or may, at the option of the lessor, be extended. Such present value shall be calculated using a discount rate equal to the rate of interest implicit in such transaction, determined in accordance with GAAP.

"Average Life" means, as of the date of determination, with respect to any Indebtedness or Preferred Stock, the quotient obtained by dividing (1) the sum of the products obtained by multiplying (a) the amount of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Preferred Stock by (b) the number of years (calculated to the nearest one-twelfth) from the date of determination to the date of such payment; by (2) the sum of the amounts of all such payments.

"Bankruptcy Code" means Title 11 of the United States Code or any applicable successor statute.

"Bankruptcy Law" means the Bankruptcy Code, as amended, or any similar federal, state or foreign law for the relief of debtors.

"beneficial ownership" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, and "beneficial owner" has a corresponding meaning.

"Board of Directors" means:

(1)    with respect to the Issuer, the board of governors of the Issuer, or in the event the Issuer has no board of governors, the board of directors or managers of the Issuer's managing member;

(2)    with respect to a corporation, the board of directors of the corporation;

(3)    with respect to a partnership, the board of directors of the general partner of the partnership; and

(4)    with respect to any other Person, the board or committee of such Person serving a similar function;

and, in each case, other than for purposes of determining a Change of Control, any duly authorized committee of any such body.

"Business Day" means each day that is not a Saturday, Sunday or other day on which banking institutions in New York, New York are authorized or required by law to close.

"Capital Stock" of any Person means any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) equity of such Person, including any Preferred Stock and limited liability or partnership interests (whether general or limited), but excluding any debt securities convertible or exchangeable into such equity.

"Capitalized Lease Obligations" means an obligation that is required to be classified and accounted for as a capitalized lease for financial reporting purposes in accordance with GAAP as in effect on the initial Issue Date. The amount of Indebtedness represented by such obligation will be the capitalized amount of such obligation at the time any determination thereof is to be made as determined in accordance with GAAP as in effect on the initial Issue Date, and the Stated Maturity thereof will be the date of the last payment of rent or any other amount due under such lease prior to the first date such lease may be terminated without penalty.

"Cash Equivalents" means:

(1)    U.S. dollars or, in the case of any Foreign Subsidiary, such local currencies held by it from time to time in the ordinary course of business;

-4-

(2)       securities issued or directly and fully Guaranteed or insured by the
U.S. government or any agency or instrumentality of the United States (*provided* that the
full faith and credit of the United States is pledged in support thereof), having maturities
of not more than one year from the date of acquisition;

(3)       marketable general obligations issued by any state of the United
States or any political subdivision of any such state or any public instrumentality thereof
maturing within one year from the date of acquisition and, at the time of acquisition,
having a credit rating of at least "A" or the equivalent thereof by S&P or Moody's or
carrying an equivalent rating by a nationally recognized rating agency, if both of the two
named rating agencies cease publishing ratings of investments;

(4)       certificates of deposit, time deposits, eurodollar time deposits,
overnight bank deposits or bankers' acceptances having maturities of not more than one
year from the date of acquisition thereof issued by any commercial bank the long-term
debt of which is rated at the time of acquisition thereof at least "A" or the equivalent
thereof by S&P or Moody's, or carrying an equivalent rating by a nationally recognized
rating agency, if both of the two named rating agencies cease publishing ratings of
investments, and having combined capital and surplus in excess of $500 million;

(5)       repurchase obligations with a term of not more than seven (7) days
for underlying securities of the types described in clauses (2), (3) and (4) entered into
with any bank meeting the qualifications specified in clause (4) above;

(6)       commercial paper rated at the time of acquisition thereof at least
"A-2" or the equivalent thereof by S&P or "P-2" or the equivalent thereof by Moody's, or
carrying an equivalent rating by a nationally recognized rating agency, if both of the two
named rating agencies cease publishing ratings of investments, and in any case maturing
within one year after the date of acquisition thereof; and

(7)       interests in any investment company or money market fund which
invests 95% or more of its assets in instruments of the type specified in clauses (1)
through (6) above.

"Cash Interest" means the payment of interest on the Notes in cash equal to the
amount of accrued and unpaid interest due on the relevant Interest Payment Date.

"Change of Control" means

(1)       any person or "group" (within the meaning of Rules 13d-3 and
13d-5 under the Exchange Act as in effect on the date of the original issuance of the
Notes hereunder, other than any employee benefit plan of such person and its
subsidiaries, any person or entity acting in its capacity as trustee, agent or other fiduciary
or administrator of any such plan or the Permitted Holders) shall have acquired beneficial
ownership of Equity Interests of the Issuer representing more than 50% of the aggregate
voting power of the Voting Stock of the Issuer (determined on a fully diluted basis but
not giving effect to contingent voting rights that have not yet vested); or

(2)     the merger or consolidation of the Issuer with or into another
Person or the merger of another Person with or into the Issuer or the merger of any
Person with or into a Subsidiary of the Issuer, unless holders of a majority of the
aggregate voting power of the Voting Stock of the Issuer immediately prior to such
transaction and/or the Permitted Holders, hold securities of the surviving or transferee
Person that represent, immediately after such transaction, more than 50% of the aggregate
voting power of the Voting Stock of the surviving or transferee Person; or

(3)     the sale, assignment, conveyance, transfer, lease or other
disposition (other than by way of merger or consolidation), in one or a series of
transactions, of all or substantially all of the assets of the Issuer and its Restricted
Subsidiaries taken as a whole to any "person" (as such term is used in Section 13.01(d)
and 14(d) of the Exchange Act); or

(4)     the adoption by the holders of Capital Stock of the Issuer or any
Parent Company of a plan or proposal for the liquidation or dissolution of the Issuer or
any Parent Company.

"Chippewa" shall mean Chippewa Capital Partners, LLC.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" means all property and assets of the Obligors from time to time
whether now owned or hereafter acquired, in which Liens are, from time to time, granted to
secure the Notes and the Obligors' Obligations under each other Notes Document pursuant to the
Collateral Documents subject to the terms of the Intercreditor Agreement; *provided, however*
that the term Collateral shall not include any real property of the Obligors upon which the HBI
Facility is constructed and/or operates or personal property of the Obligors used by the HBI
Facility, each with the consent of the Obligors, as such property is identified in any express
written notice to the Trustee by the Obligors of their intention to sell such property to the
developer of the HBI Facility, and *provided, further* that no cash that ultimately constitutes
consideration provided by an investor in exchange for equity interests in one or more Obligors as
of or after the date hereof, shall constitute Collateral unless such cash constitutes collateral under
the Priority Lien Documents.

"Collateral Documents" means the Intercreditor Agreement and the instruments
and documents executed and delivered pursuant to or otherwise in connection with the Indenture
(including, without limitation, the financing statements under the Uniform Commercial Code of
the relevant state) that create or purport to create a Lien in the Collateral in favor of the
Collateral Agent and/or the Trustee (for the benefit of the Holders of Notes and the Trustee in its
various capacities) or any notice of such pledge, assignment or grant, in each case as they may be
amended, supplemented or otherwise modified from time to time.

"Commodity Agreement" means, with respect to any Person, any commodity
future or forward, swap or option, cap or collar or other similar agreement or arrangement as to
which such Person is a party or beneficiary.

-6-

"Common Stock" means with respect to any Person, any and all shares, interests or other participations in, and other equivalents (however designated and whether voting or nonvoting) of such Person's common equity whether or not outstanding on the Issue Date, and includes, without limitation, all series and classes of such common equity.

"Consolidated Depreciation and Amortization Expense" means with respect to any Person for any period, the total amount of depreciation and amortization expense, including the amortization of deferred financing fees, debt issuance costs, commissions, fees and expenses, of such Person and its Restricted Subsidiaries for such period on a consolidated basis and otherwise determined in accordance with GAAP.

"Consolidated Net Income" means, with respect to any specified Person for any period, the aggregate of the Net Income of such Person and its Restricted Subsidiaries for such period, on a consolidated basis, determined in accordance with GAAP; *provided* that:

(1)    the Net Income (but not loss) of any Person that is not a Restricted Subsidiary or that is accounted for by the equity method of accounting will be included only to the extent of the amount of dividends or similar distributions paid in cash to the specified Person or a Restricted Subsidiary of the Person;

(2)    the Net Income of any Restricted Subsidiary will be excluded to the extent that the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of that Net Income is not at the date of determination permitted without any prior governmental approval (that has not been obtained) or, directly or indirectly, by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Restricted Subsidiary or its stockholders, partners or members;

(3)    the cumulative effect of a change in accounting principles will be excluded;

(4)    income resulting from transfers of assets (other than cash) between such Person or any of its Restricted Subsidiaries, on the one hand, and an Unrestricted Subsidiary, on the other hand, will be excluded;

(5)    any non-cash compensation charge arising from any grant of stock, stock options or other equity based awards will be excluded;

(6)    any unrealized non-cash gains or losses or charges in respect of hedge or non-hedge derivatives (including those resulting from the application of FASB ASC Topic 815) will be excluded; and

(7)    to the extent deducted in the calculation of Net Income, any non-cash or nonrecurring charges associated with any premium or penalty paid, write-off of deferred financing costs or other financial recapitalization charges in connection with redeeming or retiring any Indebtedness prior to its Stated Maturity will be excluded.

In addition, to the extent not already accounted for in the Consolidated Net Income of such Person and its Restricted Subsidiaries, notwithstanding anything to the contrary in the foregoing, Consolidated Net Income shall include (i) the amount of proceeds received during such period from business interruption insurance in respect of insured claims for such period, (ii) the amount of proceeds as to which the Issuer has determined there is reasonable evidence it shall be reimbursed by the insurer in respect of such period from business interruption insurance (with a deduction for any amounts so added back to the extent denied by the applicable carrier in writing within 180 days or not so reimbursed within 365 days) and (iii) reimbursements received of any expenses and charges that are covered by indemnification or other reimbursement provisions in connection with any Permitted Investment or any sale, conveyance, transfer or other disposition of assets permitted hereunder.

"Consolidated Priority Lien Secured Debt Ratio" as of any date of determination means, the ratio of (1) Net Priority Lien Obligations to (2) the EBITDA of the Issuer and the Restricted Subsidiaries (on a consolidated basis) for the most recently ended four full fiscal quarters for which internal financial statements have been made available immediately preceding the date on which such event for which such calculation is being made shall occur, in each case with such pro forma adjustments set forth below.

In the event that the Issuer or any Restricted Subsidiary (i) incurs, assumes, guarantees, redeems, retires or extinguishes any Indebtedness (other than, for purposes of calculating EBITDA only, Indebtedness incurred under the Priority Lien Documents unless such Indebtedness has been permanently repaid and has not been replaced) or (ii) issues or redeems Disqualified Stock or Preferred Stock subsequent to the commencement of the period for which the Consolidated Priority Lien Secured Debt Ratio is being calculated but prior to or simultaneously with the event for which the calculation of the Consolidated Priority Lien Secured Debt Ratio is made, then the Consolidated Priority Lien Secured Debt Ratio shall be calculated giving pro forma effect to such incurrence, assumption, guarantee, redemption, retirement or extinguishment of Indebtedness, or such issuance or redemption of Disqualified Stock or Preferred Stock, as if the same had occurred at the beginning of the applicable four-quarter period.

For purposes of making the computation referred to above, Investments, acquisitions, dispositions, mergers, amalgamations, consolidations and discontinued operations (as determined in accordance with GAAP) and other operational changes that the Issuer or any of the Restricted Subsidiaries has determined to make and/or made during the four-quarter reference period or subsequent to such reference period and on or prior to or simultaneously with the event for which the computation of the Consolidated Priority Lien Secured Debt Ratio is made, the Consolidated Priority Lien Secured Debt Ratio shall be calculated on a pro forma basis assuming that all such Investments, acquisitions, dispositions, mergers, amalgamations, consolidations, discontinued operations and other operational changes (and any associated change in EBITDA resulting therefrom) had occurred on the first day of the four-quarter reference period. If since the beginning of such period any Person that subsequently became a Restricted Subsidiary or was merged with or into the Issuer or any of the Restricted Subsidiaries since the beginning of such period shall have made any Investment, acquisition, disposition, merger, amalgamation, consolidation, discontinued operation or operational change that would have required adjustment pursuant to this definition, then the Consolidated Priority Lien Secured

Debt Ratio shall be calculated giving pro forma effect thereto for such period as if such Investment, acquisition, disposition, merger, amalgamation, consolidation, discontinued operation or operational change had occurred at the beginning of the applicable four-quarter period.

"Consolidated Total Assets" means, at any date, all amounts that would, in conformity with GAAP, be set forth opposite the caption "total assets" (or any like caption) on a consolidated balance sheet of the Issuer and its Restricted Subsidiaries at such date plus pro forma adjustments as set forth in the last paragraph of the definition of Fixed Charge Coverage Ratio.

"Corporate Trust Office" shall be at the address of the Trustee specified in Section 13.01 or such other address as to which the Trustee may give notice to the Holders and the Issuer.

"Currency Agreement" means, with respect to any Person, any foreign exchange future or forward, swap or option, cap or collar or other similar agreement or arrangement as to which such Person is a party or a beneficiary.

"Custodian" means the Trustee, as custodian with respect to the Notes in global form, or any successor entity thereto.

"Default" means any event that is, or after notice or passage of time or both would be, an Event of Default.

"Definitive Note" means a certificated Note (bearing the Restricted Notes Legend if the transfer of such Note is restricted by applicable law) that does not include the Global Notes Legend.

"Depositary" means, with respect to the Notes issuable or issued in whole or in part in global form, the Person specified in Section 2.03 as the Depositary with respect to the Notes, and any and all successors thereto appointed as Depositary hereunder and having become such pursuant to the applicable provision of this Indenture.

"Disqualified Stock" means, with respect to any Person, any Capital Stock of such Person that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable) or upon the happening of any event:

    (1)    matures or is mandatorily redeemable pursuant to a sinking fund obligation or otherwise;

    (2)    is convertible into or exchangeable for Indebtedness or Capital Stock that satisfies the requirements of clause (1) or (3) hereof (excluding Capital Stock which is convertible or exchangeable solely at the option of the Issuer or a Restricted Subsidiary (it being understood that upon such conversion or exchange it shall be an Incurrence of such Indebtedness or Disqualified Stock)); or

-9-

(3)    is redeemable at the option of the holder of the Capital Stock in whole or in part (other than on account of a Change of Control or an Asset Sale),

in each case on or prior to the date ninety-one (91) days after the earlier of the final maturity date of the Notes or the date the Notes are no longer outstanding; *provided, however*, that only the portion of Capital Stock which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date will be deemed to be Disqualified Stock.

"DTC" means The Depository Trust Company or any successor thereto.

"EBITDA" means, with respect to any Person for any Period, the Consolidated Net Income of such Person and any their Restricted Subsidiaries for such period:

(1)    increased (without duplication) by:

(a)    provision for taxes based on income or profits or capital gains, including, without limitation, foreign, federal, state, franchise and similar taxes and foreign withholding taxes (including penalties and interest related to such taxes or arising from tax examinations) of such Person paid or accrued during such period deducted (and not added back) in computing Consolidated Net Income; plus

(b)    Fixed Charges of such Person for such period (including (x) net losses on Hedging Obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, (y) bank fees and (z) costs of surety bonds in connection with financing activities, to the extent the same was deducted (and not added back) in calculating such Consolidated Net Income; plus

(c)    Consolidated Depreciation and Amortization Expense of such Person for such period to the extent the same were deducted (and not added back) in computing Consolidated Net Income; plus

(d)    any expenses or charges (other than depreciation or amortization expense) related to any Equity Offering, Permitted Investment, acquisition, disposition, recapitalization or the incurrence of Indebtedness permitted to be incurred by this Indenture (including a refinancing thereof) (whether or not successful), and any amendment or modification to the terms of any such transaction including such fees, expenses or charges related to the Plan, in each case, deducted (and not added back) in computing Consolidated Net Income; plus

(e)    the amount of any restructuring charge or reserve deducted (and not added back) in such period in computing Consolidated Net Income, including any one-time costs incurred in connection with acquisitions after the Issue Date and costs related to the closure and/or consolidation of facilities; plus

(f)    any other non-cash charges, including any write-offs or write-downs, reducing Consolidated Net Income for such period (provided that if any

-10-

such non-cash charges represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from EBITDA to such extent), and excluding amortization of a prepaid cash item that was paid in a prior period); plus

(g) the amount of any minority interest expense consisting of Restricted Subsidiary income attributable to minority equity interests of third parties in any non-Wholly Owned Subsidiary deducted (and not added back) in such period in calculating Consolidated Net Income; plus

(h) the amount of net cost savings and synergies projected by the Issuer in good faith to be realized as a result of specified actions taken or to be taken (calculated on a pro forma basis as though such cost savings or synergy had been realized on the first day of such period), net of the amount of actual benefits realized during such period from such actions, to the extent such net cost savings and synergies are (1) reasonably expected to be achieved, completed or realized within 24 months of the first day of such 24-month period; and (2) are factually supportable and reasonably identified in writing to the Trustee in an Officers' Certificate; plus

(i) any costs or expense incurred by the Issuer or a Restricted Subsidiary pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any stock subscription or shareholder agreement, to the extent that such cost or expenses are funded with cash proceeds contributed to the capital of the Issuer or net cash proceeds of an issuance of Equity Interests of the Issuer (other than Disqualified Stock);

(2) decreased by (without duplication) non-cash gains increasing Consolidated Net Income of such Person for such period, excluding any non-cash gains to the extent they represent the reversal of an accrual or reserve for a potential cash item that reduced EBITDA in any prior period, and

(3) increased or decreased by (without duplication):

(a) any net gain or loss resulting in such period from Hedging Obligations and the application of Financial Accounting Standards Codification No. 815—Derivatives and Hedging; plus or minus, as applicable,

(b) any net gain or loss resulting in such period from currency translation gains or losses related to currency remeasurements of Indebtedness (including any net loss or gain resulting from Hedging Obligations for currency exchange risk); plus or minus, as applicable,

(c) any losses or gains resulting from the application of FASB Interpretation No. 45 (Guarantees).

-11-

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"Equity Offering" means any public or private sale of Common Stock or Preferred Stock of the Issuer or any of its direct or indirect parent companies (excluding Disqualified Stock), other than:

(1)     public offerings with respect to the Issuer's or any Parent Company's Common Stock registered on Form S-8;

and

(2)     issuances to Issuer or any of its Restricted Subsidiaries.

"ERPI" means ERP Iron Ore, LLC.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Fair Market Value" means, with respect to any Equity Interests, any other asset or any liability, the fair market value of such asset or liability as determined by Senior Management of the Issuer in good faith; *provided* that, except as otherwise provided in this Indenture, if the fair market value exceeds $10 million, such determination shall be made by the Board of Directors of the Issuer or an authorized committee thereof in good faith (including as to the value of all non-cash assets and liabilities) whose resolution with respect thereto will be delivered to the Trustee, upon which the Trustee shall be entitled to conclusively rely.

"Fixed Charges" means, with respect to any specified Person for any period, the sum, without duplication, of:

(1)     the consolidated interest expense of such Person and its Restricted Subsidiaries for such period, whether paid or accrued (including, without limitation, amortization of debt issuance costs and original issue discount, non-cash interest payments, the interest component of any deferred payment obligations, the interest component of all payments associated with Capitalized Lease Obligations, imputed interest with respect to Attributable Debt, commissions, discounts and other fees and charges incurred in respect of letter of credit or bankers' acceptance financings) and net of the effect of all payments made or received pursuant to Hedging Obligations in respect of interest rates; plus

(2)     the consolidated interest expense of such Person and its Restricted Subsidiaries that was capitalized during such period; plus

(3)     all dividends on any series of preferred stock of such Person or any of its Restricted Subsidiaries, other than dividends on Equity Interests payable solely in Equity

Interests of the Issuer (other than Disqualified Stock) or to the Issuer or a Subsidiary of the Issuer.

"Fixed Charge Coverage Ratio" means with respect to any specified Person for any period, the ratio of the EBITDA of such Person for such period to the cash Fixed Charges of such Person for such period. In the event that the specified Person or any of its Restricted Subsidiaries incurs, assumes, repays, repurchases, redeems, defeases or otherwise discharges any Indebtedness (other than ordinary working capital borrowings) or issues, repurchases or redeems preferred stock subsequent to the commencement of the period for which the Fixed Charge Coverage Ratio is being calculated and on or prior to the date on which the event for which the calculation of the Fixed Charge Coverage Ratio is made (the "Calculation Date"), then the Fixed Charge Coverage Ratio will be calculated giving pro forma effect to such incurrence, assumption, repayment, repurchase, redemption, defeasance or other discharge of Indebtedness, or such issuance, repurchase or redemption of preferred stock, and the use of the proceeds therefrom, as if the same had occurred at the beginning of the applicable four-quarter reference period.

In addition, for purposes of calculating the Fixed Charge Coverage Ratio:

(1)    acquisitions that have been made by the specified Person or any of its Restricted Subsidiaries, including through mergers, consolidations or otherwise, or any Person or any of its Restricted Subsidiaries acquired by the specified Person or any of its Restricted Subsidiaries, and including any related financing transactions and including increases in ownership of Restricted Subsidiaries, during the four-quarter reference period or subsequent to such reference period and on or prior to the Calculation Date, shall be deemed to have occurred on the first day of the four-quarter reference period and the EBITDA for such reference period will be calculated giving pro forma effect to any expense and cost reductions that have occurred or, in the reasonable judgment of the chief financial officer of the Issuer, are reasonably expected to occur (regardless of whether those operating improvements or cost savings could then be reflected in pro forma financial statements prepared in accordance with Regulation S-X under the Securities Act or any other regulation or policy of the SEC related thereto);

(2)    the EBITDA attributable to discontinued operations, as determined in accordance with GAAP, and operations or businesses (and ownership interests therein) disposed of prior to the Calculation Date, will be excluded;

(3)    the Fixed Charges attributable to discontinued operations, as determined in accordance with GAAP, and operations or businesses (and ownership interests therein) disposed of prior to the Calculation Date, will be excluded, but only to the extent that the obligations giving rise to such Fixed Charges will not be obligations of the specified Person or any of its Restricted Subsidiaries following the Calculation Date;

(4)    any Person that is a Restricted Subsidiary on the Calculation Date will be deemed to have been a Restricted Subsidiary at all times during such four-quarter period;

(5)    any Person that is not a Restricted Subsidiary on the Calculation Date will be deemed not to have been a Restricted Subsidiary at any time during such four-quarter period; and

(6)    if any Indebtedness bears a floating rate of interest, the interest expense on such Indebtedness will be calculated as if the rate in effect on the Calculation Date had been the applicable rate for the entire period (taking into account any Hedging Obligation applicable to such Indebtedness if such Hedging Obligation has a remaining term as at the Calculation Date in excess of 12 months).

"Foreign Subsidiary" means any Subsidiary that is not organized under the laws of the United States or any state thereof or the District of Columbia.

"GAAP" means generally accepted accounting principles in the United States as in effect as of the initial Issue Date, including those set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as approved by a significant segment of the accounting profession as in effect on the initial Issue Date. Unless otherwise specified, all ratios and computations contained in this Indenture shall be computed in conformity with GAAP as then in effect, except (i) that in the event the Issuer is acquired in a transaction that is accounted for using purchase accounting, the effects of the application of purchase accounting shall be disregarded in the calculation of such ratios and other computations contained in this Indenture and (ii) for purposes of determining whether any lease would constitute an operating lease or a capital lease, such determination shall be made in accordance with GAAP as in effect on the initial Issue Date.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization.

"Government Securities" means securities that are (1) direct obligations of the United States for the timely payment of which its full faith and credit is pledged or (2) obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States the timely payment of which is unconditionally Guaranteed as a full faith and credit obligation of the United States, which, in either case, are not callable or redeemable at the option of the issuer thereof, and shall also include a depositary receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act), as custodian with respect to any such Government Securities or a specific payment of principal of or interest on any such Government Securities held by such custodian for the account of the holder of such depositary receipt; *provided* that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depositary receipt from any amount received by the custodian in respect of the Government Securities or the specific payment of principal of or interest on the Government Securities evidenced by such depositary receipt.

"Guarantee" means (1) any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness of any other Person and (2) any obligation, direct or indirect, contingent or otherwise, of such Person:

(a)    to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness of such other Person (whether arising by virtue of partnership arrangements, or by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise); or

(b)    entered into for purposes of assuring in any other manner the obligee of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); *provided, however*, that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.

"Guarantor" means each of the signatories hereto other than the Issuer and the Trustee as well as any Person that may in the future provide a Note Guarantee (including ERPI and Chippewa pursuant to Section 11.07 hereof) or that provides a Note Guarantee on the Issue Date, or agrees on the Issue Date that its Note Guarantee will become effective upon the occurrence of an event in the future, pursuant to this Indenture or otherwise.

"HBI Facility" shall mean a value added iron or other steel production facility constructed by the Issuer or a third party with consent of the Issuer within the Issuer's project boundary, including, without limitation, any hot briquetted iron production facility, and any future construction undertaken to increase production capacity at the facility.

"Hedging Obligations" of any Person means the obligations of such Person pursuant to any Interest Rate Agreement, Currency Agreement or Commodity Agreement.

"Holder" means a Person in whose name a Note is registered on the Registrar's books.

"Incur" means issue, create, assume, Guarantee, incur or otherwise become liable for; *provided, however*, that any Indebtedness or Capital Stock of a Person existing at the time such Person becomes a Restricted Subsidiary (whether by merger, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Restricted Subsidiary at the time it becomes a Restricted Subsidiary; and the terms "Incurred" and "Incurrence" have meanings correlative to the foregoing.

"Indebtedness" of any Person means, without duplication:

(1)    the principal of and premium (if any) in respect of indebtedness of such Person for borrowed money;

(2)    the principal of and premium (if any) in respect of obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(3)    the unreimbursed principal component of all obligations of such Person in respect of letters of credit, bankers' acceptances or other similar instruments (except to the extent such reimbursement obligation relates to a trade payable and such obligation is satisfied within thirty (30) days of Incurrence);

(4)    the principal component of all obligations of such Person to pay the deferred and unpaid purchase price of property (including earn-out obligations), which purchase price is due after the date of placing such property in service or taking delivery and title thereto, except (a) any such balance that constitutes a trade payable or similar obligation to a trade creditor, in each case accrued in the ordinary course of business and (b) any earn-out obligation until the amount of such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP and is due and payable;

(5)    Capitalized Lease Obligations of such Person to the extent such items would appear on the balance sheet of such Person in accordance with GAAP;

(6)    the greater of the maximum mandatory redemption or repurchase price (not including, in either case, any redemption or repurchase premium) or the principal component or liquidation preference of all obligations of such Person with respect to the redemption, repayment or other repurchase of any Disqualified Stock;

(7)    the principal component of all Indebtedness of other Persons secured by a Lien on any asset of such Person, whether or not such Indebtedness is assumed by such Person;

(8)    the principal component of Indebtedness of other Persons to the extent Guaranteed by such Person (whether or not such items would appear on the balance sheet of such Person in accordance with GAAP);

(9)    to the extent not otherwise included in this definition, net obligations of such Person under Hedging Obligations (the amount of any such obligations to be equal at any time to the termination value of such agreement or arrangement giving rise to such Obligation that would be payable by such Person at such time); and

(10)    to the extent not otherwise included in this definition, the amount of obligations outstanding under the legal documents entered into as part of a securitization transaction or series of securitization transactions that would be characterized as principal if such transaction were structured as a secured lending transaction rather than as a purchase relating to a securitization transaction or series of securitization transactions.

Notwithstanding the foregoing, under no circumstances shall trade payables less than ninety (90) days past due be deemed "Indebtedness" hereunder and the amount of any Indebtedness outstanding as of any date shall be the accreted value thereof in the case of any Indebtedness issued with original issue discount or the aggregate principal amount outstanding in the case of Indebtedness issued with interest payable in kind. Except to the extent provided in the preceding sentence, the amount of any Indebtedness that is convertible into or exchangeable for Capital Stock of the Issuer outstanding as of any date shall be deemed to be equal to the principal and premium, if any, in respect of such Indebtedness, notwithstanding the provisions of

-16-

GAAP (including Accounting Standards Codification Topic 470-20, Debt-Debt with Conversion and Other Options).

In addition, "Indebtedness" of any Person shall include Indebtedness described in the preceding paragraph that would not appear as a liability on the balance sheet of such Person if:

(1)     such Indebtedness is the obligation of a partnership or Joint Venture that is not a Restricted Subsidiary;

(2)     such Person or a Restricted Subsidiary of such Person is a general partner of the partnership or Joint Venture as contemplated in subclause (1) above; and

(3)     there is recourse, by contract or operation of law, with respect to the payment of such Indebtedness to property or assets of such Person or a Restricted Subsidiary of such Person; and then such Indebtedness shall be included in an amount not to exceed:

(a)     the lesser of (i) the net assets of a general partner as contemplated in subclause (2) above and (ii) the amount of such obligations to the extent that there is recourse, by contract or operation of law, to the property or assets of such Person or a Restricted Subsidiary of such Person; or

(b)     if less than the amount determined pursuant to clause (a) immediately above, the actual amount of such Indebtedness that is recourse to such Person or a Restricted Subsidiary of such Person, if the Indebtedness is evidenced by a writing and is for a determinable amount.

In addition, "Indebtedness" shall not include any obligations relating to any factoring or other accounts receivable or iron ore concentrate or pellet inventory sales arrangements, including, without limitation, prepayment agreements, the cash proceeds of which are encumbered by the security interest in Collateral granted to the Holders in the Security Agreement, provided that any discount to the face amount of an invoice sold shall not exceed [5.0]%, nor shall it include any obligations relating to construction or operation by, on behalf of, or on the land of the Issuer and/or the Guarantor of any value added iron or other steel production facility, including, without limitation, any hot briquetted iron production facility.

"Indenture" means this Indenture, as amended or supplemented from time to time.

