# AMENDED
# EXHIBIT F

**AMENDED AND RESTATED**

**DEBTOR IN POSSESSION CREDIT AND SECURITY AGREEMENT**

Dated as of August 1, 2018

between

ERP IRON ORE, LLC

as Borrower

and

MERIDA NATURAL RESOURCES, LLC

as Secured Lender

This **AMENDED AND RESTATED DEBTOR IN POSSESSION CREDIT AND SECURITY AGREEMENT** (this "Agreement") is made as of August 3, 2018, by and between ERP IRON ORE, LLC, a Virginia limited liability company, debtor and debtor-in-possession in the chapter 11 case described below (the "Borrower"), and Merida Natural Resources, a Virginia limited liability company (the "Secured Lender").

### RECITALS:

A. On May 25, 2018 (the "Petition Date"), an involuntary bankruptcy petition was filed against the Borrower under chapter 7 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court"). In July, 2018, an order for relief was entered and the Borrower converted the bankruptcy case to a case under Chapter 11 as of right. The proceeding is Case No. 18-50378-RJK (the "Case").

B. The Secured Lender is willing to provide post-petition financing pursuant to section 364(c) of the Bankruptcy Code in an amount not to exceed $2,000,000 on a final basis, but only for the purposes and upon the terms and conditions set forth in this Agreement.

C. It is contemplated by the parties hereto that the Bankruptcy Court will enter a Final Post-Petition Financing Order (as defined herein) which will approve this Agreement and will authorize the Borrower, pursuant to section 364 of the Bankruptcy Code, to incur senior secured indebtedness under the terms and conditions set forth in this Agreement.

D. In accordance with the applicable Financing Order, and subject to the terms and conditions of this Agreement, the Secured Lender will make post-petition loans under a line of credit to the Borrower as set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, the parties agree as follows:

1. **DEFINITIONS**

Capitalized terms used in this Agreement shall have the following respective meanings when used herein:

1.1 "Advances" shall mean the advances, in an aggregate amount not to exceed the Availability, by the Secured Lender to the Borrower (each such advance constituting a Loan) to fund the payment of expenses in accordance with the Budget and pursuant to Section 2 hereof and shall only be requested for expenses due and payable in the upcoming week.

1.2 "Agreement" shall have the meaning ascribed to such term in the introductory paragraph of this Agreement.

1.3 "Availability" shall mean a line of credit of up to up to $2,000,000 in the aggregate under the Final Post-Petition Financing Order to pay expenses of the Borrower under the Budget when due.

1.4 "Bankruptcy Code" shall mean title 11 of the United States Code, 11 U.S.C. §§ 101-1330, together with all amendments and modifications thereto.

1.5 "Bankruptcy Court" shall have the meaning ascribed to such term in the recitals of this Agreement.

1.6 "Borrower" shall have the meaning ascribed to such term in the introductory paragraph of this Agreement.

1.7 "Budget" shall mean the budget setting forth approved expenditures by the Borrower, as such budget may be modified (including, without limitation, by adding additional, removing or combining existing types of disbursements specified in the line items set forth in the budget or by increasing or decreasing the particular amounts allocated to such types of disbursements specified therein) or extended to subsequent periods upon the written agreement of both the Borrower and the Secured Lender, provided that the Borrower may be permitted to exceed the budgeted amount during any budgeted period by the Disbursement Carryover Amount plus a cumulative variance for such period of no more than fifteen per cent (15%) (the "Permitted Variance").

1.8 "Business Day" shall mean any day other than a Saturday, a Sunday, any day which is a legal holiday under the laws of the States of Minnesota, Indiana or Virginia, or any day on which banking institutions located in the States of Minnesota, Indiana or Virginia are required by law or other governmental action to close.

1.9 "Carve Out" shall have the meaning ascribed to such term or the term "DIP Carve Out" in the Interim Post-Petition Financing Order and the Final Post-Petition Financing Order.

1.10 "Case" shall have the meaning ascribed to such term in the recitals of this Agreement.

1.11 "Claim" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

1.12 "Closing Date" shall mean the first date on which each of the conditions set forth in Section 3.1 have been satisfied.

1.13 "Collateral" shall have the meaning set forth in Section 4.1 hereof.

1.14 "Disbursement Carryover Amount" shall mean the amount by which the aggregate disbursements permitted under the Budget for the period commencing on the Effective Date and ending on the last day of the week preceding the date of determination exceeds the amount of disbursements actually made by Borrower during that period.

1.15 "Disclosure Statement" shall mean the Disclosure Statement filed by the Borrower in the Case related to the Plan.

1.16 "Effective Date" shall mean the first date on which all of the conditions precedent contained in Sections 3.1 hereof are duly satisfied (or waived by the Lender).

1.17 "Event of Default" shall have the meaning set forth in Section 10.1 hereof.

