Exhibit A

BIDDING PROCEDURES

## I.   The Bidding Process

A.      ERP Iron Ore, LLC (the "Debtor") presents the following bidding procedures (the "Bidding Procedures") to be utilized in connection with the sale of some or all assets of the Debtor (the "Assets") or a Topping Proposal[1] with respect to the Debtor's Plan of Reorganization [Docket No. 152] (the "Plan").[2] The Bidding Procedures are designed to facilitate a full and fair process to maximize the value of the Assets or the equity in the Reorganized Debtor under the Plan. These Bid Procedures have been approved by Court Order dated _____ [Docket No. ____] ("Bid Procedure Order").

B.      Subject to the conditions set forth herein, at any time on or before October 3, 2018, at 12:00 p.m. (prevailing Central Time) (the "Bid Deadline"), Jefferies, LLC, ("Jefferies") as the investment banker for the Debtor will (i) engage in discussions and negotiations regarding a sale transaction or transactions with any entity (a "Potential Bidder") that Jefferies believes may have interest in purchasing the Assets or some part thereof or making a Topping Proposal under the Plan or has made inquiry with the Debtor regarding such a purchase or a Topping Proposal, (ii) furnish to such Potential Bidders, public and non-public information relating to such Assets or Topping Proposal pursuant to a confidentiality agreement between the Debtor and such Potential Bidder in form and substance reasonably acceptable to the Mag Parties (defined below) (each, a "Confidentiality Agreement" and collectively, the "Confidentiality Agreements"), and (iii) afford to any such Potential Bidder reasonable access to any data site, properties, assets, books or records of the Debtor with respect to such Assets or Topping Proposal. In addition to the foregoing, each Confidentiality Agreement must provide (1) that all "Licensed Technology"[3] and Improvements as defined in the Restated and Amended Technology and License Agreement dated December 6, 2016 (the "RATLA", a copy of which is available in the data room through Jefferies), between Magnetation, Inc., a Minnesota corporation ("MagInc"), as sublicensor, and the Debtor, as sublicensee, constitutes "confidential

---

[1] "Topping Proposal" means a proposal to step into the shoes of the Plan Sponsor under the Plan but proposing a higher overall value to the Debtor's estate.

[2] Capitalized terms not defined herein have the meanings ascribed in the Plan.

[3] The Mag Parties assert that "Licensed Technology" includes, but is not limited to, the six (6) Rev3.1 Separator™ systems located at Plants 1, 2 and 4 and the Natural pH Flotation System™ located at Plant 4.  The Mag Parties assert that each Rev3.1 Separator™ consists of and embodies proprietary and patent-protected equipment described and claimed in U.S. Patent No. 8,777,015 and U.S. Patent No. 8,708,152, and the Natural pH Flotation System™ is patent pending.  The Mag Parties further assert that the Rev3.1 Separator™ systems and the Natural pH Flotation System™ (pat.pending) can only be sold if a Potential Bidder enters into a valid license agreement with MagGlobal or with MagGlobal's consent, or if the pieces and parts that comprise these systems are disassembled or cut up into generic parts and pieces that, by themselves, do not contain any of the Licensed Technology and are not able to be reassembled into the Licensed Technology. The Debtor reserves the right to dispute the Mag Parties' assertion.

{00414634 }

information" and is protected in all respects by the Confidentiality Agreement to the same extent as Debtor's confidential information, (2) that Magnetation, Inc. and MagGlobal, LLC (collectively, the "Mag Parties") are each intended third party beneficiaries of such Confidentiality Agreements with rights equal to the Debtor thereunder with respect to the Licensed Technology, (3) no parties will be permitted to take photos, video or other recordings of any kind of any of the Licensed Technology or the Improvements and (4) no Potential Bidder will be shown or permitted any access to any computers or computer software of the Debtor or the Mag Parties, including, but not limited to, the Human Machine Interface ("HMI") screens, the Process Automation Software ("PAS") or the Pellet Plant Automation Software ("PAPAS"), or any documents depicting any of the HMI screens in any form, as each are defined in the RATLA. Any Potential Bidder that is not a currently operating entity shall have its parent entity and/or individual owners execute a Confidentiality Agreement.  The Debtors shall provide counsel for the Mag Parties copies of all Confidentiality Agreements provided that they will be subject to "attorneys eyes" only until after the Auction has concluded and only after written agreement from MagParties' attorneys that they will not share the contents of the Confidentiality Agreements with their clients or any other parties.

