## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

---

|  |  |
|---|---|
| In re: | Chapter 7 |
| ERP Iron Ore, LLC, | 18-50378 |
| Debtor. | |

---

WILMINGTON      SAVINGS      FUND
SOCIETY, FSB, solely in its capacity as
Indenture Trustee for the Floating Rate
Senior Secured Amortizing PIK Toggle
Notes Due 2019 and not in its individual
capacity, PROGRESS RAIL LEASING
CORPORATION, MERIDA NATURAL
RESOURCES, LLC, as DIP Lender to the
Debtor, THOMAS M. CLARKE, and ANA
M. CLARKE,

    Plaintiffs,

    v.

                                     Adversary Proceeding No. 18-_____

WHITE COUNTY, INDIANA,
CHAPTER 7 TRUSTEE NAUNI JO MANTY,
solely in her capacity as Chapter 7 Trustee, and
LIGHTHOUSE MANAGEMENT GROUP, INC.,
as Administrative Agent,

    Defendants.

---

## COMPLAINT AND OBJECTIONS TO CLAIM NUMBERS 13 AND 31

---

For their Complaint and Objections to Claim Numbers 13 and 31, Plaintiffs state as follows:

## INTRODUCTION

1.      This is an adversary proceeding brought by Wilmington Savings Fund Society, FSB, ("**WSFS**") solely in its capacity as Indenture Trustee for the Floating Rate Senior Secured Amortizing PIK Toggle Notes Due 2019 (the "**Notes**"), and not in its individual capacity, Progress Rail Leasing Corporation ("**Progress**"), Merida Natural Resources, LLC, ("**Merida**" or the "**DIP Lender**") as DIP lender to ERP Iron Ore, LLC (the "**Debtor**"), Thomas M. Clarke, as guarantor of the Notes, and Ana M. Clarke, as guarantor of the Notes, (together with Thomas M. Clarke, WSFS, Progress and Merida, collectively, the "**Plaintiffs**") against White County, Indiana ("**White County**"), Chapter 7 Trustee Nauni Jo Manty, solely in her capacity as Chapter 7 Trustee for the Debtor's estate (the "**Chapter 7 Trustee**"), and Lighthouse Management Group, Inc., as administrative agent for certain mechanic's and/or miner's lien claimants ("**Lighthouse**", and together with White County and the Chapter 7 Trustee, collectively, the "**Defendants**"): (i) to determine the validity, priority and extent of White County's alleged claim in Debtor's assets located in Reynolds, Indiana; and (ii) to determine the validity, priority, and extent of the various liens or interests in the Indiana sale proceeds among all the parties to this Complaint.

2.      As the Court is aware (and as more fully discussed below), the Debtor recently sold certain of its assets located in Reynolds, Indiana for $15 million.  Several creditors claim a lien or interest in the sale proceeds.

3.      The Debtor's DIP loan matured on November 30, 2018 and with no additional access to DIP funding, the Debtor's Chapter 11 case was converted to a Chapter 7 case on December 1, 2018.  The Chapter 7 Trustee now must administer the Debtor's remaining assets

2

(including the proceeds associated with the Indiana sale) and make distributions to creditors. But before such distributions can be made, this Court must determine the validity, priority, and extent of the various liens or interests in the Indiana sale proceeds. Plaintiffs have filed this adversary proceeding to commence that process.

## **DEBTOR'S BANKRUPTCY PROCEEDING**

4.    On May 25, 2018 (the "**Petition Date**"), an involuntary petition was filed against the Debtor under Chapter 7 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Minnesota (the "**Bankruptcy Court**"), commencing this bankruptcy case at Case Number 18-50378 (the "**Case**").

5.    On July 16, 2018, the Debtor filed a Consent to Order for Relief [Docket No. 42] and on July 17, 2018, the Order for Relief was entered [Docket No. 43] and a Conversion of Case by Debtor was filed pursuant to Sections 348 and 706(a) of the Bankruptcy Code and Local Rule 1019-1 [Docket No. 44], converting the Case from a Chapter 7 case to a Chapter 11 case.

6.    An Official Committee of Unsecured Creditors was appointed but subsequently disbanded [Docket No. 223].

7.    On August 1, 2018, the Debtor and Merida executed that certain DIP Credit Agreement. By Order dated August 7, 2018 (the "**DIP Order**") [Docket No. 135], the Bankruptcy Court authorized the Debtor's entry into the DIP Credit Agreement.

8.    On August 10, 2018, the Debtor filed an application to employ Jefferies as an investment banker to market and manage the sale of the Debtor's assets [Docket No. 150]. On August 24, 2018, the Bankruptcy Court authorized the Debtor to retain and employ Jefferies as an investment banker for the Debtor pursuant to sections 327(a) and 328(a) of the Bankruptcy Code [Docket No. 179].

9.      The Debtor's assets include, without limitation, a pellet plant facility located in Reynolds, Indiana, and the related equipment, fixtures and real estate (the **"Pellet Plant"**).  *See* Schedule A/B [Docket No. 99].

10.     On September 25, 2018, the Debtor filed its *Notice of Hearing and Motion to Approve (1) the Sale of All or Substantially All of the Debtor's Real Estate and Fixtures and Personal Property Free and Clear of Liens and Interests; and (2) Authorizing Assumption and Assignment of Certain Executory Contracts and Leases* (the "**Sale Motion**") [Docket No. 230].

