# Exhibit J

EXECUTION VERSION

SECURITY AGREEMENT

made by

ERP IRON ORE, LLC

and certain other Grantors party hereto from time to time,

in favor of

Wilmington Savings Fund Society, FSB
as Collateral Agent

Dated as of January 30, 2017

# TABLE OF CONTENTS

Page

SECTION 1.   DEFINED TERMS ......................................................................... 1
   1.1   Definitions......................................................................................... 1
   1.2   Other Definitional Provisions ......................................................... 4

SECTION 2.   [RESERVED] ............................................................................... 5

SECTION 3.   GRANT OF SECURITY INTEREST ........................................... 5
   3.1   Issuer Collateral ............................................................................... 5
   3.2   Coke Collateral. ............................................................................... 6

SECTION 4.   REPRESENTATIONS AND WARRANTIES.............................. 6
   4.1   Title; No Other Liens ....................................................................... 6
   4.2   Perfected First Priority Liens .......................................................... 6
   4.3   Jurisdiction of Organization; Chief Executive Office .................... 7
   4.4   Inventory and Equipment ................................................................ 7
   4.5   Farm Products .................................................................................. 7
   4.6   Investment Property ......................................................................... 7
   4.7   Receivables ...................................................................................... 7
   4.8   Contracts .......................................................................................... 7
   4.9   Intellectual Property......................................................................... 8
   4.10   Commercial Tort Claims.................................................................. 9

SECTION 5.   COVENANTS .............................................................................. 9
   5.1   Delivery of Instruments, Certificated Securities and Chattel Paper ...... 9
   5.2   Maintenance of Insurance ................................................................ 9
   5.3   Payment of Obligations.................................................................... 10
   5.4   Maintenance of Perfected Security Interest; Further Documentation.................. 10
   5.5   Changes in Name, etc ...................................................................... 10
   5.6   Notices ............................................................................................. 10
   5.7   Investment Property ......................................................................... 11
   5.8   Contracts .......................................................................................... 12
   5.9   Intellectual Property......................................................................... 12
   5.10   Commercial Tort Claims.................................................................. 13

SECTION 6.   REMEDIAL PROVISIONS ......................................................... 13
   6.1   Certain Matters Relating to Receivables......................................... 14
   6.2   Communications with Obligors; Issuer Remains Liable ................. 14
   6.3   Pledged Shares ................................................................................. 15
   6.4   Proceeds to be Turned Over To Collateral Agent............................ 16
   6.5   Application of Proceeds.................................................................... 16
   6.6   Code and Other Remedies ............................................................... 16
   6.7   Subordination................................................................................... 17
   6.8   Deficiency ........................................................................................ 17

6.9      Collateral Enforcement Standstill ........................................................................ 17

SECTION 7.     THE COLLATERAL AGENT ........................................................ 17
7.1      Collateral Agent's Appointment as Attorney-in-Fact, etc .................................. 17
7.2      Duty of Collateral Agent ..................................................................................... 19
7.3      Execution of Financing Statements ..................................................................... 19
7.4      Authority of Collateral Agent .............................................................................. 20

SECTION 8.     MISCELLANEOUS ...................................................................... 20
8.1      Amendments in Writing ....................................................................................... 20
8.2      Notices .................................................................................................................. 20
8.3      No Waiver by Course of Conduct; Cumulative Remedies .................................. 20
8.4      Enforcement Expenses; Indemnification ............................................................. 20
8.5      Successors and Assigns ........................................................................................ 21
8.6      Counterparts ......................................................................................................... 21
8.7      Severability .......................................................................................................... 21
8.8      Section Headings .................................................................................................. 21
8.9      Integration ............................................................................................................ 21
8.10     **GOVERNING LAW**......................................................................................... 21
8.11     Submission To Jurisdiction; Waivers .................................................................. 21
8.12     Acknowledgements ............................................................................................... 22
8.13     Additional Grantors ............................................................................................. 22
8.14     Termination or Release ........................................................................................ 22
8.15     **WAIVER OF JURY TRIAL** ............................................................................ 23

<u>SCHEDULES</u>

Schedule 1      Investment Property
Schedule 2      Perfection Matters
Schedule 3      Jurisdictions of Organization and Chief Executive Offices
Schedule 4      Inventory and Equipment Locations
Schedule 5      Intellectual Property
Schedule 6      Excluded Payment Obligations
Schedule 7      Notice Addresses

#4824-0892-4987v13

SECURITY AGREEMENT dated as of January 30, 2017, among the Grantors (as defined below) and Wilmington Savings Fund Society, FSB, as trustee under the Indenture (defined below) (in such capacity, the "Trustee") and as collateral agent for the Secured Parties (in such capacity, the "Collateral Agent") on behalf of the registered holders (the "Holders") of the Floating Rate Senior Secured Amortizing Notes issued pursuant to the indenture, dated as of January 30, 2017 (as amended, supplemented or otherwise modified from time to time, the "Indenture"), among ERP Iron Ore LLC, a Virginia limited liability company (the "Issuer"), the Guarantors listed on the signature pages thereto and Wilmington Savings Fund Society, FSB, as Trustee, Collateral Agent, paying agent (in such capacity, the "Paying Agent"), registrar (in such capacity, the "Registrar") and calculation agent (in such capacity, the "Calculation Agent").

W I T N E S S E T H:

WHEREAS, on May 5, 2015, Magnetation LLC (the "Debtor Company") and certain of its subsidiaries (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., in the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court") and the Debtor Company and the Debtors have continued to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

WHEREAS, the Issuer has duly authorized the creation and issuance of $22,500,000 aggregate principal amount of its Floating Rate Senior Secured Amortizing PIK Toggle Notes due December 31, 2019 (the "Notes") pursuant to the Indenture; and

WHEREAS, the Grantors will derive substantial benefits from the issuance of the Notes pursuant to the Indenture, and are willing to execute and deliver this Agreement in order to secure their Obligations under the Indenture and the other Notes Documents;

WHEREAS, pursuant to the Indenture, the Issuer has issued its Notes upon the terms and subject to the conditions set forth therein.

NOW, THEREFORE, the Grantors who are signatories hereto and the Collateral Agent agree as follows for the benefit of each other and for the equal and ratable benefit of the Holders of the Notes.

SECTION 1.   DEFINED TERMS

1.1   Definitions.  (a) Unless otherwise defined herein, terms defined in the Indenture and used herein shall have the meanings given to them in the Indenture, and the following terms are used herein as defined in the New York UCC:  Accounts, As-Extracted Collateral, Certificated Security, Chattel Paper, Commercial Tort Claims, Documents, Equipment, Farm Products, Fixtures, General Intangibles, Instruments, Inventory, Letter-of-Credit Rights and Supporting Obligations.

(b)   The following terms shall have the following meanings:

"Agreement":  this Security Agreement, as the same may be amended, supplemented or otherwise modified from time to time.

"COKE": ERP Compliant COKE, LLC, a Delaware limited liability company, and its successors.

"Coke Plant": means (i) a 244-acre parcel of real property located in Birmingham, Alabama on which coke manufacturing facilities, including coke ovens, railyard and water treatment assets, are operated by COKE to produce, among other things, blast furnace coke, foundry coke, and industrial coke, and (ii) all fixtures located on such real property.

"Collateral":  means, collectively, the Coke Collateral and the Issuer Collateral.

"Collateral Account":  any collateral account established by the Collateral Agent as provided in Section 6.1 or 6.4.

"Commodity Exchange Act":  the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Contract" means any written contracts and agreements between any Grantor and any Person (in each case, whether third party or intercompany) as the same may be amended, extended, restated, amended and restated, supplemented, replaced or otherwise modified from time to time, including (i) all rights of any Grantor to receive moneys due and to become due to it thereunder or in connection therewith, (ii) all rights of any Grantor to receive proceeds of any insurance, indemnity, warranty or guaranty with respect thereto, (iii) all rights of any Grantor to damages arising thereunder and (iv) all rights of any Grantor to terminate and to perform and compel performance of, such contracts and to exercise all remedies thereunder.

"Copyrights":  (i) all copyrights arising under the laws of the United States, any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished (including, without limitation, those listed in Schedule 5), all registrations and recordings thereof, and all applications in connection therewith, including, without limitation, all registrations, recordings and applications in the United States Copyright Office, and (ii) the right to obtain all renewals thereof.