"Indenture Covenant Compliance Period" means (i) initially, the period of time during which the aggregate amount of Priority Lien Debt incurred under Priority Lien Debt Documents to fund Project construction costs, pre-operating expenses and/or procurement expenses is less than $250 million, and (ii) all time after payment in full of all Priority Lien Debt.

"Initial Interest Period" means the date of the original issuance of the Notes hereunder through [December 30, 2017].

"Initial Notes" means the initial $300 million aggregate principal amount of Notes issued under this Indenture on the initial Issue Date.

"Intercreditor Agreement" means the intercreditor agreement, to be entered into in conjunction with the Incurrence of the Priority Lien Debt, by and among the Issuer, the Priority Lien Agent, and the Collateral Agent for and on behalf of the Holders, substantially in the form attached hereto as **Exhibit E** and as amended, amended and restated, supplemented or otherwise modified from time to time.

"Interest Determination Date" for an Interest Period shall be the second Business Day preceding the first day of such Interest Period (or, in the case of the Initial Interest Period, the second Business Day preceding the date of the original issuance of Notes hereunder).

"Interest Payment Date" means each of June 30 and December 30 of each fiscal year beginning on, and inclusive of, [December 30, 2017].

"Interest Period" means the period commencing on an Interest Payment Date (or, in the case of the Initial Interest Period, commencing on the date of the original issuance of the Notes hereunder) and ending on the day preceding the next following Interest Payment Date or the redemption date, as applicable.

"Interest Rate Agreement" means, with respect to any Person, any interest rate future or forward, swap or option, cap or collar or other similar agreement or arrangement as to which such Person is party or a beneficiary.

"Investment" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of any direct or indirect advance, loan (other than advances or extensions of credit to customers in the ordinary course of business) or other extensions of credit (including by way of Guarantee or similar arrangement, but excluding any debt or extension of credit represented by a bank deposit (other than a time deposit)) or capital contribution to (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others), or any purchase or acquisition of Capital Stock, Indebtedness or other similar instruments issued by, such Person and all other items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP; *provided* that an acquisition of assets, Capital Stock or other securities by the Issuer or a Restricted Subsidiary for consideration to the extent such consideration consists of Common Stock of the Issuer shall not be deemed to be an Investment.

"Issue Date" means the date of the issuance of any Notes hereunder, including any Interest Payment Date on which additional Notes in respect of PIK Interest are to be issued.

"Issuer" means the party named as such in the first paragraph of this Indenture or any successor obligor to its Obligations under this Indenture, the Notes or the Security Agreement.

"Joint Venture" means any Person that is not a direct or indirect Subsidiary of the Issuer in which the Issuer or any of its Restricted Subsidiaries directly or indirectly makes any Investment.

"Junior Lien" means a Lien, junior to the Priority Liens and the Parity Liens, as provided in the Intercreditor Agreement, granted by the Issuer or any Guarantor in favor of holders of Junior Lien Debt (or any collateral trustee or representative in connection therewith), at any time, upon any property of the Issuer or any Guarantor to secure the Junior Lien Obligations.

"Junior Lien Collateral Agent" means the agent, collateral trustee or other representative of lenders or holders of Junior Lien Obligations designated pursuant to the terms of the Junior Lien Documents and the Intercreditor Agreement.

"Junior Lien Debt" means Indebtedness secured by a Junior Lien for which certain requirements of the Intercreditor Agreement have been satisfied that was permitted to be incurred under Section 4.09 and Section 4.10 and so secured, as amended, restated, modified, renewed, refunded, replaced or refinanced in whole or in part from time to time; *provided* that, in the case of any Indebtedness referred to in this definition:

(1)     on or before the date on which such Indebtedness is incurred by the Issuer or any Guarantor, such Indebtedness is designated by the Issuer, in an Officers' Certificate delivered to the Junior Lien Collateral Agent and Collateral Agent as "Junior Lien Debt"; *provided* that if Indebtedness is designated "Junior Lien Debt," it cannot also be designated as Priority Lien Debt, Parity Lien Debt, or the Prepetition Lien Creditor Notes (or any combination thereof);

(2)     the collateral agent or other representative with respect to such Indebtedness, the Priority Lien Agent, the Junior Lien Collateral Agent, the Collateral Agent, the Issuer and each applicable Guarantor have duly executed and delivered the Intercreditor Agreement (or a joinder to the Intercreditor Agreement or a new Intercreditor Agreement substantially similar to the Intercreditor Agreement as in effect on the date of this Indenture and in a form reasonably acceptable to each of the parties thereto); and

(3)     all other requirements set forth in the Intercreditor Agreement as to the confirmation, grant or perfection of the Liens of the holders of Junior Debt to secure such Indebtedness or Obligations in respect thereof are satisfied.

"Junior Lien Documents" means, collectively, any indenture, credit agreement or other agreement or instrument pursuant to which Junior Lien Debt is incurred and the documents pursuant to which Junior Lien Obligations are granted, in each case, as amended, amended and restated, refinanced, supplemented or otherwise modified from time to time.

"Junior Lien Obligations" means Junior Lien Debt and all other Obligations in respect thereof.

"KYC" means the obtaining and verifying of such information as has been requested by each of the Holders and the Trustee (and has been determined by each of such to be reasonably required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the U.S.A. PATRIOT Act) prior to the proposed closing of any event purporting to be a Change of Control or Permitted

Change of Control, to the reasonable satisfaction of each such Holder and the Trustee, with respect to the Person or Persons participating in an event that is purported to be a Change of Control or Permitted Change of Control, which information includes the name and address of each participating Person and other information that will allow each such Holder and the Trustee to identify each such Person in accordance with the U.S.A. PATRIOT Act. This notice is given in accordance with the requirements of the U.S.A. PATRIOT Act and is effective for the Trustee and each Holder of Notes hereunder.

"Leased Real Property" shall have a meaning correlative to Real Estate Leases.

"Lien" means, (i) with respect to any asset, any mortgage, lien (statutory or otherwise), pledge, hypothecation, charge, security interest, preference, assignment priority or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, any lease or license in the nature thereof or sale/leaseback, any option, trust, or other preferential arrangement or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction, or having the practical effect of any of the foregoing; *provided* that in no event shall an operating lease be deemed to constitute a Lien; and (ii) in the case of Equity Interests, any purchase option, call or similar right of a third party with respect to such Equity Interests.

"Maturity Date" means the earlier of the date on which all Obligations owed under the Notes have been satisfied and [_____], 2027.

"Minority Interest" means the percentage interest represented by any Capital Stock of a Restricted Subsidiary of the Issuer that is not owned by the Issuer or a Restricted Subsidiary of the Issuer.

"Moody's" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"Mortgages" means the mortgages, leasehold mortgages (to the extent permitted by law, and after having obtained any and all necessary consents), debentures, hypothecs, deeds of trust, deeds to secure Indebtedness or other similar documents securing Liens on the Premises, as well as the other Collateral, if any, secured by and described in the mortgages, leasehold mortgages, debentures, hypothecs, deeds of trust, deeds to secure Indebtedness, mortgages made by the Issuer or any other Guarantor in favor or for the benefit of the Trustee or the Collateral Agent, or other similar documents, in form and substance reasonably satisfactory to the Trustee or the Collateral Agent, as the case may be.

"Net Award" means any awards or proceeds in respect of any condemnation, seizure, taking or other eminent domain proceeding relating to any Collateral.

"Net Insurance Proceeds" means any awards or proceeds in respect of any casualty insurance or title insurance claim relating to any Collateral.

"Net Income" means, with respect to any specified Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of preferred stock dividends, excluding, however:

(1)     any gain (or loss), together with any related provision for taxes on such gain (but not loss), realized in connection with:

(a)     any Asset Sale; or

(b)     the disposition of any securities by such Person or any of its Restricted Subsidiaries or the extinguishment of any Indebtedness of such Person or any of its Restricted Subsidiaries; and

(2)     any extraordinary or nonrecurring gain (or loss), together with any related provision for taxes on such extraordinary or nonrecurring gain (or loss).

"Net Priority Lien Obligations" means, as of any date of determination, (1) the Priority Lien Obligations of the Issuer and its Restricted Subsidiaries outstanding on such date, minus (2) the aggregate amount of the Issuer and its Restricted Subsidiaries' unrestricted cash and Cash Equivalents on hand as of such date.

"Note Guarantee" means, individually, any Guarantee of payment of the Notes and the Issuer's other Obligations under each other Notes Document by a Guarantor pursuant to the terms of this Indenture and any supplemental indenture thereto or any supplemental guarantee agreement, and, collectively, all such Guarantees.

"Non-Recourse Debt" means Indebtedness:

(1)     as to which neither the Issuer nor any of its Restricted Subsidiaries (a) provides credit support of any kind (including any undertaking, agreement or instrument that would constitute Indebtedness), (b) is directly or indirectly liable as a guarantor or otherwise, or (c) constitutes the lender; and

(2)     no default with respect to which (including any rights that the holders of the Indebtedness may have to take enforcement action against an Unrestricted Subsidiary) would permit upon notice, lapse of time or both any holder of any other Indebtedness of the Issuer or any of its Restricted Subsidiaries to declare a default on such other Indebtedness or cause the payment of the Indebtedness to be accelerated or payable prior to its Stated Maturity.

"Notes" has the meaning assigned to it in the recitals to this Indenture. Except as otherwise provided in this Indenture, the Initial Notes and the Additional Notes shall be treated as a single class for all purposes under this Indenture, and unless the context otherwise requires, all references to the Notes shall include the Initial Notes and any Additional Notes. For all purposes of this Indenture, the term "Notes" shall also include any Notes to be issued or authenticated upon registration of transfer, replacement or exchange of Notes and any Notes to be issued in connection with a PIK Payment.

"Notes Document" means any of this Indenture, the Notes, the Note Guarantees, the Security Agreement and the Collateral Documents, and any related documents thereto, as amended or supplemented from time to time.

"Obligations" means any principal, interest (including any interest accruing subsequent to the filing of a petition in bankruptcy, reorganization or similar proceeding at the rate provided for in the documentation with respect thereto, whether or not such interest is an allowed claim under applicable state, federal or foreign law), other monetary obligations, penalties, fees, indemnifications, reimbursements (including reimbursement obligations with respect to letters of credit and banker's acceptances), damages and other liabilities, and Guarantees of payment of such principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities, payable under the documentation governing any Indebtedness.

"Obligor" means the Issuer and any Guarantor.

"Officer" of any Person means the Chairman of the Board, the Chief Executive Officer, the President, the Chief Financial Officer, any Executive Vice President, Senior Vice President or Vice President, the Treasurer or the Secretary of such Person or, in the event that such Person is a partnership or a limited liability company that has no such officers, a person duly authorized under applicable law by the general partner, managers, members or a similar body to act on behalf of such Person.

"Officers' Certificate" means a certificate signed by two Officers of the Person delivering such Officers' Certificate, one of whom is the principal executive officer, the principal financial officer or the principal accounting officer.

"Opinion of Counsel" means a written opinion from legal counsel reasonably acceptable to the Trustee. The counsel may be an employee of or counsel to the Issuer.

"Parity Lien" means a Lien granted by the Issuer or any Restricted Subsidiary in favor of the Parity Lien Agent, at any time, upon any property of the Obligors or their Restricted Subsidiaries to secure the Parity Lien Obligations.

"Parity Lien Agent" means:

(1)     in the case of the Notes, the Collateral Agent; or

(2)     in the case of any other series of Parity Lien Debt, the trustee, agent or representative of the holders of such series of Parity Lien Debt that is appointed as a Parity Lien Agent (for purposes related to the administration of the Collateral Documents) pursuant to the indenture, credit agreement or other agreement governing such series of Parity Lien Debt, together with its successors in such capacity.

"Parity Lien Debt" means:

(1)     the Notes issued on the date of this Indenture and the Note Guarantees thereof; and

-22-

(2)     any other Indebtedness of the Obligors and their Restricted Subsidiaries (including Additional Notes, PIK Notes and Note Guarantees thereof) that is secured equally and ratably with the Notes by a Parity Lien that was permitted to be incurred under Section 4.09 and Section 4.10 and so secured; *provided* that, in the case of any Indebtedness referred to in clause (2) of this definition (other than PIK Notes):

> (a)     on or before the date on which such Indebtedness is incurred by the Issuer or any Restricted Subsidiary, such Indebtedness is designated by the Issuer, in an Officers' Certificate delivered to each Parity Lien Representative and the Collateral Agent, as "Parity Lien Debt"; *provided* that if Indebtedness is designated as "Parity Lien Debt," it cannot also be designated as Priority Lien Debt, Junior Lien Debt or the Prepetition Trade Creditor Notes (or any combination thereof);

> (b)     other than in the case of Additional Notes or PIK Notes issued under this Indenture, the collateral agent or other representative with respect to such Indebtedness, the Priority Lien Agent, the Junior Lien Collateral Agent (if applicable), the Collateral Agent, the Issuer and each applicable Guarantor have duly executed and delivered the Intercreditor Agreement (or a joinder to the Intercreditor Agreement or a new Intercreditor Agreement substantially similar to the Intercreditor Agreement as in effect on the date of this Indenture and in a form reasonably acceptable to each of the parties thereto); and

> (c)     all other requirements set forth in the Intercreditor Agreement as to the confirmation, grant or perfection of the Parity Liens to secure such Indebtedness or Obligations in respect thereof are satisfied;

*provided* that is understood that there may be different tranches of Parity Lien Debt with different maturities, amortization profiles, payment rights and collateral priority in accordance with the Intercreditor Agreement and the Parity Lien Documents.

"Parity Lien Documents" means, collectively, the Note Documents and any additional indenture, supplemental indenture, credit agreement or other agreement governing each other series of Parity Lien Debt and the Collateral Documents (other than any Collateral Documents that do not secure Parity Lien Obligations).

"Parity Lien Obligations" means Parity Lien Debt and all other Obligations in respect thereof.

"Parent Company" means any Person that is or becomes after the Issue Date a direct or indirect parent (which may be organized as, among other things, a partnership) of the Issuer.

"Partial PIK Interest" means the payment of interest on the Notes through an increase in the principal amount of the outstanding Notes equal to some portion (but not all) of the amount of accrued and unpaid interest due on the relevant Interest Payment Date, to the extent that only a portion of the interest due on an Interest Payment Date is so paid.

-23-

"Payment Date" means any Interest Payment Date.

"Permitted Change of Control" means a Change of Control of the Issuer and/or the Guarantor resulting from acquisition of control by one or more Permitted Holders.

"Permitted Holder" means (1) any of the Principals, (2) any Person that directly or indirectly holds or acquires 100% of the total voting power of the Voting Stock of the Issuer, and of which no other Person or group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision), other than any of the Permitted Holders, holds more than 50% of the total voting power of the Voting Stock thereof (such Person, a "Permitted Parent"), (3) any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act) of which any of the Permitted Holders are members; *provided* that in the case of such group and without giving effect to the existence of such group or any other group, the Principals, collectively, have, directly or indirectly, beneficial ownership of more than 50% of the total voting power of the Voting Stock of the Issuer or any Permitted Parent and (4) any Person acting in the capacity of an underwriter (solely to the extent that and for so long as such Person is acting in such capacity) in connection with a public or private offering of Capital Stock of the Issuer or any Parent Company.

"Permitted Investment" means:

(1)     an Investment in an Obligor;

(2)     any Investment in direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States), in each case maturing within one year from the date of acquisition thereof;

(3)     any Investment by an Obligor or any of its Restricted Subsidiaries in a Person that is engaged in a Similar Business if as a result of such Investment:

(a)     such Person becomes an Obligor; or

(b)     such Person, in one transaction or a series of related transactions, is merged or consolidated with or into, or transfers or conveys all or substantially all of its assets to, or is liquidated into, an Obligor,

and, in each case, including any Investment held by such Person; *provided* that such Investment was not acquired by such Person in contemplation of such acquisition, merger, consolidation or transfer and does not materially and adversely affect the ability of the Issuer to make scheduled payments of interest and principal under the Notes;

(4)     any Investment in cash and Cash Equivalents;

(5)     Investments in existence on the initial Issue Date;

-24-

(6)  Guarantees issued in accordance with Section 4.09;

(7)  any Investment acquired by an Obligor or any of their Restricted Subsidiaries:

(a)  in exchange for any other Investment or accounts receivable held by such Obligor or any such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable; or

(b)  as a result of a foreclosure by such Obligor or any of its Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(8)  Investments made as a result of the receipt of non-cash consideration from an Asset Sale that was made pursuant to and in compliance with Section 5.01;

(9)  Investments represented by Hedging Obligations;

(10)  loans or advances to employees, officers, or directors in the ordinary course of business made for bona fide business purposes not to exceed the greater of (a) $20 million and (b) 2.5% of Consolidated Total Assets as determined on the date of making such loan or advance;

(11)  Investments made by any Obligor in a pig iron joint venture in an amount, when combined with any amounts described in Section 4.09(b)(15) hereof, not to exceed the greater of (a) $50 million and (b) 5.0% of Consolidated Total Assets as determined on the date of making such Investment;

(12)  receivables owing to any Obligor or any of their Restricted Subsidiaries created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms; *provided* that such trade terms may include such concessionary trade terms as such applicable Obligor or Restricted Subsidiary deems reasonable under the circumstances;

(13)  surety and performance bonds and workers' compensation, utility, lease, tax, performance and similar deposits, letters of credit (whether secured or unsecured), and prepaid expenses in the ordinary course of business;

(14)  other Investments in any Person having an aggregate Fair Market Value (measured on the date each such Investment was made and without giving effect to subsequent changes in value), when taken together with all other Investments made pursuant to this clause (14) that are at the time outstanding not to exceed the greater of (a) $100 million and (b) 10% of Consolidated Total Assets as determined on the date of making such loan or advance; and

(15)  any Investments in connection with the HBI Facility.

"Permitted Liens" means, with respect to any Person:

(1)    the Priority Liens securing Priority Lien Obligations incurred under Section 4.09(a)(2) or clauses (3), (4), (7), (13), (15), (18) or (19) of Section 4.09(b);

(2)    Liens imposed by law, including carriers', warehousemen's, mechanics', materialmen's and repairmen's Liens, Incurred in the ordinary course of business;

(3)    pledges or deposits by such Person under workers' compensation laws, unemployment insurance laws or similar legislation, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety, performance or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import or customs duties or for the payment of rent, in each case Incurred in the ordinary course of business;

(4)    Liens for taxes, assessments or other governmental charges not yet subject to penalties for non-payment or that are being contested in good faith by appropriate proceedings provided appropriate reserves required pursuant to GAAP have been made in respect thereof;

(5)    encumbrances, ground leases, easements or reservations of, or rights of others for, licenses, rights of way, sewers, electric lines, gas pipelines, telephone lines and other similar purposes, or zoning, building codes or other restrictions (including, without limitation, minor defects or irregularities in title and similar encumbrances) as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties that do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(6)    leases, licenses, subleases and sublicenses of assets (including, without limitation, real property and intellectual property rights) that do not materially interfere with the ordinary conduct of the business of any Obligor or any of their Restricted Subsidiaries;

(7)    judgment Liens in connection with any judgment that does not give rise to an Event of Default under Section 6.01(5);

(8)    Liens arising solely by virtue of any statutory or common law provisions relating to banker's Liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a depositary institution; *provided* that:

(a)    such deposit account is not a dedicated cash collateral account and is not subject to restrictions against access by the applicable Obligor in excess of those set forth by regulations promulgated by the Federal Reserve Board; and

(b)    such deposit account is not intended by the applicable Obligor or any Restricted Subsidiary of such Obligor to provide collateral for Indebtedness to the depository institution;

(9)    Liens existing on the initial Issue Date;

(10)    Liens securing Indebtedness or other obligations of a Restricted Subsidiary of an Obligor owing to such Obligor or another Restricted Subsidiary of such Obligor;

(11)    the Liens securing the Notes and any increase in principal amount as the result of PIK Interest and any Parity Liens incurred under Section 4.09(b)(1) or clauses (3), (4), (7), (13), (18) or (19) of Section 4.09(b);

(12)    Liens securing Refinancing Indebtedness Incurred to refinance, refund, replace, amend, extend or modify, as a whole or in part, Indebtedness that was previously so secured pursuant to clauses (1), (2), (9), (11), this clause (12) and clause (20) of this definition;

(13)    Liens in favor of an Obligor or any Restricted Subsidiary of any Obligor;

(14)    Liens under industrial revenue, municipal or similar bonds or any cash collateral to secure letters of credit; *provided* that, for the avoidance of doubt, such Liens on cash collateral securing letters of credit shall not be subject to any intercreditor agreement or subordination agreement requirement under this Indenture;

(15)    Liens on property or Capital Stock of a Person at the time such Person becomes a Restricted Subsidiary of an Obligor; *provided, however*, that such Liens are not created, Incurred or assumed in connection with, or in contemplation of, such other Person becoming a Restricted Subsidiary of such Obligor; *provided, further, however*, that any such Lien may not extend to any other property owned by the applicable Obligor or any Restricted Subsidiary of such Obligor and as do not materially impair their use in the operation of the business of such Person;

(16)    Liens on property at the time an Obligor or a Restricted Subsidiary of an Obligor acquired the property, including any acquisition by means of a merger or consolidation with or into such Obligor or any Restricted Subsidiary of such Obligor; *provided, however*, that such Liens are not created, Incurred or assumed in connection with, or in contemplation of, such acquisition; *provided, further, however*, that such Liens may not extend to any other property owned by such Obligor or any Restricted Subsidiary of such Obligor and do not materially impair their use in the operation of the business of such Person;

(17)    Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods and as do not materially impair their use in the operation of the business of such Person; *provided, further, however*, that such Liens may not extend

-27-

to any other property owned by such Obligor or any Restricted Subsidiary of such Obligor and as do not materially impair their use in the operation of the business of such Person;

(18)    Subordinated Liens in favor of the State of Minnesota and/or its agencies on all real and personal property of the Guarantor Incurred on or after [July 1], 2017 in connection with the failure by the Issuer to pay Royalties and Other Costs when due, securing the obligation of the Issuer to pay Royalties and Other Costs to the State of Minnesota and/or its agencies, which are subordinated to the Liens on the Collateral in favor of the Collateral Agent for the benefit of the Holders and the other secured parties under the Notes Documents;

(19)    Liens claimed by mechanic's/miner's lien claimants in mining lands owned or leased by the Issuer and/or the Guarantor that have been bonded, or become bonded within 180 days after such a Lien has been filed in the applicable public records office pending resolution of the claims giving rise to such encumbrances;

(20)    the Liens on the Collateral securing the Prepetition Trade Creditor Notes;

(21)    Liens granted in connection with construction, improvement or operation by, on behalf of, or on the land of the Issuer and/or the Guarantor of any value added iron or other steel production facility, including, without limitation, any hot briquetted iron production facility;

(22)    Liens encumbering property or assets under construction arising from progress or partial payments by a customer of any Obligor or their Restricted Subsidiaries relating to such property or assets;

(23)    (a) Liens securing any Indebtedness permitted to be Incurred under Section 4.09(a)(1), (b) Purchase Money Security Interests and other Liens securing Indebtedness permitted to be incurred under Section 4.09(b)(14) (*provided* that (i) the aggregate principal amount of Indebtedness secured by such Liens does not exceed the cost of the assets or property so acquired or repaired, improved or constructed plus fees and expenses in connection therewith and (ii) such Liens are created within 180 days of repair, improvement, construction or acquisition of such assets or property and do not encumber any other assets or property of the Issuer or any of its Restricted Subsidiaries other than such assets or property and assets affixed or appurtenant thereto (including improvements); *provided further* that the aggregate principal amount of such Indebtedness secured by such Liens referred to in clause (b) of this paragraph (23) does not exceed the amount of such Indebtedness permitted by Section 4.09(b)(14)); or (c) Section 4.09(b)(19);

(24)    Liens securing any Hedging Obligation;

(25)    Liens on the Collateral securing any Junior Lien Debt incurred under Section 4.09(a)(1) or clauses (7), (13), (17) or (18) of Section 4.09(b);

-28-

(26)    other Liens of the Issuer or any Restricted Subsidiary of the Issuer with
respect to Indebtedness (which may include, without limitation, Priority Lien
Obligations, Parity Lien Obligations and Junior Lien Obligations) that does not exceed in
principal amount the greater of (a) $100 million and (b) 10.0% of the Consolidated Total
Assets determined as of the date of the incurrence of such Indebtedness after giving pro
forma effect to such incurrence and the application of proceeds therefrom and any Liens
securing any Permitted Refinancing in respect of such Indebtedness;

(27)    Liens on and pledges of Equity Interests of any Unrestricted Subsidiary or
any Joint Venture owned by the Issuer or any of its Restricted Subsidiary to the extent
securing Non-Recourse Debt of such Unrestricted Subsidiary or Joint Venture; and

(28)    To the extent constituting Liens, any Asset Sales permitted by Section
4.19 or transaction expressly excluded from the definition of "Asset Sale" in the last
sentence thereof.

"Permitted Tax Distributions" means, for any taxable period or portion thereof in
which the Issuer is a pass through entity (including a disregarded entity or partnership) for
federal income tax purposes, payments and distributions which are distributed to the direct or
indirect holders of the Equity Interests of the Issuer on or prior to each estimated payment date as
well as each other applicable due date to enable such holders to timely make payments of
federal, state and local taxes for such taxable period as a result of the operations of the Issuer not
to exceed the product of (a) the net taxable income (which shall mean the net taxable income of
the Issuer and its Restricted Subsidiaries required to be reported to Issuer's direct or indirect
holders for federal income tax purposes) of the Issuer and its Restricted Subsidiaries for such
period, and (b) the highest applicable marginal U.S. federal, state and local tax rates applicable to
an individual or, if higher, a corporation resident in New York City, New York.

"Person" means any natural person, corporation, limited partnership, general
partnership, limited liability company, limited liability partnership, joint stock company, joint
venture, association, company, trust, bank, trust company, land trust, business trust or other
organization, whether or not a legal entity, and a governmental authority.

"PIK Interest" means the payment of interest on the Notes through an increase in
the principal amount of the outstanding Notes equal to the amount of accrued and unpaid interest
due on the relevant Interest Payment Date.

"Premises" means the owned real property that is required to be subject to
Mortgages and forms a portion of the Collateral.

"Preferred Stock," as applied to the Capital Stock of any corporation, means
Capital Stock of any class or classes (however designated) which is preferred as to the payment
of dividends, or as to the distributions of assets upon any voluntary or involuntary liquidation or
dissolution of such corporation, over shares of Capital Stock of any other class of such
corporation.

"Prepetition Trade Creditor Notes" means those 1.5% notes due in 2022, that may
be issued by Issuer in accordance with the Plan.

"Principals" means Chippewa, DSA Investments, Minmetals Cheerglory Limited, any other equity holder in the Issuer or any Guarantor as of the initial Issue Date and any Person designated by Chippewa prior to the "Effective Date" (as defined by the Plan) that holds, directly or indirectly, at least 5% of the Equity Interests of the Issuer.

"Priority Lien" means a Lien granted by any Obligor or their Restricted Subsidiaries in favor of a Priority Lien Agent, at any time, upon any property of the Obligors or their Restricted Subsidiaries to secure Priority Lien Obligations.

"Priority Lien Agent" means an administrative agent (including any successors thereto), collateral agent, or other representatives of lenders or holders of Priority Lien Obligations designated pursuant to the terms of Priority Lien Documents and the Intercreditor Agreement.

"Priority Lien Debt" means:

(1)    Indebtedness of the Obligors and their Restricted Subsidiaries to be incurred and/or guaranteed pursuant to Priority Lien Documents (including letters of credit (with outstanding letters of credit being deemed to have a principal amount equal to the stated amount thereof and interest accruing on or after the filing of any petition in bankruptcy or similar proceeding or for reorganization of the Issuer or any Guarantor (at the rate provided for in the documentation with respect thereto, regardless of whether or not a claim for post-filing interest is allowed in such proceedings)) and reimbursement obligations with respect thereto) that is subject to the Intercreditor Agreement and permitted to be incurred under Section 4.09 and Section 4.10 hereof; and

(2)    additional Indebtedness of any Obligor or its Restricted Subsidiaries incurred or guaranteed under any other credit facility that is secured pursuant to Priority Lien Documents by a Priority Lien and that is permitted to be incurred under Section 4.09 and Section 4.10 hereof;

*provided* that it is understood that there may be different tranches of Priority Lien Debt with different maturities, amortization profiles, payment rights and collateral priority in accordance with the Intercreditor Agreement and the Priority Lien Documents.

"Priority Lien Debt Compliance Period" means the period of time during which the aggregate amount of Priority Lien Debt incurred under Priority Lien Documents to fund Project construction costs, pre-operating expenses and/or procurement expenses exceeds $250 million.

"Priority Lien Documents" means the credit agreements, security agreements, guaranties, mortgages, other collateral documents, and any and all other documents pursuant to which Priority Lien Obligations are incurred and Priority Liens are granted, in each case, as amended, amended and restated, refinanced, supplemented or otherwise modified from time to time.

"Priority Lien Obligations" means Priority Lien Debt and all other obligations in respect of Priority Lien Debt and Hedging Obligations, in each case, that are secured by Priority Liens.

"Purchase Money Security Interest" means a security interest granted under Article 9 of the Uniform Commercial Code as collateral security for the payment of the purchase price of certain goods and/or equipment.

"Real Estate Leases" means any existing or hereafter acquired leasehold interests in real property, or licenses or other agreements with regard to accessing real property or accessing or removing iron ore or iron ore tailings.

"Receivable" means a right to receive payment arising from a sale or lease of goods or the performance of services by a Person pursuant to an arrangement with another Person pursuant to which such other Person is obligated to pay for goods or services under terms that permit the purchase of such goods and services on credit and shall include, in any event, any items of property that would be classified as an "account," "chattel paper," "payment intangible" or "instrument" under the Uniform Commercial Code as in effect in the State of New York and any "supporting obligations" as so defined.