1.18 "Final Post-Petition Financing Order" shall mean the order entered by the Bankruptcy Court pursuant to section 364(c)(1) and 364(c)(2) of the Bankruptcy Code approving this Agreement and authorizing the incurrence by the Borrower of post-petition senior secured indebtedness in accordance with the terms and conditions of this Agreement, and as to which no stay has been entered and which has not been reversed, modified, vacated or overturned, in a form and substance that is satisfactory to the Secured Lender.

1.19 "Indebtedness" of any Person shall mean (a) all indebtedness of such Person for borrowed money or for the deferred purchase price of property or services (including, without limitation, reimbursement and all other obligations with respect to surety bonds, letters of credit and bankers' acceptances, whether or not matured), (b) all obligations evidenced by notes, debentures, bonds, or similar instruments, (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (d) all indebtedness referred to in clauses (a) through (c) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness, (e) the Obligations and (f) any guaranty of such Person relating to any Indebtedness set forth in clauses (a)-(e) above.

1.20 "Interest Rate" means a per annum interest rate equal to 10.00%.

1.21 "Lien" shall mean any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the law of any jurisdiction).

1.22 "Loans" shall mean the Advances made by the Secured Lender pursuant to this Agreement in accordance with the Budget in an aggregate amount not to exceed the Availability.

1.23 "Maturity Date" shall have the meaning set forth in Section 2.2 hereof.

1.24 "Milestone" means any of the following dates and events:

(i) on or before August 2, 2018, the Borrower shall have filed the Chapter 11 Plan and Disclosure Statement and in form and substance reasonably acceptable to the DIP Lender;

(ii) on or before August 10, 2018, the Bankruptcy Court shall have entered an order granting the Debtors' first motion to reject executory contracts and unexpired leases;

- 3 -

          (iii)    on or before September 5, 2018, the Bankruptcy Court shall have entered an order approving the adequacy of the information in the Disclosure Statement and scheduled a confirmation hearing to be held on or before September 29, 2018 if plan confirmation is uncontested or October 16, 2018 if plan confirmation is contested;

          (iv)    on or before September 29, 2018 (if plan confirmation is uncontested) or October 16, 2018 (if plan confirmation is contested), the Bankruptcy Court shall have entered an order confirming the Plan; and

          (v)    on or before October 31, 2018, the effective date of the Plan shall have occurred.

    1.25    "Obligations" means the Loans, the interest thereon and all other advances, debts, liabilities, obligations, covenants and duties owing by the Borrower to the Secured Lender arising under this Agreement, including, without limitation, any other fees, charges, or expenses incurred by the Secured Lender in connection with the enforcement of any rights or remedies under this Agreement.

    1.26    "Person" shall mean any individual, sole proprietorship, partnership, firm, association, joint venture, trust, limited liability company, unincorporated organization, association, corporation, institution, public benefit corporation, entity or government body (whether federal, state, county, city, municipal or otherwise, including, without limitation, any instrumentality, division, agency, body or department thereof).

    1.27    "Petition Date" shall have the meaning ascribed to such term in the recitals of this Agreement.

    1.28    "Plan" shall mean the Borrower's filed Chapter 11 Plan as the same may be amended from time to time by the Borrower as debtor-in-possession.

    1.29    "Post-Petition Loan Documents" shall mean this Agreement and all other instruments and agreements executed in connection with this Agreement.

    1.30    "Secured Lender" shall have the meaning ascribed to such term in the introductory paragraph of this Agreement.

    1.31    All other undefined terms contained in this Agreement shall, unless the context indicates otherwise, have the meanings provided for by the Bankruptcy Code to the extent the same are used or defined therein. The words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole, including any exhibits attached hereto, as the same may from time to time be amended, modified or supplemented and not to any particular section, subsection or clause contained in this Agreement.

    1.32    Each reference to a section or exhibit are to a section or exhibit of or to this Agreement, unless otherwise specified or the context otherwise requires.

1.33    Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter.

2.    **AMOUNT AND TERMS OF LOAN**

2.1    Credit Facility.  Subject to the terms and conditions hereof, the Secured Lender agrees to make the Advances to the Borrower (each such advance constituting a Loan), in an aggregate amount not to exceed the Availability, solely to fund the payment of expenses in accordance with the Budget.

2.2    Maturity Date.  The Obligations relating to the Advances provided for hereunder shall mature and become immediately due and payable to the Secured Lender by the Borrower upon the earliest of the following (the "Maturity Date"):

(a)    October 31, 2018, or such other date as may be agreed to in a writing by both the Borrower and the Secured Lender after the date hereof (without the need for further Bankruptcy Court approval);

(b)    the expiration of the Budget, which may be updated by the parties as necessary;

(c)    dismissal of the Case or conversion of the Case from Chapter 11 to a case under another chapter of the Bankruptcy Code;

(d)    the appointment of a Chapter 11 Trustee or a Chapter 11 Examiner with expanded powers;

(e)    the date of acceleration of the Obligations by the Secured Lender upon the occurrence of an Event of Default; or

(f)    upon the Effective Date of the Plan.