C.       Each Confidentiality Agreement entered into after the date of the entry of the Bid Procedures Order shall recognize that the Debtor is obligated to comply with the terms of these Bidding Procedures. Each confidentiality agreement previously entered into between the Debtor and a Potential Bidder in effect on the date of the entry of the Bid Procedures Order shall be deemed to be a Confidentiality Agreement subject to the Bid Procedures Order and each prior Confidentiality Agreements and the Debtor's engagement letter with Jeffries shall be amended to provide that the Mag Parties are intended third-party beneficiaries with respect to the confidentiality of the Licensed Technology as described above. Potential Bidders interested in conducting due diligence should contact Leon Szlezinger (lszlezinger@jefferies.com) or Christoph Hinder (chinder@jefferies.com) of Jefferies. Notwithstanding the foregoing, Jefferies is not required to provide confidential or proprietary information to any person if Jefferies determines, after consultation with Debtor that such disclosure could be detrimental to the interests of Debtor's estate.

D.       Any Potential Bidder who conducts an inspection of Plant 4 must be accompanied by either (i) a representative of the Mag Parties if the Debtor consents in writing in its sole discretion; or (ii) an independent third-party that is mutually acceptable to both the Debtor and the Mag Parties.  The consultant is only in attendance to observe and monitor that the requirements of the bid procedures are not violated and will be instructed not to communicate with Potential Bidders or answer any questions with respect to the Assets and the Licensed Technology.

## II.  Submission by Bid Deadline

A.       A Potential Bidder who desires to make a bid must deliver its bid to Jefferies on or before the Bid Deadline. Jefferies and the Debtor may extend the Bid Deadline, but shall promptly notify all Potential Bidders of any such extension.

## III. Requirements of "Qualified Bid" Status

A.      A bid received from a Potential Bidder by the Bid Deadline will constitute a "Qualified Bid" only if it includes all of the following (the compliance of which shall be determined by Jefferies, the Debtor and its Independent Director) (collectively, the "Required Bid Documents"):

    i.      A signed purchase agreement ("Purchase Agreement") based upon the form attached hereto as Exhibit A, together with a redline thereof, which shows any modifications made to such form by the Potential Bidder, including but not limited to an allocation of the purchase price to the specific Assets proposed to be purchased and a description of the Potential Bidders intentions with respect to approvals, technology licenses, and permits and surety bond matters;

    ii.     Evidence sufficient to the Debtor and its Independent Director and Jefferies , in consultation with the Official Committee of Unsecured Creditors of ERP Iron Ore, LLC (the "Committee"), in their reasonable discretion that such bidder has the financial ability to consummate the Transaction (including, without limitation, the ability to pay or perform the liabilities to be assumed if any) in accordance with these Bidding Procedures, which evidence may include, without limitation, current audited or unaudited financial statements of the (1) Qualified Bidder or (2) if the Qualified Bidder is an entity formed for the purpose of acquiring the Assets, current audited or unaudited financial statements of the equity holders of the Qualified Bidder, sources of equity or debt financing for payment of the purchase price, copies of commitment letters, the identity of contact persons at the financial institutions issuing the commitment letters or such other form of financial disclosure and credit-quality support information or enhancement reasonably acceptable to the Debtors and Jefferies; and

    iii.    A cash deposit (the "Good Faith Deposit") in the form of a wire transfer to the Debtor (or other form acceptable to the Debtor) in the greater of an amount of at least 10% of the purchase price for the Assets proposed to be purchased or $200,000.

B.      Each Potential Bidder that makes a Qualified Bid  before the Bid Deadline shall be referred to as a "Qualified Bidder."

## IV. Auction

A.      Jefferies and the Debtor and its Independent Director and Debtor's counsel shall evaluate the Qualified Bids and select one or more Qualified Bid(s) that they determine in their business judgment to be the best Qualified Bid(s) (the "Initial Successful Bid(s)"). In making this determination, Jefferies and the Debtor may consider, among other things, the amount of cash to be paid, delivered, or distributed, modifications made to the form of purchase agreement attached hereto as <u>Exhibit A</u> and the other terms and conditions of the Qualified Bids. If the Initial Successful Bid is the only Qualified Bid for the Assets or certain Assets, Jefferies and the Debtor

may deem the Initial Successful Bid to be the Successful Bid (defined below).

B.     The Plan constitutes a Qualified Bid and the current Initial Successful Bid for the Plan Assets.  The Plan Sponsor is deemed a Qualified Bidder in all respects, and shall not be required to submit a Good Faith Deposit, or any other deliverable or documentation to Jefferies, the Debtor, or their representatives or agents other than a Purchase Agreement and sale order in the event the Plan Sponsor also bids to acquire certain assets by sale.

C.     If more than one Qualified Bid has been submitted for the Assets or any portion of the Assets in accordance with these Bidding Procedures, Jefferies will conduct an auction (the "Auction") in order to determine, in the business judgment of the Debtor and its Independent Director, the Successful Bid(s). Prior to the Auction, Jefferies shall give each of the Auction Participants notice of the Initial Successful Bid(s) for the Assets or each subset of Assets. Jefferies and the Debtor are not required to give any party other than the Committee notice of any bids other than the Initial Successful Bid(s). The Debtor may allow other key creditors to attend.