11.     On October 16, 2018, the Debtor conducted an auction for the sale of all or substantially all of its real estate, fixtures and personal property (the "**Auction**").  As set forth in the Debtor's *Notice of (1) Filing of Purchase Agreements Entered Into By and Between the Debtor and the Successful Bidders in Connection with the Sale of Substantially All of the Debtor's Assets and (2) Withdrawal of the Debtor's First Amended Plan of Reorganization Dated September 9, 2018* (the "**Notice of Purchase Agreements**") [Docket No. 253], the Debtor selected a bid in the amount of $15,000,000 from Altos Hornos de Mexico, S.A.B. de C.V. ("**AHMSA**"), as the successful bidder of the property described on Exhibit A (the "**Indiana Assets**") to the Purchase Agreement entered into by and between the Debtor and AHMSA on October 12, 2018, (the "**AHMSA Purchase Agreement**").  *See* Docket No. 253, Ex. B.

12.     As reflected in the Notice of Purchase Agreements and the AHMSA Purchase Agreement, AHMSA did not purchase any real property in Reynolds, Indiana.

13.     The Plaintiffs generally supported the Debtor's proposed sale of the Indiana Assets.

14.     On October 22, 2018, White County filed an objection to the Debtor's Sale Motion (the "**White County Sale Objection**") [Docket No. 267].

4

15.     On October 26, 2018, the Bankruptcy Court held a hearing on the Sale Motion and the White County Sale Objection.  The Bankruptcy Court overruled the White County Sale Objection.

16.     On November 2, 2018, the Bankruptcy Court entered an Order approving the sale of the Indiana Assets (the "**Indiana Sale Order**") [Docket No. 306] expressly overruling (for the second time) the White County Sale Objection based on its finding that the White County claim is subject to a bona fide dispute under Bankruptcy Code section 363(f)(4).

17.     The Indiana Sale Order provides, among other things, that the Debtor's sale of the Indiana Assets to AHMSA:

> shall be free and clear of all Liens, Claims, and other interests of any kind or nature whatsoever, including but not limited to, (a) successor or successor-in-interest liability and (b) Claims in respect of the Excluded Liabilities, with all such Liens, Claims, or other interests to attach to the cash proceeds ultimately attributable to the property against or in which such Liens, Claims, or other interests are asserted, subject to the terms thereof, with the same validity, force, and effect, and in the same order of priority, which such Liens, Claims, or other interests now have against the Assets, subject to any rights, claims, and defenses the Debtor or its estate, as applicable, may possess with respect thereto.

*See* Indiana Sale Order at ¶ 9.

18.     On November 15, 2018, White County filed a *Notice of Appeal and Statement of Election* in connection with the Indiana Sale Order [See Docket No. 319].

19.     Also on November 15, 2018, White County filed a *Notice of Hearing and Motion to Stay Order (1) Approving the Sale of All or Substantially All of the Debtor's Real Estate and Fixtures and Personal Property Free and Clear of Liens and Interests, and (2) Authorizing the Assumption and Assignment of Certain Executory Contracts and Leases Pending Appeal* [Docket No. 320] (the "**Motion to Stay**") whereby it sought to stay the effects of the Indiana Sale Order.

20.     On November 20, 2018, the Bankruptcy Court held a hearing on the Motion to Stay and denied the relief requested by White County in the Order Denying Motion to Stay Sale Order of Indiana Assets [Docket No. 330] (the "**Order Denying Motion to Stay**").

21.     In the Order Denying Motion to Stay, the Bankruptcy Court highlighted that the Indiana Sale Order preserved White County's ability to seek a portion of the sale proceeds, which would be held pending a further decision by the Bankruptcy Court.  *See* Order Denying Motion to Stay at p. 12.

22.     White County did not seek a stay pending appeal from the District Court where its appeal is pending.

23.     The sale of the Indiana Assets closed on November 26, 2018 and the Debtor's counsel has advised the Plaintiffs that the $15 million purchase price (the "**Indiana Sale Proceeds**") was deposited into a segregated bank account.

24.     On November 29, 2018, the Bankruptcy Court entered an Order converting the Case to a case under Chapter 7 of the Bankruptcy Code effective as of December 1, 2018 by consent of the parties [Docket No. 344].

25.     On December 3, 2018, the U.S. Trustee appointed Nauni Jo Manty to serve as Chapter 7 Trustee in this Case [Docket No. 349].  Upon information and belief, the Chapter 7 Trustee now controls the segregated bank account into which the Indiana Sale Proceeds were deposited.

## THE PARTIES, JURISDICTION, AND VENUE

26.     The Debtor is a Virginia limited liability company formed to acquire certain assets from Magnetation LLC and certain of its affiliates ("**Magnetation**").  On December 21, 2016, during the course of Magnetation's bankruptcy proceeding, Case No 15-50307 (the

"**Magnetation Case**"), the Bankruptcy Court approved the sale of substantially all of Magnetation's assets, including the Pellet Plant, to the Debtor.

27.     Nauni Manty has been appointed as Chapter 7 Trustee for the bankruptcy estate of ERP Iron Ore, LLC effective as of December 1, 2018.