"Copyright Licenses":  any written agreement naming any Grantor as licensor or licensee (including, without limitation, those listed in Schedule 5), granting any right under any Copyright, including, without limitation, the grant of rights to manufacture, distribute, exploit and sell materials derived from any Copyright.

"Deposit Account":  as defined in the Uniform Commercial Code of any applicable jurisdiction and, in any event, including, without limitation, any demand, time, savings, passbook or like account maintained with a depositary institution.

"Grantor" means the Issuer, each Guarantor that is a party hereto and each Guarantor that becomes a party to this Agreement after the date hereof.

"Holders": as defined in the preamble hereto.

"Indenture": as defined in the preamble hereto.

"Intellectual Property":  the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including, without limitation, the Copyrights, the Copyright Licenses, the Patents, the Patent Licenses, the Trademarks and the Trademark Licenses, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Investment Property":  the collective reference to (i) all "investment property" as such term is defined in Section 9-102(a)(49) of the New York UCC and (ii) whether or not constituting "investment property" as so defined, all Pledged Notes and all Pledged Shares.

"Issuer":  as defined in the preamble hereto.

"Magnetation Contracts" means any material written contract or agreement between any Grantor and any Person (in each case, whether third party or intercompany) assumed by a Grantor from one or more of the Debtors in connection with the transactions described in the APA and related agreements.

"Material Adverse Effect":  a material adverse effect on (a) the business, property, operations or condition (financial or otherwise) of the Issuer and its Subsidiaries taken as a whole or (b) the validity or enforceability of the Indenture or any of the other Notes Documents or the rights or remedies of the Trustee, Collateral Agent or the other Secured Parties hereunder or thereunder.

"New York UCC":  the Uniform Commercial Code as from time to time in effect in the State of New York.

"Notes":  as defined in the preamble hereto.

"Notes Documents" means the Notes, the Guarantees, the Indenture and the related Collateral Documents.

"Obligations":  mean the Obligations in respect of the Notes, the Guarantees, the Indenture and the related Collateral Documents.

"Patents":  (i) all letters patent of the United States, any other country or any political subdivision thereof, all reissues and extensions thereof and all goodwill associated therewith, including, without limitation, any of the foregoing referred to in Schedule 5, (ii) all applications for letters patent of the United States or any other country and all divisions, continuations and continuations-in-part thereof, including, without limitation, any of the foregoing referred to in Schedule 5, and (iii) all rights to obtain any reissues or extensions of the foregoing.

"Patent License":  all agreements, whether written or oral, providing for the grant by or to any Grantor of any right to manufacture, use or sell any invention covered in whole or in part by a Patent, including, without limitation, any of the foregoing referred to in Schedule 5.

3

"<u>Pledged Notes</u>":  all promissory notes listed on <u>Schedule 1</u> and all other promissory notes issued to or held by any Grantor (other than promissory notes issued in connection with extensions of trade credit by any Grantor in the ordinary course of business).

"<u>Pledged Shares</u>":  the shares of Capital Stock listed on <u>Schedule 1</u>, together with any other shares, stock certificates, options, interests or rights of any nature whatsoever in respect of the Capital Stock of any Person that may be issued or granted to, or held by, any Grantor while this Agreement is in effect.

"<u>Pledged Share Issuers</u>":  the collective reference to each issuer of any Investment Property.

"<u>Proceeds</u>":  all "proceeds" as such term is defined in Section 9-102(a)(64) of the New York UCC and, in any event, shall include, without limitation, all dividends or other income from the Investment Property, collections thereon or distributions or payments with respect thereto.

"<u>Receivable</u>":  any right to payment for goods sold or leased or for services rendered, whether or not such right is evidenced by an Instrument or Chattel Paper and whether or not it has been earned by performance (including, without limitation, any Account).

"<u>Secured Parties</u>":  collectively, the Collateral Agent, the Trustee and each other Agent, the Holders, and the other Persons the Obligations owing to which are or are purported to be secured by the Collateral under the terms of the Collateral Documents.

"<u>Securities Act</u>":  the Securities Act of 1933, as amended.

"<u>Trademarks</u>":  (i) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos and other source or business identifiers, and all goodwill associated therewith, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof, or otherwise, and all common-law rights related thereto, including, without limitation, any of the foregoing referred to in <u>Schedule 5</u>, and (ii) the right to obtain all renewals thereof.

"<u>Trademark License</u>":  any agreement, whether written or oral, providing for the grant by or to any Grantor of any right to use any Trademark, including, without limitation, any of the foregoing referred to in <u>Schedule 5</u>.

1.2   <u>Other Definitional Provisions</u>.  (a) The words "hereof," "herein", "hereto" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section and Schedule references are to this Agreement unless otherwise specified.

(b)   The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

#4824-0892-4987v13

(c)      Where the context requires, terms relating to the Collateral or any part thereof, when used in relation to a Grantor, shall refer to such Grantor's Collateral or the relevant part thereof.

## SECTION 2.   [RESERVED]

## SECTION 3.   GRANT OF SECURITY INTEREST

As collateral security for the prompt payment in full when due (whether at stated maturity, by acceleration or otherwise) of the Obligations,

3.1      <u>Issuer Collateral</u>. The Issuer hereby pledges and grants to the Collateral Agent, for the ratable benefit of the Secured Parties, a first-priority security interest in all of the Issuer's right, title and interest in the following property, assets and revenues, whether now owned or at any time hereafter acquired by the Issuer or in which the Issuer now has or at any time in the future may acquire any right, title or interest (collectively, the "Issuer Collateral"):

(a)      all Accounts;

(b)      all As-Extracted Collateral;

(c)      all Chattel Paper;

(d)      all Contracts;

(e)      all Deposit Accounts;

(f)      all Documents;

(g)      all Equipment;

(h)      all Fixtures;

(i)      all General Intangibles;

(j)      all Instruments;

(k)      all Intellectual Property;

(l)      all Inventory;

(m)      all Investment Property;

(n)      all Letter-of-Credit Rights;

(o)      the Pledged Shares owned by the Issuer;

(p)     all other property not otherwise described above (except for any property specifically excluded from any clause in this section above, and any property specifically excluded from any defined term used in any clause of this section above);

(q)     all books and records pertaining to the Issuer Collateral; and

(r)     to the extent not otherwise included, all Proceeds, Supporting Obligations and products of any and all of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing.

3.2     <u>Coke Collateral</u>. COKE hereby pledges and grants to the Collateral Agent, for the ratable benefit of the Secured Parties, a first-priority security interest in all of COKE's right, title and interest in the following property, assets and revenues, whether now owned or at any time hereafter acquired by COKE or in which COKE now has or at any time in the future may acquire any right, title or interest (collectively, the "Coke Collateral"):

(a)     all Fixtures now or hereafter owned by COKE and attached to or installed in and used in connection with the Coke Plant;

(b)     all books and records pertaining to the Coke Collateral; and

(c)     to the extent not otherwise included, all Proceeds, Supporting Obligations and products of any and all of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing.

## SECTION 4.   REPRESENTATIONS AND WARRANTIES

Each Grantor (but with respect to Coke, limited to Section 4.1, 4.2, 4.3, 4.5 and 4.8) hereby represents and warrants to the Collateral Agent for the ratable benefit of the Secured Parties that:

4.1     <u>Title; No Other Liens</u>.  Except for the security interest granted to the Collateral Agent for the ratable benefit of the Secured Parties pursuant to this Agreement and the other Liens permitted to exist on the Collateral by the Indenture, such Grantor owns each item of the Collateral free and clear of any and all Liens or claims of others.  No financing statement or other public notice with respect to all or any part of the Collateral is on file or of record in any public office, except such as have been filed in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, pursuant to this Agreement or as are permitted by the Indenture.