"Recovery Event" means any event, occurrence, claim or proceeding that results in any Net Award or Net Insurance Proceeds.

"Record Date" for the amount payable on any Payment Date means June 15 and December 15, (whether or not a Business Day) next preceding such Interest Payment Date.

"Refinancing Indebtedness" means Indebtedness that is Incurred to refund, refinance, replace, exchange, renew, repay or extend (including pursuant to any defeasance or discharge mechanism) (collectively, "refinance," "refinances," "refinanced" and "refinancing" shall each have a correlative meaning) any Indebtedness existing on the initial Issue Date or Incurred in compliance with this Indenture, including defeasance costs, accrued interest, premiums and fees and expenses (including fees and expenses relating to the Incurrence of such Refinancing Indebtedness) in connection with any such refinancing, including Indebtedness that refinances Refinancing Indebtedness; *provided, however*, that:

(1)     (a) if the Stated Maturity of the Indebtedness being refinanced is earlier than the Stated Maturity of the Notes, the Refinancing Indebtedness has a Stated Maturity no earlier than the Stated Maturity of the Indebtedness being refinanced or (b) if the Stated Maturity of the Indebtedness being refinanced is later than the Stated Maturity of the Notes, the Refinancing Indebtedness has a Stated Maturity at least ninety-one (91) days later than the Stated Maturity of the Notes;

(2)     except for Refinancing Indebtedness with respect to any Priority Lien Obligations, the Refinancing Indebtedness has an Average Life at the time such Refinancing Indebtedness is Incurred that is equal to or greater than the Average Life of the Indebtedness being refinanced;

(3)     such Refinancing Indebtedness is Incurred in an aggregate principal amount (or if issued with original issue discount, an aggregate issue price) that is equal to or less than the sum of the aggregate principal amount (or if issued with original issue discount, the aggregate accreted value) then outstanding of the Indebtedness being refinanced (plus, without duplication, any additional Indebtedness Incurred to pay premiums required by the instruments governing such existing Indebtedness or reasonable tender premiums, as determined in good faith, defeasance costs, accrued interest and fees and expenses in connection with any such refinancing);

(4)     to the extent such Refinancing Indebtedness is secured, the Liens securing such Refinancing Indebtedness (a) shall not, except with respect to Priority Lien Obligations, extend to any property other than the collateral securing the Indebtedness being refunded, refinanced, replaced, exchanged, renewed, repaid or extended, (b) shall not secure Indebtedness in an amount greater than the Indebtedness being refunded, refinanced, replaced, exchanged, renewed, repaid or extended, including, for purposes of this clause (b), unborrowed amounts available under the Indebtedness being re-funded, refinanced, replaced, exchanged, renewed, repaid or extended, (c) if the Indebtedness being refunded, refinanced, replaced, exchanged, renewed, repaid or extended is Parity Lien Debt, such Liens shall have a Lien priority equal with or junior to the Parity Liens and (d) if the Indebtedness being refunded, refinanced, replaced, exchanged, renewed, repaid or extended is Junior Lien Debt, then such Liens shall have a Lien priority equal with or junior to the Junior Liens; and

(5)     if the Indebtedness being refinanced is subordinated in right of payment to the Notes or the Note Guarantees, such Refinancing Indebtedness is subordinated in right of payment to the Notes or the Note Guarantees on terms at least as favorable to the Holders as those contained in the documentation governing the Indebtedness being refinanced.

"Responsible Officer" means, when used with respect to the Trustee, any officer within the corporate trust department of the Trustee having direct responsibility for the administration of this Indenture.

"Restricted Investment" means any Investment other than a Permitted Investment.

"Restricted Subsidiary" of a Person means any Subsidiary of such Person that is not an Unrestricted Subsidiary.

"Royalties and Other Costs" means:

(1)     2016 royalties relating to that certain lease for Iron-Bearing Materials Canisteo Mine Second Tailings Basin North and South, between the State of Minnesota and the Debtor Company (later assigned to Mag Mining, LLC), dated October 3, 2011, as amended on December 15, 2013 and April 25, 2016;

(2)     2016 royalties relating to that certain lease for Iron-Bearing Materials Buckeye Tailings Basin #2, between the State of Minnesota and the Debtor Company (later assigned to Mag Mining, LLC), dated May 31, 2012, as amended on April 1, 2015;

-32-

(3)    the 2015 prepetition default amounts on the leases described in paragraphs (1) and (2) specifically being assumed as set forth in the applicable notice of assumption and assignment served on each non-debtor party to each such lease; and

(4)    amounts due in the first quarter of 2017 under the contracts with the State of Minnesota assigned to ERPI.

(5)    cure payments to the State of Minnesota on defaulted lease obligations assumed by the Issuer; and

(6)    non-default ordinary course payment amounts due under that certain Royalty Agreement between the Issuer and Itasca County dated [_____ __], 2017, and all other royalty agreements, leases, settlement agreements and other contracts of any kind relating to ownership and/or operation of the Collateral, including the Premises.

"S&P" means Standard & Poor's, a division of The McGraw-Hill Companies, Inc., and any successor to its rating agency business.

"SEC" means the U.S. Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Security Agreement" means the Pledge and Security Agreement, dated on or about the date of the original issuance of the Notes hereunder, by and among the Issuer, ERPI and Chippewa, and certain other grantors party thereto from time to time in favor of the Collateral Agent, in each case, as amended, amended and restated, supplemented or otherwise modified from time to time.

"Senior Management" means the chief executive officer and the chief financial officer, if any, of the Issuer.

"Significant Subsidiary" means any Restricted Subsidiary that would be a "significant subsidiary" as defined in Article I, Rule 1-02 of Regulation S-X, promulgated pursuant to the Securities Act, as such Regulation is in effect on the initial Issue Date.

"Similar Business" means any business conducted or proposed to be conducted by the Issuer and its Restricted Subsidiaries on the Issue Date or any business that is similar, reasonably related, incidental or ancillary thereto.

"Stated Maturity" means, with respect to any security, the date specified in the agreement governing or certificate relating to such Indebtedness as the fixed date on which the final payment of principal of such security is due and payable, including pursuant to any mandatory redemption provision, but not including any contingent obligations to repay, redeem or repurchase any such principal prior to the date originally scheduled for the payment thereof.

"Subordinated Indebtedness" means any financing from any source, including Affiliates of the Issuer, incurred by the Issuer to meet its working capital requirements, which

indebtedness is (i) subordinated in right of payment to the Notes and the Note Guarantees pursuant to a subordination agreement reasonably satisfactory to the Trustee and the Collateral Agent and (ii) any Liens securing such Subordinated Indebtedness must be junior to the Parity Liens.

"Subsidiary" of any Person means (1) any corporation, association or other business entity (other than a partnership, joint venture, limited liability company or similar entity) of which more than 50% of the total ordinary voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof (or Persons performing similar functions) or (2) any partnership, joint venture limited liability company or similar entity of which more than 50% of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, is, in the case of clauses (1) and (2), at the time owned or controlled, directly or indirectly, by (a) such Person, (b) such Person and one or more Restricted Subsidiaries of such Person or (c) one or more Restricted Subsidiaries of such Person. Unless otherwise specified herein, each reference to a Subsidiary shall refer to a Subsidiary of the Issuer.

"Transfer Restricted Notes" means Definitive Notes and any other Notes that bear or are required to bear the Restricted Notes Legend.

"Trust Indenture Act" means the Trust Indenture Act of 1939 (15 U.S.C. §§77aaa-77bbbb), as amended.

"Trustee" means the party named as such in the first paragraph of this Indenture, until a successor replaces it in accordance with the applicable provisions of this Indenture and thereafter means the successor serving hereunder.

"U.S.A. PATRIOT Act" means Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001.

"Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in any applicable jurisdiction.

"Unrestricted Subsidiary" means any Subsidiary of the Issuer that is designated by the Board of Directors of the Issuer as an Unrestricted Subsidiary pursuant to a resolution of the Board of Directors, but only to the extent that such Subsidiary:

(1)     has no Indebtedness other than Non-Recourse Debt;

(2)     except as permitted by Section 4.14 hereof, is not party to any agreement, contract, arrangement or understanding with the Issuer or any Restricted Subsidiary of the Issuer unless the terms of any such agreement, contract, arrangement or understanding are no less favorable to the Issuer or such Restricted Subsidiary than those that might be obtained at the time from Persons who are not Affiliates of the Issuer;

(3)     is a Person with respect to which neither the Issuer nor any of its Restricted Subsidiaries has any direct or indirect obligation or "keep well" or similar

good faith undertaking (a) to subscribe for additional Equity Interests or make any additional Investment in (other than any Investment permitted under the terms of this Indenture) or (b) to maintain or preserve such Person's financial condition or to cause such Person to achieve any specified levels of operating results; and

       (4)    has not guaranteed or otherwise directly or indirectly provided credit support for any Indebtedness of the Issuer or any of its Restricted Subsidiaries.

"Voting Stock" of a Person means all classes of Capital Stock of such Person then outstanding and normally entitled to vote in the election of directors, managers or trustees, as applicable, of such Person.

"Wholly Owned Subsidiary" means a Subsidiary, all of the Capital Stock of which (other than directors' qualifying shares) is owned by an Obligor or another Wholly Owned Subsidiary.

Section 1.02    Other Definitions.

| Term | Defined in Section |
|---|---|
| "Acceleration Effective Date" | 6.02(a)(2) |
| "Acceleration Effective Date Notice" | 4.15(a) |
| "Affiliate Transaction" | 4.13 |
| "Agent Members" | 1.2(b) of Appendix A |
| "Applicable Procedures" | 1.1(a) of Appendix A |
| "Applicable Rate" | 2.14(a) |
| "Authentication Order" | 2.02(c) |
| "Calculation Date" | 1.01 under "Fixed Charge Coverage Ratio" |
| "Change of Control Offer" | 4.16(a) |
| "Change of Control Payment" | 4.16(a) |
| "Change of Control Payment Date" | 4.16(a)(2) |
| "Clearstream" | 1.1(a) of Appendix A |
| "Definitive Notes Legend" | 1.3(e) of Appendix A |
| "Distribution Compliance Period" | 1.1(a) of Appendix A |
| "ERISA" | 1.3(e) of Appendix A |
| "ERISA Legend" | 1.3(e) of Appendix A |
| "Euroclear" | 1.1(a) of Appendix A |
| "Event of Default" | 6.01(1) |
| "Expiration Date" | 1.05(j) |
| "Global Note" | 1.2(a) of Appendix A |
| "Global Notes Legend" | 1.3(e) of Appendix A |
| "Guaranteed Obligations" | 11.01(a) |
| "IAI" | 1.1(a) of Appendix A |
| "IAI Global Note" | 1.2(a) of Appendix A |
| "Note Register" | 2.03(a) |
| "Paying Agent" | 2.03(a) |
| "PDF" | 2.06(i) |
| "PIK Payment" | 2.01(a) |
| "QIB" | 1.1(a) of Appendix A |
| "OID Notes Legend" | 1.3(e) of Appendix A |
| "Registrar" | 2.03(a) |

| Term | Defined in Section |
|------|--------------------|
| "Regulation S" | 1.1(a) of Appendix A |
| "Regulation S Global Note" | 1.2(a) of Appendix A |
| "Resale Restriction Termination Date" | 1.3(e) of Appendix A |
| "Restricted Notes Legend" | 1.3(e) of Appendix A |
| "Restricted Payment" | 4.08 |
| "Rule 144" | 1.1(a) of Appendix A |
| "Rule 144A" | 1.1(a) of Appendix A |
| "Rule 144A Global Note" | 1.2(a) of Appendix A |
| "Similar Laws" | 1.3(e) of Appendix A |
| "Standstill Period" | 6.02(b) |
| "Successor Company" | 5.01 |
| "Unrestricted Global Note" | 1.1(a) of Appendix A |
| "U.S. Person" | 1.1(a) of Appendix A |

Section 1.03    Rules of Construction.

Unless the context otherwise requires:

(1)    a term defined in Section 1.01 or Section 1.02 has the meaning assigned to it therein;

(2)    an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(3)    "or" is not exclusive;

(4)    words in the singular include the plural, and words in the plural include the singular;

(5)    provisions apply to successive events and transactions;

(6)    unless the context otherwise requires, any reference to an "Appendix," "Article," "Section," "clause," "Schedule" or "Exhibit" refers to an Appendix, Article, Section, clause, Schedule or Exhibit, as the case may be, of this Indenture;

(7)    the words "herein," "hereof" and other words of similar import refer to this Indenture as a whole and not any particular Article, Section, clause or other subdivision;

(8)    "including" means including without limitation;

(9)    references to sections of, or rules under, the Securities Act or the Exchange Act shall be deemed to include substitute, replacement or successor sections or rules adopted by the SEC from time to time; and

(10)    unless otherwise provided, references to agreements and other instruments shall be deemed to include all amendments and other modifications to such agreements or

instruments, but only to the extent such amendments and other modifications are not prohibited by the terms of this Indenture.

Section 1.04    [Reserved].

Section 1.05    Acts of Holders.

(a)    Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in person or by an agent duly appointed in writing. Except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments or record or both are delivered to the Trustee and, where it is hereby expressly required, to the Issuer and the Guarantors. Proof of execution of any such instrument or of a writing appointing any such agent, or the holding by any Person of a Note, shall be sufficient for any purpose of this Indenture and (subject to Section 7.01) conclusive in favor of the Trustee, the Issuer and the Guarantors, if made in the manner provided in this Section 1.04.

(b)    The fact and date of the execution by any Person of any such instrument or writing may be proved (1) by the affidavit of a witness of such execution or by the certificate of any notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to him the execution thereof or (2) in any other manner deemed reasonably sufficient by the Trustee. Where such execution is by or on behalf of any legal entity other than an individual, such certificate or affidavit shall also constitute proof of the authority of the Person executing the same. The fact and date of the execution of any such instrument or writing, or the authority of the Person executing the same, may also be proved in any other manner that the Trustee deems sufficient.

(c)    The ownership of Notes shall be proved by the Note Register.

(d)    Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Note shall bind every future Holder of the same Note and the Holder of every Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, in respect of any action taken, suffered or omitted by the Trustee, the Issuer or the Guarantors in reliance thereon, whether or not notation of such action is made upon such Note.

(e)    The Issuer may set a record date for purposes of determining the identity of Holders entitled to make, give or take any request, demand, authorization, direction, notice, consent, waiver or other action provided in this Indenture to be made, or to vote on or consent to any action authorized or permitted to be taken by the Holders; *provided* that the Issuer may not set a record date for, and the provisions of this paragraph shall not apply with respect to, the giving or making of any notice, declaration, request or direction referred to in clause (f) below. Unless otherwise specified, if not set by the Issuer prior to the first solicitation of a Holder made by any Person in respect of any such action, or in the case of any such vote, prior to such vote, any such record date shall be the later of thirty (30) days prior to the first solicitation of such consent or vote or the date of the most recent list of Holders furnished to the Trustee prior to

-37-

such solicitation or vote. If any record date is set pursuant to this clause (e), the Holders on such record date, and only such Holders, shall be entitled to make, give or take such request, demand, authorization, direction, notice, consent, waiver or other action (including revocation of any action), whether or not such Holders remain Holders after such record date; *provided* that no such action shall be effective hereunder unless made, given or taken on or prior to the applicable Expiration Date by Holders of the requisite principal amount of Notes, or each affected Holder, as applicable, on such record date. Promptly after any record date is set pursuant to this paragraph, the Issuer, at its own expense, shall cause notice of such record date, the proposed action by Holders and the applicable Expiration Date to be given to the Trustee in writing and to each Holder in the manner set forth in Section 13.01.

(f)     The Trustee may set any day as a record date for the purpose of determining the Holders entitled to join in the giving or making of (1) any notice of default under Section 6.01(1), (2) any declaration of acceleration referred to in Section 6.02, (3) any direction referred to in Section 6.04 or (4) any request to pursue a remedy as permitted in Section 6.05. If any record date is set pursuant to this paragraph, the Holders on such record date, and no other Holders, shall be entitled to join in such notice, declaration, request or direction, whether or not such Holders remain Holders after such record date; *provided* that no such action shall be effective hereunder unless made, given or taken on or prior to the applicable Expiration Date by Holders of the requisite principal amount of Notes or each affected Holder, as applicable, on such record date. Promptly after any record date is set pursuant to this paragraph, the Trustee, at the Issuer's expense, shall cause notice of such record date, the proposed action by Holders and the applicable Expiration Date to be given to the Issuer and to each Holder in the manner set forth in Section 13.01.

(g)     Without limiting the foregoing, a Holder entitled to take any action hereunder with regard to any particular Note may do so with regard to all or any part of the principal amount of such Note or by one or more duly appointed agents, each of which may do so pursuant to such appointment with regard to all or any part of such principal amount. Any notice given or action taken by a Holder or its agents with regard to different parts of such principal amount pursuant to this paragraph shall have the same effect as if given or taken by separate Holders of each such different part.

(h)     Without limiting the generality of the foregoing, a Holder, including a Depositary that is the Holder of a Global Note, may make, give or take, by a proxy or proxies duly appointed in writing, any request, demand, authorization, direction, notice, consent, waiver or other action provided in this Indenture to be made, given or taken by Holders, and a Depositary that is the Holder of a Global Note may provide its proxy or proxies to the beneficial owners of interests in any such Global Note through such Depositary's standing instructions and customary practices.

(i)     The Issuer may fix a record date for the purpose of determining the Persons who are beneficial owners of interests in any Global Note held by a Depositary entitled under the procedures of such Depositary, if any, to make, give or take, by a proxy or proxies duly appointed in writing, any request, demand, authorization, direction, notice, consent, waiver or other action provided in this Indenture to be made, given or taken by Holders; *provided* that if such a record date is fixed, only the beneficial owners of interests in such Global Note on such

-38-

record date or their duly appointed proxy or proxies shall be entitled to make, give or take such request, demand, authorization, direction, notice, consent, waiver or other action, whether or not such beneficial owners remain beneficial owners of interests in such Global Note after such record date. No such request, demand, authorization, direction, notice, consent, waiver or other action shall be effective hereunder unless made, given or taken on or prior to the applicable Expiration Date.

(j)     With respect to any record date set pursuant to this Section 1.04, the party hereto that sets such record date may designate any day as the "Expiration Date" and from time to time may change the Expiration Date to any earlier or later day; *provided* that no such change shall be effective unless notice of the proposed new Expiration Date is given to the other party hereto in writing, and to each Holder of Notes in the manner set forth in Section 13.01, on or prior to both the existing and the new Expiration Date. If an Expiration Date is not designated with respect to any record date set pursuant to this Section 1.04, the party hereto which set such record date shall be deemed to have initially designated the 90th day after such record date as the Expiration Date with respect thereto, subject to its right to change the Expiration Date as provided in this clause (j).

Article 2

THE NOTES

Section 2.01   Form and Dating; Terms.

(a)     Provisions relating to the Notes issued under this Indenture are set forth in Appendix A, which is hereby incorporated in and expressly made a part of this Indenture. The Notes and the Trustee's certificate of authentication shall each be substantially in the form of Exhibit A hereto, which is hereby incorporated in and expressly made a part of this Indenture. The Notes may have notations, legends or endorsements required by law, rules or agreements with national securities exchanges to which the Issuer or any Guarantor is subject, if any, or usage (*provided* that any such notation, legend or endorsement is in a form acceptable to the Issuer). Each Note shall be dated the date of its authentication. Subject to the issuance of Additional Notes or the increase in the principal amount of the Global Notes in order to evidence PIK Interest (which additional Notes or increased principal amount shall be in denominations of $1.00 or any integral multiple of $1.00 in excess thereof), the Notes shall be issuable only in registered form without interest coupons and in denominations of $2,000 and any integral multiples of $1.00. On any Interest Payment Date on which the Issuer pays interest all or in part in PIK Interest (a "PIK Payment") with respect to a Global Note, the Trustee shall, subject to the Issuer's compliance with Section 2.14(d), increase the principal amount of such Global Note by an amount equal to the interest payable as PIK Interest, rounded up to the nearest whole dollar, for the relevant Interest Period on the principal amount of such Global Note as of the relevant Record Date for such Interest Payment Date, to the credit of the Holders of such Global Note on such Record Date and an adjustment shall be made on the books and records of the Trustee with respect to such Global Note to reflect such increase.

(b)     The aggregate principal amount of Notes that may be authenticated and delivered under this Indenture is limited to $300 million, *provided* that nothing herein shall

-39-

prevent the issuance of Additional Notes or the increase in the aggregate principal amount of the Global Notes issuable hereunder in connection with the payment of PIK Interest.

The terms and provisions contained in the Notes shall constitute, and are hereby expressly made, a part of this Indenture, and the Issuer, the Guarantors and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby. However, to the extent any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

Additional Notes ranking *pari passu* with the Initial Notes may be created and issued from time to time by the Issuer without notice to or consent of the Holders and shall be consolidated with and form a single class with the Initial Notes and shall have the same terms as to status, redemption or otherwise as the Initial Notes except that interest may accrue on the Additional Notes from their date of issuance (or such other date specified by the Issuer), subject to the Issuer's right to issue Additional Notes of a different series as set forth in the next paragraph; provided that the Issuer's ability to issue Additional Notes shall be subject to the Issuer's compliance with Section 4.09 and that a separate CUSIP or ISIN will be issued for Additional Notes, if the Initial Notes and the Additional Notes are not treated as fungible for U.S. federal income tax purposes, with the Initial Notes or any other Additional Notes bearing the same CUSIP or ISIN.

Section 2.02    Execution and Authentication.

(a)    At least one Officer of the Issuer shall execute the Notes on behalf of the Issuer by manual or facsimile signature. If an Officer whose signature is on a Note no longer holds that office at the time a Note is authenticated, the Note shall nevertheless be valid.

(b)    A Note shall not be entitled to any benefit under this Indenture or be valid or obligatory for any purpose until authenticated substantially in the form of Exhibit A attached hereto by the manual signature of an authorized signatory of the Trustee. The signature shall be conclusive evidence that the Note has been duly authenticated and delivered under this Indenture.

(c)    On each Issue Date, the Trustee shall, upon receipt of a written order of the Issuer signed by an Officer of the Issuer (an "Authentication Order"), authenticate and deliver the Initial Notes specified in such Authentication Order. In addition, at any time, from time to time, the Trustee shall, upon receipt of an Authentication Order (together with such other documents as may be required pursuant to this Indenture), authenticate and deliver any Additional Notes for an aggregate principal amount specified in such Authentication Order for such Additional Notes issued or increased hereunder.

(d)    The Trustee may appoint an authenticating agent acceptable to the Issuer to authenticate Notes. An authenticating agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as an Agent to deal with Holders, the Issuer or an Affiliate of the Issuer.

Section 2.03    Registrar and Paying Agent.

                (a)    The Issuer shall maintain an office or agency where Notes may be
presented for registration of transfer or for exchange ("Registrar") and at least one office or
agency where Notes may be presented for payment ("Paying Agent"). The Registrar shall keep a
register of the Notes ("Note Register") and of their transfer and exchange. The Issuer may
appoint one or more co-registrars and one or more additional paying agents. The term
"Registrar" includes any co-registrar, and the term "Paying Agent" includes any additional
paying agent. The Issuer may change any Paying Agent or Registrar without prior notice to any
Holder. The Issuer shall notify the Trustee in writing of the name and address of any Agent not a
party to this Indenture. If the Issuer fails to appoint or maintain another entity as Registrar or
Paying Agent, the Trustee shall act as such. The Issuer or any of its Restricted Subsidiaries may
act as Paying Agent or Registrar.

                (b)    The Issuer initially appoints The Depository Trust Company to act as
Depositary with respect to the Global Notes. The Issuer initially appoints the Trustee to act as
Paying Agent and Registrar for the Notes and to act as Custodian with respect to the Global
Notes.

                (c)    The Issuer may change the Paying Agent or Registrar without notice to the
Holders. The Issuer or any of its Restricted Subsidiaries may act in any such capacity.

Section 2.04    Paying Agent to Hold Money in Trust.

                The Issuer shall, no later than 11:00 a.m. (New York City time) on each due date
for the payment of principal and, subject to Section 2.14(a), interest on any of the Notes, deposit
with a Paying Agent a sum sufficient to pay such amount, such sum to be held in trust for the
Holders entitled to the same, and (unless such Paying Agent is the Trustee) the Issuer shall
promptly notify the Trustee in writing of its action or failure so to act. Each Paying Agent shall
promptly notify the Issuer in the event that there is deposited with such Paying Agent an amount
in excess of the amount required to be paid on any such due date, and the Issuer shall be entitled
to remittance of such excess amount. The Issuer shall require each Paying Agent other than the
Trustee to agree in writing that such Paying Agent shall hold in trust for the benefit of Holders or
the Trustee all money held by such Paying Agent for the payment of principal and interest on the
Notes, and shall notify the Trustee of any default by the Issuer in making any such payment.
While any such default continues, the Trustee may require a Paying Agent to pay all money held
by it to the Trustee. The Issuer at any time may require a Paying Agent to pay all money held by
it to the Trustee. Upon payment over to the Trustee, a Paying Agent shall have no further
liability for the money. If the Issuer or a Restricted Subsidiary acts as Paying Agent, it shall
segregate and hold in a separate trust fund for the benefit of the Holders all money held by it as
Paying Agent. Upon any bankruptcy or reorganization proceedings relating to the Issuer, the
Trustee may serve as Paying Agent for the Notes.

Section 2.05    Holder Lists.

                The Registrar shall preserve in as current a form as is reasonably practicable the
most recent list available to it of the names and addresses of all Holders. If the Trustee is not the

Registrar, the Issuer shall furnish to the Trustee at least five (5) Business Days after each Record Date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of the Holders.

Section 2.06   Transfer and Exchange.

(a)   The Notes shall be issued in registered form and shall be transferable only upon the surrender of a Note for registration of transfer and in compliance with Appendix A.

(b)   To permit registrations of transfers and exchanges, the Issuer shall execute and the Trustee shall authenticate Global Notes and Definitive Notes upon receipt of an Authentication Order in accordance with Section 2.02 or at the Registrar's request.

(c)   No service charge shall be imposed in connection with any registration of transfer or exchange (other than pursuant to Section 2.07), but the Holders shall be required to pay any transfer tax or similar governmental charge payable in connection therewith (other than any such transfer taxes or similar governmental charge payable upon exchange or transfer pursuant to Section 2.10 and Section 9.05).

(d)   All Global Notes and Definitive Notes issued upon any registration of transfer or exchange of Global Notes or Definitive Notes shall be the valid obligations of the Issuer, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Global Notes or Definitive Notes surrendered upon such registration of transfer or exchange.

(e)   Neither the Issuer nor the Registrar shall be required to register the transfer of or to exchange any Note between a Record Date and the next succeeding Payment Date.

(f)   Prior to due presentment for the registration of a transfer of any Note, the Trustee, any Agent and the Issuer may deem and treat the Person in whose name any Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal and (subject to the Record Date provisions of the Notes) interest on such Notes and for all other purposes, and none of the Trustee, any Agent or the Issuer shall be affected by notice to the contrary.

(g)   Upon surrender for registration of transfer of any Note at the office of the Trustee as set forth in Section 13.01, the Issuer shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more replacement Notes of any authorized denomination or denominations of a like aggregate principal amount.

(h)   At the option of the Holder, Notes may be exchanged for other Notes of any authorized denomination or denominations of a like aggregate principal amount upon surrender of the Notes to be exchanged at such office or agency. Whenever any Global Notes or Definitive Notes are so surrendered for exchange, the Issuer shall execute, and the Trustee shall authenticate and deliver, the replacement Global Notes and Definitive Notes which the Holder making the exchange is entitled to in accordance with the provisions of Appendix A.

(i)     All certifications, certificates and Opinions of Counsel required to be submitted to the Registrar pursuant to this Section 2.06 to effect a registration of transfer or exchange may be submitted by mail or by facsimile or transmission in portable document format ("PDF").

Section 2.07   Replacement Notes.

If a mutilated Note is surrendered to the Trustee or if a Holder claims that its Note has been lost, destroyed or wrongfully taken and the Trustee receives evidence to its satisfaction of the ownership and loss, destruction or theft of such Note, the Issuer shall issue and the Trustee, upon receipt of an Authentication Order, shall authenticate a replacement Note if the Trustee's requirements are otherwise met.  Such Holder shall furnish to the Issuer and to the Trustee such security or indemnity as may be required by them to save each of them harmless, and, in every case of destruction, loss, or theft, the Holder shall also furnish to the Issuer and to the Trustee evidence to their satisfaction of the destruction, loss or theft, of such Note and of the ownership thereof.  The Issuer may charge the Holder for the expenses of the Issuer and the Trustee in replacing a Note.  Every replacement Note is a contractual obligation of the Issuer and shall be entitled to all of the benefits of this Indenture equally and proportionately with all other Notes duly issued hereunder.  Notwithstanding the foregoing provisions of this Section 2.07, in case any mutilated, lost, destroyed or wrongfully taken Note has become or is about to become due and payable, the Issuer in its discretion may, instead of issuing a new Note, pay such Note.

Section 2.08   Outstanding Notes.

(a)     The Notes outstanding at any time are all the Notes authenticated by the Trustee except for those canceled by it, those delivered to it for cancellation, those reductions in the interest in a Global Note effected by the Trustee in accordance with the provisions hereof, and those described in this Section 2.08 as not outstanding.  Except as set forth in Section 2.09, a Note does not cease to be outstanding because the Issuer or an Affiliate of the Issuer holds the Note.

(b)     If a Note is replaced pursuant to Section 2.07, it ceases to be outstanding unless the Trustee receives proof satisfactory to it that the replaced Note is held by a protected purchaser, as such term is defined in Section 8-303 of the Uniform Commercial Code in effect in the State of New York.

(c)     If the principal amount of any Note is considered paid under Section 4.01, it ceases to be outstanding and interest on it ceases to accrue from and after the date of such payment.