2.3    Repayment and Prepayment

(a)    The entire unpaid principal amount of the Loans relating to the Advances, together with all accrued and unpaid interest thereon, shall be due and payable to the Secured Lender on the Maturity Date.

(b)    The Borrower may prepay the Loans or any portion thereof to the Secured Lender at any time, which prepayment shall be applied first, to accrued and unpaid interest on such Loans and capitalized interest, fees and expenses, if any, on the Obligations and second, to principal in respect of such Loans.

2.4    Use of Proceeds.  Except as otherwise provided in this Agreement or the Final Post-Petition Financing Order, the Borrower agrees that the proceeds from the Advances may be used only to pay post-petition operating, maintenance and chapter 11 expenses of the Borrower

in accordance with the Budget (after giving effect to the Permitted Variance and Disbursement Carryover Amount).

2.5     Interest on Loan.  Interest on the Loans shall accrue at a rate per annum equal to the Interest Rate.  All interest calculated under this Agreement shall be computed based on the stated rate "365/365" method, *i.e*., the method based on the actual number of days elapsed in a year consisting of three hundred sixty-five (365) days.

2.6     Access.  The Secured Lender and any of its officers, employees and/or agents shall have the right, exercisable as frequently as the Secured Lender reasonably determines to be appropriate, during normal business hours (or at such other times as may reasonably be requested by such parties), to inspect the Borrower's facilities and to inspect, audit and make extracts from any and all of the Borrower's records, files and books of account.  The Borrower shall deliver to the Secured Lender any document or instrument whatsoever requested by the Secured Lender and shall instruct the Borrower or the Borrower's banking and other financial institutions, accountants and other advisors and agents to make available to the Secured Lender such information and records from those parties as the Secured Lender may reasonably request.  The Secured Lender shall take the steps reasonably necessary to protect the secrecy of and avoid disclosure or use of any information furnished to the Secured Lender pursuant to this Section 2.6 and to prevent such information from becoming publically available or entering the possession of persons other than the Secured Lender, its affiliates, directors, officers, employees, consultants, attorneys, advisors, investors and agents.  Such measures shall include the same degree of care that the Secured Lender utilizes to protect its own confidential information of a similar nature.

3. **CONDITIONS PRECEDENT**

3.1     Conditions Precedent to Obligation of the Secured Lender to Make Advances.  The obligations of the Secured Lender to make Advances to the Borrower under this Agreement shall be subject to and conditioned upon the full satisfaction by the Borrower or the written waiver by the Secured Lender (at its sole discretion) of each of the following conditions:

(a)     the Final Post-Petition Financing Order, in a form acceptable to the Secured Lender in its sole discretion, shall be in full force and effect and shall not have been vacated, revised, modified or amended;

(b)     no Event of Default shall have occurred and be continuing;

(c)     the Maturity Date shall not have occurred;

(d)     the Availability shall be greater or equal to the sum of (i) the aggregate amount of all Advances previously made pursuant to this Agreement and (ii) the amount of the Advance then requested;

(e)     the Borrower shall have complied in all material respects with each of its covenants and obligations under this Agreement;

108659648\V-3

    (f)  all representations and warranties made by the Borrower shall be accurate in all material respects as of the date of this Agreement and as of each date that an Advance is to be made; and

    (g)  no less than three (3) Business Days prior to the date that the Advance is requested, the Borrower shall have delivered to the Secured Lender a written request for the Advance stating the date that such Advance is requested and the dollar amount of the Advance and the Secured Lender shall have, in its reasonable discretion, consented to such Advance.

4.  **SECURITY**

  4.1  <u>Post-Petition Financing Liens</u>.  The Loans shall further be secured by (and the Borrower hereby grants the Secured Lender, subject only to the Carve Out) a duly perfected, legal, valid, binding and enforceable Lien on all assets and properties of the Borrower or Borrower's estate now owned or hereafter acquired pursuant to the Financing Orders, including all real and personal property of the Borrower of any nature, and further including, without limitation, the following unless specifically excluded below in this Section 4.1 (the "<u>Collateral</u>"):

    (a)  all of the Borrower's now-owned and hereafter acquired or arising accounts, accounts receivable and rights to payment of every kind and description, and all of the Borrower's contract rights, chattel paper, documents and instruments with respect thereto, together with all fees and other payments due the Borrower and all of the Borrower's rights, remedies, security and liens, in, to and in respect of such accounts, including, without limitation, rights of stoppage in transit, replevin, repossession and reclamation and other rights and remedies of an unpaid vendor, lienor or secured party;