D.     The Auction, if required, will commence at 10:00 a.m. (prevailing Central Time) on October 5, 2018 at the offices of Ravich Meyer Kirkman McGrath Nauman & Tansey, P.A., 150 South Fifth Street, Suite 3450, Minneapolis, Minnesota 55402, or at such later time or other place as agreed by the Debtor. Jefferies will notify all Qualified Bidders of any change to the Auction time or location (collectively, the "Auction Participants").

E.     Only the Debtor, the DIP Lender, the Auction Participants, potential financing sources of the Auction Participants, the official creditor's committee members (if any) and their respective representatives will be entitled to attend, participate and be heard at the Auction. Notwithstanding the foregoing, a representative of Progress Rail, the Collateral Agent, the Plant 4 M&M Creditors and Lighthouse may attend the Auction. The Debtor may permit other key creditors to attend.

F.     The Debtor shall have the right to adopt such other rules for the Auction which the Debtor believes in its business judgment will promote the goals of the Auction, including, without limitation, rules that allow Auction Participants to participate telephonically.

G.     The Debtor may select the best bid at the conclusion of the Auction, subject to approval of the Bankruptcy Court ("Successful Bid") as to the Minnesota Assets. As to the Indiana Assets and remaining assets under the Plan (the "Plan Assets"), the Debtor may determine to proceed with the Plan as filed, a Topping Proposal, or a bid for such Plan Assets if determined to be better than the Plan. Prior to the Bid Deadline, Jefferies, the Debtor and its Independent Director, in consultation with the Committee, shall collectively determine the value attributed by the Plan to the Assets, as a whole and or to portions for which bids might reasonably be expected, so that a Successful Bid (or Successful Bids) may be readily compared to other bids.  A bid to purchase all or any part of the Assets shall not fail to be a Qualified Bid merely because the bid does not contemplate the repayment of the DIP Facility in full or a commitment to fund the balance of the administration of the Debtor's bankruptcy case, provided however that the Debtor may factor into its decision of the determination of the highest and best

bid whether the bidder is willing to repay the existing DIP financing in full or provide DIP financing which is adequate to administer this bankruptcy estate; provided further, however, notwithstanding any other provision in these Bidding Procedures and except as otherwise determined by the Bankruptcy Court, any Topping Proposal, Successful Bid or Backup Bid other than the Plan which includes some or all of the Indiana Assets is required to repay the existing DIP financing in full in cash at closing under the terms of the Postpetition Financing. Potential Bidders shall be permitted to submit bids for all or any part of the Assets under section 363 of the Bankruptcy Code.

H.     The Debtor shall file a notice of Successful Bids and Back-Up Bids (defined below), including contact and notice information for any applicable bidder and a calculation of consideration provided thereby, on or before October 6, 2018.

## V.  Credit Bid Rights

A.     The right to credit bid under section 363(k) of the Bankruptcy Code is specifically preserved. Progress Rail (as defined in the motion to approve these procedures), shall be deemed a Qualified Bidder with respect to the Debtor's real and personal property (except relating to Plant 4 and any Minnesota real property), and shall not be required to submit a Good Faith Deposit, or any other deliverable or documentation to Jefferies, the Debtor, or their representatives or agents other than a purchase agreement and may credit bid (before or at the Auction) up to the amount of debt acknowledged by the Debtor or established by the Court but not more than $5 million, in its discretion, for some or all of the Debtor's property (other than Plant 4 and any Minnesota real property) on which it has a valid lien. Unless approved by separate court order, no party may credit bid on Plant 4 or any Minnesota real property.

B.     With respect to any Assets, any other party who wishes to be entitled to credit bid shall, no later than September 7, 2018, submit evidentiary proof of the validity, extent and priority of their liens ("Proof") to the Debtor and file same with the Court. Any party in interest may object to any Proof on or before September 14, 2018 and the party seeking to credit bid shall in that instance notice a hearing for a motion on the estimation of allowance and the disputed right to credit bid. In the event of such a dispute, and absent an order of the Court providing for a right to credit prior to the Auction, the credit bid shall not be permitted. In the event there is no objection to a Proof on or before September 14, 2018, such credit bid shall be permitted in the Debtor's discretion.

C.     Any junior lien holders seeking to credit bid will only be entitled to credit bid if they deposit sufficient funds with the Debtor to pay all liens senior in priority to the junior lien in full, as determined by the Debtor.  Credit bidding by all junior lien holders will otherwise be prohibited, but all rights, claims and objections will be reserved and can be asserted against the sale(s) proceeds, if any.

## VI. Sale Hearing

A.     An evidentiary hearing to consider the sale of assets to the Successful Bidder(s) and Back-Up Bidders and approval of such bid(s) or a Topping Proposal that constitutes a

Successful Bid (the "Sale Hearing"), will be held on October 16, 2018 at 1:30 p.m. prevailing Central time, in the courtroom of the Honorable William J. Fisher, United States Bankruptcy Judge, at the United States Bankruptcy Court, District of Minnesota, Courtroom 2B, U.S. Courthouse, 316 North Robert Street, St. Paul, MN 55101. The Sale Hearing may be continued or adjourned by the Debtor; provided, however, the Debtor shall not continue or adjourn the Sale Hearing for more than seven days in the aggregate absent the prior consent of all Successful Bidder(s).