28.     White County has filed a proof of claim (the "**White County POC**") in the Case [Claim No. 13] asserting that it is owed at least $6,790,806.78 for unpaid real property and personal property taxes, allegedly secured by the Debtor's real and personal property located in Reynolds, Indiana.  A copy of the White County POC is attached hereto as Exhibit A.

29.     Although White County asserts that its claim is fully secured, it also asserts that a portion of its claim -- $1,600,770.85 in unpaid property taxes incurred between May 25, 2017 and the Petition Date -- is entitled to priority status.

30.     Upon information and belief, White County has not amended the White County POC.

31.     Lighthouse has filed a proof of claim (the "**Lighthouse POC**") in the Case [Claim No. 31] asserting a secured claim in the amount of $32,056,481.48.  A copy of the Lighthouse POC is attached hereto as Exhibit B.

32.     The Lighthouse POC is based on that certain Settlement Agreement, dated as of January 27, 2017, among the Debtor, Lighthouse, as administrative agent, and certain mechanic's and/or miner's lien claimants (the "**Lighthouse Settlement Agreement**"), and related Security Agreement executed by the Debtor in favor of Lighthouse dated the same date (the "**Lighthouse Security Agreement**").  Copies of the Lighthouse Settlement Agreement and Lighthouse Security Agreement are attached to the Lighthouse POC.

33.     Lighthouse's interest in the Debtor's Reynolds, Indiana assets is also evidenced by that certain Mortgage and Assignment of Rents and Leases, which was recorded with the White County recorder on December 29, 2017 (the "**Lighthouse Mortgage**") and the UCC Financing Statement recorded in the State of Virginia on February 6, 2017 with filing number 17020642423 (the "**Lighthouse UCC-1**").  Copies of the Lighthouse Mortgage and Lighthouse UCC-1 are attached hereto as Exhibits C and D respectively.  Accordingly, Lighthouse asserts a security interest in both the Debtor's real and personal property located in Reynolds, Indiana.

34.     The Lighthouse POC provides that pursuant to the Lighthouse Security Agreement, the Debtor pledged to Lighthouse, for the benefit of certain mechanic's and/or miner's lien claimants, a security interest in, among other things, certain of the Debtor's assets including both its real and personal property located in Reynolds, Indiana (such portion of the Lighthouse POC, the "**Lighthouse Claim**," and together with the White County POC, collectively, the "**White County and Lighthouse Claims**").  (*See* Lighthouse Security Agreement at §§ 3.1 and 3.2.)

35.     Pursuant to Section 3.3(a) of the Lighthouse Security Agreement, however, Lighthouse agreed to subordinate its liens on the Debtor's collateral (except for certain assets, the proceeds of which are not the subject of this dispute) to those of WSFS.  *See* Lighthouse Security Agreement at § 3.3(a).

36.     Jefferies served as investment banker to the Debtor while the Case was a Chapter 11 case pursuant to the terms of that certain Engagement Letter, dated as of August 10, 2018 (the "**Jefferies Engagement Letter**") [Exhibit A to Docket No. 176] and which was approved by the Bankruptcy Court on August 24, 2018 [Docket No. 179] (the "**Jefferies Order**").  Pursuant to the Jefferies Engagement Letter and the Jefferies Order, Jefferies is entitled to a transaction fee

equal to 1.5% of the Aggregate Consideration (as such term is defined in the Jefferies Engagement Letter) up to $100,000,000, which is to be paid from the proceeds of the transaction. *See* Jefferies Engagement Letter at ¶ 4(b). The Jefferies Engagement Letter further provides that notwithstanding anything to the contrary, the minimum amount of all transaction fees payable to Jefferies shall be $2 million (the "**Jefferies Transaction Fee**"). *See* Jefferies Engagement Letter at ¶ 4(c).

37.     On December 10, 2018, Jefferies filed its *Final Fee Application for Allowance of Compensation* [Docket No. 359] seeking payment of the Jefferies Transaction Fee. The Court has set a hearing on this application for January 3, 2019. As such, any issues related to the Jefferies' Transaction Fee may be resolved prior to resolution of this adversary proceeding. If they are not, such issues should be resolved in connection with this adversary proceeding.

38.     Progress has filed a proof of claim (the "**Progress POC**") in the Case [Claim No. 20] asserting, among other things, a secured claim in the amount of $5 million. A copy of the Progress POC is attached hereto as Exhibit E. The Progress POC is based on that certain promissory note, dated as of January 30, 2017, between the Debtor and Progress (the "**Progress Note**") and that certain Security Agreement, also dated January 30, 2017, between the Debtor and Progress (the "**Progress Security Agreement**") whereby the Debtor pledged to Progress a security interest in certain equipment, fixtures and proceeds and a lien in and to properties and improvements located at the Debtor's facilities, including the facility in Reynolds, Indiana. *See* Progress Security Agreement at §§ 3.1 and 3.2. Copies of the Progress Note and Progress Security Agreement are attached to the Progress POC.

39.     Progress' interest in the Debtor's Reynolds, Indiana assets is also evidenced by that certain Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing,

which was recorded with the White County recorder on October 24, 2017 (the "**Progress Mortgage**") and the UCC Financing Statement recorded in the State of Virginia on February 2, 2017 with the filing number 17020238874 (the "**Progress UCC-1**"). Copies of the Progress Mortgage and Progress UCC-1 are attached hereto as Exhibits F and G respectively. Accordingly, Progress asserts a security interest in both the Debtor's real and personal property located in Reynolds, Indiana.