4.2     <u>Perfected First Priority Liens</u>.  The security interests granted pursuant to this Agreement (a) upon the completion of the filings in the appropriate filing offices and the other actions specified on Schedule 2 (which, in the case of all filings and other documents referred to on said Schedule, have been delivered to the Collateral Agent in completed and duly executed form) will constitute valid perfected security interests in all of the Collateral in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, as collateral security for such Grantor's Obligations, enforceable in accordance with the terms hereof against all creditors of such Grantor and any Persons purporting to purchase any Collateral from such Grantor and (b) are prior to all other Liens on the Collateral in existence on the date hereof except for (i) unrecorded Liens permitted by the Indenture which have priority over the Liens on the Collateral

6

by operation of law and (ii) Liens permitted pursuant to clause 14 of the definition of "Permitted Liens" in the Indenture.

4.3     <u>Jurisdiction of Organization; Chief Executive Office</u>.  On the date hereof, such Grantor's jurisdiction of organization, identification number from the jurisdiction of organization (if any), and the location of such Grantor's chief executive office or sole place of business or principal residence, as the case may be, are specified on Schedule 3. Such Grantor has furnished to the Collateral Agent a certified charter, certificate of incorporation or other organization document and good standing certificate as of a date which is recent to the date hereof.

4.4     <u>Inventory and Equipment</u>.  On the date hereof, the Inventory and the Equipment of the Issuer (other than mobile goods) are kept at the locations listed on Schedule 4.

4.5     <u>Farm Products</u>.  None of the Collateral constitutes, or is the Proceeds of, Farm Products.

4.6     <u>Investment Property</u>.  (a) The shares of Pledged Shares pledged by such Grantor hereunder constitute all the issued and outstanding shares of all classes of the Capital Stock of each Pledged Share Issuer owned by such Grantor.

(b)     All the shares of the Pledged Shares have been duly and validly issued and are fully paid and nonassessable.

(c)     Each of the Pledged Notes constitutes the legal, valid and binding obligation of the obligor with respect thereto, enforceable in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at law) and an implied covenant of good faith and fair dealing.

(d)     Such Grantor is the record and beneficial owner of, and has good and marketable title to, the Investment Property pledged by it hereunder, free of any and all Liens or options in favor of, or claims of, any other Person, except the security interest created by this Agreement.

4.7     <u>Receivables</u>.  (a) No amount payable to such Grantor under or in connection with any Receivable is evidenced by any Instrument or Chattel Paper which has not been delivered to the Collateral Agent.

(b)     None of the obligors on any Receivables is a Governmental Authority.

4.8     <u>Contracts</u>.  To the Issuer's actual knowledge, (a) no consent of any party (other than the Issuer) to any Contract is required, or purports to be required, in connection with the execution, delivery and performance of this Agreement, except as has been obtained.

(b)     Each Contract (with respect to the Magnetation Contracts, to the Issuer's actual knowledge) is in full force and effect and constitutes a valid and legally enforceable obligation of the parties thereto, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights

7

generally, general equitable principles (whether considered in a proceeding in equity or at law) and an implied covenant of good faith and fair dealing.

(c)     No consent or authorization of, filing with or other act by or in respect of any Governmental Authority is required in connection with the execution, delivery, performance, validity or enforceability of any of the Contracts (with respect to the Magnetation Contracts, to the Issuer's actual knowledge) by any party thereto other than those which have been duly obtained, made or performed, are in full force and effect and do not subject the scope of any such Contract to any material adverse limitation, either specific or general in nature.

(d)     Neither the Issuer or its Subsidiaries nor any of the other parties to the Contracts (with respect to the Magnetation Contracts, to the Issuer's actual knowledge) is in default in the performance or observance of any of the terms thereof in any manner that, in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(e)     The right, title and interest of the Issuer or its Subsidiaries in, to and under the Contracts (with respect to the Magnetation Contracts, to the Issuer's actual knowledge) are not subject to any material defenses, offsets, counterclaims or claims.

(f)     The Issuer has delivered to the Collateral Agent a complete and correct copy of each Contract (with respect to the Magnetation Contracts, to the Issuer's actual knowledge), including all amendments, supplements and other modifications thereto.

(g)     No amount payable to such Grantor under or in connection with any Contract (with respect to the Magnetation Contracts, to the Issuer's actual knowledge) is evidenced by any Instrument or Chattel Paper which has not been delivered to the Collateral Agent.

(h)     None of the parties to any Contract (with respect to the Magnetation Contracts, to the Issuer's actual knowledge) is a Governmental Authority.

4.9     <u>Intellectual Property</u>.  To the actual knowledge of the Issuer, (a) <u>Schedule 5</u> lists all Intellectual Property owned by or licensed to the Issuer in its own name on the date hereof.

(b)     On the date hereof, all material Intellectual Property listed on <u>Schedule 5</u> is valid, subsisting, unexpired and enforceable, has not been abandoned and does not infringe the intellectual property rights of any other Person.

(c)     Except as set forth in <u>Schedule 5</u>, on the date hereof, none of the Intellectual Property is the subject of any licensing or franchise agreement pursuant to which such Grantor is the licensor or franchisor.

(d)     No material holding, decision or judgment has been rendered by any Governmental Authority which would limit, cancel or question the validity of, or such Grantor's rights in, any Intellectual Property in any respect.

(e)     No action or proceeding is pending, or, to the knowledge of such Grantor, threatened, on the date hereof (i) seeking to limit, cancel or question the validity of any Intellectual Property listed on <u>Schedule 5</u> or such Grantor's ownership interest therein, or

8

(ii) which, if adversely determined, would have a material adverse effect on the value of any Intellectual Property.

4.10    Commercial Tort Claims.  To the actual knowledge of the Issuer:

(a)    On the date hereof, the Issuer does not have rights in any Commercial Tort Claim with potential value in excess of $100,000.

(b)    Upon the filing of a financing statement covering any Commercial Tort Claim referred to in Section 5.11 hereof against the Issuer in the jurisdiction specified in Schedule 2 hereto, the security interest granted in such Commercial Tort Claim will constitute a valid perfected security interest in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, as collateral security for the Issuer's Obligations, enforceable in accordance with the terms hereof against all creditors of the Issuer and any Persons purporting to purchase such Collateral from the Issuer, which security interest shall be prior to all other Liens on such Collateral except for unrecorded liens permitted by the Indenture which have priority over the Liens on such Collateral by operation of law.

SECTION 5.   COVENANTS

Each applicable Grantor (but with respect to Coke, limited to Section 5.3, 5.4, 5.5 and 5.6) covenants and agrees with the Collateral Agent for the ratable benefit of the Secured Parties that, from and after the date of this Agreement until the Obligations shall have been paid in full:

5.1    Delivery of Instruments, Certificated Securities and Chattel Paper.  If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any Instrument, Certificated Security or Chattel Paper, such Instrument, Certificated Security or Chattel Paper shall be immediately delivered to the Collateral Agent, duly indorsed as necessary and appropriate, to be held as Collateral pursuant to this Agreement.

5.2    Maintenance of Insurance.  (a) The Issuer will maintain, with financially sound and reputable companies, insurance policies (i) insuring the Inventory and Equipment against loss by fire, explosion, theft and such other casualties as is customary and commercially reasonable and (ii) insuring such Grantor and the Collateral Agent for the ratable benefit of the Secured Parties against liability for personal injury and property damage relating to such Inventory and Equipment, such policies to be in such form and amounts and having such coverage as is customary and commercially reasonable.

(b)    All such insurance shall (i) provide that no cancellation, material reduction in amount or material change in coverage thereof shall be effective until at least 30 days after receipt by the Collateral Agent of written notice thereof, (ii) name the Collateral Agent as insured party or loss payee and (iii) include a breach of warranty clause.

(c)    The Issuer shall deliver to the Collateral Agent a report of a reputable insurance broker with respect to such insurance substantially concurrently with each delivery of the Issuer's audited annual financial statements and such supplemental reports as are necessary and appropriate.

9

5.3     <u>Payment of Obligations</u>.  The Issuer will pay and discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all taxes, assessments and governmental charges or levies imposed upon the Collateral or in respect of income or profits therefrom, as well as all claims of any kind (including, without limitation, claims for labor, materials and supplies) against or with respect to the Collateral, except (i) where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves in conformity with GAAP with respect thereto have been provided on the books of the Issuer or (ii) as set forth in Schedule 6.