(d)     If a Paying Agent (other than the Issuer, a Restricted Subsidiary or an Affiliate of any thereof) holds, on the maturity date or any redemption date, money sufficient to pay Notes payable or to be purchased on that date, then on and after that date such Notes shall be deemed to be no longer outstanding and shall cease to accrue interest.

Section 2.09    Treasury Notes.

In determining whether the Holders of the requisite principal amount of Notes have concurred in any direction, waiver or consent, Notes beneficially owned by the Issuer or by any Affiliate of the Issuer, shall be considered as though not outstanding, except that for the purposes of determining whether the Trustee shall be protected in conclusively relying on any such direction, waiver or consent, only Notes that a Responsible Officer of the Trustee actually knows are so owned shall be so disregarded. Notes so owned which have been pledged in good faith shall not be disregarded if the pledgee establishes to the satisfaction of the Trustee the pledgee's right to deliver any such direction, waiver or consent with respect to the Notes and that the pledgee is the Issuer or any obligor upon the Notes or any Affiliate of the Issuer or of such other obligor.

Section 2.10    Temporary Notes.

Until Definitive Notes are ready for delivery, the Issuer may prepare and the Trustee, upon receipt of an Authentication Order, shall authenticate temporary Notes. Temporary Notes shall be substantially in the form of Definitive Notes but may have variations that the Issuer considers appropriate for temporary Notes and as shall be reasonably acceptable to the Trustee. Without unreasonable delay, the Issuer shall prepare and the Trustee shall authenticate Definitive Notes in exchange for temporary Notes. Holders and beneficial holders, as the case may be, of temporary Notes shall be entitled to all of the benefits accorded to Holders, or beneficial holders, respectively, of Notes under this Indenture.

Section 2.11    Cancellation.

The Issuer at any time may deliver Notes to the Trustee for cancellation. The Registrar and Paying Agent shall forward to the Trustee any Notes surrendered to them for registration of transfer, exchange or payment. The Trustee or, at the direction of the Trustee, the Registrar or the Paying Agent and no one else shall cancel all Notes surrendered for registration of transfer, exchange, payment, replacement or cancellation and shall dispose of such cancelled Notes in accordance with its customary procedures (subject to the record retention requirement of the Exchange Act). Certification of the cancellation of Notes delivered pursuant to this Section 2.11 shall, upon the written request of the Issuer, be delivered to the Issuer. The Issuer may not issue new Notes to replace Notes that it has paid or that have been delivered to the Trustee for cancellation.

Section 2.12    Defaulted Interest.

(a)    Upon the occurrence and during the continuance of an Event of Default, the outstanding principal amount of the Notes and any accrued and unpaid interest and all other overdue amounts shall, to the extent lawful, each bear interest until paid to the Persons who are Holders on a subsequent special record date at the Applicable Rate, *plus* 2.00% per annum, as provided in the Notes and in accordance with Section 2.14 and Section 4.01. The Issuer shall notify the Trustee in writing of the amount of defaulted interest proposed to be paid on each Note and the date of the proposed payment. The Trustee shall fix or cause to be fixed each such special record date and payment date; *provided* that no such special record date shall be less

-44-

than ten (10) days prior to the related payment date for such defaulted interest. The Trustee shall promptly notify the Issuer of such special record date. At least fifteen (15) days before the special record date, the Issuer (or, upon the written request of the Issuer, the Trustee in the name and at the expense of the Issuer) shall mail or deliver by electronic transmission in accordance with the applicable procedures of the Depositary, or cause to be mailed or delivered by electronic transmission in accordance with the applicable procedures of the Depositary to each Holder a notice that states the special record date, the related payment date and the amount of such interest to be paid.

(b)    Subject to the foregoing provisions of this Section 2.12 and for greater certainty, each Note delivered under this Indenture upon registration of transfer of or in exchange for or in lieu of any other Note shall carry the rights to interest accrued and unpaid, and to accrue interest, which were carried by such other Note.

Section 2.13    CUSIP and ISIN Numbers.

The Issuer in issuing the Notes may use CUSIP or ISIN numbers (if then generally in use) and, if so, the Trustee shall use CUSIP or ISIN numbers in notices of redemption or exchange as a convenience to Holders; *provided* that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice of redemption or exchange and that reliance may be placed only on the other identification numbers printed on the Notes, and any such redemption or exchange shall not be affected by any defect in or omission of such numbers. The Issuer shall as promptly as practicable notify the Trustee in writing of any change in the CUSIP or ISIN numbers.

Section 2.14    Interest.

(a)    (1) Interest on the Notes shall accrue from and including the most recent date to which interest has been paid (or, if no interest has been paid, from the Issue Date) through but excluding the date on which interest is paid. Interest shall be payable semiannually in arrears on each Interest Payment Date, commencing the date of the original issuance of the Notes hereunder at a rate per annum equal to seven percent (7.00%) (the "Applicable Rate"); *provided* that for Interest Payment Dates prior to the date that is the one-year anniversary of the Production Date (as defined in the Plan) all interest (including all interest at the default rate provided for in Section 2.12) shall be PIK interest, and thereafter, interest shall be payable 5/7ths in cash and 2/7ths PIK on each Interest Payment Date through the Maturity Date. Following an increase in the principal amount of the outstanding Global Notes as a result of a PIK Payment, the Notes shall bear interest on such increased principal amount from and after the date of such PIK Payment. With respect to any PIK Payment in the form of Definitive Notes, no later than ten (10) Business Days prior to the relevant Interest Payment Date the Issuer shall deliver to the Trustee and the Paying Agent (if other than the Trustee) an Authentication Order to authenticate on the relevant Interest Payment Date new Notes in the required principal amount (rounded up to the nearest whole dollar) (the "PIK Notes"), and the Trustee will, on the relevant Interest Payment Date, authenticate and deliver such PIK Notes in certificated form for original issuance to the Holders of Definitive Notes on the relevant Record Date, as shown by the records of the register of Holders. Each PIK Note so issued will be dated as of the applicable Interest Payment

-45-

Date and will bear interest from and after such date. Any payment of PIK Interest shall be deemed to be payment in full to the same extent as if it were paid in cash.

(b)     [Reserved.]

(c)     If the due date for any payment in respect of any Notes is not a Business Day at the place at which such payment is due to be paid, the Holder thereof shall not be entitled to payment of the amount due until the next succeeding Business Day at such place, and shall not be entitled to any further interest or other payment as a result of any such delay.

(d)     No later than 10 (ten) days prior to the relevant Interest Payment Date in connection with any PIK Payment, the Issuer shall deliver to the Trustee and the Paying Agent (if other than the Trustee) written notification, executed by an Officer of the Issuer, substantially in the form of Exhibit D hereto, setting forth the amount of PIK Interest to be paid on such Interest Payment Date and directing the Trustee and the Paying Agent (if other than the Trustee) to issue PIK Notes or increase the principal amount of the Global Notes in accordance with this paragraph and Section 2.14(a), which notification the Trustee and Paying Agent shall be entitled to rely upon.

Article 3

REDEMPTION

Section 3.01     Notices to Trustee.

(a)     If the Issuer elects to redeem Notes pursuant to Section 3.06, it shall furnish to the Trustee, at least two (2) Business Days before notice of redemption is required to be mailed or delivered to Holders pursuant to Section 3.03 (unless a shorter notice shall be agreed to by the Trustee) but not more than sixty (60) days before a redemption date, an Officers' Certificate setting forth (1) the paragraph or subparagraph of such Note or Section of this Indenture pursuant to which the redemption shall occur, (2) the redemption date, (3) the principal amount of the Notes to be redeemed, (4) the redemption price, if then ascertainable and (5) if applicable, any conditions to such redemption.

Section 3.02     Selection of Notes to be Redeemed or Purchased in Part

If less than all of the Notes are to be redeemed at any time (including, for the avoidance of doubt, under Section 4.16), selection of Notes for redemption shall be made by the Trustee by lot or by any such method as the Trustee shall deem appropriate (subject to the applicable procedures of the Depository); *provided* that no Notes of $2,000 or less (or, if a PIK Payment has been made, $1.00 or less) shall be redeemed in part. If any Note is to be redeemed in part only, the notice of redemption that relates to such Notes shall state the portion of the principal amount thereof to be redeemed.

Section 3.03     Notice of Redemption.

(a)     The Issuer shall mail or deliver by electronic transmission in accordance with the applicable procedures of the Depositary, or cause to be mailed (or delivered by

-46-

electronic transmission in accordance with the applicable procedures of the Depositary) notices of redemption of Notes not less than thirty (30) days but not more than sixty (60) days before the redemption date to each Holder whose Notes are to be redeemed pursuant to this Article at such Holder's registered address or otherwise in accordance with the applicable procedures of the Depositary, except that redemption notices may be mailed more than sixty (60) days prior to a redemption date if the notice is issued in connection with Article 8 or Article 12.

(b) The notice shall identify the Notes to be redeemed (including CUSIP and ISIN number, if applicable) and shall state:

(1) the redemption date;

(2) the redemption price, including the portion thereof representing any accrued and unpaid interest; *provided* that in connection with a redemption under Section 3.06(a), the notice need not set forth the redemption price but only the manner of calculation thereof;

(3) the name and address of the Paying Agent;

(4) that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price;

(5) that, unless the Issuer defaults in making such redemption payment or the Paying Agent is prohibited from making such payment pursuant to the terms of this Indenture, interest on Notes called for redemption ceases to accrue on and after the redemption date;

(6) the paragraph or subparagraph of the Notes or Section of this Indenture pursuant to which the Notes called for redemption are being redeemed;

(7) that no representation is made as to the correctness or accuracy of the CUSIP or ISIN number, if any, listed in such notice or printed on the Notes;

(8) if any Note is being redeemed in part, the portion of the principal amount of such Note to be redeemed and that, after the applicable redemption date upon surrender of such Note, a new Note or Notes in principal amount equal to the unredeemed portion will be issued upon cancellation of the original Note; and

(9) if applicable, any condition to such redemption.

(c) At the Issuer's request, the Trustee shall give the notice of redemption in the Issuer's name and at the Issuer's expense; *provided* that the Issuer shall have delivered to the Trustee, at least five (5) Business Days before notice of redemption is required to be sent or caused to be sent to Holders pursuant to this Section 3.03 (unless a shorter notice shall be agreed to by the Trustee), an Officers' Certificate requesting that the Trustee give such notice and setting forth the information to be stated in such notice as provided in Section 3.03(b).

(d)    If any Note is to be redeemed in part only, the notice of redemption that
relates to that Note shall state the portion of the principal amount thereof to be redeemed, in
which case a portion of the original Note will be issued in the name of the Holder thereof upon
cancellation of the original Note. In the case of a Global Note, an appropriate notation will be
made on such Note to decrease the principal amount thereof to an amount equal to the
unredeemed portion thereof. Subject to the terms of the applicable redemption notice (including
any conditions contained therein), Notes called for redemption become due on the date fixed for
redemption. On and after the applicable redemption date, unless the Issuer defaults in the
payment of the applicable redemption price, interest ceases to accrue on Notes or portions of
them called for redemption.

(e)    Notice of any redemption of the Notes in connection with a corporate
transaction (including an Equity Offering, an incurrence of Indebtedness or a Change of Control
other than a Permitted Change of Control) may, at the Issuer's discretion, be given prior to the
completion thereof and any such redemption or notice, at the Issuer's discretion, may be subject
to one or more conditions precedent, including, but not limited to, completion of the related
transaction. If such redemption is subject to any such conditions precedent, the notice in respect
thereof may state that, in the Issuer's discretion, the redemption date may be delayed until such
time as any or all such conditions precedent shall be satisfied (or waived by the Issuer in its sole
discretion), or such redemption may not occur and such notice may be rescinded in the event that
any or all such conditions precedent shall not have been satisfied (or waived by the Issuer in its
sole discretion) by the redemption date, or by the redemption date as so delayed.

Section 3.04    Effect of Notice of Redemption.

Once notice of redemption is mailed or delivered in accordance with Section 3.03,
Notes called for redemption become irrevocably due and payable on the redemption date at the
redemption price. The notice, if mailed or delivered by electronic transmission in a manner
herein provided, shall be conclusively presumed to have been given, whether or not the Holder
receives such notice. In any case, failure to give such notice or any defect in the notice to the
Holder of any Note designated for redemption shall not affect the validity of the proceedings for
the redemption of any other Note. Subject to Section 3.05, on and after the redemption date,
interest ceases to accrue on Notes or portions of Notes called for redemption.

Section 3.05    Deposit of Redemption or Purchase Price.

(a)    No later than 11:00 a.m. (New York City time) on the Business Day prior
to the redemption or purchase date, the Issuer shall deposit with the Trustee or with the Paying
Agent money sufficient to pay the redemption or purchase price of and accrued and unpaid
interest on all Notes to be redeemed or purchased on that date. If a Note is redeemed or
purchased on or after a Record Date but on or prior to the related Payment Date, then any
accrued and unpaid interest shall be paid to the Holder of record on such Record Date. The
Paying Agent shall promptly mail to each Holder whose Notes are to be redeemed or
repurchased the applicable redemption or purchase price thereof and accrued and unpaid interest
thereon. The Trustee or the Paying Agent shall promptly return to the Issuer any money
deposited with the Trustee or the Paying Agent by the Issuer in excess of the amounts necessary

-48-

to pay the redemption or purchase price of, and accrued and unpaid interest on all Notes to be redeemed or purchased.

(b)    If the Issuer complies with the provisions of Section 3.05(a), on and after the redemption or purchase date, interest shall cease to accrue on the Notes called for redemption or purchase. If a Note is redeemed or purchased on or after a Record Date but on or prior to the related Payment Date, then any accrued and unpaid interest to the redemption or purchase date in respect of such Note shall be paid on such redemption or purchase date to the Person in whose name such Note is registered at the close of business on such Record Date. If any Note called for redemption or purchase shall not be so paid upon surrender for redemption or purchase because of the failure of the Issuer to comply with Section 3.05(a), interest shall be paid on the unpaid principal, from the redemption or purchase date until such principal is paid, and, to the extent lawful, on any interest accrued to the redemption or purchase date not paid on such unpaid principal, in each case at the rate provided in the Notes and in Section 2.12 and Section 4.01.

Section 3.06    Optional Redemption.

(a)    The Issuer may, at any time, but subject in all respects to the Intercreditor Agreement and the Priority Lien Documents, redeem the Notes, in whole or in part, upon notice pursuant to Section 3.03 at a redemption price equal to 100% of the aggregate principal amount of the Notes *plus* accrued and unpaid interest thereon, to the redemption date. Promptly after the determination thereof, the Issuer shall give the Trustee notice of the redemption price provided for in this Section 3.06(a), and the Trustee shall not be responsible for such calculation.

(b)    Except pursuant to clause (a) of this Section 3.06, to the extent applicable, the Notes shall not be redeemable at the Issuer's option.

(c)    Any redemption pursuant to this Section 3.06 shall be made pursuant to the provisions of Section 3.01 through Section 3.05.

(d)    Any redemption notice in connection with this Section 3.06 may, at the Issuer's discretion, be subject to one or more conditions precedent.

Section 3.07    Mandatory Redemption.

The Issuer shall not be required to make mandatory redemption or sinking fund payments with respect to the Notes other than as set forth in Section 4.15, following the occurrence of the Acceleration Effective Date as provided in Section 6.02. The Issuer, the Guarantors, and their respective Restricted Subsidiaries and Affiliates may at any time and from time to time but subject, in all respects to the Intercreditor Agreement and the Priority Lien Documents, purchase Notes in the open market or otherwise, subject to compliance with all applicable securities laws. For the avoidance of doubt, a Change of Control offer pursuant to Section 4.16 shall not be deemed a mandatory redemption.

Section 3.08    Notes Redeemed or Purchased in Part

Upon surrender of a Note that is redeemed or purchased in part, the Issuer will issue and, upon receipt of an Authentication Order from the Issuer, the Trustee will authenticate

for the Holder at the expense of the Issuer a new Note equal in principal amount to the
unredeemed or unpurchased portion of the Note surrendered; *provided* that each such new Note
will be in a principal amount of $2,000 or integral multiple of $1.00 (solely for any PIK Notes)
in excess thereof.

## Article 4

## COVENANTS

Section 4.01    Payment of Notes.

(a)    (1) The Issuer shall pay, or cause to be paid, the principal and interest on
the Notes on the dates and in the manner provided in the Notes.  Principal and interest shall be
considered paid on the date due if the Paying Agent, if other than the Issuer or a Restricted
Subsidiary, holds as of 11:00 a.m. (New York City) time, on the due date money deposited by
the Issuer in immediately available funds and designated for and sufficient to pay the principal
and interest then due, *provided* that PIK Interest shall be considered paid on the date due if in
accordance with the terms hereof and of the Notes, PIK Notes are issued and the principal
amount of the applicable Global Notes is increased in an amount equal to the applicable amount
of interest pursuant to Section 2.01(a).

(2)    On the Maturity Date, the Issuer shall make payment of the then unpaid
aggregate principal balance of the Notes in cash in immediately available funds in lawful
money of the United States of America, by wire transfer to the bank account designated
by the Trustee or Paying Agent in writing from time to time not later than 11:00 a.m.
(New York City time) on such date.

(b)    The Issuer shall pay interest (including post-petition interest in any
proceeding under any Bankruptcy Law in accordance with applicable law) on overdue principal
at the rate equal to the then applicable interest rate on the Notes; it shall pay interest (including
post-petition interest in any proceeding under any Bankruptcy Law in accordance with applicable
law) on overdue installments of interest (without regard to any applicable grace period) at the
Applicable Rate, *plus* 2.00% per annum, as provided in the Notes to the extent lawful, in each
case, in accordance with Section 2.12.

Section 4.02    Prepayment of Notes.

The Issuer may at any time and from time to time prepay any principal amount of
the Notes in whole or in part without premium or penalty, pursuant to Article 3.
Notwithstanding anything to the contrary in this Section 4.02, the Issuer's right to make such
prepayments of any principal amount of the Notes, and the rights of such Holders of Notes to
receive such prepayments, are subject to the limitations set forth in the Intercreditor Agreement
and are only permitted to the extent permitted under the Priority Lien Documents, as applicable.

Section 4.03    Taxes

Each Obligor shall pay, and shall cause each of its Restricted Subsidiaries to pay,
prior to delinquency, all taxes, assessments and governmental levies except (a) such as are being

contested in good faith and by appropriate negotiations or proceedings or (b) where the failure to effect such payment is not adverse in any material respect to the Holders.

Section 4.04    Stay, Extension and Usury Laws

Each Obligor covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Indenture; and each Obligor (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenant that it shall not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law has been enacted.

Section 4.05    Corporate Existence.

Subject to Article 5, each Obligor shall do or cause to be done all things necessary to preserve and keep in full force and effect (1) its corporate or limited liability company existence and the corporate, partnership, limited liability company or other existence of each of its Restricted Subsidiaries, in accordance with the respective organizational documents (as the same may be amended from time to time) of such Obligor or any such Restricted Subsidiary and (2) the material rights (charter and statutory), licenses and franchises of such Obligor and its Restricted Subsidiaries; *provided* that such Obligor shall not be required to preserve any such right, license or franchise, or the corporate, partnership, limited liability company or other existence of any of its Restricted Subsidiaries, if such Obligor in good faith shall determine that the preservation thereof is no longer desirable in the conduct of the business of such Obligor and its Restricted Subsidiaries, taken as a whole.

Section 4.06    Reports and Other Information

(a)    Notwithstanding that the Issuer may not be subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, and to the extent provided under the Priority Lien Documents, the Issuer shall provide to the Holders the following reports:

(1)    audited consolidated annual financial statements with all notes related thereto, prepared in accordance with GAAP;

(2)    quarterly consolidated financial statements that (i) prior to the completion of construction of the Issuer's taconite pellet production plant in Nashwauk, Minnesota (the "Nashwauk Plant"), are unaudited quarterly financial statements in a format acceptable to Issuer but that contain substantially the same information as in the Issuer's annual financial statements, including notes relating thereto, and (ii) following the completion of the Nashwauk Plant, are unaudited consolidated quarterly financial statement including notes relating thereto, prepared in accordance with GAAP; and

(3)    starting for the month ending January 31, 2018 and ending upon the closing of the Priority Lien Debt pursuant to the Priority Lien Documents, the Issuer shall provide a monthly cash report by the 15th day of the following month to the Trustee, who

-51-

will distribute or otherwise make such reports available to the Holders. Until the closing of the Priority Lien Debt pursuant to the Priority Lien Documents, the Holders of the Initial Notes may also, upon at least five (5) Business Days' notice, request a call with the Issuer and its professionals at a mutually convenient time, for an update on progress towards closing on the Priority Lien Debt and/or related matters (subject to any confidentiality restrictions which may be in place with respect to such information).

(b)     To the extent not satisfied by Section 4.06(a), including, for avoidance of doubt, at all times prior to the effectiveness of reporting requirements under the Priority Lien Documents, for so long as any Notes are outstanding, the Issuer shall furnish to Holders and to securities analysts and prospective purchasers of the Notes, upon their request, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act. The requirements set forth in this Section 4.06(b) and Section 4.06(a) may be satisfied by delivering such information to the Trustee and posting copies of such information on a website (which may be nonpublic and may be maintained by the Issuer or a third party) to which access will be given to Holders, prospective purchasers of the Notes (which prospective purchasers will be limited to QIBs, institutional "Accredited Investors" within the meaning of Rule 501(a)(1), (2), (3) or (7) under the Securities Act, or non-U.S. persons (as defined in Regulation S)), securities analysts and market making institutions that certify their status as such to the reasonable satisfaction of the Issuer.

(c)     In the event that any Parent Company of the Issuer becomes a Guarantor of the Notes, the Issuer may satisfy its obligations under this Section 4.06 to provide consolidated financial information of the Issuer by furnishing consolidated financial information relating to such Parent Company; *provided* that (1) such financial statements are accompanied by consolidating financial information for such Parent Company, the Issuer and the Restricted Subsidiaries in the manner prescribed by the SEC without regard to whether the Issuer is then subject to periodic reporting requirements under the Exchange Act; and (2) such Parent Company is not engaged in any business in any material respect other than such activities as are incidental to its ownership, directly or indirectly, of the Capital Stock of the Issuer.

(d)     Delivery of any reports, information and documents to the Trustee, including pursuant to Section 4.06, is for informational purposes only and the Trustee's receipt of such shall not constitute actual or constructive notice of any information contained therein or determinable from information contained therein, including the Issuer's compliance with any of its covenants pursuant to Article 4 (as to which the Trustee is entitled to rely exclusively on Officers' Certificates).

Section 4.07    Compliance Certificate.

(a)     Issuer shall deliver to the Trustee, within 120 days after the end of each fiscal year, an Officers' Certificate stating that a review of the activities of the Issuer and its Subsidiaries during the preceding fiscal year has been made under the supervision of the signing Officers with a view to determining whether an Event of Default has occurred and remains in existence, and describing such Event of Default of which he or she may have knowledge and what action the Issuer is taking or proposes to take with respect thereto.

(b)      So long as any of the Notes are outstanding, the Issuer will deliver to the Trustee, forthwith upon any Officer becoming aware of any Event of Default, an Officers' Certificate specifying such Event of Default and what action the Issuer is taking or proposes to take with respect thereto.

Section 4.08    Limitation on Restricted Payments.

(a)      Each Obligor shall not, and shall not permit any of its Restricted Subsidiaries, directly or indirectly, to

(1)      declare or pay any dividend or make any distribution (whether made in cash, securities or other property) on or in respect of its or any of its Restricted Subsidiaries' Capital Stock (including any payment in connection with any merger or consolidation involving such Obligor or any of its Restricted Subsidiaries), other than dividends or distributions by a Restricted Subsidiary, so long as, in the case of any dividend or distribution payable on or in respect of any Capital Stock issued by a Restricted Subsidiary that is not a Wholly Owned Subsidiary, the Obligor or the Restricted Subsidiary holding such Capital Stock receives at least its pro rata share of such dividend or distribution;

(2)      purchase, redeem, retire or otherwise acquire for value, including in connection with any merger or consolidation, any Capital Stock of such Obligor or any Parent Company of such Obligor held by Persons other than such Obligor or a Restricted Subsidiary thereof;

(3)      make any principal payment on, or purchase, repurchase, redeem, defease or otherwise acquire or retire for value, prior to any scheduled repayment, scheduled sinking fund payment or scheduled maturity, any Subordinated Indebtedness, other than:

(A)      Indebtedness of such Obligor owing to and held by any of its Restricted Subsidiaries, or Indebtedness of any such Restricted Subsidiary owing to and held by such Obligor or any other Restricted Subsidiary, permitted under clause (6)) of Section 4.09(b), so long as no sale or other transfer of any such Indebtedness to a Person other than an Obligor or a Subsidiary of an Obligor shall have occurred; or

(B)      the purchase, repurchase, redemption, defeasance or other acquisition or retirement of Subordinated Indebtedness purchased in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of purchase, repurchase, redemption, defeasance or other acquisition or retirement; or

(4)      make any Restricted Investment (all such payments and other actions referred to in clauses (1) through (4) of this Section 4.08 (other than any exception thereto) shall be referred to as a "Restricted Payment").

unless, at the time of and after giving effect to such Restricted Payment:

-53-

(5)    no Default or Event of Default has occurred and is continuing or would occur as a consequence of such Restricted Payment;

(6)    the Issuer would, at the time of such Restricted Payment and after giving pro forma effect thereto as if such Restricted Payment had been made at the beginning of the applicable four-quarter period, have been permitted to incur at least $1.00 of additional Indebtedness pursuant to Section 4.09(a)(1) hereof; and

(7)    after giving effect to the proposed Restricted Payment, the aggregate amount of all such Restricted Payments declared or made after the Issue Date does not exceed the sum of the following:

(A)    50% of the Consolidated Net Income of the Issuer for the period (taken as one accounting period) from December 31, 2017 to the end of the Issuer's most recently ended fiscal quarter for which internal financial statements are available at the time of such Restricted Payment (but in any event not less than zero dollars); plus

(B)    (i) until the Production Date (as defined in the Plan) occurs, 50% of the aggregate net cash proceeds and 50% of the Fair Market Value of securities or other property other than cash received by an Obligor or any of its Restricted Subsidiaries since the Issue Date and (ii) thereafter, 100% of such amounts, in each case, from the sale of Equity Interests of the Issuer (other than Disqualified Stock) or as a contribution to the Issuer's common equity capital or from the sale of convertible or exchangeable Disqualified Stock or convertible or exchangeable debt securities of the Issuer that have been converted or exchanged for such Equity Interests (other than Equity Interests (or Disqualified Stock or debt securities) sold to a Subsidiary of the Issuer or to an employee stock ownership plan, option plan or similar trust to the extent such sale to an employee stock ownership plan, option plan or similar trust is financed by loans from or guaranteed the Issuer or any of its Restricted Subsidiaries unless such loans have been repaid with cash on or prior to the date of determination) *provided* that the amount of any net cash proceeds and Fair Market Value of securities or other property used for the purposes of allowing any Restricted Payment under Section 4.08(a)(3)(B) shall not also be available for Incurrence or issuance by the Issuer and its Restricted Subsidiaries of Indebtedness or Disqualified Stock under Section 4.09(b)(19); plus

(C)    the amount equal to the net reduction in Restricted Investments made by the Issuer or any of its Restricted Subsidiaries in any Person since the Issue Date resulting from repurchases or redemptions of such Restricted Investments by such Person, proceeds realized upon the sale of such Restricted Investment to a purchaser other than the Issuer or a Restricted Subsidiary or the Issuer, repayments of loans or advances or other transfers of assets (including by way of dividend or distribution) by such Person to the Issuer or any Restricted Subsidiary of the Issuer;

which amount in each case under this clause (C) was included in the calculation of the amount of Restricted Payments; *provided, however,* that no amount will be included under this clause (C) to the extent it is already included in Consolidated Net Income; plus

> (D)     the aggregate amount of Investments by the Issuer and its Restricted Subsidiaries in any Unrestricted Subsidiary redesignated as a Restricted Subsidiary (valued in each case at the Fair Market Value of the Issuer's Investment in such Unrestricted Subsidiary at the time of redesignation) not to exceed the amount of Investments previously made by the Issuer or any Restricted Subsidiary of the Issuer in such Unrestricted Subsidiary; or

> (E)     50% of any dividends received by the Issuer or its Restricted Subsidiaries after the Issue Date from an Unrestricted Subsidiary, to the extent that such dividends were not otherwise included in the Consolidated Net Income of the Issuer and its Restricted Subsidiaries for such period.