    (b)  all moneys, securities, cash, cash equivalents, and other property and the proceeds thereof, now or hereafter held or received by Borrower;

    (c)  all of the proceeds from the sale of any of the Borrower's assets;

    (d)  all of the Borrower's now owned and hereafter acquired or arising general intangibles and any other property of every kind and description with respect to, evidencing, or relating to its accounts, accounts receivable, and other rights to payment, including, but not limited to, all existing and future customer lists, chose in action, claims, books, records, ledger cards, contracts, licenses, formulae, tax and other types of refunds, deposits, returned and unearned insurance premiums, rights and claims under insurance policies, and computer programs, information, software, records, and data as the same relates to the accounts;

    (e)  all of the Borrower's other general intangibles (including, without limitation, any proceeds from insurance policies after payment of prior interests), patents, unpatented inventions, trade secrets, copyrights, contract rights, goodwill, literary rights, rights to performance, rights under licenses, chose-in-action, claims, information contained in computer media (such as data bases, source and object codes, and information therein), things in action, trademarks and trademarks applied for (together with the goodwill associated therewith) and derivatives thereof, trade names, including the right to make, use, and vend goods utilizing any of the foregoing, and permits, licenses, certifications, authorizations and approvals, and the rights of the Borrower thereunder, issued by any governmental, regulatory, or private authority,

agency, or entity whether now owned or hereafter acquired, together with all cash and non-cash proceeds and products thereof;

(f) all of the Borrower's now owned and hereafter acquired inventory of every kind and character which is held by the Borrower for sale or lease, or is furnished by the Borrower under any contract of service, or is held by the Borrower as raw materials, work in process, or materials used or consumed in business, wherever located and as the same may now or hereafter be constituted, together with all cash and non-cash proceeds and products thereof;

(g) all of the Borrower's now owned or hereafter acquired real property, machinery, equipment, tools, tooling, furniture, fixtures, goods, supplies, materials, work in process, together with additions, parts, fittings, accessories, special tools, attachments, and accessions, and all replacements and substitutions thereof;

(h) all commercial tort claims; and

(i) the income, profits and proceeds of all of the foregoing.

Collateral shall not include (i) avoidance actions under Chapter 5 of the Bankruptcy Code and (ii) Progress Rail's ownership interest in the rail cars leased by the Borrower from Progress Rail or any other lessor's ownership interest in its property as leased by the Borrower.

4.2   Liens.  The Secured Lender is entitled to the protections and priorities provided under section 364(c) of the Bankruptcy Code, in accordance with the Final Post-Petition Financing Order.  No other claim, having a priority superior to that granted to the Secured Lender by the Final Post-Petition Financing Order pursuant to sections 364 and 507(b) of the Bankruptcy Code, shall be granted while any portion of the Loans remain outstanding.  The Secured Lender's security interests and Liens in the Collateral shall maintain their priority until all of the Borrower's obligations (and any amounts that may become due under this Agreement or any of the other Post-Petition Loan Documents) are indefeasibly paid in full in cash.  Secured Lender in its sole discretion may elect to agree to alternative treatment of the Loans pursuant to the confirmed Plan.

4.3   Effectiveness of Liens.  Upon entry of the Final Post-Petition Financing Order, the Liens and security interests granted to the Secured Lender on the Collateral by virtue of the Final Post-Petition Financing Order and this Agreement with respect to the Loans shall be valid and perfected without regard to applicable federal, state or local filing or recording statutes; provided, however, that the Secured Lender may, but need not, take such steps as it deems desirable and applicable to comply with such statutes, and upon request, the Borrower shall take such reasonable actions as may be required to assist the Secured Lender in complying with such statutes.  The stay imposed by section 362(a) of the Bankruptcy Code hereby is modified to allow the filing and recording of a certified copy of this Agreement and the applicable Financing Order or any such financing statements, notices of Lien, mortgages, deeds of trust or similar instruments, and all such documents shall be deemed to have been filed or recorded coincident with the entry of the applicable Financing Order.  The post-petition Liens (a) shall be deemed perfected as of the Petition Date and (b) shall not be subject to or *pari passu* with any Lien or security interest existing as of the Petition Date.

5. **REPRESENTATIONS AND WARRANTIES**

The Borrower hereby represents and warrants, as of the date hereof and as of the date of each Advance, that:

5.1   Authorization of Agreement.  Subject to entry of the Final Post-Petition Financing Order, the Borrower has all requisite power and authority to execute and deliver this Agreement and each of the other Post-Petition Loan Documents, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  Subject to entry of the Final Post-Petition Financing Order, this Agreement has been, and each of the other Post-Petition Loan Documents will be at or prior to the Closing Date, duly executed and delivered by the Borrower.