B.      Upon the closing of any Transaction,[4] any Transaction Fee due to Jefferies as a result of the closing of any Transaction shall be paid and/or segregated and escrowed from the proceeds of such Transaction prior to any other use or distribution of such proceeds.  If any Transaction is the result of a successful credit bid without a cash component sufficient to pay any such Transaction Fee in full, then any resulting unpaid portion of the Transaction Fee due to Jefferies shall be immediately paid to Jefferies and/or segregated and escrowed at the closing of such Transaction from the available cash of the Debtor; provided, however, that if that Debtor does not have sufficient cash to pay the unpaid portion of such Transaction Fee in full, or any portion thereof, then the successful credit bidder shall immediately pay the unpaid portion of such Transaction Fee to Jefferies and/or segregate and escrow such unpaid portion of the Transaction Fee at the closing of such Transaction

## VII.       Objections

A.      Objections, if any, to the sale of assets or confirmation of the Plan or any Topping Proposal shall be filed on the docket of the Bankruptcy Court and served such that each objection is actually received by the following parties on or before October 11, 2018 (the "Objection Deadline"): (a) counsel for the Debtor at Ravich Meyer Kirkman McGrath Nauman & Tansey, P.A., Attn: Will R. Tansey, 150 South Fifth Street, Suite 3460, Minneapolis, Minnesota 55402 wrtansey@ravichmeyer.com, (b) the United States Trustee's Office, attn. Michael R. Fadlovich, 300 South Fourth Street, Suite 1015, Minneapolis, MN 55402 Michael.Fadlovich@usdoj.gov., (c) counsel for the DIP Lender and Plan Sponsor at Dentons US LLP, Attn: Oscar N. Pinkas, 1221 Avenue of the Americas, New York, NY 10020 oscar.pinkas@dentons.com, and (d) counsel to the Official Committee of Unsecured Creditors, if any.

## VIII.   Back-Up Bidder

B.      If any Auction Participant whose Qualified Bid is a Successful Bid (a "Successful Bidder") approved by the Bankruptcy Court fails to consummate the transaction because of a failure to perform on the part of such Successful Bidder, the Auction Participant (the "Back-Up Bid") that submitted the next highest or otherwise best Qualified Bid for the same Assets will be deemed to be the Successful Bidder therefor, and the Debtor will be authorized to consummate the transaction with such Back-Up Bidder without further order of the Bankruptcy Court, and such Back-Up Bid shall thereupon be deemed the Successful Bid. If any Back-up Bidder fails to

---

[4]  Capitalized terms in this paragraph shall have the meanings ascribed to them in that certain engagement letter between the Debtor and Jefferies LLC which was filed in connection with the Debtor's application to retain Jefferies LLC [Dkt. No. 150].

consummate the transaction because of a breach or failure, the process described above may continue with other Auction Participants in decreasing order of the Qualified Bids as determined by the Debtor until an Auction Participant shall consummate the Transaction.

## IX. Disposition of Good Faith Deposit

A.   The Good Faith Deposit submitted by a Qualified Bidder that is not the Successful Bidder will be returned to such Qualified Bidder within two (2) business days after consummation of the final transaction for the Assets related to such Good Faith Deposit ("Closing"); provided that any approved Successful Bidder or Back-Up Bidder that fails to Close due to its own breach of a Bankruptcy Court approved Purchase Agreement or these procedures forfeits its Good Faith Deposit as liquidated damages (actual damages being impossible to estimate) to the Debtor.  At Closing, the Successful Bidder will be entitled to a credit for the amount of its Good Faith Deposit.

## X.      TERMS OF SALE

A.      The Transaction(s) shall be without representations or warranties of any kind, nature or description by the Debtor, its agents and estate.

B.      All of the Debtors' right, title and interest in and to the Assets or equity in the Reorganized Debtor under the Plan transferred at Closing(s) shall be transferred, free and clear of all liens, claims, interests or encumbrances, if any, with such liens, claims, interests and encumbrances to attach to the proceeds of the Transaction in the event of a sale of assets pursuant to Section 363 of the Bankruptcy Code or as provided in the Plan as confirmed subject to prior order of the Bankruptcy Court.

EXHIBIT A TO BID PROCEDURES

FORM OF PURCHASE AGREEMENT

**PURCHASE AGREEMENT**

**THIS PURCHASE AGREEMENT** ("Agreement") is made and entered into by and between ERP Iron Ore, LLC, a Virginia limited liability company ("Debtor"), and _____, a _____ ("Buyer").