40.    The Progress Mortgage was filed before the Lighthouse Mortgage, and as discussed in Paragraph 43 is the subject of a subordination agreement between Progress and WSFS.

41.    WSFS has filed a proof of claim (the "**WSFS POC**") in the Case [Claim No. 21] asserting a secured claim in the amount of $15,314,457.64. A copy of the WSFS POC is attached hereto as Exhibit H. The WSFS POC is based on that certain Floating Rate Senior Secured Amortizing PIK Toggle Notes Indenture dated as of January 30, 2017 (the "**Indenture**"), related Security Agreement by and among the Debtor, the guarantors party thereto and WSFS, in favor of WSFS dated the same date (the "**WSFS Security Agreement**") and the Notes. Copies of the Indenture and the WSFS Security Agreement are attached hereto as Exhibits I and J respectively. Pursuant to the WSFS Security Agreement, the Debtor pledged to WSFS, for the benefit of the holders of the Notes, a security interest in, among other things, substantially all of the Debtor's assets, including personal property, fixtures and equipment located in Reynolds, Indiana. *See* WSFS Security Agreement at § 3.1.

42.    WSFS's interest in the Debtor's Reynolds, Indiana assets is also evidenced by that certain Mortgage, Security Agreement, Assignment of Leases and Rents, Financing Statement and Fixture Filing, which was recorded with the White County recorder on December 29, 2017

(the "**WSFS Mortgage**") and the UCC Financing Statement recorded in the State of Virginia on February 3, 2017 with the filing number 17020339513 (the "**WSFS UCC-1**"). Copies of the WSFS Mortgage and WSFS UCC-1 are attached hereto as Exhibits K and L. Accordingly, WSFS asserts a security interest in both the Debtor's real and personal property located in Reynolds, Indiana.

43.     WSFS and Progress entered into that certain Subordination Agreement, dated as of January 30, 2017 (the "**Subordination Agreement**"), whereby the parties agreed that Progress would have the right to receive any outstanding secured amounts owed under the Progress Note, up to $5 million (plus certain fees, costs, and expenses), before any payment or distribution from the sale of any Pledged Collateral (as defined in the Subordination Agreement) could be made to WSFS on account of obligations owed to it under the Indenture and the Notes. *See* Subordination Agreement at § 2.1. A copy of the Subordination Agreement is attached hereto as Exhibit M.

44.     Merida, as DIP Lender to the Debtor, has filed a proof of claim (the "**Merida POC**") in the Case [Claim No. 40] asserting a secured claim in an unknown amount. A copy of the Merida POC is attached hereto as Exhibit N. The Merida POC is based on that certain A&R DIP Credit Agreement entered into by and between the Debtor and Merida on August 1, 2018 (as subsequently amended, the "**DIP Credit Agreement**"). Pursuant to the DIP Credit Agreement, the Debtor granted to Merida continuing, valid, binding, enforceable, non-avoidable and automatically and properly perfected post-petition security interests in and liens on (collectively, the "**DIP Liens**") all of the Debtor's assets other than avoidance actions under Chapter 5 of the Bankruptcy Code. *See* DIP Credit Agreement at § 4. The DIP Liens are junior to any valid and perfected prepetition liens on the Debtor's assets, including those liens of Progress, WSFS,

11

Lighthouse and, to the extent secured, the secured portion of the White County POC.  *See* DIP

Order, Docket No. 135, at ¶ 7.  As of the date hereof, Merida estimates the amount of its claim as

in excess of $2 million.

45.     Thomas M. Clarke is a citizen of Virginia and guarantor of the Notes pursuant to

that certain Guarantee Agreement dated as of January 30, 2017 in favor of WSFS (the "**Clarke**

**Guarantee**").  A copy of the Clarke Guarantee is attached hereto as Exhibit O.  Thomas M.

Clarke has filed a proof of claim (the "**T. Clarke POC**") in the Case [Claim No. 33] asserting

secured and priority claims in an unknown amount.

46.     Ana M. Clarke is a citizen of Virginia and guarantor of the Notes pursuant to the

Clarke Guarantee.

47.     Pursuant to the Clarke Guarantee, Thomas M. Clarke and Ana M. Clarke agreed

to provide, on a senior unsecured basis, to WSFS, a guarantee for, among other things, the

principal, premium and interest owed on the Notes.  *See* Clarke Guarantee at § 2.1(a).  They also

agreed to pay all costs and expenses incurred by WSFS, as Trustee, in enforcing the terms of the

Indenture, the Notes, the WSFS Security Agreement and the Clarke Guarantee.  *Id.* at § 2.1(c).

48.     The Bankruptcy Court has jurisdiction over the subject matter of this action

pursuant to 28 U.S.C. §§ 157, 1334(b) and 2201.

49.     This action is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B) and (K).

50.     Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

## WHITE COUNTY'S CLAIM

51.     As noted above, and as reflected in the White County POC, White County asserts

a secured claim of at least $6,790,806.78, purportedly for unpaid real and personal property taxes

associated with the Pellet Plant.  Of this amount, $1,600,770.85 allegedly relates to unpaid

property taxes incurred between May 25, 2017 and the Petition Date, for which White County

asserts a priority claim under Bankruptcy Code Section 507(a)(8).