5.4     <u>Maintenance of Perfected Security Interest; Further Documentation</u>.  (a) Such Grantor shall maintain the security interest created by this Agreement as a perfected security interest having at least the priority described in Section 4.2 and shall defend such security interest against the claims and demands of all Persons whomsoever, subject to the rights of such Grantor under the Notes Documents to dispose of the Collateral.

(b)     Such Grantor will furnish to the Collateral Agent from time to time statements and schedules further identifying and describing the assets and property of such Grantor and such other reports in connection therewith as the Collateral Agent may reasonably request, all in reasonable detail.

(c)     At any time and from time to time, and at the sole expense of such Grantor, such Grantor will promptly and duly execute and deliver, and record or authorize the Collateral Agent to record, such further instruments and documents and take such further actions for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted, including, without limitation, (i) filing any financing or continuation statements under the Uniform Commercial Code (or other similar laws) in effect in any jurisdiction with respect to the security interests created hereby and (ii) in the case of Investment Property, Deposit Accounts, Letter-of-Credit Rights and any other relevant Collateral, taking any actions necessary to enable the Collateral Agent to obtain "control" (within the meaning of the applicable Uniform Commercial Code) with respect thereto.

5.5     <u>Changes in Name, etc</u>.  Such Grantor will not, except upon 15 days' prior written notice to the Collateral Agent and delivery to the Collateral Agent of filed copies of all additional executed financing statements and other documents necessary to maintain the validity, perfection and priority of the security interests provided for herein, (i) change its jurisdiction of organization or the location of its chief executive office or sole place of business or principal residence from that referred to in Section 4.3 or (ii) change its name.

5.6     <u>Notices</u>.  Such Grantor will advise the Collateral Agent in writing promptly, in reasonable detail, of:

(a)     any Lien (other than security interests created hereby or Liens permitted under the Indenture) on any of the Collateral which would adversely affect the ability of the Collateral Agent to exercise any of its remedies hereunder; and

#4824-0892-4987v13

(b)      of the occurrence of any other event which could reasonably be expected to have a material adverse effect on the aggregate value of the Collateral or on the security interests created hereby.

5.7      <u>Investment Property</u>.  (a) If such Grantor shall become entitled to receive or shall receive any certificate (including, without limitation, any certificate representing a dividend or a distribution in connection with any reclassification, increase or reduction of capital or any certificate issued in connection with any reorganization), option or rights in respect of the Capital Stock of any Pledged Share Issuer, whether in addition to, in substitution of, as a conversion of, or in exchange for, any shares of the Pledged Shares, or otherwise in respect thereof, such Grantor shall accept the same as the agent of the Secured Parties, hold the same in trust for the Secured Parties and promptly deliver the same forthwith to the Collateral Agent in the exact form received, duly indorsed by such Grantor to the Collateral Agent, if required, together with an undated stock power covering such certificate duly executed in blank by such Grantor and with signature guaranteed, to be held by the Collateral Agent, subject to the terms hereof, as additional collateral security for the Obligations.  Any sums paid upon or in respect of the Investment Property upon the liquidation or dissolution of any Issuer shall be promptly paid over to the Collateral Agent to be held by it hereunder as additional collateral security for the Obligations, and in case any distribution of capital shall be made on or in respect of the Investment Property or any property shall be distributed upon or with respect to the Investment Property pursuant to the recapitalization or reclassification of the capital of any Issuer or pursuant to the reorganization thereof, the property so distributed shall, unless otherwise subject to a perfected security interest in favor of the Collateral Agent, be promptly delivered to the Collateral Agent to be held by it hereunder as additional collateral security for the Obligations. If any sums of money or property so paid or distributed in respect of the Investment Property shall be received by such Grantor, such Grantor shall, until such money or property is paid or delivered to the Collateral Agent, hold such money or property in trust for the Secured Parties, segregated from other funds of such Grantor, as additional collateral security for the Obligations.

(b)      Without the prior written consent of the Collateral Agent, such Grantor will not (i) vote to enable, or take any other action to permit, any Pledged Share Issuer to issue any Capital Stock of any nature or to issue any other securities convertible into or granting the right to purchase or exchange for any Capital Stock of any nature of any Pledged Share Issuer, (ii) sell, assign, transfer, exchange, or otherwise dispose of, or grant any option with respect to, the Investment Property or Proceeds thereof (except pursuant to a transaction expressly permitted by the Indenture), (iii) create, incur or permit to exist any Lien or option in favor of, or any claim of any Person with respect to, any of the Investment Property or Proceeds thereof, or any interest therein, except for (x) the security interests created by this Agreement and (y) Liens securing the Borrower Obligations (as such term is defined in the Guarantee Agreement) and the Guarantor Obligations (as such term is defined in the Guarantee Agreement), in each case, permitted by the Indenture or (iv) enter into any agreement or undertaking restricting the right or ability of such Grantor or the Collateral Agent to sell, assign or transfer any of the Investment Property or Proceeds thereof.

(c)      In the case of each Grantor which is a Pledged Share Issuer, such Pledged Share Issuer agrees that (i) it will be bound by the terms of this Agreement relating to the Investment Property issued by it and will comply with such terms insofar as such terms are applicable to it,

11

(ii) it will notify the Collateral Agent promptly in writing of the occurrence of any of the events described in Section 5.7(a) with respect to the Investment Property issued by it and (iii) the terms of Sections 6.3(c) and 6.7 shall apply to it, mutatis mutandis, with respect to all actions that may be required of it pursuant to Section 6.3(c) or 6.7 with respect to the Investment Property issued by it.

5.8    Contracts.  (a) The Issuer will perform and comply in all material respects with all its obligations under the Contracts.

(b)    The Issuer will not amend, modify, terminate or waive any provision of any Contract in any manner which could reasonably be expected to materially adversely affect the value of such Contract as Collateral.

(c)    The Issuer will exercise promptly and diligently each and every material right which it may have under each Contract (other than any right of termination).

(d)    The Issuer will promptly deliver to the Collateral Agent a copy of each material demand, notice or document received by it relating in any way to any Contract that questions the validity or enforceability of such Contract.

5.9    Intellectual Property.  (a) The Issuer (either itself or through licensees) will (i) continue to use each material Trademark on each and every trademark class of goods applicable to its current line as reflected in its current catalogs, brochures and price lists in order to maintain such Trademark in full force free from any claim of abandonment for non-use, (ii) maintain as in the past the quality of products and services offered under such Trademark, (iii) use such Trademark with the appropriate notice of registration and all other notices and legends required by applicable Requirements of Law, (iv) not adopt or use any mark which is confusingly similar or a colorable imitation of such Trademark unless the Collateral Agent, for the ratable benefit of the Secured Parties, shall obtain a perfected security interest in such mark pursuant to this Agreement, and (v) not (and not permit any licensee or sublicensee thereof to) do any act or knowingly omit to do any act whereby such Trademark may become invalidated or impaired in any way if the consequence thereof would materially adversely affect the value of the Trademarks considered as a whole.

(b)    The Issuer (either itself or through licensees) will not do any act, or omit to do any act, whereby any material Patent may become forfeited, abandoned or dedicated to the public.

(c)    The Issuer (either itself or through licensees) (i) will employ each material Copyright and (ii) will not (and will not permit any licensee or sublicensee thereof to) do any act or knowingly omit to do any act whereby any material portion of the Copyrights may become invalidated or otherwise impaired.  The Issuer will not (either itself or through licensees) do any act whereby any material portion of the Copyrights may fall into the public domain if the consequence thereof would materially adversely affect the value of the Copyrights considered as a whole.

12

(d)     The Issuer (either itself or through licensees) will not do any act that knowingly uses any material Intellectual Property to infringe the intellectual property rights of any other Person.

(e)     The Issuer will notify the Collateral Agent in writing immediately if it knows, or has reason to know, that any application or registration relating to any material Intellectual Property may become forfeited, abandoned or dedicated to the public, or of any adverse determination or development (including, without limitation, the institution of, or any such determination or development in, any proceeding in the United States Patent and Trademark Office, the United States Copyright Office or any court or tribunal in any country) regarding such Grantor's ownership of, or the validity of, any material Intellectual Property or such Grantor's right to register the same or to own and maintain the same.