(b)     The provisions of Section 4.08(a) hereof will not prohibit:

(1)     the payment of any dividend within ninety (90) days after the date of declaration of the dividend or the consummation of any irrevocable redemption within sixty (60) days after the date of giving of the redemption notice, as the case may be, if at the date of declaration or notice, the dividend or redemption payment would have complied with the provisions of this Indenture;

(2)     the making of any Restricted Payment since the Issue Date in exchange for, or out of the net cash proceeds of the substantially concurrent sale (other than to a Subsidiary of any Obligor) of, Equity Interests of any Obligor (other than Disqualified Stock and other than Equity Interests issued or sold to an employee stock ownership plan, option plan or similar trust to the extent such sale to an employee stock ownership plan, option plan or similar trust is financed by loans from or guaranteed by any Obligor or any of its Restricted Subsidiaries unless such loans have been repaid with cash on or prior to the date of determination) or from the substantially concurrent contribution of common equity capital to the Issuer; *provided* that the amount of any such net cash proceeds that are utilized for any such Restricted Payment will be excluded from clause (3)(B) of this Section 4.08(a) and Section 4.09(b)(19);

(3)     the repurchase, redemption, defeasance or other acquisition or retirement for value since the Issue Date of Subordinated Indebtedness in exchange for, or with the net cash proceeds from a substantially concurrent incurrence of, Refinancing Indebtedness;

(4)     so long as no Default has occurred and is continuing or would be caused thereby, the repurchase, redemption or other acquisition or retirement for value since the Issue Date of any Equity Interests of the Issuer or any Restricted Subsidiary of the Issuer held by any of the Issuer's (or any of its Restricted Subsidiaries') current or former directors or employees pursuant to any director or employee equity subscription agreement, stock option agreement or restricted stock agreement; *provided* that the

-55-

aggregate price paid for all such repurchased, redeemed, acquired or retired Equity Interests may not exceed the greater of (a) $20 million and (b) 2.5% of Consolidated Total Assets determined as of the date of making such Restricted Payment in any twelve-month period (with unused amounts in any 12-month period being permitted to be carried over into succeeding 12-month periods); *provided, further*, that the amounts in any 12-month period may be increased by an amount not to exceed (A) the cash proceeds received by the Issuer or any of its Restricted Subsidiaries from the sale of the Issuer's Equity Interests (other than Disqualified Stock) to any such directors or employees that occurs after the initial Issue Date (provided that the amount of such cash proceeds utilized for any such repurchase, retirement or other acquisition or retirement will be excluded from clause (1)(B) of this Section 4.08(a)) plus (B) the cash proceeds of key man life insurance policies received by any Obligor or its Restricted Subsidiaries after the Issue Date;

(5)     so long as no Default has occurred and is continuing or would be caused thereby, the repurchase, redemption or other acquisition or retirement for value since the Issue Date of any Equity Interests of any Obligor or any of its Restricted Subsidiaries held by any of the Obligors' or their Restricted Subsidiaries' current or former directors or employees in connection with the exercise or vesting of any equity compensation (including, without limitation, stock options, restricted stock and phantom stock) or made in order to satisfy any Obligor's or any of its Restricted Subsidiaries' tax withholding obligation with respect to such exercise or vesting;

(6)     so long as no Default has occurred and is continuing or would be caused thereby, repurchases of Subordinated Indebtedness at a purchase price not greater than (i) 101% of the principal amount of such Subordinated Indebtedness in the event of a Change of Control or (ii) 100% of the principal amount of such Subordinated Indebtedness in the event of an Asset Sale, in each case plus accrued and unpaid interest, in connection with any change of control offer or asset sale offer required by the terms of such Subordinated Indebtedness, but only if, in the case of a Change of Control, the Issuer has first complied with and fully satisfied its obligations under Section 4.16 (including without limitation the repurchase of all Notes validly tendered for payment in connection therewith);

(7)     the repurchase, redemption or other acquisition or retirement for value of Capital Stock of the Issuer representing fractional shares of such Capital Stock in connection with a merger, consolidation or other combination involving the Issuer or any other transaction permitted by this Indenture;

(8)     Permitted Tax Distributions;

(9)     other Restricted Payments in an aggregate amount not to exceed the greater of (a) $50 million and (b) 5.0% of Consolidated Total Assets determined as of the date of making such Restricted Payment since the Issue Date; and

(10)     the declaration and payment of regularly scheduled or accrued dividends to holders of any class or series of Disqualified Stock of any Obligor or any of its

-56-

Restricted Subsidiaries issued on or after the Issue Date in accordance with any
subsection of Section 4.09(a)(1) hereof.

(c)      The amount of all Restricted Payments (other than cash) will be the Fair
Market Value on the date of the Restricted Payment of the asset(s) or securities proposed to be
transferred or issued by the Issuer or such Restricted Subsidiary, as the case may be, pursuant to
the Restricted Payment. The Fair Market Value of any assets or securities that are required to be
valued by this Section 4.08 will be evidenced by an Officers' Certificate delivered to the Trustee
within five (5) Business Days of the making of the Restricted Payment, together with a copy of
any related resolution of the Board of Directors of the Issuer. Such Officers' Certificate shall
state that the Restricted Payment is permitted by this Section 4.08. For purposes of determining
compliance with this Section 4.08, in the event that a Restricted Payment meets the criteria of
more than one of the exceptions described in (1) through (10) above or is entitled to be made
pursuant to the first paragraph of this Section 4.08, the Issuer shall, in its sole discretion, classify
such Restricted Payment, or later classify, reclassify or re-divide all or a portion of such
Restricted Payment, in any manner that complies with this Section 4.08.

Section 4.09    Limitation on Indebtedness.

(a)      Each Obligor shall not, and shall not permit any of its Restricted
Subsidiaries to, create, Incur, assume or permit to exist:

(1)      any Indebtedness (including Acquired Indebtedness but excluding Priority
Lien Obligations) or issue any shares of Disqualified Stock; *provided, however*, that each
Obligor and its Restricted Subsidiaries may Incur Indebtedness (including Acquired
Indebtedness but excluding Priority Lien Obligations) or issue Disqualified Stock, if the
Fixed Charge Coverage Ratio for the Issuer's most recently ended four full fiscal quarters
for which internal financial statements have been made available immediately preceding
the date on which such additional Indebtedness is incurred or such Disqualified Stock is
issued, as the case may be, would have been at least 2.0 to 1.0, determined on a pro forma
basis (including a pro forma application of the net proceeds therefrom), as if the
additional Indebtedness had been incurred or the Disqualified Stock had been issued, as
the case may be, at the beginning of such four-quarter period; and

(2)      any Priority Lien Obligations; *provided, however*, that each Obligor and
its Restricted Subsidiaries may Incur Priority Lien Obligations if the Consolidated
Priority Lien Secured Debt Ratio for the Issuer's most recently ended four full fiscal
quarters for which internal financial statements have been made available immediately
preceding the date on which such additional Priority Lien Obligations are Incurred would
have been no greater than 4.50 to 1.0, determined on a pro forma basis (including a pro
forma application of the net proceeds therefrom), as if the additional Priority Lien
Obligations had been Incurred at the beginning of such four-quarter period.

(b)      The provisions of Section 4.09(a) shall not prohibit the Incurrence of the
following Indebtedness:

(1)    the incurrence by any Obligor of Indebtedness represented by the Notes and the related Note Guarantees to be issued on the initial Issue Date (but excluding any Additional Notes) and any PIK Interest thereon (or PIK Notes delivered in lieu of PIK Interest) in accordance with this Indenture;

(2)    Indebtedness existing on the date of the original issuance of the Notes hereunder (other than Indebtedness described in clause (1));

(3)    Priority Lien Debt not to exceed the greater of (x) $750 million plus any additional amounts reasonably necessary or appropriate in the good faith determination of the senior management of the Issuer to fund bona fide construction costs of the Issuer's iron ore mine and pellet plant project near Nashwauk, Minnesota (the "Project") and any and all bona fide pre-operating expenses and expenses and (y) an amount equal to the sum of (A) $750 million plus (B) 10% of Consolidated Total Assets determined as of the date of the incurrence of such Indebtedness after giving pro forma effect to such incurrence and the application of the proceeds therefrom, including, in each case, any interest, fees or expenses accrued, incurred or capitalized on any of the Indebtedness permitted under the foregoing provisions of this Section 4.09(b)(3) and Refinancing Indebtedness with respect to such Priority Lien Debt.

(4)    Indebtedness for the Obligors in an aggregate principal amount not exceeding at any time outstanding (a) the aggregate principal amount of the Prepetition Trade Creditor Notes; (b) all amounts owed by the Obligors in connection with the Plan; (c) the full amount of the pre-existing Indebtedness of the Guarantor as of the initial Issue Date; (d) up to $5 million aggregate principal amount of any drawings under any standby letters of credit issued to secure the Guarantor's obligations owed to Progress Rail Leasing Corporation ("Progress Rail") under that certain Master Railcar Lease Agreement (Full Service) between the Guarantor and Progress Rail; and (e) any interest, fees or expenses accrued, incurred or capitalized on any of the Indebtedness permitted under the foregoing provisions of this Section 4.09(b)(4).

(5)    Indebtedness Incurred by an Obligor or a Restricted Subsidiary of an Obligor in respect of workers' compensation claims, health, disability or other employee benefits or property, casualty or liability insurance, self-insurance obligations, performance, bid, surety and similar bonds and completion Guarantees (not for borrowed money) provided in the ordinary course of business and letters of credit to support such arrangements;

(6)    Indebtedness of an Obligor owing to and held by any of its Restricted Subsidiaries or Indebtedness of a Restricted Subsidiary of an Obligor owing to and held by such Obligor or any other Restricted Subsidiary of such Obligor; provided, however, (a) any subsequent issuance or transfer of Capital Stock or any other event which results in any such Indebtedness being beneficially held by a Person other than an Obligor or a Restricted Subsidiary of an Obligor; (b) any sale or other transfer of any such Indebtedness to a Person other than an Obligor or a Restricted Subsidiary of an Obligor shall be deemed, in each case under this clause (6) of this Section 4.09(b), to constitute an Incurrence of such Indebtedness by such Obligor or such Restricted Subsidiary, as the

case may be; and (c) if the Issuer or any Guarantor is the Obligor on such Indebtedness and the payee is not the Issuer or a Guarantor, such Indebtedness must be expressly subordinated to the prior payment in full in cash of all Obligations then due with respect to the Notes, in the case of the Issuer, or the Note Guarantee, in the case of a Guarantor;

(7)    the Incurrence by an Obligor or any of their Restricted Subsidiaries of Refinancing Indebtedness that serves to refund or refinance any Indebtedness Incurred as permitted under Section 4.09(a), and clauses (1), (2), (4) and (7) of this Section 4.09(b);

(8)    Preferred Stock of a Restricted Subsidiary of an Obligor held by such Obligor or any other Restricted Subsidiary of such Obligor; provided, however, (A) any subsequent issuance or transfer of Capital Stock or any other event which results in such Preferred Stock being beneficially held by a Person other than such Obligor or a Restricted Subsidiary of such Obligor; and (B) any sale or other transfer of any such Preferred Stock to a Person other than such Obligor or a Restricted Subsidiary of such Obligor shall be deemed in each case under this clause (8) to constitute an Incurrence of such Preferred Stock by such Restricted Subsidiary;

(9)    Indebtedness of Persons Incurred and outstanding on the date on which such Person became a Restricted Subsidiary of, or was acquired by, or merged into, an Obligor or any Restricted Subsidiary of any Obligor; provided, however, that (i) the Incurrence of such Indebtedness does not materially impair the ability of the Issuer or the Guarantors to pay interest and principal on the Notes and (ii) such Indebtedness was not created or Incurred in anticipation of such acquisition or merger;

(10)    Indebtedness arising from agreements of an Obligor or a Restricted Subsidiary of any Obligor providing for indemnification, adjustment of purchase price or similar obligations, in each case, Incurred or assumed in connection with (a) the disposition of any business or assets of such Obligor or any business, assets or Capital Stock of a Restricted Subsidiary of such Obligor, other than Guarantees of Indebtedness Incurred by any Person acquiring all or any portion of such business, assets or a Restricted Subsidiary of an Obligor for the purpose of financing such acquisition and (b) acquisitions of any business, assets or Capital Stock of another Person or any Investments; provided that such Indebtedness is not reflected on the balance sheet of such Obligor or any of its Restricted Subsidiaries (contingent obligations referred to in a footnote to financial statements and not otherwise reflected on the balance sheet will not be deemed to be reflected on such balance sheet for purposes of this clause (10)), and the Incurrence of such Indebtedness does not materially impair the ability of any Obligor to pay interest and principal on the Notes;

(11)    Subordinated Indebtedness;

(12)    Obligations incurred and Investments made by one or more Affiliates of the Issuer or the Guarantor that may involve the Issuer and/or the Guarantor but have no adverse impact upon their ability to satisfy their Obligations with respect to the Notes;

(13)    Indebtedness (which may include, without limitation, Priority Lien Obligations, Parity Lien Obligations and Junior Lien Obligations) Incurred by the Obligors for working capital purposes on a secured basis in an aggregate principal amount not exceeding at any time outstanding the greater of (a) $150 million and (b) $100 million plus 10% of Consolidated Total Assets determined as of the date of the incurrence of such Indebtedness after giving pro forma effect to such incurrence and the application of the proceeds therefrom and any Permitted Refinancing in respect of such Indebtedness;

(14)    the incurrence by the Issuer or any of its Restricted Subsidiaries of Indebtedness represented by Capitalized Lease Obligations, mortgage financings or purchase money obligations, in each case, incurred for the purpose of financing all or any part of the purchase price or cost of design, construction, installation or improvement of property, plant or equipment used in the business of the Issuer or any of its Restricted Subsidiaries, in an aggregate principal amount, including all Refinancing Indebtedness incurred to renew, refund, refinance, replace, defease or discharge any Indebtedness incurred pursuant to this clause (14), not to exceed the greater of $50 million and 5.0% of Consolidated Total Assets determined as of the date of the incurrence of such Indebtedness after giving pro forma effect to such incurrence and the application of the proceeds therefrom;

(15)    Obligations incurred and investments made in connection with construction by, on behalf of, or on the land of the Issuer and/or the Guarantor of any value added iron or other steel production facility, including, without limitation, any hot briquetted iron production facility;

(16)    Indebtedness incurred by the Guarantor in connection with operation of a pig iron processing joint venture, including Indebtedness incurred to fund capital expenditures of the joint venture in an amount not to exceed the greater of $50 million and 5.0% of Consolidated Total Assets determined as of the date of the incurrence of such Indebtedness after giving pro forma effect to such incurrence and the application of the proceeds therefrom and any Permitted Refinancing in respect of such Indebtedness;

(17)    Junior Lien Debt in an aggregate principal amount not to exceed the greater of (a) $75 million and (b) 7.5% of Consolidated Total Assets determined as of the date of the incurrence of such Indebtedness after giving pro forma effect to such incurrence and the application of the proceeds therefrom and any Permitted Refinancing in respect of such Indebtedness;

(18)    additional Indebtedness (which may include, without limitation, Priority Lien Obligations, Parity Lien Obligations and Junior Lien Obligations) in an aggregate principal amount not to exceed the greater of (a) $75 million and (b) 7.5% of Consolidated Total Assets determined as of the date of the incurrence of such Indebtedness after giving pro forma effect to such incurrence and the application of the proceeds therefrom and any Permitted Refinancing in respect of such Indebtedness; and

(19)   Indebtedness or Disqualified Stock of the Issuer and Indebtedness, Disqualified Stock or Preferred Stock of any Restricted Subsidiary of the Issuer in an aggregate principal amount or liquidation preference equal to 200% of the cash proceeds received by the Issuer and its Restricted Subsidiaries since immediately after the Issue Date from the issue or sale of Equity Interests of the Issuer or any Parent Company of the Issuer or cash contributed to the capital of the Issuer or any Parent Company of the Issuer (which proceeds are contributed to the Issuer) as determined in accordance with clauses Section 4.08(a)(3)(B) to the extent such cash proceeds or cash have not been applied to make Restricted Payments pursuant to Section 4.08(a), Section 4.08(b)(2) or Section 4.08(b)(5) and any Permitted Refinancing in respect of such Indebtedness;

*provided*, that with respect to any Permitted Indebtedness that is Priority Lien Debt, the parties hereto hereby agree that the Issuer, the Collateral Agent, each applicable Guarantor, the Priority Lien Agent and the Trustee shall enter into or join the Intercreditor Agreement.

For purposes of determining compliance with this Section 4.09, in the event that an item of proposed Indebtedness meets the criteria of more than one of the categories of permitted Indebtedness described in clauses (1) through (19) above or is entitled to be incurred pursuant to Section 4.09(a) hereof, the Issuer will be permitted to classify such item of Indebtedness on the date of its incurrence, or later reclassify all or a portion of such item of Indebtedness, in any manner that complies with this Section 4.09; *provided* that (a) any Indebtedness outstanding on the Issue Date shall be considered incurred under clause (2) of Section 4.09(b) and may not later be reclassified and (b) Priority Lien Debt incurred under clause (3) of Section 4.09(b) may not be later reclassified. The accrual of interest, the accretion or amortization of original issue discount, the payment of interest on any Indebtedness in the form of additional Indebtedness with the same terms, and the payment of dividends on Disqualified Stock in the form of additional shares of the same class of Disqualified Stock will not be deemed to be an incurrence of Indebtedness or an issuance of Disqualified Stock for purposes of Section 4.09. Notwithstanding any other provision of this Section 4.09, the maximum amount of Indebtedness that the Issuer or any Restricted Subsidiary may incur pursuant to this Section 4.09 shall not be deemed to be exceeded solely as a result of fluctuations in exchange rates or currency values.

Section 4.10    Limitation on Liens.

Each Obligor shall not, and shall not permit any of their Restricted Subsidiaries to, directly or indirectly, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, other than Permitted Liens.

Section 4.11    Designation of Restricted and Unrestricted Subsidiaries.

The Board of Directors of the Issuer may designate any Restricted Subsidiary to be an Unrestricted Subsidiary if that designation would not cause an Event of Default. If a Restricted Subsidiary is designated as an Unrestricted Subsidiary, the aggregate Fair Market Value of all outstanding Investments owned by the Issuer and its Restricted Subsidiaries in the Subsidiary designated as an Unrestricted Subsidiary will be deemed to be an Investment made as

of the time of the designation and will reduce the amount available for Restricted Payments under Section 4.08 hereof or under one or more clauses of the definition of Permitted Investments, as determined by the Issuer. That designation will only be permitted if the Investment would be permitted at that time and if the Restricted Subsidiary otherwise meets the definition of an Unrestricted Subsidiary.

Any designation of a Subsidiary of the Issuer as an Unrestricted Subsidiary will be evidenced to the Trustee by filing with the Trustee a certified copy of a resolution of the Board of Directors giving effect to such designation and an Officers' Certificate certifying that such designation complied with the preceding conditions of this Section 4.11 and was permitted by Section 4.08 hereof. If, at any time, any Unrestricted Subsidiary would fail to meet the preceding requirements of this Section 4.11 as an Unrestricted Subsidiary, it will thereafter cease to be an Unrestricted Subsidiary for purposes of this Indenture and any Indebtedness of such Subsidiary will be deemed to be incurred by a Restricted Subsidiary of the Issuer as of such date and, if such Indebtedness is not permitted to be incurred as of such date under Section 4.09 hereof, the Issuer will be in default of such covenant. The Board of Directors of the Issuer may at any time designate any Unrestricted Subsidiary to be a Restricted Subsidiary; *provided* that such designation will be deemed to be an incurrence of Indebtedness by a Restricted Subsidiary of the Issuer of any outstanding Indebtedness of such Unrestricted Subsidiary and such designation will only be permitted if (1) such Indebtedness is permitted under Section 4.09 hereof, calculated on a pro forma basis as if such designation had occurred at the beginning of the four-quarter reference period and (2) no Default or Event of Default would be in existence immediately following such designation.

Section 4.12   Future Guarantors.

(a)   Subject to the Intercreditor Agreement, except as otherwise set forth herein, after the Issue Date, each Obligor shall cause each of its Restricted Subsidiaries (other than a Foreign Subsidiary) created or acquired by such Obligor or one or more of its Restricted Subsidiaries that Guarantee any of the Priority Lien Debt or Junior Lien Debt to execute and deliver to the Trustee a supplemental indenture to this Indenture pursuant to which such Restricted Subsidiary shall irrevocably and unconditionally Guarantee, on a joint and several basis, the full and prompt payment of the principal of and interest on the Notes and all other Obligations of the Issuer under the Notes Documents on the same basis as the payment obligations owed by the Obligors (each, a "Guarantee Supplement"). Notwithstanding anything to the contrary herein or in any other Collateral Document, during such time as any Priority Lien Debt (or commitments therefor) are outstanding, no such Guarantee Supplement shall be required under this Indenture or any other Collateral Document until the date that is no earlier than ten (10) Business Days after the date such Restricted Subsidiary is required under the Priority Lien Documents to deliver such Guarantee of the Priority Lien Debt to the Priority Lien Agent (it being agreed and understood that no such Guarantee Supplement shall be required hereunder if a corresponding guarantee is not required under the Priority Lien Documents).

(b)   The Obligations of each Guarantor shall be limited to the maximum amount as will, after giving effect to all other contingent and fixed liabilities of such Guarantor and after giving effect to any collections from or payments made by or on behalf of any other Guarantor in respect of the Obligations of such other Guarantor under its Note Guarantee or

pursuant to its contribution Obligations under this Indenture, result in the Obligations of such Guarantor under its Note Guarantee not constituting a fraudulent conveyance or fraudulent transfer under federal or state law.

(c)     Subject to the Intercreditor Agreement, each Person that becomes a Guarantor after the Issue Date shall, subject to the terms hereof become party to the applicable Collateral Documents and shall as promptly as practicable execute and deliver such security instruments, financing statements, mortgages, deeds of trust (in substantially the same form as those executed and delivered with respect to the Collateral on the Issue Date or on the date first delivered in the case of Mortgages and certificates and opinions of counsel (to the extent, and substantially in the form, delivered on the Issue Date or the date first delivered in the case of Mortgages (but no greater scope)) as may be necessary to vest in the Collateral Agent a perfected security interest (subject to Permitted Liens) in properties and assets that constitute Collateral as security for the Notes or the Note Guarantees and as may be necessary to have such property or asset added to the applicable Collateral as required under the Collateral Documents and this Indenture, and thereupon all provisions of the Indenture relating to the Collateral shall be deemed to relate to such properties and assets to the same extent and with the same force and effect.  Notwithstanding anything to the contrary herein or in any other Collateral Document, during such time as any Priority Lien Debt (or commitments therefor) are outstanding, no delivery or perfection of any Collateral or Collateral Document as security for the Notes or the Note Guarantees shall be required under this Indenture or any other Collateral Document until the date no earlier than ten (10) Business Days after the date such Restricted Subsidiary is required under the Priority Lien Documents to perfect a valid and enforceable Lien on such Collateral in favor of the Priority Lien Agent to secure the Priority Lien Debt (it being agreed and understood that no such delivery or perfection of any Collateral or Collateral Document shall be required hereunder if the corresponding delivery or perfection is not required under the Priority Lien Documents).

(d)     Each Note Guarantee shall be released in accordance with the provisions of Section 11.06.

Section 4.13    Limitation on Restrictions on Distribution From Restricted Subsidiaries

(a)     No Obligor shall, or shall permit any of its Restricted Subsidiaries to, directly or indirectly, create or otherwise cause or permit to exist or become effective any consensual encumbrance or consensual restriction on the ability of such Obligor or any such Restricted Subsidiary to:

(1)     pay dividends or make any other distributions on its Capital Stock to an Obligor or any of its Restricted Subsidiaries, or with respect to any other interest or participation in, or measured by, its profits, or pay any Indebtedness or other obligations owed to an Obligor or any Restricted Subsidiary of an Obligor (it being understood that the priority of any Preferred Stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on Common Stock shall not be deemed a restriction on the ability to make distributions on Capital Stock):

-63-

(2)    make any loans or advances to an Obligor or any Restricted Subsidiary (it being understood that the subordination of loans or advances made to an Obligor or any Restricted Subsidiary to other Indebtedness Incurred by such Obligor or any such Restricted Subsidiary shall not be deemed a restriction on the ability to make loans or advances); or

(3)    sell, lease or transfer any of its property or assets to an Obligor or any Restricted Subsidiary of any Obligor (it being understood that such transfers shall not include any type of transfer described in clause (1) or (2) of this Section 4.12(a)).

(b)    Section 4.13(a) shall not prohibit encumbrances or restrictions existing under or by reason of:

(1)    contractual encumbrances or restrictions pursuant to the Collateral Documents and related documentation and other agreements or instruments in effect at or entered into on the Issue Date;

(2)    this Indenture, the Notes and the Note Guarantees;

(3)    the Priority Lien Documents, the Parity Lien Documents or the Junior Lien Documents;

(4)    any agreement or other instrument of a Person acquired by an Obligor or any of its Restricted Subsidiaries in existence at the time of such acquisition (but not created in contemplation thereof), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person and its Restricted Subsidiaries, or the property or assets of the Person and its Restricted Subsidiaries, so acquired (including after-acquired property);

(5)    any amendment, restatement, modification, renewal, supplement, refunding, replacement or refinancing of an agreement referred to in clauses (1), (2), (3), (4), (16) of this Section 4.12(b) or this clause (5) of this Section 4.12(b);

(6)    any customary provisions in leases, subleases or licenses and other agreements entered into by an Obligor or any Restricted Subsidiary of such Obligor in the ordinary course of business;

(7)    any agreement for the sale or other disposition of assets, including without limitation an agreement for the sale or other disposition of the Capital Stock or assets of a Subsidiary that restricts distributions by the applicable Subsidiary pending the sale or other disposition;

(8)    purchase money obligations for property (including Capital Stock) acquired in the ordinary course of business, Capital Lease Obligations and mortgage financings that impose restrictions on the property purchased or leased;

(9)    Liens permitted to be incurred under the provisions of Section 4.10 hereof that limit the right of the debtor to dispose of the assets subject to such Liens;

(10)    provisions limiting the disposition or distribution of assets or property in joint venture agreements, asset sale agreements, sale-leaseback agreements, stock sale agreements and other similar agreements entered into (a) in the ordinary course of business consistent with past practice or (b) with the approval of the Issuer's Board of Directors, which limitations are applicable only to the assets or property that are the subject of such agreements;

(11)    supermajority voting requirements existing under corporate charters, bylaws, stockholders' agreements and similar documents and agreements;

(12)    customary provisions restricting subletting or assignment of any lease governing a leasehold interest;

(13)    encumbrances or restrictions contained in Hedging Obligations permitted from time to time under this Indenture;

(14)    restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(15)    encumbrances or restrictions arising or existing by reason of applicable law or any applicable rule, regulation or order; or

(16)    documents related to Indebtedness Incurred or Preferred Stock issued by a Restricted Subsidiary of an Obligor permitted to be Incurred pursuant to Section 4.09.

Section 4.14   Transactions with Affiliates

(a)    No Obligor shall, or shall permit any of its Restricted Subsidiaries to, directly or indirectly, enter into or conduct any transaction (including the purchase, sale, lease or exchange of any property or asset or the rendering of any service) with any Affiliate of such Obligor (an "Affiliate Transaction"), other than when:

(1)    the terms of such Affiliate Transaction are no less favorable to such Obligor or such Restricted Subsidiary, as the case may be, than those that could have been obtained by such Obligor or such Restricted Subsidiary in a comparable transaction at the time of such transaction in arms' length dealings with a Person that is not an Affiliate; and

(2)    in the event such Affiliate Transaction involves an aggregate consideration in excess of $25 million, (A) the terms of such transaction have been approved by a majority of the members of the Board of Directors of such Obligor and by a majority of the members of such Board of Directors having no personal stake in such transaction, if any (and such majority determines that such Affiliate Transaction satisfies the criteria in clause (1) of this Section 4.14(a)) and (B) the Board of Directors of such Obligor set forth in an Officers' Certificate certifying that such Affiliate Transaction complies with clause (2)(A) of this Section 4.14(a) and that such Affiliate Transaction has been approved by a majority of the disinterested members of such Board of Directors.

-65-

(b)     Subject to the exceptions and limitations set forth in the Priority Lien Documents and the Intercreditor Agreement, Section 4.14(a) shall not apply to:

(1)     any transaction: (A) between any Obligor and its Restricted Subsidiaries; (B) between the Issuer and ERPI; and (C) among the Issuer, ERPI, affiliates of ERPI and/or other entities in which Tom Clarke maintains an ownership interest, subject to any limitation applied by the holders of the Priority Lien Debt, and any Guarantees issued by an Obligor or a Restricted Subsidiary of any Obligor for the benefit of any other Obligor or any other Restricted Subsidiary of any Obligor, as the case may be, in accordance with Section 4.09;

(2)     Restricted Payments permitted to be made pursuant to Section 4.08 or Permitted Investments;

(3)     any agreement as in effect as of the initial Issue Date, as these agreements may be amended, modified, supplemented, extended or renewed from time to time, so long as any such amendment, modification, supplement, extension or renewal is not more disadvantageous to the Holders in any material respect in the good faith judgment of the Board of Directors of the applicable Obligor, when taken as a whole, than the terms of the agreements in effect on the Issue Date; provided that such amendment, modification, supplement, extension or renewal shall not materially affect the Issuer's or Guarantor's ability to make anticipated principal and interest payments on the Notes (in the good faith determination of the Board of Directors of such Obligor);

(4)     any agreement between any Person and an Affiliate of such Person existing at the time such Person is acquired by or merged into an Obligor or a Restricted Subsidiary of any Obligor; provided that such agreement was not entered into in contemplation of such acquisition or merger, and any amendment thereto, so long as any such amendment is not disadvantageous to the Holders in the good faith judgment of the Board of Directors of the applicable Obligor, when taken as a whole, as compared to the applicable agreement as in effect on the date of such acquisition or merger; provided that such agreement or any amendment thereof shall not materially affect such Obligor's ability to make anticipated principal and interest payments on the Notes (in the good faith determination of the Board of Directors of such Obligor); or

(5)     (a) guarantees of performance by the Issuer and its Restricted Subsidiaries of the Issuer's Unrestricted Subsidiaries in the ordinary course of business, except for guarantees of Indebtedness in respect of borrowed money, and (b) pledges of Equity Interests of the Issuer's Unrestricted Subsidiaries for the benefit of lenders of the Issuer's Unrestricted Subsidiaries.

Section 4.15  Redemption Upon Event of Default.

(a)     If both an Event of Default has occurred and is continuing and the Acceleration Effective Date has occurred as provided in Section 6.02(a), the Issuer shall, subject to the terms of the Intercreditor Agreement, redeem all of the Notes at a redemption price in cash equal to 100% of the aggregate principal amount of the Notes outstanding plus accrued and

unpaid interest (including additional interest to be paid following an Event of Default as set forth in Section 2.12), and interest upon overdue interest, if any (the "Event of Default Redemption Price"), to the date of redemption (the "Event of Default Redemption Payment Date"), subject to the right of Holders of record on a Record Date to receive any interest due on such Event of Default Redemption Payment Date (the redemption described in this Section 4.15(a), an "Event of Default Redemption").