5.2   Enforceability.  This Agreement and each of the Post-Petition Loan Documents has been duly executed and delivered by the Borrower and constitutes a legal, valid and binding obligation of the Borrower, and to the best of her knowledge, enforceable against the Borrower in accordance with its terms, subject to the Bankruptcy Code.

6. **REPORTING REQUIREMENTS**

6.1   Reporting Requirements.  The Borrower covenants and agrees that from and after the Closing Date and until the Maturity Date, repayment in full of the Obligations, and termination of this Agreement, the Borrower shall deliver the following to the Secured Lender:

(a)   as soon as practicable, but in any event within one (1) Business Day after the Borrower becomes aware of the existence of any Event of Default, written notice specifying the nature of such Event of Default, including the anticipated effect thereof;

(b)   copies of all federal, state, and local tax returns and reports filed by the Borrower; and

(c)   such other information with respect to the Borrower's business, operations, financial condition, use of Advances, collection of accounts receivable or otherwise, reasonably requested.

7. **AFFIRMATIVE COVENANTS**

The following covenants shall be binding on the Borrower, as applicable, from and after the date hereof and until the repayment in full of the Obligations and termination of this Agreement:

7.1   Maintenance of Existence and Conduct of Business.  The Borrower covenants and agrees to do all things reasonably necessary to preserve the condition and value of the Borrower's assets and business.

7.2   Supplemental Disclosure.  From time to time as may be necessary (in the event that such information is not otherwise delivered by the Borrower to the Secured Lender pursuant

to this Agreement), so long as there are Obligations outstanding, the Borrower covenants and agrees to supplement or amend each representation herein with respect to any matter hereafter arising which, if existing or occurring at the date of this Agreement, would have been required to be set forth or described in an exception to such representation or which is necessary to correct any information in such representation which has been rendered inaccurate thereby.

8. **NEGATIVE COVENANTS**

The following covenants shall be binding on the Borrower from and after the date hereof and until the repayment in full of the Obligations and termination of this Agreement:

8.1     Mergers, and Other Material Transactions.  The Borrower shall not directly or indirectly, by operation of law or otherwise, merge with, consolidate with, acquire all or substantially all of the assets or capital stock of, or otherwise combine with, any Person, unless otherwise agreed to in writing by the Secured Lender.

8.2     Sales of Assets.  The Borrower shall not sell, lease, transfer, convey, abandon or otherwise dispose of any of the Borrower's assets or properties or attempt or contract to do so, except in the ordinary course of business unless agreed to in writing by the Secured Lender; provided, however, that the Borrower shall be permitted to sell, lease, transfer, convey or otherwise dispose of its assets outside the ordinary course of business if such sale (a) is approved by the Bankruptcy Court pursuant to section 363, (b) complies with all requirements of the Bankruptcy Court and of section 363 of the Bankruptcy Code and (c) provides for the repayment to the Secured Lender of all Obligations hereunder.

8.3     Events of Default.  The Borrower shall not take or omit to take any action, which act or omission would constitute an Event of Default.

9. **TERM**

9.1     Termination.  Subject to the provisions of Section 10 hereof, the Loans provided for under this Agreement with respect to the Advances shall be in effect from the Closing Date until the Maturity Date.

9.2     Survival of Obligations upon Termination of this Agreement.  No termination or cancellation of any financing arrangement under this Agreement (regardless of the cause or procedure) shall in any way affect or impair the duties and obligations of the Borrower or the rights and powers of the Secured Lender relating to any transaction or event occurring prior to such termination and all claims granted to the Secured Lender hereunder shall continue in full force and effect until all Obligations are paid in full.  All undertakings, agreements, covenants, warranties, and representations of the Borrower contained in the Post-Petition Loan Documents shall survive such termination or cancellation and shall continue in full force and effect until such time as all of the Obligations have been paid in full in accordance with the terms of the agreements creating such Obligations.

10. **EVENTS OF DEFAULT; RIGHTS AND REMEDIES**

10.1 <u>Events of Default</u>.  The occurrence of any one or more of the following events shall constitute an "Event of Default" hereunder:

(a) the Borrower fails to pay the Loans on the Maturity Date (whether by acceleration or otherwise) or any other Obligation to the Secured Lender when due;

(b) the Borrower fails or neglects to perform, keep or observe any provision of this Agreement or any other Post-Petition Loan Document (other than those specifically enumerated in other clauses of this Section 10.1), if such failure is not cured within ten (10) days after written notice from the Secured Lender;

(c) the Borrower by motion, adversary action or other means, (i) challenges or disputes the nature, extent or validity of the Secured Lender's Liens on the Collateral or (ii) seeks subordination, in whole or in part, of any Claim filed by the Secured Lender in the Case;