**W I T N E S S E T H:**

**WHEREAS**, Debtor is operating as a debtor in possession in *In re: ERP IRON ORE, LLC, Debtor,* under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court"), Bankruptcy Case No. 18-50378 (the "Bankruptcy Case");

**WHEREAS**, on _____, 2018, the Bankruptcy Court issued an Order (the "Bidding Procedures Order") approving Bidding Procedures for the sale of certain property owned by Debtor (the "Bidding Procedures");

**WHEREAS**, capitalized terms used in this Agreement without definition have the meanings given to those terms in the Bidding Procedures;

**WHEREAS**, under and in accordance with the Bidding Procedures, Buyer is submitting this Agreement to Debtor as a bid for the Assets (the "Property") described in **Exhibit A** attached hereto and hereby made a part hereof (the "Property Schedule"); and

**WHEREAS**, if Buyer is the Successful Bidder for the Property, Buyer will purchase the Property from Debtor, and Debtor will sell the Property to Buyer, in accordance with the terms and upon the conditions contained in this Agreement.

**NOW, THEREFORE**, pursuant to the foregoing recitals, which are an integral part hereof, and in consideration of the mutual covenants contained herein, the sufficiency of which is hereby acknowledged, Buyer and Debtor (the "Parties") hereby agree as follows.

1. **BID - PURCHASE AND SALE**.

    a.   This Agreement, as executed and submitted to Debtor by Buyer, is a bid for the Property under the Bidding Procedures.  If Buyer is the Successful Bidder for the Property, Debtor will sell the Property to Buyer, and Buyer will purchase the Property from Debtor, in accordance with the terms and upon the conditions contained in this Agreement.

b. This Agreement is binding upon Buyer upon execution and submission to Debtor (notwithstanding the fact that it is not then signed by Debtor) and is not cancelable, terminable, or revocable by Buyer except as provided in **Section 8** below.

c. Without limiting any of the other provisions of the Bidding Procedures, Buyer acknowledges that (i) this Agreement may become the Successful Bid, and Buyer the Successful Bidder, for the Property under **Article VIII** of the Bidding Procedures concerning Back-Up Bidders, and (ii) in such event, this Agreement obligates Buyer to purchase the Property as a Back-Up Bidder.

2. **PURCHASE PRICE**.

a. The purchase price of and for the Property hereunder is as set forth in the Property Schedule (the "Purchase Price").

b. Buyer is providing Debtor the Good Faith Deposit that is shown in the Purchase Schedule with Buyer's submission of this Agreement to Debtor.

c. Buyer will pay the Purchase Price to Debtor as follows:

  i. by Debtor's retention of the Good Faith Deposit; and

  ii. the remainder of the Purchase Price in cash or other immediately available funds at the Closing (as that term is defined below).

d. For any and all purposes, the Purchase Price will be allocated among the items comprising the Property in the manner shown in the Property Schedule.

3. **REAL PROPERTY**.

a. The provisions of this **Section 3** apply to that part of the Property, if any, that is real estate and/or improvements thereon (the "Real Property").

b. Real estate, related tangible personal property, and/or other taxes payable with respect to the Real Property in the year of the Closing will be prorated between Debtor and Buyer on the basis of the number of days in the year of the Closing, before (and excluding) the Closing Date (as that term is defined below) as to Debtor, and after (but including) the Closing Date as to Buyer.  All special assessments levied and/or pending against the Real Property as of the Closing will be assumed in full by Buyer effective as of the Closing.

c. All costs of utilities and operating expenses relating to the Real Property will be prorated between Debtor and Buyer on the basis of the number of days in the applicable billing or payment periods, before (and excluding) the Closing Date as to Debtor, and after (but including) the Closing Date as to Buyer.

d.   If, prior to the Closing, the Real Property is damaged by fire or other casualty, Buyer will have the right to terminate this Agreement by email notice to Debtor within five business days following Buyer's receipt of written notice of the occurrence of that damage.  Pending Buyer's exercise or waiver of that right, the Closing will be continued.  If Buyer does not exercise that right, Debtor will, at the Closing, pay over to Buyer, and/or assign to Buyer the right to receive, any and all insurance proceeds payable to Debtor in respect of that damage.

e.   If, prior to the Closing, all or any portion of the Real Property is affected by a condemnation or a taking by eminent domain, or is the subject of any condemnation proceeding, Buyer will have the right to terminate this Agreement by written notice to Debtor within five business days of Buyer's receipt of written notice of that condemnation, taking or proceeding.  Pending Buyer's exercise or waiver of that right, the Closing will be continued.  If Buyer does not exercise that right, Debtor will, at the Closing, pay over to Buyer, and/or assign to Buyer the right to receive, any and all awards made or to be made to Debtor or in respect of the Real Property in that condemnation, taking or proceeding.