52.     White County is seeking payment of its claim out of the Indiana Sale Proceeds.

53.     As an initial matter, White County has not explained how a portion of its secured

claim is entitled to priority status.

54.     Additionally, the White County POC does not include an itemization of any

penalties that White County may have assessed against the Debtor related to unpaid taxes, which

penalties would be impermissible if assessed after the Case was filed.

55.     But more to the point, Plaintiffs object to the amount and classification of the

White County POC and disagree that White County is entitled to any portion of the Indiana Sale

Proceeds.  As set forth below, Plaintiffs believe that White County's claim is grossly overstated

and that most of the claim (even when appropriately reduced) should be classified as a general

unsecured claim.

### The White County POC Is Overstated Because It Is Based on an Excessive Estimated Value of the Debtor's Real and Personal Property

56.     White County's claim is based on unpaid real and personal property taxes.

Regarding unpaid real property taxes, Exhibit 2 attached to the White County POC indicates that,

as of the date of the filing of the White County POC, the Debtor owed White County (1)

$563,633.99 in real property taxes related to State Parcel Number 91-74-27-000-000.200-005;

and (2) $101,271.09 in real property taxes related to State Parcel Number 91-105-53038-00.

57.     Upon information and belief, and as reflected on Exhibit 2 attached to the White

County POC, the Debtor has failed to pay (1) an additional $120,130.94 in real property taxes

that were due on or before November 13, 2018, related to State Parcel Number 91-74-27-000-

000.200-005; and (2) an additional $92,064.63 in real property taxes that were due on or before November 13, 2018, related to State Parcel Number 91-105-53038-00.

58.    Thus, White County has asserted that it is owed $877,100.65 in assessed, but unpaid real property taxes on the real property on which the Pellet Plant sits.

59.    Regarding unpaid personal property taxes, White County has asserted that the Debtor owes it $6,125,901.70 in personal property taxes arising under Indiana law, as set forth in Exhibit 2 to the White County POC.

60.    White County's calculation of the foregoing real and personal property taxes is premised on an estimated (and, Plaintiffs believe, excessive) valuation of the Debtor's real and personal property in Reynolds, Indiana, of $267,979,910.  *See* attachment to White County POC at p. 3.    White County has provided no basis for its estimated valuation, which is flatly contradicted by the results of the Auction.    The results of the Auction, plus the valuation performed by Hilco Valuation Services, dated April 4, 2016 (the "**Hilco Appraisal**"), establish that the value of the Debtor's Reynolds, Indiana assets are worth nowhere near $267 million.    A copy of the Hilco Appraisal is attached hereto as Exhibit P.    For this reason alone, the White County POC appears substantially overstated.

61.    As recently as April 2018, in connection with the Magnetation Case, White County alleged that "[o]n or before May 10, 2018, [the Debtor] owes White County no less than $517,646.33 for real property taxes and $5,651,819.35 for personal property taxes . . . ."  *Notice of Hearing and Motion for an Order Enforcing the Sale Order and Directing ERP Iron Ore, LLC to Pay Certain Taxes and Fees* [Docket No. 1704, ¶ 20] (the "**Magnetation Motion**"). While Plaintiffs do not know why White County now is seeking $877,100.65 for real property taxes

and $6,125,901.70 for personal property taxes, the substantial increases seriously call into question the amount of White County's claim.

### The White County POC Is Overstated Because it Fails to Account for the TIF Revenues

62.     The White County POC is also overstated, and should be reduced, because White County has failed to take into account a substantial offset available to the Debtor, which holds 100% of those certain White County, Indiana Taxable Economic Development Revenue Bonds, Series 2013, dated as of June 1, 2013 (the **"TIF Bonds"**).

63.     The TIF Bonds were issued pursuant to that certain Trust Indenture by and between White County and Old National Trust Company ("**Old National**"), dated as of June 1, 2013 (the "**TIF Indenture**") and that certain Loan Agreement between Mag Pellet, LLC and White County, Indiana, dated as of June 1, 2013 (the **"Loan Agreement"**).

64.     In conjunction with the Loan Agreement, a note was issued by Mag Pellet, LLC to White County, Indiana in the principal sum of $23,470,000, dated as of June 6, 2013 (the "**TIF Note**").

65.     Although Mag Pellet, LLC was the original holder of the TIF Bonds and party to the Loan Agreement, the TIF Bonds and the Loan Agreement were assigned to the Debtor pursuant to the Asset Purchase Agreement dated December 6, 2016, that was approved by the Bankruptcy Court pursuant to a Sale Order dated December 21, 2016, in the Magnetation Case.

66.     Pursuant to the Loan Agreement, the Debtor was required to pay to White County on February 1 and August 1 of each year a sum equal to the amount due and owing on the TIF Bonds on that date, reduced by credits on the TIF Note for any TIF Revenues (as defined in the TIF Indenture) received by White County.

67.   Pursuant to the TIF Indenture, "TIF Revenues" are defined in relevant part as "eighty percent (80%) of the Tax Increment" received between January 1, 2013 and December 31, 2036.  (TIF Indenture, §1.1.)