(f)     Whenever the Issuer, either by itself or through any agent, employee, licensee or designee, shall file an application for the registration of any Intellectual Property with the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency in any other country or any political subdivision thereof, such Grantor shall report such filing to the Collateral Agent in writing within five Business Days after the last day of the fiscal quarter in which such filing occurs.  The Issuer shall execute and deliver, and have recorded, any and all agreements, instruments, documents, and papers as necessary to evidence the Secured Parties' security interest in any Copyright, Patent or Trademark and the goodwill and general intangibles of the Issuer relating thereto or represented thereby.

(g)     The Issuer will take all reasonable and necessary steps, including, without limitation, in any proceeding before the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency in any other country or any political subdivision thereof, to maintain and pursue each application (and to obtain the relevant registration) and to maintain each registration of the material Intellectual Property, including, without limitation, filing of applications for renewal, affidavits of use and affidavits of incontestability.

(h)     In the event that any material Intellectual Property is infringed, misappropriated or diluted by a third party, the Issuer shall (i) take such actions as the Issuer shall reasonably deem appropriate under the circumstances to protect such Intellectual Property and (ii) if such Intellectual Property is of material economic value, promptly notify the Collateral Agent in writing after it learns thereof and sue for infringement, misappropriation or dilution, to seek injunctive relief where appropriate and to recover any and all damages for such infringement, misappropriation or dilution.

5.10     <u>Commercial Tort Claims</u>.  If the Issuer shall obtain an interest in any Commercial Tort Claim, the Issuer shall within 30 days of obtaining such interest sign and deliver documentation granting a security interest under the terms and provisions of this Agreement in and to such Commercial Tort Claim.

SECTION 6.   REMEDIAL PROVISIONS

#4824-0892-4987v13

6.1   <u>Certain Matters Relating to Receivables</u>.  (a) At any time and from time to time during the continuance of an Event of Default, upon the Collateral Agent's request and at the expense of the Issuer, the Issuer shall cause independent public accountants or others satisfactory to the Collateral Agent to furnish to the Collateral Agent reports showing reconciliations, aging and test verifications of, and trial balances for, the Receivables.

(b)   At all times, including, subject to the following sentence, during the continuance of an Event of Default, the Issuer shall collect its Receivables.  If required by the Collateral Agent at any time after the occurrence and during the continuance of an Event of Default, any payments of Receivables, when collected by the Issuer, (i) shall be forthwith (and, in any event, within two Business Days) deposited by such Grantor in the exact form received, duly indorsed by the Issuer to the Collateral Agent if required, in a Collateral Account maintained under the sole dominion and control of the Collateral Agent, subject to withdrawal by the Collateral Agent for the account of the Secured Parties only as provided in Section 6.5, and (ii) until so turned over, shall be held by the Issuer in trust for the Secured Parties, segregated from other funds of the Issuer.  Each such deposit of Proceeds of Receivables shall be accompanied by a report identifying in reasonable detail the nature and source of the payments included in the deposit.

(c)   At the Collateral Agent's request, the Issuer shall deliver to the Collateral Agent all original and other documents evidencing, and relating to, the agreements and transactions which gave rise to the Receivables, including, without limitation, all original orders, invoices and shipping receipts.

6.2   <u>Communications with Obligors; Issuer Remains Liable</u>.  (a) At any time after the occurrence and during the continuance of an Event of Default, the Collateral Agent in its own name or in the name of others may communicate with obligors under the Receivables and parties to the Contracts to verify with them to the Collateral Agent's satisfaction the existence, amount and terms of any Receivables or Contracts.

(b)   Upon the request of the Collateral Agent at any time after the occurrence and during the continuance of an Event of Default, the Issuer shall notify obligors on the Receivables and parties to the Contracts that the Receivables and the Contracts have been assigned to the Collateral Agent for the ratable benefit of the Secured Parties and that payments in respect thereof shall be made directly to the Collateral Agent.

(c)   Anything herein to the contrary notwithstanding, the Issuer shall remain liable under each of the Receivables and Contracts to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise thereto.  Neither the Collateral Agent nor any other Secured Party shall have any obligation or liability under any Receivable (or any agreement giving rise thereto) or Contract by reason of or arising out of this Agreement or the receipt by the Collateral Agent or any other Secured Party of any payment relating thereto, nor shall the Collateral Agent or any other Secured Party be obligated in any manner to perform any of the obligations of any Grantor under or pursuant to any Receivable (or any agreement giving rise thereto) or Contract, to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party thereunder, to present or file any

14

claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

6.3     Pledged Shares.  (a) Unless an Event of Default shall have occurred and be continuing and the Collateral Agent shall have given notice to the relevant Grantor of the Collateral Agent's intent to exercise its corresponding rights pursuant to Section 6.3(b), each Grantor shall be permitted to receive all cash dividends paid in respect of the Pledged Shares and all payments made in respect of the Pledged Notes, in each case paid in the normal course of business of the relevant Issuer and consistent with past practice, to the extent permitted in the Indenture, and to exercise all voting and corporate or other organizational rights with respect to the Investment Property; provided, however, that no vote shall be cast or corporate or other organizational right exercised or other action taken which, in the Collateral Agent's reasonable judgment, would impair the Collateral or which would be inconsistent with or result in any violation of any provision of the Indenture, this Agreement or any other Notes Document.

(b)     If an Event of Default shall occur and be continuing and the Collateral Agent shall give notice of its intent to exercise such rights to the relevant Grantor or Grantors, (i) the Collateral Agent shall have the right to receive any and all cash dividends, payments or other Proceeds paid in respect of the Investment Property and make application thereof to the Obligations in such order as the Collateral Agent may determine, and (ii) any or all of the Investment Property shall be registered in the name of the Collateral Agent or its nominee, and the Collateral Agent or its nominee may thereafter exercise (x) all voting, corporate and other rights pertaining to such Investment Property at any meeting of shareholders of the relevant Pledged Share Issuer or  Pledged Share Issuers or otherwise and (y) any and all rights of conversion, exchange and subscription and any other rights, privileges or options pertaining to such Investment Property as if it were the absolute owner thereof (including, without limitation, the right to exchange at its discretion any and all of the Investment Property upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the corporate or other organizational structure of any Issuer, or upon the exercise by any Grantor or the Collateral Agent of any right, privilege or option pertaining to such Investment Property, and in connection therewith, the right to deposit and deliver any and all of the Investment Property with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as the Collateral Agent may determine), all without liability except to account for property actually received by it, but the Collateral Agent shall have no duty to any Grantor or the Trustee or (unless it has received written instruction from the Trustee or other Secured Party) any Secured Party to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing.

(c)     Each Grantor hereby authorizes and instructs each Issuer of any Investment Property pledged by such Grantor hereunder to (i) comply with any instruction received by it from the Collateral Agent in writing that (x) states that an Event of Default has occurred and is continuing and (y) is otherwise in accordance with the terms of this Agreement, without any other or further instructions from such Grantor, and each Grantor agrees that each Issuer shall be fully protected in so complying, and (ii) unless otherwise expressly permitted hereby, pay any dividends or other payments with respect to the Investment Property directly to the Collateral Agent.

#4824-0892-4987v13

6.4    Proceeds to be Turned Over To Collateral Agent.  In addition to the rights of the Secured Parties specified in Section 6.1 with respect to payments of Receivables, if an Event of Default shall occur and be continuing, all Proceeds received by any Grantor consisting of cash, checks and other near-cash items shall be held by such Grantor in trust for the Secured Parties, segregated from other funds of such Grantor, and shall, forthwith upon receipt by such Grantor, be promptly turned over to the Collateral Agent in the exact form received by such Grantor (duly indorsed by such Grantor to the Collateral Agent, if required).  All Proceeds received by the Collateral Agent hereunder shall be held by the Collateral Agent in a Collateral Account maintained under its sole dominion and control.  All Proceeds while held by the Collateral Agent in a Collateral Account (or by such Grantor in trust for the Secured Parties) shall continue to be held as collateral security for all the Obligations and shall not constitute payment thereof until applied as provided in Section 6.5.

6.5    Application of Proceeds.  At such intervals as may be agreed upon by the Issuer and the Trustee, or, if an Event of Default shall have occurred and be continuing, at any time at the Trustee's election, the Collateral Agent shall, at the written direction of the Trustee, deliver to the Trustee all or any part of Proceeds constituting Collateral, whether or not held in any Collateral Account, and any proceeds of the guarantee set forth in Section 2, for application by the Trustee pursuant to Section 6.13 of the Indenture.