(1) Within five (5) Business Days following any Acceleration Effective Date, the Issuer shall mail a notice of the Acceleration Effective Date and of the Event of Default giving rise to such Acceleration Effective Date to each Holder at such Holder's registered address or otherwise deliver notice in accordance with the applicable procedures of the Depositary, with a copy to the Trustee (an "Acceleration Effective Date Notice"), stating:

(A) the paragraph or subparagraph or Section pursuant to which such Event of Default has occurred and the manner in which such Acceleration Effective Date occurred pursuant to Section 6.02; and

(2) that the Notes have become immediately due and payable.

The Acceleration Effective Date Notice, if mailed or otherwise delivered in a manner herein provided, shall be conclusively presumed to have been given, whether or not the Holder receives such Acceleration Effective Date Notice. If (A) an Acceleration Effective Date Notice is mailed in a manner herein provided and (B) any Holder fails to receive such Acceleration Effective Date Notice or a Holder receives such Acceleration Effective Date Notice but it is defective, such Holder's failure to receive such Acceleration Effective Date Notice or such defect shall not affect the validity of the proceedings for the purchase of the Notes as to all other Holders that properly received such Acceleration Effective Date Notice without defect.

(3) No later than 11:00 a.m. (New York City time) on the Business Day prior to the Event of Default Redemption Payment Date, the Issuer shall, to the extent lawful, deposit with the Paying Agent an amount equal to the Event of Default Redemption Price in respect of all Notes. The Trustee or Paying Agent shall promptly return to the Issuer any cash in U.S. dollars, deposited with the Trustee or Paying Agent, as applicable, by the Issuer in excess of the amounts necessary to pay the Event of Default Redemption Price on all Notes to be redeemed.

(4) On the Event of Default Redemption Payment Date, the Issuer shall, to the extent lawful, and subject to the Priority Lien Documents and the Intercreditor Agreement, deliver or cause to be delivered to the Trustee for cancellation all Notes together with an Officers' Certificate stating the aggregate principal amount of Notes purchased by the Issuer in accordance with this Section 4.15 represents the total aggregate principal amount of Notes outstanding.

(5) The Paying Agent shall promptly pay (or otherwise deliver in accordance with the applicable procedures of the Depositary) to each Holder of Notes the Event of Default Redemption Price for such Notes.

(6)     If the Event of Default Redemption Payment Date is on or after a Record Date and on or before the related Payment Date, any accrued and unpaid interest to the Event of Default Redemption Payment Date shall be paid on the Event of Default Redemption Payment Date to the Person in whose name a Note is registered at the close of business on such Record Date.

(7)     The Issuer shall not be required to make an Event of Default Redemption upon an Event of Default if a third party consummates the Event of Default Redemption in the manner, at the times and otherwise in compliance with the requirements set forth in this Section 4.15 applicable to an Event of Default Redemption made by the Issuer and purchases all Notes.

(8)     If the Issuer complies with the provisions of Section 4.15, on and after the Event of Default Redemption Payment Date, interest shall cease to accrue on all redeemed Notes. If any Note called for redemption by an Acceleration Effective Date Notice shall not be so paid upon surrender for redemption because of the failure of the Issuer to comply with Section 4.15, interest shall be paid on the unpaid principal, from the Event of Default Redemption Payment Date until such principal is paid, and, to the extent lawful, on any interest accrued to the Event of Default Redemption Payment Date not paid on such unpaid principal, in each case at the rate provided in the Notes and in Section 2.12 and Section 4.01.

Section 4.16   Offer to Repurchase Upon Change of Control.

(a)     Upon the occurrence of a Change of Control (other than a Permitted Change of Control), each Holder of the Notes will have the right to require the Issuer to make an offer (a "Change of Control Offer") to repurchase all or any part (equal to $1,000 or an integral multiple of $1,000) of that Holder's Notes at a purchase price in cash equal to 101% of the aggregate principal amount of Notes repurchased plus accrued and unpaid interest, if any, on the Notes repurchased to the date of purchase, subject to the rights of Holders on a record date to receive interest due on the relevant Interest Payment Date (the "Change of Control Payment"). Within thirty days following any Change of Control (other than a Permitted Change of Control), the Issuer will send a notice to each Holder (with a copy to the Trustee) describing the transaction or transactions that constitute the Change of Control and stating:

(1)     that the Change of Control Offer is being made pursuant to this Section 4.16 and that all Notes properly tendered prior to the expiration of the Change of Control Offer will be accepted for payment;

(2)     the purchase price and the purchase date, which shall be no earlier than thirty (30) days and no later than sixty (60) days from the date such notice is mailed (the "Change of Control Payment Date");

(3)     that any Note not repurchased will remain outstanding and continue to accrue interest;

-68-

(4)     that, unless the Issuer defaults in the payment of the Change of Control Payment, all Notes accepted for payment pursuant to the Change of Control Offer will cease to accrue interest after the Change of Control Payment Date;

(5)     that Holders electing to have any Notes purchased pursuant to a Change of Control Offer will be required to surrender the Notes, with the form entitled "Option of Holder to Elect Purchase" attached to the Notes completed, or transfer by book-entry transfer, to the Paying Agent at the address specified in the notice prior to the close of business on the third Business Day preceding the Change of Control Payment Date;

(6)     that Holders will be entitled to withdraw their election if the Paying Agent receives, not later than the close of business on the second Business Day preceding the Change of Control Payment Date, a telegram, telex, facsimile transmission or letter setting forth the name of the Holder, the principal amount of Notes delivered for purchase, and a statement that such Holder is withdrawing his or her election to have the Notes purchased; and

(7)     that Holders whose Notes are being purchased only in part will be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered, which unpurchased portion must be equal to $1,000 in principal amount or an integral multiple thereof.

(b)     The Issuer will comply with the requirements of Rule 14e-1 under the Exchange Act (including the publicly available interpretations of such Rule by the staff of the SEC) and any other securities laws and regulations thereunder to the extent those laws and regulations are applicable in connection with the repurchase of the Notes as a result of a Change of Control. To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Section 4.16 hereof, the Issuer will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under this Section 4.16 by virtue of such compliance.

(c)     Promptly following the expiration of the Change of Control Offer, the Issuer will, to the extent lawful, accept for payment all Notes or portions thereof properly tendered pursuant to the Change of Control Offer, and the Issuer will:

(1)     on the Change of Control Payment Date, deposit with the Paying Agent cash in an amount equal to the aggregate Change of Control Payments in respect of all Notes or portions of Notes properly tendered; and

(2)     on the Change of Control Payment Date, deliver or cause to be delivered to the Trustee the Notes properly accepted together with an Officers' Certificate stating the aggregate principal amount of Notes or portions of Notes being purchased by the Issuer.

On the Change of Control Payment Date, the Paying Agent will send to each Holder of Notes properly tendered the Change of Control Payment for such Notes, and the Trustee will promptly authenticate and mail (or cause to be transferred by book entry) to each Holder a new Note equal in principal amount to any unpurchased portion of the Notes surrendered, if any;

*provided* that each such new Note will be in a principal amount of $1,000 or an integral multiple thereof (or $1.00 or an integral multiple thereof in the case of any PIK Notes). Any Note so accepted for payment will cease to accrue interest on and after the Change of Control Payment Date unless the Issuer defaults in making the Change of Control Payment. The Issuer will publicly announce the results of the Change of Control Offer on or as soon as practicable after the Change of Control Payment Date.

(d)    Notwithstanding anything to the contrary in this Section 4.16, the Issuer will not be required to make a Change of Control Offer upon a Change of Control if (1) a third party makes the Change of Control Offer in the manner, at the price, at the times and otherwise in compliance with the requirements set forth in this Section 4.16 and purchases all Notes properly tendered and not withdrawn under the Change of Control Offer, or (2) notice of redemption has been given pursuant to Section 3.06 hereof, at the price set forth in this Section 4.16, unless and until there is a default in payment of the applicable redemption price.

(e)    A Change of Control Offer may be made in advance of a Change of Control, and conditioned upon the occurrence of such Change of Control, if a definitive agreement is in place for the Change of Control at the time of making the Change of Control Offer.

(f)    Notes repurchased by the Issuer pursuant to a Change of Control Offer will have the status of Notes issued but not outstanding or will be retired and canceled, at the Issuer's option. Notes purchased by a third party pursuant to the preceding paragraph will have the status of Notes issued and outstanding.

(g)    The provisions described above that require the Issuer to make a Change of Control Offer following a Change of Control (other than a Permitted Change of Control) will be applicable regardless of whether or not any other provisions of this Indenture are applicable.

Section 4.17    Payments for Consent.

The Issuer will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, pay or cause to be paid any consideration to or for the benefit of any Holder for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of this Indenture or the Notes unless such consideration is offered to be paid and is paid to all Holders that consent, waive or agree to amend in the time frame set forth in the solicitation documents relating to such consent, waiver or agreement.

Section 4.18    [Reserved.]

Section 4.19    Asset Sales.

The Issuer will not, and will not permit any of its Restricted Subsidiaries to, consummate an Asset Sale unless:

(1)    the Issuer (or the Restricted Subsidiary, as the case may be) receives consideration at the time of the Asset Sale at least equal to the Fair Market Value of the Equity Interests or other assets issued or sold or otherwise disposed of; and

-70-

(2)    (a) at least 75% of the consideration received in respect of all such Asset
Sales since the initial Issue Date by the Issuer or such Restricted Subsidiary is in the form
of cash or (b) the Fair Market Value of all forms of consideration other than cash
received for all Asset Sales since the initial Issue Date does not exceed in the aggregate
[25]% of the Consolidated Total Assets of the Issuer at the time each determination is
made. For purposes of this provision, each of the following shall be deemed to be cash:

(A)    any liabilities, as shown on the Issuer's most recent consolidated
balance sheet, of the Issuer or any Restricted Subsidiary (other than contingent
liabilities and Subordinated Indebtedness) that are assumed by the transferee of
any such assets pursuant to a customary novation agreement that releases the
Issuer or such Restricted Subsidiary from further liability;

(B)    any securities, notes or other obligations received by the Issuer or
any such Restricted Subsidiary from such transferee that are converted by the
Issuer or such Restricted Subsidiary into cash within 180 days after the date of the
Asset Sale, to the extent of the cash actually received in that conversion.

(3)    [Insert asset sale proceeds application during Indenture Covenant
Compliance Period]

## Article 5

## SUCCESSORS

Section 5.01    Merger, Consolidation or Sale of Assets.

No Obligor shall, or shall permit any Restricted Subsidiary to: (i) consolidate or
merge with or into another Person); or (ii) sell, assign, transfer, lease, assign, convey or
otherwise dispose of all or substantially all of the properties and assets of the Obligors and their
Restricted Subsidiaries, taken as a whole, in one or more related transactions, to another Person,
unless:

(1)    the value of the Collateral securing the Obligations and the Note
Guarantees by the Guarantors of the Obligations are not materially reduced;

(2)    the Liens in favor of Trustee or the Collateral Agent, as applicable, for the
benefit of the Holders under the Notes Documents are not materially impaired;

(3)    there is no material and adverse effect on the material rights and remedies
of the Trustee, the Collateral Agent and/or the Holders under any Notes Document,
including the legality, validity, binding effect or enforceability of any Notes Document;

(4)    immediately after giving effect to such transaction, no Default or Event of
Default shall have occurred and be continuing;

(5)    such Obligor delivers, or causes such Subsidiary to deliver, to the Trustee
an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation,

merger, winding up or disposition, and such supplemental indenture, if any, comply with this Indenture; and

(6)    in the case of a merger or consolidation where the Obligor or the applicable Restricted Subsidiary is not the entity surviving such merger or combination and in the case of any such sale, assignment, transfer, conveyance or other disposition to another Person (any such surviving entity or purchaser or transferee, the "Successor Company"), then the Successor Company (i) shall be an entity organized or existing under the laws of the United States of America, any State or territory thereof, the District of Columbia, Canada, or any province thereof, Bermuda, Ireland, Hong Kong, or Guernsey, (ii) shall expressly assume all of the Obligations of its predecessor under this Indenture and any other obligations under the other Notes Document, including all Guarantee Supplements and Collateral Documents pursuant to supplemental indentures or other documents and instruments in form reasonably satisfactory to the Trustee, and (iii) such Obligor shall, or cause such Restricted Subsidiary to, have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, merger, winding up or disposition, and such supplemental indenture, if any, comply with this Indenture.

Notwithstanding the restrictions described in this Section 5.01, any Restricted Subsidiary may consolidate with, merge into or transfer all or part of its properties and assets to the Issuer, the Issuer may merge into a Restricted Subsidiary for the purpose of reincorporating the Issuer in another jurisdiction, and any Restricted Subsidiary may consolidate with, merge into or transfer all or part of its properties and assets to another Restricted Subsidiary.

Article 6

DEFAULTS AND REMEDIES

Section 6.01    Events of Default.

Each of the following is an "Event of Default":

(1)    default in any payment of interest on any Note when due, continued for thirty (30) days;

(2)    default in the payment of principal on any Note when due;

(3)    failure by the Issuer or any Guarantor for sixty (60) days after receipt of written notice given by the Trustee or the Holders of not less than 25% in principal amount of the then outstanding Notes issued under this Indenture to comply with any of its obligations, covenants or agreements (other than a Default referred to in clauses (1) and (2) above and, for the avoidance of doubt, clause (9) below) in this Indenture, the Notes, the Note Guarantees, the Notes Documents or the Collateral Documents;

(4)    default under any mortgage, indenture or instrument under which there is issued or by which there is secured or evidenced any Indebtedness for money borrowed by any Obligor or any of its Restricted Subsidiaries (or the payment of which is Guaranteed by any Obligor or

any of its Restricted Subsidiaries), other than Indebtedness owed to any Obligor or any of its Restricted Subsidiaries, whether such Indebtedness or Guarantee now exists or is created after the Issue Date, which default:

(A)    is caused by a failure to pay principal of, or interest or premium, if any, on such Indebtedness prior to the expiration of the grace period provided in such Indebtedness (a "Payment Default"); or

(B)    results in the acceleration of such Indebtedness prior to its maturity;

and, in each case, the principal amount of any such Indebtedness under this Section 6.01(4), together with the principal amount of any other such Indebtedness under which there has been a Payment Default or the maturity of which has been so accelerated, aggregates $50 million or more; *provided* that if any such default described in this Section 6.01(4) is cured or waived or any such acceleration rescinded, or such Indebtedness is repaid, within a period of fifteen (15) Business Days from the continuation of such default beyond the applicable grace period or the occurrence of such acceleration, as the case may be, such Event of Default and any consequential acceleration of the Notes shall be automatically rescinded, so long as such rescission does not conflict with any judgment or decree;

(5)    failure by any Obligor or any of its Restricted Subsidiaries to pay final judgments aggregating in excess of $50 million (net of any amounts that a reputable and creditworthy insurance company has acknowledged liability for in writing), which judgments are not paid, discharged or stayed for a period of sixty (60) days or more after such judgment becomes final;

(6)    (i) the Issuer or any of its Restricted Subsidiaries that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary, pursuant to or within the meaning of the Bankruptcy Law:

(A)    commences proceedings to be adjudicated bankrupt or insolvent;

(B)    consents to the institution of bankruptcy or insolvency proceedings against it, or the filing by it of a petition or answer or consent seeking an arrangement of debt, reorganization, dissolution, winding up or relief under applicable Bankruptcy Law;

(C)    consents to the appointment of a receiver, interim receiver, receiver and manager, liquidator, assignee, trustee, sequestrator or other similar official of it or for all or substantially all of its property; or

(D)    makes a general assignment for the benefit of its creditors.

(ii)    a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(A)    is for relief against the Issuer or any of its Restricted Subsidiaries that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary is to be adjudicated bankrupt or insolvent;

(B)    appoints a receiver, interim receiver, receiver and manager, liquidator, assignee, trustee, sequestrator or other similar official of the Issuer or any of its Restricted Subsidiaries that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary, or for all or substantially all of the property of the Issuer or any of its Restricted Subsidiaries that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary; or

(C)    orders the liquidation, dissolution or winding up of the Issuer or any of its Restricted Subsidiaries that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary;

and the order or decree remains unstayed and in effect for sixty (60) consecutive days;

(7)    any Note Guarantee or Collateral Document ceases to be in full force and effect (except as contemplated by the terms of this Indenture) or is declared null and void in a judicial proceeding or any Guarantor or the Issuer denies or disaffirms its obligations under this Indenture, its Note Guarantee or the Collateral Documents, or contests the validity or enforceability of any part of this Indenture or any other Notes Document;

(8)    this Indenture or any other Notes Document shall for any reason cease to create, or any Parity Lien purported to be created by such Notes Document shall be asserted in writing by the Issuer or any Guarantor not to be, a valid and perfected Lien on and security interest in any portion of the Collateral purported to be covered thereby with a Fair Market Value in excess of $75 million, other than Liens explicitly permitted hereunder; or with respect to any Collateral having a fair market value in excess of $75 million, individually or in the aggregate, (A) the failure of the security interest with respect to such Collateral under the Collateral Documents, at any time, to be in full force and effect for any reason other than in accordance with their terms and the terms of this Indenture, which failure continues for sixty (60) days or (B) the assertion by the Issuer or any Guarantor, in any pleading in any court of competent jurisdiction, that any such security interest is invalid or unenforceable;

(9)    one or more of the Issuer and/or the Guarantors fails to (a) obtain at least $650,000,000 in Priority Lien Debt commitments, solely for completion of the Project (the "Required Project Financing"), under definitive and binding Priority Lien Documents for such Priority Lien Debt entered into on or before June 30, 2018; and

(10)    (a) ERPI fails (a) to issue its Note Guarantee on or before the earlier of the date on which the Priority Lien Documents or the Priority Lien Debt described in Section 4.09(b)(3) hereof become effective and June 30, 2018, (b) grant one or more Liens on all or substantially all of its assets as collateral security for such Guarantee on or before June 30, 2018, or (c) contribute or transfer all or substantially all of its assets to the Issuer by or before June 30, 2018.

(b)    Chippewa fails to issue its Note Guarantee and grant one or more Liens on all or substantially all of its assets as collateral security for such Guarantee at the time it obtains the Required Project Financing.

Section 6.02    Acceleration.

(a)    (1) To the extent permitted by the Intercreditor Agreement, if any Event of Default occurs and is continuing, the Trustee or the Holders of at least 25% in aggregate principal amount of then outstanding Notes by written notice to the Issuer (and the Trustee, if given by the Holders) may declare the principal of, or accrued and unpaid interest, if any, on all the Notes to be due and payable and upon such declaration, shall be due and payable immediately by notice in writing to the Issuer and, in the case of notice by Holders, also to the Trustee specifying the applicable Events of Default and that it is a notice of acceleration (such date in the case of this paragraph and paragraph 1 of this Section 6.02(a), the "Acceleration Effective Date").

(2)    If an Event of Default under Section 6.01(6) hereof occurs and is continuing, the principal and accrued and unpaid interest, if any, on all the Notes shall become and be immediately due and payable, without any declaration or other act on the part of the Trustee or any Holders.

(b)    The Holders of a majority in principal amount of the then outstanding Notes may waive all Events of Default (except with respect to nonpayment of principal or interest) and rescind any acceleration with respect to the Notes and its consequences if (1) such rescission would not conflict with any judgment or decree of a court of competent jurisdiction and (2) all existing Events of Default, other than the nonpayment of the principal of and interest on the Notes that have become due solely by such declaration of acceleration, have been cured or waived.

Section 6.03    Remedies.

To the extent permitted by the Intercreditor Agreement, if an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect any deficiency claim of the Holders. The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding. A delay or omission by the Trustee or any Holder of a Note in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. All remedies are cumulative to the extent permitted by law.

Section 6.04    Waiver of Past Defaults.

The Holders of a majority in principal amount of the then outstanding Notes by written notice to the Trustee may on behalf of all Holders waive any existing Default or Event of Default and its consequences hereunder, except:

(1)    a continuing Default or Event of Default in the payment of the principal or interest on any Note held by a non-consenting Holder; and

(2)    a Default with respect to a provision that under Section 9.02 cannot be amended without the consent of each Holder affected;

-75-

*provided* that, subject to Section 6.02, the Holders of a majority in principal amount of the then
outstanding Notes may rescind an acceleration and its consequences, including any related
payment default that resulted from such acceleration. Upon any such waiver, such Default shall
cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for
every purpose of this Indenture, but no such waiver shall extend to any subsequent or other
Default or impair any right consequent thereon.

Section 6.05    Control by Majority.

        The Holders of a majority in principal amount of the then outstanding Notes may
direct the time, method and place of conducting any proceeding for any remedy available to the
Trustee or the Collateral Agent of exercising any trust or power conferred on the Trustee or the
Collateral Agent. However, the Trustee and the Collateral Agent, as the case may be, may refuse
to follow any direction that conflicts with law, this Indenture, the Notes, any Note Guarantee or
the Intercreditor Agreement, the other Collateral Documents, or that the Trustee or the Collateral
Agent determines in good faith is unduly prejudicial to the rights of any other Holder or that
would involve the Trustee or the Collateral Agent in personal liability.

Section 6.06    Limitation on Suits

        To the extent permitted by the Intercreditor Agreement, subject to Section 6.07,
no Holder may pursue any remedy with respect to this Indenture or the Notes <u>unless</u>:

        (1)    such Holder has previously given the Trustee written notice that an Event
of Default is continuing;

        (2)    the Holders of at least 25% in principal amount of the then outstanding
Notes have requested the Trustee to pursue the remedy;

        (3)    such Holders have offered the Trustee security or indemnity satisfactory to
the Trustee against any loss, liability or expense;

        (4)    the Trustee has not complied with such request within sixty (60) days after
the receipt of the request and the offer of security or indemnity; and

        (5)    the Holders of a majority in principal amount of the then outstanding
Notes have not given the Trustee a direction that, in the opinion of the Trustee, is
inconsistent with such request within such 60-day period.

A Holder may not use this Indenture to prejudice the rights of another Holder or to obtain a
preference or priority over another Holder (it being understood that the Trustee does not have an
affirmative duty to ascertain whether or not such actions or forbearances are prejudicial to such
Holders).

Section 6.07    Rights of Holders to Receive Payment.

        Subject to the Intercreditor Agreement, notwithstanding any other provision of
this Indenture, the right of any Holder to receive payment of principal and interest on its Note, on

-76-

or after the respective due dates expressed or provided for in such Note, or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder.

Section 6.08    Collection Suit by Trustee.

Subject to the Intercreditor Agreement, if an Event of Default specified in Section 6.01(a)(1) or (2) occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust against the Issuer and any other obligor on the Notes for the whole amount of principal and interest remaining unpaid on the Notes, together with interest on overdue principal and, to the extent lawful, interest and such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee and its agents and counsel.

Section 6.09    Restoration of Rights and Remedies.

If the Trustee or any Holder has instituted any proceeding to enforce any right or remedy under this Indenture and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to such Holder, then and in every such case, subject to any determination in such proceedings, the Issuer, the Guarantors, the Trustee and the Holders shall be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Trustee and the Holders shall continue as though no such proceeding has been instituted.

Section 6.10    Rights and Remedies Cumulative.

Except as otherwise provided with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes in Section 2.07, no right or remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other right or remedy, and every right and remedy are, to the extent permitted by law, cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 6.11    Delay or Omission Not Waiver.

No delay or omission of the Trustee or of any Holder to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein. Every right and remedy given by this Article or by law to the Trustee or to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders, as the case may be.

Section 6.12    Trustee May File Proofs of Claim.

The Trustee may file proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and

counsel) and the Holders of the Notes allowed in any judicial proceedings relative to the Issuer (or any other obligor upon the Notes, including the Guarantors), its creditors or its property and is entitled and empowered to participate as a member in any official committee of creditors appointed in such matter and to collect, receive and distribute any money or other property payable or deliverable on any such claims. Any custodian in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee, and in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee and its agents and counsel, and any other amounts due the Trustee or the Collateral Agent under Section 7.07. To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee or the Collateral Agent under Section 7.07 out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Holders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise. Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

Section 6.13   Priorities.

(a)   Application of Proceeds. Subject to the Intercreditor Agreement and Priority Lien Documents in all respects, if an Event of Default shall have occurred and be continuing, the Trustee or Paying Agent, as applicable, shall apply all or any part of proceeds constituting Collateral, and any proceeds of the Guarantee set forth in Article 11, in payment of the Obligations in the following order:

(1)   First, to pay incurred and unpaid fees, expenses and indemnities of the Trustee and/or each Agent under the Notes Documents, including all amounts due under Section 7.07;

(2)   Second, to the Trustee and/or Paying Agent, for application by it towards payment of amounts then due and owing and remaining unpaid in respect of the Obligations to the Holders, *pro rata* among the Holders according to the amounts of the Obligations then due and owing and remaining unpaid to the Holders;

(3)   Third, to the Trustee and/or Paying Agent, for application by it towards prepayment of the Obligations, *pro rata* among the Holders according to the amounts of the Obligations then held by the Holders; and

(4)   Fourth, any balance remaining after the Obligations shall have been paid in full shall be paid over to or at the direction of the Issuer or as a court of competent jurisdiction may otherwise direct.

(b)     Record Date. The Trustee may fix a record date and payment date for any payment to Holders pursuant to this Section 6.13. Promptly after any record date is set pursuant to this Section 6.13, the Trustee shall cause notice of such record date and payment date to be given to the Issuer and to each Holder in the manner set forth in Section 13.01.

Section 6.14   Undertaking for Costs.

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as a Trustee, a court in its discretion may require the filing by any party litigant in such suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 6.14 does not apply to a suit by the Trustee, a suit by a Holder pursuant to Section 6.07, or a suit by Holders of more than 10% in aggregate principal amount of the outstanding Notes.

Article 7

TRUSTEE

Section 7.01   Duties of Trustee.

(a)     If an Event of Default has occurred and is continuing of which a Responsible Officer of the Trustee has received written notice, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, subject to the Intercreditor Agreement in all respects, and use the same degree of care in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b)     Except during the continuance of an Event of Default of which a Responsible Officer of the Trustee has received written notice:

(1)     the duties of the Trustee shall be determined solely by the express provisions of this Indenture, and the Trustee need perform only those duties that are specifically set forth in this Indenture, subject to the Intercreditor Agreement where applicable, and no others, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(2)     in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture, subject to the Intercreditor Agreement in all respects. However, in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

-79-

(c)     The Trustee may not be relieved from liabilities for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(1)     this paragraph does not limit the effect of paragraph (b) of this Section 7.01;

(2)     the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it is proved in a court of competent jurisdiction that the Trustee was negligent in ascertaining the pertinent facts; and

(3)     the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05.

(d)     Whether or not therein expressly so provided, every provision of this Indenture that in any way relates to the Trustee is subject to the provisions of this Section 7.01.

(e)     The Trustee shall be under no obligation to exercise any of the rights or powers under this Indenture, the Intercreditor Agreement, the other Collateral Documents, the Notes and the Note Guarantees at the request or direction of any of the Holders or expend or risk its own funds or otherwise incur financial liability in the performance of its duties hereunder or under any of the Notes Documents unless such Holders have offered to the Trustee indemnity or security satisfactory to it against any loss, liability or expense.

(f)     The Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Issuer. Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

Section 7.02     Rights of Trustee.

Subject to Section 7.01:

(a)     The Trustee may conclusively rely upon any document believed by it to be genuine and to have been signed or presented by the proper Person. The Trustee need not investigate any fact or matter stated in the document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine in good faith to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuer, personally or by agent or attorney at the sole cost of the Issuer and shall incur no liability or additional liability of any kind by reason of such inquiry or investigation.

(b)     Before the Trustee acts or refrains from acting, it may require an Officers' Certificate or an Opinion of Counsel or both subject to the other provisions of this Indenture. The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on such Officers' Certificate or Opinion of Counsel. The Trustee may consult with counsel of its selection and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection from liability in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(c)    The Trustee may act through its attorneys and agents and shall not be responsible for the misconduct or negligence of any agent or attorney appointed with due care.

(d)    The Trustee shall not be liable for any action it takes or omits to take in good faith that it believes to be authorized or within the rights or powers conferred upon it by this Indenture.

(e)    Unless otherwise specifically provided in this Indenture, any demand, request, direction or notice from the Issuer or a Guarantor shall be sufficient if signed by an Officer of the Issuer or such Guarantor.

(f)    None of the provisions of this Indenture shall require the Trustee to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it.

(g)    The Trustee shall not be deemed to have notice or knowledge of any Default or Event of Default unless a Responsible Officer of the Trustee has received written notice of any event which is in fact such a Default at the Corporate Trust Office, and such notice references the existence of a Default or Event of Default, the Notes and this Indenture.

(h)    In no event shall the Trustee be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(i)    The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian and other Person employed to act hereunder.

(j)    The Trustee may request that the Issuer deliver an Officers' Certificate setting forth the names of individuals or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officers' Certificate may be signed by any person authorized to sign an Officers' Certificate, including any Person specified as so authorized in any such certificate previously delivered and not superseded.

(k)    The Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder.

(l)    The Trustee shall have no duty (A) to see to any recording, filing, or depositing of this Indenture or any agreement referred to herein or any financing statement or continuation statement evidencing a security interest, or to see to the maintenance of any such recording or filing or depositing or to any rerecording, refiling or redepositing of any thereof, (B) to see to any insurance or (C) to see to the payment or discharge of any tax, assessment, or other governmental charge or any Lien or encumbrance of any kind owing with respect to, assessed or levied against, any part of the trust fund.

(m)     Except as otherwise expressly provided herein, the rights, privileges, protections, exculpations, immunities, indemnities and benefits provided to the Trustee hereunder (including but not limited to its right to be indemnified) are extended to, and shall be enforceable by, the Trustee and to its Responsible Officers and other Persons duly employed by them hereunder as if they were each expressly set forth herein for the benefit of the Trustee in such capacity, Responsible Officers or employees of the Trustee mutatis mutandis.