(d) if there occurs any uninsured damage to or loss, theft or destruction of any portion of the Collateral that individually or in the aggregate is material to the business, operations or value of the Borrower;

(e) if the Borrower breaches or violates any term of the Final Post-Petition Financing Order then in effect or fails to comply with the Budget, in each case, in any material respect;

(f) dismissal of the Case; or conversion of the Case from Chapter 11 to a case under another Chapter of the Bankruptcy Code;

(g) the appointment of a Chapter 11 Trustee or a Chapter 11 Examiner;

(h) the Borrower's exclusive periods to file or to solicit acceptances of a Chapter 11 plan are terminated or are not extended unless consented to by the independent director of the Borrower;

(i) the Borrower uses Advances for purposes not authorized under the Budget;

(j) the failure to timely meet any Milestone;

(k) if any representation or warranty made by the Borrower herein or in any of the Post-Petition Loan Documents, any financial statement, or any statement or representation made in any other certificate, report or opinion delivered in connection herewith or therewith proves to have been incorrect or misleading in any material respect when made;

(l) the voluntary creation, existence or allowance of any Indebtedness, whether recourse or nonrecourse, and whether superior or junior, resulting from borrowings, loans, advances, or the granting of credit, whether secured or unsecured, except (a) Indebtedness to the Secured Lender arising under or as a consequence of this Agreement or the other Post-Petition Loan Documents and (b) other Indebtedness existing on the Petition Date;

(m) the creation, existence or allowance of any Liens on any of the Borrower's properties or assets except the Liens created under this Agreement, the other Post-Petition Financing Documents, the Final Post-Petition Financing Order; *provided, however*, if the Liens were created without the Borrower's acquiescence, the Borrower shall have ten (10) days to remove same;

(n) relief from the automatic stay is granted to allow another party to exercise remedies with respect to any owned assets of the Borrower with a value greater than $100,000; or

(o) the Borrower gives the Secured Lender notice of any Event of Default that is not waived by the Secured Lender.

10.2 Contractual Remedies. Upon the occurrence of an Event of Default, the Secured Lender may, without notice (other than notice required by the Final Post-Petition Financing Order), (a) accelerate any or all of the Obligations, whereupon such accelerated Obligations will be immediately due and payable, (b) terminate this Agreement, whereupon all outstanding Obligations will be immediately due and payable, (c) reduce the Availability to zero ($0.00), whereupon no further Advances may be made pursuant to this Agreement, and/or (d) exercise any and all rights and remedies provided under this Agreement and the Post-Petition Loan Documents and under applicable law, including the Uniform Commercial Code and applicable real estate foreclosure law.

10.3 Legal Remedies

(a) Execution of this Agreement and entry of the Final Post-Petition Financing Order shall be without prejudice to the right of the Secured Lender to seek relief from the automatic stay pursuant to section 362 of the Bankruptcy Code, or any other relief under the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation, the right of the Secured Lender to (a) request additional adequate protection of its interests in the Collateral, or (b) relief from or modification of the automatic stay under section 362 of the Bankruptcy Code. Upon the occurrence of an Event of Default, the Secured Lender shall be entitled to seek and obtain relief from the automatic stay under section 362(d) of the Bankruptcy Code without objection or opposition by the Borrower. The Borrower releases and waives its rights, if any, to stay, enjoin, or otherwise delay or impede the Secured Lender's rights and remedies against the Collateral (including, without limitation, any rights under section 105 and 362 of the Bankruptcy Code) upon the occurrence of an Event of Default. The Borrower hereby acknowledges and agrees that the occurrence of an Event of Default shall constitute "cause" for granting the Secured Lender relief from the automatic stay within the meaning of section 362(d)(1) of the Bankruptcy Code.

(b) Notwithstanding Section 10.3(a) above, upon the occurrence of an Event of Default, the Secured Lender may, subject to the notice period provided in the Final Post-Petition Financing Orders, exercise all rights and remedies provided under the Uniform Commercial Code or real estate foreclosure law in effect in any applicable jurisdiction and under any other applicable law. The rights and remedies provided for under this Section 10.3(b) include, without limitation, the following:

(i) The right to take possession of, send notices regarding, and collect directly the Collateral, with or without judicial process, and to exercise all rights and remedies available to the Secured Lender with respect to the Collateral under the Uniform Commercial Code in effect in any jurisdiction in which such Collateral is located;