4. **DILIGENCE, AS-IS CONDITION, ETC**.

a.   BUYER ACKNOWLEDGES, AND REPRESENTS AND WARRANTS TO DEBTOR, THAT BUYER IS SOPHISTICATED IN TRANSACTIONS OF A TYPE SIMILAR TO THE PURCHASE OF THE PROPERTY UNDER THIS AGREEMENT AND THAT IT HAS HAD THE OPPORTUNITY TO PERFORM, AND HAS PERFORMED, SUCH EXAMINATIONS, INVESTIGATIONS, ANALYSIS AND SO-CALLED "DUE DILIGENCE" ACTIVITIES WITH REGARD TO THE PROPERTY AS IT HAS DETERMINED, IN ITS SOLE AND ABSOLUTE DISCRETION, TO BE NECESSARY IN CONNECTION WITH ITS PURCHASE OF THE PROPERTY (THE "DILIGENCE").

b.   DEBTOR IS SELLING THE PROPERTY TO BUYER, AND BUYER IS PURCHASING THE PROPERTY FROM DEBTOR ON AN "AS-IS", "WHERE IS", "WITH ALL FAULTS" BASIS, AND DEBTOR IS NOT MAKING, AND HEREBY DISCLAIMS, ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER RELATING TO THE PROPERTY, WHETHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY REPRESENTATION OR WARRANTY REGARDING THE CONDITION OF THE PROPERTY, THE FUNCTIONALITY OR USABILITY OF THE PROPERTY, THE FITNESS OF THE PROPERTY FOR ANY PURPOSE, TITLE TO THE PROPERTY, THE VALUE OF THE PROPERTY, OR THE COMPLETENESS OR ACCURACY OF ANY INFORMATION OR MATERIALS PROVIDED OR MADE AVAILABLE TO BUYER.

c.   BUYER ACKNOWLEDGES, AND REPRESENTS AND WARRANTS TO DEBTOR, THAT BUYER HAS NOT RELIED, AND IS NOT RELYING, ON

ANY STATEMENTS, PROMISES, GUARANTEES, REPRESENTATIONS, OR WARRANTIES OF ANY KIND, WHETHER WRITTEN OR ORAL, BY DEBTOR, JEFFRIES, DEBTOR'S LEGAL COUNSEL, OR ANY OTHER AGENT, REPRESENTATIVE, OR EMPLOYEE OF DEBTOR, OR ARISING UNDER APPLICABLE LAW, WITH REGARD TO BUYER'S DECISION TO PURCHASE THE PROPERTY, INCLUDING, WITHOUT LIMITATION, ANY STATEMENTS, PROMISES, GUARANTEES, REPRESENTATIONS, OR WARRANTIES REGARDING THE CONDITION OF THE PROPERTY, THE FUNCTIONALITY OR USABILITY OF THE PROPERTY, THE FITNESS OF THE PROPERTY FOR ANY PURPOSE, TITLE TO THE PROPERTY, THE VALUE OF THE PROPERTY, OR THE COMPLETENESS OR ACCURACY OF ANY INFORMATION OR MATERIALS PROVIDED OR MADE AVAILABLE TO BUYER.

d.      Buyer will indemnify and hold harmless Debtor, Jeffries, Debtor's legal counsel, and all other agents or representatives of Debtor from and against any and all losses, costs or damages, of whatever type, nature, or description, including reasonable attorneys' fees, incurred or suffered by Debtor in connection with or as a result of the Diligence.  The provisions of this **Section 4(d)** will survive the Closing or the termination of this Agreement, as the case may be, and Debtor's remedies with respect to any failure of Buyer to perform its obligations under this **Section 4(d)** will not be limited by **Section 8(d)** below.

5.  **CLOSING**.

a.      The closing (the "Closing") of the purchase and sale of the Property hereunder will occur on the first business day (the "Closing Date") that is 10 days following the entry of the Sale Order (as that term is defined below).  Except as Buyer and Debtor may otherwise agree in writing, the Closing will be performed via electronic image transmission, overnight courier, and electronic funds transfer.

b.      If the Property is or includes tangible personal property, then, at the Closing, Debtor will deliver to Buyer:

  i.      a Bill of Sale for the Property (or the part thereof that is tangible personal property), which Bill of Sale will be in the form of **Schedule 5(b)** attached hereto and hereby made a part hereof; and

  ii.     any certificates of title for the Property (or the part thereof that is personal property) that exist and are in Debtor's possession.

c.      If the Property is or includes Real Property, then, at the Closing, Debtor will deliver to Buyer:

  i.      a Quit Claim Deed conveying Debtor's interest in the Real Property to Buyer (the "Deed"); and

{00414634 }                                11

      ii.     a "non-foreign affidavit" containing such information as is required by Section 1445(b)(2) of the Internal Revenue Code.