68.   "Tax Increment" under the Indenture is defined as "all real and personal property tax proceeds attributable to the assessed value of the [Pellet Plant] as of each March 1, in excess of the base assessed value as of March 1, 2007.  The incremental assessed value is multiplied by the current property tax rate (per $100 assessed value)."  (TIF Indenture, §1.1.)

69.   In turn, under the TIF Indenture, on or before January 15 and July 15 of each year, Old National is required to transfer amounts sufficient to pay the amounts then-due on the TIF Bonds for payment to the Debtor, the holder of the TIF Bonds.

70.   Thus, while White County has asserted a claim for at least $6,790,806.78 in unpaid real and personal property taxes, that amount is much less because, as holder of the TIF Bonds, the Debtor is permitted to receive a payment of 80% of real and personal property taxes assessed by White County that are in excess of the base assessed value of the Pellet Plant as of March 1, 2007.

71.   Upon information and belief, the real property on which the Pellet Plant is located was undeveloped on March 1, 2007 with a low-assessed value, entitling the Debtor to receipt from White County of close to 80% of the real and personal property taxes paid by the Debtor each year to White County as a payment on the TIF Bonds.

72.   In fact, on May 18, 2018, after White County filed the Magnetation Motion, the Bankruptcy Court entered an agreed order (the "**Agreed Order**") between White County and the debtor in the Magnetation Case [Docket No. 1750] wherein White County agreed to accept $2,569,031.19, or 20% of the tax payment owed, and further agreed that the amount of

$4,217,329.85, which represented the TIF Revenues, would be deemed paid by the Debtor to White County, by White County to Old National, and by Old National to the Debtor, as holder of the TIF Bonds.

73.     Ultimately, while the Debtor did not make the payment contemplated by the Agreed Order because the involuntary petition was filed against it before such payment became due, the Agreed Order reflects both that White County is in fact owed only a fraction of the amount asserted in the White County POC, and that White County's claim is not fully secured.

**Only a Small Portion of White County's Claim is Secured and White County Has No Secured Claim with Respect to the Indiana Sale Proceeds**

74.     In addition to the fact that the White County claim is grossly overstated, only a small portion of the claim -- that portion representing unpaid real property taxes -- is secured under state law.

75.     Indiana Code § 6-1.1-22-13 provides that: "The state acquires a lien on each tract of real property for all property taxes levied against the tract, including the land under an improvement or appurtenance described in IC 6-1.1-2-4(b), and all subsequent penalties and cost resulting from the taxes." *See* IN Code § 6-1.1-22-13 (2017).

76.     Thus, under state law, White County may assert a secured claim with respect to real property taxes that are required to be paid by the Debtor under Indiana law ("**White County's Real Property Claim**").

77.     But as discussed above, White County's Real Property Claim is subject to set-off of the TIF Revenues and, upon information and belief, White County holds a secured claim in the Debtor's real property in White County, Indiana in an amount that is no more than 20 percent of the amount of real property taxes that it asserts it is owed (the "**White County Secured Claim**").

78.     Therefore, due to the set-off of the TIF Bonds in the amount of 80 percent as described herein, and based solely upon the amount of real property taxes now due as set forth in the White County POC, the White County Secured Claim cannot exceed $175,420.13, minus any penalties arising post-petition that were included as a part of the White County claim. Moreover, under Indiana Code § 6-1.1-22-13, the White County Secured Claim is secured only by the Debtor's real property that is the subject of the real property taxes.

79.     In addition to White County's Real Property Claim, White County has asserted that the Debtor owes it personal property taxes totaling $6,125,901.70 under Indiana law.

80.     Although Indiana law allows for the assessment of personal property taxes and includes mechanisms for the collection of delinquent personal property taxes, *see* specifically Indiana Code §§ 6.1.1-23 *et al*., Indiana law does not create an automatic statutory lien to secure the payment of personal property taxes.

81.     Therefore, the portion of the White County POC that is based upon assessed personal property taxes is unsecured.

82.     Moreover, due to the set-off of the TIF Bonds in the amount of 80 percent as described herein, and based solely upon the amount of personal property taxes now due as set forth in the White County POC, White County holds an unsecured claim against the Debtor's personal property associated with the Pellet Plant in an amount not exceeding $1,225,181, minus any penalties arising post-petition that were included as a part of the White County claim.

83.     As described above, White County only has a security interest in the Debtor's assets with respect to the real property tax portion of its claim which has been asserted in the amount of $877,100.65 and, after application of the TIF Bond, is not more than $175,420.13.

The remainder of White County's claim is an unsecured claim against the Debtor that would be payable only after the payment of all secured creditors, including the Plaintiffs here.

84.     Moreover, the White County Secured Claim only is secured by the parcels of real property that were subject to the real estate tax.  Because the Indiana Assets sold to AHMSA do not include real property (as made clear in the Notice of Purchase Agreement and AHMSA Purchase Agreement), White County has no secured claim with respect to the Indiana Sale Proceeds.

85.     Accordingly, Plaintiffs dispute the amount and classification of the White County POC and disagree that White County is entitled to any portion of the Indiana Sale Proceeds.

86.     A determination regarding the amount and classification of the White County POC in conjunction with a resolution of the remaining competing claims to, and interests in, the Indiana Sale Proceeds is necessary so that the Indiana Sale Proceeds can be properly and promptly distributed.