6.6    Code and Other Remedies.  If an Event of Default shall occur and be continuing, the Collateral Agent, on behalf of the Secured Parties, shall, at the written direction of the Trustee, in accordance with Article 6 of the Indenture, exercise, in addition to all other rights and remedies granted to it in this Agreement and in any other instrument or agreement securing, evidencing or relating to the Obligations, all rights and remedies of a secured party under the New York UCC or any other applicable law.  Without limiting the generality of the foregoing, the Collateral Agent, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon any Grantor or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), shall in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or shall forthwith sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the Collateral Agent or any other Secured Party or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk.  The Trustee shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in any Grantor, which right or equity is hereby waived and released.  Each Grantor further agrees, at the Collateral Agent's request, to assemble the Collateral and make it available to the Collateral Agent at places which the Collateral Agent shall reasonably select, whether at such Grantor's premises or elsewhere.  The Collateral Agent shall deliver the net proceeds of any action taken by it pursuant to this Section 6.6, after deducting all reasonable costs and expenses of every kind incurred in connection therewith or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Secured Parties hereunder, including, without limitation, reasonable attorneys' fees and disbursements, to the Trustee for application pursuant

16

to Section 6.13 of the Indenture.  To the extent permitted by applicable law, each Grantor waives all claims, damages and demands it may acquire against the Trustee, the Collateral Agent or any other Secured Party arising out of the exercise by them of any rights hereunder.  If any notice of a proposed sale or other disposition of Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 days before such sale or other disposition.

6.7     Subordination.  Each Grantor hereby agrees that, upon the occurrence and during the continuance of an Event of Default, unless otherwise agreed by the Collateral Agent, all Indebtedness owing by it to any Subsidiary of the Issuer shall be fully subordinated to the indefeasible payment in full in cash of such Grantor's Obligations.

6.8     Deficiency.  The Issuer shall remain liable for any deficiency if the proceeds of any sale or other disposition of the Collateral are insufficient to pay its Obligations and the fees and disbursements of any attorneys employed by the Trustee or the Collateral Agent to collect such deficiency.

6.9     Collateral Enforcement Standstill.  The rights of the Collateral Agent to take enforcement actions against the Collateral may only be exercised in accordance with, and shall be otherwise subject to Article 6 of the Indenture.

SECTION 7.   THE COLLATERAL AGENT

7.1     Collateral Agent's Appointment as Attorney-in-Fact, etc.  (a) Each Grantor hereby irrevocably constitutes and appoints the Collateral Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Grantor and in the name of such Grantor or in its own name, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Agreement, and, without limiting the generality of the foregoing, each Grantor hereby gives the Collateral Agent the power and right, on behalf of such Grantor, without notice to or assent by such Grantor, to do any or all of the following:

(i)     in the name of such Grantor or its own name, or otherwise, take possession of and indorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any Receivable or Contract or with respect to any other Collateral and file any claim or take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Collateral Agent for the purpose of collecting any and all such moneys due under any Receivable or Contract or with respect to any other Collateral whenever payable;

(ii)    in the case of any Intellectual Property, execute and deliver, and have recorded, any and all agreements, instruments, documents and papers as the Collateral Agent may request to evidence the Collateral Agent's and the other Secured Parties' security interest in such Intellectual Property and the goodwill and general intangibles of such Grantor relating thereto or represented thereby;

#4824-0892-4987v13

(iii)    pay or discharge taxes and Liens levied or placed on or threatened against the Collateral, effect any repairs or any insurance called for by the terms of this Agreement and pay all or any part of the premiums therefor and the costs thereof;

(iv)    execute, in connection with any sale provided for in Section 6.6 or 6.7, any indorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral; and

(v)    (1) direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due or to become due thereunder directly to the Collateral Agent or as the Collateral Agent shall direct; (2) ask or demand for, collect, and receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral; (3) sign and indorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications, notices and other documents in connection with any of the Collateral; (4) commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any portion thereof and to enforce any other right in respect of any Collateral; (5) defend any suit, action or proceeding brought against such Grantor with respect to any Collateral; (6) settle, compromise or adjust any such suit, action or proceeding and, in connection therewith, give such discharges or releases as the Collateral Agent may deem appropriate; (7) assign any Copyright, Patent or Trademark (along with the goodwill of the business to which any such Copyright, Patent or Trademark pertains), throughout the world for such term or terms, on such conditions, and in such manner, as the Collateral Agent shall in its sole discretion determine; and (8) generally, sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Collateral Agent were the absolute owner thereof for all purposes, and do, at the Collateral Agent's option and such Grantor's expense, at any time, or from time to time, all acts and things which the Collateral Agent deems necessary to protect, preserve or realize upon the Collateral and the Collateral Agent's and the other Secured Parties' security interests therein and to effect the intent of this Agreement, all as fully and effectively as such Grantor might do.

Anything in this Section 7.1(a) to the contrary notwithstanding, the Collateral Agent agrees that it will not exercise any rights under the power of attorney provided for in this Section 7.1(a) (other than pursuant to clause (ii) thereof) unless an Event of Default shall have occurred and be continuing and it has received written instruction from the Trustee.

(b)    If any Grantor fails to perform or comply with any of its agreements contained herein, the Collateral Agent, at its option, but without any obligation so to do, may perform or comply, or otherwise cause performance or compliance, with such agreement.

(c)    Each Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.  All powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the security interests created hereby are released.

18

7.2    Duty of Collateral Agent.  The Collateral Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9-207 of the New York UCC or otherwise, shall be to deal with it in the same manner as the Collateral Agent deals with similar property for its own account.  Neither the Collateral Agent, any other Secured Party nor any of their respective officers, directors, employees or agents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any Grantor or any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof.  The powers, rights and remedies conferred on the Collateral Agent hereunder are solely to protect the Collateral Agent's and the other Secured Parties' interests in the Collateral and shall not impose any duty upon the Collateral Agent or any other Secured Party to exercise any such powers, rights and remedies.  Neither the Collateral Agent nor any of its officers, directors, employees or agents shall be responsible to any Grantor for any act or failure to act hereunder, except for its own gross negligence or willful misconduct.

7.3    Filing of Financing Statements.  The Grantors shall, and each Grantor hereby authorizes the Collateral Agent, when requested by the Trustee and at the sole expense of such Grantor, to, file or record financing statements and other filing or recording documents or instruments with respect to the Collateral without the signature of such Grantor in such form and in such offices as shall be required by applicable law or as the Collateral Agent determines appropriate to perfect the security interests of the Collateral Agent under this Agreement.  The Issuer authorizes the Collateral Agent to use the collateral description "all personal property" in any financing statements with respect to the Issuer.  Each Grantor hereby ratifies and authorizes the filing by the Collateral Agent of any financing statement with respect to the Collateral made prior to the date hereof.  Notwithstanding anything in this Agreement to the contrary:

(a)    [reserved];

(b)    each of the Issuer and COKE shall be required, and the Collateral Agent may, but shall not be obligated, to make financing statement filings at the county or other local level with respect to As-Extracted Collateral as soon as reasonably practicable, and in any event, (i) in the case of As-Extracted Collateral located on real property in which any of the Issuer or COKE Grantor owns a fee interest as of the date hereof, within 30 days of the date hereof and (ii) in the case of As-Extracted Collateral located on real property in which any of the Issuer or COKE acquires a fee interest after the date hereof, within 30 days after the date of the acquisition of such real property;

(c)    no Grantor shall be obligated to permit any financing statement filings at any county, real estate or other local filing office solely with respect to Fixtures or As-Extracted Collateral located on Leased Real Property until 30 days after the date hereof (or, with respect to future Leased Real Property, until 30 days after the date that a Grantor acquires rights to such Leased Real Property), or in any event if such a filing would be prohibited by, or constitute a breach or default under or result in the termination of or require any consent not obtained under, any contract, license, agreement, instrument or other document evidencing or giving rise to the Leased Real Property;

#4824-0892-4987v13

(d)     notwithstanding anything in this section to the contrary, the parties hereto agree that all UCC filings, including continuation statements, shall be filed by the Collateral Agent on behalf of the Secured Parties, in each case, at the sole expense of each applicable Grantor.