(n)     The Trustee may request that an Issuer deliver an Officers' Certificate setting forth the names of the individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officers' Certificate may be signed by any person authorized to sign an Officers' Certificate, including any person specified as so authorized in any such certificate previously delivered and not superseded.

(o)     The Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Indenture arising out of or caused, directly or indirectly, by circumstances beyond its control, including, without limitation, any provision of any law or regulation or any act of any governmental authority; natural catastrophes or other acts of God; earthquakes; fire; flood; terrorism; wars and other military disturbances; sabotage; epidemics; riots; interruptions; loss or malfunctions of utilities, computer (hardware or software) or communication services; accidents; labor disputes; acts of civil or military authority and governmental action.

(p)     The permissive right of the Trustee to take any action under this Indenture or under any other agreement in connection herewith shall not be construed as a duty.

Section 7.03     Individual Rights of Trustee.

The Trustee or any Agent in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Issuer or any Affiliate of the Issuer with the same rights it would have if it were not Trustee or such Agent. Any Agent may do the same with like rights and duties. The Trustee is also subject to Section 7.01.

Section 7.04     Trustee's Disclaimer.

The recitals contained herein and in the Notes, except for the Trustee's certificates of authentication, shall be taken as the statements of the Issuer, and the Trustee assumes no responsibility for their correctness. The Trustee makes no representations as to the validity, sufficiency or adequacy of this Indenture, of the Notes or of the Note Guarantees, or of any other Notes Document except that the Trustee represents that it is duly authorized to execute and deliver this Indenture, authenticate the Notes and perform its obligations hereunder. The Trustee shall not be accountable for the use or application by the Issuer of Notes or the proceeds thereof. The Trustee shall not be responsible to make any calculation with respect to any matter under this Indenture. It shall not be responsible for the use or application of any money received by any Paying Agent other than the Trustee, and it shall not be responsible for any statement or recital herein or any statement in the Notes or the Note Guarantees or any other document in connection with the issuance or sale of the Notes or pursuant to this Indenture other than its certificate of authentication. The Trustee shall have no duty to monitor or investigate the

Issuer's compliance with or the breach of, or cause to be performed or observed, any representation, warranty or covenant made in this Indenture or any Security Document.

Section 7.05    Notice of Defaults.

If a Default occurs and is continuing of which a Responsible Officer of the Trustee has received written notice, the Trustee shall send electronically or mail to each Holder a notice of the Default within ninety (90) days after it has received such written notice. Except in the case of an Event of Default specified in clauses (1) or (2) of Section 6.01(a), the Trustee may withhold from the Holders notice of any continuing Default if the Trustee determines in good faith that withholding the notice is in the interest of the Holders.

Section 7.06    Reports by Trustee to Holders of the Notes.

The Issuer shall promptly notify the Trustee in writing in the event the Notes are listed on any national securities exchange or delisted therefrom.

Section 7.07    Compensation and Indemnity.

(a)    The Issuer and the Guarantors, jointly and severally, shall pay to the Trustee and Collateral Agent, from time to time such compensation for their acceptance of this Indenture and services hereunder and under each other Notes Document as the parties shall agree in writing from time to time. The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust. The Issuer shall reimburse the Trustee promptly upon request for all reasonable disbursements, advances and expenses incurred or made by it, in its capacity as Trustee, in addition to the compensation for its services. Such expenses shall include the reasonable compensation, disbursements and expenses of the respective agents and counsel of the Trustee and the Collateral Agent.

(b)    The Issuer and the Guarantors, jointly and severally, shall indemnify the Trustee and Collateral Agent for, and hold the Trustee and Collateral Agent, and any predecessor, harmless against any and all loss, damage, claims, liability or expense (including attorneys' fees and expenses) incurred by it in connection with the acceptance or administration of this trust and the performance of its duties hereunder (including the costs and expenses of enforcing this Indenture against the Issuer or any Guarantor (including this Section 7.07)) or defending itself against any claim whether asserted by any Holder, the Issuer or any Guarantor, or liability in connection with the acceptance, exercise or performance of any of its powers or duties hereunder). The Trustee shall notify the Issuer promptly of any claim for which it may seek indemnity. Failure by the Trustee to so notify the Issuer shall not relieve the Issuer of its obligations hereunder. The Issuer shall defend the claim and the Trustee may have separate counsel and the Issuer shall pay the fees and expenses of such counsel. The Issuer need not reimburse any expense or indemnify against any loss, liability or expense incurred by the Trustee or the Collateral Agent, through the Trustee's or Collateral Agent's own willful misconduct, gross negligence or bad faith.

(c)    The obligations of the Issuer and the Guarantors under this Section 7.07 shall survive the satisfaction and discharge of this Indenture or the earlier resignation or removal of the Trustee and/or the Collateral Trustee, as the case may be.

-83-

(d)     To secure the payment obligations of the Issuer and the Guarantors in this Section 7.07, the Trustee shall have a Lien prior to the Notes on all money or property held or collected by the Trustee and/or Collateral Agent, as the case may be, except that held in trust to pay principal and interest on particular Notes.  Such Lien shall survive the satisfaction and discharge of this Indenture or the earlier resignation or removal of the Trustee and/or the Collateral Trustee, as the case may be.

(e)     When the Trustee incurs expenses or renders services after an Event of Default specified in Section 6.01(a)(7) occurs, the expenses and the compensation for the services (including the reasonable fees and expenses of its agents and counsel) are intended to constitute expenses of administration under any Bankruptcy Law.

Section 7.08   Replacement of Trustee.

(a)     A resignation or removal of the Trustee and appointment of a successor Trustee shall become effective only upon the successor Trustee's acceptance of appointment as provided in this Section 7.08.  The Trustee may resign in writing at any time by giving thirty (30) days prior notice of such resignation to the Issuer and be discharged from the trust hereby created by so notifying the Issuer.  The Holders of a majority in aggregate principal amount of the then outstanding Notes may remove the Trustee by so notifying the Trustee and the Issuer in writing.  The Issuer may remove the Trustee if:

(1)     the Trustee fails to comply with Section 7.10;

(2)     the Trustee is adjudged a bankrupt or an insolvent or an order for relief is entered with respect to the Trustee under any Bankruptcy Law;

(3)     a receiver or public officer takes charge of the Trustee or its property; or

(4)     the Trustee becomes incapable of acting.

(b)     If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, the Issuer shall promptly appoint a successor Trustee.  Within one year after the successor Trustee takes office, the Holders of a majority in aggregate principal amount of the then outstanding Notes may remove the successor Trustee to replace it with another successor Trustee.

(c)     If a successor Trustee does not take office within forty-five (45) days after the retiring Trustee resigns or is removed, the retiring Trustee (at the Issuer's expense), the Issuer or the Holders of at least 10% in aggregate principal amount of the then outstanding Notes may petition any court of competent jurisdiction for the appointment of a successor Trustee.

(d)     If the Trustee, after written request by any Holder who has been a Holder for at least six months, fails to comply with Section 7.10, such Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(e)     A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Issuer.  Thereupon, the resignation or removal of the retiring

Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture. The successor Trustee shall mail a notice of its succession to Holders. The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee; *provided* that all sums owing to the Trustee hereunder have been paid and such transfer shall be subject to the Lien provided for in Section 7.07. Notwithstanding replacement of the Trustee pursuant to this Section 7.08, the Issuer's Obligations under Section 7.07 shall continue for the benefit of the retiring Trustee.

(f)      As used in this Section 7.08, the term "Trustee" shall also include each Agent.

Section 7.09    Successor Trustee by Merger, etc.

If the Trustee consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to, another corporation or national banking association, the successor corporation or national banking association without any further act shall be the successor Trustee, subject to Section 7.10.

Section 7.10    Eligibility; Disqualification.

(a)      There shall at all times be a Trustee hereunder that is a corporation or national banking association organized and doing business under the laws of the United States or of any state thereof that is authorized under such laws to exercise corporate trustee power, that is subject to supervision or examination by federal or state authorities and that has a combined capital and surplus of at least $50 million as set forth in its most recent published annual report of condition.

(b)      This Indenture shall always have a Trustee who satisfies the requirements of Trust Indenture Act Sections 310(a)(1), (2) and (5). The Trustee is subject to Trust Indenture Act Section 310(b).

Article 8

OTHER OBLIGATIONS AND OFFSETS

Section 8.01    Plan Obligations.

No action taken by an Obligor or any of its Restricted Subsidiaries pursuant to the Plan will be a breach of any of such Obligor's or Restricted Subsidiary's Obligations with respect to the Notes.

Section 8.02    Guarantor Working Capital Obligations.

No action taken by the Guarantor to satisfy the Obligations it owes to the providers of the refinancing for its iron ore processing operation will be a breach of any of such Obligor's or Restricted Subsidiary's Obligations with respect to the Notes.

Section 8.03    Other Iron or Steel Production Facilities

No action taken in connection with construction or operation by, on behalf of, or on the land of the Issuer and/or the Guarantor of any value added iron or other steel production facility, including, without limitation, any hot briquetted iron production facility, will be a breach or default of any Obligation with respect to the Notes, or any term or provision of this Indenture, the Collateral Documents, or any other documents related to either of the foregoing.

Section 8.04    Holder Covenant.

Each Holder covenants and agrees that, to facilitate funding of the Priority Lien Debt, at the request of the Issuer, the Trustee shall consent to amendment of the terms of this Indenture and the Notes, which consent shall not be unreasonably withheld, conditioned or delayed.

Section 8.05    KYC.

Prior to the closing of any event purporting to be a Change of Control or Permitted Change of Control, the Issuer covenants and agrees to use commercially reasonable efforts to provide such information reasonably requested by any Holders and the Trustee in writing at least ten (10) Business Days prior to such closing to reasonably satisfy any applicable KYC requirements of such Holder and the Trustee.

Article 9

AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01    Without Consent of Holders.

(a)    Notwithstanding Section 9.02, without the consent of any Holder, the Issuer, the Guarantors and the Trustee may amend this Indenture, the Notes, the Note Guarantees and each other Notes Document to:

(1)    cure any ambiguity, mistake, omission, defect or inconsistency;

(2)    provide for the assumption by a successor entity of the Obligations of the Issuer or any Guarantor under this Indenture, the Note Guarantees and the other Notes Documents in accordance with Article 5;

(3)    provide for or facilitate the issuance of uncertificated Notes in addition to or in place of certificated Notes; *provided* that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code or in a manner such that the uncertificated Notes are described in Section 163(f)(2)(B) of the Code;

(4)    comply with the rules of any applicable depositary;

(5)     add Guarantors with respect to the Notes or release a Guarantor from its Obligations under its Note Guarantee or this Indenture in accordance with the applicable provisions of this Indenture;

(6)     add covenants of the Issuer, any other Obligor, and any of its or their Restricted Subsidiaries or Events of Default for the benefit of Holders or to make changes that would provide additional rights to the Holders or to surrender any right or power conferred upon any Obligor;

(7)     make any change that does not materially adversely affect the legal rights under this Indenture, the Notes or any other Notes Document of any Holder;

(8)     evidence and provide for the acceptance of an appointment under this Indenture of a successor trustee or collateral agent; *provided* that the successor trustee or collateral agent is otherwise qualified and eligible to act as such under the terms of this Indenture;

(9)     confirm and evidence the release, termination or discharge of any Parity Lien with respect to or securing the Notes or the Note Guarantees when such release, termination or discharge is provided for in accordance with the terms of this Indenture or the Collateral Documents;

(10)    to comply with requirements of the SEC in order to effect or, if effected, to maintain the qualification of this Indenture under the Trust Indenture Act (it being understood this Indenture is not required to qualify under the Trust Indenture Act of 1939); or

(11)    make any amendment to the provisions of this Indenture relating to the transfer and legending of Notes as permitted by this Indenture, including, without limitation, to facilitate the issuance and administration of the Notes; *provided, however,* that (A) compliance with this Indenture as so amended would not result in Notes being transferred in violation of the Securities Act or any applicable securities law and (B) such amendment does not materially and adversely affect the rights of Holders to transfer Notes; or

(12)    in the event that PIK Notes are issued in certificated form, to make appropriate amendments to reflect an appropriate minimum denomination of certificated PIK Notes, and establish minimum redemption amounts for certificated PIK Notes.

(b)     Upon the request of the Issuer, and upon receipt by the Trustee of the documents described in Section 13.02, the Trustee shall join with the Issuer and the Guarantor in the execution of any amended or supplemental indenture or other Notes Document authorized or permitted by the terms of this Indenture and to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee shall not be obligated to enter into such amended or supplemental indenture or other Notes Document that affects its own rights, duties or immunities in any capacity under this Indenture or otherwise. Notwithstanding the foregoing, no Opinion of Counsel shall be required in connection with the addition of a Guarantor under this Indenture upon execution and delivery by such Guarantor, the Issuer and

the Trustee of a supplemental indenture to this Indenture, the form of which is attached as
Exhibit C, and delivery of an Officers' Certificate.

(c)     The Trustee shall, pursuant to Section [5.06][1] of the Intercreditor
Agreement, execute and deliver to Priority Lien Agent and the Issuer (for purposes of this clause
(c), each as defined in the Intercreditor Agreement), at the written request of the Priority Lien
Agent or the Issuer, any and all agreements, certificates, documents, or instruments as shall be
necessary or appropriate to effect the purposes of the Intercreditor Agreement or this Indenture,
including, without limitation, any amendment to the Intercreditor Agreement to permit or
provide for an additional tranche of Indebtedness that is permitted to be incurred by the terms of
this Indenture (including, without limitation, any Prior Lien Obligations, any Parity Lien or
Junior Lien Obligations) to be bound thereby, in each case without the consent or approval of the
Issuer, any Guarantor or any Holder, *provided* that with respect to any such execution and
delivery, the Trustee shall be entitled to an Officers' Certificate and an Opinion of Counsel, each
stating that the execution and delivery of each such agreement, certificate, document, or
instrument, including any amendment to the Intercreditor Agreement, (i) is authorized or
permitted by this Indenture (and the Intercreditor Agreement, as applicable) and (ii) that all
conditions precedent provided for in this Indenture and the Intercreditor Agreement relating to
such agreements, certificates, documents, or instruments, or any amendments to the foregoing or
the Intercreditor Agreement, have been complied with, and the Trustee shall not be responsible
or liable to the Issuer, any Guarantor or any Holder in connection therewith or for any matter
arising out thereof.

Section 9.02     With Consent of Holders.

(a)     Except as provided in Section 9.01 and this Section 9.02, the Issuer, the
Guarantors and the Trustee may amend or supplement this Indenture, the Notes, the Note
Guarantees and each other Notes Document with the consent of the Holders of a majority in
principal amount of the Notes (including Additional Notes, if any) then outstanding voting as a
single class (including, without limitation, consents obtained in connection with a purchase of, or
tender offer or exchange offer for, Notes) and, subject to Section 6.04 and Section 6.07, any
existing Default or Event of Default (other than a Default or Event of Default in the payment of
the principal or interest on the Notes, except a payment default resulting from an acceleration
that has been rescinded) or compliance with any provision of this Indenture, the Notes, the Note
Guarantees or any other Notes Document may be waived with the consent of the Holders of a
majority in principal amount of the Notes (including Additional Notes, if any) then outstanding
voting as a single class (including, without limitation, consents obtained in connection with a
purchase of, or tender offer or exchange offer for, Notes). Section 2.08 and Section 2.09 shall
determine which Notes are considered to be "outstanding" for the purposes of this Section 9.02.

(b)     Upon the request of the Issuer, and upon the filing with the Trustee of
evidence satisfactory to the Trustee of the consent of the Holders as aforesaid, and upon receipt
by the Trustee of the documents described in Section 7.02 and Section 13.02, the Trustee shall
join with the Issuer and the Guarantors in the execution of such amended or supplemental
indenture unless such amended or supplemental indenture directly affects the Trustee's own

---

[1] NTD: To be conformed with the final Intercreditor Agreement.

rights, duties or immunities under this Indenture or otherwise, in which case the Trustee may in its discretion, but shall not be obligated to, enter into such amended or supplemental indenture.

(c)     It shall not be necessary for the consent of the Holders under this Section 9.02 to approve the particular form of any proposed amendment, supplement or waiver. It shall be sufficient if such consent approves the substance of such proposed amendment, supplement or waiver.

(d)     After an amendment, supplement or waiver under this Section 9.02 becomes effective, the Issuer shall give to the Holders a notice briefly describing such amendment, supplement or waiver. However, the failure of the Issuer to give such notice to all the Holders, or any defect in the notice, shall not impair or affect the validity of any such amendment, supplement or waiver.

(e)     [Reserved]

(f)     Without the consent of each affected Holder, an amendment, supplement or waiver under this Section 9.02 may not (with respect to any Notes held by a non-consenting Holder):

(1)     reduce the principal amount of Notes whose Holders must consent to an amendment, supplement or waiver;

(2)     reduce the stated rate of interest or extend the stated time for payment of interest on any Note;

(3)     reduce the principal of or extend the Stated Maturity of any Note;

(4)     waive a Default or Event of Default in the payment of principal of or interest on the Notes, except a rescission of acceleration, of the Notes by the Holders of at least a majority in aggregate principal amount of the then outstanding Notes in accordance with Section 6.02(b);

(5)     make any Note payable in a currency other than that stated in the Note;

(6)     impair the right of any Holder to receive payment of principal, premium, if any, or interest on such Holder's Notes on or after the due dates thereof or to institute suit for the enforcement of any payment on or with respect to such Holder's Notes;

(7)     make any change in the amendment or waiver provisions which require each Holder's consent; or

(8)     modify the Note Guarantees in any manner adverse to the Holders.

In addition, subject to the Intercreditor Agreement, without the consent of the Holders of at least 66 2/3% of the principal amount of the Notes then outstanding (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes), no amendment, supplement or waiver may (x) modify any Collateral Document or

-89-

the provisions in this Indenture dealing with Collateral Documents to release all or substantially all of the Collateral or (y) make any change to or modify the ranking of the Notes.

(g)    A consent to any amendment, supplement or waiver of this Indenture, the Notes or the Note Guarantee or any other Notes Document by any Holder given in connection with a tender of such Holder's Notes shall not be rendered invalid by such tender.

Section 9.03    Relation to Trust Indenture Act.

This Indenture shall not be subject to the Trust Indenture Act.

Section 9.04    Revocation and Effect of Consents.

(a)    Until an amendment, supplement or waiver becomes effective, a consent to it by a Holder of a Note is a continuing consent by the Holder of a Note and every subsequent Holder of a Note or portion of a Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent is not made on any Note. However, any such Holder of a Note or subsequent Holder of a Note may revoke the consent as to its Note if the Trustee receives written notice of revocation before the date the waiver, supplement or amendment becomes effective. An amendment, supplement or waiver becomes effective in accordance with its terms and thereafter binds every Holder.

(b)    The Issuer may, but shall not be obligated to, fix a record date pursuant to Section 1.05 for the purpose of determining the Holders entitled to consent to any amendment, supplement or waiver.

Section 9.05    Notation on or Exchange of Notes.

(a)    The Trustee may place an appropriate notation about an amendment, supplement or waiver on any Note thereafter authenticated. The Issuer in exchange for all Notes may issue and the Trustee shall, upon receipt of an Authentication Order, authenticate new Notes that reflect the amendment, supplement or waiver.

(b)    Failure to make the appropriate notation or issue a new Note shall not affect the validity and effect of such amendment, supplement or waiver.

Section 9.06    Trustee to Sign Amendments, etc.

The Trustee shall sign any amendment, supplement or waiver authorized pursuant to this Article 9 if the amendment, supplement or waiver does not adversely affect the rights, duties, liabilities or immunities of the Trustee. In executing any amendment, supplement or waiver, the Trustee shall receive and (subject to Section 7.01) shall be fully protected in conclusively relying upon, in addition to the documents required by Section 13.02, an Officers' Certificate and an Opinion of Counsel stating that the execution of such amendment, supplement or waiver is authorized or permitted by this Indenture and that such amendment, supplement or waiver is the legal, valid and binding obligation of the Issuer and any Guarantor party thereto, enforceable against them in accordance with its terms, subject to customary exceptions, and complies with the provisions hereof (including Section 9.03).

Article 10

COLLATERAL AND SECURITY

Section 10.01  The Collateral.

(a)     The Issuer hereby appoints the Collateral Agent, and each Holder by its
acceptance of any Notes and the Guarantees thereof, irrevocably consents and agrees to such
appointment. The Collateral Agent shall have the privileges, powers indemnities and immunities
set forth in this Indenture and the Collateral Documents. All of the rights, indemnities and
protections granted to the Trustee pursuant to Article 7 and Section 13.02 of this Indenture are
applicable to the Collateral Agent *mutatis mutandis*. Subject to the Intercreditor Agreement and
the Priority Lien Documents, the due and punctual payment of the principal of and interest on the
Notes and the Guarantees thereof when and as the same shall be due and payable, whether on an
Interest Payment Date, at maturity, by acceleration, repurchase, redemption or otherwise, interest
on the overdue principal of and interest (to the extent permitted by law), if any, on the Notes and
the Guarantees thereof and performance of all other Obligations under this Indenture, including,
without limitation, the Obligations of the Issuer set forth in Section 7.07 herein, and the Notes
and the Guarantees thereof and any other Parity Lien Debt and the Collateral Documents, shall
be secured by second-priority Liens and security interests in the Collateral, in each case subject
to (i) Permitted Liens, as and to the extent provided in the Collateral Documents which the Issuer
and Guarantor have entered into simultaneously with the execution of this Indenture and shall be
secured by all Collateral Documents hereafter delivered as required or permitted by this
Indenture and the Collateral Documents and (ii) the Intercreditor Agreement. The Issuer and the
Guarantors hereby agree that the Collateral Agent shall hold the Collateral in trust for the benefit
of all of the Holders and the Trustee, in each case pursuant to the terms of the Collateral
Documents, and the Collateral Agent and the Trustee are hereby authorized to execute and
deliver the Collateral Documents.

(b)     Each Holder, by its acceptance of any Notes and the Guarantees thereof,
irrevocably consents and agrees to the terms of the Collateral Documents (including, without
limitation, the provisions providing for foreclosure and release of Collateral) as the same may be
in effect or may be amended from time to time in accordance with their terms, agrees to the
appointment of the Collateral Agent and authorizes and directs the Collateral Agent to perform
its obligations and exercise its rights, powers and discretions under the Collateral Documents in
accordance therewith.

(c)     The Trustee and each Holder, by accepting the Notes and the Guarantees
thereof, acknowledges that, as more fully set forth in the Collateral Documents, the Collateral as
now or hereafter constituted shall be held for the benefit of all the Holders and the Trustee, and
that the Parity Liens with respect to this Indenture and the Collateral Documents in respect of the
Trustee and the Holders is subject to and qualified and limited in all respects by the Collateral
Documents and actions that may be taken thereunder as permitted by the Intercreditor
Agreement.

Section 10.02  After-Acquired Property.

(a)     Subject in each case to the Intercreditor Agreement and the Priority Lien Documents, upon the acquisition by the Issuer or any of the Guarantors after the Issue Date of any assets, or any equipment or fixtures which constitute accretions, additions or technological upgrades to the equipment or fixtures or any working capital assets that, in any such case, form part of the Collateral, the Issuer or such Guarantor shall execute and deliver:

(1)     with regard to real property, the items described in Section 10.05 within ninety (90) days of the date of acquisition of the applicable asset (but not earlier than 150 days after the Issue Date) and,

(2)     with regard to any other after-acquired property to the extent required by the Collateral Documents, any information, documentation, financing statements or other certificates and opinions of counsel as may be necessary to vest in the Collateral Agent a perfected security interest, subject only to Permitted Liens, in such after-acquired property and to have such after-acquired property added to the Collateral, and thereupon all provisions of the Indenture and the Collateral Documents relating to the Collateral shall be deemed to relate to such after-acquired property to the same extent and with the same force and effect.

(b)     Subject to the Intercreditor Agreement and the Priority Lien Documents, with respect to as-extracted Collateral, if any, on any real property, the Issuer and Guarantors shall be required to make any financing statement required by the Collateral Documents as soon as reasonably practicable, but in any event, within thirty (30) days of date of acquisition of the real property. Further, the Issuer and Guarantors shall not be obligated to make any financing statement filings at any county, real estate or other local filing office solely with respect to fixtures or as-extracted Collateral, if any, located on Leased Real Property until thirty (30) days after the date the Issuer or Guarantors acquire rights to such Leased Real Property, or in any event if such a filing would be prohibited by, or constitute a breach or default under or result in the termination of or require any consent not obtained under, any contract, license, agreement, instrument or other document evidencing or giving rise to the Leased Real Property.

Notwithstanding anything to the contrary herein or in any other Collateral Document, during such time as any Priority Lien Debt (or commitments therefor) are outstanding, no delivery or perfection of any Collateral or Collateral Document as security for the Notes or the Note Guarantees or delivery of any other deliverable contemplated by or pursuant to this Section 10.02 shall be required or permitted under this Indenture or any other Collateral Document until the date no earlier than ten (10) Business Days after the date such Restricted Subsidiary is required under the Priority Lien Documents to perfect a valid and enforceable Lien on such Collateral in favor of the Priority Lien Agent to secure the Priority Lien Debt or otherwise make the delivery contemplated by or pursuant to this Section 10.02 (it being agreed and understood that no such delivery or perfection shall be required hereunder if the corresponding delivery or perfection is not required under the Priority Lien Documents).

Section 10.03  Real Estate Mortgages and Filings.

Subject in each case to the Intercreditor Agreement and/or the Priority Lien Documents, with respect to any fee interest in any Premises owned by an Obligor or any of their Restricted Subsidiaries on the Issue Date or acquired by an Obligor or any of their Restricted Subsidiaries after the Issue Date that forms a part of the Collateral, (i) within 180 days of the Issue Date or ninety (90) days of the date of acquisition (but not earlier than 180 days from the Issue Date), as applicable, such Obligor shall cause to be filed documents constituting such Obligor's application for the creation and registration of its land title to such Premises, and (ii) within 180 days after creation and registration of its land title to such Premises:

(a)     each Obligor or any of its Restricted Subsidiaries shall deliver to the Collateral Agent, as mortgagee or beneficiary, as applicable, for the ratable benefit of itself and the Holders, fully executed counterparts of Mortgages, in accordance with the requirements of this Indenture and/or the Collateral Documents, duly executed by such Obligor or such Restricted Subsidiary, together with satisfactory evidence of the completion (or satisfactory arrangements for the completion) of all recordings and filings of such Mortgage (and payment of any taxes or fees in connection therewith), together with any necessary fixture filings, as may be necessary to create a valid, perfected Lien, with the priority required by the Collateral Documents and the Intercreditor Agreement, subject to Permitted Liens, against the properties purported to be covered thereby;

(b)     the Collateral Agent shall have received mortgagee's title insurance policies in favor of the Collateral Agent, and its successors and/or assigns, in the form necessary, with respect to the surface rights in real property purported to be covered by the applicable Mortgages, to insure that the interests created by the Mortgages constitute valid Liens thereon, with the priority required by the Collateral Documents and the Intercreditor Agreement, free and clear of all Liens, defects and encumbrances, other than Permitted Liens. All such title policies to be in amounts equal to 100% of the estimated Fair Market Value of the Premises covered thereby and such policies shall also include, to the extent available, all such endorsements as shall be reasonably required in transactions of similar size and purpose and shall be accompanied by evidence of the payment in full by the Issuer or the applicable Guarantor of all premiums thereon (or that satisfactory arrangements for such payment have been made); and

(c)     each applicable Obligor or any of its Restricted Subsidiaries shall deliver to the Collateral Agent (x) with respect to each of the Premises owned on the Issue Date, such existing surveys, plats, or maps that are in the possession of any such Obligor or Restricted Subsidiary and such local counsel opinions and opinions of counsel in the jurisdiction of organization of the owner of the applicable Premises as are necessary and appropriate and (y) with respect to each of the Premises acquired after the Issue Date, such existing surveys, plats, or maps that are in the possession of such Obligor or such Restricted Subsidiary and such local counsel opinions and opinions of counsel in the jurisdiction of organization of the owner of the applicable Premises as the Collateral Agent and its counsel may reasonably request.

Notwithstanding anything to the contrary herein or in any other Collateral Document, during such time as any Priority Lien Debt (or commitments therefor) are outstanding, no delivery or perfection of any Collateral or Collateral Document as security for

the Notes or the Note Guarantees or delivery of any other deliverable contemplated by or pursuant to this Section 10.03 shall be required or permitted under this Indenture or any other Collateral Document until the date no earlier than ten (10) Business Days after the date such Restricted Subsidiary is required under the Priority Lien Documents to perfect a valid and enforceable Lien on such Collateral in favor of the Priority Lien Agent to secure the Priority Lien Debt or otherwise make the delivery contemplated by or pursuant to this Section 10.03 (it being agreed and understood that no such delivery or perfection shall be required hereunder if the corresponding delivery or perfection is not required under such Priority Lien Debt).

Section 10.04 Release of Collateral.

(a) Subject to the Intercreditor Agreement, the Parity Liens on the Collateral shall be released with respect to the Notes and the Note Guarantees, as applicable:

(1) in whole, upon payment in full of the principal of and accrued and unpaid interest on the Notes;

(2) in whole, upon satisfaction and discharge of this Indenture in accordance with Article 12 of this Indenture;

(3) with respect to any real property related to the HBI Facility, on the date of sale following express written notice to the Trustee of the Issuer's agreement to sell such real property;

(4) in part, as to any property constituting Collateral (A) that is sold, transferred or otherwise disposed of by the Issuer or any of the Guarantors (other than to the Issuer or another Guarantor) in a transaction permitted by the Collateral Documents (to the extent of the interest sold or disposed of); or (B) otherwise in accordance with, and as expressly provided for under, this Indenture or the Collateral Documents;

(5) in whole as to all Collateral that is owned by a Guarantor that is released from its Note Guarantee in accordance with this Indenture;

(6) in whole or in part, with the consent of Holders of 66 2/3% in aggregate principal amount of the Notes (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes); and

(7) in whole or in part, as provided in the Intercreditor Agreement.