(ii) The right to (A) notify any and all parties to any of the Borrower's accounts and accounts receivable that the same have been assigned to the Secured Lender and that all performance thereunder shall thereafter be rendered to the Secured Lender; (B) renew, extend, modify, amend, accelerate, accept partial performance on, release, settle, compromise, compound, collect or otherwise liquidate or deal with, on terms acceptable to the Secured Lender, in whole or in part, such accounts and accounts receivable; (C) enter into any other agreement relating to or affecting such accounts and accounts receivable; (D) enforce performance and prosecute any action or proceeding with respect to any and all of such accounts and accounts receivable; and (E) exercise all other rights, powers and remedies of the Secured Lender with respect to such accounts and accounts receivable; _provided_, _however_, that the Secured Lender shall have no liability or responsibility for any act or omission taken with respect thereto. The Borrower hereby nominates and appoints the Secured Lender as attorney-in-fact to perform all acts and execute all documents deemed necessary by the Secured Lender in furtherance of the terms hereof; and

(iii) The right to (by its own means or with judicial assistance) enter any of the Borrower's premises and take possession of the Collateral, or render it unusable, or dispose of the Collateral on such premises without any liability for rent, storage, utilities, or other sums. The Borrower hereby covenants and agrees not to resist or interfere with such actions.

11. **MISCELLANEOUS**

11.1 <u>Complete Agreement</u>. This Agreement, the Post-Petition Loan Documents and the Final Post-Petition Financing Order constitute the complete agreement between the parties with respect to the subject matter hereof.

11.2 <u>Sale of Interests</u>. The Borrower may not sell, assign or transfer this Agreement or any of the Post-Petition Loan Documents or any portion thereof, including, without limitation, the Borrower's duties and obligations thereunder. The Borrower hereby consents to the Secured Lender's sale of participation, assignment, transfer or other dispositions, at any time or times following an Event of Default, of any of the Post-Petition Loan Documents or of any portion thereof or interest therein, including, without limitation, the Secured Lender's rights, title, interest, remedies, powers, or duties thereunder, whether evidenced by a writing or not. For the avoidance of doubt, any such proposed sale, assignment, transfer, or other disposition prior to an Event of Default requires the written approval of the Borrower, such approval not to be unreasonably withheld. No rights are intended to be created hereunder for the benefit of any third party or creditor or any direct or indirect incidental beneficiary, except as specifically provided herein.

11.3 <u>Modification of Agreement</u>. No amendment, modification or alteration to this Agreement or any other Post-Petition Loan Document shall be effective unless the same shall be in writing and be signed by each of the Secured Lender and the Borrower. No waiver of any

- 13 -

provision of this Agreement nor any consent to any departure by the Secured Lender therefrom, shall be effective unless the same shall be in writing and signed by each of the Secured Lender and the Borrower, and then, such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it is given.

   11.4  No Waiver by the Secured Lender. The failure of the Secured Lender at any time to require strict performance by the Borrower of any provision of this Agreement or any other Post-Petition Loan Document shall not waive, affect, or diminish any right of the Secured Lender thereafter to demand strict compliance and performance therewith. Any suspension or waiver by the Secured Lender of an Event of Default by the Borrower under this Agreement or any other Post-Petition Loan Document shall not suspend, waive, or affect any other Event of Default by the Borrower under this Agreement any other Post-Petition Loan Document whether the same are prior or subsequent thereto and whether of the same or of a different type. None of the undertakings, agreements, warranties, covenants, and representations of the Borrower contained in this Agreement shall be deemed to have been suspended or waived by the Secured Lender, unless such suspension or waiver is by an instrument in writing signed by the Secured Lender and directed to the Borrower specifying such suspension or waiver.

   11.5  Additional Remedies. The Secured Lender's rights and remedies under this Agreement shall be cumulative and nonexclusive of any other rights and remedies that the Secured Lender may have under any other agreement, including, without limitation, any other Post-Petition Loan Document, the Final Post-Petition Financing Order, the Bankruptcy Code, by operation of law or otherwise. This Agreement is without prejudice to any rights of the Secured Lender under the Bankruptcy Code or under applicable non-bankruptcy law.

   11.6  Severability. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

   11.7  Parties. This Agreement and the Post-Petition Loan Documents shall be binding upon the parties hereto and their respective successors, and shall inure to the benefit of the parties and their assigns, transferees and endorsees.

   11.8  Conflict of Terms. Except as otherwise provided in this Agreement by specific reference to the applicable provisions of this Agreement, if any provision contained in this Agreement is in conflict with, or inconsistent with, any provision in the any other Post-Petition Loan Document, the provision contained in this Agreement shall govern and control.

   11.9  Governing Law; Litigation. Except as otherwise expressly provided in any of the Post-Petition Loan Documents, in all respects, including all matters of construction, validity and performance, this Agreement and the Obligations arising hereunder shall be governed by, and be construed and enforced in accordance with, the laws of the State of Minnesota applicable to contracts made and performed in such state, without regard to the principles thereof regarding conflict of laws, and any applicable laws of the United States of America. Service of process on the Borrower or the Secured Lender in any action arising out of or relating to any of the Post-

Petition Loan Documents shall be effective if mailed to such party at the address listed in Section 11.11 hereof.