6. **TRANSACTION COSTS**.   Each of the Parties will bear and pay those costs and expenses incurred by it or on its behalf in connection with the purchase and sale of the Property hereunder, including, without limitation, attorneys' and accountants' fees, without contribution from the other Party; provided, however, that if the Property is or includes Real Property:

    a.     Debtor will pay the cost to prepare the Deed;

    b.     Buyer will pay the cost to record the Deed and any deed tax (or other transfer or similar taxes) relating to the Deed; and

    c.     Buyer will pay the fees and costs charged by any title company or title insurer through which it elects to conduct the Closing.

7. **CONTINGENCIES**.

    a.     Debtor's obligation to sell the Property under this Agreement is contingent upon:

      i.     the Bankruptcy Court having issued a final Order authorizing the sale of the Property to Buyer pursuant to 11 U.S.C. § 363(f) (the "Sale Order"); and

      ii.     Buyer having performed, in all material respects, all of the obligations that this Agreement requires Buyer to perform at or prior to the Closing.

If Debtor proceeds with the Closing, Debtor will be deemed to have waived any of the contingencies set forth in this **Section 7(a)** that are not then satisfied.

    b.     Buyer's obligation to purchase the Property under this Agreement is contingent upon:

      i.     the Bankruptcy Court having issued the Sale Order; and

      ii.     Debtor having performed, in all material respects, all of the obligations that this Agreement requires Debtor to perform at or prior to the Closing.

If Buyer proceeds with the Closing, Buyer will be deemed to have waived any of the contingencies set forth in this **Section 7(b)** that are not then satisfied.

8.    **TERMINATION - REMEDIES**.

  a.    This Agreement will automatically terminate upon a return of the Good Faith Deposit to Buyer, or a forfeiture of the Good Faith Deposit to Debtor, under **Article IX** of the Bidding Procedures.

  b.    This Agreement may be terminated as follows:

    i.    by Buyer, by written notice to Debtor, if Debtor breaches or violates this Agreement and fails to cure that breach or violation within 10 days following receipt of written notice thereof from Buyer;

    ii.    by Debtor, by written notice to Buyer, if Buyer breaches or violates this Agreement and fails to cure that breach or violation within 10 days following receipt of written notice thereof from Debtor; or

    iii.    by Buyer or Debtor, by written notice to the other, if the Closing has not occurred by 5:00 p.m., local time in Minneapolis Minnesota, on the date that is 30 days following the entry of the Sale Order, provided, however, that a Party may not terminate this Agreement under this **Section 8(b)(iii)** if that Party is then in breach or violation of this Agreement.

  c.    If Buyer terminates this Agreement under **Section 8(b)(i)** or **Section 8(b)(iii)** above, or if Debtor terminates this Agreement under **Section 8(b)(iii)** above, Debtor will return the Good Faith Deposit to Buyer within 10 days following the effective date of that termination.

  d.    Buyer's sole and exclusive remedies in the event of a breach or violation of this Agreement by Debtor, to the exclusion of all other remedies, whether at law or in equity, is the termination of this Agreement under **Section 8(b)(i)** above and the return of the Good Faith Deposit under **Section 8(c)** above.  Without limiting the generality of the foregoing, and for the avoidance of any doubt or confusion in that regard, Buyer will not be entitled to specific performance or to any actual, consequential, punitive or other damages or costs.

  e.    If Debtor terminates this Agreement under **Section 8(b)(ii)** above, Debtor will retain the Good Faith Deposit as liquidated damages for the subject breach or violation by Buyer; provided, however, that this **Section 8(e)** will not operate to limit any of Debtor's remedies with respect to a failure of Buyer to perform its obligations under **Section 4(d)** above.

  f.    **Sections 4(d)**, **8(c)**, and **8(e)** of this Agreement, together with any other provisions of this Agreement that contemplate performance following the termination of this Agreement, will survive and continue in effect following any termination of this Agreement.

7.   **NOTICES**.  A notice from one of the Parties to the other under this Agreement will be in writing and will be considered to have been duly delivered or served if personally delivered, delivered by overnight courier, or sent by first class certified mail, return receipt requested, postage prepaid, to the proper Party at its address as set forth below or to such other address as such Party may hereafter designate by written notice to the other Party:

        If to Debtor, to:

        ERP Iron Ore, LLC
        7908 US Highway 169, Suite B
        Bovey, MN 55709
        Attn: Todd Roth, CEO

        With a copy to:

        Ravich Meyer Kirkman McGrath Nauman & Tansey, P.A.
        Attn: Will R. Tansey, Esq.
        150 South Fifth Street, Suite 3450
        Minneapolis, MN 55402

        If to Buyer, to:

        _____
        _____
        _____
        Attn: _____

        With a copy to:

        _____
        Attn:  _____, Esq.
        _____
        _____

8.   **NO THIRD PARTY BENEFICIARIES**.  This Agreement is a contract solely between Buyer and Debtor.  No third party beneficiaries (including, without limitation, employees and customers of Debtor) are intended hereunder and none will be inferred herein.