## LIGHTHOUSE'S CLAIM

87.     Also as noted above, the Lighthouse Claim is expressly subordinate to that of WSFS.  *See* Lighthouse Security Agreement at § 3.3(a).  Further, since the Progress Mortgage was filed before the Lighthouse Mortgage, the Lighthouse Claim is also subordinate to that of Progress.  As such, to the extent valid, Plaintiffs dispute any contention by Lighthouse that its claim is entitled to higher priority than the claims of WSFS and Progress.

88.     A determination of the validity, scope and priority of the Lighthouse Claim, along with a resolution of the remaining competing claims to, and interests in, the Indiana Sale Proceeds is necessary so that the Indiana Sale Proceeds can be properly distributed.

## **COUNT ONE**

### **(Determination of the Validity, Priority, and Extent of the White County POC)**

89.  Plaintiffs repeat and reallege paragraphs 1 through 88 of this Complaint.

90.  This is an adversary proceeding brought pursuant to Rules 7001(2) and (8) of the Federal Rules of Bankruptcy Procedure, "to determine the validity, priority, or extent" of the various competing liens or other interests in the Indiana Sale Proceeds, including the White County and Lighthouse Claims.

91.  In the White County POC, White County asserts interests in both the Debtor's real and personal property located in Reynolds, Indiana.  White County is secured by a statutory lien in the Debtor's real property located in White County, Indiana for the amount of real property taxes that the Debtor owes to White County, subject to the Debtor's set-off of the TIF Revenues.  The maximum amount of White County's secured claim is $175,420.13, which is secured solely by the real property owned by the Debtor.   $6,125,901.70 of the White County POC that arose from the assessment of personal property taxes is an unsecured claim, also subject to the Debtor's set-off of the TIF Revenues.

92.  The issues concerning the validity, priority, and extent of White County's claim must be resolved, so that the Indiana Sale Proceeds may be allocated appropriately among the parties to this action.

93.  This issue is ripe for adjudication.  Adjudication of this issue now will allow the Chapter 7 Trustee to promptly and properly distribute the Indiana Sale Proceeds.

WHEREFORE, Plaintiffs request judgment to determine the validity, priority, and extent of White County's claim, if any, to the Indiana Sale Proceeds.

## COUNT TWO

### (Declaratory Relief of the Validity, Priority, and Extent of the White County POC)

94.     Plaintiffs repeat and reallege paragraphs 1 through 93 of this Complaint.

95.     Plaintiffs seek a declaratory judgment determining the relative rights and interests in the Indiana Sale Proceeds, including the validity, priority, and extent of any alleged security interests therein.

96.     Because the Indiana Assets do not constitute real property and include only personal property of the Debtor, the White County Secured Claim does not attach to the Indiana Assets or the Indiana Sale Proceeds, and to the extent that White County is entitled to any recovery from the Indiana Sale Proceeds, all parties secured in the Indiana Assets, including the Plaintiffs, must be first fully repaid.

WHEREFORE, Plaintiffs request judgment to determine the validity, priority, and extent of White County's claim, if any, in the Debtor's real and personal property located in Reynolds, Indiana and Indiana Sale Proceeds.

## COUNT THREE

### (Determination of the Validity, Priority, and Extent of the Lighthouse Claim)

97.     Plaintiffs repeat and reallege paragraphs 1 through 96 of this Complaint.

98.     In the Lighthouse POC, Lighthouse asserts interests in both the Debtor's real and personal property assets located in Reynolds, Indiana.  The Lighthouse Claim is secured by the Lighthouse Mortgage on the Debtor's real property located in White County, Indiana.  The Lighthouse Mortgage was filed after the Progress Mortgage and the Lighthouse Claim is expressly subordinate to any obligation owed to WSFS.

99.    The issues concerning the validity, priority, and extent of Lighthouse's claim must be resolved, so that the Indiana Sale Proceeds may be allocated appropriately among the parties to this action.

100.    This issue is ripe for adjudication.  Adjudication of this issue now will allow the Chapter 7 Trustee to promptly and properly distribute the Indiana Sale Proceeds.

WHEREFORE, Plaintiffs request judgment to determine the validity, priority, and extent of the Lighthouse Claim, if any in the Debtor's real and personal property located in Reynolds, Indiana and the Indiana Sale Proceeds.

## COUNT FOUR

### (Declaratory Relief of the Validity, Priority, and Extent of the Lighthouse Claim)

101.    Plaintiffs repeat and reallege paragraphs 1 through 100 of this Complaint.

102.    Plaintiffs seek a declaratory judgment determining relative rights and interests in the Indiana Sale Proceeds, including the validity, priority, and extent of any alleged security interests therein.

103.    The Lighthouse Claim is subordinate to all obligations owed by the Debtor to Progress and WSFS.

WHEREFORE, Plaintiffs request judgment to determine the validity, priority, and extent of the Lighthouse Claim, if any, in the Debtor's real and personal property located in Reynolds, Indiana and the Indiana Sale Proceeds.

## COUNT FIVE

### (Declaratory Relief of the Validity, Priority, and Extent of All Liens and Claims)

104.    Plaintiffs repeat and reallege paragraphs 1 through 103 of this Complaint.

105.    Plaintiffs seek a declaratory judgment determining relative rights and interests in the Indiana Sale Proceeds, including the validity, priority, and extent of any alleged security interests.