7.4     <u>Authority of Collateral Agent</u>.  Each Grantor acknowledges that the rights and responsibilities of the Collateral Agent under this Agreement with respect to any action taken by the Collateral Agent or the exercise or non-exercise by the Collateral Agent of any option, voting right, request, judgment or other right or remedy provided for herein or resulting or arising out of this Agreement shall, as between the Secured Parties, be governed by the Indenture and by such other agreements with respect thereto as may exist from time to time among them, but, as between the Collateral Agent and the Grantors, the Collateral Agent shall be conclusively presumed to be acting as agent for the Secured Parties with full and valid authority so to act or refrain from acting, and no Grantor shall be under any obligation, or entitlement, to make any inquiry respecting such authority.

## SECTION 8.   MISCELLANEOUS

8.1     <u>Amendments in Writing</u>.  None of the terms or provisions of this Agreement may be waived, amended, supplemented or otherwise modified except in accordance with Article 9 of the Indenture.

8.2     <u>Notices</u>.  All notices, requests and demands to or upon the Collateral Agent or any Grantor hereunder shall be effected in the manner provided for in Section 13.01 of the Indenture; *provided* that any such notice, request or demand to or upon any Guarantor shall be addressed to such Guarantor at its notice address set forth on <u>Schedule 7</u>.

8.3     <u>No Waiver by Course of Conduct; Cumulative Remedies</u>.  Neither the Collateral Agent nor any other Secured Party shall by any act (except by a written instrument pursuant to Section 8.1), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default.  No failure to exercise, nor any delay in exercising, on the part of the Trustee, the Collateral Agent or any other Secured Party, any right, power or privilege hereunder shall operate as a waiver thereof.  No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

A waiver by the Collateral Agent or any other Secured Party of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which the Collateral Agent or such Secured Party would otherwise have on any future occasion.  The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

8.4     <u>Enforcement Expenses; Indemnification</u>.  (a) The Collateral Agent shall be entitled to reimbursement of its reasonable out-of-pocket expenses incurred hereunder and indemnity for its actions in connection herewith as provided in Section 7.07 of the Indenture (or any equivalent provision of any other Notes Document).

(b)     The agreements in this Section 8.4 shall survive repayment of the Obligations and all other amounts payable under the Indenture and the other Notes Documents.

20

8.5     <u>Successors and Assigns</u>.  This Agreement shall be binding upon the successors and assigns of each Grantor and shall inure to the benefit of the Collateral Agent and the other Secured Parties and their successors and assigns; provided that no Grantor may assign, transfer or delegate any of its rights or obligations under this Agreement without the prior written consent of the Trustee.

8.6     <u>Counterparts</u>.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by email or telecopy), and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

8.7     <u>Severability</u>.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

8.8     <u>Section Headings</u>.  The Section headings used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

8.9     <u>Integration</u>.  This Agreement and the other Notes Documents represent the agreement of the Grantors and the Secured Parties with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Collateral Agent or any other Secured Party relative to subject matter hereof and thereof not expressly set forth or referred to herein or in the other Notes Documents.

**8.10    <u>GOVERNING LAW</u>. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.**

8.11    <u>Submission To Jurisdiction; Waivers</u>.  Each Grantor hereby irrevocably and unconditionally:

(a)     submits for itself and its property in any legal action or proceeding relating to this Agreement, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of any state or federal court sitting in the Borough of Manhattan in the City of New York, and appellate courts from any thereof;

(b)     consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)     agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Grantor at its address referred to in Section 8.2 or at such other address of which the Collateral Agent shall have been notified pursuant thereto;

#4824-0892-4987v13

(d)    agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(e)    waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

8.12    Acknowledgements.  Each Grantor hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Notes Documents to which it is a party;

(b)    none of the Trustee, the Collateral Agent or any other Secured Party has any fiduciary relationship with or duty to any Grantor arising out of or in connection with this Agreement or any of the other Notes Documents, and the relationship between the Grantors, on the one hand, and the Trustee, the Collateral Agent and the other Secured Parties, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)    no joint venture is created hereby or by the other Notes Documents or otherwise exists by virtue of the transactions contemplated hereby among the Secured Parties or among the Grantors and the Secured Parties.

8.13    Additional Grantors.  Pursuant to Section 4.11 of the Indenture, certain additional Subsidiaries of the Grantors may enter in this Agreement as Grantors.  Upon execution and delivery by the Collateral Agent and a Subsidiary of a Security Agreement Supplement in the form set forth on Annex I hereto, such Subsidiary shall become a Grantor hereunder with the same force and effect as if originally named as a Grantor herein.  The execution and delivery of any such instrument shall not require the consent of any other Grantor hereunder.  The rights and obligations of each Grantor hereunder shall remain in full force and effect notwithstanding the addition of any new Grantor as a party to this Agreement.

8.14    Termination or Release.  (a) This Agreement and the security interests granted hereby shall terminate with respect to all Obligations and any Liens arising therefrom shall be automatically released when the principal of and interest under the Notes and all fees and other Obligations (other than contingent obligations not yet accrued and payable) shall have been paid in full.

(b)    The Liens securing the Obligations in respect of the Notes will be released, in whole or in part, at such time as provided in Section 10.06 of the Indenture or upon the effectiveness of any written consent to the release of the security interest granted hereby in any Collateral pursuant to Sections 9.02 and 10.06 of the Indenture.

(c)    In connection with any termination or release pursuant to paragraph (a) or (b) of this Section 8.14, the Collateral Agent shall, upon receipt of an Officer's Certificate and an Opinion of Counsel that complies with Sections 13.02 and 13.03 of the Indenture, execute and deliver to any Grantor, at such Grantor's expense, all documents that such Grantor shall reasonably request to evidence such termination or release and shall perform such other actions, at such Grantor's expense, reasonably requested by such Grantor to effect such release, including

22

delivery of certificates, securities and instruments.  Any execution and delivery of documents pursuant to this Section 8.14 shall be without recourse to or warranty by the Collateral Agent.

8.15 **WAIVER OF JURY TRIAL.  EACH GRANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER NOTE DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.**

#4824-0892-4987v13

IN WITNESS WHEREOF, each of the undersigned has caused this Security Agreement to be duly executed and delivered as of the date first above written.

ERP IRON ORE, LLC

By: _____

Name: Thomas M. Clarke
Title: Chief Executive Officer

ERP COMPLIANT COKE, LLC

By: _____

Name: Thomas M. Clarke
Title: Managing Member

[Signature Page to Security Agreement]

WILMINGTON SAVINGS FUND SOCIETY,
FSB,
as Collateral Agent

By: _____
    Name:
    Title:

**Geoffrey J. Lewis**
**Vice President**

Schedule 1

DESCRIPTION OF INVESTMENT PROPERTY

**Pledged Shares:**

None

**Pledged Notes:**

None

Schedule 2

FILINGS AND OTHER ACTIONS
REQUIRED TO PERFECT SECURITY INTERESTS

Uniform Commercial Code Filings

UCC Financing Statement - filed with the State Corporation Commission, Commonwealth of Virginia and with the Minnesota Secretary of State

Patent and Trademark Filings

None

Copyright Filings

None

Actions with respect to Pledged Shares

None

Other Actions

Fixture Filing, filed with the White County Recorder, White County, Indiana re the Pellet Plant

Fixture Filing, filed with the Itasca County Recorder, Itasca County, Minnesota re Jessie Load-Out Facility

Fixture Filing, filed with the Itasca County Recorder, Itasca County, Minnesota re Plant #1

Fixture Filing, filed with the Itasca County Recorder, Itasca County, Minnesota re Plant #2

Fixture Filing, filed with the Itasca County Recorder, Itasca County, Minnesota re Plant #4

<u>Schedule 3</u>

LOCATION OF JURISDICTION OF ORGANIZATION AND CHIEF EXECUTIVE OFFICE

| <u>Grantor</u> | <u>Jurisdiction of Organization / Identification Number</u> | <u>Location of Chief Executive Office</u> |
|---|---|---|
| ERP Iron Ore, LLC | VA | 15 Appledore Lane, Natural Bridge, VA 24578 |
| ERP Compliant COKE, LLC | DE | 3500 35th Avenue North, Birmingham, AL 35207 |
|  |  |  |
|  |  |  |
|  |  |  |