*provided*, that, in the case of any release in whole pursuant to clauses (1) through (3) above, all amounts owing to the Trustee and the Collateral Agent under this Indenture, the Notes, the Note Guarantees and the Collateral Documents have been paid or otherwise provided for to the reasonable satisfaction of the Trustee and Collateral Agent.

(b) With respect to the release of Collateral, the Issuer shall furnish to the Trustee and Collateral Agent, prior to each proposed release of Collateral pursuant to the Collateral Documents and this Indenture, an Officers' Certificate and an Opinion of Counsel to the effect that all conditions precedent provided for in this Indenture and the Collateral

-94-

Documents to such release have been complied with; *provided, however*, in no event shall an Officers' Certificate be required to release a Lien on Collateral that is sold or pledged in the ordinary course of business to the extent such sale or pledge is permitted by this Indenture.

Upon compliance by the Issuer or the Guarantors, as the case may be, with the conditions precedent set forth above, the Trustee or the Collateral Agent shall promptly cause to be released and reconveyed to the Issuer or the Guarantors, as the case may be, the released Collateral and, if necessary, the Collateral Agent shall, at the Issuer's expense, execute (and the Issuer shall file) such documents or instruments (that are prepared by the Issuer and provided to the Collateral Agent) as shall be necessary to provide for the release by the Collateral Agent of the released Collateral.

Section 10.05  Authorization of Actions to be Taken by the Trustee or the Collateral Agent Under the Collateral Documents.

(a)  Subject to the provisions of the Intercreditor Agreement and the other Collateral Documents, each of the Trustee or the Collateral Agent may, in its sole discretion and without the consent of the Holders, on behalf of the Holders, take all actions it deems necessary or appropriate in order to (i) enforce any of its rights or any of the rights of the Holders under the Collateral Documents and (ii) collect and receive any and all amounts payable in respect of the Collateral in respect of the Obligations of the Obligors and any of their Restricted Subsidiaries hereunder and thereunder. Subject to the provisions of the Intercreditor Agreement and the other Collateral Documents, the Trustee or the Collateral Agent shall have the power to institute and to maintain such suits and proceedings as it may deem expedient to prevent any impairment of the Collateral by any acts that may be unlawful or in violation of the Collateral Documents or this Indenture, and such suits and proceedings as the Trustee or the Collateral Agent may deem expedient to preserve or protect its interest and the interests of the Holders in the Collateral (including power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair the security interest hereunder or be prejudicial to the interests of the Holders or the Trustee).

(b)  The Trustee or the Collateral Agent shall not be responsible for the perfection or priority of the Parity Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence, bad faith or willful misconduct on the part of the Trustee or the Collateral Agent, for the validity, sufficiency, existence, genuineness or value of the Collateral or the validity or enforceability of the Parity Liens in any of the Collateral or any agreement or assignment contained therein, for the validity of the title of the Issuer or the Guarantors to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Parity Liens upon the Collateral or otherwise as to the maintenance of the Collateral. The Trustee or the Collateral Agent shall have no responsibility for recording, filing, re-recording or re-filing any financing statement, continuation statement, document, instrument or other notice in any public office at any time or times or to otherwise take any action to perfect or maintain the perfection of any security interest granted to it under the Collateral Documents or otherwise.

(c) Subject in each case to the Intercreditor Agreement and the Priority Lien Documents, where any provision of this Indenture requires that additional property or assets be added to the Collateral, the Issuer shall deliver to the Trustee or the Collateral Agent the following:

(1) the form of instrument adding such Collateral, which, based on the type and location of the property subject thereto, shall be in substantially the form of the applicable Collateral Documents entered into on or about the date of this Indenture, with such changes thereto as the Issuer shall consider appropriate, or in such other form as the Issuer shall deem proper; provided that any such changes or such form are administratively satisfactory to the Trustee or the Collateral Agent; and

(2) such financing statements, if any, as the Issuer shall deem necessary to perfect the Collateral Agent's security interest in such Collateral.

Section 10.06 Intercreditor Agreement.

This Indenture, including without limitation this Article 10, and the provisions of each other Collateral Document are subject to the terms, conditions and benefits set forth in the Intercreditor Agreement. The Issuer and each Guarantor consents to, and agrees to be bound by, the terms of the Intercreditor Agreement, as the same may come into and be in effect from time to time, and to perform its obligations thereunder in accordance with the terms thereof. Each Holder of Notes, by its acceptance of the Notes (a) consents to the subordination of Parity Liens provided for in the Intercreditor Agreement, (b) agrees that it will be bound by, and will take no actions contrary to, the provisions of the Intercreditor Agreement upon such provisions coming into effect and (c) authorizes and instructs the Collateral Agent (and the Trustee to direct the Collateral Agent) on behalf of each Holder of Notes to enter into the Intercreditor Agreement as Collateral Agent on behalf of such Holders of Notes as Second Priority Debt Parties (as defined in the Intercreditor Agreement). In addition, the Collateral Agent and the Trustee shall have full and unconditional authority to enter into any and all amendments or joinders to the Intercreditor Agreement and this Indenture, as applicable, without the consent or direction of any Holder or the Trustee, to (x) add additional Indebtedness as Priority Lien Debt or Junior Lien Debt and add other parties (or any authorized agent or trustee therefor) holding such Indebtedness thereto (it being understood that there may be different tranches of Priority Lien Debt and Junior Lien Debt with different maturities, amortization profiles and lien priorities) and (y) to effectuate the incurrence of Refinancing Indebtedness with respect to all or any part of the Notes. The foregoing provisions are intended as an inducement to the lenders under the Priority Lien Documents and Junior Lien Documents to extend credit to the Issuer and certain of its Restricted Subsidiaries, and such lenders and investors are intended third party beneficiaries of such provisions and the provisions of the Intercreditor Agreement. Notwithstanding anything to the contrary herein, in the event any of any conflict or inconsistency between the terms hereof and the Intercreditor Agreement, the Intercreditor Agreement shall control.

Section 10.07 Collateral Account.

(a) Subject to the Intercreditor Agreement and the Priority Lien Documents, the Collateral Agent is authorized to receive any funds as proceeds of Collateral for the benefit of

the Holders distributed under, and in accordance with, the Collateral Documents, and to make further distributions of such funds to the Holders according to the provisions of this Indenture and the Collateral Documents.

(b)     Subject to the Intercreditor Agreement, the satisfaction in full of all Priority Lien Obligations, and no outstanding commitments on account of the Priority Lien Documents, all cash and Cash Equivalents received by the Collateral Agent from Recovery Events, Net Award or Net Insurance Proceeds, foreclosures of or sales of the Collateral, and other awards or proceeds pursuant to the Collateral Documents, including earnings, revenues, rents, issues, profits and income from the Collateral received pursuant to the Collateral Documents, shall be deposited in the Collateral Account and thereafter shall be held, applied and/or disbursed by the Collateral Agent in accordance with the terms of this Indenture (including, without limitation, Section 6.13 and Section 10.07(a)). The Collateral Account shall be a trust account and shall be established and maintained by the Collateral Agent at one of its corporate trust offices (which may include the New York corporate trust office), and all Collateral shall be credited thereto.

(c)     Subject to the Intercreditor Agreement, the satisfaction in full of all Priority Lien Obligations, and no outstanding commitments on account of the Priority Lien Documents, and pending the distribution of funds in the Collateral Account in accordance with the provisions hereof and provided that no Event of Default shall have occurred and be continuing, the Issuer may direct the Collateral Agent in writing to invest such funds in Cash Equivalents specified in such direction, such investments to mature by the times such funds are needed hereunder and such direction to certify that such funds constitute Cash Equivalents and that no Event of Default shall have occurred and be continuing. So long as no Event of Default shall have occurred and be continuing, the Issuer may direct the Collateral Agent to sell, liquidate or cause the redemption of any such investments, such direction to certify that no Event of Default shall have occurred and be continuing. Any gain or income on any investment of funds in the Collateral Account shall be credited to the Collateral Account. The Collateral Agent shall have no liability for any loss, fee, tax or other charge incurred in connection with any investment or any sale, reinvestment, liquidation or redemption thereof made in accordance with the provisions of this Section 10.07(c).

## Article 11

## GUARANTEES

Section 11.01 Guarantee.

(a)     Subject to the Intercreditor Agreement and this Article 11, each of the Guarantors party hereto jointly and severally irrevocably and unconditionally guarantees to each Holder and to the Trustee and its successors and assigns, in its capacity as Trustee and in each other capacity in which the Trustee serves as an Agent, irrespective of the validity and enforceability of this Indenture, the Notes or the Obligations of the Issuer hereunder or under any other Notes Document, that: (1) the principal and interest on the Notes shall be promptly paid in full when due, whether at Stated Maturity, by acceleration, redemption or otherwise, and interest on the overdue principal and interest on the Notes, if any, if lawful, and all other Obligations of

the Issuer to the Holders or the Trustee hereunder or under the Notes Documents shall be promptly paid in full or performed, all in accordance with the terms hereof and thereof; and (2) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that same shall be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at Stated Maturity, by acceleration or otherwise collectively, the "Guaranteed Obligations". Failing payment by the Issuer when due of any amount so guaranteed or any performance so guaranteed for whatever reason, the Guarantors shall be jointly and severally obligated to pay. Each Guarantor agrees that this is a guarantee of payment and not a guarantee of collection.

(b) The Guarantors hereby agree that their Obligations hereunder shall be unconditional, irrespective of the validity, regularity or enforceability of the Notes or this Indenture or any other Notes Document, the absence of any action to enforce the same, any waiver or consent by any Holder with respect to any provisions hereof or thereof, the recovery of any judgment against the Issuer, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor. Each Guarantor hereby waives diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Issuer, protest, notice and all demands whatsoever and covenants that this Note Guarantee shall not be discharged except by complete performance of the Obligations contained in the Notes, this Indenture and each other Notes Document, or pursuant to Section 11.06.

(c) Each of the Guarantors jointly and severally also agrees to pay any and all costs and expenses (including reasonable attorneys' fees and expenses) incurred by the Trustee, any Agent or any Holder in enforcing any rights under this Section 11.01.

(d) If any Holder, any Agent or the Trustee is required by any court or otherwise to return to the Issuer, the Guarantors or any custodian, trustee, liquidator or other similar official acting in relation to the Issuer or the Guarantors, any amount paid either to the Trustee, such Agent or such Holder, this Note Guarantee, to the extent theretofore discharged, shall be reinstated in full force and effect.

(e) Each Guarantor agrees that it shall not be entitled to enforce any right of subrogation in relation to the Holders in respect of any Obligations guaranteed hereby until payment in full of all Obligations guaranteed hereby. Each Guarantor further agrees that, as between the Guarantors, on the one hand, and the Holders, each Agent and the Trustee, on the other hand, (1) the maturity of the Obligations guaranteed hereby may be accelerated as provided in Article 6 for the purposes of this Note Guarantee, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Obligations guaranteed hereby, and (2) in the event of any declaration of acceleration of such Obligations as provided in Article 6, such Obligations (whether or not due and payable) shall forthwith become due and payable by the Guarantors for the purpose of this Note Guarantee. The Guarantors shall have the right to seek contribution from any non-paying Guarantor so long as the exercise of such right does not impair the rights of the Holders under the Note Guarantees.

(f) Each Note Guarantee shall remain in full force and effect and continue to be effective should any petition be filed by or against the Issuer for liquidation or reorganization,

should the Issuer become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any significant part of the Issuer's assets, and shall, to the fullest extent permitted by law, continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Notes are, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee on the Notes or the Note Guarantees, whether as a "voidable preference," "fraudulent transfer" or otherwise, all as though such payment or performance had not been made. In the event that any payment or any part thereof, is rescinded, reduced, restored or returned, the Notes shall, to the fullest extent permitted by law, be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

(g)     In case any provision of any Note Guarantee shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

(h)     Each payment to be made by a Guarantor in respect of its Note Guarantee shall be made without set-off, counterclaim, reduction or diminution of any kind or nature.

Section 11.02  Limitation on Guarantor Liability.

Each Guarantor, and by its acceptance of Notes, each Holder, hereby confirms that it is the intention of all such parties that the Note Guarantee of such Guarantor not constitute a fraudulent conveyance or a fraudulent transfer for purposes of Bankruptcy Law, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar federal or state law to the extent applicable to any Note Guarantee. To effectuate the foregoing intention, the Trustee, each Agent, the Holders and the Guarantors hereby irrevocably agree that the Obligations of each Guarantor shall be limited to the maximum amount as will, after giving effect to such maximum amount and all other contingent and fixed liabilities of such Guarantor that are relevant under such laws and after giving effect to any collections from, rights to receive contribution from or payments made by or on behalf of any other Guarantor in respect of the Obligations of such other Guarantor under this Article 11, result in the Obligations of such Guarantor under its Note Guarantee not constituting a fraudulent conveyance or fraudulent transfer under applicable law. Each Guarantor that makes a payment under its Note Guarantee shall be entitled upon payment in full of all Guaranteed Obligations under this Indenture to a contribution from each other Guarantor in an amount equal to such other Guarantor's pro rata portion of such payment based on the respective net assets of all the Guarantors at the time of such payment, determined in accordance with GAAP.

Section 11.03  Execution and Delivery.

(a)     To evidence its Note Guarantee set forth in Section 11.01, each Guarantor hereby agrees that this Indenture shall be executed on behalf of such Guarantor by an Officer or person holding an equivalent title.

(b)     Each Guarantor hereby agrees that its Note Guarantee set forth in Section 11.01 shall remain in full force and effect notwithstanding the absence of the endorsement of any notation of such Note Guarantee on the Notes.

(c)     If an Officer whose signature is on this Indenture no longer holds that office at the time the Trustee authenticates the Note, the Note Guarantees shall be valid nevertheless.

(d)     The delivery of any Note by the Trustee, after the authentication thereof hereunder, shall constitute due delivery of the Note Guarantee set forth in this Indenture on behalf of the Guarantors.

(e)     If required by Section 4.11, any applicable Obligor shall cause any newly created or acquired Restricted Subsidiary to comply with the provisions of Section 4.11 and this Article 11, to the extent applicable.

Section 11.04  Subrogation.

Each Guarantor shall be subrogated to all rights of Holders against the Issuer in respect of any amounts paid by any Guarantor pursuant to the provisions of Section 11.01; *provided* that, if an Event of Default has occurred and is continuing, no Guarantor shall be entitled to enforce or receive any payments arising out of, or based upon, such right of subrogation until all amounts then due and payable by the Issuer under this Indenture or the Notes shall have been paid in full.

Section 11.05  Benefits Acknowledged.

Each Guarantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated by this Indenture and that the guarantee and waivers made by it pursuant to its Note Guarantee are knowingly made in contemplation of such benefits.

Section 11.06  Release of Note Guarantees.

(a)     In accordance with the Intercreditor Agreement, a Note Guarantee by a Guarantor shall be automatically and unconditionally released and discharged, and no further action by such Guarantor, the Issuer or the Trustee shall be required for the release of such Guarantor's Note Guarantee:

(1)     (A) upon in the case of a Guarantor, any sale, assignment, transfer, conveyance, exchange or other disposition (by merger, consolidation or otherwise) of the Capital Stock of such Guarantor after which the applicable Guarantor is no longer a Restricted Subsidiary, which sale, assignment, transfer, conveyance, exchange or other disposition is made in compliance with the provisions of this Indenture and Section 5.01; or

(B)     [Reserved]; or

(C)     upon the discharge of the Issuer's Obligations in accordance with Article 12 of this Indenture; or

(D)     upon designation of any Guarantor as an Unrestricted Subsidiary in accordance with the terms of this Indenture; or

(E)    as provided in the Intercreditor Agreement.

(2)    such Guarantor or Issuer delivering to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that all conditions precedent provided for in this Indenture relating to such transaction or release have been complied with.

(b)    At the written request of the Issuer, the Trustee shall execute and deliver any documents reasonably required in order to evidence such release, discharge and termination in respect of the applicable Note Guarantee.

Section 11.07  Effective Date of ERPI Note Guarantee and the Chippewa Note Guarantee.

(a)    If ERPI has not otherwise contributed or transferred all or substantially all of its assets to the Issuer by or before June 30, 2018, then the Note Guarantee of ERPI shall become effective on the earlier of: (a) the date on which the Priority Lien Documents for the Priority Lien Debt described in Section 4.09(b)(3) hereof become effective and (b) June 30, 2018.

(b)    The Note Guarantee of Chippewa shall become effective on the date on which the Priority Lien Documents for the Priority Lien Debt for the Project described in Section 4.09(b)(3) hereof to which Chippewa becomes a party become effective.

Article 12

SATISFACTION AND DISCHARGE

Section 12.01  Satisfaction and Discharge.

(a)    This Indenture shall be discharged, and shall cease to be of further effect as to all Notes, when either:

(1)    all Notes that have been authenticated and delivered (except lost, stolen or destroyed Notes that have been replaced or paid and Notes for whose payment money has been deposited in trust) have been delivered to the Trustee for cancellation; or

(2)    (A) all Notes not theretofore delivered to the Trustee for cancellation have become due and payable by reason of the giving of a notice of redemption or otherwise, shall become due and payable within one year or are to be called for redemption within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Issuer, and the Issuer or any Guarantor have irrevocably deposited or caused to be deposited with the Trustee, as trust funds in trust solely for the benefit of the Holders, cash in U.S. dollars, Government Securities, or a combination thereof, in such amounts as shall be sufficient, as confirmed, certified or attested to by an Independent Financial Advisor in writing to the Trustee, without consideration of any reinvestment of interest, to pay and discharge the entire Indebtedness on the Notes not theretofore delivered to the Trustee for cancellation for principal and accrued interest to the date of maturity or redemption, as the case may be;

-101-

(B) no Default or Event of Default has occurred and is continuing on the date of such deposit or will occur as a result of such deposit (other than a Default or an Event of Default resulting from the borrowing of funds to be applied to make such deposit and any similar and simultaneous deposit relating to other Indebtedness and, in each case, the granting of Parity Liens in connection therewith) and the deposit will not result in a breach or violation of, or constitute a default under, any other material agreement or material instrument (other than this Indenture) to which the Issuer or any Guarantor are a party or by which the Issuer or any Guarantor are bound;

(C) the Issuer or any Guarantor has paid or caused to be paid all sums payable by the Issuer under this Indenture; and

(D) the Issuer has delivered irrevocable instructions to the Trustee to apply the deposited money toward the payment of the Notes at maturity or the redemption date, as the case may be.

(b) In addition, the Issuer shall, upon its request for acknowledgement of satisfaction and discharge, deliver to the Trustee an Officers' Certificate and an Opinion of Counsel (which Opinion of Counsel may be subject to customary assumptions and exclusions) each stating that all conditions precedent to satisfaction and discharge have been satisfied. Notwithstanding the satisfaction and discharge of this Indenture, if money shall have been deposited with the Trustee pursuant to subclause (A) of clause (2) of Section 12.01(a), the provisions of Section 12.02 shall survive.

Section 12.02  Application of Trust Money.

(a) All money deposited with the Trustee pursuant to Section 12.01 shall be held in trust and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Issuer acting as its own Paying Agent) as the Trustee may determine, to the Persons entitled thereto, of the principal and interest for whose payment such money has been deposited with the Trustee, but such money need not be segregated from other funds except to the extent required by law.

(b) If the Trustee or Paying Agent is unable to apply any money or Government Securities in accordance with Section 12.01 by reason of any legal proceeding or by reason of any order or judgment of any court or Governmental Authority enjoining, restraining or otherwise prohibiting such application, the Issuer's and any Guarantor's Obligations under this Indenture, the Notes and the Note Guarantees shall be revived and reinstated as though no deposit had occurred pursuant to Section 12.01; *provided* that if the Issuer has made any payment of principal or interest on any Notes because of the reinstatement of its Obligations, the Issuer shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money or Government Securities held by the Trustee or Paying Agent, as the case may be.

Article 13

MISCELLANEOUS

Section 13.01 Notices.

(a)    Any notice or communication to the Issuer, any Guarantor or the Trustee is duly given if in writing and (1) delivered in person, (2) mailed by first-class mail (certified or registered, return receipt requested), postage prepaid, or overnight air courier guaranteeing next day delivery or (3) sent by facsimile or electronic transmission (PDF only), to its address:

> if to the Issuer or any Guarantor:
>
> 192 Summerfield Court, Suite 201
> Roanoke, Virginia 24019
> Attention: Tom Clarke
> Email: Tom.Clarke@kissito.org
>
> with a copy to:
>
> Dentons US LLP
> 1221 Avenue of the Americas
> New York, New York 10022
> Attention: Oscar Pinkas
> Email: oscar.pinkas@dentons.com
>
> if to the Trustee, Collateral Agent, Paying Agent or Registrar:
>
> Wilmington Savings Fund Society, FSB
> 501 Carr Road, Suite 100
> Wilmington, DE 19809
> Attention: Patrick Healy
> Fax No.:
> Email: phealy@wsfsbank.com

The Issuer, any Guarantor or the Trustee, by like notice, may designate additional or different addresses for subsequent notices or communications.

(b)    All notices and communications (other than those sent to Holders) shall be deemed to have been duly given: at the time delivered by hand, if personally delivered; on the first date of which publication is made, if by publication; five (5) calendar days after being deposited in the mail, postage prepaid, if mailed by first-class mail; the next Business Day after timely delivery to the courier, if mailed by overnight air courier guaranteeing next day delivery; when receipt acknowledged, if sent by facsimile or electronic transmission; *provided* that any notice or communication delivered to the Trustee shall be deemed effective upon actual receipt thereof.

(c)     Any notice or communication to a Holder shall be mailed by first-class mail (certified or registered, return receipt requested) or by overnight air courier guaranteeing next day delivery to its address shown on the Note Register or by such other delivery system as the Trustee agrees to accept. Failure to mail a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.

(d)     Where this Indenture provides for notice in any manner, such notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by Holders shall be filed with the Trustee, but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

(e)     Notwithstanding any other provision herein, where this Indenture provides for notice of any event to any Holder of an interest in a Global Note (whether by mail or otherwise), such notice shall be sufficiently given if given to the Depositary for such Note (or its designee), according to the applicable procedures of such Depositary, if any, prescribed for the giving of such notice.

(f)     The Trustee agrees to accept and act upon notice, instructions or directions pursuant to this Indenture sent by unsecured facsimile or electronic transmission; *provided, however*, that (1) the party providing such written notice, instructions or directions, subsequent to such transmission of written instructions, shall provide the originally executed instructions or directions to the Trustee in a timely manner, and (2) such originally executed notice, instructions or directions shall be signed by an authorized representative of the party providing such notice, instructions or directions. The Trustee shall not be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's reasonable reliance upon and compliance with such notice, instructions or directions notwithstanding such notice, instructions or directions conflict or are inconsistent with a subsequent notice, instructions or directions.

(g)     If a notice or communication is sent in the manner provided above within the time prescribed, it is duly given, whether or not the addressee receives it.

(h)     If the Issuer mails a notice or communication to Holders, it shall mail a copy to the Trustee and each Agent at the same time.

Section 13.02  Certificate and Opinion as to Conditions Precedent.

Upon any request or application by the Issuer or any Guarantor to the Trustee to take any action under this Indenture, including any action as an Agent, the Issuer or such Guarantor, as the case may be, shall furnish to the Trustee, at the Trustee's request, either or both of:

(1)     an Officers' Certificate in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 13.03) stating that, in the opinion of the signer(s), all conditions precedent and covenants, if any, provided for in this Indenture relating to the proposed action have been complied with; and

-104-

(2)     an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 13.03) stating that, in the opinion of such counsel, all such conditions precedent and covenants have been complied with.

Section 13.03  Statements Required in Certificate or Opinion.

Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture shall include:

(1)     a statement that the Person making such certificate or opinion has read such covenant or condition;

(2)     a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(3)     a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to enable him or her to express an informed opinion as to whether or not such covenant or condition has been complied with (and, in the case of an Opinion of Counsel, may be limited to reliance on an Officers' Certificate as to matters of fact); and

(4)     a statement as to whether or not, in the opinion of such Person, such condition or covenant has been complied with.

Section 13.04  Rules by Trustee and Agents.

The Trustee may make reasonable rules for action by or at a meeting of Holders. The Registrar or Paying Agent may make reasonable rules and set reasonable requirements for its functions.

Section 13.05  No Personal Liability of Directors, Officers, Employees, Members, Partners and Stockholders.

No past, present or future director, officer, employee, incorporator, member, partner or stockholder of the Issuer or any Guarantor, as such, shall have any liability for any Obligations of the Issuer or any Guarantor (other than the Issuer in respect of the Notes and each Guarantor in respect of its Note Guarantee) under the Notes, the Note Guarantees or this Indenture or for any claim based on, in respect of, or by reason of, such Obligations or their creation.

Each Holder by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes.

Section 13.06 Governing Law.

THIS INDENTURE, THE NOTES AND ANY NOTE GUARANTEE WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

Section 13.07 Waiver of Jury Trial.

THE ISSUER AND EACH OF THE GUARANTORS, THE COLLATERAL AGENT AND THE TRUSTEE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES, THE NOTE GUARANTEES OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 13.08 Force Majeure.

In no event shall the Trustee or any Agent be responsible or liable for any failure or delay in the performance of its Obligations under this Indenture arising out of or caused by, directly or indirectly, forces beyond its reasonable control, including without limitation strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services; it being understood that the Trustee and each Agent shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

Section 13.09 No Adverse Interpretation of Other Agreements.

This Indenture may not be used to interpret any other indenture, loan or debt agreement of the Issuer or its Restricted Subsidiaries or of any other Person. Any such indenture, loan or debt agreement may not be used to interpret this Indenture.

Section 13.10 Successors.

All agreements of the Issuer in this Indenture and the Notes shall bind its successors. All agreements of the Trustee in this Indenture shall bind its successors. All agreements of each Guarantor in this Indenture shall bind its successors, except as otherwise provided in Section 11.06.

Section 13.11 Severability.

In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 13.12  Counterpart Originals.

The parties may sign any number of copies of this Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.

Section 13.13  Table of Contents, Headings, etc.

The Table of Contents and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and shall in no way modify or restrict any of the terms or provisions hereof.

Section 13.14  Facsimile and PDF Delivery of Signature Pages.

The exchange of copies of this Indenture and of signature pages by facsimile or PDF transmission shall constitute effective execution and delivery of this Indenture as to the parties hereto and may be used in lieu of the original Indenture for all purposes.  Signatures of the parties hereto transmitted by facsimile or PDF shall be deemed to be their original signatures for all purposes.

Section 13.15  U.S.A. PATRIOT Act.

The parties hereto acknowledge that in accordance with Section 326 of the U.S.A. PATRIOT Act, the Trustee is required to obtain, verify, and record information that identifies each Person or legal entity that establishes a relationship or opens an account with the Trustee.  The parties to this Indenture agree that they shall provide the Trustee with such information as it may request in order for the Trustee to satisfy the requirements of the U.S.A. PATRIOT Act.

Section 13.16  Payments Due on Non-Business Days.

In any case where any Payment Date, redemption date or repurchase date or the Stated Maturity of the Notes shall not be a Business Day, then (notwithstanding any other provision of this Indenture or of the Notes) payment of principal or interest on the Notes need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on the applicable Payment Date, redemption date or repurchase date, or at the Stated Maturity of the Notes, *provided* that no interest will accrue for the period from and after such Payment Date, redemption date, repurchase date or Stated Maturity, as the case may be.

Section 13.17  Effectiveness of Indenture.

No party shall have any rights, obligations or other benefits or responsibilities hereunder unless and until such time as the parties have issued the Notes hereunder in connection with the Effective Date (as defined in the Plan) of the Plan, and the Effective Date has occurred.

Section 13.18  Trustee as Agent.

Each Holder of a Note, by accepting a Note, hereby appoints the Trustee, on its behalf and on behalf of each future Holder of such Note, as its contractual representative under the Intercreditor Agreement and hereby authorizes the Trustee to execute and deliver to [Priority Lien Agent][2] and the Issuer the Intercreditor Agreement, and any and all agreements, certificates, documents or instruments as shall be necessary or appropriate to effect the purposes of the Intercreditor Agreement, on its behalf and on behalf of each future Holder of such Note, and to act as the contractual representative of such Holder and each such future Holder for all purposes of the Intercreditor Agreement.  Notwithstanding the foregoing, nothing in this Section 13.18 shall create any additional duty or obligation on the Trustee not otherwise contemplated by the terms of this Indenture,  and the Trustee shall have no obligation or liability to any Holder by virtue of this Section 13.18 or for any action taken, or for failing to take any action, as agent or contractual representative of the Holders under the Intercreditor Agreement.

Section 13.19  Trustee as Third Party Beneficiary

(a)     The Trustee shall be an intended third party beneficiary entitled, subject to Section 7.01(e) of this Indenture, to enforce the obligations to make any remaining unpaid Capital Contributions (as such term is defined in the Limited Liability Company Agreement of Chippewa) to Chippewa, and capital contributions to the Issuer under the Issuer's operating agreement, on the terms and subject to the conditions set forth in the Order Granting Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 1142(b) for Entry of an Order Implementing the Provisions of the Plan with Respect to the Prepetition Lender Notes and Prepetition Lender Notes Documents entered on December 12, 2017 [D.I. [ ]] in In re Essar Steel Minnesota LLC and ESML Holdings Inc., Case No. 16 11626 (Bankr. D. Del.) (Jointly Administered).

(b)     Trustee's rights as third party beneficiary shall expire upon the full $250 million of equity funding in the aggregate being received by the Issuer from any source.

*[Signatures on following page]*

---

[2]NTD: To be conformed with Intercreditor Agreement.

MESABI METALLICS COMPANY LLC

By

    By:    _____

            Name:
            Title:


WILMINGTON SAVINGS FUND SOCIETY, FSB
as Trustee

    By:    _____

            Name:
            Title:

*[Signature page to Indenture]*