  11.10 Venue.  The Borrower and the Secured Lender hereby agree that the Bankruptcy Court or, if the Case has closed or the Bankruptcy Court refuses or declines jurisdiction for any reason, any state or federal court located in the State of Minnesota, shall have jurisdiction to hear and determine any claims or disputes between the Borrower and the Secured Lender, pertaining directly or indirectly to this Agreement, the Loans or to any matter relating thereto.  The parties expressly submit and consent in advance to such jurisdiction in any action or proceeding commenced in such courts, hereby waiving personal service of the summons and complaint, or other process or papers issued therein, and agreeing that service of such summons and complaint, or other process or papers may be made by registered or certified mail addressed to the Borrower or the Secured Lender, as the case may be, at their respective addresses set forth in Section 11.11 hereof.  Should a party fail to appear or answer any summons, complaint, process or papers so served within thirty (30) days after the mailing thereof, it shall be deemed in default and an order or judgment may be entered against it as demanded or prayed for in such summons, complaint, process or papers.  The choice of forum set forth in this section shall not be deemed to preclude the enforcement of any judgment obtained in such forum or the taking of any action under this Agreement to enforce same in any other jurisdiction.

  11.11 Notices.  All notices, consents, waivers and communications hereunder given by any party to the other shall be in writing (including electronic mail) and delivered personally, by electronic mail, by a recognized overnight courier, or by dispatching the same by certified or registered mail, return receipt requested, with postage prepaid, in each case addressed:

  If to the Borrower to:

> ERP Iron Ore, LLC
> 7908 US Highway 169
> Suite B
> Bovey, MN 55709
> Attn.:  Todd Roth, Chief Executive Officer
> Email: todd.roth@erpionore.com

  With a copy to:

> Will R. Tansey, Esq.
> Michael F. McGrath, Esq.
> Ravich Meyer
> 150 South Fifth Street
> Suite 3450
> Minneapolis, MN 55402
> Email:  wrtansey@ravichmeyer.com
>    mfmcgrath@ravichmeyer.com

  If to the Secured Lender to:

- 15 -

>Merida Natural Resources, LLC
>192 Summerfield Court, Suite 203
>Roanoke, VA 24019
>Attention: Thomas M. Clarke
>Email: tom.clarke@kissito.org
>
>With a copy to
>
>Oscar N. Pinkas, Esq.
>Dentons US LLP
>1221 Avenue of the Americas
>Suite 2500
>New York, New York 10020
>Email: oscar.pinkas@dentons.com

or to such other address or addresses as the Borrower or the Secured Lender may from time to time designate by notice as provided herein, except that notices of changes of address shall be effective only upon receipt. All such notices, consents, waivers and communications shall: (a) when posted by certified or registered mail, postage prepaid, return receipt requested, be effective three (3) Business Days after dispatch, (b) when sent by electronic mail, be effective upon transmission, or (c) when delivered by a recognized overnight courier or in person, be effective upon receipt when hand delivered.

  11.12 <u>Reversal of Payments</u>.  To the extent that the Borrower makes a payment or payments to the Secured Lender that are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a Borrower, receiver, or any other party under any bankruptcy law, state or federal law, common law, or equitable cause, then, to the extent of such payment or proceeds received, the Obligations or part thereof intended to be satisfied shall be revived and shall continue in full force and effect, as if such payment or proceeds had not been received by the Secured Lender.

  11.13 <u>No Control</u>.  By agreeing to and executing this Agreement, by making advances or extending financial accommodations of any type, kind or nature under this Agreement, the Budget or the applicable Financing Order, the Secured Lender shall not be deemed to be (i) in control of the Borrower's operations or business or (ii) acting as a "responsible person," "managing agent" or "owner or operator" with respect to the operation or maintenance of the Borrower.

  11.14 <u>Survival</u>.  The representations and warranties of the Borrower in this Agreement shall survive the execution, delivery and acceptance hereof by the parties hereto and the closing of the transactions described herein or related hereto.

  11.15 <u>Section Titles</u>.  The section titles and table of contents contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever.

11.16 <u>Counterparts</u>. This Agreement may be executed in any number of separate counterparts, each of which shall, collectively and separately, constitute one agreement. Signature sent by pdf shall be binding.

11.17 <u>JURY TRIAL WAIVER</u>. THE PARTIES HERETO IRREVOCABLY WAIVE ANY RIGHT TO TRIAL BY JURY IN CONNECTION WITH THIS AGREEMENT OR ANY MATTER RELATED TO THIS FINANCING.

IN WITNESS WHEREOF, this Agreement have been duly executed as of the date first written above.

**ERP IRON ORE, LLC**

By: _____

Title:  Chief Executive Officer


**MERIDA NATURAL RESOURCES, LLC**

By: _____

Title: Chief Executive Officer

- 17 -