9.   **BUSINESS DAYS**.  As used in this Agreement, the term "business day" means a day that is not a Saturday, a Sunday, or a day on which United States government offices are closed.  Whenever a time period specified in this Agreement ends on a day that is not a business day, that time period will be extended until the next subsequent business day.

10. **ASSIGNMENT**.  Neither Party may assign any right or interest under this Agreement, or delegate any duty under this Agreement, without (a) the prior written consent of the other Party, and (b) any Order of the Bankruptcy Court that may be required under the Bankruptcy Code.

11. **BENEFIT**.  This Agreement will inure to the benefit of and will be binding upon each of the Parties and their respective successors and permitted assigns.

12. **HEADINGS**.  Section headings have been used in this Agreement for convenience purposes only.  In no manner will any section heading in this Agreement limit any term or provision of the section to which it relates.

13. **WAIVER**.  No waiver, modification or amendment of any term, condition or provision of this Agreement will be valid, binding or of any effect unless it (a) is made by way of a writing that is signed by the Party(ies) to be bound thereby or its(their) duly authorized representative(s) and specifies with particularity the nature and extent of that waiver, modification or amendment, and (b) is approved by the Bankruptcy Court if required under the Bankruptcy Code.  No waiver by any Party of any provision hereof will affect or impair any other provision hereof.

14. **BIDDING PROCEDURES - ENTIRE AGREEMENT**.  The Bidding Procedures and the Bidding Procedures Order are hereby incorporated into and made a part of this Agreement.  This Agreement (inclusive of the Bidding Procedures and the Bidding Procedures Order) contains the entire understanding of the Parties with respect to the subject matter addressed herein and supersedes all prior agreements, discussions, negotiations and understandings between the Parties with respect to that subject matter.

15. **INTERPRETATION AND SEVERANCE**.  The provisions of this Agreement will be applied and interpreted in a manner consistent with each other so as to carry out the purposes and intent of the Parties.  If, for any reason, any provision of this Agreement is determined to be unenforceable or invalid, that provision (or such part thereof as may be unenforceable or invalid) will be deemed severed from this Agreement, and the remaining provisions of this Agreement will be carried out with the same force and effect as if that provision (or such part thereof) had not been a part of this Agreement.

16. **COUNTERPARTS – ELECTRONIC IMAGES**.  This Agreement may be executed and delivered in counterparts and by electronic image transmission and any such execution and delivery will have the same force and effect as delivery of an original document with original signatures.

17. **GOVERNING LAW**.  This Agreement will be construed and enforced in accordance with the laws of the State of Minnesota (without regard to the laws of any jurisdiction that concern conflicts of laws).  Any suit, action or proceeding relating to the interpretation or enforcement of this Agreement will be brought, to the exclusion of all other courts: (a) in the Bankruptcy Court if such suit, action or proceeding is brought prior to the entry of a final decree closing the Bankruptcy Case; and (b) in the state or

federal courts located in the State of Minnesota if such suit, action, or proceeding is brought after the entry of a final decree closing the Bankruptcy Case. Each of the Parties hereby consents and submits to the jurisdiction of such courts.

**THE REMAINDER OF THIS PAGE IS BLANK**

**SEPARATE SIGNATURE PAGES FOLLOW**

## SIGNATURE PAGE TO PURCHASE AGREEMENT

**IN WITNESS WHEREOF:**

Buyer has executed and submitted this Agreement to Debtor this __ day of _____, 2018.

**[NAME OF BUYER]**


By: _____
        Name: _____
        Title:  _____


And Debtor has accepted and executed this Agreement this __ day of _____, 2018.

**ERP IRON ORE, LLC**


By: _____
        Name: _____
        Title:  _____

# EXHIBIT A

## PROPERTY SCHEDULE

| Description of Assets[1] | Purchase Price |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| **Total Purchase Price** | |
| **Good Faith Deposit[2]** | |

[1]Provide commercially reasonable descriptions of the Assets based on the information provided in the Plan or furnished by Jefferies.  Reference and attach schedules or exhibits if additional space is needed.

[2]Insert $0.00 if Buyer is exempt from providing a Good Faith Deposit under the Bidding Procedures.  Otherwise insert the greater of (a) $200,000, or (b) 10% of the total Purchase Price.

## <u>SCHEDULE 5(b)</u>

## QUIT CLAIM BILL OF SALE

**KNOW ALL BY THESE PRESENTS**, that for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, ERP Iron Ore, LLC, a Virginia limited liability company ("Debtor"), hereby quitclaims to _____, a _____ ("Buyer"), all of Debtor's interest and estate in and to the Property, as that term is defined in a certain Purchase Agreement between Buyer and Debtor, executed by Buyer on _____, 2018 and Debtor on _____, 2018 (the "Purchase Agreement").

Nothing contained in this Quit Claim Bill of Sale modifies, amends, limits, or expands any provision of the Purchase Agreement.

Dated: _____, 2018

**ERP IRON ORE, LLC**

By: _____

Its _____

{00414634 }