106.    At all relevant times, Plaintiffs WSFS and Progress have held contractual, statutory and/or common law liens or interests in the Debtor's assets that are superior to the DIP Lien and to the White County and Lighthouse Claims.

107.    The Lighthouse Claim is subordinate to the claims of Progress and WSFS.

108.    At all relevant times, Plaintiff Merida has held a security interest in the Debtor's assets that are superior to White County's claim, to the extent that White County's claim is unsecured.

109.    As a result of the foregoing, an actual controversy has arisen and now exists between the Plaintiffs and Defendants as to the validity, priority, and extent of the purported White County and Lighthouse Claims on the Indiana Sale Proceeds.

110.    A determination by the Bankruptcy Court of the validity, priority, and extent of the liens and claims of Progress, WSFS, Merida, White County and Lighthouse assert against the Indiana Sale Proceeds is necessary to the proper administration of the Debtor's estate.

111.    This issue is ripe for adjudication.  Adjudication of this issue now will allow the Chapter 7 Trustee to promptly and properly distribute the Indiana Sale Proceeds.

WHEREFORE, Plaintiffs seek (i) a declaratory judgment determining the validity, priority, and extent of all liens and claims, including those of  Progress, WSFS, Merida, White County and Lighthouse against the Indiana Sale Proceeds, (ii) a declaratory judgment determining that White County's interest in the Indiana Sale Proceeds, if any, is junior to those of Plaintiffs WSFS, Progress, and Merida, and (iii) a declaratory judgment determining that Lighthouse's interest in the Indiana Sale Proceeds, if any, is junior to those of Plaintiffs WSFS and Progress.

## COUNT SIX

### (Objection to White County's Claim)

112.    Plaintiffs repeat and reallege paragraphs 1 through 111 of this Complaint.

113.    Plaintiffs object to the White County POC as overstated because it is based on an excessive estimated value of the Debtor's real and personal property and fails to take into account the TIF Revenues that are ultimately payable to the Debtor.

114.    Plaintiffs further object to, and seek reclassification of, the White County POC to the extent that it purports to be a fully secured claim and/or a claim entitled to priority superior to that of the Plaintiffs.

115.    In the White County POC, White County asserts that the value of the Debtor's Indiana property exceeds $267 million but provides no basis or support for that assertion.  As noted above, however, the Indiana Assets, not including the real estate, have been sold to AHMSA for $15 million after a Bankruptcy Court-approved marketing process.  Accordingly, White County cannot substantiate its assertion that the Debtor's property is worth in excess of $267 million.  Plaintiffs challenge the White County POC, if valid, to the extent it is based on an inflated valuation of the Debtor's assets, and request that the White County POC, if valid, be appropriately reduced to reflect the actual value of the Indiana Assets.

WHEREFORE, Plaintiffs seek to disallow the White County POC to the extent it overstates the total claim or the value of any collateral against which it holds a validly perfected prepetition lien and such further relief as the Bankruptcy Court deems proper.

## COUNT SEVEN

### (Objection to Lighthouse's Claim)

116.    Plaintiffs repeat and reallege paragraphs 1 through 115 of this Complaint.

117.    Plaintiffs object to the Lighthouse Claim to the extent that Lighthouse claims priority higher than the claims of WSFS and Progress.

WHEREFORE, Plaintiffs seek to disallow Lighthouse's Claim to the extent Lighthouse claims priority higher than the claims of WSFS and Progress.  Plaintiffs seek such further relief as the Bankruptcy Court deems proper.

Dated:  December 17, 2018

**DORSEY & WHITNEY LLP**

By: /e/ Monica Clark_____
Monica Clark, # 28211X
Natasha Wells, # 397950
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600
Facsimile: (612) 340-2868

*Attorneys for Progress Rail Leasing Corporation*

-and

**BALLARD SPAHR LLP**

By: /s/ Charles E. Nelson
William P. Wassweiler (0232348)
Charles E. Nelson (0392389)
80 South Eighth Street, 2000 IDS Center
Minneapolis, MN 55402-2119
Telephone: (612) 371-3211
wassweilerw@ballardspahr.com
nelsonc@ballardspahr.com

-and

**PRYOR CASHMAN LLP**

Seth H. Lieberman (pro hac vice)
Conrad K. Chiu (pro hac vice)
Matthew W. Silverman (pro hac vice)
7 Times Square
New York, NY 10036-6569
Telephone: (212) 326-0258
slieberman@pryorcashman.com
cchiu@pryorcashman.com
msilverman@pryorcashman.com

*Attorneys for Wilmington Savings Fund
Society, FSB, as Indenture Trustee*

-and

**DENTONS US LLP**

By: /s/ Robert Richards

Oscar Pinkas (pro hac vice)
Robert Richards (pro hac vice)
Lauren Macksoud (pro hac vice)
Dentons US LLP
1221 Ave of the Americas
New York, NY 10020
Tel: (212) 768-6700
oscar.pinkas@dentons.com
robert.richards@dentons.com
lauren.macksoud@dentons.com

*Attorneys for Merida Natural Resources,
LLC, Thomas M. Clarke and Ana M. Clarke*