<u>Schedule 4</u>

LOCATIONS OF INVENTORY AND EQUIPMENT

| <u>Grantor</u> | <u>Locations</u> |
|---|---|
| ERP Iron Ore, LLC | Plant 4 - 28754 County Road 61, Grand Rapids, Minnesota<br><br>Plant 2 - 27692 County Road 10, Bovey, Minnesota 55709<br><br>Plant 1 - 35001 County Road 571, Keewatin, Minnesota 55753<br><br>Pellet Plant - 64 E 100 N, Reynolds, Indiana 47980<br><br>Jessie Load-Out Facility - 27038 Midway Pit Haul Road, Grand Rapids, Minnesota 55744 |
| ERP Compliant COKE, LLC | COKE Plant - 3500 35th Avenue North, Birmingham, Alabama |
|  |  |
|  |  |
|  |  |

Schedule 5

## COPYRIGHTS AND COPYRIGHT LICENSES

Restated and Amended Technology License Agreement, dated as of December 6, 2016, by and among Magnetation, Inc., a corporation organized under the laws of the State of Minnesota, and Magnetation LLC, a Delaware limited liability company.

## PATENTS AND PATENT LICENSES

Restated and Amended Technology License Agreement, dated as of December 6, 2016, by and among Magnetation, Inc., a corporation organized under the laws of the State of Minnesota, and Magnetation LLC, a Delaware limited liability company.

## TRADEMARKS AND TRADEMARK LICENSES

None

<u>Schedule 6</u>

## EXCLUDED PAYMENT OBLIGATIONS

None

<u>Schedule 7</u>

NOTICE ADDRESSES OF GRANTORS

ERP Iron Ore, LLC
15 Appledore Lane
Natural Bridge, Virginia 24578
Attention:  Tom Clarke
Email:  [Tom.Clarke@kissito.org](mailto:Tom.Clarke@kissito.org)

with a copy to:
Dentons US LLP
1221 Avenue of the Americas
New York, NY 10020
Attention:  Oscar N. Pinkas
Email:  oscar.pinkas@dentons.com

ERP Compliant COKE, LLC
c/o ERP Compliant Fuels, LLC
15 Appledore Lane
Natural Bridge, Virginia 24578
Attention:  Tom Clarke
Email:  [Tom.Clarke@kissito.org](mailto:Tom.Clarke@kissito.org)

with a copy to:
Dentons US LLP
1221 Avenue of the Americas
New York, NY 10020
Attention:  Oscar N. Pinkas
Email:  oscar.pinkas@dentons.com

## ACKNOWLEDGEMENT AND CONSENT

The undersigned hereby acknowledges receipt of a copy of the Security Agreement dated as of January 30, 2017 (the "Agreement"), made by the Grantors parties thereto for the benefit of Wilmington Savings Fund Society, FSB, as Collateral Agent.  The undersigned agrees for the benefit of the Collateral Agent and the other Secured Parties as follows:

1.    The undersigned will be bound by the terms of the Agreement and will comply with such terms insofar as such terms are applicable to the undersigned.

2.    The undersigned will notify the Collateral Agent promptly in writing of the occurrence of any of the events described in Section 5.7(a) of the Agreement.

3.    The terms of Sections 6.3(c) and 6.7 of the Agreement shall apply to it, mutatis mutandis, with respect to all actions that may be required of it pursuant to Section 6.3(c) or 6.7 of the Agreement.

[NAME OF PLEDGED SHARE ISSUER]

By: _____
      Name:
      Title:

Address for Notices:

_____

_____

_____

Fax:

Annex I to the
Security Agreement

SUPPLEMENT NO. _____ dated as of [●] (the "**Supplement**"), to the Security Agreement (the "**Security Agreement**"), dated as of January 30, 2017, among the Grantors identified therein and Wilmington Savings Fund Society, FSB, as Collateral Agent.

A.       Reference is made to that certain the Indenture dated as of January 30, 2017 (as amended, supplemented or otherwise modified from time to time, the "**Indenture**"), among ERP Iron Ore, LLC, a Virginia limited liability company (the "**Issuer**"), the Guarantors party thereto from time to time and Wilmington Savings Fund Society, FSB, as Trustee and Collateral Agent.

B.       Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Indenture and the Security Agreement.

C.       The Grantors have entered into the Security Agreement in order to secure the obligations under the Indenture and the other Obligations.  Section 8.13 of the Security Agreement provides that additional Subsidiaries of the Issuer may become Grantors under the Security Agreement by execution and delivery of an instrument in the form of this Supplement. The undersigned (the "**New Grantor**") is executing this Supplement in accordance with the requirements of the Indenture to become a Grantor under the Security Agreement.

Accordingly, the Collateral Agent and the New Grantor agree as follows:

SECTION 1. In accordance with Section 8.13 of the Security Agreement, the New Grantor by its signature below becomes a Grantor under the Security Agreement with the same force and effect as if originally named therein as a Grantor and the New Grantor hereby (a) agrees to all the terms and provisions of the Security Agreement applicable to it as a Grantor thereunder and (b) represents and warrants that the representations and warranties made by it as a Grantor thereunder are true and correct on and as of the date hereof; *provided* that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all respects as of such earlier date.  In furtherance of the foregoing, the New Grantor, as security for the payment and performance in full of the Obligations, does hereby create and grant to the Collateral Agent, its successors and assigns, for the benefit of the Secured Parties, their successors and assigns, a security interest in and lien on all of the New Grantor's right, title and interest in and to the Collateral (as defined in the Security Agreement) of the New Grantor. Each reference to a "Grantor" in the Security Agreement shall be deemed to include the New Grantor.  The Security Agreement is hereby incorporated herein by reference.

SECTION 2. The New Grantor represents and warrants to the Collateral Agent and the other Secured Parties that this Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy laws and by general principles of equity.

SECTION 3. This Supplement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Supplement shall become effective when the Collateral Agent shall have received a counterpart of this Supplement that bears the signature of the New Grantor and the Collateral Agent has executed a counterpart hereof.  Delivery of an executed signature page to this Supplement by facsimile transmission or other electronic communication shall be as effective as delivery of a manually signed counterpart of this Supplement.

SECTION 4. The New Grantor hereby represents and warrants that (a) set forth on Schedule I attached hereto is a true and correct schedule of the information required by Schedules 1 through 5 to the Security Agreement applicable to it and (b) set forth under its signature hereto is the true and correct legal name of the New Grantor, its jurisdiction of formation and the location of its chief executive office.

SECTION 5. Except as expressly supplemented hereby, the Security Agreement shall remain in full force and effect.

**SECTION 6. THIS SUPPLEMENT SHALL BE GOVERNED BY**, **AND CONSTRUED IN ACCORDANCE WITH**, **THE LAW OF THE STATE OF NEW YORK.**

SECTION 7. If any provision of this Supplement is held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Supplement shall not be affected or impaired thereby.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

SECTION 8. All communications and notices hereunder shall be in writing and given as provided in Section 13.01 of the Indenture.

SECTION 9. The New Grantor agrees to reimburse the Collateral Agent for its reasonable out-of-pocket expenses in connection with the execution and delivery of this Supplement, including the reasonable fees, other charges and disbursements of counsel for the Collateral Agent.

*[Signature pages follow.]*

#4824-0892-4987v13

IN WITNESS WHEREOF, the New Grantor and the Collateral Agent have duly executed this Supplement to the Security Agreement as of the day and year first above written.

[NAME OF NEW GRANTOR]

By: _____

Name:
Title:

Legal Name:
Jurisdiction of Formation:
Location of Chief Executive office:

WILMINGTON SAVINGS FUND SOCIETY,
FSB,
as Collateral Agent


By: _____
     Name:
     Title:

2

Annex 1-A to
<u>Supplement</u>

<u>Supplement to Schedule 1</u>

<u>Supplement to Schedule 2</u>

<u>Supplement to Schedule 3</u>

<u>Supplement to Schedule 4</u>

<u>Supplement to Schedule 5</u>

<u>Supplement to Schedule 6</u>

<u>Supplement to Schedule 7</u>